a co-conspirator with Mr. Manookian for knowingly, willfully, and intentionally perpetrating an ongoing fraud against this Court, the attorneys, and the parties.

Second, on April 21, 2016, in his *Response* to the Non-Parties' *Petitions*, Mr. Hammervold represented to the Court he had "not disclosed, referenced, filed, or otherwise 'used' any of the protected materials that the Non-Parties (mass) designated as confidential in the *King v. Chase* case." (Tr. Exhibit 23, Sept. 23, 2016.) However, Mr. Hammervold and Mr. Manookian had already used the confidential documents in the *King v. Chase* case. Specifically, Mr. Hammervold and Mr. Manookian had **filed** with the Davidson County Chancery Court a copy of the Agreement of Partnership of NV Partners, which had been provided to them and marked confidential by the Non-Parties pursuant to the *Agreed Protective Order.* (Tr. Exhibit 17, Sept. 23, 2016.) Thus, clearly Mr. Hammervold's statement he had "not disclosed, referenced, **filed**, or otherwise **'used'** any of the protected materials that the Non-Parties (mass) designated as confidential in the *King v. Chase* case," was totally false and was made while under oath. (Tr. Exhibit 23, at n. 2, Sept. 23, 2016.)

Third, on March 2, 2017, Mr. Hammervold intentionally made false and misleading statements to Mrs. Rubenstein, who was acting on behalf of the Court, regarding the reasons for his absence for the hearing held on March 2, 2017. As noted above in numbered paragraphs 75-78, Mr. Hammervold submitted an email to Ms. Rubenstein on the day of the hearing indicating his "other hearing" in Dallas, Texas, to which he claimed he had planned to attend in lieu of the hearing in this matter, had been cancelled that morning at 7:11 a.m. However, the Court finds it perplexing that Mr. Hammervold was in Chicago, Illinois that morning when the hearing he was "planning"





to attend was set to begin at 9:00 a.m. in Dallas, Texas. The Court finds if Mr. Hammervold truly was planning to attend the hearing in Dallas, Texas, at 9:00 a.m., then it would have been impossible for him to attend said hearing if he was still in Chicago, Illinois, at 7:11 a.m. Obviously, Mr. Hammervold lied to Mrs. Rubenstein about his intentions in an effort to hide the fact he had no intention appearing at the hearing on March 2, 2017.

Fourth, the Court finds throughout the course of these proceedings, from the hearing on October 20, 2015 through the evidentiary hearing on November 9, 2017, well over two years, Mr. Hammervold also prepared and filed numerous pleadings and made multiple oral arguments before this Court on numerous occasions over and over again regarding the issues related to the Non-Parties' confidential material disclosures. Without regard to his obligations as an Officer of the Court and his clear ethical responsibilities under the Rules of Professional Conduct as an attorney in the State of Tennessee, Mr. Hammervold continuously has gone to great lengths and has gone about a course of conduct to hide the truth and mislead the Court about the improper disclosures as explained above.

Fifth, on March 10, 2016, the Court held a hearing regarding the *Non-Parties' Motion for Sanctions.* However, Mr. Manookian failed to appear. (*See Non-Parties' Notice of Filing of Court Transcript* of April 26, 2017, Exhibit A, March 10, 2016, Hr'g Tr. 11:21-12:11; 29:23-24.) Mr. Hammervold did appear and made arguments on behalf of Mr. Manookian as well as himself. (*Id.* at 25:21-28:2; 51:18-54:18.) Mr. Hammervold argued Defendant, Clayton McKenzie, whom Mr. Hammervold and Mr. Manookian represented, was not bound by the *Agreed Protective Order;* the *Agreed Protective*

*Order* allowed the Non-Parties' confidential materials to be used in related litigation, and the sanctions sought by the Non-Parties were inappropriate. (*Id.* at 25:21-28:2; 29:23-24.) Once again, this argument is contradictory to Mr. Manookian's prior email to Ms. Fenelon in which he clearly acknowledged the *Agreed Protective Order* was in effect and binding on him and his clients and stated, "I agree that the Order is binding on me and my clients at the time it is signed with permission as opposed to entered by the Court." (Tr. Exhibit 3, Sept. 23, 2016.)

Furthermore, at this hearing, the Court fully explained to all of the attorneys the Court should not be required to investigate these types of situations. Thus, the Court strongly urged and implored all of the attorneys, as officers of the Court, to come forward and admit to violating the *Agreed Protective Order* and the Court's subsequent *Orders*. Despite the fact Mr. Hammervold, who was there for Mr. Manookian and himself, knowing full well they were involved in willfully disobeying the *Orders* of the Court, nonetheless, Mr., Hammervold sat and remained silent when it was his opportunity to tell the truth and to stop the perpetration of the fraud against the Court, the litigants, and the attorneys.

Sixth, another example of Mr. Hammervold's dishonesty is on March 17, 2016, when Mr. Hammervold filed his *Supplemental Response to NonParties [sic] Motion for Sanctions* on behalf of Defendants Lovrenovic, Bryan Everett, Susan Martin, and Clayton McKenzie, in which he asserted he did not disseminate any of the Non-Parties' confidential discovery and, even if such was the case, this would constitute "future related litigation" per the terms of the *Agreed Protective Order* and, thereby, not violate the Court's *Orders*. However, Mr. Hammervold failed to mention Chancellor Lyle's

Case 3:19-bk-07235    Claim 5-1 Part 4    Filed 03/30/20    Desc Exhibit July 2018
Sanctions Judgment    Page 68 of 124

612

Scheduling Order in the *King v. Chase* case in Davidson County, <u>which clearly found</u> <u>the cases were not related based upon Mr. Hammervold's and Mr. Manookian's, his co-</u> <u>counsel, own statements to Chancellor Lyle</u>. (Tr. Exhibit 1, Nov. 9, 2017.) Thus, Mr. Hammervold clearly was attempting to mislead this Court as to this issue.[46]

Thus, based upon the above analysis, the Court finds Mr. Hammervold totally lacks credibility in this Court and further finds Mr. Hammervold was knowingly, willfully, and intentionally dishonest in his statements, representations, and in his pleadings in this case. Once again, the Court notes it takes no pleasure in finding an Officer of the Court's testimony to lack credibility; however, again, the facts in this case give the Court no other option.

### (3) Timing of Mr. Manookian's Disclosures to the Media

Mr. Manookian claims he provided the Non-Parties' confidential materials and deposition testimonies to the news media sometime between October 4, 2015 and October 6, 2015. Accordingly, this timeframe would be prior to the Court's *First Oral Order* of October 20, 2015, yet, it also would be after the Parties, Non-Parties, and attorneys in this case entered into the *Agreed Protective Order*. Regrettably, Mr. Manookian failed to present any evidence to show this submission took place in his alleged timeframe, other than his own testimony. As determined above, Mr. Manookian has no credibility due to his own conduct throughout these proceedings. Consequently, the Court makes the following factual findings regarding the timing of Mr. Manookian's disclosures to the news media.

---

[46] As shall be examined more thoroughly in Section (a) of this *Memorandum and Order* below, the Court finds the *King v. Chase* case does not constitute "future related litigation" pursuant to the terms of the *Agreed Protective Order* as asserted by Mr. Hammervold.

As explained above in numbered paragraphs 44-47, the version of the Non-Parties' confidential documents and deposition testimonies Mr. Finley sent to General Funk and Phil Robertson, Esq. in January of 2016 contained exhibit stickers indicating they were previously included as "Exhibit G," "Exhibit H," and "Exhibit I," respectively, of Mr. Manookian's *Defendants' Response to Plaintiff's Expedited Motion for Sanctions, Protective Orders and Other Relief* filed on October 19, 2015. (*See* Tr. Exhibit 9, Sept. 23, 2016.) Additionally, the version of the Non-Parties' confidential documents and deposition testimonies shown in Channel 4 WSMV's news broadcast related to such materials containing exhibit stickers indicating they were previously included as "Exhibit G," "Exhibit H," and "Exhibit I" of Mr. Manookian's *Response*.

With these above facts, the Court shall attempt to disentangle the timeline for which the release of the confidential material and deposition testimonies occurred, based upon a preponderance of the evidence.

Mr. Manookian represented to counsel for the Non-Parties on October 21, 2015, and then testified at the trial of this matter, that he had only filed the exhibits to his *Response* of October 19, 2015, including "Exhibit G," "Exhibit H," and "Exhibit I" under seal and had not given them to anyone outside the case. (*See* Tr. Exhibit 10, Sept. 23, 2016.) However, Mr. Manookian's *Defendants' Response to Plaintiff's Expedited Motion for Sanctions, Protective Orders and Other Relief* of October 19, 2015, in which the subject exhibits were attached, was filed in response to Plaintiff David Chase's *Expedited Motion for Sanctions, Protective Orders, and Other Related Relief* on October 8, 2015.

The Court finds Mr. Manookian's "timeline" to be riddled with many obvious inconsistencies. First, the Non-Parties' confidential discovery materials and deposition testimonies which were given to Mr. Finley with WSMV Channel 4 News, and the other news outlets, NewsChannel 5 WTVF and the *Nashville Scene*, by Mr. Manookian contain exhibit stickers indicating they were previously included as "Exhibit G," "Exhibit H," and "Exhibit I" to Mr. Manookian's *Response* of October 19, 2015. Second, said *Response* and exhibits could not have existed during the **October 4, 2015** through **October 6, 2015** time period because the filing to which the pleading was responding was not filed until **October 8, 2015.** Thus, the only logical conclusion is the confidential discovery material and deposition testimonies were sent to Mr. Finley at a later date than that to which Mr. Manookian testified under oath.

In light of the above analysis, it appears, by a preponderance of the evidence, Mr. Manookian sent the confidential discovery materials and deposition testimonies to Mr. Finley **after** he filed his *Response* on October 19, 2015, because the documents presented by Mr. Finley to General Funk and Phil Robertson, Esq. contained the very same "Exhibit G," "Exhibit H," and "Exhibit I" labels found attached to his *Response*. However, this finding does not automatically establish Mr. Manookian sent the confidential documents and deposition testimonies after the Court entered its *First Oral Order* of October 20, 2015. It is still possible after filing his *Response* with the attached exhibits under seal with this Court, Mr. Manookian decided to send to Mr. Finley the confidential documents and deposition testimonies **prior** to the hearing on October 20, 2015. Thus, the release of the confidential material and deposition testimonies would

not be a violation of the Court's *Orders*.[47] However, other circumstantial evidence makes this scenario highly unlikely.

For instance, Mr. Finley did not contact General Funk and Phil Robertson, Esq. for comment on the confidential discovery materials or run any news story regarding such materials until late January 2016 and early February of 2016. The Court struggles to find any explanation as to why Mr. Finley would have received these documents prior to October 20, 2015, but then fail to run a news story on such materials for four months.

Moreover, the Court arrives at the same conclusion as it relates to the confidential materials released to the other news media outlets. Just like Mr. Finley, there is no possible explanation as to why Phil Williams of News Channel 5 WTVF and Jim Ridley at the *Nashville Scene* would have received the documents prior to October 20, 2015, but then fail to run a news story on such materials for four months. In order to accept this proposition, this Court would have to believe it is more likely three competing news agencies received confidential information that would form the basis of what each believed to be a compelling news story about a high-profile, domestic violence case, yet all three collectively just sat on the story and delayed the release of the story and did not attempt to be the first to break the story. In light of the probable excitement and near frenzy atmosphere created in the newsrooms of these various media outlets when Mr. Manookian violated the Court's *Orders* by sending sensitive materials to the various media outlets, the Court finds such a result to be highly improbable.

Furthermore, Mr. Manookian claimed at the evidentiary hearing on September 23, 2016, he had an email documenting he sent to Phil Williams of NewsChannel 5

---

[47] The Court notes this would **still** be a violation of the *Agreed Protective Order* which Mr. Manookian signed and agreed to be bound to the terms set forth therein.

616

WTVF the deposition testimonies of Dean Chase and Sandra Chase on October 6, 2015. Regrettably, but noteworthy, Mr. Manookian failed to present this exonerating email at any time in these proceedings. Any lawyer with the most rudimentary technical skills could easily retrieve and pinpoint the exact date and time of email purportedly sent between October 4 and 6, 2015. Mr. Manookian did not retrieve and produce the purported email because it did not exist. Therefore, given the nature of this email and its importance, and based upon the numerous facts supporting Mr. Manookian's inability to tell the truth, the Court now concludes the exonerating email does not exist or Mr. Manookian would have surely presented it to the Court.

Lastly, if Mr. Manookian did disclose the Non-Parties' confidential discovery material prior to October 20, 2015 and believed such to be entirely proper, Mr. Manookian could have very easily avoided this entire issue and months of highly-contested issues and the accumulation of well over half of a million dollars in fees, which Mr. Manookian knew at some point in the future he would have to pay because of his own dilatory tactics involving his fraud upon the Court, by alerting the Court and the Non-Parties to such. For example, Mr. Manookian had the following opportunities to disclose his "innocent" disclosures to NewsChannel 5 WTVF, News Channel 4 WSMV, and the *Nashville Scene*, by disclosing to this Court: (1) in response to the email exchange of January 2016 with the Non-Parties concerning News Channel 4 WSMV's possession of such materials; (2) in response to the Non-Parties' *Motion for Sanctions* of February 2016; (3) at the hearing on March 10, 2016; (4) in his *Declaration* of March 17, 2016; and (5) in any one of the numerous pleadings he filed prior to being compelled to testify on September 23, 2016 at the evidentiary hearing.

Knowingly, willfully, intentionally and wrongfully, Mr. Manookian failed at absolutely every juncture in these proceedings to finally tell the truth, to stop the lies and his fraud upon the Court, and to admit he was the one who released the confidential material. Thus, the Court infers these omissions as evidence the release of the confidential material was performed after October 20, 2015 and in January 2016, around the time of Mr. Finley's first inquiry into this matter, because why would Mr. Manookian continue down a path of knowingly, willfully, and intentionally perpetrating a fraud and numerous misrepresentations, if a simple admission of the release of the confidential documents prior to October 20, 2015, would exonerate him. The only plausible conclusion is Mr. Manookian released the confidential information after October 20, 2015, which would be in violation of not only the *Agreed Protective Order*, but also the Court's *Orders*.

Based upon all of the evidence and in light of Mr. Manookian's own conduct, which clearly establishes his total lack of credibility, the Court finds by a preponderance of the evidence Mr. Manookian gave such materials to the news media after October 20, 2015, and in January 2016.

### (4)    Mr. Hammervold's Involvement in the Media Disclosures

In light of the Court's finding Mr. Hammervold's lack of credibility and based upon the other evidence in the case, the Court finds by a preponderance of the evidence Mr. Hammervold knew about Mr. Manookian's disclosures of the Non-Parties' confidential discovery materials and deposition testimonies to the news media since January 2016, which was when all of the attorneys were notified of News Channel 4 WSMV's receipt of

Case 3:19-bk-07235    Claim 5-1 Part 4    Filed 03/30/20    Desc Exhibit July 2018
Sanctions Judgment    Page 74 of 124

the confidential information.[48] Furthermore, the Court finds once Mr. Hammervold became aware of Mr. Manookian's disclosures, he took knowing, willful, and intentional actions to prevent the Court, the attorneys, and the Parties from uncovering the truth about the disclosures. These actions make Mr. Hammervold complicit to the "leak" of the confidential materials to the news media and a co-conspirator in Mr. Manookian's fraud upon the Court, the Parties, and the attorneys. The Court finds the following facts support the Court's conclusion:

On April 21, 2016, Mr. Hammervold filed *Mark Hammervold and Hammervold PLC's Response to NonParties' Petition for Contempt and Sanctions Motion* which stated, *inter alia*, Mr. Hammervold did "not know how the media obtained protected material." (Tr. Exhibit 23, at n. 2, September 23, 2016.)

However, the Court finds the circumstances in this case indicate Mr. Hammervold knew Mr. Manookian had performed such acts. Mr. Hammervold was in receipt of Mr. Manookian's email of September 20, 2016 in which he wrote, "did Mr. Finley indicate who the 'source' may be? I would note that [my client Defendant] Clayton McKenzie never agreed to keep any materials confidential; nor was he required to at any time prior to October 20, 2015." (Tr. Exhibit 11, Sept. 23, 2016.) The Court finds such an unprovoked email submitted by one's own co-counsel which implicates one's own client would likely draw the attention of any reasonable attorney. However, Mr. Hammervold testified he never asked Mr. Manookian whether he gave the confidential documents and deposition testimonies to the media or even discussed the topic with

---

[48] *See* numbered ¶¶ 42-43 above. Also, at a bare minimum, Mr. Hammervold was well aware of the disclosures to the news media before his claimed knowledge of only days before the evidentiary hearing on September 23, 2016.

him until a few days before the hearing on September 23, 2016. Such an explanation is untenable.

Based upon this rationale, Mr. Hammervold would have this Court believe he filed numerous filings, including filings that were made jointly with Mr. Manookian, and asserted arguments at hearings before the Court, stating that whoever leaked such documents could not or should not be punished for what they had done, without knowledge the very person he was defending was sitting next to him as his long-standing co-counsel and co-conspirator. (*See Mark Hammervold, Hammervold PLC, Brian Manookian, and Cummings Manookian's Joint Motion to Dismiss Contempt Petition and Motion for Sanctions* of September 16 , 2016; *Supplemental Response to NonParties [sic] Motion for Sanctions* of March 17, 2016; and Transcript of Hearing, Vol. I of II, September 23, 2016, *Chase v. Stewart, et al*, Williamson Circuit Court Case No. 2015-200.) The Court is not persuaded and finds the most logical reason for such a steadfast effort to protect the individual who had surreptitiously "leaked" the documents to the media is that Mr. Hammervold knew it was his co-counsel, Mr. Manookian, who gave the Non-Parties' confidential documents to the various news media outlets, in knowing, willful, and intentional violation of this Court's *Orders*.

Thus, the Court draws the reasonable inference that Mr. Hammervold's inaction upon seeing his own client accused of potentially violating the Court's *Orders* means either (1) he knew Mr. Manookian had given the confidential documents to the news media before the email of January 20, 2016 was sent, and he was complicit in the scheme to mislead the Non-Parties, or (2) he, as any reasonable attorney would do, asked Mr. Manookian what he meant by his email of January 20, 2016 and learned at

620

that point Mr. Manookian had leaked the confidential documents and deposition testimonies to the news media. In either scenario, Mr. Hammervold intentionally kept this knowledge hidden from the Court, the Parties, the attorneys and Non-Parties throughout the proceedings, making him complicit in Mr. Manookian's actions and guilty of an ongoing fraud against this Court, the attorneys, and the parties. There can be no doubt both Mr. Manookian and Mr. Hammervold conspired to defraud this Court, the Non-Parties, and the attorneys involved in this case, by actively participating in an ongoing and continuing fraud and cover up by both of them by gaming the system for their own personal benefit and desires and causing hundreds of thousands of dollars to be spent chasing Mr. Manookian and Mr. Hammervold to simply get to the truth.

Therefore, based upon the findings of facts above, the Court shall now apply these facts to the applicable law.

## III.     **CONCLUSIONS OF LAW**

### A. <u>Civil Contempt</u>

A trial court's power to punish contempts can be traced back to twelfth century England. *Baker v. State*, 417 S.W.3d 428, 435 (Tenn. 2013) (citing Ronald L. Goldfarb, *The Contempt Power* 9, 19 (1963)). This power was eventually incorporated into American common law by the colonists. *Id.* In *Graham v. Williamson*, the Tennessee Supreme Court explained the inherent power of courts to punish contempt as follows:

> The power of courts to punish for contempt is of immemorial antiquity, and is inherent in all courts as a necessary power belonging to them in order to enable them to accomplish the purposes for which they were designed; that is, the orderly trial and decision of causes, the enforcement of public order, the prevention of interferences with their proceedings, and the enforcement of the due respect belonging to them as institutions of the country. While this power may be regulated by the Legislature, it is not conferred. Bailey on Habeas Corpus, pp. 219-260; 2 Broom & Hadley's

Commentaries, 567-569, 435, and 436; 1 Bacon's Abridgment, 473; 2 Id. 633, 634.

*Graham v. Williamson*, 128 Tenn. 720, 164 S.W. 781, 782 (1914).

However, in light of the limitless, discretionary power bestowed upon the courts by common law, which naturally accompanied the potential for abuse, the Tennessee General Assembly enacted statutory provisions to curb the contempt power of state judges and to specifically define the conduct punishable by contempt. *Baker*, 417 S.W.3d at 435.

Accordingly, Tennessee Code Annotated § 16-1-103 states, "For the effectual exercise of its powers, every court is vested with the power to punish for contempt, as provided for in this code." Tenn. Code Ann. § 16-1-103. Moreover, Tennessee Code Annotated § 29-9-102 defines the statutory framework for contempt as follows:

> The power of the several courts to issue attachments, and inflict punishments for contempts of court, shall not be construed to extend to any except the following cases:
>
> (1) The willful misbehavior of any person in the presence of the court, or so near thereto as to obstruct the administration of justice;
>
> (2) The willful misbehavior of any of the officers of such courts, in their official transactions;
>
> (3) The willful disobedience or resistance of any officer of the such courts, party, juror, witness, or any other person, to any lawful writ, process, order, rule, decree, or command of such courts;
>
> (4) Abuse of, or unlawful interference with, the process or proceedings of the court;
>
> (5) Willfully conversing with jurors in relation to the merits of the cause in the trial of which they are engaged, or otherwise tampering with them; or
>
> (6) Any other act or omission declared a contempt by law.

Tenn. Code Ann. § 29-9-102.

"Contempt proceedings are *sui generis* and are incidental to the case out of which they arise." *Baker*, 417 S.W.3d at 435. Further, contempts may be classified as either criminal or civil in nature. *Black v. Blount*, 938 S.W.2d 394, 398 (Tenn. 1996).

Here, the Non-Parties assert claims for civil contempt in violation of Tennessee Code Annotated § 29-9-102(3).

Civil contempt "occurs when a person refuses or fails to comply with a court order and a contempt action is brought to enforce private rights." *State ex rel. Flowers v. Tennessee Trucking Ass'n Self Ins. Grp. Tr.*, 209 S.W.3d 602, 613 (Tenn. Ct. App. 2006) (citing *Black*, 938 S.W.2d at 398; *Robinson v. Air Draulics Engineering Co.*, 214 Tenn. 30, 377 S.W.2d 908, 911 (1964)). In *Konvalinka v. Chattanooga-Hamilton County Hosp. Authority*, the Tennessee Supreme Court illustrated the essential elements and proper analysis necessary for a civil contempt claim:

> Civil contempt claims based upon an alleged disobedience of a court order have four essential elements. First, the order alleged to have been violated must be 'lawful.' Second, the order alleged to have been violated must be clear, specific, and unambiguous. Third, the person alleged to have violated the order must have actually disobeyed or otherwise resisted the order. Fourth, the person's violation of the order must be 'willful.'

*Konvalinka v. Chattanooga-Hamilton Cty. Hosp. Auth.*, 249 S.W.3d 346, 354-55 (Tenn. 2008) (footnotes omitted).

Thus, the Court shall address each essential element of a civil contempt claim in the context of this case herein.

623

### 1. Lawful Orders

The Court shall address the threshold issues as to whether the *Orders* alleged to have been violated are lawful. In *Chattanooga-Hamilton Cty. Hosp. Auth.*, the Supreme Court explained:

> A lawful order is one issued by a court with jurisdiction over both the subject matter of the case and the parties. An order is not rendered void or unlawful simply because it is erroneous or subject to reversal on appeal. Erroneous orders must be followed until they are reversed. However, an order entered without either subject matter jurisdiction or jurisdiction over the parties is void and cannot provide the basis for a finding of contempt. Naturally, the determination of whether a particular order is lawful is a question of law.

*Chattanooga-Hamilton Cty. Hosp. Auth.*, 249 S.W.3d at 355 (footnotes and citations omitted).

First, clarification as to which *Orders* were allegedly violated by Mr. Manookian and Mr. Hammervold is necessary for the Court's analysis. While the parties entered into the *Agreed Protective Order* on August 28, 2015, and subsequently followed its framework,[49] this matter did not come before the Court until the filing of Plaintiff, David Chase's *Expedited Motion for Sanctions, Protective Orders, and Other Related Relief* on October 8, 2015.

On October 20, 2015, the Court held a hearing to resolve the pressing discovery issues in this case. Based upon the *Oral Motion* of Mr. Crider, the Court made its *First Oral Order*, in which the Court commanded (1) *Defendants' Response to Plaintiff's Expedited Motion for Sanctions, Protective Order, and Other Related Relief,* as well as the exhibits, were under seal, (2) all materials previously produced by the Non-Parties shall be treated as confidential pending the hearing on October 30, 2015, and (3) all

---

[49] This is evident by the Non-Parties' disclosing the requested confidential documents to the Respondents on August 28, 2015 and Dean Chase's and Sandra Chase's depositions being taken, without objection, on September 16, 2015.

transcripts and videos of Dean Chase and Sandra Chase shall be treated as confidential pending the hearing on October 30, 2015. (*See Order on Plaintiff's Expedited Motion for Sanctions, Protective Order, and Other Related Relief and Expedited Motion to Compel* of Order of November 7, 2015, which memorialized the Court's *First Oral Order*.)[50] Thus, from this point on in the proceedings, the mentioned materials and deposition testimonies were to be treated as confidential and placed under seal until the pending hearing on October 30, 2015.

Consequently, at the hearing on October 30, 2015, the Court made its *Second Oral Order*, in which the Court granted the Non-Parties' *Motion*. The Court modified the *Agreed Protective Order* to permit the Non-Parties to designate documents as "confidential" in the manner in which such designations had been made, and any and all documents so marked by the Non-Parties were to be protected from disclosure consistent with the terms of the *Agreed Protective Order*, essentially entering in the *Agreed Protective Order* with the Court's modifications. (See *Order* of November 6, 2015, memorializing the *Second Oral Order* of October 30, 2015.) Both the *First Oral Order* and *Second Oral Order* were subsequently memorialized into written orders. Therefore, the *First Oral Order*, *Second Oral Order*, and the subsequent memorialized *Orders* are the alleged *Orders* violated by Mr. Manookian and Mr. Hammervold. Specifically, based upon the alleged dates Mr. Manookian and Mr. Hammervold violated the Court's *Orders*, the written *Order* of November 6, 2015 was clearly in effect at the time.

---

[50] The Court notes there was not a court reporter at this hearing; however, the parties have not objected or asserted the memorialized *Orders* differed from the oral command made in open court.

Accordingly, an oral command which takes effect prior to a written order being entered can constitute a lawful order. *Ross v. Ross*, No. M200800594COAR3CV, 2008 WL 5191329, at *5 n.6 (Tenn. Ct. App. Dec. 10, 2008).[51] As explained in the Tennessee Court of Appeals opinion in *Outdoor Mgmt., LLC v. Thomas*:

> Among the conduct that courts have the authority to punish as contempt is "[t]he willful disobedience or resistance of any officer of the said courts, party, juror, witness, or any other person, to any lawful writ, process, order, rule, decree, or **command of such courts.**" T.C.A. § 29–9–102(3). The language of T.C.A. § 29–9–102(3) is unambiguous. Two elements are required for a finding of contempt: (1) willful disobedience or resistance, and (2) a lawful writ, process, order, rule, decree, or **command of a court** of this State. T.C.A. § 29–9–102(3); *State v. Winningham,* 958 S.W.2d 740, 745 (Tenn.1997). A court order specifically mandating or prohibiting the alleged contemptuous conduct is essential. *See Overnite Transp. Co. v. Teamsters Local Union No. 480,* 172 S.W.3d 507, 511–12 (Tenn.2005) ("One may violate a court's order by either refusing to perform an act mandated by the order or performing an act forbidden by the order.").

*Outdoor Mgmt., LLC v. Thomas*, 249 S.W.3d 368, 376–77 (Tenn. Ct. App. 2007) (emphasis added).

Thus, the Court finds it had subject matter jurisdiction and personal jurisdiction over the Parties and the Non-Parties. Further, the Court's *Oral Orders* were clear and specific and prohibited the alleged contemptuous conduct. Finally, the subsequent written *Orders* memorialized the Court's lawful *Oral Orders*.

## 2. Clear, Specific, and Unambiguous

Next, the second essential issue involves the clarity of the order alleged to have been violated. In *Chattanooga-Hamilton Cty. Hosp. Auth*, the Tennessee Supreme Court elaborated as to this issue as follows:

---

[51] The Court notes an oral command from the bench may constitute a lawful order, but all orders of a court should be memorialized in writing, filed with the Clerk, and submitted to the judge for his or her approval in a matter. *Ross v. Ross*, No. 2008 WL 5191329, at *5 n.6. However, an oral command cannot constitute a final judgment. *Id.*; *see also Blackburn v. Blackburn*, 270 S.W.3d 42, 56 (Tenn. 2008).

A person may not be held in civil contempt for violating an order unless the order expressly and precisely spells out the details of compliance in a way that will enable reasonable persons to know exactly what actions are required or forbidden. The order must, therefore, be clear, specific, and unambiguous.

Vague or ambiguous orders that are susceptible to more than one reasonable interpretation cannot support a finding of civil contempt. Orders need not be "full of superfluous terms and specifications adequate to counter any flight of fancy a contempner may imagine in order to declare it vague." They must, however, leave no reasonable basis for doubt regarding their meaning.

Orders alleged to have been violated should be construed using an objective standard that takes into account both the language of the order and the circumstances surrounding the issuance of the order, including the audience to whom the order is addressed. Ambiguities in an order alleged to have been violated should be interpreted in favor of the person facing the contempt charge. Determining whether an order is sufficiently free from ambiguity to be enforced in a contempt proceeding is a legal inquiry that is subject to de novo review.

*Chattanooga-Hamilton Cty. Hosp. Auth.*, 249 S.W.3d at 355-56 (footnotes and citations omitted).

Here, the *First Oral Order*, the *Second Oral Order*, and subsequent written *Orders*, were clear, specific, and unambiguous. First, the *First Oral Order* and the *Second Oral Order* were made in the context of the Parties' and Non-Parties' seeking to resolve the very discovery dispute as to the release of the confidential information. Hence, all of the Parties, Non-Parties, and the present legal counsel were aware a determination of the confidential information release was before the Court. There can be no other reasonable interpretation as to what action was being prohibited by the *First Oral Order* of October 20, 2015, which prohibited the releasing of the confidential information and the deposition testimonies provided by the Non-Parties pending the hearing on October 30, 2015. Additionally, there can be no other reasonable interpretation as to the Court's *Second Oral Order* on October 30, 2015, by which the

Court granted the *Joint Motion for Entry of a Protective Order of* September 14, 2015 in open court. The *Second Oral Order* entered and modified the *Agreed Protective Order*. This was clear to all Parties, Non-Parties, and legal counsel present. Additionally, as to any assertion the *First Oral Order* and *Second Oral Order* were not clear and specific, such erroneous claims are resolved with the Court's entering the written *Order* of November 6, 2015 and the written *Order* of November 7, 2015.

Furthermore, the "twilight period" from October 20, 2015 through November 6, 2015, is immaterial based upon the Court's above findings Mr. Manookian released the confidential information sometime in January 2016, after the Court entered the written *Orders* on November 6, 2015 and November 7, 2015. Therefore, based upon the objective standard provided above and even analyzing the *First Oral Order* and *Second Oral Order* and the subsequent *Orders* of November 6, 2015 and November 7, 2015 for ambiguities and accounting these in favor of Mr. Manookian and Mr. Hammervold, the Court finds all of the Court's *Orders* were clear, specific, and unambiguous.

### 3. Violations of the Orders

As to the third issue, the Court must analyze whether Mr. Manookian and Mr. Hammervold actually violated the Court's *Orders*. Specifically, the Court must analyze whether Mr. Manookian and Mr. Hammervold violated the Court's *Order* of November 6, 2015, which was in effect at the time of the alleged violations. The Tennessee Supreme Court explained the Court's analysis for this third element as follows:

> The third issue focuses on whether the party facing the civil contempt charge actually violated the order. This issue is a factual one to be decided by the court without a jury. The quantum of proof needed to find that a person has actually violated a court order is a preponderance of the evidence. Thus, decisions regarding whether a person actually violated a

court order should be reviewed in accordance with the standards in Tenn. R. App. P. 13(d).[52]

*Chattanooga-Hamilton Cty. Hosp. Auth.*, 249 S.W.3d at 356 (citations omitted).

Thus, the Court must make a determination as to whether the evidence is sufficient to find Mr. Manookian and Mr. Hammervold violated the Court's *Order* of November 6, 2015 by a preponderance of the evidence. Accordingly, the Court shall address each instance to which the Non-Parties assert a violation has occurred and determine whether, based upon the preponderance of the evidence, Mr. Manookian and Mr. Hammervold actually violated the Court's *Order* of November 6, 2015.[53]

### (a) *King v. Chase* Violations

As the Court found above, in December of 2015, Mr. Manookian and Mr. Hammervold began using the Non-Parties' confidential materials in their representation of Mr. King in the *King v. Chase* case. First, on December 30, 2015, Mr. King clearly admitted to reading the confidential documents provided by the Non-Parties and even stated in an email:

> I was put in touch with an extremely competent and savvy attorney in Nashville who, through discovery, has ascertained all communications between the law firm [Waller], Dean [Chase] and David [Chase] and has intimate knowledge of with [sic] what really took place behind the scenes.
> . . . .
>
> You will be shocked to read the communications between Steve and Dean [Chase], always putting Dean's [Chase] personal interest first and never operating out of the best interest of the group.

---

[52] The Court notes Rule 13(d) of the Tennessee Rules of Appellate Procedure provides: "Unless otherwise required by statute, review of findings of fact by the trial court in civil actions shall be de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise . . . ." Tenn. R. App. P. 13(d).

[53] The Court also notes it has already found Mr. Manookian released the confidential information to General Funk, David Raybin, Kim Hodde, and Eli Richardson, but these disclosures were violations of the *Agreed Protective Order* prior to the Court's entering an order on the matter. Thus, this is not relevant for the civil contempt issue, but is relevant to this abuse of discovery and sanctionable.

(See Tr. Exhibit 4, Nov. 9, 2017.)

The very next day Mr. Manookian sent a demand letter on behalf of Mr. King to a Waller attorney in regard to the future *King v. Chase* case. Thus, it is clear Mr. King, who was not a party to this litigation, was improperly given the confidential text messages in this case from Mr. Manookian. The Court notes the evidence is clear Mr. Manookian provided confidential material to Mr. King; however, as for Mr. Hammervold, the Court finds the record lacks any direct evidence of Mr. Hammervold's releasing this information to Mr. King. Thus, this was a violation of the Court's *Order of* November 6, 2015.

Second, on January 6, 2016, Mr. Manookian used these confidential materials to assist Mr. King's litigation in his case by attempting to hold out the "80,000 pages of documents," as evidence for an alleged fraud and cover up relating to NV Partners. (*See* Tr. Exhibit 15, Sept. 23, 2016; Hr'g Tr. 157:24-158:12, Sept. 23 2016.) Mr. Hammervold was copied on this email. However, these "80,000 pages" of confidential materials were only supposed to be used for the proceedings in this case. This also constitutes a violation of the Court's *Order of* November 6, 2015 by Mr. Manookian.

Third, Mr. Manookian and other co-counsel also attended a meeting with opposing counsel regarding the *King v. Chase* case, at which they cited to documents by Bates-number supporting the threatened litigation against Dean Chase. (Hr'g Tr. 291:8-293:3, Sept. 23, 2016.) These documents were again the very documents marked confidential pursuant to the *Agreed Protective Order* and the above *Orders* of this Court. (*Id.*) Accordingly, the Court finds this constitutes a violation of the Court's *Order of* November 6, 2015 by Mr. Manookian.

Fourth, on February 3, 2016, Mr. Manookian and Mr. Hammervold filed *Plaintiff's Response to Defendant's Motion for Protective Order* in the *King v. Chase* case, attaching an Exhibit 1 which was a copy of an unsigned Agreement of Partnership of NV Partners. (Tr. Exhibit 17, Sept. 23, 2016.) This document was provided by the Non-Parties in their initial discovery and was ordered by this Court to be under seal. Even if Mr. Manookian and Mr. Hammervold could have received this document from another source, i.e. their client, Mr. King, the record is clear that they did not do so and merely attached the document provided by the Non-Parties, which was marked with the word "confidential" and a bates-number. (*Id.*) This constitutes a violation of the Court's *Order* of November 6, 2015 by Mr. Manookian and Mr. Hammervold for their improper filing of the confidential material.

As a defense for these violations, Mr. Manookian and Mr. Hammervold argue they did not "use" the documents and *King v. Chase* is related to the current litigation and meets the meaning of "future related litigation" which was permitted by the *Agreed Protective Order*. First, the Court finds Mr. Manookian's and Mr. Hammervold's "use" argument to be unpersuasive. Clearly, Mr. Manookian and Hammervold were using the confidential materials throughout the *King v. Chase* case. These documents were used for preparation into Mr. King's case against Dean Chase, as evidenced by Mr. King's reading confidential text messages between the Non-Parties and his subsequent email admitting the disclosure to Mr. Palmer.[54] (See Tr. Exhibit 4, Nov. 9, 2017.) Additionally, Mr. Manookian and Mr. Hammervold would have been the only individuals to show the confidential material to Mr. King because they were co-counsel for his *King v. Chase*

---

[54] The Court notes Mr. Palmer, another non-party to this case, was the recipient of an email from Mr. King discussing his potential lawsuit against Dean Chase and also copied Mr. Manookian on this email.

631

case and in possession of the confidential material. Further, clearly Mr. Manookian and Mr. Hammervold were making "use" of the documents by Mr. Manookian referencing the "80,000 pages of documents" in not one interaction with the Waller attorneys, but two, as a negotiation tool and a part of their litigation strategy.

Finally, it is even more apparent Mr. Manookian and Mr. Hammervold used the confidential material in the *King v. Chase* case because they actually filed one of the confidential material documents with the Davidson County Chancery Court attached to their *Plaintiff's Response to Defendant's Motion for Protective Order.* (Tr. Exhibit 17, Sept. 23, 2016.) Therefore, Mr. Manookian and Mr. Hammervold were using the confidential materials throughout the *King v. Chase* case in violation of the *Order* of November 6, 2015.

Next, as to Mr. Manookian's and Mr. Hammervold's claims the cases are related and constitute a "future related litigation" pursuant to the *Agreed Protective Order*, the Court finds this argument to be unavailing as well. This present case involves a malicious prosecution action brought by Plaintiff, David Chase, against numerous individuals for allegedly conspiring to make false allegations of domestic violence against him. However, the *King v. Chase* case involves a lawsuit against Dean Chase arising out of a partnership dispute involving a hotel. (*See* Tr. Exhibit 16, Sept. 23, 2016 (*Complaint* filed on January 12, 2016 in the Chancery Court of Davidson County in *King v. Chase*)).

Here, the Court finds the terms "future related litigation" did not encompass such a nonrelated matter. Moreover, the Court is persuaded by Mr. Manookian's legal argument in Chancellor Lyle's Davidson County Chancery Court, in which Chancellor

Lyle found: "the Court documents that Plaintiff's Counsel [Mr. Manookian] stated that this lawsuit and the Williamson County lawsuits *are not related*." (emphasis added) (Tr. Exhibit 1, Nov. 9, 2017.) Hence, Mr. Manookian and Mr. Hammervold submitted to Chancellor Lyle the cases were not related, but Mr. Manookian and Mr. Hammervold now claim they are related. The Court agrees with Mr. Manookian's and Mr. Hammervold's first impression of these cases and earlier submission to Chancellor Lyle and finds the *King v. Chase* case is not related and does not constitute a "future related litigation" pursuant to the *Agreed Protective Order*.

Therefore, the Court finds, by the preponderance of the evidence, Mr. Manookian's knowingly, willfully, and intentionally disclosed the text messages to Mr. King in the *King v. Chase* case, used the confidential materials on two separate occasions in his negotiations with the Waller attorneys representing Dean Chase, and attached a confidential document to the filing in the *King v. Chase* case. This constitutes four clear incidents of Mr. Manookian's improperly releasing and using the confidential materials for the benefit of another client in another proceeding, and in so doing, he knowingly, willfully, and intentionally violated of the Court's *Order* of November 6, 2015.

In addition, the Court finds, specifically, Mr. Hammervold knowingly, willfully, and intentionally improperly released and used the confidential materials by filing *Plaintiff's Response to Defendant's Motion for Protective Order* in the *King v. Chase* case, with the attached confidential material as Exhibit 1. (*See* Tr. Exhibit 17, Sept. 23, 2016.) Thus, Mr. Hammervold knowingly, willfully, and intentionally violated the Court's *Order* of November 6, 2015 on one occasions during his representation of Mr. King in the *King v. Chase* case.

### (b)   _Disclosure to Media Violations_

As stated above, the Court found, based upon a preponderance of the evidence, Mr. Manookian released the confidential materials to the news media **after** the Court entered its _Orders_. The Court finds the release of the confidential material was a violation of the _Order_ of November 6, 2015. This was evident from Mr. Finley's contacting David Chase on January 20, 2016 and General Funk on January 21, 2016 regarding his receipt of the confidential materials and deposition testimonies of Dean Chase and Sandra Chase. Even more telling were the documents Mr. Finley attached to his email to General Funk included (1) Mr. Manookian's _Response to Plaintiff's Expedited Motion for Sanctions, Protective Orders and Other Relief_ of October 19, 2015; (2) the deposition transcript of Dean Chase; and (3) text messages produced by the Non-Parties in the original document discovery, along with matching Exhibits.[55]

Further, News Channel 4 WSMV, NewsChannel 5 WTVF, and the _Nashville Scene_ broadcasted news stories on February 3, 2016 and February 4, 2016, in which each showed the Non-Parties' confidential materials and deposition testimonies. Lastly, at the evidentiary hearing on September 23, 2016, Mr. Manookian admitted he had disclosed the portions of the Non-Parties' confidential materials and deposition testimonies to Mr. Finley of News Channel 4 WSMV, Phil Williams at NewsChannel 5 WTVF, and Jim Ridley at the _Nashville Scene_. Although Mr. Manookian claims he submitted the confidential materials in early October 2015, prior to the Court's _Orders_. This Court has determined Mr. Manookian lacks credibility and based upon the circumstantial and direct evidence in this case, the Court found by a preponderance of

---

[55] The Court notes these attachments were designated confidential by the _Agreed Protective Order_ and the _Orders_ entered by this Court.

634

the evidence this disclosure of the confidential material to the news media occurred in January 2016. Thus, the Court finds these releases to three different news outlets in January 2016 constitute three separate violations of the Court's *Order* of November 6, 2015, which was in effect at this time.

### 4. <u>Willful Violation</u>

The final issue the Court must determine is whether Mr. Manookian and Mr. Hammervold knowingly, willfully, and intentionally violated the Court's *Order* of November 6, 2015. Once again, the Court relies upon the framework established by the Tennessee Supreme Court in *Chattanooga-Hamilton Cty. Hosp. Auth.*:

> The fourth issue focuses on the willfulness of the person alleged to have violated the order. The word 'willfully' has been characterized as a word of many meanings whose construction depends on the context in which it appears. Most obviously, it differentiates between deliberate and unintended conduct. However, in criminal law, 'willfully' connotes a culpable state of mind. In the criminal context, a willful act is one undertaken for a bad purpose.

> In the context of a civil contempt proceeding under Tenn. Code Ann. § 29–2–102(3), acting willfully does not require the same standard of culpability that is required in the criminal context. Rather, willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is 'willful' if it is the product of free will rather than coercion. Thus, a person acts 'willfully' if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

> *State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Group Trust,* 209 S.W.3d at 612 (citations omitted). Thus, acting contrary to a known duty may constitute willfulness for the purpose of a civil contempt proceeding. Determining whether the violation of a court order was willful is a factual issue that is uniquely within the province of the finder-of-fact who will be able to view the witnesses and assess their credibility. Thus, findings regarding 'willfulness' should be reviewed in accordance with the Tenn. R. App. P. 13(d) standards.

*Chattanooga-Hamilton Cty. Hosp. Auth.*, 249 S.W.3d 356-57 (citations and footnotes omitted).

First, as to Mr. Manookian, the Court finds Mr. Manookian knowingly, willfully, and intentionally used the confidential material and deposition testimonies of Dean Chase and Sandra Chase in his representation of Mr. King in the unrelated case of *King v. Chase*. Mr. Manookian was a free agent, knew the Court entered the *Agreed Protective Order* on October 30, 2015 with modifications, and subsequently entered its written *Order* of November 6, 2015, which was in effect at this time, but chose to use the confidential material in his Davidson County lawsuit. The confidential material was used as a bargaining chip with opposing counsel on at least two separate occasions and some of the confidential information was even filed with the Davidson County Chancery Court. Additionally, Mr. Manookian even disclosed the confidential text messages to his own client, Mr. King, to provide more support in the *King v. Chase* lawsuit. Thus, the Court finds Mr. Manookian knowingly, willfully, and intentionally violated the *Order* of November 6, 2015 on four separate occasions as it relates to the *King v. Chase* case.

Second, the Court finds Mr. Manookian knowingly, willfully, and intentionally violated the Court's *Orders* when he released the confidential materials to News Channel 4 WSMV, NewsChannel 5 WTVF, and the *Nashville Scene* in January 2016. The Court finds Mr. Manookian was not coerced to release this information and did so freely for his and his client's personal gain. As Mr. Manookian admitted, he did provide the news media with the confidential material, yet he submits to this Court it was performed in the time period of October 4-6, 2015. The Court has already found Mr. Manookian's testimony was not credible, and this also leads the Court to find he

knowingly, willfully, and intentionally released the confidential material to the news media _after_ the Court's Order of November 6, 2015.

Moreover, the Court finds Mr. Manookian's time period for his disclosure to be illogical, because if such were the case, why would Mr. Manookian fail to inform the Court it was he that gave the evidence to the news media prior to the Court's entering an _Order_, to which no violation would have occurred? The Court infers Mr. Manookian's silence to be deafening as to this point. Furthermore, Mr. Manookian claimed to have evidence of this apparent submission to Phil Williams, but at the hearing, failed to present the exonerating evidence. After searching the record for any evidence to corroborate Mr. Manookian's time period, the Court finds no such evidence exists.

Additionally, Mr. Manookian would have the Court believe three separate news outlets would receive information for a news story, which involved very recognizable individuals in the Nashville community in October 2015, and fail to investigate the contents of the story, and fail to run the story until February 2016. The Court finds sometimes the most likely stories are the most simple, which is Mr. Manookian released the documents **after** the Court's _Orders_ in late October 2015 and early November 2016. Thus, the Court finds Mr. Manookian knowingly, willfully, and intentionally violated the _Order_ of November 6, 2015, which was in effect at the time, on three separate occasions as it relates to the disclosures to the media.

Next, as to Mr. Hammervold, the Court finds Mr. Hammervold knowingly, willfully, and intentionally used and released the confidential material in his representation of Mr. King in _King v. Chase_. Mr. Hammervold was co-counsel with Mr. Manookian and, as such, is responsible for the filings submitted by the parties. Thus, he knowingly, willfully,

and intentionally violated the Court's *Orders* by permitting the filing of *Plaintiff's Response to Defendant's Motion for Protective Order* in the *King v. Chase* case, with the attached confidential material as Exhibit 1. (*See* Tr. Exhibit 17, Sept. 23, 2016.) Thus, Mr. Hammervold was a free agent, knew what he was doing when he filed the Exhibit with the Court and intended to do so, and freely used the confidential material in the *King v. Chase* case. Thus, Mr. Hammervold knowingly, willfully, and intentionally violated the Court's *Order* of November 6, 2015, which was in effect at the time, on one occasion by his use and release of the confidential information in the *King v. Chase* case. Additionally, the Court finds Mr. Hammervold may have also knowingly, willfully, and intentionally disclosed the confidential text messages to Mr. King, while acting as co-counsel with Mr. Manookian. However, the record lacks sufficient evidence to meet the threshold for a contempt violation. Thus, the Court finds Mr. Hammervold willfully violated the *Order* of November 6, 2015, which was in effect at the time, on one occasion as it relates to his involvement in the *King v. Chase* case.

As to the news media disclosure violations by Mr. Manookian, the Court finds Mr. Hammervold did not knowingly, willfully, and intentionally violate the Court's *Orders* in this regard. However, most of the evidence shows Mr. Hammervold's willful blindness to the matter, and failure to alert the Court to Mr. Manookian's disobedience to the Court's *Order*, but the Court does not find this to be a violation of the Court's *Order* of November 6, 2015.

Therefore, in total, the Court finds Mr. Manookian in civil contempt for knowingly, willfully, and intentionally violating the Court's *Order* of November 6, 2015 on seven separate incidents when he used, released, and filed the confidential material during his

representation of Mr. King in the *King v. Chase* case and when he knowingly, willfully, and intentionally released the confidential materials to the news media. Additionally, the Court finds Respondent, Cummings Manookian, PLC is also in civil contempt based upon the knowing, willful, and intentional violations of Mr. Manookian acting as its agent for the law firm. As to Mr. Hammervold, the Court finds Mr. Hammervold in civil contempt for knowingly, willfully, and intentionally violating the Court's *Order* of November 6, 2015 on one incident when he used, released, and filed the confidential material during his representation of Mr. King in the *King v. Chase* case. Furthermore, Respondent, Hammervold Law, PLC is also in civil contempt based upon the knowing, willful, and intentional violation of Mr. Hammervold's acting as its agent for the law firm.

## B. <u>Tennessee Rules of Civil Procedure Sanctions</u>

While the Court finds Mr. Manookian and Mr. Hammervold in civil contempt for their violations of the Court's *Orders*, the Court also finds alternative grounds for sanctions based upon Mr. Manookian's and Mr. Hammervold's abuse of the discovery process in this case. As such, the Non-Parties also move the Court to issue Rule 37.02 sanctions against Mr. Manookian and Mr. Hammervold for their failure to adhere to the *Agreed Protective Order* and Court's *Orders*, relating to the discovery in this matter. Rule 37.02 of the Tennessee Rules of Civil Procedure provides as follow:

> If a deponent; party; an officer, director, or managing agent of a party; or, a person designated under Rule 30.02(6) or 31.01 to testify on behalf of a party fails to obey an order to provide or permit discovery, including an order made under Rule 37.01 or Rule 35, or if a party fails to obey an order entered under Rule 26.06, the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

**(A)** An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

**(B)** An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence;

**(C)** An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;

**(D)** In lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders except an order to submit to a physical or mental examination;

**(E)** Where a party has failed to comply with an order under Rule 35.01 requiring the party to produce another for examination, such orders as are listed in paragraphs (A), (B), and (C) of this rule, unless the party failing to comply shows that he or she is unable to produce such person for examination.

In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising the party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

Tenn. R. Civ. P. 37.02

Additionally, in *Alexander v. Jackson Radiology Assocs., P.A.*, the Tennessee Court of Appeals explained the power trial courts have to remedy abuses of discovery:

> The provisions of Rule 37.02 primarily apply to sanctions for non-compliance with a court order. *Lyle v. Exxon,* 746 S.W.2d at 698–99. However, as this Court previously has observed, the rules governing discovery would be ineffectual absent the trial court's authority to sanction their abuse. *Mansfield v. Mansfield,* No. 01A019412CH00587, 1995 WL 643329, at *5 (Tenn. Ct. App. Nov. 3, 1995)(*no perm. app. filed* )(citing 8A Charles A. Wright, et al. *Federal Practice and Procedure* § 2281 (2d ed.1994)). Thus, although the Rules do not explicitly provide for sanctions for discovery abuse absent a court order, trial courts possess the inherent authority to take actions to prevent abuse of the discovery process. *Mercer,* 134 S.W.3d 121, 133. Further, wide discretion is afforded to the

trial courts to determine the appropriate sanction. *Id.* Although "reasonable judicial minds can differ concerning [its] soundness," the trial court's determination of the appropriate sanction will be set aside only where the court "has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of the evidence." *Id.* (quoting *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999)).

*Alexander v. Jackson Radiology Assocs., P.A.*, 156 S.W.3d 11, 15 (Tenn. Ct. App. 2004).

Furthermore, in *Mansfield v. Mansfield*, the Tennessee Court of Appeals also explained:

[T]he Tennessee Rules of Civil Procedure authorize serious sanctions against persons who seek to evade or thwart full and candid discovery, including being found in contempt, having designated facts be taken as established, striking pleadings, dismissing an action or claim or granting a judgment by default, or assessing expenses and attorneys' fees.[1] These sanctions serve a three-fold purpose: (1) to secure a party's compliance with the discovery rules, (2) to deter other litigants from violating the discovery rules, and (3) to punish parties who violate the discovery rules. *Electronic Data Sys. Corp. v. Tyson*, 862 S.W.2d 728, 735 (Tex.Ct.App.1993). Monetary sanctions serve the additional purpose of providing compensation for the expenses caused by the inappropriate conduct. *Carlucci v. Piper Aircraft Corp.*, 775 F.2d 1440, 1453 (11th Cir.1985).

*Mansfield v. Mansfield*, No. 01A019412CH0058, 1995 WL 643329, at *5 (Tenn. Ct. App. Nov. 3, 1995) (footnotes omitted).

As stated in *Pegues v. Illinois Cent. R. Co.*, 288 S.W.3d 350, 354 (Tenn. Ct. App. 2008) *perm. app. denied* (Tenn. Jan. 20, 2009) (quoting *Alexander v. Jackson Radiology Assoc., P.A.,* 1567 S.W.3d 11, 14 (Tenn. Ct. App. 2004), *perm. app. denied* (Tenn. Nov. 15, 2004)):

[T]he inherent powers of the court to impose sanctions are most effective when utilized with discretion and restraint . . . "[T]he punishment must fit the offense" . . . "[T]he power to sanction should be used sparingly. It should not be used like a sword and used frequently . . . to do so would diminish the significance when sanctions are imposed."

Thus, sanctions are a drastic measure which the Court wisely imposes with discretion. The Court finds Mr. Manookian and Mr. Hammervold abused the discovery process in this case and sanctions are appropriate. First, Mr. Manookian entered into the *Agreed Protective Order* on August 28, 2015, in order to receive sensitive materials and for permission to depose Dean Chase and Sandra Chase. However, upon receipt of the confidential material and the taking of the depositions, Mr. Manookian failed to follow the *Agreed Protective Order* and disseminated the confidential material to third parties and news outlets. For example, while Mr. Manookian claims he released the confidential materials and deposition testimonies to the news outlets in early October 2015, which the Court has already found to be untrue and the documents were released in January 2016, even if such were the case, Mr. Manookian would still be abusing the discovery process by completely ignoring the terms of the *Agreed Protective Order* to which Mr. Manookian claimed to be bound. This in itself is an abuse of the discovery process, and performed by an Officer of the Court nonetheless.

As explained above in the civil contempt section of this *Memorandum and Order*, the Court finds Mr. Manookian is in civil contempt for seven counts for his willful disobedience of the Court's *Order* of November 6, 2015. Thus, the Court finds sanctions are also appropriate for these seven offenses. In addition, as examined above, Mr. Manookian also admitted to releasing the confidential information to the following third parties: (1) General Funk, (2) David Raybin, (3) Kim Hodde, and (4) Eli Richardson.[56] These disclosures were in violation of the *Agreed Protective Order* prior to the Court entering an order on the matter, but are still actionable offenses for the abuse of the

---

[56] See numbered ¶ 69 above.

discovery process. Thus, the Court finds sanctions are appropriate for these four violations of the *Agreed Protective Order*.

As for Mr. Hammervold, the Court finds sanctions are also appropriate pursuant to Rule 37.02 of the Tennessee Rules of Civil Procedure. First, as explained above, Mr. Hammervold is in civil contempt for one count for violating of the Court's *Order* of November 6, 2015 as it relates to his representation of Mr. King in the *King v. Chase* case. Additionally, as to the dissemination of the confidential material to the news media, the Court finds, by a preponderance of the evidence, Mr. Hammervold had knowledge of and was complicit in concealing the improper disclosure to the Court. Furthermore, the Court finds Mr. Hammervold's actions in the discovery process and his failure to be truthful with this Court about his absence at the hearing on March 22, 2017 are both sanctionable offenses under Rule 37.02 of the Tennessee Rules of Civil Procedure.

### C. Damages

Based upon the Court's finding Mr. Manookian and Mr. Hammervold are in civil contempt of the Court's *Orders*, specifically the *Order* of November 6, 2015, and they have also exhibited sanctionable conduct throughout these proceedings, the Court must determine the legal basis for an award of damages in the context of civil contempt and Rule 37.02 sanctions.

"Punishment for civil contempt is designed to coerce compliance with the court's order and is imposed at the insistence and for the benefit of the private party who has suffered a violation of his or her rights." *Reed v. Hamilton*, 39 S.W.3d 115, 118 (Tenn. Ct. App. 2000). An award of damages for civil contempt is remedial in nature. *Id.*;

*Wilson v. Wilson*, 984 S.W.2d 898, 904 (Tenn.1998) (Birch, J., dissenting). To the extent attorneys' fees are awarded as damages in a civil contempt action, an "appellate court will not interfere with the trial court's award of attorneys' fees except upon a showing that the trial court abused its discretion. " *Reed*, 39 S.W.3d at 119 (quoting *Kuyendall*, 1991 WL 10178 at *2).

As explained above, Rule 37.02 of the Tennessee Rules of Civil Procedure provides: "[i]n lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising the party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust." Tenn. R. Civ. P. 37.02; *see Berg v. Berg*, No. M2013-00211-COA-R3CV, 2014 WL 2931954, at *14 (Tenn. Ct. App. June 25, 2014).

Here, the Court finds Mr. Manookian and Mr. Hammervold's failure to obey the Court's *Order* of November 6, 2015 to be without justification.

Thus, the Non-Parties submit their damages are in the form of attorneys' fees and expenses, which were incurred due to Mr. Manookian's and Mr. Hammervold's contempt and abuse of the discovery process. Accordingly, the Court finds it necessary to examine procedural history as is relates to the contempt and discovery dispute to fully examine the expenses and attorneys' fees requested.

At the outset of these contempt proceedings, the Court entered a *Scheduling Order* of August 12, 2016, which bifurcated this issue for the purposes of liability and damages on the Non-Parties' *Petitions*. (*See Scheduling Order* of August 12, 2016.) However, on November 9, 2017, the Court held the last day of the evidentiary hearing

on liability and the evidentiary hearing on damages on the same day. At this evidentiary hearing on November 9, 2017, the Non-Parties submitted their claim for damages in the form of attorneys' fees and expenses. Hence, the Non-Parties provided *Affidavits* of Charles Malone, Gayle Malone, John Day, and Marcus Crider in support of their damages. (Collective Tr. Exhibit 3, Nov. 9, 2017.) The *Affidavits of Charles Malone and Gayle Malone* of Butler Snow catalogue the attorneys' fees and expenses of Butler Snow that were incurred by the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., due to Mr. Manookian's and Mr. Hammervold's misconduct. (*Id.*) The *Affidavit of Marcus Crider* describes the attorneys' fees and expenses of Waller that were incurred by the Non-Parties as a result of the misconduct of Mr. Manookian and Mr. Hammervold. (*Id.*) Lastly, the *Affidavit of John Day* provides an expert opinion regarding the reasonableness and necessity of the attorneys' fees and expenses of Butler Snow that were incurred by the Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc. (*Id.*)

At the evidentiary hearing, Mr. Manookian and Mr. Hammervold failed to submit any evidence to contradict or dispute the damages evidence presented by the Non-Parties. Mr. Manookian and Mr. Hammervold instead chose to rely solely upon cross-examination of the Non-Parties' affiants. However, the Court finds Mr. Manookian and Mr. Hammervold failed to undermine the testimony provided by the Non-Parties' claims and evidence.

First, it appears Mr. Manookian and Mr. Hammervold contend the total attorneys' fees and expenses amount was excessive. However, the Court finds this argument to be unpersuasive. The Non-Parties were required to incur these additional costs due to

Mr. Manookian's and Mr. Hammervold's misconduct in both this case and the *King v. Chase* case. Regrettably, the Court finds the great majority, if not all, of these costs could have been avoided had Mr. Manookian and Mr. Hammervold simply done what is required as a bare minimum of any lawyer, and that is to simply tell the truth and not spend months on end perpetrating an active fraud against the Court, the attorneys, and the Parties. Mr. Manookian and Mr. Hammervold had plenty of opportunities to stop the fraud upon the Court and be candid and honest with the Court, but instead both attorneys made the conscious decision that attempting to conceal and to defraud the Court and then cover up their fraudulent conduct with more lies and deception as has been set out in this *Memorandum and Order*. Thus, the meter continued to run until Mr. Manookian admitted to releasing the confidential material at the hearing on November 9, 2017, as well as Mr. Hammervold admitting to knowing about Mr. Manookian's involvement of the disclosures to the news media. As a result, now the bill has come due.

Next, Mr. Manookian and Mr. Hammervold appeared to argue the attorneys' fees and expenses are not recoverable due to the fact they were paid by D.F. Chase, Inc. Such an argument fails as well. First, D.F. Chase, Inc. is one of the Non-Parties prosecuting the *Petitions* against Mr. Manookian and Mr. Hammervold. Second, Dean Chase, Sandra Chase, and D.F. Chase, Inc. all incurred, jointly and severally as to the legal liability for the attorneys' fees and expenses at issue. Further, Mr. Manookian and Mr. Hammervold essentially argued the release of the documents did not "cause" the damages sought by the Non-Parties, but as explained thoroughly in this *Memorandum and Order*, the Court finds Mr. Manookian's and Mr. Hammervold's contemptuous,

sanctionable, and obviously intentional conduct caused the Non-Parties to incur unnecessary fees and expenses. The entire basis for the proceedings that lead up to the final hearing on November 9, 2017 was to determine who released the confidential material in violation of the *Agreed Protective Order* and the Court's *Orders*. Now, after all of the consuming and tedious investigation and Court proceedings, Mr. Manookian, after being pressed during examination by Mr. Gayle Malone, finally admitted he was the one that released the information, and claims he and Mr. Hammervold did not cause the costs incurred to the Non-Parties. The Court finds such an assertion to be utterly false.

Finally, Mr. Manookian and Mr. Hammervold essentially submit the *King v. Chase* damages should not be included because they believe Mr. King could have filed the lawsuit irrespective of Mr. Manookian's and Mr. Hammervold's violations of this Court's *Orders*. First, this argument was not presented to the Court and there was no evidence provided to this Court besides the non-credible testimony of Mr. Manookian and Mr. Hammervold. Second, the Court finds this argument to also be unavailing. While Mr. King may have had other grounds to file his lawsuit, the evidence presented to this Court was that the release of the confidential material to Mr. King by Mr. Manookian and Mr. Hammervold propelled the lawsuit to be filed, even to go so as far as filing confidential material in the Davidson County Chancery Court in support of the *King v. Chase* lawsuit, all the while doing so in a knowing, willful, intentional and wrongful violation of this Court's *Orders*. (Tr. Exhibit 17, Sept. 23, 2016.) Thus, the Court finds the confidential information disclosure did cause Mr. King to file his complaint in the *King v. Chase* case. This argument fails.

Upon determining the implicit arguments by Mr. Manookian and Mr. Hammervold despite the fact the Court has given Mr. Manookian and Mr. Hammervold opportunity after opportunity to be heard and provide their evidence to this Court, Mr. Manookian and Mr. Hammervold failed to properly make said arguments or present evidence to this Court. Accordingly, the Court shall now determine the reasonableness of the attorneys' fees submitted by the Non-Parties and as to which fees were actually as a result of the Mr. Manookian's and Mr. Hammervold's contemptuous and sanctionable conduct.

The Tennessee Supreme Court Rule 8, Rule 1.5 of the Rules of Professional Conduct, provides the factors a Court must consider in determining reasonableness of an attorney fees and states:

> (a) A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:
>
> > (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
> >
> > (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
> >
> > (3) the fee customarily charged in the locality for similar legal services;
> >
> > (4) the amount involved and the results obtained;
> >
> > (5) the time limitations imposed by the client or by the circumstances;
> >
> > (6) the nature and length of the professional relationship with the client;
> >
> > (7) the experience, reputation, and ability of the lawyer or lawyers performing the services;

(8) whether the fee is fixed or contingent;

(9) prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and

(10) whether the fee agreement is in writing . . . .

Tenn. R. S. Ct. Rule 8, RPC 1.5.

## 1. Butler Snow Attorneys' Fees and Expenses

The evidence presented to the Court shows Butler Snow's representation of the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., in this action and the attorneys' fees and expenses billed to the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., as a result of investigating and litigating the various matters surrounding the *Petition for Contempt* and *Motions for Sanctions* as well as the media matters that arose in this case. Accordingly, Butler Snow began representing the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., shortly after January 20, 2016, when it was learned certain media outlets had been provided and were intending to publish the confidential material disclosed by the Non-Parties. (Collective Tr. Exhibit 3, *Affidavit of Charles I. Malone*, at numbered ¶ 3, Nov. 9, 2017.)

Consequently, after the publication of the Non-Parties' confidential material, the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., filed their initial *Motion for Sanctions* on February 25, 2016. As it is, Butler Snow represented the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., regarding these matters through the final hearing on November 9, 2017. (*Id.* at numbered ¶ 4.)

First, the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., seek their attorneys' fees and expenses incurred or will be paid to Butler Snow by the Non-

Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., in this action from January 20, 2016 through September 30, 2017. (Collective Tr. Exhibit 3, *Affidavit of Charles I. Malone* and *Affidavit of Gayle I. Malone, Jr.*, Nov. 9, 2017.) In support, the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., provide the sworn testimony of Charles Malone and Gayle Malone, as well as the monthly bills, documented on an entry-by-entry basis. (*Id.*) The Court also notes this final sum for attorneys' fees and expenses in this action has been discounted by $59,936.70 as a credit to the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., and a substantial sum has been redacted by Mr. Charles Malone and Mr. Gayle Malone for the legal services provided by Butler Snow. (Collective Tr. Exhibit 3, *Affidavit of Charles I. Malone*, at numbered ¶ 16, Nov. 9, 2017.) For the reasons set forth below, the Court finds the attorneys' fees requests are reasonable.

Second, the time, labor, and skill required to perform these legal services reflect this are reasonable attorneys' fees.[57] The Court has reviewed the time entries contained in Butler Snow's monthly billing statements and has considered the reasonableness of the fees based upon the Court's knowledge of the nature of this matter, which includes the complexity, the time required to respond to various issues, the adversaries, and the novelty of the issues in dispute.[58] These attorneys' fees are proper.

Third, in light of the time involved in representing the Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc. and the likelihood the particular employment would

---

[57] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(1).
[58] *Id.*

preclude other employment by the attorneys on this case from Butler Snow heavily weighs in favor of the reasonableness of the fees.[59]

Fourth, the Court finds the fees charged by Butler Snow to be customarily charged in this locality.[60] It appears Gayle Malone, Jr. charges an hourly rate of $525.00; Charles Malone charges an hourly rate of $395.00; Beau Creson charges an hourly rate of $275.00; and Paige (Ayres) Nutini charges an hourly rate of $215.00. (Collective Tr. Exhibit 3, *Affidavit of Gayle I. Malone, Jr.*, at numbered ¶ 9, Nov. 9, 2017.) Based upon each attorney's level of experience, skill, and expertise in these matters, the Court finds the rates of the attorneys listed above are typically charged in Williamson County and the surrounding area for similar legal services rendered. (*Id.*)

Fifth, while this sum of the attorneys' fees and expenses are significant, the Court finds this amount involved is reasonable to uncover the contemptuous conduct and discovery abuses of Mr. Manookian and Mr. Hammervold and the result was favorable for the Non-Parties.[61]

Sixth, the Court also finds there were time limitations imposed by the circumstances for counsel of Butler Snow to respond to filings and attend unnecessary hearings in which Mr. Manookian and Mr. Hammervold failed to appear for one reason or another.[62]

---

[59] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(2).
[60] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(3).
[61] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(4).
[62] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(5).

Seventh, the Court was unable to find the nature and length of the professional relationship between the attorneys at Butler Snow and the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., for this factor's consideration.[63]

Eighth, the Court finds the Non-Parties' attorneys have excellent experience, reputation, and ability as attorneys to perform the legal services in this case.[64] (*Id.*)

Ninth, as described above, the Butler Snow attorneys charged hourly rates as follows: Gayle Malone, Jr. charged an hourly rate of $525.00; Charles Malone charged an hourly rate of $395.00; Beau Creson charged an hourly rate of $275.00; and Paige (Ayres) Nutini charged an hourly rate of $215.00.[65] This, too, appears to be reasonable.

Tenth, there is no evidence in the record of prior advertisements or statements by the attorneys as to their fees or whether the fee agreement is in writing.[66] Additionally, in considering the expert opinion of Mr. John Day, the Court concurs with Mr. Day's expert opinion regarding the reasonableness and necessity of the attorneys' fees and expenses of Butler Snow incurred by the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc. (*See generally* Collective Tr. Exhibit 3, *Affidavit of John Day*, Nov. 9, 2017).

Therefore, the Court finds the $297,870.64 in attorneys' fees and expenses that have been or will be paid to Butler Snow by the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., in this matter for the period of January 2016 through September 30, 2017 were incurred as a direct and proximate result of Mr. Manookian's and Mr. Hammervold's contemptuous conduct. (See Collective Tr. Exhibit 3, *Affidavit of*

---

[63] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(6).
[64] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(7).
[65] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(8).
[66] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(9) and (10).

*Charles I. Malone*, Exhibit B, Nov. 9, 2017.) Furthermore, in the alternative, the Court also awards these reasonable attorneys' fees based upon Mr. Manookian's and Mr. Hammervold's abuses of the discovery process throughout this case. These attorneys' fees and expense are reasonable in light of the circumstances of this case and are hereby awarded against Mr. Manookian, Mr. Hammervold, and their respective firms.

Next, the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., also seek their attorneys' fees and expenses in this matter from October 1, 2017 through the conclusion of this case. (*See* Collective Tr. Exhibit 3, *Affidavit of Charles I. Malone*, numbered ¶ 18, Nov. 9, 2017.) As such, the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., request, as an award of damages, their attorneys' fees and expenses for Butler Snow they have not yet incurred, but reasonably estimate will incur in this matter as a result of the prosecution of the *Petitions*. The Non-Parties estimate $75,000.00 for future attorneys' fees and expenses.[67] (*Id.*)

Here, the Court denies the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc.'s, request as to award these fees at this time. The Court finds such an award would be premature and solely based upon projections. However, the Court shall grant the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc.'s, request for leave of Court to supplement their *Affidavits* with the fees and expenses incurred in this matter for this period of time.

Lastly, the next form of damages sought by the Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc., as it relates to the Butler Snow representation, is the attorneys' fees and expenses incurred by the Non-Parties Dean Chase, Sandra Chase,

---

[67] This estimate is partly based upon the fact Butler Snow incurred over $90,000.000 in attorneys' fees and expenses in September of 2016, the month in which the first day of the evidentiary hearing was held on the Non-Parties' *Petitions* occurred.

and D.F. Chase, Inc. in *King v. Chase* and other threatened litigation by Mr. Manookian, Mr. Hammervold, and their firms. (*See* Collective Tr. Exhibit 3, *Affidavit of Charles I. Malone*, Exhibit F, Nov. 9, 2017.) These attorneys' fees and expenses are limited to the investigating and litigating the claims and threatened claims made by Mr. Manookian and Mr. Hammervold using the Non-Parties' confidential discovery materials, with such fees and expenses ending on September 29, 2016, the date the original claims brought by Mr. Manookian and Mr. Hammervold, on behalf of Mr. King, were dismissed. (*Id.*)

The Court finds the Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc. suffered $113,500.64 in damages in the form of attorneys' fees and expenses as a direct and proximate result of Mr. Manookian's and Mr. Hammervold's wrongful use and disclosure of the Non-Parties' confidential discovery materials in their representation of Mr. King in *King v. Chase* and other threatened litigation. Accordingly, these damages shall be awarded against Mr. Manookian, Mr. Hammervold, and their law firms based upon the finding of civil contempt against them. In the alternative, the Court also awards these damages pursuant to Rule 37.02 of the Tennessee Rules of Civil Procedure and the inherent power of the Court. The Court finds the $113,500.64 in attorneys' fees and expenses related to *King v. Chase* and the other threatened litigation are reasonable in amount based upon the time and labor required and difficulty and complexity of the numerous factual and legal issues involved, and the contentiousness of the case. The Court finds the accuracy of this figure is supported by the sworn testimony of Charles Malone and Gayle Malone, as well as the monthly bills, documented on an entry-by-entry basis, evidencing the fees and expenses charged by Butler Snow to the Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc. in the *King v. Chase* matter.

654

(*See* Collective Tr. Exhibit 3, *Affidavit of Charles I. Malone*, Exhibit F; Nov. 9, 2017; Collective Tr. Exhibit 3, *Affidavit of Charles I. Malone*, at numbered ¶ 24, Nov. 9, 2017.) The Court also finds the factors analyzed above are applicable to those incurred in the *King v. Chase* action. Moreover, the Court finds the total attorneys' fees and expenses charged by Butler Snow in the *King v. Chase* matter and threatened litigation are reasonable and necessary based upon the time entries found in Butler Snow's monthly billing statements and considering the legal and factual questions at issue in *King v. Chase* and the threatened litigation, the complexity of each and the substantial investigation, motion practice, and hearing preparation required. Therefore, the Court finds the $113,500.64 in attorneys' fees and expenses that have been or will be paid to Butler Snow by the Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc. in the *King v. Chase* matter were incurred as a direct and proximate result of Mr. Manookian's and Mr. Hammervold's contemptuous and sanctionable conduct. Furthermore, these attorneys' fees and expense are reasonable in light of the circumstances of this case and are hereby awarded against Mr. Manookian, Mr. Hammervold, and their respective firms.

Ultimately, the Court awards $297,870.64 in reasonable attorneys' fees and expenses incurred by the Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc. in this matter for the period of January 2016 through September 30, 2017, awards $113,500.64 in reasonable attorneys' fees and expenses incurred by the Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc. in the *King v. Chase* matter, and grants the Non-Parties' Dean Chase, Sandra Chase, and D.F. Chase, Inc. request for leave of Court to supplement their *Affidavits* with the fees and expenses that were

incurred from the period of time from the preparation for the final hearing on November 9, 2017, which was not included in the *Affidavits*, to the entry of this *Memorandum and Order*. The total amount of attorneys' fees and expense of $411,371.28 are hereby awarded against Mr. Manookian, Mr. Hammervold, and their respective firms.

### 2. Waller Attorneys' Fees and Expenses

Next, the Non-Parties collectively also seek an award of damages damages in the form of attorneys' fees and expenses incurred from September 1, 2015 through October 18, 2017 by the Non-Parties due to Mr. Manookian's, Mr. Hammervold's, and their respective firms' contemptuous and sanctionable conduct and violations of the *Agreed Protective Order* and the Court's *Orders* regarding same.[68] The Court finds the accuracy of the this figure is supported by the sworn testimony of Marcus Crider of the relevant bills transmitted by Waller to the Non-Parties in this matter, as well as the monthly bills, documented on an entry-by-entry basis, for all of the relevant bills transmitted by Waller to the Non-Parties in this matter. (Collective Tr. Exhibit 3, *Affidavit of Marcus Crider*, Exhibit A, Nov. 9, 2017.)

The Court finds the attorneys' fees and expenses are reasonable. As explained by Mr. Crider in his *Affidavit*, Waller has been actively involved in the representation of the Non-Parties throughout the litigation since Mr. Manookian's July 20, 2015, and July 23, 2015 subpoenas to the Non-Parties. (Collective Tr. Exhibit 3, *Affidavit of Marcus Crider*, at ¶ 3, Nov. 9, 2017.) Specifically, Waller negotiated with Mr. Manookian and other defense counsel over the entry of the *Agreed Protective Order* prepared by Mr. Manookian; reviewed and produced numerous documents, correspondences,

---

[68] The Court notes total attorneys' fees are $177,660.00 and $13,664.84 in expenses. (Collective Tr. Exhibit 3, *Affidavit of Marcus Crider*, at numbered ¶ 12, Nov. 9, 2017.)

electronically-stored information and other discovery materials in accordance with the *Agreed Protective Order*; drafted pleadings relating to the entry of the *Agreed Protective Order*, the Court's subsequent oral and written orders regarding the same, and violations of said orders; and represented Dean Chase and Sandra Chase during the depositions. (Collective Tr. Exhibit 3, *Affidavit of Marcus Crider*, Exhibit A, Nov. 9, 2017.) Additionally, Waller prepared for and attended many hearings in these proceedings. Accordingly, with this background, the Court shall apply the factors set forth above. (*Id.*)

First, the Court finds the time, labor, and skill required to perform the legal services in this case were significant due to the complexity, the time required to respond to filings, and the adversaries in this matter.[69]

Second, in light of the time involved in representing the Non-Parties, the likelihood the particular employment would preclude other employment by the attorneys at Waller weighs in favor of the reasonableness of the fees.[70]

Third, the Court finds the fees charged by Waller to be customarily charged in this locality.[71] It appears Marcus Crider charged an hourly rate of $410.00 in 2015, an hourly rate of $425.00 in 2016, and a current hourly rate of $440.00. (Collective Tr. Exhibit 3, *Affidavit of Marcus Crider*, at numbered ¶ 2, Nov. 9, 2017.) Heath E. Edwards charged an hourly rate of $275.00 in 2015, an hourly rate of $305.00 in 2016, and a current hourly rate of $325.00. (*Id.* at numbered ¶ 5.) Chris Dunn charged an hourly rate of $400.00 in 2015, an hourly rate of $420 in 2016, and a current hourly rate of $430.00. (*Id.* at numbered ¶ 7.) Lastly, Shandra Wright, CEDS, and Michael Creath, CEDS,

---

[69] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(1).
[70] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(2).
[71] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(3).

657

although not attorneys but technical support each charged an hourly rate of $150.00. (*Id.* at numbered ¶ 8.) Based upon each attorney's level of experience, skill, and expertise in these matters, the Court finds the rates as typically charged in Williamson County and the surrounding area for similar legal services rendered.

Fourth, although these attorneys' fees and expenses are substantial, the Court finds this amount involved is reasonable to uncover the contemptuous conduct of Mr. Manookian and Mr. Hammervold and the result was favorable for the Non-Parties.[72]

Fifth, the Court also finds there were time limitations imposed by the circumstances for counsel of Waller to respond to pleadings and attend unnecessary hearings in which Mr. Manookian and Mr. Hammervold failed to appear for one reason or another.[73]

Sixth, the Court was unable to find the nature and length of the professional relationship between the attorneys at Waller and the Non-Parties for this factor's consideration.[74]

Seventh, the Court finds the Non-Parties' attorneys, Marcus Crider, Heath E. Edwards, and Chris Dunn, are in good standing with this Court and have superb experience, reputation, and ability as attorney to perform the legal services in this case.[75]

---

[72] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(4).
[73] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(5).
[74] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(6).
[75] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(7); *see* Collective Tr. Exhibit 3, *Affidavit of Marcus Crider*, at numbered ¶¶ 2-7, Nov. 9, 2017.

Eighth, as described above, the Waller attorneys charge reasonable rates compared to similar situated attorneys in Williamson County and the surrounding areas.[76]

Ninth, there is no evidence in the record of prior advertisements or statements by the attorneys as to their fees or whether the fee agreement is in writing.[77]

Therefore, the Court finds the $191,324.84 rendered for attorneys' fees and expenses incurred which have been or will be paid to Waller by the Non-Parties in this matter for legal representation from September 1, 2015 through October 8, 2017 due to Mr. Manookian's, Mr. Hammervold's, and their respective law firms' violations of the *Agreed Protective Order* and Court's *Orders* regarding the same are reasonable and necessary. Furthermore, these attorneys' fees and expense are reasonable in light of the circumstances of this case. Moreover, the attorneys from Waller are granted permission to supplement their requested attorneys' fees to reflect subsequent billable matters incurred from the period of time from the preparation for the final hearing on November 9, 2017, which was not included in Mr. Crider's *Affidavit*, to the entry of this *Memorandum and Order*. (*See* Collective Tr. Exhibit 3, *Affidavit of Marcus Crider,* at numbered ¶ 15, Nov. 9, 2017.)

Ultimately, these awards are based upon Mr. Manookian and Mr. Hammervold's civil contempt counts by violating the Court's *Orders*, specifically the *Order* of November 6, 2015 which was in effect at the time of the violations. Furthermore, in the alternative, these awards are also for sanctions against Mr. Manookian and Mr. Hammervold for

---

[76] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(8).
[77] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(9)&(10).

their abuse of the discovery process and failure to maintain candor with this Court throughout these proceedings.

## IV.    CONCLUSION

For the above reasons, the Court finds Mr. Manookian in civil contempt for knowingly, willfully, and intentionally violating the Court's Order of November 6, 2015 on seven separate occasions.

The Court also finds Mr. Hammervold knowingly, willfully, and intentionally violated the Court's *Order* of November 6, 2015 on one occasion when he used, released, and filed a confidential document in his representation of Mr. King in *King v. Chase.*

The Court finds due to Mr. Manookian's abuse of the discovery process, failure to maintain candor with this Court, continuous violations of the *Agreed Protective Order,* and attempt to defraud this Court, sanctions are also appropriate for these offenses under Rule 37.02 of the Tennessee Rules of Civil Procedure.

The Court also finds Mr. Hammervold's abuse of the discovery process, failure to maintain candor with this Court, continuous violations of the *Agreed Protective Order,* and attempt to defraud this Court for over two years, sanctions are also appropriate for these offenses under Rule 37.02 of the Tennessee Rules of Civil Procedure.

Accordingly, the Court makes the following recapitulation of the total of the reasonable attorneys' fees and expenses awarded to the Non-Parties:

1. The Court awards the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc.'s, reasonable attorneys' fees and expenses incurred by the representation of the attorneys at Butler Snow for the period of January 2016

through September 30, 2017 in the amount of $297,870.64 against Mr. Manookian, Mr. Hammervold, and their respective firms;

2. The Court awards the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc.'s, their reasonable attorneys' fees and expenses incurred by the representation of the attorneys at Butler Snow for the period in the *King v. Chase* matter in the amount of $133,500.64 against Mr. Manookian, Mr. Hammervold, and their respective firms;

3. The Court awards the sum of $191,324.84 for attorneys' fees rendered and expenses incurred which have been or will be paid to Waller by the Non-Parties in this matter for legal representation from September 1, 2015 through October 8, 2017 against Mr. Manookian, Mr. Hammervold, and their respective firms;

4. The Court grants the Non-Parties' request for leave of this Court to supplement their *Affidavits* with the fees rendered and expenses incurred from the period of time from the preparation for the final hearing on November 9, 2017, which was not included in the *Affidavits*, to the entry of this *Memorandum and Order.* The Non-Parties' attorneys shall prepare, file, and serve an affidavit listing these remaining attorneys' fees and expenses incurred in litigating this matter while also applying the factors set forth in Rule 8, RPC 1.5 of the Tennessee Rules of the Supreme Court, to each fee not later than Friday, July 27, 2018. The Respondents shall prepare, file, and serve a response in opposition not later than the close of business on Friday, August 10, 2018. The Court shall decide the issue of the supplemental

attorneys' fees on the papers unless either party requests a hearing for good cause, in which event, the matter shall be set on the Court's regularly scheduled civil motion docket.

**THEREFORE**, the Court awards the total sum of **$622,696.12** as reflected above to the Non-Parties, CK Global, LLC; NV Music Row, LLC; Dean Chase, Sandra Chase, and D.F. Chase, Inc., to be paid by Respondents, Brian Manookian; Cummings Manookian, PLC; Mark Hammervold; and Hammervold Law, PLC, as a result of the findings herein.

This *Memorandum and Order*, together with an Order deciding Non-Parties' supplemental request for assessment of reasonable attorneys' fees and expenses shall constitute a Final Judgment within the meaning of Rule 54.01 of the Tennessee Rules of Civil Procedure from which the parties may appeal as a matter of right pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure.

This Court shall refer to the Board of Professional Responsibility the conduct of Mr. Brian Manookian and Mr. Mark Hammervold. This Court shall also refer to the District Attorney General's Office of the 21st Judicial District the conduct of Mr. Brian Manookian and Mr. Mark Hammervold.

**IT IS SO ORDERED.**

**ENTERED** this _20th_ day of July, 2018.

Michael W. Binkley
**Circuit Court Judge/Chancellor, Division III**

Page **118** of **122**

## CLERK'S CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing Memorandum and Order as entered by the Court has been forwarded postage prepaid, and/or emailed, and/or faxed, to:

Philip L. Robertson, Esq. (BPR No. 021668)
Brittany M. Bartkowiak, Esq. (BPR No. 031637)
Robertson Law Group
1896 General George Patton, Suite 600
Franklin, TN 37067
t. 615.656.1729
e. probertson@robertsonlg.com
e. brittany@robertsonlg.com
e. bspeight@robertsonlg.com
*Counsel for Plaintiff, David Chase*

Robert F. Parsley, Esq. (BPR No. 023819)
Michael J. Dumitru, Esq. (BPR No. 030140)
Miller & Martin
832 Georgia Avenue, Suite 1000
Chattanooga, TN 37402-2289
t. 423.756.6600
f. 423. 785.8480
e. bob.parsley@millermartin.com
e. michael.dumitru@millermartin.com
*Counsel for Defendant Andy Cho*

Brian Cummings, Esq. (BPR No. 019354)
Brian Manookian, Esq. (BPR No. 026455)
Cummings Manookian
45 Music Square West
Nashville, TN 37203
t. 615.266.3333
t. 615.266.0226
f. 615.266.0250
e. bmanookian@cummingsmanookian.com
e. brian.manookian@cmtriallawyers.com
e. bcummings@cummingsnaookian.com
*Counsel for Defendants Chris Stewart, Emily Stewart, Susan Martin, Clayton Mckenzie, Bryan Everett, and Lino Lovrenovic*

**[Clerk's Certificate of Service continued on next page]**

663

Rob McGuire, Esq. (BPR No. 021594)
Assistant United States Attorney
United States Attorney's Office
Middle District of Tennessee
110 Ninth Avenue South Ste A961
Nashville, TN 37203
*Former Counsel for Defendant Lauren Bull*

Mark Hammervold, Esq. (BPR No. 031147)
315 Deaderick Street Ste 1550
Nashville, TN 37238-3003
t. 615.928.2466
m. 615.509.0372
mark@hammervoldlaw.com
*Counsel for Bryan Everett, Susan Martin, Lino Lovrenovic & Clayton
   McKenzie*

Gayle I. Malone, Jr., Esq. (BPR No. 002388)
Charles I. Malone, Esq. (BPR No. 022904)
Gibeault "Beau" C. Creson, Esq. (BPR No. 03049)
Butler Snow, LLP
150 Third Avenue South, Suite 1600
Nashville, TN 37201
t. 615.651.6782
f. 615.651.6701
e. gayle.malone@butlersnow.com
e. charlie.malone@butlersnow.com
e. beau.creson@butlersnow.com
*Counsel for Intervenors D.F. Chase, Inc. Dean Chase, and Sandra Chase*

Marcus M. Crider, Esq. (BPR No. 018608)
Heath H. Edwards, Esq. (BPR No. 034076)
Frances Fenelon, Esq. (BPR No. 017315)
Christopher S. Dunn, Esq. (BPR No. 017067)
Waller
511 Union Street, Suite 2700
Nashville, TN 37219
t. 615.850.8067
f. 615.244.6804
e. marcus.crider@wallerlaw.com
e. heath.edwards@wallerlaw.com
e. chris.dunn@wallerlaw.com
e. frances.fenelon@waller.law.com
*Counsel for Intervenor Meredith Corp.*
**[Clerk's Certificate of Service continued on next page]**

664

Ronald G. Harris, Esq. (BPR No. 009054)
Neal & Harwell
1201 Demonbreaum Street Ste 1000
Nashville, TN 37203
t. 615.244.1713
f. 615.726.0573
e. rharris@nealharwell.com
*Counsel for Intervenor Scripps Media Inc.*

James D. Kay, Jr. (BPR No. 011556)
John B. Enkema, Esq. (BPR No. 016670)
Kay, Griffin, Enkema & Colbert PLLC
222 Second Ave. North Ste 340M
Nashville, TN 37201
t. 615.742.4800
f. 615.742.4801
e. john.enkema@kaygriffin.com
e. jim.kay@kaygriffin.com
*Counsel for Intervenor Glenn Funk*

David T. Hooper, Esq. (BPR No. 005413)
Hooper Zinn McNamee PLLC
109 Westpark Drive, Suite 300
Brentwood, TN 37027
t. 615.661.5472
f. 615.661.5473
e. dhooper@hooperzinn.com
*Counsel for Defendant Jason Ritzen*

John Phillip Williams, Esq. (BPR No. 000531)
Tune, Entrekin & White P.C.
315 Deaderick Street, Suite 1700
Nashville, TN 37238
t. 615.244.2770
f. 615.244.2778
e. jwilliams@tewlawfirm.com
*Attorney for the Nashville Scene*

**[Clerk's Certificate of Service continued on next page]**

665

Paul R. McAdoo, Esq. (BPR No. 034066)
Aaron & Sanders, PLLC
810 Dominican Drive Ste 208
Nashville, TN 37228-1906
t. 615.734.1188
f. 615.250.9807
e. paul@aaronsanderslaw.com
Attorneys for Meredith Corporation, owner
    and Operator of WSMV Channel 4 Nashville

This the 20th day of July, 2018.

_Augio Williams 4c_

**Circuit Court Clerk**

**[END OF DOCUMENT]**

Page 122 of 122

## Deborah Rubenstein - Court date offered

**From:** Deborah Rubenstein
**To:** Chase v. Stewart
**Date:** 2/3/2017 11:28 AM
**Subject:** Court date offered
**Bc:** Mike Binkley; Barton, Cathy; Woodruff, Judge.Joseph; Williams, Angie

Counsel,

Judge Binkley would like to offer to you Thursday, March 2, 2017 for the continuation of the Chase v. Stewart matter, which was "bumped" on Wednesday, February 1, 2017, due to the first setting trial going forward. The Chase case would be a first setting on March 2, 2017.

Please get together and see if this date is available for everyone and let me know.

Thank you.


Debbie Rubenstein, PLS
Judicial Legal Assistant
Circuit Court Judge Michael W. Binkley
State of Tennessee, 21st Judicial District
135 Fourth Avenue South, Ste 286
Franklin, TN 37064
Direct: 615.599.4014
Office: 615.425.4009
Fax: 615.790.5047
NALS Editorial Board 2014-2015/2015-2016
**LEGAL CONFIDENTIAL: The information in this email and in any attachments hereto may contain information which is privileged either legally or otherwise. It is intended only for the attention and use of the named recipient. If you are not the intended recipient, you are not authorized to retain, disclose, copy or distribute the message and/or any of its attachments. If you received this email in error, please notify me and delete this message.**



EXHIBIT "A"
is an Exhibit referenced in footnote 40,
p. 35 of 123

EXHIBIT
_A_

file:///C:/Users/aocuser/AppData/Local/Temp/XPgrpwise/58946956William1tnciswm1100... 7/10/2018
Case 3:19-bk-07235 Claim 5-1 Part 4 Filed 03/30/20 Desc Exhibit July 2018
Sanctions Judgment Page 123 of 124

667

RECEIVED
SEP 2 8 2018
CIRCUIT COURT

IN THE CIRCUIT COURT FOR WILLIAMSON COUNTY, TENNESSEE
AT FRANKLIN

DAVID CHASE,                                )
                                            )
        PLAINTIFF,                          )
                                            )
VS.                                         )          CASE NO. 2015-200
                                            )
CHRIS STEWART, EMILY STEWART,               )
LAUREN BULL, ANDY CHO, LINO                 )          FILED Sept. 27, 18
LOVRENOVIC, BRYAN EVERETT,                  )
SUSAN MARTIN, and CLAYTON                   )          ENTERED BOOK_____ PAGE____
MACKENZIE,                                  )          DEBBIE McMILLIAN BARRETT
                                            )
        DEFENDANTS.                         )

## ORDER ON SUPPLEMENTAL ATTORNEYS' FEES AND EXPENSES AWARD

This matter came before the Court upon Petitioners' Dean Chase, Sandra Chase, and D.F. Chase, Inc. *Petition for Civil Contempt and Motion for Sanctions* filed on April 11, 2016, as well as the *Motion for Sanctions* filed by Non-Parties CK Global, LLC and NV Music Row, LLC (hereinafter collectively referred to as "Non-Parties"), against Respondents, Brian Manookian; Cummings Manookian, PLC; Mark Hammervold; and Hammervold Law, PLC (hereinafter collectively referred to as "Respondents"). The Court held an evidentiary hearing on September 23, 2016 and November 9, 2017. Accordingly, the Court entered its *Memorandum and Order* on July 20, 2018 disposing of all issues except for the Non-Parties' request for an award of supplemental attorneys' fees incurred from the period of time from the preparation for the final hearing on November 9, 2017 to the entry of this Court's *Memorandum and Order* of July 20, 2018. The Court heard oral arguments as to the Non-Parties' request

Page **1** of **13**

Case 3:19-bk-07235   Claim 5-1 Part 5   Filed 03/30/20   Desc Exhibit September 2018
Supplemental Sanctions Judgment   Page 1 of 13

669

for supplemental attorneys' fees regarding the reasonableness of these fees on September 25, 2018.

## I.  BRIEF PROCEDURAL HISTORY

The Court finds a brief procedural history since the entry of the Court's *Memorandum and Order* of July 20, 2018 is necessary to preserve the record of this case.

On July 27, 2018, Marcus Crider, Esq., the billing attorney for the representation of Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc., CK Global, LLC, and NV Music Row, LLC, filed his *Affidavit of Marcus Crider* regarding the supplemental attorneys' fees request. On the same day, Charles I. Malone, Esq. and Gayle I. Malone, Jr., Esq., the billing attorneys for the representation of Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc., filed their *Non-Parties' Notice of Filing of Supplemental Affidavits*.[1] On August 10, 2018, Respondents Mark Hammervold and Hammervold PLC (hereinafter collectively referred to as "Hammervold") filed a *Response in Opposition and Objection to Supplemental Affidavits Filed in Support of Supplemental Award for Attorney Fees and Expenses*. In addition, Respondents Brian Manookian and Cummings Manookian, PLC (hereinafter referred to collectively as "Manookian") filed a *Response in Opposition and Objections to Supplemental Affidavits Filed in Support [sic] Supplemental Award For Attorney Fees and Expenses.*

Additionally, on August 10, 2018, the Court entered a *Supplemental Order*, pursuant to 201 of the Tennessee Rules of Evidence, requesting the parties to brief and submit their positions in regard to whether the Court was authorized to take judicial

---

[1] This filing attached the following affidavits: (1) *The Supplemental Affidavit of Charles I. Malone*, and (2) *The Supplemental Affidavit of Gayle I. Malone, Jr.*

Case 3:19-bk-07235   Claim 5-1 Part 5   Filed 03/30/20   Desc Exhibit September 2018
Supplemental Sanctions Judgment   Page 2 of 13

670

notice of the *Opinion and Order Regarding Sanctions* entered on August 3, 2017 in *Diamond Consortium, Inc. v. Manookian*, No. 4:16CV94-ALM, 2017 WL 3301527 (E.D. Tex. Aug. 3, 2017) against Respondents Brian Manookian and Cummings Manookian, PLC in a similar case.

On August 16, 2018, Defendant Andy Cho filed his *Response*, stating he takes no position on the issue. On August 17, 2018, Hammervold filed his *Brief and Position RE: Court's August 10, 2018 Supplemental Order*, in which he submitted his opposition to the Court taking judicial notice of the matter. Also, on the same day, Manookian filed his *Brief and Request for Hearing Regarding the Proprietary of this Court Taking Judicial Notice of the Matters Raised by this Court's August 10, 2018 Order.*[2] Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc. filed their *Positional Brief in Response to the Court's August 10, 2018 Supplemental Order*, in which they argued the Court is permitted to take judicial notice of the referenced order as it is a fact that is "not subject to reasonable dispute, in that it is . . . capable of accurate and ready determination by resort to source whose accuracy cannot reasonably be questioned"; however, Non-Parties also contended taking judicial notice was unnecessary due to the Court's findings in its *Memorandum and Order* of July 20, 2018. *See* Tenn. R. Evid. 201(b)(2).

Subsequently, on August 28, 2018, the Court entered an *Order* based upon a request from Respondent Brian Manookian (hereinafter referred to as "Mr. Manookian"), through the Circuit Court Clerk's Office for Williamson County, Tennessee, to obtain certain information from the court file in this case, which was and currently is under seal. In this *Order*, the Court simply directed Mr. Manookian to follow the Tennessee Rules of

---

[2] The Court notes Mr. Manookian failed to properly request to set this matter for a hearing.

Case 3:19-bk-07235   Claim 5-1 Part 5   Filed 03/30/20   Desc Exhibit September 2018 Supplemental Sanctions Judgment   Page 3 of 13

671

Civil Procedure and file a motion for his request for certain information in the court file which was under seal. Such procedure would be necessary for any party or counsel of record to review the case file. Accordingly, Mr. Manookian filed a *Motion for Access to Case Records* on August 28, 2018, yet Mr. Manookian again failed to set the matter for hearing or request a proper date to set the hearing, which is the custom in the Twenty-First Judicial District on such matter.

Mr. Manookian then filed his *Third Motion for Recusal* on September 21, 2018.[3] On September 24, 2018, Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc. filed their *Response to Brian Manookian and Cummings Manookian, PLC's Third Motion for Recusal*. In accordance with Rule 10B of the Tennessee Supreme Court Rules and due to the brief amount of time to respond in light of the setting of the hearing regarding the reasonableness of the supplemental attorneys' fees on September 25, 2018, the Court filed its *Response and Order* on September 25, 2018 and denied Mr. Manookian's *Third Motion for Recusal* stating in writing the grounds.

Ultimately, the Court continued and heard the matter regarding the reasonableness of Non-Parties' request for supplemental attorneys' fees on September 25, 2018.

## II.    DISCUSSION

At the outset of the hearing on September 25, 2018, Mr. Manookian asserted two objections to the proceedings. First, Mr. Manookian objected to not being provided this

---

[3] The Court notes pursuant to Rule 10B of the Tennessee Supreme Court Rules any party seeking recusal of a judge can do so by submitting "a timely filed written motion"; however, the Court inquires whether Mr. Manookian's *Third Motion for Recusal* was timely in light of the delay to submit these allegations and only providing the Court with one business day to respond prior to the hearing set on September 25, 2018, which required a Court order to set due to the parties' scheduling conflicts. TN R S CT Rule 10B.

Page 4 of 13

Case 3:19-bk-07235    Claim 5-1 Part 5    Filed 03/30/20    Desc Exhibit September 2018
Supplemental Sanctions Judgment    Page 4 of 13

672

Court's previously entered *Response and Order* on September 25, 2018 denying Mr. Manookian's *Third Motion for Recusal* prior to the hearing. However, the Court notes with the short period of time it had to prepare a response to Mr. Manookian's *Motion*, the Court merely filed its *Response and Order* denying Mr. Manookian's *Motion* with the Williamson County Circuit Court Clerk prior to beginning the hearing set on September 25, 2018, at 3:00 p.m., in accordance with Rule 10B of the Tennessee Supreme Court Rules. At the hearing, the Court explained to all of the parties and legal counsel that the Court had entered a *Response and Order* denying the *Motion* and there would be no further delay in concluding this matter. The Court also finds it pertinent to address the fact the matter scheduled for a hearing was on the award of supplemental attorneys' fees and in no way was relevant to the disposition of Mr. Manookian's previously requested *Third Motion for Recusal*.

Second, Mr. Manookian objected to his inability to review the court file, which was and currently is under seal. In support, Mr. Manookian argued he had filed a *Motion for Access to Case Records* on August 28, 2018 pursuant to the *Order* of August 28, 2018, but was never allowed to review the court file. While the Court recognizes the court file was under seal and all parties and counsel would need to file a motion to review the court file, to Mr. Manookian properly adhered to, it is apparent Mr. Manookian failed procedurally to properly set this matter for adjudication before this Court and allow a response to be filed by his opposing counsel. Nonetheless, at the hearing, the Court was willing to hear the *Motion* after the supplemental attorneys' fees matter was resolved, even though it was not properly set.

Case 3:19-bk-07235   Claim 5-1 Part 5   Filed 03/30/20   Desc Exhibit September 2018
Supplemental Sanctions Judgment   Page 5 of 13

673

Upon the Court's determination of Mr. Manookian's objections, Mr. Manookian decided to unilaterally excuse himself from the hearing and did not cross-examine any of the attorneys regarding their supplemental attorneys' fees requests.

Consequently, the hearing continued and Mr. Hammervold questioned both Marcus Crider, Esq. and Charles Malone, Esq. The Tennessee Supreme Court Rule 8, Rule 1.5 of the Rules of Professional Conduct, provides the factors a Court must consider in determining reasonableness of an attorney's fees and states:

(a) A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;

(8) whether the fee is fixed or contingent;

(9) prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and

Page 6 of 13

Case 3:19-bk-07235   Claim 5-1 Part 5   Filed 03/30/20   Desc Exhibit September 2018 .
Supplemental Sanctions Judgment   Page 6 of 13

674

(10) whether the fee agreement is in writing . . . .

Tenn. R. S. Ct. Rule 8, RPC 1.5.

Based upon the cross-examinations, a review of the *Supplemental Affidavits of Gayle Malone, Jr,, Esq., Charles Malone, Esq., and Marcus Crider, Esq.* and the Court's previous determinations regarding the attorneys and their attorneys' fees for representing Non-Parties in the *Memorandum and Order* of July 20, 2018, the Court finds as follows: (1) the attorneys' fees and expenses from October 1, 2017 through December 31, 2017 of Butler Snow, LLP, which were submitted by Charles I. Malone and Gayle I. Malone, Jr., Esq. on behalf of Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc., in the amount of **$110,663.39**, to be reasonable under the Tennessee Supreme Court Rule 8, Rule 1.5 of the Rules of Professional Conduct and necessary for the prosecution of Respondents' contemptuous and sanctionable misconduct; and (2) the attorneys' fees and expenses from October 1, 2017 through January 22, 2018 of Waller Lansden Dortch & Davis, LLP, which were submitted by Marcus Crider, Esq. on behalf of Non-Parties Dean Chase, Sandra Chase, and D.F. Chase Inc., CK Global, LLC, and NV Music Row, LLC, in the amount of **$15,409.70**, to be reasonable under the Tennessee Supreme Court Rule 8, Rule 1.5 of the Rules of Professional Conduct and necessary for the prosecution of Respondents' contemptuous and sanctionable misconduct. The Court incorporates by reference its ruling set forth in the *Memorandum and Order* of July 20, 2018 regarding the requested attorneys' fees and expenses., as if fully set forth herein.

**[Space intentionally left blank]**

Page 7 of 13

Case 3:19-bk-07235   Claim 5-1 Part 5   Filed 03/30/20   Desc Exhibit September 2018
Supplemental Sanctions Judgment   Page 7 of 13

675

### III. CONCLUSION

For the reasons set forth above and in the Court's *Memorandum and Order* of July 20, 2018, the Court awards Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc. their reasonable attorneys' fees and expenses incurred by the representation of the attorneys at Butler Snow, LLP in the amount of **$110,663,39** for the period of October 1, 2017 through December 31, 2017 against Respondents Brian Manookian; Cummings Manookian, PLC; Mark Hammervold; and Hammervold Law, PLC.

The Court awards Non-Parties Dean Chase, Sandra Chase, and D.F. Chase Inc., CK Global, LLC, and NV Music Row, LLC their reasonable attorneys' fees and expenses incurred by the representation of the attorneys at Waller Lansden Dortch & Davis, LLP in the amount of **$15,409.70** for the period of October 1, 2017 through January 22, 2018 against Respondents Brian Manookian; Cummings Manookian, PLC; Mark Hammervold; and Hammervold Law, PLC.

As a result of this *Order on Supplemental Attorneys' Fees and Expenses Award* and the *Memorandum and Order* of July 20, 2018, the total award of attorneys' fees and expenses against Respondents Brian Manookian; Cummings Manookian, PLC; Mark Hammervold; and Hammervold Law, PLC is in the amount of **$748,769.21**.

Furthermore, the Court greatly appreciates the scholarship of the attorneys in this case in preparing briefs regarding whether the Court could take judicial notice of the *Opinion and Order Regarding Sanctions* entered on August 3, 2017 in *Diamond Consortium, Inc. v. Manookian*, No. 4:16CV94-ALM, 2017 WL 3301527 (E.D. Tex. Aug. 3, 2017). Upon review of these submissions, the Court declines to take judicial notice of

Case 3:19-bk-07235   Claim 5-1 Part 5   Filed 03/30/20   Desc Exhibit September 2018
Supplemental Sanctions Judgment   Page 8 of 13

676

this matter and has based its decisions in the *Memorandum and Order* of July 20, 2018 and this *Order on Supplemental Attorneys' Fees and Expenses Award* entirely on the evidence presented at the hearings and the legal authority cited therein.

This *Order on Supplemental Attorneys' Fees and Expenses Award* and the *Memorandum and Order* of July 20, 2018, together constitute a Final Judgment pursuant to Rule 54.01 of the Tennessee Rules of Civil Procedure, upon the express determination that there is no just reason for delay.

**IT IS SO ORDERED.**

ENTERED this ___ day of September 2018.

**Michael W. Binkley**
**Circuit Court Judge/Chancellor, Division III**

Page **9** of **13**

Case 3:19-bk-07235    Claim 5-1 Part 5    Filed 03/30/20    Desc Exhibit September 2018
Supplemental Sanctions Judgment    Page 9 of 13

677

## CLERK'S CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing *Order on Supplemental Attorneys' Fees and Expenses Award* as entered by the Court has been forwarded postage prepaid, and/or emailed, and/or faxed, to:

Philip L. Robertson, Esq. (BPR No. 021668)
Brittany M. Bartkowiak, Esq. (BPR No. 031637)
Robertson Law Group
1896 General George Patton, Suite 600
Franklin, TN 37067
t. 615.656.1729
e. probertson@robertsonlg.com
e. brittany@robertsonlg.com
e. bspeight@robertsonlg.com
*Counsel for Plaintiff, David Chase*

Robert F. Parsley, Esq. (BPR No. 023819)
Michael J. Dumitru, Esq. (BPR No. 030140)
Miller & Martin
832 Georgia Avenue, Suite 1000
Chattanooga, TN 37402-2289
t. 423.756.6600
f. 423. 785.8480
e. bob.parsley@millermartin.com
e. michael.dumitru@millermartin.com
*Counsel for Defendant Andy Cho*

Brian Cummings, Esq. (BPR No. 019354)
Brian Manookian, Esq. (BPR No. 026455)
Cummings Manookian
45 Music Square West
Nashville, TN 37203
t. 615.266.3333
t. 615.266.0226
f. 615.266.0250
e. bmanookian@cummingsmanookian.com
e. brian.manookian@cmtriallawyers.com
e. bcummings@cummingsnaookian.com
*Counsel for Defendants Chris Stewart, Emily Stewart, Susan Martin, Clayton Mckenzie, Bryan Everett, and Lino Lovrenovic*

**[Clerk's Certificate of Service is continued on next page]**

Page **10 of 13**

Case 3:19-bk-07235   Claim 5-1 Part 5   Filed 03/30/20   Desc Exhibit September 2018
Supplemental Sanctions Judgment    Page 10 of 13

678

Rob McGuire, Esq. (BPR No. 021594)
Assistant United States Attorney
United States Attorney's Office
Middle District of Tennessee
110 Ninth Avenue South Ste A961
Nashville, TN 37203
*Former Counsel for Defendant Lauren Bull*

Mark Hammervold, Esq. (BPR No. 031147)
315 Deaderick Street Ste 1550
Nashville, TN  37238-3003
t. 615.928.2466
m. 615.509.0372
mark@hammervoldlaw.com
*Counsel for Bryan Everett, Susan Martin, Lino Lovrenovic & Clayton*
*McKenzie*

Gayle I. Malone, Jr., Esq. (BPR No. 002388)
Charles I. Malone, Esq.  (BPR No. 022904)
Gibeault "Beau" C. Creson, Esq. (BPR No. 03049)
Butler Snow, LLP
150 Third Avenue South, Suite 1600
Nashville, TN 37201
t. 615.651.6782
f. 615.651.6701
e. gayle.malone@butlersnow.com
e. charlie.malone@butlersnow.com
e. beau.creson@butlersnow.com
*Counsel for Intervenors D.F. Chase, Inc. Dean Chase, and Sandra Chase*

Marcus M. Crider, Esq. (BPR No. 018608)
Heath H. Edwards, Esq. (BPR No. 034076)
Frances Fenelon, Esq. (BPR No. 017315)
Christopher S. Dunn, Esq. (BPR No. 017067)
Waller
511 Union Street, Suite 2700
Nashville, TN 37219
t. 615.850.8067
f. 615.244.6804
e. marcus.crider@wallerlaw.com
e. heath.edwards@wallerlaw.com
e. chris.dunn@wallerlaw.com
e. frances.fenelon@waller.law.com
*Counsel for Intervenor Meredith Corp.*
          **[Clerk's Certificate of Service is continued on next page]**

679

Ronald G. Harris, Esq. (BPR No. 009054)
Neal & Harwell
1201 Demonbreaum Street Ste 1000
Nashville, TN 37203
t. 615.244.1713
f. 615.726.0573
e. rharris@nealharwell.com
*Counsel for Intervenor Scripps Media Inc.*

James D. Kay, Jr. (BPR No. 011556)
John B. Enkema, Esq. (BPR No. 016670)
Kay, Griffin, Enkema & Colbert PLLC
222 Second Ave. North Ste 340M
Nashville, TN 37201
t. 615.742.4800
f. 615.742.4801
e. john.enkema@kaygriffin.com
e. jim.kay@kaygriffin.com
*Counsel for Intervenor Glenn Funk*

David T. Hooper, Esq. (BPR No. 005413)
Hooper Zinn McNamee PLLC
109 Westpark Drive, Suite 300
Brentwood, TN 37027
t. 615.661.5472
f. 615.661.5473
e. dhooper@hooperzinn.com
*Counsel for Defendant Jason Ritzen*

John Phillip Williams, Esq. (BPR No. 000531)
Tune, Entrekin & White P.C.
315 Deaderick Street, Suite 1700
Nashville, TN 37238
t. 615.244.2770
f. 615.244.2778
e. jwilliams@tewlawfirm.com
*Attorney for the Nashville Scene*

**[Clerk's Certificate of Service is continued on next page]**

Page 12 of 13

Case 3:19-bk-07235    Claim 5-1 Part 5    Filed 03/30/20    Desc Exhibit September 2018
Supplemental Sanctions Judgment    Page 12 of 13

680

Paul R. McAdoo, Esq. (BPR No. 034066)
Aaron & Sanders, PLLC
810 Dominican Drive Ste 208
Nashville, TN  37228-1906
t. 615.734.1188
f. 615.250.9807
e. paul@aaronsanderslaw.com
Attorneys for Meredith Corporation, owner
  and Operator of WSMV Channel 4 Nashville

This the 28 day of September, 2018.

_____
**Circuit Court Clerk**

FILED

02/04/2021

Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### January 7, 2020 Session

## DAVID CHASE v. CHRIS STEWART ET AL.

**Appeal from the Circuit Court for Williamson County**
**No. 2015-200      Michael Binkley, Judge**

---

### No. M2018-01991-COA-R3-CV

---

A trial court held two attorneys in contempt, assessing damages and sanctions against them. Shortly before another hearing in which the court was to consider a supplemental award of attorney's fees, the judge of the trial court made comments in an unrelated case about one of the attorneys held in contempt. That attorney moved to recuse based, in part, on the judge's comments. The trial court denied the motion to recuse and later entered a supplemental order of damages against the attorneys. Because the judge's comments provide a reasonable basis for questioning his impartiality, we reverse the denial of the motion to recuse. And because retroactive recusal is appropriate, we also vacate the contempt and damages orders.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Vacated**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which ANDY D. BENNETT, J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Brian P. Manookian, Nashville, Tennessee, pro se appellant.

Mark Andrew Hammervold, Elmhurst, Illinois, pro se appellant.

Brian P. Manookian, Nashville, Tennessee, for the appellant, Cummings Manookian PLC.

Mark Andrew Hammervold, Elmhurst, Illinois, for the appellant, Hammervold Law, PLC.

Gayle I. Malone, Jr., Charles I. Malone, and Beau C. Creson, Nashville, Tennessee, for the appellees, Dean Chase, Sandra Chase, and D.F. Chase, Inc.

Marcus M. Crider and Heath H. Edwards, Nashville, Tennessee, for the appellees, CK Global, LLC and NV Music Row, LLC.

## OPINION

### I.

### A.

In this consolidated appeal, we review the trial court's denial of a motion to recuse and its orders holding in contempt and sanctioning two attorneys, Brian Manookian and Mark Hammervold, and their respective law firms, Cummings Manookian PLC[1] and Hammervold Law, PLC. The orders on appeal arise from, but have little to do with, a case filed by David Chase ("Plaintiff") against multiple defendants. Mr. Manookian and Mr. Hammervold represented several of the defendants. Purportedly to defeat an element of the malicious prosecution claim brought by Plaintiff and to prove Plaintiff had not suffered reputational harm, Mr. Manookian subpoenaed individuals and entities that were not parties to the case. The non-parties included Plaintiff's parents, Dean Chase and Sandra Chase; and entities to which Plaintiff had some connection, D.F. Chase, Inc.; CK Global, LLC; and NV Music Row, LLC. Mr. Manookian also sought deposition testimony from Plaintiff's parents.

Wanting to protect confidential information, Dean Chase; Sandra Chase; D.F. Chase, Inc.; CK Global, LLC; and NV Music Row, LLC (collectively, "Petitioners") proposed an agreed protective order before responding to the subpoenas or submitting to the depositions. And, after negotiations, counsel reached an agreement on the terms of the protective order. Among other things, the proposed order defined confidential information, provided methods for both designating information as "confidential" and challenging such designations, and restricted the indiscriminate or mass designation of information as "confidential."

Counsel for Petitioners then proposed that the document production could proceed provided that Mr. Manookian would agree that the production was subject to the protective order despite it not being entered by the court. Mr. Manookian responded: "I agree that the Order is binding on me and my clients at the time it is signed with permission as opposed to entered by the Court." So counsel for Petitioners filed the proposed agreed protective order with the court. The same day, Petitioners produced

---

[1] After briefing in this appeal, Cummings Manookian PLC filed a voluntary bankruptcy petition for relief under Chapter 7 of Title 11 of the United States Code in the United States Bankruptcy Court for the Middle District of Tennessee. Late last year, the Chapter 7 Trustee reported that "it is unforeseeable that the bankruptcy case will be resolved before April, 2021, at the earliest."

2

over 78,000 pages of documents in response to the subpoenas. Petitioners designated all of the documents as "confidential" under the proposed agreed protective order. In a cover letter, counsel for Petitioners stated that, while they "realize[d] that the Protective Order cautioned against mass designation of documents as 'confidential' . . . it would have been unduly burdensome upon our clients to review each of the . . . documents . . . ." Counsel for Petitioners offered to conduct a page-by-page review if Mr. Manookian's clients would pay for it. Counsel alternatively suggested that Mr. Manookian's clients could challenge any "confidential" designation to a specific document or documents.

Mr. Manookian objected to the mass designation and, in a filing with the court, withdrew his consent to the proposed agreed protective order. But, a few days later, he made another filing requesting that the court enter the proposed agreed protective order. Petitioners then filed a motion requesting the entry of a protective order and that the court sustain its confidentiality designations. They set the motion for hearing on October 30, 2015.

Before the hearing took place, Mr. Manookian filed documents and excerpts from the deposition transcripts of Dean and Sandra Chase, all of which had been designated as "confidential," in response to a motion filed by Plaintiff. Counsel for Petitioners appeared at an October 20, 2015 hearing on Plaintiff's motion and made an oral motion. Counsel requested that the court treat as confidential all documents already produced by Petitioners, as well as the deposition testimony of Dean and Sandra Chase. Counsel also requested that the response filed by Mr. Manookian, including the exhibits, be kept under seal. The court granted the oral motion.

At the October 30, 2015 hearing, the court again ruled in favor of Petitioners and ordered that "all pleadings or documents containing, attaching, or referencing documents, testimony, or information designated as confidential . . . were to be filed under seal." And the court "adopted,"[2] with modifications, the proposed agreed protective order. The court ordered that documents designated as "confidential" be protected consistent with the terms of the agreed protective order. The court's oral rulings at the October 20 and October 30 hearings were reflected in written orders entered on November 7, 2015, and November 6, 2015, respectively.

B.

On February 25, 2016, Dean Chase, Sandra Chase, and D.F. Chase, Inc. moved for sanctions. They claimed that, on February 3, 2016, confidential materials, including video recordings of Dean Chase's and Sandra Chase's deposition testimony, were

---

[2] It is unclear if the court entered the proposed agreed protective order.

3

featured on two television news broadcasts and were also published online. And other media outlets had published stories using the same materials.

While the motion did not specifically allege that either Mr. Manookian or Mr. Hammervold provided the confidential materials to the media, it blamed the pair for use of confidential documents in separate litigation they had filed on behalf of another client against Dean Chase. The motion asked the court to identify who had violated its previous orders and to hold those parties or counsel in contempt and award costs, attorney's fees, and other expenses.

Following a hearing on the motion for sanctions, the court entered an order identifying four attorneys "whose actions in this matter strongly indicate violations of Tennessee Rule of Civil Procedure 37.02 and possible contempt of the orders of th[e] Court." The court granted leave to those "affected by alleged violations of Tennessee Rule of Civil Procedure 37.02 and violations of the corresponding Court Orders [to] file appropriate pleadings for sanctions, listing specifically each violation alleged to have occurred and the specific injury inflicted upon each party." Petitioners did so against three attorneys, including Mr. Manookian and Mr. Hammervold and their respective law firms.

After the hearing, the trial court found Mr. Manookian and Mr. Hammervold in contempt. The court found Mr. Manookian in contempt for using confidential materials in preparing, strategizing, and negotiating the separate lawsuit and in attaching a confidential document to a pleading in that lawsuit. And the trial court also found that Mr. Manookian had disclosed confidential materials to the media after the court had ordered that such documents not be disclosed. The trial court found Mr. Hammervold in contempt for allowing the filing of the confidential document in the separate lawsuit. Though Mr. Manookian made the filing, Mr. Hammervold was his co-counsel. As such, the court held that Mr. Hammervold was responsible as well.

The trial court also sanctioned Mr. Manookian and Mr. Hammervold under Tennessee Rule of Civil Procedure 37.02. The trial court first sanctioned both attorneys for the same actions for which it had found them in contempt. The court then found other actions of the two attorneys sanctionable. As to Mr. Manookian, the trial court sanctioned him for disclosing confidential materials to law enforcement and three attorneys not involved in the case before the court issued any ruling on the protective order. The court categorized those actions as an abuse of discovery. The court also found that he was not candid with the court and attempted to defraud the court. As to Mr. Hammervold, the trial court sanctioned him for Mr. Manookian's disclosure to the media. The court found that Mr. Hammervold "had knowledge of and was complicit in concealing the improper disclosure" from the court. The court reasoned that Mr. Hammervold had also abused the discovery process, failed to be candid with the court, and attempted to defraud the court.

4

Based on its finding of contempt—and, alternatively, its finding of sanctionable conduct—the trial court awarded damages to Petitioners in the form of attorney's fees and expenses against Mr. Manookian and Mr. Hammervold and their respective law firms. Considering affidavits filed by Petitioners' attorneys, the court awarded Petitioners $622,696.12. The trial court also granted counsel for Petitioners leave to supplement their affidavits with fees incurred for time spent preparing for the contempt hearing through the date of the contempt order.

C.

About a month after the contempt order and before the hearing on the supplemental fee request, the judge of the trial court referenced Mr. Manookian while presiding over a hearing in the case of *Elite Emergency Services, LLC v. Nesmith*. In open court, the judge said

> There was a lawyer, Mr. Brian Manookian, who I have released a one-hundred-twenty-two page memorandum and order on, who, among many, many other things, submitted a false and fake package, along with another person, to the Board of Professional Responsibility and the Court of the Judiciary.

> Well, come to find out that it was fake. And it was wrong. Channel 4 News picked it up and made it a headline . . . . Totally false. Totally false.

> The Board of Professional Responsibility saw what it was and said, "We're not going to investigate it, Judge Binkley." And I said, "Oh, please do. I'm begging you to investigate because you know how people are. They'll read half the story and say, 'Ah, that was a put-up. They're helping Judge Binkley out.'"

> I don't want that. I hired a lawyer and I said, "Let's do it right." Full investigation, dismissed, and it should've been. Now, Channel 4 News published it as if it were true. Now, what do I do when I'm sitting there watching that, and my family is watching it, and all of my friends are watching it?

> And as a judge it's probably good that I don't say a word. It's very difficult. But my day will come. And it's just about here . . . . I feel like it's necessary for me to be crystal clear, transparent and clear. I did not like what Mr. Manookian did at all, and my day will come.

5

After the trial court made these comments, Mr. Manookian, on behalf of himself and his law firm, moved to recuse the judge.[3] In his recusal motion, Mr. Manookian argued, among other things, that the above comments showed the court's bias against him. The trial court denied the recusal motion, finding the statements made in open court "irrelevant to the issues in the present case."

Two days after the denial of Mr. Manookian's recusal motion, the trial court awarded Petitioners $126,073.09 in supplemental attorney's fees in a separate order. In total, then, the trial court held Mr. Manookian, Mr. Hammervold, and their respective law firms jointly and severally liable for $748,769.21. The trial court designated the original order of contempt and damages and the supplemental order of damages together as a final judgment under Tennessee Rule of Civil Procedure 54.02.

## II.

Mr. Manookian petitioned for an accelerated interlocutory appeal of the denial of his third recusal motion. *See* TENN. SUP. CT. R. 10B, § 2.01. And Mr. Manookian and Mr. Hammervold appealed the final judgment of contempt and damages. We consolidated the interlocutory appeal with the appeal of the final judgment.

The parties' arguments focus both on whether the trial judge should have recused himself and on the merits of the contempt and damages orders. We find the recusal issue dispositive. As to that issue, the parties argue over various possible grounds for recusal. We focus on the trial court's comments about Mr. Manookian in the unrelated proceeding.

## A.

Rule 10B of the Rules of the Supreme Court of Tennessee governs the procedure for "determin[ing] whether a judge should preside over a case." TENN. SUP. CT. R. 10B. When a trial court denies a motion to recuse, a party can either take an interlocutory appeal or raise the issue in an appeal after entry of final judgment. *Id.* § 2.01. In both scenarios, we review a trial court's ruling on a motion to recuse de novo. *Id.*

In Tennessee, litigants "have a fundamental right to a 'fair trial before an impartial tribunal.'" *Holsclaw v. Ivy Hall Nursing Home, Inc.*, 530 S.W.3d 65, 69 (Tenn. 2017) (quoting *State v. Austin*, 87 S.W.3d 447, 470 (Tenn. 2002)); *see Kinard v. Kinard*, 986

---

[3] The previous year Mr. Manookian filed two recusal motions, which were denied. He sought accelerated interlocutory review of the denial of his first recusal motion. *See* TENN. SUP. CT. R. 10B, § 2.01. We affirmed the denial of that motion. *Chase v. Stewart*, No. M2017-01192-COA-T10B-CV, 2017 WL 3738466, at *4 (Tenn. Ct. App. Aug. 29, 2017). Mr. Manookian did not seek interlocutory review of his second recusal motion.

S.W.2d 220, 227 (Tenn. Ct. App. 1998) (reasoning that litigants "are entitled to the 'cold neutrality of an impartial court'" (quoting *Leighton v. Henderson*, 414 S.W.2d 419, 421 (Tenn. 1967))); *see also* TENN. CONST. art. VI, § 11. It "goes without saying that a trial before a biased or prejudiced fact finder is a denial of due process." *Wilson v. Wilson*, 987 S.W.2d 555, 562 (Tenn. Ct. App. 1998).

Tennessee has long recognized that "the appearance of bias is as injurious to the integrity of the judicial system as actual bias." *Davis v. Liberty Mut. Ins. Co.*, 38 S.W.3d 560, 565 (Tenn. 2001); *see In re Cameron*, 151 S.W. 64, 76 (Tenn. 1912) ("[I]t is of immense importance, not only that justice shall be administered . . . , but that [the public] shall have no sound reason for supposing that it is not administered."). Of course, a judge should recuse when they have "any doubt as to [their] ability to preside impartially in [a] case." *Davis*, 38 S.W.3d at 564. But a judge must also "disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned." TENN. SUP. CT. R. 10, Rule 2.11(A). This test is "an objective one." *State v. Cannon*, 254 S.W.3d 287, 307 (Tenn. 2008). It requires recusal "when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." *Davis*, 38 S.W.3d at 564-65 (quoting *Alley v. State*, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994)).

A party seeking disqualification or recusal must support a recusal motion with an affidavit or declaration and "other appropriate materials." TENN. SUP. CT. R. 10B, § 1.01. When a party brings forward a trial court's comments as evidence to support a recusal motion, we must determine whether the comments "indicate that the judge has prejudged factual issues." *Alley*, 882 S.W.2d at 822. "Any comments made by the trial court must be construed in the context of all the facts and circumstances to determine whether a reasonable person would construe those remarks as indicating partiality on the merits of the case." *Id.*

Here, Mr. Manookian submitted the declaration of Samuel Clemmons. In this declaration, Mr. Clemmons detailed the comments that the trial judge made about Mr. Manookian in the *Elite Emergency Services* case, to which Mr. Clemmons was a party.[4] Petitioners challenge Mr. Clemmons's declaration as "inherently suspect, at best." We disagree. Courts instead presume that testimony provided under oath and

---

[4] Petitioners argue that Mr. Manookian waived the right to seek recusal of the trial judge based on the judge's comments. A party waives the right "to question a judge's impartiality" if the party does not assert the grounds for recusal "in a timely manner." *Kinard*, 986 S.W.2d at 228 (citations omitted). A one-year delay in asserting grounds for recusal constitutes waiver. *Chase*, 2017 WL 3738466, at *3; *In re Samuel P.*, No. W2016-01592-COA-T10B-CV, 2016 WL 4547543, at *6 (Tenn. Ct. App. Aug. 31, 2016). Here, Mr. Manookian filed the third recusal motion twenty-two days after the judge's comments. Under the circumstances, we find that Mr. Manookian acted in a timely manner.

penalty of perjury is true. *See, e.g., Hogue v. Kroger Co.*, 356 S.W.2d 267, 271 (Tenn. 1962) ("This court certainly will not ascribe to the oath-taker the infamy of a perjurious mind. We think, with every presumptive support, that people normally are honest and tell the truth." (citation omitted)). In its order denying the recusal motion, the trial court treated the comments as if they had been made, so we do also.

In his comments, the judge claimed that Mr. Manookian "submitted a false and fake package . . . to the Board of Professional Responsibility and the Court of the Judiciary." The media ultimately "picked it up" and published a "[t]otally false" story about the judge. But, the judge continued, the media published the story "as if it were true." So, the judge wondered, "what do I do when I'm sitting there watching that, and my family is watching it, and all of my friends are watching it?"

The gist of the comments is that the judge blamed Mr. Manookian for the court's exposure to negative publicity, possibly drawing the scrutiny of the judge's family and friends. The judge was "crystal clear" and "transparent" about not liking that "at all." The court also did not like "many, many other things" Mr. Manookian had done. And the judge envisaged that "my day will come."

Taken in context, "a reasonable person would construe th[e] remarks as indicating" that the judge may have sought retribution against Mr. Manookian for a perceived wrongdoing unrelated to the contempt charges.[5] *See Alley*, 882 S.W.2d at 822. This possible motivation provides "a reasonable basis for questioning the judge's impartiality." *See Davis*, 38 S.W.3d at 564; *see also State v. Cobbins*, No. E2012-02025-CCA-10B-DD, 2012 WL 5266427, at *22-23 (Tenn. Crim. App. Oct. 25, 2012) (recusal warranted based, in part, on trial court's comments that it was "[m]y time" and "my day had finally come").

Petitioners insist that the trial court was "impartial and entirely fair" to Mr. Manookian and Mr. Hammervold.[6] The record reflects that the judge showed

---

[5] In the order denying the motion to recuse, the trial court provided more context. The judge explained that Mr. Manookian had been providing information about the judge to Mr. Clemmons. Mr. Clemmons then used this information to file a complaint with the Board of Judicial Conduct. That complaint was later dismissed. In the judge's view, Mr. Manookian and Mr. Clemmons "have obviously worked together for the sole purpose of . . . attempt[ing] to publicly embarrass or ridicule the Court."

[6] Petitioners argue that Mr. Hammervold did not properly preserve the recusal issue for appeal. In response to our order directing the parties to respond to Mr. Manookian's Rule 10B petition for recusal appeal, *see* TENN. SUP. CT. R. 10B, § 2.05, Mr. Hammervold, on behalf of himself and his law firm, joined the petition. And as a party, he was entitled to raise the denial of the recusal motion in his brief, which he did. *See* Tenn. R. App. P. 3(h) (broadly allowing any party to raise any issue "upon the filing of a single notice of appeal"). Although Mr. Hammervold did not join Mr. Manookian's recusal motion in the trial court, the Rules of the Supreme Court of Tennessee speak of recusal as to proceedings, not as to parties. *See* TENN. SUP. CT. R. 10, Rule 2.11(A).

8

extraordinary patience and was thorough in his review of serious allegations against Mr. Manookian and Mr. Hammervold. We do not conclude that the judge was actually partial. But that is not the standard for recusal. *See Kinard*, 986 S.W.2d at 228 ("[T]he public's confidence in judicial neutrality requires not only that the judge be impartial in fact, but also that the judge be perceived to be impartial."). Under Tennessee's objective standard, the judge's impartiality might reasonably be questioned. So the judge should have recused himself. *See Cook v. State*, 606 S.W.3d 247, 255 (Tenn. 2020) (reasoning that Tennessee's objective standard "'may sometimes bar trial by judges who have no actual bias'" (quoting *In re Murchison*, 349 U.S. 133, 136 (1955))).

Petitioners also contend that, because the judge made the comments after the contempt order, the comments cannot be evidence of any predisposition against Mr. Manookian. *See Alley*, 882 S.W.2d at 821. We again disagree. The unfavorable news story for which the judge claimed Mr. Manookian was responsible ran in February 2017. And the trial court issued the contempt order in July 2018. So the impetus for the judge's thoughts about Mr. Manookian may have existed for almost a year and a half before the court entered the contempt order.[7] That the judge did not air those thoughts until after entry of the contempt order misses the point.

B.

Having determined that recusal was appropriate, we must consider the impact on the final judgment of contempt and damages. Retroactive recusal generally is not the appropriate remedy. *See Watson v. Cal-Three, LLC*, 254 P.3d 1189, 1193 (Colo. App. 2011) ("Recusal provides prospective relief; it does not necessarily invalidate orders previously entered."); 46 AM. JUR. 2D *Judges* § 210, Westlaw (database updated Nov. 2020). But, in *Liljeberg v. Health Services Acquisition Corp.*, the United States Supreme Court set forth a test to determine whether retroactive recusal is appropriate under the federal recusal statute. 486 U.S. 847, 863-64 (1988). We find it appropriate to apply the *Liljeberg* test here. Tennessee courts "may look to federal interpretation of similar federal laws for guidance in enforcing [Tennessee] statutes." *Van Tran v. State*, 66 S.W.3d 790, 821 (Tenn. 2001) (Barker, J., concurring in part and dissenting in part); *see Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 705 (Tenn. 2000) (interpreting Tennessee anti-discrimination laws), *abrogated on other grounds by Gossett v. Tractor Supply Co.*, 320 S.W.3d 777 (Tenn. 2010); *Arnold v. Morgan Keegan & Co.*, 914 S.W.2d 445, 448 & n.2 (Tenn. 1996) (interpreting the Tennessee Uniform Arbitration Act); *Thomas v. Oldfield*, 279 S.W.3d 259, 261-62 & n.3 (Tenn. 2009) (interpreting the

---

[7] Although one of the two hearing dates on the contempt petition occurred before the media story ran, there is still a "reasonable basis for questioning" whether partiality may have affected the trial court's contempt order. *See Davis*, 38 S.W.3d at 564.

9

Tennessee Rules of Civil Procedure); *State v. Clayton*, 131 S.W.3d 475, 478 (Tenn. Crim. App. 2003) (interpreting the Tennessee Rules of Criminal Procedure). Tennessee's recusal standard is identical to the federal standard, save for noun and pronoun usage. *Compare* TENN. SUP. CT. R. 10, Rule 2.11(A), *with* 28 U.S.C. § 455(a) (2018). And Tennessee courts have often cited the United States Supreme Court with approval on recusal issues. *See State v. Griffin*, 610 S.W.3d 752, 760 (Tenn. 2020) (citing *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1907-09 (2016)); *Cook*, 606 S.W.3d at 255 (citing *In re Murchison*, 349 U.S. at 136); *Bailey v. Blount Cty. Bd. of Educ.*, 303 S.W.3d 216, 239 (Tenn. 2010) (citing *Chapman v. California*, 386 U.S. 18, 23 n.8 (1967)); *Kinard*, 986 S.W.2d at 228 (citing *Offutt v. United States*, 348 U.S. 11, 14 (1954)); *Alley*, 882 S.W.2d at 821 (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966)).

The *Liljeberg* test "consider[s] the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." *Liljeberg*, 486 U.S. at 864. As to the parties in this case, the purpose of the right to impartiality "is to guard against the prejudgment of the rights of litigants and to avoid situations in which the litigants might have cause to conclude that the court had reached a prejudged conclusion." *State v. Benson*, 973 S.W.2d 202, 205 (Tenn. 1998) (citing *Chumbley v. People's Bank & Tr. Co.*, 57 S.W.2d 787, 788 (Tenn. 1933)).

As noted above, the basis for the judge's thoughts about Mr. Manookian may have existed for nearly a year and a half before the July 2018 contempt order. It likely existed at least since May 23, 2017, when the trial court entered the order denying an earlier recusal motion filed by Mr. Manookian. That order indicates that, by then, the judge suspected that Mr. Manookian was behind the news story and unfounded complaints about the judge made to the Board of Professional Responsibility and the Court of the Judiciary. The contempt order itself references the Board of Professional Responsibility complaint in an adverse credibility finding against Mr. Manookian. So once the court revealed its thoughts about Mr. Manookian in open court, one might reasonably question whether the court "had reached a prejudged conclusion" as to the contempt order. *See Benson*, 973 S.W.2d at 205. Although the contempt order is the product of over two years of litigation, under these circumstances "there is a greater risk of unfairness in upholding the judgment in favor of [Petitioners] than there is in allowing a new judge to take a fresh look at the issues." *See Liljeberg*, 486 U.S. at 868; *see also Olerud v. Morgan*, No. M2010-01248-COA-R3-CV, 2011 WL 607113, at *2-3 (Tenn. Ct. App. Feb. 18, 2011) (vacating orders of the trial court entered before a recusal motion was filed when the basis for recusal "was discovered . . . after the court entered critical rulings in the case").

Second, to deny retroactive relief could cause injustice in other cases. Our supreme court has cautioned judges about inappropriate remarks. *See Cook*, 606 S.W.3d at 257 (admonishing Tennessee judges "to refrain from [making] inappropriate

10

comments"); *see also Leighton*, 414 S.W.2d at 420 ("[T]he judge must be careful not to give an expression to any thought, or to infer what his opinion would be in favor or against either of the parties in the trial."). Allowing a remedy for inappropriate remarks even late in the proceedings would encourage judges to reflect on possible grounds for recusal through all phases of a case. *See Liljeberg*, 486 U.S. at 868 (Retroactive enforcement "may prevent a substantive injustice in some future case by encouraging a judge . . . to more carefully examine possible grounds for disqualification and to promptly disclose them when discovered.").

Third, allowing the contempt order to stand risks undermining public confidence in the judiciary. Surely, "'justice must satisfy the appearance of justice.'" *Liljeberg*, 486 U.S. at 864 (quoting *In re Murchison*, 349 U.S. at 136); *Cook*, 606 S.W.3d at 255 (quoting same). Here, when the judge mused that "my day will come," the judge also said that day is "just about here"—less than a month before awarding supplemental damages and finalizing the contempt order. And the judge mentioned that he had "released a one-hundred-twenty-two page memorandum and order on" Mr. Manookian, which was the order holding him in contempt. So the basis upon which it is reasonable to question the judge's impartiality is directly connected to the contempt order.

Because the trial court's impartiality might reasonably be questioned, the court should have recused itself. And under the circumstances of this case, retroactive recusal is warranted. In finding retroactive recusal warranted, we express no opinion on the merits of the contempt proceeding.

### III.

We reverse the denial of the third motion to recuse. And we vacate the contempt and damages order of July 20, 2018, and the order awarding supplemental attorney's fees and expenses of September 27, 2018. This case is remanded for reassignment and further proceedings consistent with this opinion.

_____

W. NEAL McBRAYER, JUDGE

11

IN THE UNITED STATES BANKRUPTCY COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CUMMINGS MANOOKIAN, PLLC, | ) | Case No: 3:19-bk-07235 |
| | ) | Chapter 7 |
| | ) | Judge Walker |
| Debtor. | ) | |

## TRUSTEE'S RESPONSE TO BRIAN MANOOKIAN'S OBJECTION TO PROPOSED CHASE CLAIM AND SETTLEMENT

Jeanne Ann Burton, Chapter 7 Trustee herein, by and through special counsel, hereby respectfully responds to Brian Manookian's Objection to Proposed Chase Claim and Settlement (Doc. 112) and the Notice of Filing Supplement to Manookian Objection to Proposed Chase Claim and Settlement (Doc. 123) (collectively, the "Manookian Objection").

### BACKGROUND

Shortly after Cummings Manookian, PLLC (the "Debtor") filed for Chapter 7 bankruptcy relief on November 6, 2019 (the "Petition Date") and Jeanne Ann Burton (the "Trustee") was appointed to serve as Trustee, it became obvious that one of the central issues in this case would be the allowance or disallowance of a claim by Dean Chase, Sandra Chase and B.F. Chase, Inc. (the "Chase Parties"). The Chase Parties filed an $806,927.04 secured claim (the "Chase Claim") in this case on March 30, 2020, based on a sanctions judgment (the "Judgment") granted by the Williamson County Circuit Court (the "State Court") in favor of the Chase Parties against the Debtor, Brian Manookian, Mark Hammervold, and Hammervold Law, PLC (the "Judgment Parties"), jointly and severally. The two opinions issuing the Judgment are attached hereto as collective Exhibit A. As of the Petition Date, some of the Judgment Parties had appealed the Judgment to the Tennessee Court of Appeals, though the execution of the Judgment had not been stayed.

On February 4, 2021, the Tennessee Court of Appeals (the "Court of Appeals") vacated the Judgment, and remanded the matter for rehearing by another judge. The Court of Appeals decision is attached hereto as Exhibit B. While the Court of Appeals noted that the State Court judge "showed extraordinary patience and was thorough in his review of serious allegations against Mr. Manookian and Mr. Hammervold" (Exhibit B pp. 8-9) , and while it noted that "[w]e do not conclude that the judge was actually partial" (Id at p. 9), the Court of Appeals concluded, "[b]ecause the trial court's impartiality might reasonably be questioned, the court should have recused itself." Id at p. 12. The Chase Parties sought permission to appeal the Court of Appeals' decision to the Tennessee Supreme Court (the "Supreme Court"), but the Supreme Court denied the Chase Parties' application for permission to appeal on August 6, 2021. With the Supreme Court's decision, all issues that gave rise to the Judgment are now returning to the State Court for rehearing by another judge.

While the Chase Parties' Judgment was being appealed, the Trustee began exercising her fiduciary duty of identifying and pursuing assets of the Debtor's estate. Among those assets were certain causes of action against Afsoon Hagh, Hagh Law PLLC, and Manookian PLLC (collectively, the "Defendants"). In the infancy of this case, the Trustee took action to freeze $715,000 of funds in the possession of the Defendants, but which the Trustee claimed belonged to this estate. Those funds were ultimately deposited with the Clerk of this Court where they remain today. At the urging of the Defendants, the Trustee acted expeditiously in filing her complaint against the Defendants on January 8, 2020, which initiated Adversary Proceeding Number 3:20-ap-90002 (the "AP"). The AP was proceeding rapidly, with the Trustee having already issued written discovery to the Defendants, when the pandemic shut down the court

2

system. For a number of months during the pandemic the Defendants asked the Court to delay proceedings, which the Court obliged.

In more recent months, the Defendants suddenly began urging the Trustee and the Court to speed up the pretrial deadlines associated with the AP. The Trustee explained to the Defendants and to the Court that pursuit of the AP in light of the uncertainty associated with the allowance of the Chase Claim was imprudent and inefficient. After all, the Chase Claim is by far this estate's largest claim; if it is allowed in full, then the Trustee might need to pursue each and every cause of action alleged in the AP but if it is disallowed or allowed in a reduced amount, then the Trustee might be able to only pursue certain causes of action in the AP that are less factually intensive. Despite this explanation, the Defendants have urged the Court to force the Trustee to immediately pursue all claims in the AP.

It is against this backdrop that the Trustee began objecting to certain claims filed in this case, and decided to entertain a potential settlement of the Chase Claim. As more fully described in the Trustee's Motion to Approve Compromise and Settlement (Doc. 108) (the "Settlement Motion"), the Trustee has negotiated a settlement that would allow the Chase Claim as a general unsecured claim against the estate in the amount of $250,000, would waive any causes of action that the Trustee and estate might otherwise have against the Chase Parties, would dismiss the estate from all causes of action in the State Court, and would waive any other causes of action that the Chase Parties might have against the estate or the Trustee (including any claims that they might have as an alleged secured creditor).

As stated in the Settlement Motion, the Trustee has three primary motivations for entering into the proposed settlement with the Chase Parties. First, the proposed settlement eliminates the risk that the State Court will assess a new sanctions judgment against the Debtor

3

in a similar amount, or even a higher amount given the fees incurred by the Chase Parties since the Judgment was issued, than was first assessed against the Debtor in the Judgment. After all, the facts underlying this matter have not changed and neither the Court of Appeals nor the Supreme Court opined on the ultimate outcome; the Court of Appeals questioned only whether *that particular* judge should have issued the sanctions judgment. There is no reason to believe that a different judge reviewing the same facts will reach a different conclusion.

Second, the proposed settlement significantly reduces potential legal expenses of the estate. As mentioned in the Settlement Motion, the Trustee believes that the estate's participation in the retrial of the sanctions issues before the State Court could cost the estate $150,000 or more in legal fees, given the litigious nature of the sanctions issues and the length of time it took to try the matter initially.[1] The proposed settlement might also allow the Trustee to limit the issues that must be tried in the AP. If the Trustee is able to reduce the estate's allowed claims to a point where the $715,000 being held by the Court would be sufficient to pay all creditors in full (or even close thereto), the issues to be tried in the AP and legal fees associated with that trial will be substantially curtailed. The Trustee believes this could save the estate an additional $100,000+ in legal fees and expenses.

Finally, fixing the Chase Claim via this settlement is in the best interest of the estate and judicial economy, as reaching some finality on the Chase Claim will allow the Trustee to proceed with the AP and fully administer this estate. If the Court were to reject the settlement, it is likely that the Trustee will be embroiled in litigation over the sanctions before the State Court (and this state's appellate courts) for years to come. Even if the Trustee were to move forward with the AP, despite it being inefficient to do so without first fixing the Chase Claim, she would not be

---

[1] Currently, the estate would lack the funds necessary to pay such legal fees. The balance on-hand in the estate's account is $86,683.37.

4

able to administer the estate and make a distribution until the conclusion of the litigation concerning the sanctions award. That would hold this case, and the creditors' distributions, in limbo for many years to come.

For these reasons, the Trustee, in the exercise of her fiduciary duty and business judgment, has determined that it is in the estate's best interest to enter into the proposed settlement at this time. The Settlement Motion drew two objections: one by Grant, Konvalinka & Harrison, P.C. (Doc. 111) (the "GKH Objection") and one by Brian Manookian (Doc. 112) (the "Manookian Objection"). The Trustee respectfully requests that the Court grant the Settlement Motion and deny the GKH Objection and the Manookian Objection.

## BRIAN MANOOKIAN LACKS STANDING

The Trustee has raised the issue of Brian Manookian's lack of standing in the past. While the Court has indicated that it has reason to doubt that Mr. Manookian has standing in this matter, it has previously declined to specifically find that he lacks standing. The Trustee renews her objection to Mr. Manookian's participation in this matter on the grounds that he has no standing and asks for such a finding.

Mr. Manookian has not filed a claim in this case, nor did he list himself as a creditor of the estate when he completed, signed and filed the schedules in this case. Nevertheless, he has periodically attempted to object to motions filed by the Trustee in her attempt to administer this estate. His objection to the Settlement Motion is the most recent of these attempts, but it is clear he lacks standing to be heard on this issue.

Bankruptcy courts are quite consistent in finding that a Chapter 7 debtor, or the principal of a corporate Chapter 7 debtor, lacks standing to challenge the actions of the bankruptcy trustee or the administration of the estate. *See, e.g., Furlough v. Cage (In re Technicool Systems),* 896

5

F.3d 382 (5th Cir. 2008) (principal of a chapter 7 debtor corporation had no standing to challenge trustee's employment of counsel); *In re White*, 2018 Bankr. LEXIS 2289 (Bankr. E.D. Mich. 2018) (Chapter 7 debtor had no standing to challenge trustee's fees and expenses); *In re St. Michael Motor Express,* 2016 Bankr. LEXIS 959 (Bankr. W.D. Tenn. 2016) (principal of chapter 7 debtor had no standing to challenge trustee's abandonment of property because the case was not a surplus case); *Khan v. Regions Bank*, 2011 Bankr. LEXIS 3786 (Bankr. E.D. Tenn. 2011) (debtor in an insolvent case had no standing to challenge a proof of claim); *Ultimore, Inc. v. Bucala,* 464 B.R. 626 (Bankr. S.D.N.Y. 2012) (debtor had no standing to pursue a cause of action because it was not an interested party); *Boyd v. Shuford*, 2018 U.S. Dist. LEXIS 54661 (W.D.N.C. 2018) (Chapter 7 debtor had no standing to challenge attorneys' fees because it was not a surplus case); *Pascazi v. Fiber Consultants, Inc.,* 445 B.R. 124 (Bankr. S.D.N.Y. 2011) (debtor's principal had no standing to object to a claim because the case was not a surplus case). This is because a Chapter 7 debtor, or its corporate principal, is not deemed an "interested party" by these courts. *Id.* The two exceptions to this general rule are where (1) a proceeding might affect a discharge or an exempt asset or (2) where the case is likely to be a surplus case. *See In re St. Michael Motor Express*, 2016 Bankr. LEXIS 959, *11 (Bankr. W.D. Tenn. 2016). If the debtor or its principal claims standing because a matter is a surplus case, it is the debtor's burden to prove that the case is likely to result in a surplus *Id*.

In this matter, there will be no discharge (because the Debtor is a corporate entity) and there are no exempt assets. Mr. Manookian has signed statements under penalty of perjury that list $70,000 of assets against more than $1,000,000 of claims. Because of his prior statements under penalty of perjury that the Debtor has no substantial assets, which he has repeated in subsequent pleadings, he is now estopped from arguing that this might be a surplus case.

6

*Reynolds v. Commissioner of Internal Revenue*, 861 F.2d 469, 472-73 (6th Cir. 1988) (the doctrine of judicial estoppel prevents a party "from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding.")

Based upon the facts of this case and the law regarding standing of the principal of a corporate chapter 7 debtor, Mr. Manookian has no standing to object to the Settlement Motion. Therefore, the Trustee respectfully requests that the Court reject the Manookian Objection on those grounds.

## EVEN IF MR. MANOOKIAN HAD STANDING, THE MANOOKIAN OBJECTION LACKS ANY SUBSTANTIVE MERIT

The Manookian Objection is a collection of scatter-shot critiques of the proposed settlement, including: (1) that the Chase Parties would have simply withdrawn their claim but for the proposed settlement; (2) that the underlying claims by the Chase Parties against Mr. Manookian and the Debtor lack merit and will ultimately be dismissed by the State Court; (3) that, even if the proposed settlement is approved, the Debtor will remain liable to the Chase Parties on account of an alleged indemnity agreement between the Debtor and Mr. Manookian; and (4) that the proposed settlement is the result of some quid pro quo arrangement between the Chase Parties and the Trustee's special counsel. For the reasons stated herein, none of these arguments have merit.

### 1. The Chase Parties were not going to "walk away" from their claim against the estate.

In his Objection, Mr. Manookian alleges that the Chase Parties were prepared to walk away from all claims against the Judgment Parties, including the Debtor, but for the proposed settlement and the Settlement Motion. There are as host of problems with this allegation.

7

First, Mr. Manookian cannot offer proof of any previous settlement discussions between him and the Chase Parties pursuant to Federal Rule of Evidence 408. Rule 408 provides as follows:

> (a) Prohibited Uses. Evidence of the following is not admissible — on behalf of any party — either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
> (1) furnishing, promising, or offering — or accepting, promising to accept, or offering to accept — a valuable consideration in compromising or attempting to compromise the claim; and
> (2) conduct or a statement made during compromise negotiations about the claim — except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

Exhibit 2 to the Manookian Objection is a March 18, 2021 letter purportedly from Charlie Malone, counsel to the Chase Parties, to counsel for Mr. Manookian and to Mark Hammervold. This letter (which the Trustee had never seen prior to its attachment to the Manookian Objection) is clearly and unambiguously marked as a privileged and confidential settlement document. Neither that letter, nor any testimony regarding conversations surrounding that letter, are admissible in this matter pursuant to Rule 408 of the Federal Rules of Evidence.

Even if the settlement letter were admissible, it does not demonstrate that the Chase Parties were willing to unequivocally withdraw their claim in this Court. The letter indicates that the Chase Parties were willing to "walk away" if a number of parties, including Brian Manookian, Mark Hammervold, Hammervold Law PLC, Afsoon Hagh, Ms. Hagh's law firm, and the Trustee[2] were willing to sign full releases. The Trustee was not involved in these discussions and was not made aware of these discussions until the filing of the Manookian Objection. However, the fact that no party approached the Trustee about a release indicates to

---

[2] The letter seems to indicate that the parties would approach the Trustee about a release if and when all other parties had agreed to terms of a settlement. The Trustee was never approached about a proposed walk-away.

8

the Trustee that some party or parties were unwilling to consummate the proposed settlement.  In fact, after reviewing the Manookian Objection, counsel for the Chase Parties confirmed that the parties were unable to reach terms of a settlement and that the offer was withdrawn months prior to the Trustee's proposed settlement was reached with the Chase Parties.

Because Mr. Manookian's prior settlement discussions with the Chase Parties are not admissible in this matter, those settlement discussions did not involve the Trustee, and those discussions did not lead to a consummated agreement, the purported "walk away" discussions have no import on this matter.

**2. It is unlikely that the State Court is going to imminently dismiss the causes of action against the Debtor, if at all.**

In the Manookian Objection, Mr. Manookian also repeatedly alleges that the Chase Parties' claims for sanctions against him and the Debtor have no merit, that they will be imminently dismissed, and that the Trustee could have ascertained that if she had done proper due diligence.   All of the information available to the Trustee belies Mr. Manookian's conclusive, unsupported statements about the merits of the underlying matter.

As demonstrated by the opinions attached hereto as Exhibit A, the State Court went into extensive detail about Mr. Manookian's actions and why they constitute contempt of the State Court's orders.  While the Judgment was ultimately vacated by the Court of Appeals, and the Supreme Court declined to review that decision, the Court of Appeals decision did not go to the merits of the State Court's findings against Mr. Manookian and the Debtor.  In fact, the Court of Appeals explicitly said its order was not to be deemed a decision on the merits of the Judgment: "In finding retroactive recusal, we express no opinion on the merit of the contempt proceeding." Exhibit A, p. 12.   The fact that the Court of Appeals and the Supreme Court vacated the

9

Judgment due to the possible appearance of bias by the state court judge does not mean that Mr. Manookian is likely to prevail on a rehearing of this matter; it simply means that the process must now start over. The Trustee expects the facts and the arguments to be the same. The only thing that has changed is the identity of the factfinder. Thus, there is no reason to believe that the outcome is likely to be substantially different after a rehearing, and certainly no reason to believe that Mr. Manookian will prevail imminently.

The fact that Mr. Manookian has recently filed a motion for summary judgment in the State Court does not alter this conclusion. Mr. Manookian's motion for summary judgment rests on little more than his conclusory statement that he did not violate the State Court's order. A copy of Mr. Manookian's motion for summary judgment and the related pleadings are attached hereto as Exhibit C. As the Court can readily see, this motion and the related pleadings do not include sufficient legal or factual support to make it likely that the State Court will grant it; rather, this motion appears to have been hastily drafted and filed in order to represent to this Court that a motion for summary judgment is pending so as to attempt to block the Trustee's settlement of the Chase Claim in furtherance of her administration of the estate.

While no one can predict the future or always accurately predict the outcome of litigation, the Trustee thinks it is unlikely that Mr. Manookian will prevail on his motion for summary judgment, or any other motions he might file seeking a quick resolution of the sanctions matter in his favor. Rather, as the Trustee predicted in her Settlement Motion, it appears that the parties to the sanctions matter likely have years of litigation before them. The

10

Trustee wishes to avoid the time and expense of that litigation[3], which is one of the factors motivating the proposed settlement.

**3. If the proposed settlement is approved, this estate will not be required to indemnify Mr. Manookian against a sanctions judgment against him individually.**

In his recently filed supplement to the Manookian Objection, Mr. Manookian for the first time alleges that the Debtor owes an obligation to indemnify him against any sanctions judgment that might be obtained by the Chase Parties. Mr. Manookian alleges that this indemnity obligation arises as a result of a clause in the Debtor's operating agreement. Thus, Mr. Manookian reasons, even if the Trustee were to settle the Chase Claim, the estate would remain liable for any subsequent sanctions judgment against Mr. Manookian and would not be able to extract itself from the State Court litigation.

This basis for objection is faulty for a couple of reasons. First, the Trustee denies that the estate would owe Mr. Manookian a duty to indemnify him for his sanctionable conduct due to a provision in Debtor's operating agreement. The operating agreement, which he fails to attach, provides that a member of the firm may be indemnified by the Debtor to the extent permitted by the Tennessee Revised Limited Liability Company Act, but that the decision about whether an act is subject to indemnification is to be made by the members of the Debtor, excluding any member seeking indemnification. Given that stipulation, and considering the Trustee is the only authorized representative of the Debtor, she could simply decline to indemnify Mr. Manookian for the sanctions award.

---

[3] Indeed, in the past two weeks the Chase Parties have filed a motion to stay the State Court proceedings while Mr. Manookian has filed at least three motions in the State Court matter seeking various relief. If the Settlement Motion is denied, the Trustee will be forced to review and potentially respond to each such motion currently pending, and the barrage of motions that will inevitably be filed in the future.

11

More importantly, Mr. Manookian failed to timely file any claim for the alleged indemnification, even though the Judgment existed and was in force at the time of the Petition Date and the claims bar date. He also failed to list himself as a creditor, even as a contingent and unliquidated creditor, when he completed and signed the Debtor's schedules under penalty of perjury. To the extent Mr. Manookian ever had a right to be indemnified by the Debtor for any sanctions issued against him, that claim is now time-barred.

In summary, if the Settlement Motion is approved, the estate will have no further obligation to the Chase Parties, whether as a direct result of the Debtor's liability or as a result of Mr. Manookian's conduct. The purported indemnity provision does not affect whether the Trustee has properly exercised her business judgment in agreeing to the terms of the proposed settlement.

**4. There is no merit, in fact or law, to Mr. Manookian's allegations of a quid pro quo arrangement between the Chase Parties and the Trustee or her special counsel.**

The Trustee does not wish to give credence to unfounded allegations made by Mr. Manookian and his counsel, but she feels that she must address the serious allegations that the Trustee and/or her special counsel have engaged in an unethical quid pro quo deal with the Chase Parties. These allegations are without any factual or legal merit.[4]

The Manookian Objection seems primarily premised upon an unsupported theory that the Trustee has agreed to allow the Chase Parties a reduced claim in this bankruptcy case because the Chase Parties "offered" to pay certain receivership fees to the Trustee's special counsel. Mr.

---

[4] The Trustee and undersigned counsel would have sent opposing counsel a letter pursuant to Bankruptcy Rule 9011 concerning these allegations but they did not want to detract from the timely and efficient administration of this estate, including the approval of this settlement agreement. While Mr. Manookian has engaged in personal attacks, the Trustee prefers to focus on the end goal of collecting and distributing assets of this estate.

12

Manookian alleges that the only reason that the Chase Parties now refuse to "walk away" is because of this under-the-table deal. This allegation is simply Mr. Manookian's revised attempt to ask the Court to do what it declined to do in response to his objection to the Trustee's motion to employ counsel; that is, to disqualify the Trustee's special counsel. However, this argument has less factual support than the one previously rejected by the Court.

As previously disclosed to the Court, the Trustee's special counsel in this case, Phillip Young, was appointed on June 20, 2019 to serve as a receiver for the purpose of collecting certain choses in action belonging to the Debtor and Hammervold Law PLC. As of the Petition Date, Mr. Young ceased collecting any accounts receivable belonging to the Debtor and turned over all funds belonging to the estate to the Trustee. Subsequently, the State Court approved Mr. Young's motion for compensation and approved the payment of his fees from remaining receivership funds. After the application of those funds on hand, there remained a balance of approximately $17,500 still owing for which the receivership could not pay. Mr. Young made no formal or informal attempt to collect that balance from any party.

Earlier this year, a dispute arose between the Chase Parties and Mark Hammervold concerning who should bear the burden of paying the receiver's attorney fees. Neither Mr. Manookian nor Mr. Young were parties to those pleadings. In essence, Mr. Hammervold argued that the Chase Parties should be required to reimburse him for funds taken by the receiver from Hammervold Law PLC receivables since the Judgment was ultimately vacated. While the State Court has declined to take action on that request until the conclusion of the rehearing of the sanctions issue, the Chase Parties mentioned in one of their briefs on this topic that they would agree to take responsibility for any unpaid receivership fees, thus reducing the issues that must be decided by the Court. Mr. Young did not ask the Chase Parties to accept that responsibility,

13

nor was he involved in any discussion about whether the Chase Parties, Mr. Hammervold, or Mr. Manookian would be responsible for any unpaid fees. Presumably, the Chase Parties consented to that responsibility knowing that state receivership law generally burdens the party moving for the appointment of a receiver (in this instance, the Chase Parties) with compensation of the court-appointed receiver to the extent receivership assets prove insufficient. *See, e.g., Sklar v. Bernstein,* 7 Tenn. App. 593 (Tenn. Ct. App. 1928). The State Court ultimately included a provision in one of its orders requiring that the Chase Parties compensate the receiver for any unpaid legal fees.

Based upon those facts, Mr. Manookian constructs a theory that the Trustee and her special counsel "traded" allowance of a claim against this estate for an agreement to pay $17,500 in receivership fees. There are major and obvious problems with Mr. Manookian's theory, all of which were discoverable by him before he filed a pleading making demonstrably false allegations. First, it was the Trustee, not her special counsel, who made the decision (1) to reach out to the Chase Parties about a potential settlement as part of her claims adjudication process and (2) to propose, and agree to, terms of that settlement. The Trustee's special counsel merely relayed the offer made by the Trustee and assisted in the drafting of a settlement agreement and the Settlement Motion. The Trustee's special counsel had no substantive input into the settlement itself. Furthermore, Mr. Young has in fact *received no compensation* from the Chase Parties.[5] He has not made any demand for payment of the remaining fees nor has he accepted any offer of payment from the Chase Parties. Indeed, as he indicated to the Court at the employment stage in this matter, Mr. Young made a decision to waive any right to payment from

---

[5] Notably, counsel for Mr. Manookian only asked whether the Chase Parties had made any payment to Mr. Young *after* signing and filing a pleading accusing him of executing a quid pro quo arrangement.

14

the Debtor when he agreed to represent the Trustee as special counsel. Because he was concerned that any payment of receivership fees might somehow increase the Chase Parties' claim against the Debtor, he decided not to make a demand for payment and, if payment had been offered, he would have declined to accept it.

These facts and circumstances contradict and disprove Mr. Manookian's quid pro quo allegation. The Trustee and her special counsel are highly respected members of the bar in the United States Bankruptcy Court for the Middle District of Tennessee. These allegations are insulting, beyond the pale, and deserve no consideration by the Court.

WHEREFORE, for all of the foregoing reasons, the Trustee respectfully requests that the Court overrule the Manookian Objection, grant the Settlement Motion, and grant the Trustee such other relief as the Court deems necessary and appropriate.

Respectfully submitted,

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
6100 Tower Circle, Suite 200
Franklin, Tennessee 37067
Tel:    (615) 465-6000
phillip@thompsonburton.com

Special Counsel for Chapter 7 Trustee

15

**<u>Certificate of Service</u>**

The undersigned hereby certifies that a copy of the preceding document was electronically filed and served via the Court's ECF system this 14th day of September, 2021.

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
6100 Tower Circle, Suite 200
Franklin, Tennessee 37067
Tel:     (615) 465-6000
phillip@thompsonburton.com

Special Counsel for Chapter 7 Trustee

16

IN THE CIRCUIT COURT FOR WILLIAMSON COUNTY, TENNESSEE
AT FRANKLIN

DAVID CHASE,                        )
                                    )
            PLAINTIFF,              )
                                    )
VS.                                 )        CASE NO. 2015-200
                                    )
CHRIS STEWART, EMILY STEWART,       )        THIS *MEMORANDUM AND ORDER*
LAUREN BULL, ANDY CHO, LINO         )        IS <u>NOT</u> TO BE FILED UNDER SEAL
LOVRENOVIC, BRYAN EVERETT,          )
SUSAN MARTIN, and CLAYTON           )
MACKENZIE,                          )
                                    )
            DEFENDANTS.             )

---

## MEMORANDUM AND ORDER

This matter came before the Court upon Petitioners, Dean Chase, Sandra Chase, and D.F. Chase, Inc.'s *Petition for Civil Contempt and Motion for Sanctions* filed on April 11, 2016, as well as the *Motion for Sanctions* filed by Non-Parties CK Global, LLC and NV Music Row, LLC (hereinafter collectively referred to as the "Non-Parties"), against Respondents, Brian Manookian; Cummings Manookian, PLC; Mark Hammervold; and Hammervold Law, PLC (hereinafter collectively referred to as Respondents").[1] The Court held an evidentiary hearing on September 23, 2016 and November 9, 2017. On December 21, 2017, the Court received Non-Parties' *Proposed Findings of Fact and Conclusions of Law* and Respondents' *Proposed Findings of Fact*

---

[1] The Non-Parties originally filed their *Petitions* against Rob McGuire and McGuire, Menke, Reddick & Shabayek, PLLC, but subsequently dismissed all of their claims based upon a non-monetary settlement. (Hr'g Tr. 117:20-119:4, November 9, 2016.) However, this Court has not excused Mr. McGuire's conduct in his irregular activities in this case involving Mr. Manookian, which will hereinafter be discussed.

Page 1 of 122

and Conclusions of Law.[2] Upon a review of the filings, arguments of counsel, and the record, the Court makes the following findings of fact and conclusions of law.

## I.    RELEVANT PROCEDURAL HISTORY AND BACKGROUND INFORMATION

Prior to analyzing the current issues before the Court, the Court finds it necessary to provide relevant procedural history and background to understand the underlying issues in this case.

Plaintiff, David Chase, filed his original *Complaint* in the Circuit Court for Williamson County, Tennessee, on May 7, 2015. On June 5, 2015, Plaintiff, David Chase, filed his *First Amended Complaint*. Additionally, the Court eventually granted Plaintiff, David Chase, leave to file his *Verified Second Amended Complaint* on October 5, 2015. All of the allegations in the *Verified Second Amended Complaint* stemmed from a central allegation of civil conspiracy relating to a domestic violence incident between Plaintiff, David Chase, and Defendant, Lauren Bull, with the other Defendants acting as alleged co-conspirators. In the *Verified Second Amended Complaint*, Plaintiff, David Chase, named the following Defendants: (1) Lauren Bull; (2) Andy Cho; (3) Bryan Everett; (4) Lino Lovrenovic; (5) Clayton Mackenzie; (6) Susan Martin; (7) Jason Ritzen; (8) Chris Stewart; and (9) Emily Moss Stewart. Furthermore, in the *Verified Second Amended Complaint*, Plaintiff, David Chase, asserted the following claims against the Defendants: (1) assault and battery, (2) trespass, (3) defamation, (4) intentional interference with business relationships, (5) abuse of process and malicious prosecution, (6) outrageous conduct, (7) damage to property, and (8) civil conspiracy. In

---

[2] The Court notes Respondents Brian Manookian and Cummings Manookian, PLC filed a separate *Proposed Findings of Fact and Conclusions of Law* from Respondent's Mark Hammervold and Hammervold Law, PLC.

due course, the Defendants filed multiple dispositive motions against Plaintiff, David Chase's, claims.[3]

On October 30, 2015, the Court heard a lengthy hearing on the numerous motions for summary judgments, motions for dismissals, and discovery disputes.[4] On February 12, 2016, the Court issued an *Interim Order* on the *Motions for Summary Judgment* and determined a significant procedural issue in the record and invited the Defendants to file supplemental filings to correct the record.

After the Parties filed their supplemental filings and in an attempt to provide a succinct ruling on the multiple and complex motions for summary judgment filed in this case, the Court treated each one of the voluminous motions for summary judgment individually and entered a *Memorandum and Order* on June 27, 2016. First, the Court denied *Defendants Chris and Emily Stewart's Motion for Summary Judgment* filed on February 16, 2016. Second, the Court denied Defendants', Lino Lovrenovic, Bryan Everett, Susan Martin, and Clayton McKenzie, *Motion for Summary Judgment* filed on February 16, 2016. Third, the Court denied Defendant Lauren Bull's *Motion for Summary Judgment* filed on February 16, 2016. Fourth, the Court granted, in its entirety, Defendant, Andy Cho's, *Amended Motion for Summary Judgment* filed on September 28, 2015, and *Supplemental Grounds for an Amended Motion for Summary*

---

[3] On August 28, 2015, Defendants, Lino Lovrenovic, Bryan Everett, and Susan Martin, also filed a *Motion for Summary Judgment*. Additionally, on August 31, 2015, Plaintiff, David Chase, filed his *Motion for Default Judgment* against Defendant, Bryan Everett. Moreover, on September 23, 2015, Defendant, Clayton McKenzie, filed his *Motion for Summary Judgment*; Defendants, Chris Stewart and Emily Stewart, filed a *Supplemental Filing in Support of their Motion to Dismiss and/or Summary Judgment*; Defendants, Lino Lovrenovic, Bryan Everett and Susan Martin, filed a *joint Motion for Summary Judgment*; and Defendant, Lauren Bull filed her *Motion for Summary Judgment on Counts III-VI*. On September 28, 2015, Defendant, Andy Cho, filed his *Amended Motion for Summary Judgment*. Lastly, on October 20, 2015, Defendant, Andy Cho, also filed a *Motion to Dismiss Second Amended Complaint*.
[4] Most notably, at the hearing of October 30, 2015, the Court adopted and modified the *Agreed Protective Order* at issue in this current proceeding.

*Judgment* filed on February 16, 2016. Fifth, the Court granted, in its entirety, Defendant, Jason Ritzen's, *Motion for Summary Judgment* filed on July 17, 2015; and *Supplemental Grounds for Summary Judgment* filed on March 21, 2016, all of which the Court analyzed in detail and made its findings of fact and conclusions of law in a 40-page *Memorandum and Order* entered on June 27, 2016. From this description, this would appear to be a typical case, albeit much larger, which was nearly concluded.

Unfortunately, there was what this Court can only describe as an undercurrent of discovery abuses and contemptuous misconduct beneath the surface performed by certain attorneys involved in this case. Thus, this case transformed into essentially a case within a case.

Dating back to August 28, 2015, which is the day the Parties, the Non-Parties, and the attorneys involved in this matter entered into the *Agreed Limited Protective Order as to Certain Subpoenaed Non-Parties* (hereinafter referred to as the "*Agreed Protective Order*") and the Non-Parties provided their initial discovery distribution, this case has been riddled with discovery disputes and abuses. So much so, on October 8, 2015, Plaintiff, David Chase, filed an *Expedited Motion for Sanctions, Protective Orders, and Other Related Relief.* On October 20, 2015 and October 30, 2015, respectively, the Court held hearings to resolve the discovery disputes and entered *Orders* to prevent the dissemination of confidential material.[5]

On February 25, 2016, the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., filed *Non-Parties' Motion to File their Motion for Sanctions and All Attachments Thereto Under Seal.* The *Motion for Sanctions* was based upon the violations of the *Agreed Protective Order* and sought to discover how certain

[5] *See* Court's *Order* of November 6, 2015 and *Order* of November 7, 2015.

confidential material was disseminated to members of the public and the news media. Subsequently, the Defendants filed their relative *Responses*.

On March 10, 2016, the Court conducted a hearing, *inter alia*, on the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc.'s, *Motion for Sanctions* and the Non-Parties, CK Global, LLC, NV Music Row, LLC, D.F. Chase, Inc., Dean Chase and Sandra Chase's, *Motions and Supplements for: (1) Entry of Agreed Limited Protective Order; (2) Declaration that All Parties are Bound by the Order; and (3) Expedited Hearing.*[6] The Court analyzed these *Motions*, arguments from the March 10, 2016 hearing, and a thorough review of the voluminous record, over many weeks of review,[7] the Court entered an *Order* on March 29, 2016 finding these allegations were supported by fact and credible affidavit testimony, warranting serious consideration by this Court. The Court identified the following attorneys and firms whose actions in this matter strongly indicate violations of Tennessee Rule of Civil Procedure 37.02 and possible contempt of Court:

(1) Brian Manookian and Cummings Manookian, PLC;

(2) Mark Hammervold and Hammervold, PLC;

(3) Rob McGuire and MRRS Law; and

(4) Travis R. Thompson and Miller & Martin, PLLC.[8]

---

[6] The Court notes the following *Motions* were also before the Court at this hearing: (1) Plaintiff, David Chase's, *Motion to Alter or Amend Entered Protective Order on Plaintiff's Expedited Motion for Sanctions, Protective Order, and Other Related Relief and Expedited Motion to Compel*; (2) Plaintiff's *Supplemental Motion to Alter or Amend*; and (3) Defendants, Stewarts, Ritzen, Martin, Lovrenovic and McKenzie's, *Motions for Sanctions, Motion to Compel, and to Hold Plaintiff in Contempt*. See *Order* of March 10, 2016.
[7] Specifically, in connection with the oral *Orders* issued at the October 20, 2015 and October 30, 2015 hearings, and the corresponding written *Orders* entered on November 7, 2015 and November 6, 2015, respectively.
[8] The Court understands Travis R. Thompson is no longer with the firm of Miller & Martin, PLC. No action has been taken against Travis R. Thompson, Esq., as a result of the Court's review. There are, however,

The Parties and/or Non-Parties affected by alleged violations of Tennessee Rules of Civil Procedure 37.02 and violations of the corresponding Court *Orders* were instructed through this Court's *Order* entered on March 29, 2016 to file within ten days of the March 29, 2016 *Order* appropriate pleadings for sanctions, listing specifically each violation alleged to have occurred and the specific injury inflicted upon each Party. Further, it was ordered in the March 29, 2016 *Order*, should any Party and/or Non-Party pursue civil contempt and/or criminal contempt, those affected shall file appropriately-pled petitions for civil contempt and/or criminal contempt within ten days of the March 29, 2016 *Order*, following precisely the well-established case law for bringing such allegations set forth in the Tennessee Court of Appeals' Eastern Section case of *Furlong v. Furlong*, 370 S.W.3d 329 (Tenn. Ct. App. 2011) and its progeny.

Thus, the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, filed their *Petition for Civil Contempt and Motion for Sanctions* on April 11, 2016. Non-Parties, CK Global, LLC and NV Music Row, LLC, filed their *Motion for Sanctions*, against Respondents, Brian Manookian; Cummings Manookian, PLC; Mark Hammervold; and Hammervold Law, PLC on April 11, 2016 as well. Therefore, the Court held evidentiary hearings on September 23, 2016 and November 9, 2017, respectively, in order to address the alleged attorney misconduct.

---

two other attorneys of record with the firm who represent Andy Cho, namely, Robert F. Parsley and Michael Kohler.

## II.   **FINDINGS OF FACT**

The Court finds it necessary to provide a thorough and wide-ranging findings of fact to clearly and efficiently make factual determinations on the Non-Parties' *Petition for Civil Contempt and Motion for Sanctions* and the Non-Parties, CK Global, LLC and NV Music Row, LLC's, *Motion for Sanctions*. Thus, the Court finds it is essential to first list the relevant attorneys representing the Parties and the Non-Parties involved in this matter. Second, the Court shall make its general findings relating to facts of this case. Finally, the Court shall make specific findings relating to the material facts at issue.

### A.   **Attorneys for the Parties**

1. Plaintiff, David Chase, has at all times been represented by Phillip Robertson, Esq. (hereinafter referred to as "Mr. Robertson") and Brittany Bartkowiak, Esq. (hereinafter referred to as "Ms. Bartkowiak") of Robertson Law Group.

2. Defendants, Chris Stewart, Emily Stewart, Susan Martin, Lino Lovrenovic, Bryan Everett, and Clayton McKenzie, have at all times been represented by Brian Manookian, Esq. (hereinafter referred to as "Mr. Manookian") of Cummings Manookian, PLC.

3. Defendants, Bryan Everett, Lino Lovrenovic, Susan Martin, and Clayton McKenzie, have also been represented simultaneously by Mark Hammervold, Esq. (hereinafter referred to as "Mr. Hammervold") of Hammervold Law, PLC, who has served as co-counsel with Mr. Manookian.

4. Defendant, Jason Ritzen, has at all relevant times been represented by David Hooper, Esq. (hereinafter referred to as "Mr. Hooper") of Hooper, Zinn, and McNamee.

Case 3:19-bk-07235   Claim 5-1 Part 4   Filed 03/30/20   Desc Exhibit July 2018 Sanctions Judgment   Page 7 of 124

715

5. Defendant, Lauren Bull, has at all relevant times been represented by Rob McGuire, Esq. (hereinafter referred to as "Mr. McGuire") of Rob McGuire Law and previously of McGuire, Menke, Reddick & Shabayek, PLLC ("MMRS Law").[9]

6. Defendant, Andy Cho, has at all relevant times been represented by Robert Parsley, Esq. (hereinafter referred to as "Mr. Parsley") and others of Miller & Martin, PLC.

### B. Attorneys for the Non-Parties

7. At all relevant times in these proceedings, the Non-Parties, CK Global, LLC; NV Music Row, LLC; Dean Chase, Sandra Chase, and D.F. Chase, Inc., were represented by Marcus Crider, Esq. (hereinafter referred to as "Mr. Crider"), Frances Fenelon, Esq. (hereinafter referred to as "Ms. Fenelon"), Heath E. Edwards, Esq. (hereinafter referred to as "Mr. Edwards"), and Chris Dunn, Esq. (hereinafter referred to as "Mr. Dunn") at the law firm of Waller (hereinafter collectively referred to as "Waller").

8. The Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., have also been represented in this matter by Gayle Malone, Jr. Esq. (hereinafter referred to as "Mr. Gayle Malone"), Charles I. Malone, Esq. (hereinafter referred to as "Mr. Charles Malone"), and Beau C. Creson, Esq. (hereinafter referred to as "Mr. Creson") of Butler Snow, LLP since shortly after January 20, 2016, when it was learned certain media outlets had been provided and were intending to publish confidential material disclosed by the Non-Parties.

Accordingly, after identifying the relevant attorneys involved in this matter, the Court makes the following findings of fact:

---

[9] MMRS Law is now a defunct law firm, and Mr. McGuire is now serving as an Assistant United States Attorney in the United States Attorney's Office in Nashville, Tennessee

716

## C.   General Findings of Fact

9. On May 7, 2015, Plaintiff, David Chase, filed a *Complaint* alleging multiple claims against Defendants, Chris Stewart, Emily Stewart, Lauren Bull, Jason Ritzen, Andy Cho, Lino Lovrenovic, Bryan Everett, Susan Martin, and Clayton McKenzie.

10. On July 20, 2015, Mr. Manookian issued third-party subpoenas on the Non-Parties seeking certain documents and deposition testimonies. (*See* Subpoenas to Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., issued on July 20, 2015.)[10] These subpoenas required the Non-Parties to produce 39 categories of documents and for Dean Chase and Sandra Chase to submit to deposition testimony. (Hr'g Tr. 95:7-98:15, Sept. 23, 2016.) In lieu of objecting to these subpoenas, the Non-Parties, through their counsel from Waller, bargained to produce documents and give testimony, provided these documents and testimonies would be given under the protection of a protective order.[11] (Hr'g Tr. 41:14-21, Nov. 9, 2016.)

11. On August 24, 2015, Frances Fenelon, Esq. of Waller, emailed Mr. Manookian a proposed protective order for Defendants' review. (Hr'g Tr. 189:10-190:11, Sept. 23, 2016; Tr. Exhibit 18, Sept. 23, 2016.) In response, Mr. Manookian sent Ms. Fenelon a new proposed protective order drafted by him, which included the names of the individual Defendants he, his partner, Brian Cummings, and their firm, Cummings Manookian PLC, represented. (Hr'g Tr. 190:12-191:6, Sept. 23, 2016; Tr. Exhibit 19, Sept. 23, 2016.)

---

[10] The Court also notes the other Non-Parties, CK Global, LLC and NV Music Row, LLC, were also issued subpoenas.
[11] *See Agreed Protective Order*, Nov. 9, 2017.

12. On August 28, 2015, Ms. Fenelon emailed to Mr. Manookian a final version of the *Agreed Protective Order* which had been negotiated between the Parties and Non-Parties. (Hr'g Tr. 108:24-109:12, Sept. 23, 2016; Tr. Exhibit 3, Sept. 23, 2016.)

13. In the same email, Ms. Fenelon stated "[i]f you can agree that the productions are subject to the terms of the Protective Order even before the Court has signed and entered it, timing of production versus order entry shouldn't be a problem. Can you agree?" *Id.* In his Response, Mr. Manookian unequivocally stated, "I agree that the Order is binding on me and my clients at the time it is signed with permission as opposed to entered by the Court." (*Id.*) (emphasis added).

14. On August 28, 2015, Ms. Fenelon of Waller, as counsel for the Non-Parties, signed the *Agreed Limited Protective Order As to Certain Subpoenaed Non-Parties* (which was previously referred to above as the "*Agreed Protective Order*") for all counsel and parties by permission and filed the *Agreed Protective Order* with the Court. (*Motion for Entry of Agreed Limited Protective Order as to Certain Subpoenaed Parties* of August 28, 2015, Exhibit 1.) Upon the signing of the *Agreed Protective Order*, that very same day, the Non-Parties made their first production of documents pursuant to the terms of the *Agreed Protective Order*. (Hr'g Tr. 113:13-116:8, Sept. 23, 2016; Tr. Exhibit 5, Sept. 23, 2016.)

15. In a letter attached to the August 28, 2015 document production, Ms. Fenelon stated the production was being made jointly on behalf of all of the Non-Parties subpoenaed by Mr. Manookian. (Tr. Exhibit 5, Sept. 23, 2016.) The letter also mentioned while the Non-Parties "realize[d] that the [*Agreed Protective Order*] cautioned against mass designation of documents as 'confidential' . . . it would have

been unduly burdensome upon our clients to review each of the 17,648 of documents (**representing 78,000 pages**) identified through search designed to be as reasonably comprehensive as possible." (*Id.*) (emphasis added) In so doing, the Non-Parties designated all of the disclosed documents as "confidential" under the *Agreed Protective Order*, but offered either to conduct a page-by-page review for confidentiality, if Mr. Manookian's clients were willing to pay for such a review, or to review any confidentiality challenge Mr. Manookian wanted to make to the Non-Parties' specific designations, pursuant to the challenge procedures set forth in the *Agreed Protective Order*. (*Id.*)

16. The *Agreed Protective Order* includes the following procedure for challenging the Non-Parties' designation of documents or deposition testimony as confidential:

## 6. CHALLENGING CONFIDENTIALITY DESIGNATIONS

6.1 <u>Timing of Challenges</u>. A Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

6.2 <u>Challenge to Designation</u>. A Challenging Party who disputes a designation need only give written notice to the Designating Party that consists of an identification of the documents or materials whose designation is being challenged. The written notice does not require that a basis for the challenge be specified. Written notice may be provided by letter, fax, or electronically by email.

6.3 <u>Responses to Challenge</u>. Upon receipt of the Challenging Party's written notice, the Designating Party has fourteen (14) days of such written notice to apply to the Court for an order specifically designating the Disclosure or Discovery Material at issue as confidential. The Party seeking such an order has the burden of establishing good cause for the Disclosure or Discovery Material to be treated as confidential.

6.4 <u>Treatment of Information While Challenge is Pending</u>. Notwithstanding any challenge to the designation of Disclosure or Discovery Material as Confidential, all materials designated as such must

be treated as such and subject to this order until one of the following occurs:

    a.    the Designating Party withdraws its confidentiality designation in writing;

    b.    the Designating Party fails to apply to the Court for an order designating the material confidential within the time period specified above after receipt of a written challenge to such designation; or

    c.    the Court decides the material issue is not subject to protection as confidential.

*(Motion for Entry of Agreed Limited Protective Order as to Certain Subpoenaed Parties of August 28, 2015, Exhibit 1, Section 6.)*

17. On August 31, 2015, Mr. Manookian submitted a challenge to the confidential designations made by the Non-Parties by filing *Defendants Chris Stewart, Emily Stewart, Jason Ritzen, Susan Martin, Lino Lovrenovic, and Bryan Everett's Response in Opposition to the Non-Parties' Motion for Entry of Agreed Limited Protective Order.*[12] In this *Response*, Mr. Manookian requested the Court to not enter the *Agreed Protective Order*. However, on September 3, 2015, Mr. Manookian struck his *Response* of August 31, 2015 in opposition to the entry of the *Agreed Protective Order*, and instead "respectfully request[ed] that the proposed order be entered" by the Court. (Tr. Exhibit 6, Sept. 23, 2016.) Mr. Manookian claims he struck his *Response* so the Parties and Non-Parties could go through the designation-challenge procedure set forth in the *Agreed Protective Order*. (Hr'g Tr. 117:21-24, Sept. 23, 2016.)

18. On September 14, 2015, the Non-Parties filed their *Non-Parties' Joint Motion for Entry of a Protective Order*, in which the Non-Parties requested the Court uphold the

---

[12] In the *Response*, Mr. Manookian claimed misrepresentations had been made to the Defendants, as well as this Court.

confidential designation of the materials that had been challenged by Mr. Manookian.[13] This *Joint Motion* was filed in accordance with the *Agreed Protective Order* and was set to be heard before this Court on October 30, 2015. (*Id.*) Accordingly, based upon the terms of the *Agreed Protective Order*, all of the materials designated "confidential" were to be treated as such until an adjudication by this Court could be made. (*Motion for Entry of Agreed Limited Protective Order as to Certain Subpoenaed Parties*, Aug. 28, 2015, Exhibit 1, Section 6.4.)

19. On September 16, 2015, the Defendants, which included Mr. Manookian, took the depositions of Dean Chase and Sandra Chase. (Hr'g Tr. 120:14-15, Sept. 23, 2016.) In Section 5.2b of the *Agreed Protective Order*, the following is stated as the procedure for the Non-Parties' giving deposition testimony:

> b. <u>For testimony given by the Subpoenaed Parties in deposition or in other pretrial or trial proceedings,</u> the Party or Non-party offering or sponsoring the testimony must identify on the record, before the close of the deposition, hearing, or other proceeding, all protected testimony. When it is impractical to identify separately each portion of testimony that is entitled to protection, and when it appears that substantial portions of the testimony may qualify for protection, the Party or Non-party that sponsors, offers, or gives the testimony may invoke on the record (before the deposition or proceeding is concluded) a right to have up to 10 days to identify the specific portions of the testimony as to which protection is sought.

(*Motion for Entry of Agreed Limited Protective Order as to Certain Subpoenaed Parties* of August 28, 2015, Exhibit 1, Section 5.2b.)

20. At the beginning of the depositions, Marc Crider, Esq., an attorney at Waller and attorney for the Non-Parties, designated specific portions of the testimonies of the Non-Parties as "confidential" pursuant to the terms of the *Agreed Protective Order*. (Hr'g Tr. 182:15-21, Sept. 23, 2016.)

---

[13] The Court notes Non-Parties, NV Music Row, LLC, and CK Global LLC, jointly filed this *Motion*.

21. On October 1, 2015, Mr. Manookian sent an email to counsel for the Non-Parties requesting authority to provide News Channel 4 WSMV with copies of Sandra Chase's deposition testimony. (Tr. Exhibits 7 & 8, Sept. 23, 2016.) In the email, Mr. Manookian inquired whether the Non-Parties took the position that certain portions of Sandra Chase's testimony were confidential, and stated, "I will, obviously, follow your preference on this issue. I just need to know what that is." (*Id.*)

22. In two emails sent on October 2, 2015, Mr. Crider of Waller, on behalf of the Non-Parties, rejected Mr. Manookian's request, and stated he considered the entirety of Dean Chase and Sandra Chase's deposition testimonies to be confidential. (Tr. Exhibit 8, Sept. 23, 2016.)

23. On October 8, 2015, Plaintiff, David Chase, filed an *Expedited Motion for Sanctions, Protective Orders, and Other Related Relief*, and this matter was later set to be heard on October 20, 2015.

24. On October 19, 2015, Mr. Manookian filed *Defendants' Response to Plaintiff's Expedited Motion for Sanctions, Protective Orders and Other Relief*. (Tr. Exhibit 9, Sept. 23, 2016.) This filing included portions of Dean Chase and Sandra Chase's testimonies, which were marked as "Exhibit G" and "Exhibit H," respectively, and portions of text messages that had been produced and designated in the first document production of August 28, 2015, which was marked as "Exhibit I." (*Id.*) Mr. Manookian testified he filed these exhibits under seal. (Hr'g Tr. 133:20-135:1, Sept. 23, 2016; Tr. Exhibit 10, Sept. 23, 2016.)

### (1) **This Court's First Oral Order of October 20, 2015:**

25. On October 20, 2015, the Court held a hearing to resolve the urgent discovery issues in this case. At this hearing, Mr. Crider of Waller, on behalf of all Non-Parties, made an oral motion to ensure all of the Non-Parties' materials and deposition testimonies that had been designated confidential, as well as Mr. Manookian's *Response* of October 19, 2015 and attachments thereto, be treated as confidential and remain under seal pending the hearing set on October 30, 2015 for the *Non-Parties' Joint Motion for Entry of a Protective Order* of September 14, 2015. At the conclusion of the hearing, this Court granted Mr. Crider's oral motion to seal all of the related documents and testimonies and considered this information confidential (hereinafter referred to as the "*First Oral Order.*")[14]

26. On October 21, 2015, Mr. Manookian sent an email to the other attorneys in this case and stated he, "took precautions to ensure [the designated confidential material] were [sic] provided only to the Court and attorneys for the parties to this action. You apparently received them nonetheless. To the extent these materials surface outside of the seal, it is important to know who has been disclosing them and to what additional non-parties they have been disclosed." (Tr. Exhibit 10, Sept. 23, 2016.)

27. On October 26, 2015, Mr. Manookian filed *Defendants' Response to Non-Parties' Joint Motion for Entry of a Protective Order of October 26, 2015*, arguing the Court should not uphold the Non-Parties' confidential designations because the Non-

---

[14] This *First Oral Order* was memorialized by the Court's *Order on Plaintiff's Expedited Motion for Sanctions, Protective Order, and Other Related Relief and Expedited Motion to Compel* entered on November 7, 2015.

Parties had breached the *Agreed Protective Order* when they designated their production as confidential.

### (2)    This Court's Second Oral Order of October 30, 2015:

28. At the hearing on October 30, 2015, this Court rejected the arguments presented by Mr. Manookian and orally granted the Non-Parties' *Joint Motion*, and so doing the Court ordered: (1) all pleadings or documents containing, attaching, or referencing documents, testimony, or information designated as confidential by the Non-Parties were to be filed under seal; and (2) adopted and modified the *Agreed Protective Order* to permit the Non-Parties to designate all materials as confidential in the manner set forth by the Non-Parties (hereinafter referred to as the "*Second Oral Order*.")[15]

### (3)    This Court's *Order on Plaintiff's Expedited Motion for Sanctions, Protective Order, and Other Related Relief and Expedited Motion to Compel* entered on November 7, 2015

29. On November 7, 2015, the Court entered the *Order on Plaintiff's Expedited Motion for Sanctions, Protective Order, and Other Related Relief and Expedited Motion to Compel*, memorializing its *First Oral Order* from the hearing on October 20, 2015, which stated, in pertinent part, as follows:

> Non-Parties D.F. Chase, Inc., Dean Chase, and Sandra Chase's Oral Motion to Seal is **GRANTED** as follows:
>
> 4. a.    Defendants' Response to Plaintiff's Expedited Motion for Sanctions, Protective Order, and Other Related Relief as well as the Exhibits attached thereto shall be sealed pending hearing of Non-Parties' Motion for Protective Order;
>
> b.    All materials previously produced by Nonparties D.F. Chase, Inc., Dean Chase, and Sandra Chase in this action shall be

---

[15] This *Second Oral Order* was memorialized by the Court's *Order* entered on November 6, 2015.

treated as confidential and only filed under seal pending hearing of Nonparties' Motion for Protective Order;

c.   All transcripts and video of deposition testimony previously given by Dean Chase and Sandra Chase shall be treated as confidential and only filed under seal pending hearing of Nonparties' Motion for Protective Order;

*Order on Plaintiff's Expedited Motion for Sanctions, Protective Order, and Other Related Relief and Expedited Motion to Compel* entered on November 7, 2015, p. 2-3.[16]

### (4)   This Court's *Order* entered on November 6, 2015:

30. On November 6, 2015, the Court memorialized its *Second Oral Order*, which provided in pertinent part:

It appearing to the Court, based upon the pleadings and record before the Court and arguments of counsel, that the Motions submitted on behalf of the Nonparties . . . should be and hereby are GRANTED. The Court Orders as follows:

. . .

3.   Any pleading or document filed or submitted to the Court that contains, attaches, or refers to documents, testimony, or information designated as confidential by the Nonparties must be filed or submitted under seal;

4.   The Agreed Protective Order is modified to permit the Nonparties to designate documents as "confidential" in the manner in which such designations have been made, and any and all documents so marked by the Nonparties shall be protected from disclosure consistent with the terms of the Agreed Protective Order and in accordance with this Order;

. . . .

*Order* of November 6, 2015.

---

[16] The Court notes this *Order* was filed on November 9, 2015.

31. The Court finds, as of October 20, 2015, all of the materials designated as confidential by the Non-Parties in their document production and the deposition testimonies of Dean Chase and Sandra Chase were ordered to be kept confidential by this Court. The subsequent oral and typewritten *Orders* entered by this Court relating to the *Agreed Protective Order* shall hereinafter be referred to collectively as "the Court's *Orders*."

### D. Findings of Fact Regarding the Lawsuit Styled *Jonathan King v. Dean Chase*, Case No. 16-0030-BC in Davidson County Chancery Court

32. In December of 2015, despite the plain terms of the *Agreed Protective Order* and the multiple *Orders* entered by this Court, as explained above, Mr. Manookian and Mr. Hammervold, knowingly, willfully, and intentionally and in blatant disregard of this Court's *Orders*, began using the Non-Parties' confidential materials in their representation of Jonathan King (hereinafter referred to as "Mr. King"), the Plaintiff in the lawsuit styled *Jonathan King v. Dean Chase*, Case No. 16-0030-BC, in the Davidson County Chancery Court (hereinafter referred to as "*King v. Chase*").

33. On December 30, 2015, Mr. King sent an email to John Palmer (hereinafter referred to as "Mr. Palmer"), another non-party to this present case, in which he discussed a potential lawsuit against Dean Chase and copied Mr. Manookian. The email Mr. King wrote on December 30, 2015, stated, in pertinent part:

> I believe David mentioned that I am vigilantly pursing a cause of action for breach of fiduciary duties on behalf of the law firm [Waller] and Dean [Chase] and attorney malpractice.
>
> **I was put in touch with an extremely competent and savvy attorney in Nashville who, through discovery, has ascertained all communications between the law firm [Waller], Dean [Chase] and**

**David [Chase]** and has intimate knowledge of with [sic] what really took place behind the scenes.

. . . .

**You will be shocked to read the communications between Steven and Dean,** always putting Dean's personal interest first and never operating out of the best interest of the group.

(Tr. Exhibit 4, Nov. 9, 2017.) (emphasis added)

34. The Court finds this email was sent after the Court entered its *Order* of November 6, 2015. (*Id.*) Also, this email clearly shows Mr. Manookian disclosed the confidential text messages to Mr. King. (*Id.*)

35. Right on cue, on December 31, 2015, Mr. Manookian sent a demand letter on behalf of Mr. King to a Waller attorney, Steven Kirkham, Esq. (hereinafter referred to as "Mr. Kirkham"), which requested to examine, copy, and audit the books and records of NV Partners, a Tennessee partnership. (Tr. Exhibit 13, Sept. 23, 2016.)

36. Additionally, in this letter, Mr. Manookian threatened various lawsuits against Waller, as well as Non-Parties, Dean Chase and D.F. Chase, Inc., as Mr. Manookian said, committing fraud, conversion, breach of fiduciary duty, legal malpractice, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). (*Id.*) Mr. Hammervold was copied as co-counsel on Mr. Manookian's demand letter. (*Id.*)

37. On January 6, 2016, Mr. Manookian sent another email to certain attorneys at Waller regarding the threatened litigation against Dean Chase and accused Waller of fraud and attempting to cover up criminal activity relating to NV Partners, citing "80,000 pages of documents evidencing the same" that Mr. Manookian said had been produced by counsel for the Non-Parties in this case and that were "preserved in

Case 3:19-bk-07235    Claim 5-1 Part 4    Filed 03/30/20    Desc Exhibit July 2018
Sanctions Judgment    Page 19 of 124

727

[Mr. Manookian's] custody."[17] (Tr. Exhibit 15, Sept. 23, 2016.) (emphasis added) Mr. Hammervold was again copied on this email exchange. (*Id.*)

38. On January 12, 2016, Mr. Manookian and Mr. Hammervold, acting as co-counsel, filed a Complaint against Dean Chase in the *King v. Chase* case in the Chancery Court of Davidson County, Case No. 16-0030-II. (Tr. Exhibit 16, Sept. 23, 2016.)

39. On February 3, 2016, Mr. Manookian and Mr. Hammervold filed *Plaintiff's Response to Defendant's Motion for Protective Order*, attaching as Exhibit 1 a copy of an unsigned Agreement of Partnership of NV Partners, which had been produced to Mr. Manookian and Mr. Hammervold by the Non-Parties in this case and had been marked confidential pursuant to the *Agreed Protective Order* and the *Orders* of this Court. (Tr. Exhibit 17, Sept. 23, 2016.)[18]

40. Subsequently, Mr. Manookian and Mr. McGuire attended a meeting with Mr. Charles Malone together with other counsel of record regarding the *King v. Chase* case, at which they cited to documents by Bates-number supporting the threatened litigation against Dean Chase.[19] (Hr'g Tr. 291:8-293:3, Sept. 23, 2016.) These documents were again the very documents marked confidential pursuant to the *Agreed Protective Order* and the above *Orders* of this Court. (*Id.*)

41. As to the question of whether the *King v. Chase* case in Davidson County is related to these current court proceedings in Williamson County, on October 28, 2016,

---

[17] *See* numbered ¶ 15 above, in which Ms. Fenelon explained the August 28, 2015 document production included 17,648 of documents representing 78,000 pages. (Tr. Exhibit 5, Sep. 23, 2016.)

[18] Mr. Manookian and Mr. Hammervold contend this document was in the possession of Mr. King and is not the confidential material submitted by the Non-Parties.

[19] At the hearing on September 23, 2016, Mr. McGuire testified he attended a meeting with his co-counsel, Mr. Manookian, wherein they informed the opposing counsel in the *King v. Chase* case of the documents they believed to support their threatened litigation. (Hr'g Tr. 291:8-17, Sept. 23, 2016.) Mr. McGuire claimed this was a discovery meeting in the *King v. Chase* case. (Hr'g Tr. 292:3-24, Sept. 23, 2016.)

Page **20** of **122**

Chancellor Ellen H. Lyle entered a *Scheduling Order* in *King v. Chase*, finding as follows: **"the Court documents that Plaintiff's Counsel [Mr. Manookian] stated that this lawsuit and the Williamson County lawsuits are not related."** (Tr. Exhibit 1, Nov. 9, 2017.) (emphasis added)  Mr. Manookian and Mr. Hammervold were copied on this *Scheduling Order* as counsel for Mr. King. (*Id.*)

### E.  Findings of Fact Regarding the News Media Disclosure of Possession of Confidential Material

42. On January 20, 2016, through an email from Mr. Phillip Robertson, Plaintiff, David Chase, notified counsel for the Non-Parties and Defendants he had recently received a phone call from Jeremy Finley (hereinafter referred to as "Mr. Finley"), an investigative reporter at News Channel 4 WSMV, wherein Mr. Finley disclosed he was in receipt of certain discovery materials from this case, which included confidential text messages produced by the Non-Parties and the confidential deposition testimonies of Dean Chase and Sandra Chase. (Tr. Exhibit 11, Sept. 23, 2016.)

43. On that same day, in an email exchange among Mr. Manookian to Mr. Phillip Robertson, copying counsel Brittany Bartkowiak, David Hooper, Mark Hammervold, Michael Kohler, Travis Thompson, Bob Parsley, Rob McGuire, Brian Cummings, Frances Fenelon, Marcus Crider and Heath Edwards, concerning the report of the leaked, confidential material, Mr. Manookian wrote, **"[d]id Mr. Finley indicate who the 'source' may be? I would note that [my [Manookian's] client Defendant] Clayton McKenzie never agreed to keep any materials confidential; nor was he**

required to at any time prior to October 20, 2015 . . . "[20] (*Id.*) (emphasis added) Mr. Hammervold, co-counsel for Mr. McKenzie, was copied on the January 20, 2016 email. (*Id.*)

44. On January 21, 2016, Mr. Finley also contacted Davidson County District Attorney General Glenn R. Funk (hereinafter referred to as "General Funk") to discuss a news story he planned to broadcast concerning this case. (Hr'g Tr. 222:11-229:7, Sept. 23, 2016; Tr. Exhibit 21, Sept. 23, 2016.) Subsequently, Mr. Finley submitted a series of emails to General Funk for the basis of his news story, which included (1) Mr. Manookian's October 19, 2015 *Response to Plaintiff's Expedited Motion for Sanctions, Protective Orders and Other Relief*; (2) the deposition transcript of Dean Chase and Sandra Chase of September 16, 2015; and (3) text messages produced by the Non-Parties in the original document discovery.[21] (Tr. Exhibit 21, Sept. 23, 2016.)

45. Notably, the Dean Chase and Sandra Chase deposition transcripts sent to General Funk from Mr. Finley had the exact same document identification marker as "Exhibit G" and "Exhibit H" to Mr. Manookian's *Defendants' Response to Plaintiff's Expedited Motion for Sanctions, Protective Orders and Other Relief* filed on October 19, 2015.[22] **As stated above, these documents were ordered to be under seal at this time in the proceedings, and by Mr. Manookian's own account he had "[taken] precautions to ensure [the designated confidential materials] were**

---

[20] This statement is contradictory to Mr. Manookian's prior email to Ms. Fenelon in which he clearly acknowledged the *Agreed Protective Order* was in effect and binding on him and his clients and stated, "I agree that the Order is binding on me and my clients at the time it is signed with permission as opposed to entered by the Court." (Tr. Exhibit 3, Sept. 23, 2016.)

[21] The Court notes these attachments were designated "confidential" by the *Agreed Protective Order* and the *Orders* entered by this Court.

[22] *See* numbered ¶ 24 above; Trial Exhibit 9, Sept. 23, 2016.

Page 22 of 122

provided only to the Court and attorneys for the parties to this action." (emphasis added) (Tr. Exhibit 10, Sept. 23, 2016.) The Court finds Mr. Manookian's alleged "precautions" were thwarted by News Channel 4 WSMV's receipt of these documents, which only the Court and the attorneys in this case were in possession of and privileged to view.

46. In addition, on January 29, 2016, Phil Robertson, Esq. (hereinafter referred to as "Mr. Robertson"), the attorney for Plaintiff, David Chase, forwarded two emails dated January 27, 2016 from Mr. Finley to counsel for the Non-Parties and Parties. (*See Order* of March 29, 2016, p. 8.) The first email attached four pages of text messages the Non-Parties had designated and labeled as confidential, and which were previously included as part of "Exhibit I" of Mr. Manookian's *Response to Plaintiff's Expedited Motion for Sanctions, Protective Orders and Other Relief* of October 19, 2015. (*Id.*; Hr'g Tr. 129:20-132:3, Sept. 23, 2016; Exhibit 9, Sept. 23, 2016.)

47. The second email contained ten pages of excerpts from the transcripts of Dean Chase's and Sandra Chase's depositions, with each such deposition's cover page also showing the "Exhibit G" and "Exhibit H" stickers from Mr. Manookian's *Response to Plaintiff's Expedited Motion for Sanctions, Protective Orders and Other Relief* of October 19, 2015. (*Id.*) Based upon this evidence, the Court finds Mr. Finley was in possession of the exhibits to Mr. Manookian's *Response to Plaintiff's Expedited Motion for Sanctions, Protective Orders and Other Relief* of October 19, 2015 and attached exhibits. Who provided the confidential information to Mr. Finley and when this disclosure was made is still to be determined and will be shown in detail below.

### F. Findings of Fact Regarding News Channel 4 WSMV's Publication of Confidential Discovery Materials

48. On February 3, 2016, Mr. Finley and News Channel 4 WSMV published a story in which the Non-Parties' confidential materials and deposition testimonies were released. (Tr. Exhibit 2, Nov. 9, 2017.) The following confidential material and deposition testimonies were broadcasted: (1) from the 2:29 to 2:47 minute mark, Mr. Manookian's *Response to Plaintiff's Expedited Motion for Sanctions, Protective Orders and Other Relief* of October 19, 2015 is shown and discussed by Mr. Finley;[23] (2) from the 2:48-3:02 and 4:56-5:48 minute marks, portions of the text messages that were previously included as part of "Exhibit I" of Mr. Manookian's *Response to Plaintiff's Expedited Motion for Sanctions, Protective Orders and Other Relief* of October 19, 2015 are shown and discussed by Mr. Finley; and (3) from the 4:21-4:55 minute mark, the transcripts of Dean Chase's and Sandra Chase's depositions are shown, with each deposition's cover page showing the "Exhibit G" and "Exhibit H" stickers from Mr. Manookian's October 19, 2015 *Response to Plaintiff's Expedited Motion for Sanctions, Protective Orders and Other Relief.* (*Id.*)[24]

### G. Findings of Fact Regarding News Channel 5 WTVF and the *Nashville Scene's* Publication of Confidential Discovery Materials[25]

49. On February 3, 2016 and February 4, 2016, News Channel 5 WTVF and the *Nashville Scene* published separate stories containing the confidential materials and

---

[23] The Court also notes Mr. Manookian is featured in the broadcast video giving what appears to be an interview.

[24] Once again, the Court reiterates these confidential materials and deposition testimonies were designated as confidential by the *Agreed Protective Order* and the Court's *Orders.*

[25] The Court took judicial notice that News Channel 5 WTVF, News Channel 4 WSMV, and the *Nashville Scene* made publications, but did not make a determination as to whether the information was confidential at that time. (Hr'g Tr. 211:2-212:16; 233:2-7, Sept. 23, 2016; Hr'g Tr. 19:13-19, Nov. 9, 2017; Tr. Exhibit 2, Nov. 9, 2016.)

Case 3:19-bk-07235 Claim 5-1 Part 4 Filed 03/30/20 Desc Exhibit July 2018 Sanctions Judgment Page 24 of 124

732

deposition testimonies of Dean Chase and Sandra Chase. (Hr'g Tr. 211:2-212:16; 233:2-7, Sept. 23, 2016; Hr'g Tr. 19:13-19, Nov. 9, 2017; Tr. Exhibit 2, Nov. 9, 2016.)

50. In the NewsChannel 5 WTVF story, from the 0:00-0:17, 1:41-1:49, 2:31-3:20, 3:34-4:11, and 5:19-5:49 minute marks, the video recordings of the depositions of Dean Chase and Sandra Chase are shown and discussed by Phil Williams. (Tr. Exhibit 2, Nov. 9, 2017.) Additionally, from the 2:00-2:17, 4:20-4:46, 5:10-5:19, and 5:58-6:13 minute marks, portions of the text messages that were previously included as part of "Exhibit I" of Mr. Manookian's October 19, 2015 *Response to Plaintiff's Expedited Motion for Sanctions, Protective Orders and Other Relief* are shown and discussed by Phil Williams. (*Id.*)

## H.    Findings of Fact as to the Subsequent Proceedings

51. On February 25, 2016, the Non-Parties filed a *Motion for Sanctions* based primarily on two violations of the *Agreed Protective Order* and the Court's *Orders*: (1) the dissemination of the Non-Parties' confidential discovery materials and deposition testimonies to the news media; and (2) the use of the Non-Parties' confidential discovery materials in the *King v. Chase* case and other threatened litigation. The Non-Parties requested the Court conduct an investigation to determine which of the parties and/or counsel for the parties violated the *Agreed Protective Order* and subsequent Court *Orders* and to levy all necessary sanctions against the violator(s).

52. On March 7, 2016, Miller & Martin, PLC and Defendant Cho filed a *Response* to the *Non-Parties' Motion for Sanctions* that contained the following sworn representations from both Bob Parsley, Esq. as an Officer of the Court and Defendant Cho: (1) they did not disseminate, directly or indirectly, the Non-Parties' confidential discovery

materials to the media, the public, or any other prohibited persons and (2) they do not know who disseminated any confidential discovery materials to the news media. (*See Defendant Andy Cho's Response to Various Motions Set for Hearing on March 10, 2016.*)

53. On March 7, 2016, David T. Hooper, Esq. of Hooper, Zinn & McNamee, PLLC and Defendant Ritzen, filed a *Response* to the *Non-Parties' Motion for Sanctions* that contained the following sworn representations from both David Hooper as an Officer of the Court and Defendant Ritzen:(1) they did not disseminate, directly or indirectly, the Non-Parties' confidential discovery materials to the media, the public, or any other prohibited personal and (2) they do not know who disseminated any confidential discovery materials to the news media. (*Response of Jason Ritzen to Motion for Sanctions of Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc.* of March 7, 2016.)

54. On March 7, 2016, Mr. Manookian, together with the assistance of Mr. Hammervold, executed a different strategy, and began what this Court can only describe as a knowing, willful, and intentional course of conduct to deceive and defraud this Court in order to avoid punishment for their actions and to gain personal advantage in this case and the *King v. Chase* lawsuit. First, Mr. Manookian filed a *Motion to Strike and Response to Non-Parties' Motion for Sanctions*, asserting the Non-Parties' *Motion for Sanctions* was in reality a petition for contempt that should be stricken because the *Motion* does not even identify who the Non-Parties believe should be held in contempt. Also, Mr. Manookian argued the Court had "no authority" to sanction the offending individuals.

55. Second, in conjunction with Mr. Manookian's filing of his *Motion to Strike*, Mr. Hammervold failed to file a response to the Non-Parties' *Motion for Sanctions* prior to the Court-ordered March 10, 2016 hearing date. Mr. Hammervold never asked for an extension of time to file his ordered response.

56. Third, on March 10, 2016, the Court held a hearing regarding the *Non-Parties' Motion for Sanctions*. However, Mr. Manookian failed to appear. (*See Non-Parties' Notice of Filing of Court Transcript* of April 26, 2017, Exhibit A, March 10, 2016, Hr'g Tr. 11:21-12:11; 29:23-24.) Mr. Hammervold did appear and made arguments on behalf of Mr. Manookian as well as himself. (*Id.* at 25:21-28:2; 51:18-54:18.) It is noteworthy Mr. Hammervold argued Defendant, Clayton McKenzie, whom Mr. Hammervold and Mr. Manookian represented, was not bound by the *Agreed Protective Order;* the *Agreed Protective Order* allowed the Non-Parties' confidential materials to be used in related litigation, and the sanctions sought by the Non-Parties were inappropriate. (*Id.* at 25:21-28:2; 29:23-24.) Once again, this argument is contradictory to Mr. Manookian's prior email to Ms. Fenelon in which he clearly acknowledged the *Agreed Protective Order* was in effect and binding on him and his clients and stated, "I agree that the Order is binding on me and my clients at the time it is signed with permission as opposed to entered by the Court." (Tr. Exhibit 3, Sept. 23, 2016.)

57. After oral arguments, this Court explained it did not wish to rule on the *Motion for Sanctions* at the present time, stating:

> But I really think I want to give everyone an opportunity either to certify they had nothing to do with it or come forward, say, "Yeah, I did."

This should not have to be an investigation. Really shouldn't. If it involves lawyers violating an order, the Court should not have to be required to do that. But if that's what it takes, that's what we'll do. I believe that a lawyer should, as a member of the bar -- and under some very stringent rules and regulations, should certify that they had nothing to do with it. If they cannot, then they simply cannot.

(*Id.* at p. 48:20-49:7.)

58. Upon review of the *Motion for Sanctions*, the Court fully explained to all of the attorneys the Court should not be required to investigate these types of situations. Thus, the Court strongly urged and implored all of the attorneys, as officers of the Court, to come forward and admit to violating the *Agreed Protective Order* and the Court's subsequent *Orders*. Regrettably, the guilty party(ies) remained silent, refused come forward and to tell the truth, and continued to actively perpetrate a continuing fraud upon this Court, the attorneys, and the parties in this case and thus traveled down an expensive and unnecessary path to uncover the truth, despite this Court's adamant attempts to persuade the guilty party(ies) to admit to their violations of the Court's *Orders* to prevent an extremely time-consuming project for this Court and the litigants, not to mention an expensive undertaking for the Non-Parties.[26]

59. Accordingly, the Court took the *Non-Parties' Motions for Sanctions* under advisement to begin a lengthy and time-consuming, fact-finding review of the evidence and issue a written order which would set forth the result of the Court's review into the Non-Parties' *Motion for Sanctions*.

60. On March 17, 2016, Mr. Hammervold filed a *Supplemental Response to NonParties* [sic] *Motion for Sanctions* on behalf of Defendants, Lovrenovic, Bryan Everett, Susan

---

[26] As Senator Howard Henry Baker, Jr., a former Republican United States Senator from Tennessee, who served as the Senate Majority Leader and White House Chief of Staff under President Ronald Reagan, and who was also the ranking minority member of the Senate committee which investigated the Watergate scandal, stated, "[i]t is almost always the cover-up rather than the event that causes trouble."

Martin, and Clayton McKenzie. In the *Response*, Mr. Hammervold stated as an Officer of the Court: (1) he had not disseminated any of the Non-Parties' confidential discovery materials or depositions to the media, any unauthorized third party, or to his clients; and (2) asserted his and Mr. Manookian's claims that the use of the Non-Parties' confidential discovery materials in *King v. Chase* were not wrongful because such litigation should be considered "future related litigation" under the *Agreed Protective Order.*[27]

61. On March 17, 2016, Mr. Manookian filed (*in camera* with the Court only) a *Declaration* under penalty of perjury, to which Mr. Manookian stated (1) he "had not disseminated confidential discovery materials in this case in violation of a court order;" (emphasis added) (2) that between October 2, 2015 through October 8, 2015, he had given and/or discussed certain of the Non-Parties' discovery materials to/with David Raybin, Kim Hodde, and Eli Richardson, three attorneys who do not represent any of the Parties in this case, as well as law enforcement; and (3) he was only disclosing such dissemination because it prevented him from "broadly certify[ing] that I have not disseminated portions of the Non-Parties' discovery materials to third parties." (*Declaration of Brian Manookian* filed In-Camera on March 17, 2016.)

62. At this time in the proceedings, Mr. Manookian had the opportunity to come forward and provide to the Court information as to how the media received the confidential materials. Instead, Mr. Manookian submitted to this Court the only people he had

---

[27] Mr. Hammervold contended the *Agreed Protective Order* permitted the use of protected materials in "future related litigation." Thus, he submitted the *King v. Chase* case constituted "future related litigation." However, the Court notes this was also *after* Mr. Manookian argued to Chancellor Lyle in the *King v. Chase* case in Davidson County the cases were not related. (*See* numbered ¶ 41 above; Tr. Exhibit 1, Nov. 9, 2017.)

disclosed the confidential material to were with the three attorneys mentioned above and law enforcement. However, as will be thoroughly examined below, this was a complete and blatant lie made under oath (with the penalty of perjury), which is evident by Mr. Manookian's subsequent admission to this Court at the evidentiary hearing on September 23, 2016, that <u>he did release the confidential information to the news media</u>.

63. On March 29, 2016, the Court entered an *Order* on the Non-Parties' *Motion for Sanctions*, finding the allegations in the Non-Parties' *Motion* were "supported by fact and credible affidavit testimony, warranting serious consideration by the Court." (*Order* of March 29, 2016, at p. 1-2.) Furthermore, the Court declined at that time to grant the Non-Parties' *Motion for Sanctions*, but instead ruled the Non-Parties should file detailed motions for sanctions and/or petitions for contempt if they wished to pursue the matter at a later date. (*Id.*)

## I.   <u>Findings of Fact as to the Non-Parties' *Petition for Contempt* and *Motion for Sanctions* of April 11, 2016</u>

64. On April 11, 2016, the Non-Parties filed their *Petition for Civil Contempt and Motion for Sanctions* (hereinafter referred collectively as the "*Petitions*") against Mr. Manookian and Mr. Hammervold, as well as against their respective law firms.[28]

65. In furtherance of Mr. Manookian's and Mr. Hammervold's attempts to defraud the Court, on April 21, 2016, Mr. Manookian filed a *Response* to the Non-Parties' *Petitions*, arguing the *Petitions* should be denied because they constitute "**rank unsupported hypothesizing,**" "**speculation and shameless, Johnny-come-lately histrionics,**" and "**assorted real and imagined conduct.**" (emphasis added) (*Brian*

---

[28] The Court notes the Non-Parties, CK Global, LLC and NV Music Row, LLC, also filed a separate *Motion for Sanctions* on April 11, 2016.

*Manookian and Cummings Manookian PLC's Response to Non-Parties' Petition for Contempt and Motion for Sanctions* of April 21, 2016, at p. 1-2; 8.) On that same day, Mr. Hammervold also filed a *Response to the Non-Parties Petitions*, in which Mr. Hammervold noted his previous representations he had not disclosed any materials to the media or third parties and added he did **"not know how the media obtained the protected materials."** (Tr. Exhibit 23, n. 2, Sept. 23, 2016) (emphasis added). Also, Mr. Hammervold represented he had **"not disclosed, referenced, filed, or otherwise 'used'** *any* **of the Protected Materials that the Non-Parties (mass) designated as confidential in the** *King v. Chase* **case."** (*Id.* at p.1.) (emphasis added).

66. After the conclusion of the proof in this matter and ample time to thoroughly examine the evidence, the Court has been utterly dumbfounded by Mr. Manookian's willingness to attempt to mislead the Court from uncovering his violations of the Court's *Orders* by any means necessary, and even to go so far, as he did here, to claim the Non-Parties' *Petitions* were merely "rank unsupported hypothesizing" when he very well knew he was the one who released the information to the news media. Also, the Court notes at this point Mr. Hammervold lied to the Court because he and Mr. Manookian "used" the confidential material in their representation of Mr. King in the *King v. Chase* case, which he was co-counsel with Mr. Manookian.[29]

---

[29] *See* numbered ¶¶ 32-41 above (showing Mr. Manookian's and Mr. Hammervold's use of the confidential material in their representation of Mr. King.)

### J. Findings of Fact Regarding Evidentiary Hearing of September 23, 2016

67. On September 23, 2016, the Court held the first day of the evidentiary hearing on the Non-Parties' *Petitions*. Prior to the beginning of the hearing, the Court denied *Respondents Mark Hammervold, Hammervold PLC, Brian Manookian, and Cummings Manookian's Joint Motion to Dismiss Contempt Petition and Motion for Sanctions* filed on September 16, 2016. In their *Joint Motion to Dismiss*, Mr. Manookian and Mr. Hammervold argued the Non-Parties' *Petition* was a "circus-like mass-inquisition" and "chas[ing] a wild goose" but also that it was "abundantly clear that [the Non-Parties] have no information to support their speculative allegations." (*Mark Hammervold, Hammervold PLC, Brian Manookian, and Cummings Manookian's Joint Motion to Dismiss Contempt Petition and Motion for Sanctions* of September 16 , 2016, p. 2-3.)

68. Once again, Mr. Manookian and Mr. Hammervold continued their ongoing fraud upon the Court by their adamant insistence the investigation into the release of the confidential information was nothing more than a "wild goose chase." However, this Court finds, based upon Mr. Manookian's own testimony below, the apparent "wild goose" had been caught.

#### (1) Mr. Manookian's Testimony

69. At the hearing on September 23, 2016, Mr. Manookian was placed under oath and gave the following testimony in response to cross-examination: (1) Mr. Manookian admitted he disclosed portions of the Non-Parties' confidential discovery materials to General Funk on September 1, 2015;[30] (2) Mr. Manookian admitted he disclosed

---

[30] (Hr'g Tr. 109:13-110:11, Sept. 23, 2016; Tr. Exhibit 4, Sept. 23, 2016.)

portions of the Non-Parties' confidential discovery materials and deposition testimonies to Mr. Finley of News Channel 4 WSVM; however, Mr. Manookian claimed he physically delivered the materials to Mr. Finley sometime between October 4, 2015 through October 6, 2015;[31] (3) Mr. Manookian admitted he disclosed portions of the Non-Parties' confidential discovery materials and deposition testimonies to Phil Williams of News Channel 5 WTVF. However, Mr. Manookian claimed he emailed the deposition testimonies to Mr. Williams on October 6, 2015, but he hand-delivered the video portions of the confidential discovery materials in the same time period;[32] (4) Mr. Manookian admitted he disclosed portions of the Non-Parties' confidential discovery materials and deposition testimonies to Jim Ridley at the *Nashville Scene* between October 4-6, 2015, and he physically delivered the materials to Mr. Ridley;[33] (5) Mr. Manookian admitted he disclosed portions of the Non-Parties' confidential deposition testimonies to attorneys David Raybin, Kim Hodde, and Eli Richardson in the same early October 2015 period because he wanted to find out from them if he had an affirmative obligation to present such information to law enforcement;[34] Mr. Manookian failed to advise any of these attorneys about the *Agreed Protective Order* when seeking such advice, yet, each attorney, at least according to Mr. Manookian, still advised him he did not have an affirmative obligation to disclose the Non-Parties' confidential deposition testimonies to law enforcement;[35] and (6) Mr. Manookian testified he already disclosed portions of the Non-Parties' confidential deposition testimonies to the U.S.

[31] (Hr'g Tr. 107:3-10; 159:20-160:13; 161:5-10, Sept. 23, 2016.)
[32] (Hr'g Tr. 107:11-17; 160:14-25; 161:5-10, Sept. 23, 2016.)
[33] (Hr'g Tr. 107:18-24; 108:2-4, Sept. 23, 2016.)
[34] (Hr'g Tr. 126:7-127:13, Sept. 23, 2016.)
[35] (*Id.*)

Attorney's Office and Federal Bureau of Investigation ("FBI") on October 4, 2015, after he had consulted with his attorney, if in fact Mr. Manookian can be believed as to his assertions.[36]

70. Mr. Manookian provided no credible information in any form to support his statements, and the Court seriously doubts the veracity of Mr. Manookian's statements set forth in numbered paragraph 69 above.

### (2)  Mr. Hammervold's Testimony

71. At the hearing on September 23, 2016, Mr. Hammervold was placed under oath and gave the following testimony in response to cross-examination: (1) Mr. Hammervold testified he learned Mr. Manookian had given the Non-Parties' confidential documents and deposition testimonies to the news media a few days before the hearing on September 23, 2016;[37] (2) Mr. Hammervold testified, prior to his new found knowledge of Mr. Manookian's disclosure before the hearing, he had never asked Mr. Manookian, his co-counsel, whether he gave the confidential documents or the deposition videos to the media;[38] (3) Mr. Hammervold testified he was acting as co-counsel with Mr. Manookian when Mr. Manookian explicitly sent emails relating to confidential documents to opposing counsel in the *King v. Chase* case and when Mr. Manookian and Mr. McGuire cited these confidential documents at a

---

[36] (Hr'g Tr. 124:17-21, Sept. 23, 2016.)

[37] (Hr'g Tr. 257:24-258:14, Sept. 23, 2016.) Based upon Mr. Hammervold's testimony of only finding out about Mr. Manookian's disclosure of the confidential information a few days prior to the hearing, the Court is perplexed as to why Mr. Hammervold did not amend, strike, or make a statement at the outset of the hearing correcting his *Joint Motion to Dismiss*, which included assertions the *Petitions* were futile and unsubstantiated. Instead of taking such actions, Mr. Hammervold stood by his *Joint Motion to Dismiss*, which included assertions of which he knew to be false.

[38] (Hr'g Tr. 257:24-258:2, Sept. 23, 2016.)

meeting with opposing counsel;[39] and (3) Mr. Hammervold admitted Mr. Manookian, with Mr. Hammervold as his co-counsel, had filed in *King v. Chase* a copy of the Agreement of Partnership of NV Partners, which had been produced to them by the Non-Parties in this present case and had been marked confidential pursuant to the *Agreed Protective Order* and subsequent *Orders* of this Court on October 20, 2015 and October 30, 2015.[40]

### K.  Findings of Fact Regarding Attempts to Conclude Evidentiary Hearing on the Petitions

72. The evidentiary hearing on the *Petitions* was not completed on September 23, 2016, and the Court scheduled the second day of the hearing for November 7, 2016 to permit Mr. Manookian and Mr. Hammervold to introduce additional evidence in their defense.

73. Regrettably, this case was set to be heard after another case also set on November 7, 2016, which inevitably exceeded its allotted time. Thus, the second day set for the remainder of the evidentiary hearing did not resume on November 7, 2016.

74. After three months of delay, on February 16, 2017, the Non-Parties filed the *Non-Parties' Motion to Close Liability Hearing on Non-Parties' Petition for Contempt and Motion for Sanctions*. This *Motion* was set to be heard on March 2, 2017.[41]

---

[39] (Hr'g Tr. 156:19-159:2; 267:2-4; 269:5-272:7; 289;21-24; 291:8-19; 292:22-24, Sept. 23, 2016: Tr. Exhibits 13, 15, and 16, Sept. 23, 2016.)

[40] (Hr'g Tr. 266:23-267;122; 287:24-289:20, Sept. 23, 2016; Tr. Exhibit 17, Sept. 23, 2016.) The Court notes Mr. Hammervold pointed out Mr. King is a signatory to this Agreement, and he believed Mr. King was entitled to use the document in the *King v. Chase* case in the Davidson County Chancery Court.

[41] The *Non-Parties' Motion to Close Liability Hearing on Non-Parties' Petition for Contempt and Motion for Sanctions* was "specially set" by this Court to be heard on March 2, 2017 at 9:00 a.m. via an email from this Court's Judicial Legal Assistant, Deborah M. Rubenstein, PLS, to all counsel of record dated February 3, 2017 at 11:28 a.m., a copy of which is annexed hereto as **Exhibit "A"** and made a part hereof. This Court never received any communication in any form whatsoever by email, letter, or in any other way through pleadings or otherwise stating that either Mr. Manookian or Mr. Hammervold would be attending the hearing on March 2, 2017. This Court was convinced the non-communication from both attorneys was yet another delay tactic. Mr. Hammervold never responded to Mr. Malone's numerous

75. On March 2, 2017, the Court held a hearing on the *Non-Parties' Motion to Close Liability Hearing on Non-Parties' Petition for Contempt and Motion for Sanctions*. However, both Mr. Manookian and Mr. Hammervold failed to appear. In an attempt to give Mr. Manookian and Mr. Hammervold every opportunity to be heard regarding the evidentiary hearing, the Court temporarily suspended the hearing to reach Mr. Manookian and Mr. Hammervold and inquire as to their absence. Mrs. Deborah Rubenstein, this Court's Judicial Legal Assistant (hereinafter referred to as "Mrs. Rubenstein"), acting on behalf of the Court and pursuant to the direction of the Court, vigorously attempted to contact Mr. Manookian and Mr. Hammervold to discover any reason for their failures to appear. (*Notice of Filing* of April 26, 2017, Exhibit C, Hr'g Tr. 19:11-22:18; 24:2-27:17, Mar. 2, 2017.) Mrs. Rubenstein sent emails to the known email addresses owned by Mr. Manookian and Mr. Hammervold. (*Id.* at 26:1-27:16.) Despite this Court's efforts to contact Mr. Manookian and Mr. Hammervold by leaving numerous telephone messages as well as emails, neither Mr. Manookian nor anyone working on his behalf responded to confirm why he failed to appear. (*Id.*)

76. Mrs. Rubenstein was eventually able to make contact with Mr. Hammervold. (*Id.* at 27:18-29:4.) Mr. Hammervold, who was in Chicago, Illinois, at the time of the 10:20 a.m. phone call with Mrs. Rubenstein, represented to Mrs. Rubenstein he (Mr.

---

attempts to set this matter for hearing. Based upon Mr. Malone's statements in *Non-Parties' Motion to Close Liability Hearing on Non-Parties' Petition for Contempt and Motion for Sanctions; or, Alternatively, for the Court to Set a Date for Continuation of the Hearing* and his attempts to coordinate a date by agreement received absolutely no cooperation from Mr. Manookian or Mr. Hammervold. Therefore, this Court allowed the hearing date to remain on March 2, 2017. It should be clearly known the *Non-Parties' Motion* was properly noticed by counsel for Dean Chase, Sandra Chase, and D. F. Chase, Inc., Mr. Gayle Malone, in said *Motion* pursuant to the Williamson County Local Rules of Practice of the 21st Judicial District, with the *Motion* including the required Certificate of Service to all counsel of record and setting forth the hearing date of **March 2, 2017.**

744

Hammervold) was not able to make the hearing in this matter because he had a "conflict" with a hearing set in Dallas, Texas that same morning which he planned to attend, but the Dallas hearing had been cancelled earlier in the day. (*Id.* at 28:7-29:4.)

77. When Mrs. Rubenstein asked Mr. Hammervold when the hearing in Dallas, Texas, was to take place that morning and how he planned to attend such a hearing if he was in Chicago, Illinois, inexplicably, he had no answer for her. (*Id.* at 27:18-31:3.) Mr. Hammervold eventually agreed to send an email to Mrs. Rubenstein substantiating his representations. (*Id.*) Consequently, the email Mr. Hammervold sent Mrs. Rubenstein indicated the hearing he had planned to attend in Dallas, Texas, had been cancelled that morning at 7:11 a.m. (*See Notice of Filing* of March 7, 2017, Exhibit B.) The email also indicated the hearing to which Mr. Hammervold was to attend was set to begin at 9:00 a.m. in Dallas, Texas. (*Id.*) Thus, by Mr. Hammervold's own explanation, he was unable to attend this Court's hearing because he had a "conflict" with another hearing set in Dallas, Texas at 9:00 a.m. However, the Dallas, Texas hearing was cancelled at 7:11 a.m., and Mr. Hammervold was actually in Chicago, Illinois at the time of the cancellation of the hearing scheduled in Dallas, Texas, which obviously makes no sense.

78. Based upon the conflicting evidence that Mr. Hammervold was in Chicago, Illinois at the time of Mrs. Rubenstein's phone call at 10:20 a.m. CDT on March 2, 2017, Mr. Hammervold submitted to this Court he could not attend this Court's hearing due to another hearing in Dallas, Texas, nearly 800 miles away from his location, at 9:00 a.m. CDT, which was in fact only cancelled at 7:11 a.m. CDT that morning [March 2,

2017], the Court is unconvinced of Mr. Hammervold's excuse. Mr. Hammervold's representations to the Court through Mrs. Rubenstein simply make no sense. The Court finds this to be another instance of Mr. Hammervold's failing to be honest with the Court and an attempt to deceive the Court from his wrongful actions.

79. Despite Mr. Manookian's and Mr. Hammervold's unexplained absences from the hearing on March 2, 2017, the Court once again, as it had on numerous previous occasions, gave Mr. Manookian and Mr. Hammervold the benefit of the growing doubt about their honesty with this Court. The Court declined to rule on the *Non-Parties' Motion to Close Liability Hearing on Non-Parties' Petition for Contempt and Motion for Sanction* until Mr. Manookian and Mr. Hammervold had the opportunity to be fully heard. The Court reset the hearing for oral arguments on April 19, 2017.

80. On April 19, 2017, at 8:00 a.m., Mr. Manookian filed his first *Motion to Disqualify* minutes prior to the hearing on the same day, April 19, 2017, at 8:15 a.m. Unfortunately, the Court had to adjourn the anticipated hearing, pursuant to Tennessee Supreme Court Rule 10B.

81. On May 23, 2017, this Court filed *Court's Response to Motion to Disqualify* denying Mr. Manookian's *Motion to Disqualify* filed April 19, 2017. Mr. Manookian appealed this Court's denial of his *Motion to Disqualify* of April 19, 2017 to the Tennessee Court of Appeals, and on August 29, 2017, the Tennessee Court of Appeals affirmed this Court's denial. (*See* Tennessee Court of Appeals Opinion, Aug. 29, 2017 in Case No. M2017-01192-COA-T10B-CV.) It is noteworthy, when Mr. Manookian filed his *Motion to Disqualify* on April 19, 2017, he gave no prior notice such a motion was going to be filed. Instead, he waited minutes prior to the hearing to file his *Motion to*

*Disqualify* all in an effort to delay this lawsuit based upon reasons in his first *Motion to Disqualify*, as will further be explained in more detail below under section (1) Mr. Manookian's credibility, beginning on p. 58, based upon the false and made-up reasons provided by Mr. Manookian, totally contrary to the explicit requirements of Supreme Court Rule 10B. As will be seen below under section (1) Mr. Manookian's credibility, beginning on p. 58, Mr. Manookian was clearly "gaming the system" by using the rules and procedures meant to protect the order and integrity of our legal system to manipulate the system for his own personal desired outcome.

82. On November 9, 2017, immediately prior to the scheduled hearing which was to begin at 9:00 a.m. on the same day [November 9, 2017], Mr. Manookian filed yet another *Motion to Disqualify* this Court. The second *Motion to Disqualify*, which is stamped filed with the Circuit Court Clerk's Office, bears the date and time of "2017 NOV 9 AM 8:14," again, as in his first *Motion to Disqualify*, just minutes before the hearing was to be conducted at 9:00 a.m., despite the fact Mr. Manookian had eight months from the last hearing date of March 2, 2017, which he and Mr. Hammervold failed to appear, to November 9, 2017, to file his *Motion to Disqualify*, he waited until the last minute of the day of the hearing to file his second *Motion to Disqualify* without giving anyone any prior notice such a motion was being filed. As will be set forth below under section (1) Mr. Manookian's credibility, beginning on p. 62, as to the second *Motion to Disqualify*, based upon the bogus statements made in Mr. Manookian's second request to disqualify this Court, Mr. Manookian was once again "gaming the system" by using the rules and procedures meant to protect the order and integrity of our legal system to manipulate the system for his own personal

Case 3:19-bk-07235    Claim 5-1 Part 4    Filed 03/30/20    Desc Exhibit July 2018
Sanctions Judgment    Page 39 of 124

747

desired outcome. Upon receipt of the *Motion to Disqualify* at 8:14 a.m., the Court was forced to postpone the hearing for four hours (the attorneys and/or parties waited in the courtroom).

83. At 1:01 p.m. on November 9, 2017, this Court entered *Court's Response to Second Motion to Disqualify* in response to Mr. Manookian's second *Motion to Disqualify* filed on the same day, November 9, 2017, at 8:14 a.m., denying the *Motion to Disqualify*, which read, in pertinent part, as follows:

> [T]he Court can draw no other conclusion than good cause is presented, which would lead any reasonable personal to conclude that the motions to disqualify and the means stated therein along with the inordinate delay and the timing of the filing of the *Motion* leads to only one conclusion, that the *Motion* is being used in an improper manner and not in conformity with the purpose and rules of the Supreme Court Rules, Rule 10B.

The final day of the evidentiary hearing then proceeded to commence.

## L.   Findings of Fact of the Hearing on November 9, 2017

84. After the Tennessee Court of Appeals affirmed the Court's ruling on the *Motion to Disqualify*, this Court set the final hearing on Non-Parties' *Petitions* for November 9, 2017 at 9:00 a.m., with a pre-trial conference set for November 3, 2017 at 8:00 a.m.

85. On November 3, 2017, Mr. Manookian and Mr. Hammervold appeared for the pre-trial hearing and an *Order* was entered on various evidentiary issues.

86. On November 9, 2017, the Court held the second day of the evidentiary hearing. At the hearing, Mr. Manookian and Mr. Hammervold inexplicably chose not to present any evidence in their defense. Such a decision is surprising to the Court because of Mr. Manookian's adamant testimony, whereby he claimed to have sent the confidential information to members of the news media by email, which could have assisted the Court in determining when or even if he violated the Court's *Orders*.

Page **40** of **122**

Nonetheless, the evidence presented at the hearing was primarily related to the Non-Parties' claimed damages, which were the Non-Parties' attorneys' fees and expenses related to the *Petitions*.[42] Accordingly, at the close of the proof, the Court took this matter under advisement.

Based upon the above findings of fact, the Court finds it necessary to make specific determinations, which are essentially undisputed, based upon the Court's findings above and the testimonies provided by Mr. Manookian and Mr. Hammervold, to narrow the remaining issues.

### M. Specific Findings of Fact on Material Matters Regarding Liability

87. Based upon the facts set forth in numbered paragraphs 11-15 herein, the Court finds on August 28, 2015, Mr. Manookian and Mr. Hammervold, as co-counsel, agreed on behalf of themselves and their clients they were bound by the *Agreed Protective Order* at the time it was signed, as opposed to when it was entered by the Court.

88. Based upon the facts set forth in numbered paragraph 17 herein, the Court finds on August 31, 2015, Mr. Manookian submitted a challenge to the Non-Parties' confidential designations and opposed entry of the *Agreed Protective Order;* however, Mr. Manookian struck his opposition on September 3, 2015 and requested specifically the Court enter the *Agreed Protective Order*, which the participants would follow in resolution of their dispute. However, as clearly shown on the face of the *Agreed Protective Order*, Mr. Manookian had already specifically agreed to be bound by it and the terms set forth therein.

---

[42] The Court shall address the findings of fact and conclusions of law as regards to damages below.

89. Based upon the facts set forth in numbered paragraph 69 herein, on September 1, 2015, Mr. Manookian knowingly, willfully, and intentionally disclosed certain documents of the Non-Parties' confidential discovery materials to General Funk. This disclosure of Non-Parties'. confidential documents did not comply with the *Agreed Protective Order*.

90. Based upon the facts set forth in numbered paragraph 69 herein, in early October 2015, the Court finds Mr. Manookian knowingly, willfully, and intentionally disclosed documents of the Non-Parties' confidential discovery materials to David Raybin, Kim Hodde, and Eli Richardson, in violation of the procedures set forth in the *Agreed Protective Order*, each disclosure being an individual violation of the Court's Orders.

91. Based upon the facts set forth in numbered paragraphs 25-31 herein, on October 20, 2015 and October 30, 2015, the Court entered *Oral Orders* and subsequently written *Orders* on November 6, 2015 and November 7, 2015, respectively, mandating the Non-Parties' confidential discovery materials and deposition testimonies were to be kept confidential under the terms of the *Agreed Protective Order*. At both hearings, Mr. Manookian knowingly, willfully, and intentionally misled the Court in an attempt to cover up his wrongful acts by his failure to disclose his violations of the Court's *Order*.

92. Based upon the facts set forth in numbered paragraph 69 herein, Mr. Manookian knowingly, willfully, and intentionally violated the Court's *Orders* by providing the Non-Parties' confidential discovery materials and deposition testimonies to News Channel 4 WSMV, NewsChannel 5 WTVF, and the *Nashville Scene* and then continued to "cover up" his violations of the Court's *Orders* by perpetrating a

continuing and active fraud on the Court, the attorneys, and the parties to this lawsuit for many months.

93. Based upon the facts set forth in numbered paragraphs 48-50 herein, in February 2016, News Channel 4 WSMV, NewsChannel 5 WTVF, and the *Nashville Scene* took the Non-Parties' confidential discovery materials and deposition testimonies that Mr. Manookian unlawfully provided to these news entities, who then broadcasted separate news stories that disseminated such confidential materials and deposition testimonies to the general public throughout Middle Tennessee.

94. Based upon the facts set forth in numbered paragraphs 32-41 herein, starting in December 2016, Mr. Manookian and Mr. Hammervold knowingly, willfully, and intentionally employed the Non-Parties' confidential discovery materials in their representation of Mr. King in the matter of *King v. Chase* and other threatened criminal litigation in violation of the Court's *Orders*.

N. **Critical Disputed Factual Issues**

The Court finds there are two critical factual disputes as to which the Court must resolve. First, the Court must determine whether Mr. Manookian gave the Non-Parties' confidential discovery materials and deposition testimonies to the news media between October 4, 2015 and October 6, 2015, as he claimed at the September 23, 2016 hearing and which would still be a violation of the *Agreed Protective Order* to which he signed and agreed to be bound by on August 28, 2015, or whether he gave such materials to the news media sometime after the Court ordered all of the Non-Parties' materials be kept confidential on October 20, 2015.

Second, the Court must determine whether Mr. Hammervold first found out about Mr. Manookian's disclosures to the news media a few days before the hearing of September 23, 2016, or whether he knew about and was complicit in such disclosures before that time, and has been an active participant in keeping such information from the Non-Parties and the Court throughout these proceedings.

For the Court to make such a factual finding related to the disputed facts, it first must determine the credibility of Mr. Manookian and Mr. Hammervold and measure the proper weight to give their respective testimonies. Over the many months of this misrepresentation and fraud perpetrated upon the Court, this Court has had the opportunity to witness the demeanor of Mr. Manookian, who testified as a witness, and Mr. Hammervold, who testified as a witness. It was important for this Court to carefully observe the demeanor of these witnesses since it appeared all of the proof was pointing to these two lawyers, as the two who wrongfully released protected documents to the media and others and then perpetrated an ongoing fraud against the Court for over two years, and it would be their opportunities to explain their actions. The Court carefully observed the behavior and appearance of both Mr. Manookian and Mr. Hammervold. Courts have always acknowledged the significance of observing and hearing a witness prior to assessing his or her credibility. For instance, the United States Court of Appeals for the Second Circuit has recognized that the carriage, behavior, bearing, manner and appearance of a witness—in short, his "demeanor"—is part of the evidence. The words used are by no means all that we rely on in making up our minds as judges about the truth of a question that arises in our ordinary affairs . . . . *Dyer v. MacDougall*, 201 F.2d 265, 268-69 (2d Cir. 1952); *see also, e.g., Ruggieri*, 291 A.2d at



445 (resolving the question of a witness' credibility would depend largely upon the observations of the witness' testifying at trial).

### (1)   Mr. Manookian's Credibility

The Court finds a credibility determination for Mr. Manookian is particularly important in this proceeding, because many of his positions and arguments are supported solely by his uncorroborated testimony. As such, the Court makes the following findings:

First, Mr. Manookian's *Declaration* of March 17, 2016 is a clear course of conduct to knowingly, willfully, and intentionally mislead the Court, the parties, and the attorneys. Although Mr. Manookian acknowledged the hearing of March 10, 2016, regarding the Non-Parties' *Motion for Sanctions*, "involve[d] the media's possession of discovery materials from this case," Mr. Manookian refused and failed to notify the Court in his *Declaration* under oath (emphasis added) of the fact that **he** was the individual who gave the confidential materials at issue to the news media. Mr. Manookian knowingly, willfully, and intentionally left out these crucial facts and did not mention the most important detail relating to this case, which was **he** was the actual person who released the confidential material to the news media. Instead, Mr. Manookian knowingly, willfully, and intentionally made the Court and the Non-Parties believe he was not the culprit of the leaked, confidential information through his knowing, willful, and intentional deception. There was no mystery that at the time he submitted his *Declaration* on March 17, 2016, Mr. Manookian knew he had violated the Court's *Orders*, and he was responsible for the disclosures to the news media; however, for weeks and months on end, Mr. Manookian purposefully chose to lie and perpetrate a continuing fraud on this

Page 45 of 122

Court, the parties, and the attorneys in order to gain a personal advantage in his lawsuit, all to the detriment of everyone else.

Second, despite the procedure set forth in the *Agreed Protective Order*, to challenge certain designations of discovery material being marked as "confidential," on September 1, 2015, Mr. Manookian knowingly, willfully, and intentionally disclosed information the Non-Parties had designated "confidential" under the *Agreed Protective Order* in a letter to General Funk. (Tr. Exhibit 4, Sept. 23, 2016.) Mr. Manookian's letter claimed his improper disclosure was based upon, at least in part, "an interest of General Funk's safety," which this Court finds not credible. (*Id.*) Regardless of Mr. Manookian's "feelings" for General Funk, such a disclosure clearly violates the *Agreed Protective Order*, which provides any concerns about non-disclosure adversely affecting public safety should first be addressed with the Court. (*Motion for Entry of Agreed Limited Protective Order as to Certain Subpoenaed Parties* of August 28, 2015, Exhibit 1, section 12.1.) It should be noted, Mr. Manookian never raised these concerns laid out in his September 1, 2015 letter with the Court to disclose the Non-Parties' confidential materials to General Funk. Further, when General Funk did not respond to Mr. Manookian's "warning" letter of September 1, 2015, Mr. Manookian served General Funk with a deposition subpoena on September 9, 2015, which underscores the Court's finding that Mr. Manookian's interest in General Funk's "safety," was feigned as Mr. Manookian previously claimed.

Third, on February 3, 2016, Mr. Manookian and Mr. Hammervold filed *Plaintiff's Response to Defendant's Motion for Protective Order*, attaching as Exhibit 1 a copy of an unsigned Agreement of Partnership of NV Partners, which had been produced to Mr.

Manookian and Mr. Hammervold by the Non-Parties in this case and had been marked confidential pursuant to the *Agreed Protective Order* and the Court's *Orders*. (Tr. Exhibit 17, Sept. 23, 2016.) The Court finds such conduct shows Mr. Manookian's lack of credibility because he was willing to file a confidential document in violation of the *Agreed Protective Order* and this Court's *Orders*.

Fourth, Mr. Manookian and Mr. McGuire attended a meeting with Mr. Charles Malone together with other counsel of record regarding the *King v. Chase* case, at which they cited to documents by Bates-number supporting the threatened litigation against Dean Chase. (Hr'g Tr. 291:8-293:3, Sept. 23, 2016.) These documents were the very documents marked confidential pursuant to the *Agreed Protective Order* and the above *Orders* of this Court. (*Id.*) Thus, Mr. Manookian's failure to follow the terms of the *Agreed Protective Order* and the Court's *Orders* and attempting to use the confidential information provided in this case to support his other client's, Mr. King's case, shows Mr. Manookian's lack of credibility in this matter.

Fifth, as explained above, on January 21, 2016, Mr. Finley contacted General Funk to discuss a news story he planned to broadcast concerning this case. (Hr'g Tr. 222:11-229:7, Sept. 23, 2016; Tr. Exhibit 21, Sept. 23, 2016.) Mr. Finley submitted a series of emails to General Funk for the basis of his news story, which included (1) Mr. Manookian's October 19, 2015 *Response to Plaintiff's Expedited Motion for Sanctions, Protective Orders and Other Relief*; (2) the deposition transcript of Dean Chase and Sandra Chase of September 16, 2015; and (3) text messages produced by the Non-Parties in the original document discovery.[43] (Tr. Exhibit 21, Sept. 23, 2016.) Mr.

---

[43] The Court again notes these attachments were designated "confidential" by the *Agreed Protective Order* and the *Orders* entered by this Court.

Manookian admitted he in fact was the one that disclosed this information to Mr. Finley, which again was a violation of the *Agreed Protective Order* and the Court's *Orders*. This is further proof of Mr. Manookian's lack of credibility.

Sixth, on March 7, 2016, Mr. Manookian, together with the assistance of Mr. Hammervold, began a strategy to knowingly, willfully, and intentionally attempt to deceive and defraud this Court in order to avoid punishment for their actions. First, Mr. Manookian filed a *Motion to Strike and Response to Non-Parties' Motion for Sanctions*, asserting the Non-Parties' *Motion for Sanctions* was in reality a petition for contempt that should be stricken because the *Motion* does not even identify who the Non-Parties believe should be held in contempt. Also, Mr. Manookian argued the Court had "no authority" to sanction the offending individuals. It is apparent these actions were taken to prevent the Court from discovering the violators of the Court's *Orders* and the actual party that disseminated the confidential material to members of the public and the news media.



Seventh, on March 10, 2016, the Court held a hearing regarding the *Non-Parties' Motion for Sanctions*. However, Mr. Manookian failed to appear. (*See Non-Parties' Notice of Filing of Court Transcript* of April 26, 2017, Exhibit A, March 10, 2016, Hr'g Tr. 11:21-12:11; 29:23-24.) Mr. Hammervold did appear and made arguments on behalf of Mr. Manookian as well as himself. (*Id.* at 25:21-28:2; 51:18-54:18.) Mr. Hammervold argued Defendant, Clayton McKenzie, whom Mr. Hammervold and Mr. Manookian represented, was not bound by the *Agreed Protective Order;* the *Agreed Protective Order* allowed the Non-Parties' confidential materials to be used in related litigation, and the sanctions sought by the Non-Parties were inappropriate. (*Id.* at 25:21-28:2; 29:23-

Case 3:19-bk-07235    Claim 5-1 Part 4    Filed 03/30/20    Desc Exhibit July 2018
Sanctions Judgment    Page 48 of 124

756



24.) Once again, this argument is contradictory to Mr. Manookian's prior email to Ms. Fenelon in which he clearly acknowledged the *Agreed Protective Order* was in effect and binding on him and his clients and stated, "I agree that the Order is binding on me and my clients at the time it is signed with permission as opposed to entered by the Court." (Tr. Exhibit 3, Sept. 23, 2016. Thus, for Mr. Manookian to allow Mr. Hammervold to represent him at the hearing and make such egregious arguments, while being fully aware he violated the *Agreed Protective Order* and the Court's *Orders* is indicative of Mr. Manookian's lack of credibility.

Eighth, on December 30, 2015, Mr. King sent an email to Mr. Palmer, another non-party to this present case, in which he discussed a potential lawsuit against Dean Chase and copied Mr. Manookian. The email Mr. King wrote on December 30, 2015, stated, in pertinent part:

> I believe David mentioned that I am vigilantly pursing a cause of action for breach of fiduciary duties on behalf of the law firm [Waller] and Dean [Chase] and attorney malpractice.
>
> **I was put in touch with an extremely competent and savvy attorney in Nashville who, through discovery, has ascertained all communications between the law firm [Waller], Dean [Chase] and David [Chase]** and has intimate knowledge of with [sic] what really took place behind the scenes.
>
> . . . .
>
> **You will be shocked to read the communications between Steven and Dean,** always putting Dean's personal interest first and never operating out of the best interest of the group.

(Tr. Exhibit 4, Nov. 9, 2017) (emphasis added).

The Court already found that this email was sent after the Court's *Order* of November 6, 2015 and, by a preponderance of the evidence, shows Mr. Manookian

disclosed this information to his client Mr. King. Thus, this again establishes Mr. Manookian's willingness to violate the *Agreed Protective Order* and Court's *Orders* for his own advantage and shows his lack of credibility.

Ninth, on August 31, 2015, Mr. Manookian submitted a challenge to the Non-Parties' confidential designations and opposed entry of the *Agreed Protective Order;* however, Mr. Manookian struck his opposition on September 3, 2015 and requested specifically the Court enter the *Agreed Protective Order*, which the participants would follow in resolution of their dispute. However, as clearly shown on the face of the *Agreed Protective Order*, Mr. Manookian had already specifically agreed to be bound by it and the terms set forth therein. Thus, Mr. Manookian attempting to unravel the *Agreed Protective Order* after he had already received the benefit of the bargain by receiving the confidential material shows his lack of credibility.

Tenth, on October 1, 2016, Mr. Manookian emailed counsel for the Non-Parties requesting authority to provide News Channel 4 WSMV with copies of Sandra Chase's deposition testimony, stating, "I will, **obviously**, follow your preference on this issue. I just need to know what that is." (*See* Tr. Exhibits 7 & 8, Sept. 23, 2016.) (emphasis added) Contrary to his representation he would respect the Non-Parties' "preference on this issue," Mr. Manookian once again knowingly, willfully, and intentionally violated the Court's *Orders* and disclosed the confidential deposition transcripts of both Dean Chase and Sandra Chase and the confidential documentation of text messages to Mr. Finley of News Channel 4 WSMV, Phil Williams of News Channel 5 WTVF, and Jim Ridley at the *Nashville Scene*. Each of these three disclosures represents individual, knowing, willful, and intentional violations of the Court's *Orders*, after Mr. Manookian was specifically told

the Non-Parties considered the depositions of both Dean Chase and Sandra Chase to be confidential. The Court finds Mr. Manookian's statement to counsel for the Non-Parties to be untrue. In other words, Mr. Manookian once again outright lied to counsel for the Non-Parties. This shows Mr. Manookian's lack of credibility.

Eleventh, on October 21, 2015, in an email to counsel for the Non-Parties and the Parties, Mr. Manookian, after asserting he had filed the exhibits to his October 19, 2015 filing under seal, represented that he:

> [T]ook precautions to ensure that [the exhibits containing the Non-Parties' confidential deposition testimonies and text messages] were provided only to the Court and attorneys for the parties to this action. You apparently received them nonetheless. To the extent these materials surface outside of the seal, it is important to know who has been disclosing them and to what additional non-parties they have been disclosed.

(Tr. Exhibit 10, Sept. 23, 2016.)

Remarkably, at the time Mr. Manookian sent this email, he had in fact already disclosed the subject confidential discovery materials and deposition testimonies to a number of individuals in violation of the *Agreed Protective Order*, which included General Funk, David Raybin, Kim Hodde, and Eli Richardson, and members of law enforcement. These disclosures to these individuals, plus law enforcement, if they in fact occurred, as stated by Mr. Manookian, are all just more examples of Mr. Manookian's defiant conduct as well as his knowing, willful, and intentional conduct to continue to perpetrate a fraud on the Court, the attorneys involved in the case, and the parties and his attempts to try and cover up his conduct by more misrepresentations, knowing, willful, and intentional false statements, and other deceitful conduct. This shows Mr. Manookian's lack of credibility.

Twelfth, in response to an email on January 20, 2016, concerning the report of a leak to the news media and a potential violation of the Court's Orders, Mr. Manookian wrote, "did Mr. Finley indicate who the 'source' may be? I would note that [my client Defendant] Clayton McKenzie never agreed to keep any materials confidential; nor was he required to at any time prior to October 20, 2015." (Tr. Exhibit 11, Sept. 23, 2016.) As later admitted by Mr. Manookian, this email was knowingly, willfully, and intentionally "misleading" when written because Mr. Manookian was well aware at that time **he** had given the materials to Mr. Finley.[44] The Court finds the statement when made by Mr. Manookian was known by him to be false and misleading, but was made knowingly, willfully, and intentionally to extend even longer Mr. Manookian's continuing ruse and fraud upon the Court, the attorneys involved, and the parties herein.

In addition, this Court finds it uncanny that any lawyer would knowingly, willfully, and intentionally implicate his own client of wrongdoing in order to defray the Court's attention from himself in order to, once again, continue to perpetrate his ongoing fraud against the Court, the attorneys involved, and the parties. This shows Mr. Manookian's lack of credibility.

Thirteenth, on April 21, 2016, Mr. Manookian filed a Response to the Non-Parties' Petitions, arguing the Petitions should be denied because they constituted "rank, unsupported hypothesizing," "speculation and shameless, Johnny-come-lately histrionics," and "assorted real and imagine conduct." (Brian Manookian and Cummings Manookian PLC's Response to Non-Parties' Petition for Contempt and Motion for

---

[44] The Court is astounded with Mr. Manookian's ability to not only implicate his own client in the violation of the Agreed Protective Order, but at the same time cover the tracks of his own wrongdoing, and his continuous deceptive conduct to accomplish such a feat in only one email exchange. The time and effort utilized by Mr. Manookian to continue to perpetrate his fraud, deceptive conduct, and misrepresentations upon the Court is astonishing.

*Sanctions* of April 21, 2016, at p. 1-2; 8.) When Mr. Manookian filed these statements, he knew they were false and misleading because he had, in fact, already disclosed the Non-Parties' confidential discovery materials to the news media and others, and he was using the Non-Parties' materials in *King v. Chase* and other threatened criminal litigation to attempt to intimidate the attorneys. This also shows Mr. Manookian's willingness to continue on his path of deceiving this Court through his fraud and misrepresentations. This shows Mr. Manookian's lack of credibility.

Fourteenth, on September 16, 2016, Mr. Manookian, in yet another attempt to continue his ongoing fraud against the Court, the attorneys, and the litigants herein, filed a *Joint Motion to Dismiss* the *Petitions* [for contempt] prior to the September 23, 2016 evidentiary hearing at which he would have to testify, claiming to the Court the Non-Parties' *Petitions* constituted a "circus-like mass-inquisition" and "chas[ing] a wild goose," but also that it was "abundantly clear that [the Non-Parties] have no information to support their speculative allegations." (*Respondents Mark Hammervold, Hammervold PLC, Brian Manookian, and Cummings Manookian's Joint Motion to Dismiss Contempt Petition and Motion for Sanctions* of September 16, 2016, at p. 2-3.) Mr. Manookian utilized very selective and convenient outrage to describe the actions of contempt set forth in the *Petition for Contempt*. Further, Mr. Manookian's use of theatrical histrionics to continue his fraud and deception are yet additional examples of his "litigation strategy" in this case, which was to lie, deceive, and then to "cover up". However, despite Mr. Manookian's knowing, willful, and intentional warped and false portrayal of the facts in this case, and after being warned by the Court of his evasive, non-responsive, and deceitful responses, he would be forced to admit on cross-examination,

only hours after said *Joint Motion* was argued, that it was he who had disseminated the materials to the news media. This is yet another example of a false statement made by Mr. Manookian to continue his ongoing fraud, misrepresentation, and manipulation of the Court, the attorneys, and the litigants. This shows Mr. Manookian's lack of credibility. This shows Mr. Manookian's lack of credibility.

Fifteenth, on October 28, 2016, Chancellor Lyle entered a *Scheduling Order* in *the King v. Chase* case in the Chancery Court of Davidson County, Case No. 16-0030-II, in which she noted Mr. Manookian had stated in open court that "this lawsuit and the Williamson County lawsuits are not related." (Tr. Exhibit 1, Nov. 9, 2017.) However, Mr. Manookian's and Mr. Hammervold's representations to this Court have always been the filings in this case **are** related to *King v. Chase*. This leaves the Court with two logical conclusions; either Mr. Manookian and Mr. Hammervold were truthful with Chancellor Lyle, while at the same time they were deceiving and lying to this Court in order for their disclosure of confidential discovery materials to be permissible under the terms of the *Agreed Protective Order*, or Mr. Manookian and Mr. Hammervold were truthful with this Court but untruthful and lied to Chancellor Lyle in the *King v. Chase* case. Either way, Mr. Manookian and Mr. Hammervold have proven to have lied before at least two judges of this state to promote their own personal interests and to continue to perpetrate a fraud upon this Court, the lawyers, and the litigants.[45] This shows Mr. Manookian's and Mr. Hammervold's lack of credibility.

---

[45] Throughout this *Memorandum and Order*, the Court has given several examples of Mr. Manookian's lying under oath regarding material matters in his ongoing fraud on this Court. The Court makes no decision whether or not Mr. Manookian's perjury is misdemeanor perjury or felony aggravated perjury. This task will be left to the individuals and/or bodies in charge of making that determination.

Sixteenth, the Court noted, during Mr. Manookian's opportunity to finally tell the complete truth and stop the incessant, knowing, willful, and intentional lying on material issues, he still had an extremely difficult time being candid with the Court. In addition, the Court noted on numerous occasions, when Mr. Manookian made statements to this Court and to the attorneys, his tone of voice during arguments or while testifying as a witness, where his animosity and resentment of this Court and the attorneys was almost palpable. Throughout his sworn testimony on September 23, 2016, Mr. Manookian was warned repeatedly by this Court he was being evasive, vague, and ambiguous, and he was continuously failing to answer the questions being presented by Mr. Gayle Malone, counsel for the Non-Parties. The following are seven examples of this Court's attempts to warn Mr. Manookian of his evasive conduct in responding to questions under oath:

> **(1)   THE COURT:**          All right.  This is what I want to do:  Mr. Manookian, I know it's not comfortable testifying up here, and I understand that, and I'm not trying to be disrespectful to you, sir, as a lawyer.  But what I like to hear as a trier of fact is a question, and then if you would, if you can answer the question with yes, then feel free to explain; no, feel free to explain; I don't know.

Transcript of Hearing, Vol. I of II, September 23, 2016 at 111:17-23, *Chase v. Stewart, et al*, Williamson Circuit Court Case No. 2015-200.

> **(2)   THE COURT:**          All right.   Let's – let's – excuse me just a moment.  I'm sorry to interrupt.
> Let's try to be responsive to the question first, because I want to be clear.
> So let's ask the question again.
> If you'll answer the question first, sir, and then feel free to explain that answer any way you want to.

Hr'g Tr. at 128:12-18.

> **(3)   THE COURT:**          Let's do this:  I would really like to get an answer to the question.

Page 55 of 122

MR. GAYLE MALONE:     Me too.

THE COURT:            I really would.    Because this is
important. I want to do the right thing. And in order to do the right thing, I
want to be crystal clear.
So, once again, I don't want to accuse you, sir, of being evasive.
I'm not ready to do that at all.  What I'd like for you to do, to help me
understand, is to answer the question first if you can then feel free to
explain.
Would you do that for me?

MR. MANOOKIAN:       Absolutely.

THE COURT:           All right.

Hr'g Tr. at 137:15-138:1-2.

(4)  THE COURT:            But let's just try to answer the
question and then explain so I can be crystal clear.

MR. MANOOKIAN:       And I've done that.  And Your Honor will
probably notice –

THE COURT:           I don't think –

MR. MANOOKIAN:       -- that I haven't made hardly any
objections to any of the questions –

THE COURT:           That's not what –

MR. MANOOKIAN:       -- because I want to get on the record
precisely what occurred here with all the allegations have been made.

THE COURT:           I understand.  That's not what I'm talking
about.  I simply want you to answer the question, if you can:  yes; no; I
don't know.  And then, if you can, feel free to explain that.  I just want to be
clear, instead of going off into orbit somewhere without answering the
question.  Would you do that for me?

MR. MANOOKIAN:       Absolutely I will, Your Honor.

THE COURT:           Thank you.  All right.

MR. GAYLE MALONE:    I'll try again.

Page 56 of 122

| THE COURT: | Okay. Thank you. |
|---|---|
| MR. GAYLE MALONE: | I'll try to keep it simple. |
| THE COURT: | That's what I want to do. |

Hr'g Tr. at 138:8-139:1-5.

**(5)** THE COURT: Okay. This is not difficult to me at all. It is very simple. The questions that are being asked are directed to you and your conduct. I understand that you may be trying to provide a defense of some type, but that's not in response to the question. I would appreciate it, if you would, in fact, answer the question.

MR. MANOOKIAN: I believe I have. I'm just –

THE COURT: I don't believe you have. I would appreciate if you would, once again, please answer the question so that I can understand what happened.

MR. GAYLE MALONE: Do you want me to ask it again?

THE COURT: Let's try it again.

Q. (By Mr. Gayle Malone) I'm trying to be simple.

Hr'g Tr. at 140:3-15.

**(6)** THE COURT: Stand by. I really, one more time, sir, would like for you to answer the question first, if you could, and then explain. That will really help me. We're evolving into responses that are nonresponsive to the question that is very simple. I know it's not pleasant.

MR. MANOOKIAN: It's not unpleasant.

THE COURT: May I – may I just finish. I know it's not pleasant. I know you don't like to be on the witness stand any more than anybody else. But you've got to play by the rules like everyone else.

I would like for you to please answer the question first and then explain. So let's be responsive.

Let's ask the question again, please.

Hr'g Tr. at 148:15-25; 149:1-2.

**(7) THE COURT:** Once again, sir, very respectfully, I would like for you to answer the question and then feel free to explain that answer. I do not want to find that you, as a witness, that you're being evasive and nonresponsive. I don't want to do that.

Hr'g Tr. at 150:21-25.

As noted throughout the above examples, this Court continuously tried to be respectful of Mr. Manookian in admonishing him and warning him about his obviously knowing, willful, and intentional avoidance in responding to easy and legitimate questions involving the history of his fraud and deceit on this Court, the attorneys, and the parties to this lawsuit. This shows Mr. Manookian's lack of credibility.

Seventeenth, in Mr. Manookian's first *Motion to Disqualify* filed April 19, 2017, (to which this Court filed *Court's Response to Motion to Disqualify* on May 23, 2017, Mr. Manookian sought disqualification because the Court entered its March 29, 2016 *Order* relating to the Non-Parties' original *Motion for Sanctions, Motions and Supplements for: (1) Entry of Agreed Limited Protective Order; (2) Declaration that All Parties are Bound by the Order;* and *(3) Expedited Hearing.* In that March 29, 2016 *Order,* this Court explained the documents filed in support of the *Motions for Sanctions, Supplements, Entry of Protective Order, Declaration of All Parties Bound by the Order,* numerous affidavits and declarations filed by attorneys of record and parties to the case (including a declaration from Mr. Manookian himself), and oral argument, indicated Mr. Manookian and others may have committed sanctionable and/or contemptuous conduct. This March 29, 2016 *Order* also declined to grant the Non-Parties' *Motion for Sanctions* even though Mr. Manookian failed to appear at the March 10, 2016 hearing on the *Motion for Sanctions,* and instead, the Court ordered the Non-Parties to file detailed motions for

Page 58 of 122

sanctions and/or petitions for contempt allowing Mr. Manookian and other Respondents sufficient opportunity to defend themselves. Mr. Manookian's allegation provided absolutely no facts in the form of affidavits or information based upon personal knowledge that served as any factual basis for his allegation. It was simply a bald statement with no factual basis or other supporting documentation as required by Supreme Court Rule 10B, Rules of Judicial Conduct. This allegation was false.

In addition, Mr. Manookian alleged in his first *Motion to Disqualify* this Court's outright refusal to rule upon Defendants' *Motion for Summary Judgment* and its ongoing refusal to rule on *Motions to Alter or Amend*, which is totally false and again is not supported by any facts from personal knowledge or other information as required by Supreme Court Rule 10B. Again, this allegation was false.

In another allegation set forth in the first *Motion to Disqualify* this Court, Mr. Manookian stated Judge Michael Binkley's alleged conduct and bias toward the media parties as a reason for recusal of Judge Binkley from this case. Yet, Mr. Manookian provided no affidavits or other factual information, citations to the record, or any other proof or facts to support this allegation. However, the Court responded to the vague allegation the best it could in its *Response to Motion to Disqualify* entered May 23, 2017.

Mr. Manookian also made baseless allegations about Judge Binkley's personal connections to "parties and material witnesses." (*See*, *Motion to Disqualify*, E. The Overwhelming Bases [sic] for Disqualification, p. 4.) The information provided by Mr. Manookian on this issue in his original *Motion to Disqualify* is totally false and was repeated claims from an anonymous complaint filed with the Board of Professional

Responsibility involving this Court (Judge Michael W. Binkley), District Attorney General Glenn Funk of Nashville, Davidson County, and others. (*See, Motion to Disqualify*, Apr. 19, 2017 and *Court's Response to Motion to Disqualify*, May 23, 2017.) The "anonymous" complainant to the Board of Professional Responsibility provided a fake and false email address and other supposedly "verifying information" which was false, fake, and incapable of being verified. Regardless, the allegations were thoroughly investigated by the Board of Professional Responsibility with this Court's full and complete cooperation, and as a result, the false complaint was unfounded and was dismissed by the Board on March 23, 2017. Although complaints to the Board of Professional Responsibility are supposed to be confidential unless formal action is taken, the false complaint was, not surprisingly, released to a friend of Mr. Manookian's with News Channel 4 WSMV television news station, as well as to News Channel 5 WTVF, and the *Nashville Scene* on the same day the false and fake public and anonymous complaint was made to the Board of Professional Responsibility. This Court specifically notes the same media sources that received protected information from Mr. Manookian were the same exact sources that received the fake and false Board of Professional Responsibility complaint involving this Court, District Attorney Glenn Funk, and others. (*See Motion to Disqualify*, Exhibit 3, Apr. 19, 2017.) Mr. Manookian also made references to this Court's alleged inappropriate relationship with Mr. Glenn Funk, District Attorney General for Davidson County, Tennessee, but again provided absolutely no facts, statements, affidavits, or any other information in any form whatsoever as required by Supreme Court Rule 10B to support his allegations. (*See Motion to Disqualify*, p. 14-15, Apr. 19, 2017.) Mr. Manookian also went on to state,

without any factual statement whatsoever, in any form whatsoever, and without any affidavits, actual knowledge, or any other proof in any other form whatsoever, that former Davidson County General Sessions Judge Casey Moreland is "a material witness to this action." (*Id.*) These statements made by Mr. Manookian were likewise false. It is noteworthy, in this present case, Mr. Manookian and Mr. Hammervold previously prepared their list of witnesses related to the petitions and the motions for contempt in this case, and not surprisingly, Judge Casey Moreland was NOT identified on any of these documents, and is not "a material witness to this action" in any form whatsoever, and of course, was never called as a witness. Once again, Mr. Manookian has used the courts and Supreme Court Rule 10B in his attempts to recuse this Court from further hearing the facts in this case as a vehicle by which to delay this case, and to embarrass, ridicule, and demean this Court.

In addition, as stated above, Mr. Manookian filed his second *Motion to Disqualify* at 8:14 a.m. on November 9, 2017, in an obvious attempt to delay the final hearing in the proceedings which were to begin at 9:00 a.m., to buy additional time, and to frustrate everyone. Mr. Manookian had eight months from the date of the last hearing of March 2, 2017 (which he and Mr. Hammervold failed to attend) in which to file such a motion. This Court responded immediately in its *Response to Second Motion to Disqualify* entered the same day, November 9, 2017 at 1:01 p.m., and would point out once again the allegations made by Mr. Manookian are not in any way whatsoever supported by any affidavits, sworn testimony, and other factual information as required by Supreme Court Rule 10B. In fact, one of Mr. Manookian's reasons to disqualify this Court was already ruled upon by the Court of Appeals in affirming this Court's refusal to

be disqualified based upon an alleged *ex parte* communication with Senior Judge William B. Acree Jr. The other allegations made in the second *Motion to Disqualify* this Court are false, misleading, and serve as yet additional examples of Mr. Manookian's inability to be truthful under oath and his propensity and history to outright lie without hesitation. This type of manipulative and unethical conduct is extremely concerning to this Court from a member of the Bar who clearly uses the rules of this Court to game the legal system in an intolerable manner over and over again. These two *Motions to Disqualify* and the total unsupported allegations are yet even more examples of Mr. Manookian's lack of credibility.

Ultimately, Mr. Manookian did everything within his power to undermine the foundation of the integrity of this case, the integrity of this Court, and the integrity of the lawyers, of the parties, and of others involved in this lawsuit. It is extremely unfortunate Mr. Manookian tried over and over again to not only destroy the credibility and integrity of this Court, but also doing the same thing with the lawyers in this lawsuit, as well as the parties, all in what appears to be "pure sport" for Mr. Manookian. Mr. Manookian could have, at any time, been forthright, honest, and candid about his ongoing fraud, misrepresentation, and dishonesty employed throughout this lawsuit. This minimum requirement was totally lost on Mr. Manookian. As one can see, this record is replete with this Court's giving Mr. Manookian the benefit of the doubt over, and over, and over again, almost to the point of being absurd when it could have sanctioned Mr. Manookian for his unethical conduct and for his knowing, willful, and intentional refusal to appear in court or to exercise the common courtesy of notifying this Court of his inability to appear.

After reviewing the entire record, Mr. Manookian's dishonest and deceitful conduct throughout this case, in looking back on all the examples of his ongoing and continuing fraud against this Court, his chronic dishonesty and lying under oath, this Court now has no doubt whatsoever Mr. Manookian does not deserve the benefit of the doubt as to his dishonesty and fraudulent ongoing behavior in this Court. Throughout the course of these proceedings, from the hearing on October 20, 2015 through the evidentiary hearing on November 9, 2017, Mr. Manookian filed numerous filings and made oral arguments before this Court on multiple occasions regarding the issues relating to the release of the Non-Parties' confidential material. Despite his obligations as a licensed attorney in the State of Tennessee, his ethical responsibilities as a lawyer, and the mandates of the *Agreed Protective Order*, to which Mr. Manookian agreed to be bound and was eventually ordered by this Court to follow, Mr. Manookian continued to perpetrate an active fraud upon the Court, week after week, month after month, for two years, by not only perpetrating lies but also by refusing to alert the Court and to simply tell the truth and be honest with the Court, the litigants, and the attorneys during any one of those appearances, that he had previously disclosed the Non-Parties' confidential discovery materials to the media. In fact, it is obvious now from all of the facts, Mr. Manookian went to great lengths on numerous occasions to knowingly, willfully, and intentionally mislead the Court regarding such facts when he knew exactly what he was doing was dishonest and unethical, at the very least.

The Court notes it takes no pleasure in finding an Officer of the Court as lacking credibility; however, the facts in this case give the Court no other option. Therefore, based upon the above analysis, the Court finds Mr. Manookian totally lacked credibility

in this Court during the evidentiary hearing of this case by his continuing knowing, willful, and intentional misrepresentations to the Court throughout this lawsuit, his refusing to disclose the truth of all matters involving his obstructionist conduct and fraud, and his testimony, all of which shall be given the appropriate weight in accordance with this determination. It is clear from all the evidence cited Mr. Manookian cannot be believed under oath and Mr. Manookian's sworn oath to tell the truth while he is under oath means nothing to him. In addition, it is clear Mr. Manookian's giving "his word" to his fellow lawyers means nothing, and he has no problem being deceitful and dishonest to his fellow lawyers. In addition, Mr. Manookian has no qualms about lying to judges on material issues.

### (2)   Mr. Hammervold's Credibility

Mr. Hammervold's demeanor as an attorney arguing as co-counsel with Mr. Manookian and while testifying was somewhat different.   Mr. Hammervold made arguments which were circular, disingenuous, and in many cases, simply nonsensical. In observing Mr. Hammervold's demeanor, his carriage, and his approach to discussing issues in an attempt to defend his and Mr. Manookian's actions, Mr. Hammervold appeared to be struggling, even to the point of stuttering and being unable to finish sentences in a clear and cogent manner.   The Court observed and noted Mr. Hammervold's struggling to try and explain his bogus arguments as well as his testimony under oath, and the Court is aware now that he, too, was involved in the fraud and cover up of Mr. Manookian's fraudulent and deceitful conduct in this case.

Furthermore, the Court must make a factually-based determination as to Mr. Hammervold's credibility to assist in resolving these factual disputes as well. Just like

Mr. Manookian, Mr. Hammervold's positions and arguments are based solely upon his own uncorroborated testimony. Thus, the Court must analyze his testimony and the circumstantial evidence in this case in order to determine the weight to be given his testimony. Accordingly, the Court makes the following findings as to Mr. Hammervold's credibility:

First, at the hearing of September 23, 2016, Mr. Hammervold made the following argument in support of his *Joint Motion to Dismiss*:

> [I] want to point out here is that Rule 11 requires anyone who's making an affirmative pleading to stand behind it and to say, I have factual and legal grounds to make this allegation, and if they don't, the Court can sanction them. ·
>
> Now, the movants [Non-Parties], **they don't have factual and legal ground for their allegations**, which is why they're hedging so much . . . **They know that they don't have the factual and legal support for it,** they don't want to stand behind the allegations, and they shouldn't simultaneously be allowed to go forward and not stand behind the allegations.

(Hr'g Tr. 47:21-48:8, Sept. 23, 2016.) (Emphasis added)

However, later that same day, Mr. Hammervold testified he knew Mr. Manookian had given the Non-Parties' confidential documents and deposition testimonies to the news media a few days before the hearing on September 23, 2016. Yet, Mr. Hammervold utterly failed to tell the Court this apparently "new information" and to disclose to this Court his knowledge of his co-counsel's unethical and blatantly dishonest behavior. Thus, at the time Mr. Hammervold presented his oral argument for his *Joint Motion to Dismiss*, he was fully aware the Non-Parties indeed had a factual basis and legal grounds for their *Petitions*, yet he continued to protest these proceedings knowing his statements were false. Mr. Hammervold is nothing more than

a co-conspirator with Mr. Manookian for knowingly, willfully, and intentionally perpetrating an ongoing fraud against this Court, the attorneys, and the parties.

Second, on April 21, 2016, in his *Response* to the Non-Parties' *Petitions*, Mr. Hammervold represented to the Court he had "not disclosed, referenced, filed, or otherwise 'used' any of the protected materials that the Non-Parties (mass) designated as confidential in the *King v. Chase* case." (Tr. Exhibit 23, Sept. 23, 2016.) However, Mr. Hammervold and Mr. Manookian had already used the confidential documents in the *King v. Chase* case. Specifically, Mr. Hammervold and Mr. Manookian had **filed** with the Davidson County Chancery Court a copy of the Agreement of Partnership of NV Partners, which had been provided to them and marked confidential by the Non-Parties pursuant to the *Agreed Protective Order.* (Tr. Exhibit 17, Sept. 23, 2016.) Thus, clearly Mr. Hammervold's statement he had "not disclosed, referenced, **filed**, or otherwise **'used'** any of the protected materials that the Non-Parties (mass) designated as confidential in the *King v. Chase* case," was totally false and was made while under oath. (Tr. Exhibit 23, at n. 2, Sept. 23, 2016.)

Third, on March 2, 2017, Mr. Hammervold intentionally made false and misleading statements to Mrs. Rubenstein, who was acting on behalf of the Court, regarding the reasons for his absence for the hearing held on March 2, 2017. As noted above in numbered paragraphs 75-78, Mr. Hammervold submitted an email to Ms. Rubenstein on the day of the hearing indicating his "other hearing" in Dallas, Texas, to which he claimed he had planned to attend in lieu of the hearing in this matter, had been cancelled that morning at 7:11 a.m. However, the Court finds it perplexing that Mr. Hammervold was in Chicago, Illinois that morning when the hearing he was "planning"



to attend was set to begin at 9:00 a.m. in Dallas, Texas. The Court finds if Mr. Hammervold truly was planning to attend the hearing in Dallas, Texas, at 9:00 a.m., then it would have been impossible for him to attend said hearing if he was still in Chicago, Illinois, at 7:11 a.m. Obviously, Mr. Hammervold lied to Mrs. Rubenstein about his intentions in an effort to hide the fact he had no intention appearing at the hearing on March 2, 2017.

Fourth, the Court finds throughout the course of these proceedings, from the hearing on October 20, 2015 through the evidentiary hearing on November 9, 2017, well over two years, Mr. Hammervold also prepared and filed numerous pleadings and made multiple oral arguments before this Court on numerous occasions over and over again regarding the issues related to the Non-Parties' confidential material disclosures. Without regard to his obligations as an Officer of the Court and his clear ethical responsibilities under the Rules of Professional Conduct as an attorney in the State of Tennessee, Mr. Hammervold continuously has gone to great lengths and has gone about a course of conduct to hide the truth and mislead the Court about the improper disclosures as explained above.

Fifth, on March 10, 2016, the Court held a hearing regarding the *Non-Parties' Motion for Sanctions*. However, Mr. Manookian failed to appear. (*See Non-Parties' Notice of Filing of Court Transcript* of April 26, 2017, Exhibit A, March 10, 2016, Hr'g Tr. 11:21-12:11; 29:23-24.) Mr. Hammervold did appear and made arguments on behalf of Mr. Manookian as well as himself. (*Id.* at 25:21-28:2; 51:18-54:18.) Mr. Hammervold argued Defendant, Clayton McKenzie, whom Mr. Hammervold and Mr. Manookian represented, was not bound by the *Agreed Protective Order;* the *Agreed Protective*

*Order* allowed the Non-Parties' confidential materials to be used in related litigation, and the sanctions sought by the Non-Parties were inappropriate. (*Id.* at 25:21-28:2; 29:23-24.) Once again, this argument is contradictory to Mr. Manookian's prior email to Ms. Fenelon in which he clearly acknowledged the *Agreed Protective Order* was in effect and binding on him and his clients and stated, "I agree that the Order is binding on me and my clients at the time it is signed with permission as opposed to entered by the Court." (Tr. Exhibit 3, Sept. 23, 2016.)

Furthermore, at this hearing, the Court fully explained to all of the attorneys the Court should not be required to investigate these types of situations. Thus, the Court strongly urged and implored all of the attorneys, as officers of the Court, to come forward and admit to violating the *Agreed Protective Order* and the Court's subsequent *Orders*. Despite the fact Mr. Hammervold, who was there for Mr. Manookian and himself, knowing full well they were involved in willfully disobeying the *Orders* of the Court, nonetheless, Mr., Hammervold sat and remained silent when it was his opportunity to tell the truth and to stop the perpetration of the fraud against the Court, the litigants, and the attorneys.

Sixth, another example of Mr. Hammervold's dishonesty is on March 17, 2016, when Mr. Hammervold filed his *Supplemental Response to NonParties [sic] Motion for Sanctions* on behalf of Defendants Lovrenovic, Bryan Everett, Susan Martin, and Clayton McKenzie, in which he asserted he did not disseminate any of the Non-Parties' confidential discovery and, even if such was the case, this would constitute "future related litigation" per the terms of the *Agreed Protective Order* and, thereby, not violate the Court's *Orders*. However, Mr. Hammervold failed to mention Chancellor Lyle's

Scheduling Order in the *King v. Chase* case in Davidson County, <u>which clearly found</u> <u>the cases were not related based upon Mr. Hammervold's and Mr. Manookian's, his co-</u> <u>counsel, own statements to Chancellor Lyle</u>. (Tr. Exhibit 1, Nov. 9, 2017.) Thus, Mr. Hammervold clearly was attempting to mislead this Court as to this issue.[46]

Thus, based upon the above analysis, the Court finds Mr. Hammervold totally lacks credibility in this Court and further finds Mr. Hammervold was knowingly, willfully, and intentionally dishonest in his statements, representations, and in his pleadings in this case. Once again, the Court notes it takes no pleasure in finding an Officer of the Court's testimony to lack credibility; however, again, the facts in this case give the Court no other option.

### (3) Timing of Mr. Manookian's Disclosures to the Media

Mr. Manookian claims he provided the Non-Parties' confidential materials and deposition testimonies to the news media sometime between October 4, 2015 and October 6, 2015. Accordingly, this timeframe would be prior to the Court's *First Oral Order* of October 20, 2015, yet, it also would be after the Parties, Non-Parties, and attorneys in this case entered into the *Agreed Protective Order*. Regrettably, Mr. Manookian failed to present any evidence to show this submission took place in his alleged timeframe, other than his own testimony. As determined above, Mr. Manookian has no credibility due to his own conduct throughout these proceedings. Consequently, the Court makes the following factual findings regarding the timing of Mr. Manookian's disclosures to the news media.

---

[46] As shall be examined more thoroughly in Section (a) of this *Memorandum and Order* below, the Court finds the *King v. Chase* case does not constitute "future related litigation" pursuant to the terms of the *Agreed Protective Order* as asserted by Mr. Hammervold.

As explained above in numbered paragraphs 44-47, the version of the Non-Parties' confidential documents and deposition testimonies Mr. Finley sent to General Funk and Phil Robertson, Esq. in January of 2016 contained exhibit stickers indicating they were previously included as "Exhibit G," "Exhibit H," and "Exhibit I," respectively, of Mr. Manookian's *Defendants' Response to Plaintiff's Expedited Motion for Sanctions, Protective Orders and Other Relief* filed on October 19, 2015. (*See* Tr. Exhibit 9, Sept. 23, 2016.) Additionally, the version of the Non-Parties' confidential documents and deposition testimonies shown in Channel 4 WSMV's news broadcast related to such materials containing exhibit stickers indicating they were previously included as "Exhibit G," "Exhibit H," and "Exhibit I" of Mr. Manookian's *Response*.

With these above facts, the Court shall attempt to disentangle the timeline for which the release of the confidential material and deposition testimonies occurred, based upon a preponderance of the evidence.

Mr. Manookian represented to counsel for the Non-Parties on October 21, 2015, and then testified at the trial of this matter, that he had only filed the exhibits to his *Response* of October 19, 2015, including "Exhibit G," "Exhibit H," and "Exhibit I" under seal and had not given them to anyone outside the case. (*See* Tr. Exhibit 10, Sept. 23, 2016.) However, Mr. Manookian's *Defendants' Response to Plaintiff's Expedited Motion for Sanctions, Protective Orders and Other Relief* of October 19, 2015, in which the subject exhibits were attached, was filed in response to Plaintiff David Chase's *Expedited Motion for Sanctions, Protective Orders, and Other Related Relief* on October 8, 2015.

The Court finds Mr. Manookian's "timeline" to be riddled with many obvious inconsistencies. First, the Non-Parties' confidential discovery materials and deposition testimonies which were given to Mr. Finley with WSMV Channel 4 News, and the other news outlets, NewsChannel 5 WTVF and the *Nashville Scene*, by Mr. Manookian contain exhibit stickers indicating they were previously included as "Exhibit G," "Exhibit H," and "Exhibit I" to Mr. Manookian's *Response* of October 19, 2015. Second, said *Response* and exhibits could not have existed during the **October 4, 2015** through **October 6, 2015** time period because the filing to which the pleading was responding was not filed until **October 8, 2015**. Thus, the only logical conclusion is the confidential discovery material and deposition testimonies were sent to Mr. Finley at a later date than that to which Mr. Manookian testified under oath.

In light of the above analysis, it appears, by a preponderance of the evidence, Mr. Manookian sent the confidential discovery materials and deposition testimonies to Mr. Finley **after** he filed his *Response* on October 19, 2015, because the documents presented by Mr. Finley to General Funk and Phil Robertson, Esq. contained the very same "Exhibit G," "Exhibit H," and "Exhibit I" labels found attached to his *Response*. However, this finding does not automatically establish Mr. Manookian sent the confidential documents and deposition testimonies after the Court entered its *First Oral Order* of October 20, 2015. It is still possible after filing his *Response* with the attached exhibits under seal with this Court, Mr. Manookian decided to send to Mr. Finley the confidential documents and deposition testimonies **prior** to the hearing on October 20, 2015. Thus, the release of the confidential material and deposition testimonies would

not be a violation of the Court's *Orders*.[47] However, other circumstantial evidence makes this scenario highly unlikely.

For instance, Mr. Finley did not contact General Funk and Phil Robertson, Esq. for comment on the confidential discovery materials or run any news story regarding such materials until late January 2016 and early February of 2016. The Court struggles to find any explanation as to why Mr. Finley would have received these documents prior to October 20, 2015, but then fail to run a news story on such materials for four months.

Moreover, the Court arrives at the same conclusion as it relates to the confidential materials released to the other news media outlets. Just like Mr. Finley, there is no possible explanation as to why Phil Williams of News Channel 5 WTVF and Jim Ridley at the *Nashville Scene* would have received the documents prior to October 20, 2015, but then fail to run a news story on such materials for four months. In order to accept this proposition, this Court would have to believe it is more likely three competing news agencies received confidential information that would form the basis of what each believed to be a compelling news story about a high-profile, domestic violence case, yet all three collectively just sat on the story and delayed the release of the story and did not attempt to be the first to break the story. In light of the probable excitement and near frenzy atmosphere created in the newsrooms of these various media outlets when Mr. Manookian violated the Court's *Orders* by sending sensitive materials to the various media outlets, the Court finds such a result to be highly improbable.

Furthermore, Mr. Manookian claimed at the evidentiary hearing on September 23, 2016, he had an email documenting he sent to Phil Williams of NewsChannel 5

---

[47] The Court notes this would **still** be a violation of the *Agreed Protective Order* which Mr. Manookian signed and agreed to be bound to the terms set forth therein.

WTVF the deposition testimonies of Dean Chase and Sandra Chase on October 6, 2015. Regrettably, but noteworthy, Mr. Manookian failed to present this exonerating email at any time in these proceedings. Any lawyer with the most rudimentary technical skills could easily retrieve and pinpoint the exact date and time of email purportedly sent between October 4 and 6, 2015. Mr. Manookian did not retrieve and produce the purported email because it did not exist. Therefore, given the nature of this email and its importance, and based upon the numerous facts supporting Mr. Manookian's inability to tell the truth, the Court now concludes the exonerating email does not exist or Mr. Manookian would have surely presented it to the Court.

Lastly, if Mr. Manookian did disclose the Non-Parties' confidential discovery material prior to October 20, 2015 and believed such to be entirely proper, Mr. Manookian could have very easily avoided this entire issue and months of highly-contested issues and the accumulation of well over half of a million dollars in fees, which Mr. Manookian knew at some point in the future he would have to pay because of his own dilatory tactics involving his fraud upon the Court, by alerting the Court and the Non-Parties to such. For example, Mr. Manookian had the following opportunities to disclose his "innocent" disclosures to NewsChannel 5 WTVF, News Channel 4 WSMV, and the *Nashville Scene*, by disclosing to this Court: (1) in response to the email exchange of January 2016 with the Non-Parties concerning News Channel 4 WSMV's possession of such materials; (2) in response to the Non-Parties' *Motion for Sanctions* of February 2016; (3) at the hearing on March 10, 2016; (4) in his *Declaration* of March 17, 2016; and (5) in any one of the numerous pleadings he filed prior to being compelled to testify on September 23, 2016 at the evidentiary hearing.

Knowingly, willfully, intentionally and wrongfully, Mr. Manookian failed at absolutely every juncture in these proceedings to finally tell the truth, to stop the lies and his fraud upon the Court, and to admit he was the one who released the confidential material. Thus, the Court infers these omissions as evidence the release of the confidential material was performed after October 20, 2015 and in January 2016, around the time of Mr. Finley's first inquiry into this matter, because why would Mr. Manookian continue down a path of knowingly, willfully, and intentionally perpetrating a fraud and numerous misrepresentations, if a simple admission of the release of the confidential documents prior to October 20, 2015, would exonerate him. The only plausible conclusion is Mr. Manookian released the confidential information after October 20, 2015, which would be in violation of not only the *Agreed Protective Order*, but also the Court's *Orders*.

Based upon all of the evidence and in light of Mr. Manookian's own conduct, which clearly establishes his total lack of credibility, the Court finds by a preponderance of the evidence Mr. Manookian gave such materials to the news media after October 20, 2015, and in January 2016.

### (4) Mr. Hammervold's Involvement in the Media Disclosures

In light of the Court's finding Mr. Hammervold's lack of credibility and based upon the other evidence in the case, the Court finds by a preponderance of the evidence Mr. Hammervold knew about Mr. Manookian's disclosures of the Non-Parties' confidential discovery materials and deposition testimonies to the news media since January 2016, which was when all of the attorneys were notified of News Channel 4 WSMV's receipt of

the confidential information.[48] Furthermore, the Court finds once Mr. Hammervold became aware of Mr. Manookian's disclosures, he took knowing, willful, and intentional actions to prevent the Court, the attorneys, and the Parties from uncovering the truth about the disclosures. These actions make Mr. Hammervold complicit to the "leak" of the confidential materials to the news media and a co-conspirator in Mr. Manookian's fraud upon the Court, the Parties, and the attorneys. The Court finds the following facts support the Court's conclusion:

On April 21, 2016, Mr. Hammervold filed *Mark Hammervold and Hammervold PLC's Response to NonParties' Petition for Contempt and Sanctions Motion* which stated, *inter alia,* Mr. Hammervold did "not know how the media obtained protected material." (Tr. Exhibit 23, at n. 2, September 23, 2016.)

However, the Court finds the circumstances in this case indicate Mr. Hammervold knew Mr. Manookian had performed such acts. Mr. Hammervold was in receipt of Mr. Manookian's email of September 20, 2016 in which he wrote, "did Mr. Finley indicate who the 'source' may be? I would note that [my client Defendant] Clayton McKenzie never agreed to keep any materials confidential; nor was he required to at any time prior to October 20, 2015." (Tr. Exhibit 11, Sept. 23, 2016.) The Court finds such an unprovoked email submitted by one's own co-counsel which implicates one's own client would likely draw the attention of any reasonable attorney. However, Mr. Hammervold testified he never asked Mr. Manookian whether he gave the confidential documents and deposition testimonies to the media or even discussed the topic with

---

[48] *See* numbered ¶¶ 42-43 above. Also, at a bare minimum, Mr. Hammervold was well aware of the disclosures to the news media before his claimed knowledge of only days before the evidentiary hearing on September 23, 2016.

him until a few days before the hearing on September 23, 2016. Such an explanation is untenable.

Based upon this rationale, Mr. Hammervold would have this Court believe he filed numerous filings, including filings that were made jointly with Mr. Manookian, and asserted arguments at hearings before the Court, stating that whoever leaked such documents could not or should not be punished for what they had done, without knowledge the very person he was defending was sitting next to him as his long-standing co-counsel and co-conspirator. (*See Mark Hammervold, Hammervold PLC, Brian Manookian, and Cummings Manookian's Joint Motion to Dismiss Contempt Petition and Motion for Sanctions* of September 16 , 2016; *Supplemental Response to NonParties [sic] Motion for Sanctions* of March 17, 2016; and Transcript of Hearing, Vol. I of II, September 23, 2016, *Chase v. Stewart, et al*, Williamson Circuit Court Case No. 2015-200.) The Court is not persuaded and finds the most logical reason for such a steadfast effort to protect the individual who had surreptitiously "leaked" the documents to the media is that Mr. Hammervold knew it was his co-counsel, Mr. Manookian, who gave the Non-Parties' confidential documents to the various news media outlets, in knowing, willful, and intentional violation of this Court's *Orders*.

Thus, the Court draws the reasonable inference that Mr. Hammervold's inaction upon seeing his own client accused of potentially violating the Court's *Orders* means either (1) he knew Mr. Manookian had given the confidential documents to the news media before the email of January 20, 2016 was sent, and he was complicit in the scheme to mislead the Non-Parties, or (2) he, as any reasonable attorney would do, asked Mr. Manookian what he meant by his email of January 20, 2016 and learned at

Case 3:19-bk-07235    Claim 5-1 Part 4    Filed 03/30/20    Desc Exhibit July 2018
Sanctions Judgment    Page 76 of 124

784

that point Mr. Manookian had leaked the confidential documents and deposition testimonies to the news media. In either scenario, Mr. Hammervold intentionally kept this knowledge hidden from the Court, the Parties, the attorneys and Non-Parties throughout the proceedings, making him complicit in Mr. Manookian's actions and guilty of an ongoing fraud against this Court, the attorneys, and the parties. There can be no doubt both Mr. Manookian and Mr. Hammervold conspired to defraud this Court, the Non-Parties, and the attorneys involved in this case, by actively participating in an ongoing and continuing fraud and cover up by both of them by gaming the system for their own personal benefit and desires and causing hundreds of thousands of dollars to be spent chasing Mr. Manookian and Mr. Hammervold to simply get to the truth.

Therefore, based upon the findings of facts above, the Court shall now apply these facts to the applicable law.

### III. CONCLUSIONS OF LAW

#### A. Civil Contempt

A trial court's power to punish contempts can be traced back to twelfth century England. *Baker v. State*, 417 S.W.3d 428, 435 (Tenn. 2013) (citing Ronald L. Goldfarb, *The Contempt Power* 9, 19 (1963)). This power was eventually incorporated into American common law by the colonists. *Id.* In *Graham v. Williamson*, the Tennessee Supreme Court explained the inherent power of courts to punish contempt as follows:

> The power of courts to punish for contempt is of immemorial antiquity, and is inherent in all courts as a necessary power belonging to them in order to enable them to accomplish the purposes for which they were designed; that is, the orderly trial and decision of causes, the enforcement of public order, the prevention of interferences with their proceedings, and the enforcement of the due respect belonging to them as institutions of the country. While this power may be regulated by the Legislature, it is not conferred. Bailey on Habeas Corpus, pp. 219-260; 2 Broom & Hadley's

Commentaries, 567-569, 435, and 436; 1 Bacon's Abridgment, 473; 2 Id. 633, 634.

*Graham v. Williamson*, 128 Tenn. 720, 164 S.W. 781, 782 (1914).

However, in light of the limitless, discretionary power bestowed upon the courts by common law, which naturally accompanied the potential for abuse, the Tennessee General Assembly enacted statutory provisions to curb the contempt power of state judges and to specifically define the conduct punishable by contempt. *Baker*, 417 S.W.3d at 435.

Accordingly, Tennessee Code Annotated § 16-1-103 states, "For the effectual exercise of its powers, every court is vested with the power to punish for contempt, as provided for in this code." Tenn. Code Ann. § 16-1-103. Moreover, Tennessee Code Annotated § 29-9-102 defines the statutory framework for contempt as follows:

> The power of the several courts to issue attachments, and inflict punishments for contempts of court, shall not be construed to extend to any except the following cases:
>
> (1) The willful misbehavior of any person in the presence of the court, or so near thereto as to obstruct the administration of justice;
>
> (2) The willful misbehavior of any of the officers of such courts, in their official transactions;
>
> (3) The willful disobedience or resistance of any officer of the such courts, party, juror, witness, or any other person, to any lawful writ, process, order, rule, decree, or command of such courts;
>
> (4) Abuse of, or unlawful interference with, the process or proceedings of the court;
>
> (5) Willfully conversing with jurors in relation to the merits of the cause in the trial of which they are engaged, or otherwise tampering with them; or
>
> (6) Any other act or omission declared a contempt by law.

Tenn. Code Ann. § 29-9-102.

"Contempt proceedings are *sui generis* and are incidental to the case out of which they arise." *Baker*, 417 S.W.3d at 435. Further, contempts may be classified as either criminal or civil in nature. *Black v. Blount*, 938 S.W.2d 394, 398 (Tenn. 1996).

Here, the Non-Parties assert claims for civil contempt in violation of Tennessee Code Annotated § 29-9-102(3).

Civil contempt "occurs when a person refuses or fails to comply with a court order and a contempt action is brought to enforce private rights." *State ex rel. Flowers v. Tennessee Trucking Ass'n Self Ins. Grp. Tr.*, 209 S.W.3d 602, 613 (Tenn. Ct. App. 2006) (citing *Black*, 938 S.W.2d at 398; *Robinson v. Air Draulics Engineering Co.*, 214 Tenn. 30, 377 S.W.2d 908, 911 (1964)). In *Konvalinka v. Chattanooga-Hamilton County Hosp. Authority*, the Tennessee Supreme Court illustrated the essential elements and proper analysis necessary for a civil contempt claim:

> Civil contempt claims based upon an alleged disobedience of a court order have four essential elements. First, the order alleged to have been violated must be 'lawful.' Second, the order alleged to have been violated must be clear, specific, and unambiguous. Third, the person alleged to have violated the order must have actually disobeyed or otherwise resisted the order. Fourth, the person's violation of the order must be 'willful.'

*Konvalinka v. Chattanooga-Hamilton Cty. Hosp. Auth.*, 249 S.W.3d 346, 354-55 (Tenn. 2008) (footnotes omitted).

Thus, the Court shall address each essential element of a civil contempt claim in the context of this case herein.

### 1. Lawful Orders

The Court shall address the threshold issues as to whether the *Orders* alleged to have been violated are lawful. In *Chattanooga-Hamilton Cty. Hosp. Auth.*, the Supreme Court explained:

> A lawful order is one issued by a court with jurisdiction over both the subject matter of the case and the parties. An order is not rendered void or unlawful simply because it is erroneous or subject to reversal on appeal. Erroneous orders must be followed until they are reversed. However, an order entered without either subject matter jurisdiction or jurisdiction over the parties is void and cannot provide the basis for a finding of contempt. Naturally, the determination of whether a particular order is lawful is a question of law.

*Chattanooga-Hamilton Cty. Hosp. Auth.*, 249 S.W.3d at 355 (footnotes and citations omitted).

First, clarification as to which *Orders* were allegedly violated by Mr. Manookian and Mr. Hammervold is necessary for the Court's analysis. While the parties entered into the *Agreed Protective Order* on August 28, 2015, and subsequently followed its framework,[49] this matter did not come before the Court until the filing of Plaintiff, David Chase's *Expedited Motion for Sanctions, Protective Orders, and Other Related Relief* on October 8, 2015.

On October 20, 2015, the Court held a hearing to resolve the pressing discovery issues in this case. Based upon the *Oral Motion* of Mr. Crider, the Court made its *First Oral Order*, in which the Court commanded (1) *Defendants' Response to Plaintiff's Expedited Motion for Sanctions, Protective Order, and Other Related Relief*, as well as the exhibits, were under seal, (2) all materials previously produced by the Non-Parties shall be treated as confidential pending the hearing on October 30, 2015, and (3) all

---

[49] This is evident by the Non-Parties' disclosing the requested confidential documents to the Respondents on August 28, 2015 and Dean Chase's and Sandra Chase's depositions being taken, without objection, on September 16, 2015.