transcripts and videos of Dean Chase and Sandra Chase shall be treated as confidential pending the hearing on October 30, 2015. (*See Order on Plaintiff's Expedited Motion for Sanctions, Protective Order, and Other Related Relief and Expedited Motion to Compel* of Order of November 7, 2015, which memorialized the Court's *First Oral Order*.)[50] Thus, from this point on in the proceedings, the mentioned materials and deposition testimonies were to be treated as confidential and placed under seal until the pending hearing on October 30, 2015.

Consequently, at the hearing on October 30, 2015, the Court made its *Second Oral Order*, in which the Court granted the Non-Parties' *Motion*. The Court modified the *Agreed Protective Order* to permit the Non-Parties to designate documents as "confidential" in the manner in which such designations had been made, and any and all documents so marked by the Non-Parties were to be protected from disclosure consistent with the terms of the *Agreed Protective Order*, essentially entering in the *Agreed Protective Order* with the Court's modifications. (See *Order* of November 6, 2015, memorializing the *Second Oral Order* of October 30, 2015.) Both the *First Oral Order* and *Second Oral Order* were subsequently memorialized into written orders. Therefore, the *First Oral Order*, *Second Oral Order*, and the subsequent memorialized *Orders* are the alleged *Orders* violated by Mr. Manookian and Mr. Hammervold. Specifically, based upon the alleged dates Mr. Manookian and Mr. Hammervold violated the Court's *Orders*, the written *Order* of November 6, 2015 was clearly in effect at the time.

---

[50] The Court notes there was not a court reporter at this hearing; however, the parties have not objected or asserted the memorialized *Orders* differed from the oral command made in open court.

Page **81** of **122**

Accordingly, an oral command which takes effect prior to a written order being entered can constitute a lawful order. *Ross v. Ross*, No. M200800594COAR3CV, 2008 WL 5191329, at *5 n.6 (Tenn. Ct. App. Dec. 10, 2008).[51] As explained in the Tennessee Court of Appeals opinion in *Outdoor Mgmt., LLC v. Thomas*:

> Among the conduct that courts have the authority to punish as contempt is "[t]he willful disobedience or resistance of any officer of the said courts, party, juror, witness, or any other person, to any lawful writ, process, order, rule, decree, or **command of such courts**." T.C.A. § 29–9–102(3). The language of T.C.A. § 29–9–102(3) is unambiguous. Two elements are required for a finding of contempt: (1) willful disobedience or resistance, and (2) a lawful writ, process, order, rule, decree, or **command of a court** of this State. T.C.A. § 29–9–102(3); *State v. Winningham*, 958 S.W.2d 740, 745 (Tenn.1997). A court order specifically mandating or prohibiting the alleged contemptuous conduct is essential. *See Overnite Transp. Co. v. Teamsters Local Union No. 480*, 172 S.W.3d 507, 511–12 (Tenn.2005) ("One may violate a court's order by either refusing to perform an act mandated by the order or performing an act forbidden by the order.").

*Outdoor Mgmt., LLC v. Thomas*, 249 S.W.3d 368, 376–77 (Tenn. Ct. App. 2007) (emphasis added).

Thus, the Court finds it had subject matter jurisdiction and personal jurisdiction over the Parties and the Non-Parties. Further, the Court's *Oral Orders* were clear and specific and prohibited the alleged contemptuous conduct. Finally, the subsequent written *Orders* memorialized the Court's lawful *Oral Orders*.

## 2. Clear, Specific, and Unambiguous

Next, the second essential issue involves the clarity of the order alleged to have been violated. In *Chattanooga-Hamilton Cty. Hosp. Auth*, the Tennessee Supreme Court elaborated as to this issue as follows:

---

[51] The Court notes an oral command from the bench may constitute a lawful order, but all orders of a court should be memorialized in writing, filed with the Clerk, and submitted to the judge for his or her approval in a matter. *Ross v. Ross*, No. 2008 WL 5191329, at *5 n.6. However, an oral command cannot constitute a final judgment. *Id.*; *see also Blackburn v. Blackburn*, 270 S.W.3d 42, 56 (Tenn. 2008).



A person may not be held in civil contempt for violating an order unless the order expressly and precisely spells out the details of compliance in a way that will enable reasonable persons to know exactly what actions are required or forbidden. The order must, therefore, be clear, specific, and unambiguous.

Vague or ambiguous orders that are susceptible to more than one reasonable interpretation cannot support a finding of civil contempt. Orders need not be "full of superfluous terms and specifications adequate to counter any flight of fancy a contempner may imagine in order to declare it vague." They must, however, leave no reasonable basis for doubt regarding their meaning.

Orders alleged to have been violated should be construed using an objective standard that takes into account both the language of the order and the circumstances surrounding the issuance of the order, including the audience to whom the order is addressed. Ambiguities in an order alleged to have been violated should be interpreted in favor of the person facing the contempt charge. Determining whether an order is sufficiently free from ambiguity to be enforced in a contempt proceeding is a legal inquiry that is subject to de novo review.

*Chattanooga-Hamilton Cty. Hosp. Auth.*, 249 S.W.3d at 355-56 (footnotes and citations omitted).

Here, the *First Oral Order*, the *Second Oral Order*, and subsequent written *Orders*, were clear, specific, and unambiguous. First, the *First Oral Order* and the *Second Oral Order* were made in the context of the Parties' and Non-Parties' seeking to resolve the very discovery dispute as to the release of the confidential information. Hence, all of the Parties, Non-Parties, and the present legal counsel were aware a determination of the confidential information release was before the Court. There can be no other reasonable interpretation as to what action was being prohibited by the *First Oral Order* of October 20, 2015, which prohibited the releasing of the confidential information and the deposition testimonies provided by the Non-Parties pending the hearing on October 30, 2015. Additionally, there can be no other reasonable interpretation as to the Court's *Second Oral Order* on October 30, 2015, by which the

Court granted the *Joint Motion for Entry of a Protective Order of* September 14, 2015 in open court. The *Second Oral Order* entered and modified the *Agreed Protective Order*. This was clear to all Parties, Non-Parties, and legal counsel present. Additionally, as to any assertion the *First Oral Order* and *Second Oral Order* were not clear and specific, such erroneous claims are resolved with the Court's entering the written *Order* of November 6, 2015 and the written *Order* of November 7, 2015.

Furthermore, the "twilight period" from October 20, 2015 through November 6, 2015, is immaterial based upon the Court's above findings Mr. Manookian released the confidential information sometime in January 2016, after the Court entered the written *Orders* on November 6, 2015 and November 7, 2015. Therefore, based upon the objective standard provided above and even analyzing the *First Oral Order* and *Second Oral Order* and the subsequent *Orders* of November 6, 2015 and November 7, 2015 for ambiguities and accounting these in favor of Mr. Manookian and Mr. Hammervold, the Court finds all of the Court's *Orders* were clear, specific, and unambiguous.

### 3. Violations of the Orders

As to the third issue, the Court must analyze whether Mr. Manookian and Mr. Hammervold actually violated the Court's *Orders*. Specifically, the Court must analyze whether Mr. Manookian and Mr. Hammervold violated the Court's *Order* of November 6, 2015, which was in effect at the time of the alleged violations. The Tennessee Supreme Court explained the Court's analysis for this third element as follows:

> The third issue focuses on whether the party facing the civil contempt charge actually violated the order. This issue is a factual one to be decided by the court without a jury. The quantum of proof needed to find that a person has actually violated a court order is a preponderance of the evidence. Thus, decisions regarding whether a person actually violated a

court order should be reviewed in accordance with the standards in Tenn. R. App. P. 13(d).[52]

*Chattanooga-Hamilton Cty. Hosp. Auth.*, 249 S.W.3d at 356 (citations omitted).

Thus, the Court must make a determination as to whether the evidence is sufficient to find Mr. Manookian and Mr. Hammervold violated the Court's *Order* of November 6, 2015 by a preponderance of the evidence. Accordingly, the Court shall address each instance to which the Non-Parties assert a violation has occurred and determine whether, based upon the preponderance of the evidence, Mr. Manookian and Mr. Hammervold actually violated the Court's *Order* of November 6, 2015.[53]

      (a)    **_King v. Chase_ Violations**

As the Court found above, in December of 2015, Mr. Manookian and Mr. Hammervold began using the Non-Parties' confidential materials in their representation of Mr. King in the *King v. Chase* case. First, on December 30, 2015, Mr. King clearly admitted to reading the confidential documents provided by the Non-Parties and even stated in an email:

> I was put in touch with an extremely competent and savvy attorney in Nashville who, through discovery, has ascertained all communications between the law firm [Waller], Dean [Chase] and David [Chase] and has intimate knowledge of with [sic] what really took place behind the scenes.
> . . . .
>
> You will be shocked to read the communications between Steve and Dean [Chase], always putting Dean's [Chase] personal interest first and never operating out of the best interest of the group.

---

[52] The Court notes Rule 13(d) of the Tennessee Rules of Appellate Procedure provides: "Unless otherwise required by statute, review of findings of fact by the trial court in civil actions shall be de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise . . . ." Tenn. R. App. P. 13(d).

[53] The Court also notes it has already found Mr. Manookian released the confidential information to General Funk, David Raybin, Kim Hodde, and Eli Richardson, but these disclosures were violations of the *Agreed Protective Order* prior to the Court's entering an order on the matter. Thus, this is not relevant for the civil contempt issue, but is relevant to this abuse of discovery and sanctionable.

(See Tr. Exhibit 4, Nov. 9, 2017.)

The very next day Mr. Manookian sent a demand letter on behalf of Mr. King to a Waller attorney in regard to the future *King v. Chase* case. Thus, it is clear Mr. King, who was not a party to this litigation, was improperly given the confidential text messages in this case from Mr. Manookian. The Court notes the evidence is clear Mr. Manookian provided confidential material to Mr. King; however, as for Mr. Hammervold, the Court finds the record lacks any direct evidence of Mr. Hammervold's releasing this information to Mr. King. Thus, this was a violation of the Court's *Order of* November 6, 2015.

Second, on January 6, 2016, Mr. Manookian used these confidential materials to assist Mr. King's litigation in his case by attempting to hold out the "80,000 pages of documents," as evidence for an alleged fraud and cover up relating to NV Partners. (*See* Tr. Exhibit 15, Sept. 23, 2016; Hr'g Tr. 157:24-158:12, Sept. 23 2016.) Mr. Hammervold was copied on this email. However, these "80,000 pages" of confidential materials were only supposed to be used for the proceedings in this case. This also constitutes a violation of the Court's *Order of* November 6, 2015 by Mr. Manookian.

Third, Mr. Manookian and other co-counsel also attended a meeting with opposing counsel regarding the *King v. Chase* case, at which they cited to documents by Bates-number supporting the threatened litigation against Dean Chase. (Hr'g Tr. 291:8-293:3, Sept. 23, 2016.) These documents were again the very documents marked confidential pursuant to the *Agreed Protective Order* and the above *Orders* of this Court. (*Id.*) Accordingly, the Court finds this constitutes a violation of the Court's *Order of* November 6, 2015 by Mr. Manookian.

Fourth, on February 3, 2016, Mr. Manookian and Mr. Hammervold filed *Plaintiff's Response to Defendant's Motion for Protective Order* in the *King v. Chase* case, attaching an Exhibit 1 which was a copy of an unsigned Agreement of Partnership of NV Partners. (Tr. Exhibit 17, Sept. 23, 2016.) This document was provided by the Non-Parties in their initial discovery and was ordered by this Court to be under seal. Even if Mr. Manookian and Mr. Hammervold could have received this document from another source, i.e. their client, Mr. King, the record is clear that they did not do so and merely attached the document provided by the Non-Parties, which was marked with the word "confidential" and a bates-number. (*Id.*) This constitutes a violation of the Court's *Order* of November 6, 2015 by Mr. Manookian and Mr. Hammervold for their improper filing of the confidential material.

As a defense for these violations, Mr. Manookian and Mr. Hammervold argue they did not "use" the documents and *King v. Chase* is related to the current litigation and meets the meaning of "future related litigation" which was permitted by the *Agreed Protective Order*. First, the Court finds Mr. Manookian's and Mr. Hammervold's "use" argument to be unpersuasive. Clearly, Mr. Manookian and Hammervold were using the confidential materials throughout the *King v. Chase* case. These documents were used for preparation into Mr. King's case against Dean Chase, as evidenced by Mr. King's reading confidential text messages between the Non-Parties and his subsequent email admitting the disclosure to Mr. Palmer.[54] (See Tr. Exhibit 4, Nov. 9, 2017.) Additionally, Mr. Manookian and Mr. Hammervold would have been the only individuals to show the confidential material to Mr. King because they were co-counsel for his *King v. Chase*

---

[54] The Court notes Mr. Palmer, another non-party to this case, was the recipient of an email from Mr. King discussing his potential lawsuit against Dean Chase and also copied Mr. Manookian on this email.

case and in possession of the confidential material. Further, clearly Mr. Manookian and Mr. Hammervold were making "use" of the documents by Mr. Manookian referencing the "80,000 pages of documents" in not one interaction with the Waller attorneys, but two, as a negotiation tool and a part of their litigation strategy.

Finally, it is even more apparent Mr. Manookian and Mr. Hammervold used the confidential material in the *King v. Chase* case because they actually filed one of the confidential material documents with the Davidson County Chancery Court attached to their *Plaintiff's Response to Defendant's Motion for Protective Order.* (Tr. Exhibit 17, Sept. 23, 2016.) Therefore, Mr. Manookian and Mr. Hammervold were using the confidential materials throughout the *King v. Chase* case in violation of the *Order* of November 6, 2015.

Next, as to Mr. Manookian's and Mr. Hammervold's claims the cases are related and constitute a "future related litigation" pursuant to the *Agreed Protective Order*, the Court finds this argument to be unavailing as well. This present case involves a malicious prosecution action brought by Plaintiff, David Chase, against numerous individuals for allegedly conspiring to make false allegations of domestic violence against him. However, the *King v. Chase* case involves a lawsuit against Dean Chase arising out of a partnership dispute involving a hotel. (*See* Tr. Exhibit 16, Sept. 23, 2016 (*Complaint* filed on January 12, 2016 in the Chancery Court of Davidson County in *King v. Chase*)).

Here, the Court finds the terms "future related litigation" did not encompass such a nonrelated matter. Moreover, the Court is persuaded by Mr. Manookian's legal argument in Chancellor Lyle's Davidson County Chancery Court, in which Chancellor

796

Lyle found: "the Court documents that Plaintiff's Counsel [Mr. Manookian] stated that this lawsuit and the Williamson County lawsuits *are not related*." (emphasis added) (Tr. Exhibit 1, Nov. 9, 2017.) Hence, Mr. Manookian and Mr. Hammervold submitted to Chancellor Lyle the cases were not related, but Mr. Manookian and Mr. Hammervold now claim they are related. The Court agrees with Mr. Manookian's and Mr. Hammervold's first impression of these cases and earlier submission to Chancellor Lyle and finds the *King v. Chase* case is not related and does not constitute a "future related litigation" pursuant to the *Agreed Protective Order*.

Therefore, the Court finds, by the preponderance of the evidence, Mr. Manookian's knowingly, willfully, and intentionally disclosed the text messages to Mr. King in the *King v. Chase* case, used the confidential materials on two separate occasions in his negotiations with the Waller attorneys representing Dean Chase, and attached a confidential document to the filing in the *King v. Chase* case. This constitutes four clear incidents of Mr. Manookian's improperly releasing and using the confidential materials for the benefit of another client in another proceeding, and in so doing, he knowingly, willfully, and intentionally violated of the Court's *Order* of November 6, 2015.

In addition, the Court finds, specifically, Mr. Hammervold knowingly, willfully, and intentionally improperly released and used the confidential materials by filing *Plaintiff's Response to Defendant's Motion for Protective Order* in the *King v. Chase* case, with the attached confidential material as Exhibit 1. (*See* Tr. Exhibit 17, Sept. 23, 2016.) Thus, Mr. Hammervold knowingly, willfully, and intentionally violated the Court's *Order* of November 6, 2015 on one occasions during his representation of Mr. King in the *King v. Chase* case.

**(b)** *__Disclosure to Media Violations__*

As stated above, the Court found, based upon a preponderance of the evidence, Mr. Manookian released the confidential materials to the news media **after** the Court entered its *Orders*. The Court finds the release of the confidential material was a violation of the *Order* of November 6, 2015. This was evident from Mr. Finley's contacting David Chase on January 20, 2016 and General Funk on January 21, 2016 regarding his receipt of the confidential materials and deposition testimonies of Dean Chase and Sandra Chase. Even more telling were the documents Mr. Finley attached to his email to General Funk included (1) Mr. Manookian's *Response to Plaintiff's Expedited Motion for Sanctions, Protective Orders and Other Relief* of October 19, 2015; (2) the deposition transcript of Dean Chase; and (3) text messages produced by the Non-Parties in the original document discovery, along with matching Exhibits.[55]

Further, News Channel 4 WSMV, NewsChannel 5 WTVF, and the *Nashville Scene* broadcasted news stories on February 3, 2016 and February 4, 2016, in which each showed the Non-Parties' confidential materials and deposition testimonies. Lastly, at the evidentiary hearing on September 23, 2016, Mr. Manookian admitted he had disclosed the portions of the Non-Parties' confidential materials and deposition testimonies to Mr. Finley of News Channel 4 WSMV, Phil Williams at NewsChannel 5 WTVF, and Jim Ridley at the *Nashville Scene*. Although Mr. Manookian claims he submitted the confidential materials in early October 2015, prior to the Court's *Orders*. This Court has determined Mr. Manookian lacks credibility and based upon the circumstantial and direct evidence in this case, the Court found by a preponderance of

---

[55] The Court notes these attachments were designated confidential by the *Agreed Protective Order* and the *Orders* entered by this Court.

the evidence this disclosure of the confidential material to the news media occurred in January 2016. Thus, the Court finds these releases to three different news outlets in January 2016 constitute three separate violations of the Court's *Order* of November 6, 2015, which was in effect at this time.

### 4.   <u>Willful Violation</u>

The final issue the Court must determine is whether Mr. Manookian and Mr. Hammervold knowingly, willfully, and intentionally violated the Court's *Order* of November 6, 2015. Once again, the Court relies upon the framework established by the Tennessee Supreme Court in *Chattanooga-Hamilton Cty. Hosp. Auth.*:

> The fourth issue focuses on the willfulness of the person alleged to have violated the order. The word 'willfully' has been characterized as a word of many meanings whose construction depends on the context in which it appears. Most obviously, it differentiates between deliberate and unintended conduct. However, in criminal law, 'willfully' connotes a culpable state of mind. In the criminal context, a willful act is one undertaken for a bad purpose.
>
> In the context of a civil contempt proceeding under Tenn. Code Ann. § 29–2–102(3), acting willfully does not require the same standard of culpability that is required in the criminal context. Rather, willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is 'willful' if it is the product of free will rather than coercion. Thus, a person acts 'willfully' if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.
>
> *State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Group Trust,* 209 S.W.3d at 612 (citations omitted). Thus, acting contrary to a known duty may constitute willfulness for the purpose of a civil contempt proceeding. Determining whether the violation of a court order was willful is a factual issue that is uniquely within the province of the finder-of-fact who will be able to view the witnesses and assess their credibility. Thus, findings regarding 'willfulness' should be reviewed in accordance with the Tenn. R. App. P. 13(d) standards.

*Chattanooga-Hamilton Cty. Hosp. Auth.*, 249 S.W.3d 356-57 (citations and footnotes omitted).

First, as to Mr. Manookian, the Court finds Mr. Manookian knowingly, willfully, and intentionally used the confidential material and deposition testimonies of Dean Chase and Sandra Chase in his representation of Mr. King in the unrelated case of *King v. Chase*. Mr. Manookian was a free agent, knew the Court entered the *Agreed Protective Order* on October 30, 2015 with modifications, and subsequently entered its written *Order* of November 6, 2015, which was in effect at this time, but chose to use the confidential material in his Davidson County lawsuit. The confidential material was used as a bargaining chip with opposing counsel on at least two separate occasions and some of the confidential information was even filed with the Davidson County Chancery Court. Additionally, Mr. Manookian even disclosed the confidential text messages to his own client, Mr. King, to provide more support in the *King v. Chase* lawsuit. Thus, the Court finds Mr. Manookian knowingly, willfully, and intentionally violated the *Order* of November 6, 2015 on four separate occasions as it relates to the *King v. Chase* case.

Second, the Court finds Mr. Manookian knowingly, willfully, and intentionally violated the Court's *Orders* when he released the confidential materials to News Channel 4 WSMV, NewsChannel 5 WTVF, and the *Nashville Scene* in January 2016. The Court finds Mr. Manookian was not coerced to release this information and did so freely for his and his client's personal gain. As Mr. Manookian admitted, he did provide the news media with the confidential material, yet he submits to this Court it was performed in the time period of October 4-6, 2015. The Court has already found Mr. Manookian's testimony was not credible, and this also leads the Court to find he

Case 3:19-bk-07235    Claim 5-1 Part 4    Filed 03/30/20    Desc Exhibit July 2018
Sanctions Judgment    Page 92 of 124

800

knowingly, willfully, and intentionally released the confidential material to the news media after the Court's Order of November 6, 2015.

Moreover, the Court finds Mr. Manookian's time period for his disclosure to be illogical, because if such were the case, why would Mr. Manookian fail to inform the Court it was he that gave the evidence to the news media prior to the Court's entering an *Order*, to which no violation would have occurred? The Court infers Mr. Manookian's silence to be deafening as to this point. Furthermore, Mr. Manookian claimed to have evidence of this apparent submission to Phil Williams, but at the hearing, failed to present the exonerating evidence. After searching the record for any evidence to corroborate Mr. Manookian's time period, the Court finds no such evidence exists.

Additionally, Mr. Manookian would have the Court believe three separate news outlets would receive information for a news story, which involved very recognizable individuals in the Nashville community in October 2015, and fail to investigate the contents of the story, and fail to run the story until February 2016. The Court finds sometimes the most likely stories are the most simple, which is Mr. Manookian released the documents **after** the Court's *Orders* in late October 2015 and early November 2016. Thus, the Court finds Mr. Manookian knowingly, willfully, and intentionally violated the *Order* of November 6, 2015, which was in effect at the time, on three separate occasions as it relates to the disclosures to the media.

Next, as to Mr. Hammervold, the Court finds Mr. Hammervold knowingly, willfully, and intentionally used and released the confidential material in his representation of Mr. King in *King v. Chase*. Mr. Hammervold was co-counsel with Mr. Manookian and, as such, is responsible for the filings submitted by the parties. Thus, he knowingly, willfully,

and intentionally violated the Court's *Orders* by permitting the filing of *Plaintiff's Response to Defendant's Motion for Protective Order* in the *King v. Chase* case, with the attached confidential material as Exhibit 1. (*See* Tr. Exhibit 17, Sept. 23, 2016.) Thus, Mr. Hammervold was a free agent, knew what he was doing when he filed the Exhibit with the Court and intended to do so, and freely used the confidential material in the *King v. Chase* case. Thus, Mr. Hammervold knowingly, willfully, and intentionally violated the Court's *Order* of November 6, 2015, which was in effect at the time, on one occasion by his use and release of the confidential information in the *King v. Chase* case. Additionally, the Court finds Mr. Hammervold may have also knowingly, willfully, and intentionally disclosed the confidential text messages to Mr. King, while acting as co-counsel with Mr. Manookian. However, the record lacks sufficient evidence to meet the threshold for a contempt violation. Thus, the Court finds Mr. Hammervold willfully violated the *Order* of November 6, 2015, which was in effect at the time, on one occasion as it relates to his involvement in the *King v. Chase* case.

As to the news media disclosure violations by Mr. Manookian, the Court finds Mr. Hammervold did not knowingly, willfully, and intentionally violate the Court's *Orders* in this regard. However, most of the evidence shows Mr. Hammervold's willful blindness to the matter, and failure to alert the Court to Mr. Manookian's disobedience to the Court's *Order*, but the Court does not find this to be a violation of the Court's *Order* of November 6, 2015.

Therefore, in total, the Court finds Mr. Manookian in civil contempt for knowingly, willfully, and intentionally violating the Court's *Order* of November 6, 2015 on seven separate incidents when he used, released, and filed the confidential material during his

representation of Mr. King in the *King v. Chase* case and when he knowingly, willfully, and intentionally released the confidential materials to the news media. Additionally, the Court finds Respondent, Cummings Manookian, PLC is also in civil contempt based upon the knowing, willful, and intentional violations of Mr. Manookian acting as its agent for the law firm. As to Mr. Hammervold, the Court finds Mr. Hammervold in civil contempt for knowingly, willfully, and intentionally violating the Court's *Order* of November 6, 2015 on one incident when he used, released, and filed the confidential material during his representation of Mr. King in the *King v. Chase* case. Furthermore, Respondent, Hammervold Law, PLC is also in civil contempt based upon the knowing, willful, and intentional violation of Mr. Hammervold's acting as its agent for the law firm.

### B. Tennessee Rules of Civil Procedure Sanctions

While the Court finds Mr. Manookian and Mr. Hammervold in civil contempt for their violations of the Court's *Orders*, the Court also finds alternative grounds for sanctions based upon Mr. Manookian's and Mr. Hammervold's abuse of the discovery process in this case. As such, the Non-Parties also move the Court to issue Rule 37.02 sanctions against Mr. Manookian and Mr. Hammervold for their failure to adhere to the *Agreed Protective Order* and Court's *Orders*, relating to the discovery in this matter. Rule 37.02 of the Tennessee Rules of Civil Procedure provides as follow:

> If a deponent; party; an officer, director, or managing agent of a party; or, a person designated under Rule 30.02(6) or 31.01 to testify on behalf of a party fails to obey an order to provide or permit discovery, including an order made under Rule 37.01 or Rule 35, or if a party fails to obey an order entered under Rule 26.06, the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

**(A)** An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

**(B)** An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence;

**(C)** An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;

**(D)** In lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders except an order to submit to a physical or mental examination;

**(E)** Where a party has failed to comply with an order under Rule 35.01 requiring the party to produce another for examination, such orders as are listed in paragraphs (A), (B), and (C) of this rule, unless the party failing to comply shows that he or she is unable to produce such person for examination.

In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising the party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

Tenn. R. Civ. P. 37.02

Additionally, in *Alexander v. Jackson Radiology Assocs., P.A.*, the Tennessee

Court of Appeals explained the power trial courts have to remedy abuses of discovery:

The provisions of Rule 37.02 primarily apply to sanctions for non-compliance with a court order. *Lyle v. Exxon,* 746 S.W.2d at 698–99. However, as this Court previously has observed, the rules governing discovery would be ineffectual absent the trial court's authority to sanction their abuse. *Mansfield v. Mansfield,* No. 01A019412CH00587, 1995 WL 643329, at *5 (Tenn. Ct. App. Nov. 3, 1995)(*no perm. app. filed* )(citing 8A Charles A. Wright, et al. *Federal Practice and Procedure* § 2281 (2d ed.1994)). Thus, although the Rules do not explicitly provide for sanctions for discovery abuse absent a court order, trial courts possess the inherent authority to take actions to prevent abuse of the discovery process. *Mercer,* 134 S.W.3d 121, 133. Further, wide discretion is afforded to the

trial courts to determine the appropriate sanction. *Id.* Although "reasonable judicial minds can differ concerning [its] soundness," the trial court's determination of the appropriate sanction will be set aside only where the court "has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of the evidence." *Id.* (quoting *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999)).

*Alexander v. Jackson Radiology Assocs., P.A.*, 156 S.W.3d 11, 15 (Tenn. Ct. App. 2004).

Furthermore, in *Mansfield v. Mansfield*, the Tennessee Court of Appeals also explained:

[T]he Tennessee Rules of Civil Procedure authorize serious sanctions against persons who seek to evade or thwart full and candid discovery, including being found in contempt, having designated facts be taken as established, striking pleadings, dismissing an action or claim or granting a judgment by default, or assessing expenses and attorneys' fees.[1] These sanctions serve a three-fold purpose: (1) to secure a party's compliance with the discovery rules, (2) to deter other litigants from violating the discovery rules, and (3) to punish parties who violate the discovery rules. *Electronic Data Sys. Corp. v. Tyson*, 862 S.W.2d 728, 735 (Tex.Ct.App.1993). Monetary sanctions serve the additional purpose of providing compensation for the expenses caused by the inappropriate conduct. *Carlucci v. Piper Aircraft Corp.*, 775 F.2d 1440, 1453 (11th Cir.1985).

*Mansfield v. Mansfield*, No. 01A019412CH0058, 1995 WL 643329, at *5 (Tenn. Ct. App. Nov. 3, 1995) (footnotes omitted).

As stated in *Pegues v. Illinois Cent. R. Co.*, 288 S.W.3d 350, 354 (Tenn. Ct. App. 2008) *perm. app. denied* (Tenn. Jan. 20, 2009) (quoting *Alexander v. Jackson Radiology Assoc., P.A.,* 1567 S.W.3d 11, 14 (Tenn. Ct. App. 2004), *perm. app. denied* (Tenn. Nov. 15, 2004)):

[T]he inherent powers of the court to impose sanctions are most effective when utilized with discretion and restraint . . . "[T]he punishment must fit the offense" . . . "[T]he power to sanction should be used sparingly. It should not be used like a sword and used frequently . . . to do so would diminish the significance when sanctions are imposed."

Thus, sanctions are a drastic measure which the Court wisely imposes with discretion. The Court finds Mr. Manookian and Mr. Hammervold abused the discovery process in this case and sanctions are appropriate. First, Mr. Manookian entered into the *Agreed Protective Order* on August 28, 2015, in order to receive sensitive materials and for permission to depose Dean Chase and Sandra Chase. However, upon receipt of the confidential material and the taking of the depositions, Mr. Manookian failed to follow the *Agreed Protective Order* and disseminated the confidential material to third parties and news outlets. For example, while Mr. Manookian claims he released the confidential materials and deposition testimonies to the news outlets in early October 2015, which the Court has already found to be untrue and the documents were released in January 2016, even if such were the case, Mr. Manookian would still be abusing the discovery process by completely ignoring the terms of the *Agreed Protective Order* to which Mr. Manookian claimed to be bound. This in itself is an abuse of the discovery process, and performed by an Officer of the Court nonetheless.

As explained above in the civil contempt section of this *Memorandum and Order*, the Court finds Mr. Manookian is in civil contempt for seven counts for his willful disobedience of the Court's *Order* of November 6, 2015. Thus, the Court finds sanctions are also appropriate for these seven offenses. In addition, as examined above, Mr. Manookian also admitted to releasing the confidential information to the following third parties: (1) General Funk, (2) David Raybin, (3) Kim Hodde, and (4) Eli Richardson.[56] These disclosures were in violation of the *Agreed Protective Order* prior to the Court entering an order on the matter, but are still actionable offenses for the abuse of the

---

[56] See numbered ¶ 69 above.

discovery process. Thus, the Court finds sanctions are appropriate for these four violations of the *Agreed Protective Order*.

As for Mr. Hammervold, the Court finds sanctions are also appropriate pursuant to Rule 37.02 of the Tennessee Rules of Civil Procedure. First, as explained above, Mr. Hammervold is in civil contempt for one count for violating of the Court's *Order* of November 6, 2015 as it relates to his representation of Mr. King in the *King v. Chase* case. Additionally, as to the dissemination of the confidential material to the news media, the Court finds, by a preponderance of the evidence, Mr. Hammervold had knowledge of and was complicit in concealing the improper disclosure to the Court. Furthermore, the Court finds Mr. Hammervold's actions in the discovery process and his failure to be truthful with this Court about his absence at the hearing on March 22, 2017 are both sanctionable offenses under Rule 37.02 of the Tennessee Rules of Civil Procedure.

### C. Damages

Based upon the Court's finding Mr. Manookian and Mr. Hammervold are in civil contempt of the Court's *Orders*, specifically the *Order* of November 6, 2015, and they have also exhibited sanctionable conduct throughout these proceedings, the Court must determine the legal basis for an award of damages in the context of civil contempt and Rule 37.02 sanctions.

"Punishment for civil contempt is designed to coerce compliance with the court's order and is imposed at the insistence and for the benefit of the private party who has suffered a violation of his or her rights." *Reed v. Hamilton*, 39 S.W.3d 115, 118 (Tenn. Ct. App. 2000). An award of damages for civil contempt is remedial in nature. *Id.*;

*Wilson v. Wilson*, 984 S.W.2d 898, 904 (Tenn.1998) (Birch, J., dissenting). To the extent attorneys' fees are awarded as damages in a civil contempt action, an "appellate court will not interfere with the trial court's award of attorneys' fees except upon a showing that the trial court abused its discretion. " *Reed*, 39 S.W.3d at 119 (quoting *Kuyendall*, 1991 WL 10178 at *2).

As explained above, Rule 37.02 of the Tennessee Rules of Civil Procedure provides: "[i]n lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising the party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust." Tenn. R. Civ. P. 37.02; *see Berg v. Berg*, No. M2013-00211-COA-R3CV, 2014 WL 2931954, at *14 (Tenn. Ct. App. June 25, 2014).

Here, the Court finds Mr. Manookian and Mr. Hammervold's failure to obey the Court's *Order* of November 6, 2015 to be without justification.

Thus, the Non-Parties submit their damages are in the form of attorneys' fees and expenses, which were incurred due to Mr. Manookian's and Mr. Hammervold's contempt and abuse of the discovery process. Accordingly, the Court finds it necessary to examine procedural history as is relates to the contempt and discovery dispute to fully examine the expenses and attorneys' fees requested.

At the outset of these contempt proceedings, the Court entered a *Scheduling Order* of August 12, 2016, which bifurcated this issue for the purposes of liability and damages on the Non-Parties' *Petitions*. (*See Scheduling Order* of August 12, 2016.) However, on November 9, 2017, the Court held the last day of the evidentiary hearing

on liability and the evidentiary hearing on damages on the same day. At this evidentiary hearing on November 9, 2017, the Non-Parties submitted their claim for damages in the form of attorneys' fees and expenses. Hence, the Non-Parties provided *Affidavits* of Charles Malone, Gayle Malone, John Day, and Marcus Crider in support of their damages. (Collective Tr. Exhibit 3, Nov. 9, 2017.) The *Affidavits of Charles Malone and Gayle Malone* of Butler Snow catalogue the attorneys' fees and expenses of Butler Snow that were incurred by the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., due to Mr. Manookian's and Mr. Hammervold's misconduct. (*Id.*) The *Affidavit of Marcus Crider* describes the attorneys' fees and expenses of Waller that were incurred by the Non-Parties as a result of the misconduct of Mr. Manookian and Mr. Hammervold. (*Id.*) Lastly, the *Affidavit of John Day* provides an expert opinion regarding the reasonableness and necessity of the attorneys' fees and expenses of Butler Snow that were incurred by the Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc. (*Id.*)

At the evidentiary hearing, Mr. Manookian and Mr. Hammervold failed to submit any evidence to contradict or dispute the damages evidence presented by the Non-Parties. Mr. Manookian and Mr. Hammervold instead chose to rely solely upon cross-examination of the Non-Parties' affiants. However, the Court finds Mr. Manookian and Mr. Hammervold failed to undermine the testimony provided by the Non-Parties' claims and evidence.

First, it appears Mr. Manookian and Mr. Hammervold contend the total attorneys' fees and expenses amount was excessive. However, the Court finds this argument to be unpersuasive. The Non-Parties were required to incur these additional costs due to

809

Mr. Manookian's and Mr. Hammervold's misconduct in both this case and the *King v. Chase* case. Regrettably, the Court finds the great majority, if not all, of these costs could have been avoided had Mr. Manookian and Mr. Hammervold simply done what is required as a bare minimum of any lawyer, and that is to simply tell the truth and not spend months on end perpetrating an active fraud against the Court, the attorneys, and the Parties. Mr. Manookian and Mr. Hammervold had plenty of opportunities to stop the fraud upon the Court and be candid and honest with the Court, but instead both attorneys made the conscious decision that attempting to conceal and to defraud the Court and then cover up their fraudulent conduct with more lies and deception as has been set out in this *Memorandum and Order*. Thus, the meter continued to run until Mr. Manookian admitted to releasing the confidential material at the hearing on November 9, 2017, as well as Mr. Hammervold admitting to knowing about Mr. Manookian's involvement of the disclosures to the news media. As a result, now the bill has come due.

Next, Mr. Manookian and Mr. Hammervold appeared to argue the attorneys' fees and expenses are not recoverable due to the fact they were paid by D.F. Chase, Inc. Such an argument fails as well. First, D.F. Chase, Inc. is one of the Non-Parties prosecuting the *Petitions* against Mr. Manookian and Mr. Hammervold. Second, Dean Chase, Sandra Chase, and D.F. Chase, Inc. all incurred, jointly and severally as to the legal liability for the attorneys' fees and expenses at issue. Further, Mr. Manookian and Mr. Hammervold essentially argued the release of the documents did not "cause" the damages sought by the Non-Parties, but as explained thoroughly in this *Memorandum and Order*, the Court finds Mr. Manookian's and Mr. Hammervold's contemptuous,

810

sanctionable, and obviously intentional conduct caused the Non-Parties to incur unnecessary fees and expenses. The entire basis for the proceedings that lead up to the final hearing on November 9, 2017 was to determine who released the confidential material in violation of the *Agreed Protective Order* and the Court's *Orders*. Now, after all of the consuming and tedious investigation and Court proceedings, Mr. Manookian, after being pressed during examination by Mr. Gayle Malone, finally admitted he was the one that released the information, and claims he and Mr. Hammervold did not cause the costs incurred to the Non-Parties. The Court finds such an assertion to be utterly false.

Finally, Mr. Manookian and Mr. Hammervold essentially submit the *King v. Chase* damages should not be included because they believe Mr. King could have filed the lawsuit irrespective of Mr. Manookian's and Mr. Hammervold's violations of this Court's *Orders*. First, this argument was not presented to the Court and there was no evidence provided to this Court besides the non-credible testimony of Mr. Manookian and Mr. Hammervold. Second, the Court finds this argument to also be unavailing. While Mr. King may have had other grounds to file his lawsuit, the evidence presented to this Court was that the release of the confidential material to Mr. King by Mr. Manookian and Mr. Hammervold propelled the lawsuit to be filed, even to go so as far as filing confidential material in the Davidson County Chancery Court in support of the *King v. Chase* lawsuit, all the while doing so in a knowing, willful, intentional and wrongful violation of this Court's *Orders*. (Tr. Exhibit 17, Sept. 23, 2016.) Thus, the Court finds the confidential information disclosure did cause Mr. King to file his complaint in the *King v. Chase* case. This argument fails.

Upon determining the implicit arguments by Mr. Manookian and Mr. Hammervold despite the fact the Court has given Mr. Manookian and Mr. Hammervold opportunity after opportunity to be heard and provide their evidence to this Court, Mr. Manookian and Mr. Hammervold failed to properly make said arguments or present evidence to this Court. Accordingly, the Court shall now determine the reasonableness of the attorneys' fees submitted by the Non-Parties and as to which fees were actually as a result of the Mr. Manookian's and Mr. Hammervold's contemptuous and sanctionable conduct.

The Tennessee Supreme Court Rule 8, Rule 1.5 of the Rules of Professional Conduct, provides the factors a Court must consider in determining reasonableness of an attorney fees and states:

> (a) A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:
>
> > (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
> >
> > (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
> >
> > (3) the fee customarily charged in the locality for similar legal services;
> >
> > (4) the amount involved and the results obtained;
> >
> > (5) the time limitations imposed by the client or by the circumstances;
> >
> > (6) the nature and length of the professional relationship with the client;
> >
> > (7) the experience, reputation, and ability of the lawyer or lawyers performing the services;

(8) whether the fee is fixed or contingent;

(9) prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and

(10) whether the fee agreement is in writing . . . .

Tenn. R. S. Ct. Rule 8, RPC 1.5.

### 1. Butler Snow Attorneys' Fees and Expenses

The evidence presented to the Court shows Butler Snow's representation of the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., in this action and the attorneys' fees and expenses billed to the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., as a result of investigating and litigating the various matters surrounding the *Petition for Contempt* and *Motions for Sanctions* as well as the media matters that arose in this case. Accordingly, Butler Snow began representing the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., shortly after January 20, 2016, when it was learned certain media outlets had been provided and were intending to publish the confidential material disclosed by the Non-Parties. (Collective Tr. Exhibit 3, *Affidavit of Charles I. Malone*, at numbered ¶ 3, Nov. 9, 2017.)

Consequently, after the publication of the Non-Parties' confidential material, the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., filed their initial *Motion for Sanctions* on February 25, 2016. As it is, Butler Snow represented the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., regarding these matters through the final hearing on November 9, 2017. (*Id.* at numbered ¶ 4.)

First, the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., seek their attorneys' fees and expenses incurred or will be paid to Butler Snow by the Non-

Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., in this action from January 20, 2016 through September 30, 2017. (Collective Tr. Exhibit 3, *Affidavit of Charles I. Malone* and *Affidavit of Gayle I. Malone, Jr.*, Nov. 9, 2017.) In support, the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., provide the sworn testimony of Charles Malone and Gayle Malone, as well as the monthly bills, documented on an entry-by-entry basis. (*Id.*) The Court also notes this final sum for attorneys' fees and expenses in this action has been discounted by $59,936.70 as a credit to the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., and a substantial sum has been redacted by Mr. Charles Malone and Mr. Gayle Malone for the legal services provided by Butler Snow. (Collective Tr. Exhibit 3, *Affidavit of Charles I. Malone*, at numbered ¶ 16, Nov. 9, 2017.) For the reasons set forth below, the Court finds the attorneys' fees requests are reasonable.

Second, the time, labor, and skill required to perform these legal services reflect this are reasonable attorneys' fees.[57] The Court has reviewed the time entries contained in Butler Snow's monthly billing statements and has considered the reasonableness of the fees based upon the Court's knowledge of the nature of this matter, which includes the complexity, the time required to respond to various issues, the adversaries, and the novelty of the issues in dispute.[58] These attorneys' fees are proper.

Third, in light of the time involved in representing the Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc. and the likelihood the particular employment would

---

[57] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(1).
[58] *Id.*

preclude other employment by the attorneys on this case from Butler Snow heavily weighs in favor of the reasonableness of the fees.[59]

Fourth, the Court finds the fees charged by Butler Snow to be customarily charged in this locality.[60] It appears Gayle Malone, Jr. charges an hourly rate of $525.00; Charles Malone charges an hourly rate of $395.00; Beau Creson charges an hourly rate of $275.00; and Paige (Ayres) Nutini charges an hourly rate of $215.00. (Collective Tr. Exhibit 3, *Affidavit of Gayle I. Malone, Jr.*, at numbered ¶ 9, Nov. 9, 2017.) Based upon each attorney's level of experience, skill, and expertise in these matters, the Court finds the rates of the attorneys listed above are typically charged in Williamson County and the surrounding area for similar legal services rendered. (*Id.*)

Fifth, while this sum of the attorneys' fees and expenses are significant, the Court finds this amount involved is reasonable to uncover the contemptuous conduct and discovery abuses of Mr. Manookian and Mr. Hammervold and the result was favorable for the Non-Parties.[61]

Sixth, the Court also finds there were time limitations imposed by the circumstances for counsel of Butler Snow to respond to filings and attend unnecessary hearings in which Mr. Manookian and Mr. Hammervold failed to appear for one reason or another.[62]

---

[59] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(2).
[60] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(3).
[61] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(4).
[62] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(5).

Seventh, the Court was unable to find the nature and length of the professional relationship between the attorneys at Butler Snow and the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., for this factor's consideration.[63]

Eighth, the Court finds the Non-Parties' attorneys have excellent experience, reputation, and ability as attorneys to perform the legal services in this case.[64] (*Id.*)

Ninth, as described above, the Butler Snow attorneys charged hourly rates as follows: Gayle Malone, Jr. charged an hourly rate of $525.00; Charles Malone charged an hourly rate of $395.00; Beau Creson charged an hourly rate of $275.00; and Paige (Ayres) Nutini charged an hourly rate of $215.00.[65] This, too, appears to be reasonable.

Tenth, there is no evidence in the record of prior advertisements or statements by the attorneys as to their fees or whether the fee agreement is in writing.[66] Additionally, in considering the expert opinion of Mr. John Day, the Court concurs with Mr. Day's expert opinion regarding the reasonableness and necessity of the attorneys' fees and expenses of Butler Snow incurred by the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc. (*See generally* Collective Tr. Exhibit 3, *Affidavit of John Day*, Nov. 9, 2017).

Therefore, the Court finds the $297,870.64 in attorneys' fees and expenses that have been or will be paid to Butler Snow by the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., in this matter for the period of January 2016 through September 30, 2017 were incurred as a direct and proximate result of Mr. Manookian's and Mr. Hammervold's contemptuous conduct. (See Collective Tr. Exhibit 3, *Affidavit of*

---

[63] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(6).
[64] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(7).
[65] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(8).
[66] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(9) and (10).

*Charles I. Malone*, Exhibit B, Nov. 9, 2017.) Furthermore, in the alternative, the Court also awards these reasonable attorneys' fees based upon Mr. Manookian's and Mr. Hammervold's abuses of the discovery process throughout this case. These attorneys' fees and expense are reasonable in light of the circumstances of this case and are hereby awarded against Mr. Manookian, Mr. Hammervold, and their respective firms.

Next, the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., also seek their attorneys' fees and expenses in this matter from October 1, 2017 through the conclusion of this case. (*See* Collective Tr. Exhibit 3, *Affidavit of Charles I. Malone*, numbered ¶ 18, Nov. 9, 2017.) As such, the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc., request, as an award of damages, their attorneys' fees and expenses for Butler Snow they have not yet incurred, but reasonably estimate will incur in this matter as a result of the prosecution of the *Petitions*. The Non-Parties estimate $75,000.00 for future attorneys' fees and expenses.[67] (*Id.*)

Here, the Court denies the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc.'s, request as to award these fees at this time. The Court finds such an award would be premature and solely based upon projections. However, the Court shall grant the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc.'s, request for leave of Court to supplement their *Affidavits* with the fees and expenses incurred in this matter for this period of time.

Lastly, the next form of damages sought by the Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc., as it relates to the Butler Snow representation, is the attorneys' fees and expenses incurred by the Non-Parties Dean Chase, Sandra Chase,

---

[67] This estimate is partly based upon the fact Butler Snow incurred over $90,000.000 in attorneys' fees and expenses in September of 2016, the month in which the first day of the evidentiary hearing was held on the Non-Parties' *Petitions* occurred.

817

and D.F. Chase, Inc. in *King v. Chase* and other threatened litigation by Mr. Manookian, Mr. Hammervold, and their firms. (*See* Collective Tr. Exhibit 3, *Affidavit of Charles I. Malone*, Exhibit F, Nov. 9, 2017.) These attorneys' fees and expenses are limited to the investigating and litigating the claims and threatened claims made by Mr. Manookian and Mr. Hammervold using the Non-Parties' confidential discovery materials, with such fees and expenses ending on September 29, 2016, the date the original claims brought by Mr. Manookian and Mr. Hammervold, on behalf of Mr. King, were dismissed. (*Id.*)

The Court finds the Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc. suffered $113,500.64 in damages in the form of attorneys' fees and expenses as a direct and proximate result of Mr. Manookian's and Mr. Hammervold's wrongful use and disclosure of the Non-Parties' confidential discovery materials in their representation of Mr. King in *King v. Chase* and other threatened litigation. Accordingly, these damages shall be awarded against Mr. Manookian, Mr. Hammervold, and their law firms based upon the finding of civil contempt against them. In the alternative, the Court also awards these damages pursuant to Rule 37.02 of the Tennessee Rules of Civil Procedure and the inherent power of the Court. The Court finds the $113,500.64 in attorneys' fees and expenses related to *King v. Chase* and the other threatened litigation are reasonable in amount based upon the time and labor required and difficulty and complexity of the numerous factual and legal issues involved, and the contentiousness of the case. The Court finds the accuracy of this figure is supported by the sworn testimony of Charles Malone and Gayle Malone, as well as the monthly bills, documented on an entry-by-entry basis, evidencing the fees and expenses charged by Butler Snow to the Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc. in the *King v. Chase* matter.

(*See* Collective Tr. Exhibit 3, *Affidavit of Charles I. Malone*, Exhibit F; Nov. 9, 2017; Collective Tr. Exhibit 3, *Affidavit of Charles I. Malone*, at numbered ¶ 24, Nov. 9, 2017.) The Court also finds the factors analyzed above are applicable to those incurred in the *King v. Chase* action. Moreover, the Court finds the total attorneys' fees and expenses charged by Butler Snow in the *King v. Chase* matter and threatened litigation are reasonable and necessary based upon the time entries found in Butler Snow's monthly billing statements and considering the legal and factual questions at issue in *King v. Chase* and the threatened litigation, the complexity of each and the substantial investigation, motion practice, and hearing preparation required. Therefore, the Court finds the $113,500.64 in attorneys' fees and expenses that have been or will be paid to Butler Snow by the Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc. in the *King v. Chase* matter were incurred as a direct and proximate result of Mr. Manookian's and Mr. Hammervold's contemptuous and sanctionable conduct. Furthermore, these attorneys' fees and expense are reasonable in light of the circumstances of this case and are hereby awarded against Mr. Manookian, Mr. Hammervold, and their respective firms.

Ultimately, the Court awards $297,870.64 in reasonable attorneys' fees and expenses incurred by the Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc. in this matter for the period of January 2016 through September 30, 2017, awards $113,500.64 in reasonable attorneys' fees and expenses incurred by the Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc. in the *King v. Chase* matter, and grants the Non-Parties' Dean Chase, Sandra Chase, and D.F. Chase, Inc. request for leave of Court to supplement their *Affidavits* with the fees and expenses that were

819

incurred from the period of time from the preparation for the final hearing on November 9, 2017, which was not included in the *Affidavits*, to the entry of this *Memorandum and Order*. The total amount of attorneys' fees and expense of $411,371.28 are hereby awarded against Mr. Manookian, Mr. Hammervold, and their respective firms.

### 2. Waller Attorneys' Fees and Expenses

Next, the Non-Parties collectively also seek an award of damages damages in the form of attorneys' fees and expenses incurred from September 1, 2015 through October 18, 2017 by the Non-Parties due to Mr. Manookian's, Mr. Hammervold's, and their respective firms' contemptuous and sanctionable conduct and violations of the *Agreed Protective Order* and the Court's *Orders* regarding same.[68] The Court finds the accuracy of the this figure is supported by the sworn testimony of Marcus Crider of the relevant bills transmitted by Waller to the Non-Parties in this matter, as well as the monthly bills, documented on an entry-by-entry basis, for all of the relevant bills transmitted by Waller to the Non-Parties in this matter. (Collective Tr. Exhibit 3, *Affidavit of Marcus Crider*, Exhibit A, Nov. 9, 2017.)

The Court finds the attorneys' fees and expenses are reasonable. As explained by Mr. Crider in his *Affidavit*, Waller has been actively involved in the representation of the Non-Parties throughout the litigation since Mr. Manookian's July 20, 2015, and July 23, 2015 subpoenas to the Non-Parties. (Collective Tr. Exhibit 3, *Affidavit of Marcus Crider*, at ¶ 3, Nov. 9, 2017.) Specifically, Waller negotiated with Mr. Manookian and other defense counsel over the entry of the *Agreed Protective Order* prepared by Mr. Manookian; reviewed and produced numerous documents, correspondences,

---

[68] The Court notes total attorneys' fees are $177,660.00 and $13,664.84 in expenses. (Collective Tr. Exhibit 3, *Affidavit of Marcus Crider*, at numbered ¶ 12, Nov. 9, 2017.)

electronically-stored information and other discovery materials in accordance with the *Agreed Protective Order*; drafted pleadings relating to the entry of the *Agreed Protective Order*, the Court's subsequent oral and written orders regarding the same, and violations of said orders; and represented Dean Chase and Sandra Chase during the depositions. (Collective Tr. Exhibit 3, *Affidavit of Marcus Crider*, Exhibit A, Nov. 9, 2017.) Additionally, Waller prepared for and attended many hearings in these proceedings. Accordingly, with this background, the Court shall apply the factors set forth above. (*Id.*)

First, the Court finds the time, labor, and skill required to perform the legal services in this case were significant due to the complexity, the time required to respond to filings, and the adversaries in this matter.[69]

Second, in light of the time involved in representing the Non-Parties, the likelihood the particular employment would preclude other employment by the attorneys at Waller weighs in favor of the reasonableness of the fees.[70]

Third, the Court finds the fees charged by Waller to be customarily charged in this locality.[71] It appears Marcus Crider charged an hourly rate of $410.00 in 2015, an hourly rate of $425.00 in 2016, and a current hourly rate of $440.00. (Collective Tr. Exhibit 3, *Affidavit of Marcus Crider*, at numbered ¶ 2, Nov. 9, 2017.) Heath E. Edwards charged an hourly rate of $275.00 in 2015, an hourly rate of $305.00 in 2016, and a current hourly rate of $325.00. (*Id.* at numbered ¶ 5.) Chris Dunn charged an hourly rate of $400.00 in 2015, an hourly rate of $420 in 2016, and a current hourly rate of $430.00. (*Id.* at numbered ¶ 7.) Lastly, Shandra Wright, CEDS, and Michael Creath, CEDS,

---

[69] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(1).
[70] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(2).
[71] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(3).

although not attorneys but technical support each charged an hourly rate of $150.00. (*Id.* at numbered ¶ 8.) Based upon each attorney's level of experience, skill, and expertise in these matters, the Court finds the rates as typically charged in Williamson County and the surrounding area for similar legal services rendered.

Fourth, although these attorneys' fees and expenses are substantial, the Court finds this amount involved is reasonable to uncover the contemptuous conduct of Mr. Manookian and Mr. Hammervold and the result was favorable for the Non-Parties.[72]

Fifth, the Court also finds there were time limitations imposed by the circumstances for counsel of Waller to respond to pleadings and attend unnecessary hearings in which Mr. Manookian and Mr. Hammervold failed to appear for one reason or another.[73]

Sixth, the Court was unable to find the nature and length of the professional relationship between the attorneys at Waller and the Non-Parties for this factor's consideration.[74]

Seventh, the Court finds the Non-Parties' attorneys, Marcus Crider, Heath E. Edwards, and Chris Dunn, are in good standing with this Court and have superb experience, reputation, and ability as attorney to perform the legal services in this case.[75]

---

[72] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(4).
[73] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(5).
[74] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(6).
[75] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(7); *see* Collective Tr. Exhibit 3, *Affidavit of Marcus Crider,* at numbered ¶¶ 2-7, Nov. 9, 2017.

Eighth, as described above, the Waller attorneys charge reasonable rates compared to similar situated attorneys in Williamson County and the surrounding areas.[76]

Ninth, there is no evidence in the record of prior advertisements or statements by the attorneys as to their fees or whether the fee agreement is in writing.[77]

Therefore, the Court finds the $191,324.84 rendered for attorneys' fees and expenses incurred which have been or will be paid to Waller by the Non-Parties in this matter for legal representation from September 1, 2015 through October 8, 2017 due to Mr. Manookian's, Mr. Hammervold's, and their respective law firms' violations of the *Agreed Protective Order* and Court's *Orders* regarding the same are reasonable and necessary. Furthermore, these attorneys' fees and expense are reasonable in light of the circumstances of this case. Moreover, the attorneys from Waller are granted permission to supplement their requested attorneys' fees to reflect subsequent billable matters incurred from the period of time from the preparation for the final hearing on November 9, 2017, which was not included in Mr. Crider's *Affidavit*, to the entry of this *Memorandum and Order*. (*See* Collective Tr. Exhibit 3, *Affidavit of Marcus Crider,* at numbered ¶ 15, Nov. 9, 2017.)

Ultimately, these awards are based upon Mr. Manookian and Mr. Hammervold's civil contempt counts by violating the Court's *Orders*, specifically the *Order* of November 6, 2015 which was in effect at the time of the violations. Furthermore, in the alternative, these awards are also for sanctions against Mr. Manookian and Mr. Hammervold for

---

[76] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(8).
[77] Tenn. R. S. Ct. Rule 8, RPC 1.5(a)(9)&(10).

Page 115 of 122

their abuse of the discovery process and failure to maintain candor with this Court throughout these proceedings.

## IV.  CONCLUSION

For the above reasons, the Court finds Mr. Manookian in civil contempt for knowingly, willfully, and intentionally violating the Court's Order of November 6, 2015 on seven separate occasions.

The Court also finds Mr. Hammervold knowingly, willfully, and intentionally violated the Court's *Order* of November 6, 2015 on one occasion when he used, released, and filed a confidential document in his representation of Mr. King in *King v. Chase.*

The Court finds due to Mr. Manookian's abuse of the discovery process, failure to maintain candor with this Court, continuous violations of the *Agreed Protective Order*, and attempt to defraud this Court, sanctions are also appropriate for these offenses under Rule 37.02 of the Tennessee Rules of Civil Procedure.

The Court also finds Mr. Hammervold's abuse of the discovery process, failure to maintain candor with this Court, continuous violations of the *Agreed Protective Order*, and attempt to defraud this Court for over two years, sanctions are also appropriate for these offenses under Rule 37.02 of the Tennessee Rules of Civil Procedure.

Accordingly, the Court makes the following recapitulation of the total of the reasonable attorneys' fees and expenses awarded to the Non-Parties:

1. The Court awards the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc.'s, reasonable attorneys' fees and expenses incurred by the representation of the attorneys at Butler Snow for the period of January 2016

824

through September 30, 2017 in the amount of $297,870.64 against Mr. Manookian, Mr. Hammervold, and their respective firms;

2. The Court awards the Non-Parties, Dean Chase, Sandra Chase, and D.F. Chase, Inc.'s, their reasonable attorneys' fees and expenses incurred by the representation of the attorneys at Butler Snow for the period in the *King v. Chase* matter in the amount of $133,500.64 against Mr. Manookian, Mr. Hammervold, and their respective firms;

3. The Court awards the sum of $191,324.84 for attorneys' fees rendered and expenses incurred which have been or will be paid to Waller by the Non-Parties in this matter for legal representation from September 1, 2015 through October 8, 2017 against Mr. Manookian, Mr. Hammervold, and their respective firms;

4. The Court grants the Non-Parties' request for leave of this Court to supplement their *Affidavits* with the fees rendered and expenses incurred from the period of time from the preparation for the final hearing on November 9, 2017, which was not included in the *Affidavits*, to the entry of this *Memorandum and Order*. The Non-Parties' attorneys shall prepare, file, and serve an affidavit listing these remaining attorneys' fees and expenses incurred in litigating this matter while also applying the factors set forth in Rule 8, RPC 1.5 of the Tennessee Rules of the Supreme Court, to each fee not later than Friday, July 27, 2018. The Respondents shall prepare, file, and serve a response in opposition not later than the close of business on Friday, August 10, 2018. The Court shall decide the issue of the supplemental

Case 3:19-bk-07235   Claim 5-1 Part 4   Filed 03/30/20   Desc Exhibit July 2018 Sanctions Judgment   Page 117 of 124

825

attorneys' fees on the papers unless either party requests a hearing for good cause, in which event, the matter shall be set on the Court's regularly scheduled civil motion docket.

THEREFORE, the Court awards the total sum of **$622,696.12** as reflected above to the Non-Parties, CK Global, LLC; NV Music Row, LLC; Dean Chase, Sandra Chase, and D.F. Chase, Inc., to be paid by Respondents, Brian Manookian; Cummings Manookian, PLC; Mark Hammervold; and Hammervold Law, PLC, as a result of the findings herein.

This *Memorandum and Order*, together with an Order deciding Non-Parties' supplemental request for assessment of reasonable attorneys' fees and expenses shall constitute a Final Judgment within the meaning of Rule 54.01 of the Tennessee Rules of Civil Procedure from which the parties may appeal as a matter of right pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure.

This Court shall refer to the Board of Professional Responsibility the conduct of Mr. Brian Manookian and Mr. Mark Hammervold. This Court shall also refer to the District Attorney General's Office of the 21st Judicial District the conduct of Mr. Brian Manookian and Mr. Mark Hammervold.

**IT IS SO ORDERED.**

**ENTERED** this _20th_ day of July, 2018.

**Michael W. Binkley**
**Circuit Court Judge/Chancellor, Division III**

Page **118** of **122**

## CLERK'S CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing Memorandum and Order as entered by the Court has been forwarded postage prepaid, and/or emailed, and/or faxed, to:

Philip L. Robertson, Esq. (BPR No. 021668)
Brittany M. Bartkowiak, Esq. (BPR No. 031637)
Robertson Law Group
1896 General George Patton, Suite 600
Franklin, TN 37067
t. 615.656.1729
e. probertson@robertsonlg.com
e. brittany@robertsonlg.com
e. bspeight@robertsonlg.com
*Counsel for Plaintiff, David Chase*

Robert F. Parsley, Esq. (BPR No. 023819)
Michael J. Dumitru, Esq. (BPR No. 030140)
Miller & Martin
832 Georgia Avenue, Suite 1000
Chattanooga, TN 37402-2289
t. 423.756.6600
f. 423. 785.8480
e. bob.parsley@millermartin.com
e. michael.dumitru@millermartin.com
*Counsel for Defendant Andy Cho*

Brian Cummings, Esq. (BPR No. 019354)
Brian Manookian, Esq. (BPR No. 026455)
Cummings Manookian
45 Music Square West
Nashville, TN 37203
t. 615.266.3333
t. 615.266.0226
f. 615.266.0250
e. bmanookian@cummingsmanookian.com
e. brian.manookian@cmtriallawyers.com
e. bcummings@cummingsnaookian.com
*Counsel for Defendants Chris Stewart, Emily Stewart, Susan Martin, Clayton Mckenzie, Bryan Everett, and Lino Lovrenovic*

**[Clerk's Certificate of Service continued on next page]**

Rob McGuire, Esq. (BPR No. 021594)
Assistant United States Attorney
United States Attorney's Office
Middle District of Tennessee
110 Ninth Avenue South Ste A961
Nashville, TN 37203
*Former Counsel for Defendant Lauren Bull*

Mark Hammervold, Esq. (BPR No. 031147)
315 Deaderick Street Ste 1550
Nashville, TN 37238-3003
t. 615.928.2466
m. 615.509.0372
mark@hammervoldlaw.com
*Counsel for Bryan Everett, Susan Martin, Lino Lovrenovic & Clayton McKenzie*

Gayle I. Malone, Jr., Esq. (BPR No. 002388)
Charles I. Malone, Esq. (BPR No. 022904)
Gibeault "Beau" C. Creson, Esq. (BPR No. 03049)
Butler Snow, LLP
150 Third Avenue South, Suite 1600
Nashville, TN 37201
t. 615.651.6782
f. 615.651.6701
e. gayle.malone@butlersnow.com
e. charlie.malone@butlersnow.com
e. beau.creson@butlersnow.com
*Counsel for Intervenors D.F. Chase, Inc. Dean Chase, and Sandra Chase*

Marcus M. Crider, Esq. (BPR No. 018608)
Heath H. Edwards, Esq. (BPR No. 034076)
Frances Fenelon, Esq. (BPR No. 017315)
Christopher S. Dunn, Esq. (BPR No. 017067)
Waller
511 Union Street, Suite 2700
Nashville, TN 37219
t. 615.850.8067
f. 615.244.6804
e. marcus.crider@wallerlaw.com
e. heath.edwards@wallerlaw.com
e. chris.dunn@wallerlaw.com
e. frances.fenelon@waller.law.com
*Counsel for Intervenor Meredith Corp.*

**[Clerk's Certificate of Service continued on next page]**

828

Ronald G. Harris, Esq. (BPR No. 009054)
Neal & Harwell
1201 Demonbreaum Street Ste 1000
Nashville, TN 37203
t. 615.244.1713
f. 615.726.0573
e. rharris@nealharwell.com
*Counsel for Intervenor Scripps Media Inc.*

James D. Kay, Jr. (BPR No. 011556)
John B. Enkema, Esq. (BPR No. 016670)
Kay, Griffin, Enkema & Colbert PLLC
222 Second Ave. North Ste 340M
Nashville, TN 37201
t. 615.742.4800
f. 615.742.4801
e. john.enkema@kaygriffin.com
e. jim.kay@kaygriffin.com
*Counsel for Intervenor Glenn Funk*

David T. Hooper, Esq. (BPR No. 005413)
Hooper Zinn McNamee PLLC
109 Westpark Drive, Suite 300
Brentwood, TN 37027
t. 615.661.5472
f. 615.661.5473
e. dhooper@hooperzinn.com
*Counsel for Defendant Jason Ritzen*

John Phillip Williams, Esq. (BPR No. 000531)
Tune, Entrekin & White P.C.
315 Deaderick Street, Suite 1700
Nashville, TN 37238
t. 615.244.2770
f. 615.244.2778
e. jwilliams@tewlawfirm.com
*Attorney for the Nashville Scene*

**[Clerk's Certificate of Service continued on next page]**

Paul R. McAdoo, Esq. (BPR No. 034066)
Aaron & Sanders, PLLC
810 Dominican Drive Ste 208
Nashville, TN  37228-1906
t. 615.734.1188
f. 615.250.9807
e. paul@aaronsanderslaw.com
Attorneys for Meredith Corporation, owner
  and Operator of WSMV Channel 4 Nashville

This the 20th day of July, 2018.

**Circuit Court Clerk**

**[END OF DOCUMENT]**

## Deborah Rubenstein - Court date offered

| | |
|---|---|
| **From:** | Deborah Rubenstein |
| **To:** | Chase v. Stewart |
| **Date:** | 2/3/2017 11:28 AM |
| **Subject:** | Court date offered |
| **Bc:** | Mike Binkley;  Barton, Cathy;  Woodruff, Judge.Joseph;  Williams, Angie |

Counsel,

Judge Binkley would like to offer to you Thursday, March 2, 2017 for the continuation of the Chase v. Stewart matter, which was "bumped" on Wednesday, February 1, 2017, due to the first setting trial going forward.  The Chase case would be a first setting on March 2, 2017.

Please get together and see if this date is available for everyone and let me know.

Thank you.

Debbie Rubenstein, PLS
Judicial Legal Assistant
Circuit Court Judge Michael W. Binkley
State of Tennessee, 21st Judicial District
135 Fourth Avenue South, Ste 286
Franklin, TN 37064
Direct: 615.599.4014
Office: 615.425.4009
Fax:    615.790.5047
NALS Editorial Board 2014-2015/2015-2016
**LEGAL CONFIDENTIAL: The information in this email and in any attachments hereto may contain information which is privileged either legally or otherwise. It is intended only for the attention and use of the named recipient. If you are not the intended recipient, you are not authorized to retain, disclose, copy or distribute the message and/or any of its attachments. If you received this email in error, please notify me and delete this message.**



**EXHIBIT "A"**
is an Exhibit referenced in footnote 40,
p. 35 of 123

**EXHIBIT**
*A*

file:///C:/Users/aocuser/AppData/Local/Temp/XPgrpwise/58946956William1tnciswm1100...  7/10/2018
Case 3:19-bk-07235   Claim 5-1 Part 4   Filed 03/30/20   Desc Exhibit July 2018
Sanctions Judgment   Page 123 of 124

831

RECEIVED
SEP 2 8 2018
CIRCUIT COURT

IN THE CIRCUIT COURT FOR WILLIAMSON COUNTY, TENNESSEE
AT FRANKLIN

DAVID CHASE,                                    )
                                                )
            PLAINTIFF,                           )
                                                )
VS.                                             )        CASE NO. 2015-200
                                                )
CHRIS STEWART, EMILY STEWART,                   )
LAUREN BULL, ANDY CHO, LINO                     )        FILED Sept. 27 20 18
LOVRENOVIC, BRYAN EVERETT,                      )
SUSAN MARTIN, and CLAYTON                       )        ENTERED BOOK _____ PAGE _____
MACKENZIE,                                      )        DEBBIE McMILLIAN BARRETT
                                                )
            DEFENDANTS.                          )

## ORDER ON SUPPLEMENTAL ATTORNEYS' FEES AND EXPENSES AWARD

This matter came before the Court upon Petitioners' Dean Chase, Sandra Chase, and D.F. Chase, Inc. *Petition for Civil Contempt and Motion for Sanctions* filed on April 11, 2016, as well as the *Motion for Sanctions* filed by Non-Parties CK Global, LLC and NV Music Row, LLC (hereinafter collectively referred to as "Non-Parties"), against Respondents, Brian Manookian; Cummings Manookian, PLC; Mark Hammervold; and Hammervold Law, PLC (hereinafter collectively referred to as "Respondents"). The Court held an evidentiary hearing on September 23, 2016 and November 9, 2017. Accordingly, the Court entered its *Memorandum and Order* on July 20, 2018 disposing of all issues except for the Non-Parties' request for an award of supplemental attorneys' fees incurred from the period of time from the preparation for the final hearing on November 9, 2017 to the entry of this Court's *Memorandum and Order* of July 20, 2018. The Court heard oral arguments as to the Non-Parties' request

Case 3:19-bk-07235   Claim 5-1 Part 5   Filed 03/30/20   Desc Exhibit September 2018
Supplemental Sanctions Judgment   Page 1 of 13

833

for supplemental attorneys' fees regarding the reasonableness of these fees on September 25, 2018.

## I. BRIEF PROCEDURAL HISTORY

The Court finds a brief procedural history since the entry of the Court's *Memorandum and Order* of July 20, 2018 is necessary to preserve the record of this case.

On July 27, 2018, Marcus Crider, Esq., the billing attorney for the representation of Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc., CK Global, LLC, and NV Music Row, LLC, filed his *Affidavit of Marcus Crider* regarding the supplemental attorneys' fees request. On the same day, Charles I. Malone, Esq. and Gayle I. Malone, Jr., Esq., the billing attorneys for the representation of Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc., filed their *Non-Parties' Notice of Filing of Supplemental Affidavits.*[1] On August 10, 2018, Respondents Mark Hammervold and Hammervold PLC (hereinafter collectively referred to as "Hammervold") filed a *Response in Opposition and Objection to Supplemental Affidavits Filed in Support of Supplemental Award for Attorney Fees and Expenses.* In addition, Respondents Brian Manookian and Cummings Manookian, PLC (hereinafter referred to collectively as "Manookian") filed a *Response in Opposition and Objections to Supplemental Affidavits Filed in Support [sic] Supplemental Award For Attorney Fees and Expenses.*

Additionally, on August 10, 2018, the Court entered a *Supplemental Order,* pursuant to 201 of the Tennessee Rules of Evidence, requesting the parties to brief and submit their positions in regard to whether the Court was authorized to take judicial

---

[1] This filing attached the following affidavits: (1) *The Supplemental Affidavit of Charles I. Malone,* and (2) *The Supplemental Affidavit of Gayle I. Malone, Jr.*

Page **2** of **13**

Case 3:19-bk-07235   Claim 5-1 Part 5   Filed 03/30/20   Desc Exhibit September 2018 Supplemental Sanctions Judgment   Page 2 of 13

834

notice of the *Opinion and Order Regarding Sanctions* entered on August 3, 2017 in *Diamond Consortium, Inc. v. Manookian*, No. 4:16CV94-ALM, 2017 WL 3301527 (E.D. Tex. Aug. 3, 2017) against Respondents Brian Manookian and Cummings Manookian, PLC in a similar case.

On August 16, 2018, Defendant Andy Cho filed his *Response*, stating he takes no position on the issue. On August 17, 2018, Hammervold filed his *Brief and Position RE: Court's August 10, 2018 Supplemental Order*, in which he submitted his opposition to the Court taking judicial notice of the matter. Also, on the same day, Manookian filed his *Brief and Request for Hearing Regarding the Proprietary of this Court Taking Judicial Notice of the Matters Raised by this Court's August 10, 2018 Order*.[2] Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc. filed their *Positional Brief in Response to the Court's August 10, 2018 Supplemental Order*, in which they argued the Court is permitted to take judicial notice of the referenced order as it is a fact that is "not subject to reasonable dispute, in that it is . . . capable of accurate and ready determination by resort to source whose accuracy cannot reasonably be questioned"; however, Non-Parties also contended taking judicial notice was unnecessary due to the Court's findings in its *Memorandum and Order* of July 20, 2018. *See* Tenn. R. Evid. 201(b)(2).

Subsequently, on August 28, 2018, the Court entered an *Order* based upon a request from Respondent Brian Manookian (hereinafter referred to as "Mr. Manookian"), through the Circuit Court Clerk's Office for Williamson County, Tennessee, to obtain certain information from the court file in this case, which was and currently is under seal. In this *Order*, the Court simply directed Mr. Manookian to follow the Tennessee Rules of

---

[2] The Court notes Mr. Manookian failed to properly request to set this matter for a hearing.

Civil Procedure and file a motion for his request for certain information in the court file which was under seal. Such procedure would be necessary for any party or counsel of record to review the case file. Accordingly, Mr. Manookian filed a *Motion for Access to Case Records* on August 28, 2018, yet Mr. Manookian again failed to set the matter for hearing or request a proper date to set the hearing, which is the custom in the Twenty-First Judicial District on such matter.

Mr. Manookian then filed his *Third Motion for Recusal* on September 21, 2018.[3] On September 24, 2018, Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc. filed their *Response to Brian Manookian and Cummings Manookian, PLC's Third Motion for Recusal*. In accordance with Rule 10B of the Tennessee Supreme Court Rules and due to the brief amount of time to respond in light of the setting of the hearing regarding the reasonableness of the supplemental attorneys' fees on September 25, 2018, the Court filed its *Response and Order* on September 25, 2018 and denied Mr. Manookian's *Third Motion for Recusal* stating in writing the grounds.

Ultimately, the Court continued and heard the matter regarding the reasonableness of Non-Parties' request for supplemental attorneys' fees on September 25, 2018.

## II.   DISCUSSION

At the outset of the hearing on September 25, 2018, Mr. Manookian asserted two objections to the proceedings. First, Mr. Manookian objected to not being provided this

---

[3] The Court notes pursuant to Rule 10B of the Tennessee Supreme Court Rules any party seeking recusal of a judge can do so by submitting "a timely filed written motion"; however, the Court inquires whether Mr. Manookian's *Third Motion for Recusal* was timely in light of the delay to submit these allegations and only providing the Court with one business day to respond prior to the hearing set on September 25, 2018, which required a Court order to set due to the parties' scheduling conflicts. TN R S CT Rule 10B.

Court's previously entered *Response and Order* on September 25, 2018 denying Mr. Manookian's *Third Motion for Recusal* prior to the hearing. However, the Court notes with the short period of time it had to prepare a response to Mr. Manookian's *Motion*, the Court merely filed its *Response and Order* denying Mr. Manookian's *Motion* with the Williamson County Circuit Court Clerk prior to beginning the hearing set on September 25, 2018, at 3:00 p.m., in accordance with Rule 10B of the Tennessee Supreme Court Rules. At the hearing, the Court explained to all of the parties and legal counsel that the Court had entered a *Response and Order* denying the *Motion* and there would be no further delay in concluding this matter. The Court also finds it pertinent to address the fact the matter scheduled for a hearing was on the award of supplemental attorneys' fees and in no way was relevant to the disposition of Mr. Manookian's previously requested *Third Motion for Recusal*.

Second, Mr. Manookian objected to his inability to review the court file, which was and currently is under seal. In support, Mr. Manookian argued he had filed a *Motion for Access to Case Records* on August 28, 2018 pursuant to the *Order* of August 28, 2018, but was never allowed to review the court file. While the Court recognizes the court file was under seal and all parties and counsel would need to file a motion to review the court file, to Mr. Manookian properly adhered to, it is apparent Mr. Manookian failed procedurally to properly set this matter for adjudication before this Court and allow a response to be filed by his opposing counsel. Nonetheless, at the hearing, the Court was willing to hear the *Motion* after the supplemental attorneys' fees matter was resolved, even though it was not properly set.

Upon the Court's determination of Mr. Manookian's objections, Mr. Manookian decided to unilaterally excuse himself from the hearing and did not cross-examine any of the attorneys regarding their supplemental attorneys' fees requests.

Consequently, the hearing continued and Mr. Hammervold questioned both Marcus Crider, Esq. and Charles Malone, Esq. The Tennessee Supreme Court Rule 8, Rule 1.5 of the Rules of Professional Conduct, provides the factors a Court must consider in determining reasonableness of an attorney's fees and states:

(a) A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;

(8) whether the fee is fixed or contingent;

(9) prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and

Page 6 of 13

Case 3:19-bk-07235   Claim 5-1 Part 5   Filed 03/30/20   Desc Exhibit September 2018 .
Supplemental Sanctions Judgment   Page 6 of 13

838

(10) whether the fee agreement is in writing . . . .

Tenn. R. S. Ct. Rule 8, RPC 1.5.

Based upon the cross-examinations, a review of the *Supplemental Affidavits of Gayle Malone, Jr,, Esq., Charles Malone, Esq., and Marcus Crider, Esq.* and the Court's previous determinations regarding the attorneys and their attorneys' fees for representing Non-Parties in the *Memorandum and Order* of July 20, 2018, the Court finds as follows: (1) the attorneys' fees and expenses from October 1, 2017 through December 31, 2017 of Butler Snow, LLP, which were submitted by Charles I. Malone and Gayle I. Malone, Jr., Esq. on behalf of Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc., in the amount of **$110,663.39**, to be reasonable under the Tennessee Supreme Court Rule 8, Rule 1.5 of the Rules of Professional Conduct and necessary for the prosecution of Respondents' contemptuous and sanctionable misconduct; and (2) the attorneys' fees and expenses from October 1, 2017 through January 22, 2018 of Waller Lansden Dortch & Davis, LLP, which were submitted by Marcus Crider, Esq. on behalf of Non-Parties Dean Chase, Sandra Chase, and D.F. Chase Inc., CK Global, LLC, and NV Music Row, LLC, in the amount of **$15,409.70**, to be reasonable under the Tennessee Supreme Court Rule 8, Rule 1.5 of the Rules of Professional Conduct and necessary for the prosecution of Respondents' contemptuous and sanctionable misconduct. The Court incorporates by reference its ruling set forth in the *Memorandum and Order* of July 20, 2018 regarding the requested attorneys' fees and expenses., as if fully set forth herein.

**[Space intentionally left blank]**

Page 7 of 13

Case 3:19-bk-07235 Claim 5-1 Part 5 Filed 03/30/20 Desc Exhibit September 2018 Supplemental Sanctions Judgment Page 7 of 13

839

### III.   **CONCLUSION**

For the reasons set forth above and in the Court's *Memorandum and Order* of July 20, 2018, the Court awards Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc. their reasonable attorneys' fees and expenses incurred by the representation of the attorneys at Butler Snow, LLP in the amount of **$110,663,39** for the period of October 1, 2017 through December 31, 2017 against Respondents Brian Manookian; Cummings Manookian, PLC; Mark Hammervold; and Hammervold Law, PLC.

The Court awards Non-Parties Dean Chase, Sandra Chase, and D.F. Chase Inc., CK Global, LLC, and NV Music Row, LLC their reasonable attorneys' fees and expenses incurred by the representation of the attorneys at Waller Lansden Dortch & Davis, LLP in the amount of **$15,409.70** for the period of October 1, 2017 through January 22, 2018 against Respondents Brian Manookian; Cummings Manookian, PLC; Mark Hammervold; and Hammervold Law, PLC.

As a result of this *Order on Supplemental Attorneys' Fees and Expenses Award* and the *Memorandum and Order* of July 20, 2018, the total award of attorneys' fees and expenses against Respondents Brian Manookian; Cummings Manookian, PLC; Mark Hammervold; and Hammervold Law, PLC is in the amount of **$748,769.21**.

Furthermore, the Court greatly appreciates the scholarship of the attorneys in this case in preparing briefs regarding whether the Court could take judicial notice of the *Opinion and Order Regarding Sanctions* entered on August 3, 2017 in *Diamond Consortium, Inc. v. Manookian*, No. 4:16CV94-ALM, 2017 WL 3301527 (E.D. Tex. Aug. 3, 2017). Upon review of these submissions, the Court declines to take judicial notice of

Case 3:19-bk-07235   Claim 5-1 Part 5   Filed 03/30/20   Desc Exhibit September 2018
Supplemental Sanctions Judgment   Page 8 of 13

840

this matter and has based its decisions in the *Memorandum and Order* of July 20, 2018 and this *Order on Supplemental Attorneys' Fees and Expenses Award* entirely on the evidence presented at the hearings and the legal authority cited therein.

This *Order on Supplemental Attorneys' Fees and Expenses Award* and the *Memorandum and Order* of July 20, 2018, together constitute a Final Judgment pursuant to Rule 54.01 of the Tennessee Rules of Civil Procedure, upon the express determination that there is no just reason for delay.

**IT IS SO ORDERED.**

ENTERED this ___ day of September 2018.

Michael W. Binkley
**Circuit Court Judge/Chancellor, Division III**

Page **9** of **13**

Case 3:19-bk-07235   Claim 5-1 Part 5   Filed 03/30/20   Desc Exhibit September 2018
Supplemental Sanctions Judgment   Page 9 of 13

841

## CLERK'S CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing *Order on Supplemental Attorneys' Fees and Expenses Award* as entered by the Court has been forwarded postage prepaid, and/or emailed, and/or faxed, to:

Philip L. Robertson, Esq. (BPR No. 021668)
Brittany M. Bartkowiak, Esq. (BPR No. 031637)
Robertson Law Group
1896 General George Patton, Suite 600
Franklin, TN 37067
t. 615.656.1729
e. probertson@robertsonlg.com
e. brittany@robertsonlg.com
e. bspeight@robertsonlg.com
*Counsel for Plaintiff, David Chase*

Robert F. Parsley, Esq. (BPR No. 023819)
Michael J. Dumitru, Esq. (BPR No. 030140)
Miller & Martin
832 Georgia Avenue, Suite 1000
Chattanooga, TN 37402-2289
t. 423.756.6600
f. 423. 785.8480
e. bob.parsley@millermartin.com
e. michael.dumitru@millermartin.com
*Counsel for Defendant Andy Cho*

Brian Cummings, Esq. (BPR No. 019354)
Brian Manookian, Esq. (BPR No. 026455)
Cummings Manookian
45 Music Square West
Nashville, TN 37203
t. 615.266.3333
t. 615.266.0226
f. 615.266.0250
e. bmanookian@cummingsmanookian.com
e. brian.manookian@cmtriallawyers.com
e. bcummings@cummingsnaookian.com
*Counsel for Defendants Chris Stewart, Emily Stewart, Susan Martin, Clayton Mckenzie, Bryan Everett, and Lino Lovrenovic*

**[Clerk's Certificate of Service is continued on next page]**

Case 3:19-bk-07235    Claim 5-1 Part 5    Filed 03/30/20    Desc Exhibit September 2018
Supplemental Sanctions Judgment    Page 10 of 13

842

Rob McGuire, Esq. (BPR No. 021594)
Assistant United States Attorney
United States Attorney's Office
Middle District of Tennessee
110 Ninth Avenue South Ste A961
Nashville, TN 37203
*Former Counsel for Defendant Lauren Bull*

Mark Hammervold, Esq. (BPR No. 031147)
315 Deaderick Street Ste 1550
Nashville, TN 37238-3003
t. 615.928.2466
m. 615.509.0372
mark@hammervoldlaw.com
*Counsel for Bryan Everett, Susan Martin, Lino Lovrenovic & Clayton
McKenzie*

Gayle I. Malone, Jr., Esq. (BPR No. 002388)
Charles I. Malone, Esq. (BPR No. 022904)
Gibeault "Beau" C. Creson, Esq. (BPR No. 03049)
Butler Snow, LLP
150 Third Avenue South, Suite 1600
Nashville, TN 37201
t. 615.651.6782
f. 615.651.6701
e. gayle.malone@butlersnow.com
e. charlie.malone@butlersnow.com
e. beau.creson@butlersnow.com
*Counsel for Intervenors D.F. Chase, Inc. Dean Chase, and Sandra Chase*

Marcus M. Crider, Esq. (BPR No. 018608)
Heath H. Edwards, Esq. (BPR No. 034076)
Frances Fenelon, Esq. (BPR No. 017315)
Christopher S. Dunn, Esq. (BPR No. 017067)
Waller
511 Union Street, Suite 2700
Nashville, TN 37219
t. 615.850.8067
f. 615.244.6804
e. marcus.crider@wallerlaw.com
e. heath.edwards@wallerlaw.com
e. chris.dunn@wallerlaw.com
e. frances.fenelon@waller.law.com
*Counsel for Intervenor Meredith Corp.*
            **[Clerk's Certificate of Service is continued on next page]**

Case 3:19-bk-07235   Claim 5-1 Part 5   Filed 03/30/20   Desc Exhibit September 2018
Supplemental Sanctions Judgment    Page 11 of 13

843

Ronald G. Harris, Esq. (BPR No. 009054)
Neal & Harwell
1201 Demonbreaum Street Ste 1000
Nashville, TN 37203
t. 615.244.1713
f. 615.726.0573
e. rharris@nealharwell.com
*Counsel for Intervenor Scripps Media Inc.*

James D. Kay, Jr. (BPR No. 011556)
John B. Enkema, Esq. (BPR No. 016670)
Kay, Griffin, Enkema & Colbert PLLC
222 Second Ave. North Ste 340M
Nashville, TN 37201
t. 615.742.4800
f. 615.742.4801
e. john.enkema@kaygriffin.com
e. jim.kay@kaygriffin.com
*Counsel for Intervenor Glenn Funk*

David T. Hooper, Esq. (BPR No. 005413)
Hooper Zinn McNamee PLLC
109 Westpark Drive, Suite 300
Brentwood, TN 37027
t. 615.661.5472
f. 615.661.5473
e. dhooper@hooperzinn.com
*Counsel for Defendant Jason Ritzen*

John Phillip Williams, Esq. (BPR No. 000531)
Tune, Entrekin & White P.C.
315 Deaderick Street, Suite 1700
Nashville, TN 37238
t. 615.244.2770
f. 615.244.2778
e. jwilliams@tewlawfirm.com
*Attorney for the Nashville Scene*

**[Clerk's Certificate of Service is continued on next page]**

844

Paul R. McAdoo, Esq. (BPR No. 034066)
Aaron & Sanders, PLLC
810 Dominican Drive Ste 208
Nashville, TN  37228-1906
t. 615.734.1188
f. 615.250.9807
e. paul@aaronsanderslaw.com
Attorneys for Meredith Corporation, owner
   and Operator of WSMV Channel 4 Nashville

This the _28_ day of September, 2018.

_____
**Circuit Court Clerk**

Case 3:19-bk-07235    Claim 5-1 Part 5    Filed 03/30/20    Desc Exhibit September 2018
Supplemental Sanctions Judgment    Page 13 of 13

845

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 7, 2020 Session

## DAVID CHASE v. CHRIS STEWART ET AL.

Appeal from the Circuit Court for Williamson County
No. 2015-200        Michael Binkley, Judge

---

### No. M2018-01991-COA-R3-CV

---

A trial court held two attorneys in contempt, assessing damages and sanctions against
them.  Shortly before another hearing in which the court was to consider a supplemental
award of attorney's fees, the judge of the trial court made comments in an unrelated case
about one of the attorneys held in contempt.  That attorney moved to recuse based, in
part, on the judge's comments.  The trial court denied the motion to recuse and later
entered a supplemental order of damages against the attorneys.  Because the judge's
comments provide a reasonable basis for questioning his impartiality, we reverse the
denial of the motion to recuse.  And because retroactive recusal is appropriate, we also
vacate the contempt and damages orders.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Vacated**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which ANDY D. BENNETT,
J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Brian P. Manookian, Nashville, Tennessee, pro se appellant.

Mark Andrew Hammervold, Elmhurst, Illinois, pro se appellant.

Brian P. Manookian, Nashville, Tennessee, for the appellant, Cummings Manookian
PLC.

Mark Andrew Hammervold, Elmhurst, Illinois, for the appellant, Hammervold Law,
PLC.

Gayle I. Malone, Jr., Charles I. Malone, and Beau C. Creson, Nashville, Tennessee, for
the appellees, Dean Chase, Sandra Chase, and D.F. Chase, Inc.

Marcus M. Crider and Heath H. Edwards, Nashville, Tennessee, for the appellees, CK Global, LLC and NV Music Row, LLC.

## OPINION

### I.

### A.

In this consolidated appeal, we review the trial court's denial of a motion to recuse and its orders holding in contempt and sanctioning two attorneys, Brian Manookian and Mark Hammervold, and their respective law firms, Cummings Manookian PLC[1] and Hammervold Law, PLC. The orders on appeal arise from, but have little to do with, a case filed by David Chase ("Plaintiff") against multiple defendants. Mr. Manookian and Mr. Hammervold represented several of the defendants. Purportedly to defeat an element of the malicious prosecution claim brought by Plaintiff and to prove Plaintiff had not suffered reputational harm, Mr. Manookian subpoenaed individuals and entities that were not parties to the case. The non-parties included Plaintiff's parents, Dean Chase and Sandra Chase; and entities to which Plaintiff had some connection, D.F. Chase, Inc.; CK Global, LLC; and NV Music Row, LLC. Mr. Manookian also sought deposition testimony from Plaintiff's parents.

Wanting to protect confidential information, Dean Chase; Sandra Chase; D.F. Chase, Inc.; CK Global, LLC; and NV Music Row, LLC (collectively, "Petitioners") proposed an agreed protective order before responding to the subpoenas or submitting to the depositions. And, after negotiations, counsel reached an agreement on the terms of the protective order. Among other things, the proposed order defined confidential information, provided methods for both designating information as "confidential" and challenging such designations, and restricted the indiscriminate or mass designation of information as "confidential."

Counsel for Petitioners then proposed that the document production could proceed provided that Mr. Manookian would agree that the production was subject to the protective order despite it not being entered by the court. Mr. Manookian responded: "I agree that the Order is binding on me and my clients at the time it is signed with permission as opposed to entered by the Court." So counsel for Petitioners filed the proposed agreed protective order with the court. The same day, Petitioners produced

---

[1] After briefing in this appeal, Cummings Manookian PLC filed a voluntary bankruptcy petition for relief under Chapter 7 of Title 11 of the United States Code in the United States Bankruptcy Court for the Middle District of Tennessee. Late last year, the Chapter 7 Trustee reported that "it is unforeseeable that the bankruptcy case will be resolved before April, 2021, at the earliest."

2

over 78,000 pages of documents in response to the subpoenas. Petitioners designated all of the documents as "confidential" under the proposed agreed protective order. In a cover letter, counsel for Petitioners stated that, while they "realize[d] that the Protective Order cautioned against mass designation of documents as 'confidential' . . . it would have been unduly burdensome upon our clients to review each of the . . . documents . . . ." Counsel for Petitioners offered to conduct a page-by-page review if Mr. Manookian's clients would pay for it. Counsel alternatively suggested that Mr. Manookian's clients could challenge any "confidential" designation to a specific document or documents.

Mr. Manookian objected to the mass designation and, in a filing with the court, withdrew his consent to the proposed agreed protective order. But, a few days later, he made another filing requesting that the court enter the proposed agreed protective order. Petitioners then filed a motion requesting the entry of a protective order and that the court sustain its confidentiality designations. They set the motion for hearing on October 30, 2015.

Before the hearing took place, Mr. Manookian filed documents and excerpts from the deposition transcripts of Dean and Sandra Chase, all of which had been designated as "confidential," in response to a motion filed by Plaintiff. Counsel for Petitioners appeared at an October 20, 2015 hearing on Plaintiff's motion and made an oral motion. Counsel requested that the court treat as confidential all documents already produced by Petitioners, as well as the deposition testimony of Dean and Sandra Chase. Counsel also requested that the response filed by Mr. Manookian, including the exhibits, be kept under seal. The court granted the oral motion.

At the October 30, 2015 hearing, the court again ruled in favor of Petitioners and ordered that "all pleadings or documents containing, attaching, or referencing documents, testimony, or information designated as confidential . . . were to be filed under seal." And the court "adopted,"[2] with modifications, the proposed agreed protective order. The court ordered that documents designated as "confidential" be protected consistent with the terms of the agreed protective order. The court's oral rulings at the October 20 and October 30 hearings were reflected in written orders entered on November 7, 2015, and November 6, 2015, respectively.

B.

On February 25, 2016, Dean Chase, Sandra Chase, and D.F. Chase, Inc. moved for sanctions. They claimed that, on February 3, 2016, confidential materials, including video recordings of Dean Chase's and Sandra Chase's deposition testimony, were

---

[2] It is unclear if the court entered the proposed agreed protective order.

3

featured on two television news broadcasts and were also published online. And other media outlets had published stories using the same materials.

While the motion did not specifically allege that either Mr. Manookian or Mr. Hammervold provided the confidential materials to the media, it blamed the pair for use of confidential documents in separate litigation they had filed on behalf of another client against Dean Chase. The motion asked the court to identify who had violated its previous orders and to hold those parties or counsel in contempt and award costs, attorney's fees, and other expenses.

Following a hearing on the motion for sanctions, the court entered an order identifying four attorneys "whose actions in this matter strongly indicate violations of Tennessee Rule of Civil Procedure 37.02 and possible contempt of the orders of th[e] Court." The court granted leave to those "affected by alleged violations of Tennessee Rule of Civil Procedure 37.02 and violations of the corresponding Court Orders [to] file appropriate pleadings for sanctions, listing specifically each violation alleged to have occurred and the specific injury inflicted upon each party." Petitioners did so against three attorneys, including Mr. Manookian and Mr. Hammervold and their respective law firms.

After the hearing, the trial court found Mr. Manookian and Mr. Hammervold in contempt. The court found Mr. Manookian in contempt for using confidential materials in preparing, strategizing, and negotiating the separate lawsuit and in attaching a confidential document to a pleading in that lawsuit. And the trial court also found that Mr. Manookian had disclosed confidential materials to the media after the court had ordered that such documents not be disclosed. The trial court found Mr. Hammervold in contempt for allowing the filing of the confidential document in the separate lawsuit. Though Mr. Manookian made the filing, Mr. Hammervold was his co-counsel. As such, the court held that Mr. Hammervold was responsible as well.

The trial court also sanctioned Mr. Manookian and Mr. Hammervold under Tennessee Rule of Civil Procedure 37.02. The trial court first sanctioned both attorneys for the same actions for which it had found them in contempt. The court then found other actions of the two attorneys sanctionable. As to Mr. Manookian, the trial court sanctioned him for disclosing confidential materials to law enforcement and three attorneys not involved in the case before the court issued any ruling on the protective order. The court categorized those actions as an abuse of discovery. The court also found that he was not candid with the court and attempted to defraud the court. As to Mr. Hammervold, the trial court sanctioned him for Mr. Manookian's disclosure to the media. The court found that Mr. Hammervold "had knowledge of and was complicit in concealing the improper disclosure" from the court. The court reasoned that Mr. Hammervold had also abused the discovery process, failed to be candid with the court, and attempted to defraud the court.

Based on its finding of contempt—and, alternatively, its finding of sanctionable conduct—the trial court awarded damages to Petitioners in the form of attorney's fees and expenses against Mr. Manookian and Mr. Hammervold and their respective law firms. Considering affidavits filed by Petitioners' attorneys, the court awarded Petitioners $622,696.12. The trial court also granted counsel for Petitioners leave to supplement their affidavits with fees incurred for time spent preparing for the contempt hearing through the date of the contempt order.

C.

About a month after the contempt order and before the hearing on the supplemental fee request, the judge of the trial court referenced Mr. Manookian while presiding over a hearing in the case of *Elite Emergency Services, LLC v. Nesmith*. In open court, the judge said

> There was a lawyer, Mr. Brian Manookian, who I have released a one-hundred-twenty-two page memorandum and order on, who, among many, many other things, submitted a false and fake package, along with another person, to the Board of Professional Responsibility and the Court of the Judiciary.
>
> Well, come to find out that it was fake. And it was wrong. Channel 4 News picked it up and made it a headline . . . . Totally false. Totally false.
>
> The Board of Professional Responsibility saw what it was and said, "We're not going to investigate it, Judge Binkley." And I said, "Oh, please do. I'm begging you to investigate because you know how people are. They'll read half the story and say, 'Ah, that was a put-up. They're helping Judge Binkley out.'"
>
> I don't want that. I hired a lawyer and I said, "Let's do it right." Full investigation, dismissed, and it should've been. Now, Channel 4 News published it as if it were true. Now, what do I do when I'm sitting there watching that, and my family is watching it, and all of my friends are watching it?
>
> And as a judge it's probably good that I don't say a word. It's very difficult. But my day will come. And it's just about here . . . . I feel like it's necessary for me to be crystal clear, transparent and clear. I did not like what Mr. Manookian did at all, and my day will come.

5

After the trial court made these comments, Mr. Manookian, on behalf of himself and his law firm, moved to recuse the judge.[3] In his recusal motion, Mr. Manookian argued, among other things, that the above comments showed the court's bias against him. The trial court denied the recusal motion, finding the statements made in open court "irrelevant to the issues in the present case."

Two days after the denial of Mr. Manookian's recusal motion, the trial court awarded Petitioners $126,073.09 in supplemental attorney's fees in a separate order. In total, then, the trial court held Mr. Manookian, Mr. Hammervold, and their respective law firms jointly and severally liable for $748,769.21. The trial court designated the original order of contempt and damages and the supplemental order of damages together as a final judgment under Tennessee Rule of Civil Procedure 54.02.

## II.

Mr. Manookian petitioned for an accelerated interlocutory appeal of the denial of his third recusal motion. *See* TENN. SUP. CT. R. 10B, § 2.01. And Mr. Manookian and Mr. Hammervold appealed the final judgment of contempt and damages. We consolidated the interlocutory appeal with the appeal of the final judgment.

The parties' arguments focus both on whether the trial judge should have recused himself and on the merits of the contempt and damages orders. We find the recusal issue dispositive. As to that issue, the parties argue over various possible grounds for recusal. We focus on the trial court's comments about Mr. Manookian in the unrelated proceeding.

### A.

Rule 10B of the Rules of the Supreme Court of Tennessee governs the procedure for "determin[ing] whether a judge should preside over a case." TENN. SUP. CT. R. 10B. When a trial court denies a motion to recuse, a party can either take an interlocutory appeal or raise the issue in an appeal after entry of final judgment. *Id.* § 2.01. In both scenarios, we review a trial court's ruling on a motion to recuse de novo. *Id.*

In Tennessee, litigants "have a fundamental right to a 'fair trial before an impartial tribunal.'" *Holsclaw v. Ivy Hall Nursing Home, Inc.*, 530 S.W.3d 65, 69 (Tenn. 2017) (quoting *State v. Austin*, 87 S.W.3d 447, 470 (Tenn. 2002)); *see Kinard v. Kinard*, 986

---

[3] The previous year Mr. Manookian filed two recusal motions, which were denied. He sought accelerated interlocutory review of the denial of his first recusal motion. *See* TENN. SUP. CT. R. 10B, § 2.01. We affirmed the denial of that motion. *Chase v. Stewart*, No. M2017-01192-COA-T10B-CV, 2017 WL 3738466, at *4 (Tenn. Ct. App. Aug. 29, 2017). Mr. Manookian did not seek interlocutory review of his second recusal motion.

S.W.2d 220, 227 (Tenn. Ct. App. 1998) (reasoning that litigants "are entitled to the 'cold neutrality of an impartial court'" (quoting *Leighton v. Henderson*, 414 S.W.2d 419, 421 (Tenn. 1967))); *see also* TENN. CONST. art. VI, § 11. It "goes without saying that a trial before a biased or prejudiced fact finder is a denial of due process." *Wilson v. Wilson*, 987 S.W.2d 555, 562 (Tenn. Ct. App. 1998).

Tennessee has long recognized that "the appearance of bias is as injurious to the integrity of the judicial system as actual bias." *Davis v. Liberty Mut. Ins. Co.*, 38 S.W.3d 560, 565 (Tenn. 2001); *see In re Cameron*, 151 S.W. 64, 76 (Tenn. 1912) ("[I]t is of immense importance, not only that justice shall be administered . . . , but that [the public] shall have no sound reason for supposing that it is not administered."). Of course, a judge should recuse when they have "any doubt as to [their] ability to preside impartially in [a] case." *Davis*, 38 S.W.3d at 564. But a judge must also "disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned." TENN. SUP. CT. R. 10, Rule 2.11(A). This test is "an objective one." *State v. Cannon*, 254 S.W.3d 287, 307 (Tenn. 2008). It requires recusal "when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." *Davis*, 38 S.W.3d at 564-65 (quoting *Alley v. State*, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994)).

A party seeking disqualification or recusal must support a recusal motion with an affidavit or declaration and "other appropriate materials." TENN. SUP. CT. R. 10B, § 1.01. When a party brings forward a trial court's comments as evidence to support a recusal motion, we must determine whether the comments "indicate that the judge has prejudged factual issues." *Alley*, 882 S.W.2d at 822. "Any comments made by the trial court must be construed in the context of all the facts and circumstances to determine whether a reasonable person would construe those remarks as indicating partiality on the merits of the case." *Id.*

Here, Mr. Manookian submitted the declaration of Samuel Clemmons. In this declaration, Mr. Clemmons detailed the comments that the trial judge made about Mr. Manookian in the *Elite Emergency Services* case, to which Mr. Clemmons was a party.[4] Petitioners challenge Mr. Clemmons's declaration as "inherently suspect, at best." We disagree. Courts instead presume that testimony provided under oath and

---

[4] Petitioners argue that Mr. Manookian waived the right to seek recusal of the trial judge based on the judge's comments. A party waives the right "to question a judge's impartiality" if the party does not assert the grounds for recusal "in a timely manner." *Kinard*, 986 S.W.2d at 228 (citations omitted). A one-year delay in asserting grounds for recusal constitutes waiver. *Chase*, 2017 WL 3738466, at *3; *In re Samuel P.*, No. W2016-01592-COA-T10B-CV, 2016 WL 4547543, at *6 (Tenn. Ct. App. Aug. 31, 2016). Here, Mr. Manookian filed the third recusal motion twenty-two days after the judge's comments. Under the circumstances, we find that Mr. Manookian acted in a timely manner.

Case 3:19-bk-07235   Doc 112-1   Filed 07/27/21   Entered 07/27/21 17:34:02   Desc
Exhibit COA Opinion - Chase   Page 8 of 12

852

penalty of perjury is true. *See, e.g., Hogue v. Kroger Co.*, 356 S.W.2d 267, 271 (Tenn. 1962) ("This court certainly will not ascribe to the oath-taker the infamy of a perjurious mind. We think, with every presumptive support, that people normally are honest and tell the truth." (citation omitted)). In its order denying the recusal motion, the trial court treated the comments as if they had been made, so we do also.

In his comments, the judge claimed that Mr. Manookian "submitted a false and fake package . . . to the Board of Professional Responsibility and the Court of the Judiciary." The media ultimately "picked it up" and published a "[t]otally false" story about the judge. But, the judge continued, the media published the story "as if it were true." So, the judge wondered, "what do I do when I'm sitting there watching that, and my family is watching it, and all of my friends are watching it?"

The gist of the comments is that the judge blamed Mr. Manookian for the court's exposure to negative publicity, possibly drawing the scrutiny of the judge's family and friends. The judge was "crystal clear" and "transparent" about not liking that "at all." The court also did not like "many, many other things" Mr. Manookian had done. And the judge envisaged that "my day will come."

Taken in context, "a reasonable person would construe th[e] remarks as indicating" that the judge may have sought retribution against Mr. Manookian for a perceived wrongdoing unrelated to the contempt charges.[5] *See Alley*, 882 S.W.2d at 822. This possible motivation provides "a reasonable basis for questioning the judge's impartiality." *See Davis*, 38 S.W.3d at 564; *see also State v. Cobbins*, No. E2012-02025-CCA-10B-DD, 2012 WL 5266427, at *22-23 (Tenn. Crim. App. Oct. 25, 2012) (recusal warranted based, in part, on trial court's comments that it was "[m]y time" and "my day had finally come").

Petitioners insist that the trial court was "impartial and entirely fair" to Mr. Manookian and Mr. Hammervold.[6] The record reflects that the judge showed

---

[5] In the order denying the motion to recuse, the trial court provided more context. The judge explained that Mr. Manookian had been providing information about the judge to Mr. Clemmons. Mr. Clemmons then used this information to file a complaint with the Board of Judicial Conduct. That complaint was later dismissed. In the judge's view, Mr. Manookian and Mr. Clemmons "have obviously worked together for the sole purpose of . . . attempt[ing] to publicly embarrass or ridicule the Court."

[6] Petitioners argue that Mr. Hammervold did not properly preserve the recusal issue for appeal. In response to our order directing the parties to respond to Mr. Manookian's Rule 10B petition for recusal appeal, *see* TENN. SUP. CT. R. 10B, § 2.05, Mr. Hammervold, on behalf of himself and his law firm, joined the petition. And as a party, he was entitled to raise the denial of the recusal motion in his brief, which he did. *See* Tenn. R. App. P. 3(h) (broadly allowing any party to raise any issue "upon the filing of a single notice of appeal"). Although Mr. Hammervold did not join Mr. Manookian's recusal motion in the trial court, the Rules of the Supreme Court of Tennessee speak of recusal as to proceedings, not as to parties. *See* TENN. SUP. CT. R. 10, Rule 2.11(A).

8

extraordinary patience and was thorough in his review of serious allegations against Mr. Manookian and Mr. Hammervold. We do not conclude that the judge was actually partial. But that is not the standard for recusal. *See Kinard*, 986 S.W.2d at 228 ("[T]he public's confidence in judicial neutrality requires not only that the judge be impartial in fact, but also that the judge be perceived to be impartial."). Under Tennessee's objective standard, the judge's impartiality might reasonably be questioned. So the judge should have recused himself. *See Cook v. State*, 606 S.W.3d 247, 255 (Tenn. 2020) (reasoning that Tennessee's objective standard "'may sometimes bar trial by judges who have no actual bias'" (quoting *In re Murchison*, 349 U.S. 133, 136 (1955))).

Petitioners also contend that, because the judge made the comments after the contempt order, the comments cannot be evidence of any predisposition against Mr. Manookian. *See Alley*, 882 S.W.2d at 821. We again disagree. The unfavorable news story for which the judge claimed Mr. Manookian was responsible ran in February 2017. And the trial court issued the contempt order in July 2018. So the impetus for the judge's thoughts about Mr. Manookian may have existed for almost a year and a half before the court entered the contempt order.[7] That the judge did not air those thoughts until after entry of the contempt order misses the point.

B.

Having determined that recusal was appropriate, we must consider the impact on the final judgment of contempt and damages. Retroactive recusal generally is not the appropriate remedy. *See Watson v. Cal-Three, LLC*, 254 P.3d 1189, 1193 (Colo. App. 2011) ("Recusal provides prospective relief; it does not necessarily invalidate orders previously entered."); 46 AM. JUR. 2D *Judges* § 210, Westlaw (database updated Nov. 2020). But, in *Liljeberg v. Health Services Acquisition Corp.*, the United States Supreme Court set forth a test to determine whether retroactive recusal is appropriate under the federal recusal statute. 486 U.S. 847, 863-64 (1988). We find it appropriate to apply the *Liljeberg* test here. Tennessee courts "may look to federal interpretation of similar federal laws for guidance in enforcing [Tennessee] statutes." *Van Tran v. State*, 66 S.W.3d 790, 821 (Tenn. 2001) (Barker, J., concurring in part and dissenting in part); *see Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 705 (Tenn. 2000) (interpreting Tennessee anti-discrimination laws), *abrogated on other grounds by Gossett v. Tractor Supply Co.*, 320 S.W.3d 777 (Tenn. 2010); *Arnold v. Morgan Keegan & Co.*, 914 S.W.2d 445, 448 & n.2 (Tenn. 1996) (interpreting the Tennessee Uniform Arbitration Act); *Thomas v. Oldfield*, 279 S.W.3d 259, 261-62 & n.3 (Tenn. 2009) (interpreting the

---

[7] Although one of the two hearing dates on the contempt petition occurred before the media story ran, there is still a "reasonable basis for questioning" whether partiality may have affected the trial court's contempt order. *See Davis*, 38 S.W.3d at 564.

9

Tennessee Rules of Civil Procedure); *State v. Clayton*, 131 S.W.3d 475, 478 (Tenn. Crim. App. 2003) (interpreting the Tennessee Rules of Criminal Procedure). Tennessee's recusal standard is identical to the federal standard, save for noun and pronoun usage. *Compare* TENN. SUP. CT. R. 10, Rule 2.11(A), *with* 28 U.S.C. § 455(a) (2018). And Tennessee courts have often cited the United States Supreme Court with approval on recusal issues. *See State v. Griffin*, 610 S.W.3d 752, 760 (Tenn. 2020) (citing *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1907-09 (2016)); *Cook*, 606 S.W.3d at 255 (citing *In re Murchison*, 349 U.S. at 136); *Bailey v. Blount Cty. Bd. of Educ.*, 303 S.W.3d 216, 239 (Tenn. 2010) (citing *Chapman v. California*, 386 U.S. 18, 23 n.8 (1967)); *Kinard*, 986 S.W.2d at 228 (citing *Offutt v. United States*, 348 U.S. 11, 14 (1954)); *Alley*, 882 S.W.2d at 821 (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966)).

The *Liljeberg* test "consider[s] the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." *Liljeberg*, 486 U.S. at 864. As to the parties in this case, the purpose of the right to impartiality "is to guard against the prejudgment of the rights of litigants and to avoid situations in which the litigants might have cause to conclude that the court had reached a prejudged conclusion." *State v. Benson*, 973 S.W.2d 202, 205 (Tenn. 1998) (citing *Chumbley v. People's Bank & Tr. Co.*, 57 S.W.2d 787, 788 (Tenn. 1933)).

As noted above, the basis for the judge's thoughts about Mr. Manookian may have existed for nearly a year and a half before the July 2018 contempt order. It likely existed at least since May 23, 2017, when the trial court entered the order denying an earlier recusal motion filed by Mr. Manookian. That order indicates that, by then, the judge suspected that Mr. Manookian was behind the news story and unfounded complaints about the judge made to the Board of Professional Responsibility and the Court of the Judiciary. The contempt order itself references the Board of Professional Responsibility complaint in an adverse credibility finding against Mr. Manookian. So once the court revealed its thoughts about Mr. Manookian in open court, one might reasonably question whether the court "had reached a prejudged conclusion" as to the contempt order. *See Benson*, 973 S.W.2d at 205. Although the contempt order is the product of over two years of litigation, under these circumstances "there is a greater risk of unfairness in upholding the judgment in favor of [Petitioners] than there is in allowing a new judge to take a fresh look at the issues." *See Liljeberg*, 486 U.S. at 868; *see also Olerud v. Morgan*, No. M2010-01248-COA-R3-CV, 2011 WL 607113, at *2-3 (Tenn. Ct. App. Feb. 18, 2011) (vacating orders of the trial court entered before a recusal motion was filed when the basis for recusal "was discovered . . . after the court entered critical rulings in the case").

Second, to deny retroactive relief could cause injustice in other cases. Our supreme court has cautioned judges about inappropriate remarks. *See Cook*, 606 S.W.3d at 257 (admonishing Tennessee judges "to refrain from [making] inappropriate

10

comments"); *see also Leighton*, 414 S.W.2d at 420 ("[T]he judge must be careful not to give an expression to any thought, or to infer what his opinion would be in favor or against either of the parties in the trial."). Allowing a remedy for inappropriate remarks even late in the proceedings would encourage judges to reflect on possible grounds for recusal through all phases of a case. *See Liljeberg*, 486 U.S. at 868 (Retroactive enforcement "may prevent a substantive injustice in some future case by encouraging a judge . . . to more carefully examine possible grounds for disqualification and to promptly disclose them when discovered.").

Third, allowing the contempt order to stand risks undermining public confidence in the judiciary. Surely, "'justice must satisfy the appearance of justice.'" *Liljeberg*, 486 U.S. at 864 (quoting *In re Murchison*, 349 U.S. at 136); *Cook*, 606 S.W.3d at 255 (quoting same). Here, when the judge mused that "my day will come," the judge also said that day is "just about here"—less than a month before awarding supplemental damages and finalizing the contempt order. And the judge mentioned that he had "released a one-hundred-twenty-two page memorandum and order on" Mr. Manookian, which was the order holding him in contempt. So the basis upon which it is reasonable to question the judge's impartiality is directly connected to the contempt order.

Because the trial court's impartiality might reasonably be questioned, the court should have recused itself. And under the circumstances of this case, retroactive recusal is warranted. In finding retroactive recusal warranted, we express no opinion on the merits of the contempt proceeding.

### III.

We reverse the denial of the third motion to recuse. And we vacate the contempt and damages order of July 20, 2018, and the order awarding supplemental attorney's fees and expenses of September 27, 2018. This case is remanded for reassignment and further proceedings consistent with this opinion.

W. NEAL McBRAYER, JUDGE

11

# IN THE CIRCUIT COURT FOR WILLIAMSON COUNTY, TENNESSEE

| | | |
|---|---|---|
| **DAVID CHASE** | ) | ENTERED_____ |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO. 2015-200** |
| | ) | |
| **CHRIS STEWART,** *et al.* | ) | |
| | ) | **JURY DEMAND** |
| **Defendants.** | ) | |

---

## RESPONDENT BRIAN MANOOOOKIAN'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Comes now Respondent Brian Manookian, pursuant to Rule 56 of the Tennessee Rules of Civil Procedure, and hereby moves this Court for an order granting summary judgment on all claims asserted against Mr. Manookian in the Chase Parties' Petition for Contempt.

The Petition for Contempt alleges that Mr. Manookian provided discovery materials originally produced by the Chase Parties to third-parties in violation of an order of the Court. The Declaration of Brian Manookian, Respondent's Statement of Undisputed Material Facts, and Respondent's Memoradum in Support of Motion for Summary Judgment demonstrate that there is no genuine issue of material fact as to the following: Respondent did not provide any person or entity with discovery materials from this case in violation of an existing court order. Mr. Manookian is entitled to summary judgment on Petitioner's claims.

1

**THIS MOTION IS ANTICIPATED TO BE HEARD FOLLOWING THIS MATTER'S ASSIGNMENT TO A JUDGE AND IDENTIFICATION OF A BRIEFING AND HEARING SCHEDULE CONSISTENT WITH THE LOCAL RULES AND TENNESSEE RULES OF CIVIL PROCEDURE.**

Respectfully submitted,

s/ BRIAN MANOOKIAN

**Brian Manookian**
P.O. Box 150229
Nashville, TN 37215

## CERTIFICATE OF SERVICE

I certify that, on September 3, 2021, a true and correct copy of this document was provided by email to the following:

| | |
|---|---|
| Philip L. Robertson<br>Brittany M. Bartkowiak<br>Robertson Law Group<br>1896 General George Patton, Suite 600<br>Franklin, TN 37067<br>(T) 615.656.1729<br>(F) 615.656.1736<br>probertson@robertsonlg.com<br>*Attorneys for David Chase* | David Hooper<br>Hooper, Zinn, McNamee<br>109 Westpark Drive, Suite 300<br>Brentwood, Tennessee 37027<br>(T) 615.661.5472<br>(F) 615.661.5473<br>dhooper@hooperzinn.com<br>*Attorney for Jason Ritzen* |

| | |
|---|---|
| Robert F. Parsley<br>Michael Kohler<br>Miller & Martin<br>832 Georgia Avenue, Suite 1200<br>Chattanooga, TN 37402<br>(T) 423.756.6600<br>(F) 423.785.8480<br>bparsley@millermartin.com<br>mkohler@millermartin.com<br>*Attorneys for Andy Cho* | John Phillip Williams, Esq.<br>Tune, Entrekin & White P.C.<br>315 Deaderick Street, Suite 1700<br>Nashville, TN 37238<br>Telephone: 615.244.2770<br>Facsimile: 615.244.2778<br>jwilliams@tewlawflrm.com<br>*Attorney for the Nashville Scene* |
| Mark Hammervold<br>Hammervold PLC<br>155 S. Lawndale Avenue<br>Elmhurst, Illinois 60126<br>mark@hammervoldlaw.com | Charles I. Malone<br>Beau C. Creson<br>K&L Gates LLP<br>222 Second Avenue South, Suite 1700<br>Nashville, Tennessee 37201<br><br>Gayle I. Malone, Jr.<br>150 Third Avenue South, Suite 1600<br>Nashville, Tennessee 37201<br><br>*Attorneys for Dean Chase, Sandra Chase, and D.F. Chase, Inc.* |
| Marcus Crider<br>Heath Edwards<br>Waller Lansden<br>511 Union Street, Suite 2700<br>Nashville, TN 37219<br>(T): 615.244.6380<br>(F): 615.244.6804<br>marcus.crider@wallerlaw.com<br>heath.edwards@wallerlaw.com<br>*Attorneys for Intervening Parties NV Partners, CK Global, and D.F. Chase* | Ronald Harris<br>Neal & Harwell<br>2000 One Nashville Place<br>150 Fourth Ave. N.<br>Nashville, TN 37219<br>(T): 615.244.1713<br>(F): 615.726.0573<br>rharris@nealharwell.com<br>*Attorney for Intervening Party Scripps Media* |

3

859

| John Enkema<br>James Kay<br>Kay, Griffin, Enkema, & Colbert<br>222 Second Ave. N., Suite 340M<br>Nashville, TN 37201<br>(T): 615.742.4800<br>(F): 615.742.4801<br>jenkema@kaygriffin.com<br>jim.kay@kaygriffin.com<br>*Attorneys for Intervening Party Glenn Funk* | Paul R. McAdoo<br>Reporters Committee for Freedom of the Press<br>6688 Nolensville Road, Suite 108-20<br>Brentwood, Tennessee 37027<br>pmcadoo@rcfp.org<br>*Attorney for Non-Party Meredith Corporation* |
| --- | --- |
| Jeanne Ann Burton, Trustee<br>4117 Hillsboro Pike, Suite 103-116<br>Nashville, Tennessee 37215<br>Jeanne.burton@comcast.net | |

s/ BRIAN MANOOKIAN

BRIAN MANOOKIAN

4

FILED
WILLIAMSON COUNTY
CIRCUIT COURT

# IN THE CIRCUIT COURT FOR WILLIAMSON COUNTY, TENNESSEE

2021 SEP -3 PM 3:18

ENTERED

2021 SEP -3 PM 3:19
WILLIAMSON COUNTY
CIRCUIT COURT
FILED



| | | |
|---|---|---|
| **DAVID CHASE** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **NO. 2015-200** |
| | ) | |
| **CHRIS STEWART**, *et al.* | ) | **JURY DEMAND** |
| Defendants. | ) | |

---

## RESPONDENT BRIAN MANOOKIAN'S
## MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

---

### I.   INTRODUCTION AND PROCEDURAL HISTORY

#### A. The Original Chase Matter

This is a malicious prosecution case brought by real estate developer David Chase. Mr. Chase was arrested during the early morning hours of June 8, 2014 for domestic violence after beating his live-in girlfriend, Lauren Bull. Upon being booked into the Davidson County jail, Mr. Chase contacted attorney Bryan Lewis, who in turn called General Sessions Judge Casey Moreland, who arranged for Mr. Chase to be released from jail – notwithstanding a mandatory hold period – at which time Mr. Chase returned to his home and assaulted Lauren Bull a second time, leading to his immediate re-arrest, national headlines, and, ultimately this lawsuit.

David Chase filed this suit contending that various individuals conspired to

1

have him arrested for domestic violence for the purpose of ruining his reputation and depriving him of his burgeoning career in real estate development.

Brian Manookian, a partner with the firm Cummings Manookian PLC, agreed to represent six (6) of the eight (8) defendants in Mr. Chase's lawsuit, and moreover, to do so on a *pro bono* basis. As part of his representation, Mr. Manookian set out to prove that the dismissal of the criminal charges against Mr. Chase were not on the merits, but rather secured as part of a release-dismissal agreement with the Davidson County District Attorney. Doing so would defeat a central element of a malicious prosecution claim, in that the underlying charge must be dismissed on the merits as opposed to resulting from a negotiated settlement. Mr. Manookian additionally sought to prove that David Chase's claims of reputational harm were without merit.

## B. Discovery Materials from the Chase Parties

Toward that end, Mr. Manookian subpoenaed targeted materials from David Chase's employers, business entities, and relatives (hereinafter "the Chase Parties"). On August 31, 2015, the Chase Parties responded by filing a Motion for the Entry of an Agreed Limited Protective Order (hereinafter the "ALPO") covering a narrow, specifically defined set of materials that could potentially be viewed as confidential.

The terms of ALPO expressly forbid the Chase Parties from mass or blanket designations of discovery materials as confidential. Nevertheless, on the same day that the Chase Parties submitted the ALPO to the Court – and prior to its entry – the

2

Chase Parties made a production of over 79,000 pages of documents, all of which were self and mass-designated confidential in violation of the fundamental terms of the very Order they had proffered for the Court's consideration.

The Trial Court never entered the ALPO as submitted by the Chase Parties, and the Chase Parties themselves immediately disregarded its terms. As such, and in the absence of any Order to the contrary, Brian Manookian disseminated certain of the Chase Parties discovery materials – both those that had been improperly self-designated confidential and those not so designated – to Media Outlets, the U.S. Attorney's Office, and the Federal Bureau of Investigation between October 4 and 8, 2015.

### C. The Contempt Proceeding

The Trial Court subsequently entered materially modified versions of the ALPO on October 30, 2015 and November 6, 2016; the terms of which the Manookian Parties complied. The Chase Parties nevertheless petitioned the Trial Court to hold Brian Manookian and Cummings Manookian PLC ("the Manookian Parties") in contempt of court for dissemination of discovery materials purportedly in "violation" of: (1) an order that did not exist at the time of dissemination; (2) a proposed order that, to date, has never been entered by the Trial Court; and (3) the same proposed order that the Chase Parties themselves immediately chose to disregard.

3

Deep into the pendency of the years-long contempt proceeding the Trial Court revealed – during *sua sponte* statements in a totally different proceeding – that it held a deep, pervasive personal animus against Brian Manookian over its belief that Mr. Manookian had filed a "false and fake" package of materials against it with Board of Judicial Conduct that led to widespread media reporting of the Trial Court's arrest for solicitation of prostitution.

Shortly thereafter, the Trial Court began, *sua sponte*, filing and relying upon highly prejudicial and inadmissible outside materials in this action, related to a wholly unrelated case in which the Manookian Parties were litigants, and that the Trial Court obtained through its own extrajudicial investigation.

The Trial Court followed up on its improper extrajudicial investigation by authoring a series of letters to the Board of Professional Responsibility making deeply personal and unfounded attacks on Brian Manookian's character and "entire being," all arising out of allegations outside of this case, and for which the Trial Court had no personal knowledge.

Brian Manookian and Cummings Manookian PLC quickly moved for the Trial Court's recusal. The Trial Court not only refused to do so but began swiftly entering orders finding Manookian Parties in contempt of court and awarding $748,769.21 in civil contempt damages against them, before this appeal could be heard.

### D. The Appellate Course of Proceedings

The Manookian Parties appealed the Trial Court's Orders on recusal and contempt. On February 4, 2021, the Tennessee Court of Appeals released its holding in *Chase v. Stewart*. The Court of Appeals vacated the judgment of $748,769,21, finding that Judge Michael Binkley should have recused himself as a result of an appearance of bias; and further finding that the bias had existed for so long as to justify his retroactive recusal.

The Chase Parties petitioned the Court of Appeals for rehearing. Their Petition was denied in a multi-page order issued on March 16, 2021. The Chase Parties then filed a Rule 11 Application for Permission to Appeal to the Tennessee Supreme Court. That Petition was denied on August 6, 2021.

### E. The Present Posture of the Contempt Proceeding

Respondent Brian Manookian now moves for summary judgment on all the claims against him for contempt and seeking sanctions. The gravamen of those claims is that Mr. Manookian disseminated discovery materials from the Chase Parties *after* the entry of a Protective Order prohibiting doing so.

Mr. Manookian has admitted distributing selected portions of the Chase Parties' discovery materials to news outlets and law enforcement. Mr. Manookian has testified, however, that he did so prior to the entry of any order precluding such

5

distribution, and, as a result, he may not be held in contempt of an order that did not exist at the time.

## II.   LEGAL STANDARD

A party against whom a claim is sought may move, at any time, with or without supporting affidavits for summary judgment in his favor.  Tenn. R. Civ. P. 56.02.  Summary judgment "shall be rendered" in favor of the moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Tenn. R. Civ. P. 56.04.

The purpose of Rule 56 is to provide a means for accelerating litigation of issues that are not disputed, or which cannot be genuinely disputed by the parties. *Byrd*, 847 SW 2d 208, 210 (Tenn. 1993). "Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial." *Byrd v. Hall*, 847 SW 2d 208, 211 (Tenn. 1993).  The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced. . .at a future trial." *Rye v. Women's Care Center of Memphis*, 477 S.W.3d 235, 265 (Tenn. 2015).

6

## III. STATEMENT OF FACTS

Brian Manookian served as counsel to various Defendants in this action.[1] During the course of his representation, Mr. Manookian received discovery materials from David Chase's employers, business entities, and parents.[2]

Brian Manookian has not provided any discovery materials produced by the Chase Parties to any person or entity in violation of any existing court order.[3]

## IV. ARGUMENT

Civil contempt claims based upon an alleged disobedience of a court order have four essential elements: (1) the order must be "lawful"; (2) the order must be "clear, specific, and unambiguous"; (3) "the person alleged to have violated the order must have actually disobeyed or otherwise resisted the order"; and (4) "the person's violation of the order must be willful." *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 356 (Tenn. 2008).

To prove an "actual" violation (the third element), the petitioner must prove, by a preponderance of the evidence, that the respondent either refused to perform some specific act mandated by the order, or performed an act forbidden by the order. *Overnite Transp. Co. v. Teamsters Local Union No. 480*, 172 S.W.3d 507, 511 (Tenn. 2011).

---

[1] Respondent Brian Manookian's Statement of Undisputed Mater Facts, at Para. 1.
[2] Respondent Brian Manookian's Statement of Undisputed Mater Facts, at Para. 1.
[3] Respondent Brian Manookian's Statement of Undisputed Mater Facts, at Para. 2.

7

867

To prove the "willfulness" element, the petitioner must prove that that the Respondent intentionally acted contrary to a known duty. *Konvalinka,* 249 S.W.3d at 357; *see Hopwood v. Hopwood*, 2017 Tenn. App. LEXIS 472, *14-15 (Tenn. Ct. App. Jul. 12, 2017).

The Declaration of Brian Manookian, along with Respondent's Statement of Undisputed Material Facts, demonstrate that Mr. Manookian did not provide discovery materials produced by the Chase's to any third-party in violation of a court order.

The Petitioners are incapable of coming forward with competent, record evidence as required by Rule 56 of the Tenn. R. Civ. Pro. creating a genuine issue of material fact on this point. To this date, years after instituting their contempt proceeding, and years after having the opportunity to present an entire trial on this point, the Petitioners still lack any testimony or record evidence that Brian Manookian provided discovery materials to the media or any other third-party at any point *after* the Court entered an order prohibiting doing so.

To that point, the Petitioners have not presented a single individual as a witness who has testified to having received discovery materials from Brian Manookian at any date after the entry of a Court order precluding dissemination, and Brian Manookian has testified unambiguously that he did not do so.

8

Because the Petitioner's have not and cannot produce any competent evidence supporting their claims; and because Mr. Manookian has submitted competent evidence rebutting the Chase Parties' claims; Respondent Brian Manookian is entitled to summary judgment.

## V.  CONCLUSION

For all of the foregoing reasons, Respondent respectfully requests that the Court enter summary judgment in his favor.

Respectfully submitted,

s/ BRIAN MANOOKIAN

**Brian Manookian**
P.O. Box 150229
Nashville, TN 37215

9

## CERTIFICATE OF SERVICE

I certify that on September 3, 2021 a true and correct copy of this document was provided by email to the following:

| | |
|---|---|
| Philip L. Robertson<br>Brittany M. Bartkowiak<br>Robertson Law Group<br>1896 General George Patton, Suite 600<br>Franklin, TN 37067<br>(T) 615.656.1729<br>(F) 615.656.1736<br>probertson@robertsonlg.com<br>*Attorneys for David Chase* | David Hooper<br>Hooper, Zinn, McNamee<br>109 Westpark Drive, Suite 300<br>Brentwood, Tennessee 37027<br>(T) 615.661.5472<br>(F) 615.661.5473<br>dhooper@hooperzinn.com<br>*Attorney for Jason Ritzen* |
| Robert F. Parsley<br>Michael Kohler<br>Miller & Martin<br>832 Georgia Avenue, Suite 1200<br>Chattanooga, TN 37402<br>(T) 423.756.6600<br>(F) 423.785.8480<br>bparsley@millermartin.com<br>mkohler@millermartin.com<br>*Attorneys for Andy Cho* | John Phillip Williams, Esq.<br>Tune, Entrekin & White P.C.<br>315 Deaderick Street, Suite 1700<br>Nashville, TN 37238<br>Telephone: 615.244.2770<br>Facsimile: 615.244.2778<br>jwilliams@tewlawflrm.com<br>*Attorney for the Nashville Scene* |

| | |
|---|---|
| Mark Hammervold<br>Hammervold PLC<br>155 S. Lawndale Avenue<br>Elmhurst, Illinois 60126<br>mark@hammervoldlaw.com | Charles I. Malone<br>Beau C. Creson<br>K&L Gates LLP<br>222 Second Avenue South, Suite 1700<br>Nashville, Tennessee 37201<br><br>Gayle I. Malone, Jr.<br>150 Third Avenue South, Suite 1600<br>Nashville, Tennessee 37201<br><br>*Attorneys for Dean Chase, Sandra Chase, and D.F. Chase, Inc.* |
| Marcus Crider<br>Heath Edwards<br>Waller Lansden<br>511 Union Street, Suite 2700<br>Nashville, TN 37219<br>(T): 615.244.6380<br>(F): 615.244.6804<br>marcus.crider@wallerlaw.com<br>heath.edwards@wallerlaw.com<br>*Attorneys for Intervening Parties NV Partners, CK Global, and D.F. Chase* | Ronald Harris<br>Neal & Harwell<br>2000 One Nashville Place<br>150 Fourth Ave. N.<br>Nashville, TN 37219<br>(T): 615.244.1713<br>(F): 615.726.0573<br>rharris@nealharwell.com<br>*Attorney for Intervening Party Scripps Media* |

11

871

| | |
|---|---|
| John Enkema<br>James Kay<br>Kay, Griffin, Enkema, & Colbert<br>222 Second Ave. N., Suite 340M<br>Nashville, TN 37201<br>(T): 615.742.4800<br>(F): 615.742.4801<br>jenkema@kaygriffin.com<br>jim.kay@kaygriffin.com<br>*Attorneys for Intervening Party*<br>*Glenn Funk* | Paul R. McAdoo<br>Reporters Committee for Freedom of<br>the Press<br>6688 Nolensville Road, Suite 108-20<br>Brentwood, Tennessee 37027<br>pmcadoo@rcfp.org<br>*Attorney for Non-Party Meredith*<br>*Corporation* |
| Jeanne Ann Burton, Trustee<br>4117 Hillsboro Pike, Suite 103-116<br>Nashville, Tennessee 37215<br>Jeanne.burton@comcast.net | |

s/ BRIAN MANOOKIAN
_____
BRIAN MANOOKIAN

872

IN THE CIRCUIT COURT FOR WILLIAMSON COUNTY, TENNESSEE

| DAVID CHASE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 2015-200 |
| | ) | |
| CHRIS STEWART, *et al.* | ) | |
| | ) | JURY DEMAND |
| Defendants. | ) | |

---

## RESPONDENT BRIAN MANOOKIAN'S
## STATEMENT OF UNDISPUTED MATERIAL FACTS

---

Pursuant to Tenn. R. Civ. P. 56.03, the Respondent, Brian Manookian, hereby submits this Statement of Undisputed Material Facts in Support of his Motion for Summary Judgment.

## UNDISPUTED MATERIAL FACTS

1.    Brian Manookian served as counsel to various Defendants in this action. During the course of his representation, he received discovery materials from David Chase's employers, business entities, and parents (hereinafter "the Chase Parties").

**SOURCE: Declaration of Brian Manookian, Para. 2.**

**RESPONSE:**

1

2.    Brian Manookian has not provided any discovery materials produced by the Chase Parties to any person or entity in violation of any existing court order.

**SOURCE: Declaration of Brian Manookian, Para. 3.**

**RESPONSE:**

Respectfully submitted,

s/ BRIAN MANOOKIAN

**Brian Manookian**
P.O. Box 150229
Nashville, TN 37215

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on September 3, 2021 a true and correct copy of this document was provided by email to the following:

| | |
|---|---|
| Philip L. Robertson<br>Brittany M. Bartkowiak<br>Robertson Law Group<br>1896 General George Patton, Suite 600<br>Franklin, TN 37067<br>(T) 615.656.1729<br>(F) 615.656.1736<br>probertson@robertsonlg.com<br>*Attorneys for David Chase* | David Hooper<br>Hooper, Zinn, McNamee<br>109 Westpark Drive, Suite 300<br>Brentwood, Tennessee 37027<br>(T) 615.661.5472<br>(F) 615.661.5473<br>dhooper@hooperzinn.com<br>*Attorney for Jason Ritzen* |

2

| | |
|---|---|
| Robert F. Parsley<br>Michael Kohler<br>Miller & Martin<br>832 Georgia Avenue, Suite 1200<br>Chattanooga, TN 37402<br>(T) 423.756.6600<br>(F) 423.785.8480<br>bparsley@millermartin.com<br>mkohler@millermartin.com<br>*Attorneys for Andy Cho* | John Phillip Williams, Esq.<br>Tune, Entrekin & White P.C.<br>315 Deaderick Street, Suite 1700<br>Nashville, TN 37238<br>Telephone: 615.244.2770<br>Facsimile: 615.244.2778<br>jwilliams@tewlawflrm.com<br>*Attorney for the Nashville Scene* |
| Mark Hammervold<br>Hammervold PLC<br>155 S. Lawndale Avenue<br>Elmhurst, Illinois 60126<br>mark@hammervoldlaw.com | Charles I. Malone<br>Beau C. Creson<br>K&L Gates LLP<br>222 Second Avenue South, Suite 1700<br>Nashville, Tennessee 37201<br><br>Gayle I. Malone, Jr.<br>150 Third Avenue South, Suite 1600<br>Nashville, Tennessee 37201<br><br>*Attorneys for Dean Chase, Sandra Chase, and D.F. Chase, Inc.* |
| Marcus Crider<br>Heath Edwards<br>Waller Lansden<br>511 Union Street, Suite 2700<br>Nashville, TN 37219<br>(T): 615.244.6380<br>(F): 615.244.6804<br>marcus.crider@wallerlaw.com<br>heath.edwards@wallerlaw.com<br>*Attorneys for Intervening Parties NV Partners, CK Global, and D.F. Chase* | Ronald Harris<br>Neal & Harwell<br>2000 One Nashville Place<br>150 Fourth Ave. N.<br>Nashville, TN 37219<br>(T): 615.244.1713<br>(F): 615.726.0573<br>rharris@nealharwell.com<br>*Attorney for Intervening Party Scripps Media* |

3

| | |
|---|---|
| John Enkema<br>James Kay<br>Kay, Griffin, Enkema, & Colbert<br>222 Second Ave. N., Suite 340M<br>Nashville, TN 37201<br>(T): 615.742.4800<br>(F): 615.742.4801<br>jenkema@kaygriffin.com<br>jim.kay@kaygriffin.com<br>*Attorneys for Intervening Party Glenn Funk* | Paul R. McAdoo<br>Reporters Committee for Freedom of the Press<br>6688 Nolensville Road, Suite 108-20<br>Brentwood, Tennessee 37027<br>pmcadoo@rcfp.org<br>*Attorney for Non-Party Meredith Corporation* |
| Jeanne Ann Burton, Trustee<br>4117 Hillsboro Pike, Suite 103-116<br>Nashville, Tennessee 37215<br>Jeanne.burton@comcast.net | |

s/ BRIAN MANOOKIAN

BRIAN MANOOKIAN

4

IN THE CIRCUIT COURT FOR WILLIAMSON COUNTY, TENNESSEE

FILED
WILLIAMSON COUNTY
CIRCUIT COURT
2021 SEP -3 PM 3: 19

ENTERED_____

| | | |
|---|---|---|
| DAVID CHASE | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 2015-200 |
| | ) | |
| CHRIS STEWART, *et al.* | ) | |
| | ) | **JURY DEMAND** |
| Defendants. | ) | |

---

## DECLARATION OF BRIAN MANOOKIAN

---

Pursuant to Tennessee Rule of Civil Procedure 72, Brian Manookian declares as follows:

1.      I am an adult over the age of 18 and am competent to make this declaration. I have personal knowledge of the matters stated herein.

2.      I served as counsel to various Defendants in this action. During the course of my representation, I received discovery materials from David Chase's employers, business entities, and parents (hereinafter "the Chase Parties").

3.      I have not provided any discovery materials produced by the Chase Parties to any person or entity in violation of any existing court order.

### SIGNATURE PAGE TO FOLLOW

1

877

I DECLARE UNDER PENALTY OF PERJURY THE FOREGOING IS TRUE AND CORRECT.

Brian Manookian

September 3, 2021

_____

Date

2

IN THE UNITED STATES BANKRUPTCY COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CUMMINGS MANOOKIAN, PLLC, | ) | Case No: 3:19-bk-07235 |
| | ) | Chapter 7 |
| | ) | Judge Walker |
| Debtor. | ) | |
| | ) | **Hearing Date: September 17, 2021** |
| | ) | **at 11:00 a.m.** |

**TRUSTEE JEANNE ANN BURTON'S WITNESS AND EXHIBIT LIST FOR
SEPTEMBER 17, 2021 HEARING ON TRUSTEE'S MOTION TO APPROVE
COMPROMISE AND SETTLEMENT**

Comes now Movant, Jeanne Ann Burton, by and through special counsel, and hereby gives notice of the witnesses she may call, and exhibits she may introduce, at the September 17, 2021 hearing on the Trustee's Motion to Approve Compromise and Settlement (Doc. 108) (the "Settlement Motion"), the objection thereto by Grant, Konvalinka & Harrison, P.C. (Doc. 111) (the "GKH Objection"), the objection thereto of Brian Manookian (Doc. 112) (the "Manookian Objection") and the supplement to the Manookian Objection (Doc. 123) (the "Manookian Supplement"):

**WITNESS LIST**

1.     <u>Jeanne Ann Burton, Trustee</u>.    If called to testify, Trustee Burton will testify regarding the considerations and justifications for the settlement proposed in the Settlement Motion.    She will also address issues raised in the GKH Objection, Manookian Objection, and Manookian Supplement.

2.     The Trustee reserves the right to call the witnesses identified by any other party and any other witnesses needed to rebut evidence offered by any other party.

**EXHIBIT LIST**

1.      All documents previously filed with the Court in this matter, including statements, schedules, proofs of claim, the Settlement Motion, the GKH Objection, the Manookian Objection, the Manookian Supplement, the Trustee's responses to the GKH Objection and the Manookian Objection, and all exhibits to any document previously filed with the Court in this matter.

2.      All documents filed in the *Chase v. Stewart* state court matter including order, appellate opinions, and motions.

3.      The Trustee reserves the right to introduce any exhibits identified by any other party and any exhibits needed to rebut evidence offered by any other party.

DATED:  September 15, 2021

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
6100 Tower Circle, Suite 200
Franklin, Tennessee 37067
Tel:    (615) 465-6000
phillip@thompsonburton.com

Special Counsel for Chapter 7 Trustee

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **IN RE:** )| |
| )| **Case No. 3:19-bk-07235** |
| **CUMMINGS MANOOKIAN, PLLC,** )| **Chapter 7** |
| )| **Judge Walker** |
| **Debtor.** )| |
| )| |

---

## BRIAN MANOOKIAN'S WITNESS AND EXHIBIT LIST FOR SEPTEMBER 17, 2021 HEARING ON TRUSTEE'S MOTION TO APPROVE

---

Brian Manookian, through counsel, gives notice of the witnesses he may call and exhibits he may introduce at the September 17, 2021 hearing on the Trustee's Motion to Approve Compromise and Settlement.

### WITNESS LIST

1.  <u>Brian Manookian, Member, Cummings Manookian</u>.  If called to testify, Brian Manookian will testify regarding his objection to the proposed settlement with the Chase Parties, the underlying Chase Litigation, and the bases for the objections raised in this objection (Doc. 112) and supplement thereto (Doc. 123).  Mr. Manookian will also testify as to his personal knowledge of the Chase Parties' prior and recent offer to settle all claims with Cummings Manookian for a "walk-away."

2.  <u>Jeanne Burton, Trustee</u>.  Mr. Manookian may call Jeanne Burton to testify regarding her investigation of the Chase Claim, her awareness and verification of the Chase "walk-away" offer, and her rationale for proposing the particular terms contained in the proposed Settlement Agreement.

881

3.    <u>Phillip Young, Special Counsel</u>.  Mr. Manookian may call Phillip Young to testify regarding his role as receiver in the Chase State Court litigation as well as his arrangement, and the timing of his arrangement, to receive payments directly from the Chase Parties in that case.

4.    Mr. Manookian reserves the right to call the witnesses identified by any other party as well as rebuttal witnesses as necessary, including Charlie Malone, Beau Creason, and any of the Chase Parties.


## EXHIBIT LIST

1.    All documents previously filed with the Court in this matter, and particularly any Exhibits to Mr. Manookian's objection and supplement thereto.

2.    All pleadings filed in the *Chase v. Stewart* state court matter as well as the *Chase v. Cummings Manookian* matter.

3.    Any exhibit identified by any other party and any exhibits necessary for rebuttal.


Date:   September 15, 2021                          Respectfully submitted,


                                        */s/ John Spragens*
                                        John Spragens (TN Bar No. 31445)
                                        Spragens Law PLC
                                        311 22nd Ave. N.
                                        Nashville, TN 37203
                                        T: (615) 983-8900
                                        F: (615) 682-8533
                                        john@spragenslaw.com

                                        *Attorney for Manookian PLLC and Brian Manookian*

**<u>CERTIFICATE OF SERVICE</u>**

      The undersigned hereby certifies that the foregoing was filed September 15, 2021 and served electronically upon all parties in interest or their counsel as indicated on the receipt issued by the Court's electronic filing system.

                                     */s/ John Spragens*

883

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CUMMINGS MANOOKIAN, PLLC, | ) | Case No. 3:19-bk-07235 |
|     Debtor. | ) | Chapter 7 |
| | ) | Judge Walker |

## ORDER REGARDING HEARING ON TRUSTEE'S MOTION TO APPROVE COMPROMISE AND SETTLEMENT

On September 17, 2021, the Court continued the hearing on the Trustee's Motion to Approve Compromise and Settlement (Doc. 108), and the objections thereto filed by Grant, Konvalinka & Harrison, P.C. (Doc. 111) and by Brian Manookian (Doc. 112 and 124) to September 29, 2021. In conjunction with that continued hearing, the Court hereby issues the following deadlines:

IT IS HEREBY ORDERED that the parties shall file any motions in limine by September 24, 2021.

IT IS FURTHER ORDERED that the parties shall file witness and exhibit list, upload all exhibits, and file any factual stipulations by Noon on September 27, 2021.

---

**THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY AS INDICATED AT THE TOP OF THE FIRST PAGE**

---

884

Submitted for entry:


/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
6100 Tower Circle, Suite 200
Franklin, TN 37067
Tel: (615) 465-6000
phillip@thompsonburton.com

Counsel for Trustee


/s/ John P. Konvalinka
John P. Konvalinka
Harry R. Cash
Grant Konvalinka & Harrison, P.C.
633 Chestnut Street, Suite 900
Chattanooga, TN 37450-0900
Tel: (423) 756-8400
jkonvalinka@gkhpc.com
hcash@gkhpc.com

Counsel for Grant, Konvalinka & Harrison, P.C.


/s/ John Spragens
John Spragens
Spragens Law PLC
311 22nd Ave. N.
Nashville, TN 37203
Tel: (615) 983-8900
John@spragenslaw.com

Counsel for Brian Manookian

2

885

Charles M. Walker
U.S. Bankruptcy Judge
        Dated: 9/22/2021



## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **CUMMINGS MANOOKIAN, PLLC,** | ) | **Case No. 3:19-bk-07235** |
| **Debtor.** | ) | **Chapter 7** |
| | ) | **Judge Walker** |

### ORDER REGARDING HEARING ON TRUSTEE'S MOTION TO APPROVE
### COMPROMISE AND SETTLEMENT

On September 17, 2021, the Court continued the hearing on the Trustee's Motion to

Approve Compromise and Settlement (Doc. 108), and the objections thereto filed by Grant,

Konvalinka & Harrison, P.C. (Doc. 111) and by Brian Manookian (Doc. 112 and 124) to
                                                            at 1:00 p.m.
September 29, 2021.  In conjunction with that continued hearing, the Court hereby issues the

following deadlines:

IT IS HEREBY ORDERED that the parties shall file any motions in limine by September

24, 2021.

IT IS FURTHER ORDERED that the parties shall file witness and exhibit list, upload all

exhibits, and file any factual stipulations by Noon on September 27, 2021.

---

**THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY AS
INDICATED AT THE TOP OF THE FIRST PAGE**

---

1

Submitted for entry:


/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
6100 Tower Circle, Suite 200
Franklin, TN 37067
Tel: (615) 465-6000
phillip@thompsonburton.com

Counsel for Trustee


/s/ John P. Konvalinka
John P. Konvalinka
Harry R. Cash
Grant Konvalinka & Harrison, P.C.
633 Chestnut Street, Suite 900
Chattanooga, TN 37450-0900
Tel: (423) 756-8400
jkonvalinka@gkhpc.com
hcash@gkhpc.com

Counsel for Grant, Konvalinka & Harrison, P.C.


/s/ John Spragens
John Spragens
Spragens Law PLC
311 22nd Ave. N.
Nashville, TN 37203
Tel: (615) 983-8900
John@spragenslaw.com

Counsel for Brian Manookian

This Order has been electronically
signed. The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **CUMMINGS MANOOKIAN, PLLC,** | ) | Case No. 3:19-bk-07235 |
| **Debtor.** | ) | Chapter 7 |
| | ) | Judge Walker |

**TRUSTEE'S MOTION TO APPROVE PARTICIPATION
OF PHILLIP YOUNG AT SEPTEMBER 29, 2021 HEARING**

Jeanne Ann Burton, chapter 7 trustee herein ("Trustee"), hereby moves (the "Motion") this Court for entry of an order (the "Order"), substantially in the form submitted herewith, approving the participation of Phillip G. Young as counsel for the Trustee at the hearing scheduled for September 29, 2021. In support of this Motion, the Trustee respectfully represents as follows:

1. This Motion may be moot but is filed out of an abundance of caution. Brian Manookian has filed an objection to the Trustee's Motion to Approve Compromise and Settlement of a claim in this estate, and has indicated on his witness and exhibit list that he may call the Trustee's special counsel, Phillip G. Young, as a fact witness. The Trustee has asked the Court to strike the objection and to preclude Mr. Manookian's participation in the hearing because, pursuant to well-settled case law, Mr. Manookian lacks standing. If the Court finds that Mr. Manookian has standing and if he calls Mr. Young as a fact witness, it creates a potential issue with Mr. Young's participation in the hearing as counsel for the Trustee pursuant to Rule 3.7 of the Tennessee Rules of Professional Conduct.

2. Because Mr. Manookian's counsel previously informed the Court that he did not anticipate calling Mr. Young as a witness, the Trustee asked if Mr. Manookian would strike Mr. Young from the witness and exhibit list or, alternatively, agree that Mr. Young could participate

in the hearing as counsel for the Trustee on all other matters. Mr. Manookian would not agree to either request, which necessitated this Motion.

3.  Rule 3.7 of the Tennessee Rules of Professional Conduct states, in relevant part:

(a) A lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness unless:
(1) the testimony relates to an uncontested issue;
(2) the testimony relates to the nature and value of legal services rendered in the case; or
(3) disqualification of the lawyer would work a substantial hardship on the client.

If Mr. Young were called as a witness in this case, it would not relate to an uncontested issue nor would the testimony relate to the nature and value of legal services rendered.

4.  Disallowing Mr. Young's participation on behalf of the Trustee would, however, create a substantial hardship for the estate. While Mr. Young intends to have another lawyer from his firm, Ronn Steen, present to represent the Trustee in the direct and cross-examination of Mr. Young (should he be called as a witness), Mr. Steen does not have knowledge of all of the other issues involved in this case that might be relevant to Mr. Manookian's standing, the motion to approve the claim settlement, or the objections thereto. As the Court knows, this has been a contentious and complicated bankruptcy case. It would take a considerable amount of time, and cost the estate considerable fees, for Mr. Young to educate Mr. Steen on all issues that might arise concerning Mr. Manookian's standing and/or the objections to the settlement motion. That hardship is unwarranted under these circumstances, and the Court should permit Mr. Young's participation pursuant to the exception under Rule 3.7(a)(3).

5.  Furthermore, the comments and opinion notes to Rule 3.7 of the Tennessee Rules of Professional Conduct demonstrate that the exclusion of Mr. Young's participation in this, a bench hearing, is unnecessary. The comment to Rule 3.7 make clear that the purpose of this rule

is to prevent the fact-finder from being confused about a lawyer's role on the witness stand versus his role as an advocate for his client:

> [1] Combining the roles of advocate and witness can prejudice the tribunal and the opposing party and can also involve a conflict of interest between the lawyer and client.

The first three opinion notes to Rule 3.7 continue that theme:

> [2] The tribunal has a proper objection when the trier of fact may be confused or misled by a lawyer serving as both advocate and witness. The opposing party has a proper objection where the combination of roles may prejudice that party's rights in the litigation. A witness is required to testify on the basis of personal knowledge, while an advocate is expected to explain and comment on evidence given by others. It may not be clear whether a statement by an advocate-witness should be taken as proof or as an analysis of the proof.

> [3] To protect the tribunal, paragraph (a) prohibits a lawyer from simultaneously serving as advocate at trial and necessary witness except in those circumstances specified in paragraphs (a)(1) through (a)(3). Paragraph (a)(1) recognizes that if the testimony will be uncontested the ambiguities in the dual role are purely theoretical. Paragraph (a)(2) recognizes that, where the testimony concerns the extent and value of legal services rendered in the action in which the testimony is offered, permitting the lawyer to testify avoids the need for a second trial with new counsel to resolve that issue. Moreover, in such a situation the judge has firsthand knowledge of the matter in issue; hence, there is less dependence on the adversary process to test the credibility of the testimony.

> [4] Apart from these two exceptions, paragraph (a)(3) recognizes that a balancing is required between the interests of the client and those of the tribunal and the opposing party. Whether the tribunal is likely to be misled or the opposing party is likely to suffer prejudice depends on the nature of the case, the importance and probable tenor of the lawyer's testimony, and the probability that the lawyer's testimony will conflict with that of other witnesses. Even if there is risk of such prejudice, in determining whether the lawyer should be disqualified, due regard must be given to the effect of disqualification on the lawyer's client. It is relevant that one or both parties could reasonably foresee that the lawyer would probably be a witness. The conflict of interest principles stated in RPCs 1.7, 1.9 and 1.10 have no application to this aspect of the problem.

6. The exclusion of Mr. Young's participation in this matter as counsel for the Trustee would cause undue hardship on this estate, and the Court is not likely to be confused by his participation as both an attorney and a potential fact-witness. Accordingly, the Trustee respectfully requests that the Court enter an order, in the form submitted herewith, allowing Mr. Young's participation in the hearing before this Court on September 29, 2021, even if he might also be called as a fact witness.

7. The Trustee also respectfully requests that the Court enter an order on this matter in advance of the September 29, 2021 hearing so that, if Mr. Steen needs to be prepared to represent the Trustee on all issues before the Court at that hearing, the Trustee and Mr. Young are given sufficient time to educate him on the issues likely to be heard.

WHEREFORE, the Trustee respectfully requests that this Court enter an order in the form submitted herewith as soon as practicable and grant such other and further relief as is appropriate under the circumstances.

Respectfully submitted,

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
One Franklin Park
6100 Tower Circle, Suite 200
Franklin, TN 37067
Tel: 615-465-6008
phillip@thompsonburton.com

*Counsel to Trustee*

4

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been served this 23rd day of September, 2021, upon all parties of record through the Court's electronic filing system.

<div align="right">

/s/  Phillip G. Young, Jr.

</div>

892

# PROPOSED

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **IN RE:** ) | |
| ) | |
| **CUMMINGS MANOOKIAN, PLLC,** ) | **Case No. 3:19-bk-07235** |
| **Debtor.** ) | **Chapter 7** |
| ) | **Judge Walker** |

### ORDER APPROVING PARTICIPATION
### OF PHILLIP YOUNG AT SEPTEMBER 29, 2021 HEARING

This matter having come before the Court on the motion (the "Motion") filed by Jeanne Ann Burton, chapter 7 trustee herein ("Trustee"), for an order approving the participation of her counsel, Phillip G. Young, at a hearing scheduled in this matter for September 29, 2021 at which Mr. Young might be called as a fact witness; and based upon the arguments made in the Motion; and the Court having reviewed Rule 3.7 of the Tennessee Rules of Professional Conduct; and the Court being satisfied that the relief herein is appropriate under the circumstances; and the court being otherwise sufficiently advised,

IT IS HEREBY FOUND THAT:

A. Exclusion of Phillip G. Young's participation at the September 29, 2021 hearing in this matter as counsel for the Trustee would work a substantial hardship on the Trustee and this

6

893

bankruptcy estate.

       B.    Exclusion of Phillip G. Young's participation at the September 29, 2021 hearing in this matter as counsel for the Trustee is unnecessary, as the Court can ascertain the difference between comments made by Mr. Young as an advocate versus those made as a witness, and the Court will not be confused or misled by his participation as counsel

       NOW THEREFORE, IT IS HEREBY ORDERED THAT:

       1.    The Motion is granted.

       2.    Phillip G. Young is allowed to participate as counsel for the Trustee at the September 29, 2021 hearing for all matters except for any direct examination or cross-examination of Mr. Young as a witness. The Trustee shall have other counsel present at the September 29, 2021 hearing to represent her with respect to any testimony that might be required of Mr. Young.

---

This order was signed and entered electronically as indicated at the top of the first page.

---

AGREED TO AND
APPROVED FOR ENTRY:

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
One Franklin Park
6100 Tower Circle, Suite 200
Franklin, TN 37067
Tel: 615-465-6008
phillip@thompsonburton.com

*Special Counsel to Trustee*

7

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **CUMMINGS MANOOKIAN, PLLC,** | ) | **Case No. 3:19-bk-07235** |
| Debtor. | ) | **Chapter 7** |
| | ) | **Judge Walker** |

### ORDER APPROVING PARTICIPATION
### OF PHILLIP YOUNG AT SEPTEMBER 29, 2021 HEARING

This matter having come before the Court on the motion (the "Motion") filed by Jeanne Ann Burton, chapter 7 trustee herein ("Trustee"), for an order approving the participation of her counsel, Phillip G. Young, at a hearing scheduled in this matter for September 29, 2021 at which Mr. Young might be called as a fact witness; and based upon the arguments made in the Motion; and the Court having reviewed Rule 3.7 of the Tennessee Rules of Professional Conduct; and the Court being satisfied that the relief herein is appropriate under the circumstances; and the court being otherwise sufficiently advised,

IT IS HEREBY FOUND THAT:

A.     Exclusion of Phillip G. Young's participation at the September 29, 2021 hearing in this matter as counsel for the Trustee would work a substantial hardship on the Trustee and this

bankruptcy estate.

B.     Exclusion of Phillip G. Young's participation at the September 29, 2021 hearing in this matter as counsel for the Trustee is unnecessary, as the Court can ascertain the difference between comments made by Mr. Young as an advocate versus those made as a witness, and the Court will not be confused or misled by his participation as counsel

NOW THEREFORE, IT IS HEREBY ORDERED THAT:

1.     The Motion is granted.

2.     Phillip G. Young is allowed to participate as counsel for the Trustee at the September 29, 2021 hearing for all matters except for any direct examination or cross-examination of Mr. Young as a witness.  The Trustee shall have other counsel present at the September 29, 2021 hearing to represent her with respect to any testimony that might be required of Mr. Young.

---

This order was signed and entered electronically as indicated at the top of the first page.

---

AGREED TO AND
APPROVED FOR ENTRY:

/s/  Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
One Franklin Park
6100 Tower Circle, Suite 200
Franklin, TN 37067
Tel: 615-465-6008
phillip@thompsonburton.com

*Special Counsel to Trustee*

2



Charles M. Walker
U.S. Bankruptcy Judge
Dated: 9/24/2021

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

IN RE:                      )
                           )   Case No; 3: 19-bk-07235
CUMMINGS MANOOKIAN, PLLC,  )   Chapter 7
                           )   Honorable Charles M. Walker
     Debtor.             )

## ORDER SETTING FORTH PROCEDURES
## FOR HEARING ON
## THE TRUSTEE'S MOTION FOR COMPROMISE AND SETTLEMENT

THIS ORDER establishes the format for the hearing set before this Court on September 29, 2021 on the Trustee's Motion for Compromise and Settlement (ECF #108), and related matters (ECF 111, 112, 123, 124, and 125).

In order for a party to seek relief in a federal court, the U.S. Constitution requires the party to establish that it possesses standing to seek such relief. Standing is a mandatory jurisdictional requirement, and as such, this Court possesses the power to exercise its discretion to bifurcate jurisdictional issues from the merits of a controversy. Therefore,

IT IS HEREBY ORDERED that the issue of Brian Manookian's standing, as raised in the Trustee's response to Brian Manookian's Objection to the Trustee's proposed settlement of the Chase Parties[1], will be bifurcated from the merits of his objection and heard as a preliminary matter at the September 29, 2021 hearing. The Court will hear all evidence and argument and rule on the issue before taking up the merits of the settlement and the objections.

## THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY AS
## INDICATED AT THE TOP OF THE FIRST PAGE

---

[1] Dean Chase, Sandra Chase, and D.F. Chase, Inc. (collectively, the "Chase Parties")

This Order has been electronically
signed. The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.

IN THE UNITED STATES BANKRUPTCY COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CUMMINGS MANOOKIAN, PLLC, | ) | Case No: 3:19-bk-07235 |
| | ) | Chapter 7 |
| | ) | Judge Walker |
| Debtor. | ) | |

**TRUSTEE'S MOTION TO STRIKE BRIAN MANOOKIAN'S OBJECTION AND TO PRECLUDE HIS PARTICIPATION IN THE SEPTEMBER 29, 2021 HEARING FOR LACK OF STANDING**

Comes now Jeanne Ann Burton, Chapter 7 Trustee herein, by and through special counsel, and hereby respectfully moves the Court to strike Brian Manookian's Objection to Proposed Chase Claim and Settlement (Doc. 112) and the Notice of Filing Supplement to Manookian Objection to Proposed Chase Claim and Settlement (Doc. 123) (collectively, the "Manookian Objection"), and to preclude Mr. Manookian's participation at the September 29, 2021 hearing (the "Hearing") on the Trustee's Motion to Approve Compromise and Settlement (Doc. 108) (the "Settlement Motion") of Claim No. 5 (the "Chase Claim") because Mr. Manookian lacks standing.

The Trustee objected to Brian Manookian's standing in her response to the Manookian Objection, *see* Doc. 125, but now does so via motion since the Court invited the parties to file any motions in limine by Friday, September 24, 2021.[1] This is not the first time the Trustee has raised Brian Manookian's lack of standing. The Trustee previously raised the issue of Mr. Manookian's standing when he objected to the Trustee's attempts to employ special counsel. The Court conducted a hearing on that matter and, while the Court indicated from the bench that the Court had reason to doubt that Mr. Manookian has standing in this matter, the Court allowed

[1] The Court has now entered an Order indicating that it will address this standing issue as a preliminary matter at the September 29, 2021 hearing. *See* Doc. 135.

Mr. Manookian to be heard because it found that the Court had an independent duty to ensure that special counsel was qualified to serve under the Bankruptcy Code. The Trustee now renews her objection to Mr. Manookian's participation in this matter on the grounds that he has no standing and asks for such a finding.

Brian Manookian has not filed a claim in this case, as evidenced by the claims register maintained by the Court Clerk in this case. Mr. Manookian, who signed the schedules under oath subject to penalty of perjury, did not list himself as a creditor of this estate. *See* Doc. 7, 8 and 9. Nevertheless, he has periodically attempted to object to motions filed by the Trustee in her attempt to administer this estate. His objection to the Settlement Motion is the most recent of these attempts, but it is clear he lacks standing to be heard on this issue.

Bankruptcy courts are quite consistent in finding that a Chapter 7 debtor, or the principal of a corporate Chapter 7 debtor, lacks standing to challenge the actions of the bankruptcy trustee or the administration of the estate. *See, e.g., Furlough v. Cage (In re Technicool Systems),* 896 F.3d 382 (5th Cir. 2008) (principal of a chapter 7 debtor corporation had no standing to challenge trustee's employment of counsel); *In re White*, 2018 Bankr. LEXIS 2289 (Bankr. E.D. Mich. 2018) (Chapter 7 debtor had no standing to challenge trustee's fees and expenses); *In re St. Michael Motor Express,* 2016 Bankr. LEXIS 959 (Bankr. W.D. Tenn. 2016) (principal of chapter 7 debtor had no standing to challenge trustee's abandonment of property because the case was not a surplus case); *Khan v. Regions Bank*, 2011 Bankr. LEXIS 3786 (Bankr. E.D. Tenn. 2011) (debtor in an insolvent case had no standing to challenge a proof of claim); *Ultimore, Inc. v. Bucala,* 464 B.R. 626 (Bankr. S.D.N.Y. 2012) (debtor had no standing to pursue a cause of action because it was not an interested party); *Boyd v. Shuford*, 2018 U.S. Dist. LEXIS 54661 (W.D.N.C. 2018) (Chapter 7 debtor had no standing to challenge attorneys' fees because it was

2

not a surplus case); *Pascazi v. Fiber Consultants, Inc.,* 445 B.R. 124 (Bankr. S.D.N.Y. 2011) (debtor's principal had no standing to object to a claim because the case was not a surplus case). This is because a Chapter 7 debtor, or its corporate principal, is not deemed an "interested party" by the courts. *Id.* The two exceptions to this general rule are (1) where a proceeding might affect a discharge or an exempt asset or (2) where the case is likely to be a surplus case. *See In re St. Michael Motor Express*, 2016 Bankr. LEXIS 959, *11 (Bankr. W.D. Tenn. 2016). If the debtor or its principal claims standing because a matter is a surplus case, it is the debtor's burden to prove, with *concrete evidence*, that the case is likely to result in a surplus. *Id.*; *see also Simon v. Amir,* 436 B.R. 1, 11 (6th Cir. BAP 2010); *United States v. Jones,* 260 B.R. 415, 418 (E.D. Mich. 2000). A party seeking standing "cannot simply claim that there is a theoretical chance of a surplus in the estate, but must show that such a surplus is a reasonable possibility." *Simon v. Amir*, 436 B.R. at 11 (quoting *In re Rake,* 363 B.R. 146, 151 (Bankr. D. Idaho 2007)). The ability of a party to prove that a surplus is a reasonable possibility is an even more difficult burden when the primary asset upon which a surplus *might* be attained is contingent litigation. Valuing such "soft assets" is a difficult exercise for a court, and requires the court to discount those assets for cost of litigation and risks attendant to litigation. *Pascazi v. Fiber Consultants, Inc.*, 445 B.R. 124, 127-28 (S.D.N.Y. 2011).

In this matter, there will be no discharge (because the Debtor is a corporate entity) and there are no exempt assets. In order for Brian Manookian to affirmatively prove that he has standing to be heard in this matter, he has the burden of showing, with "concrete evidence" that there is a "reasonable possibility" of a surplus. However, he is prohibited from making this showing due to the equitable doctrine of estoppel. Mr. Manookian has signed statements under penalty of perjury that list $70,000 of assets against allowed claims that already exceed

3

$370,000, and which allowed claims will grow if the Chase Claim is allowed in any amount. *See* Doc. 9. Indeed, the Trustee currently holds approximately $85,000 with which to satisfy all administrative claims (including her commission and mounting legal fees) and unsecured claims of at least $370,000, plus the amount of the Chase Claim.

The only other significant source of funds available to this estate depends upon the success of Adversary Proceeding No. 3:20-ap-9002 (the "Adversary Proceeding" or "Adv. Proc."), and successful collection of any judgment rendered therein. Not only did Mr. Manookian fail to list any cause of action related to the Adversary Proceeding in the schedules, he and his counsel have repeatedly stated, in open court and in filed pleadings, that the Adversary Proceeding has no merit. For example:

- Brian Manookian denied, in a declaration signed under penalty of perjury on January 13, 2020, that the Trustee is entitled to recover any portion of the Fitzgerald fees, including the $715,000 held by the Clerk of this Court. *See* Adv. Proc. Doc. 7, Exhibit 1.

- Manookian PLLC, which is wholly owned by Brian Manookian and which is represented by the same counsel who now represents Brian Manookian, denied in its Answer substantially all allegations of the Complaint filed in the Adversary Proceeding. *See* Adv. Proc. Doc. 43.

- In the Joint Pretrial Statement filed in the Adversary Proceeding, Manookian PLLC, the entity wholly owned by Brian Manookian, adopted the argument of Afsoon Hagh and Hagh Law PLLC, including this portion:

  "The proof will show that at the point in time of its forced dissolution, CM's only 'property' were the contract rights available to it under CM's engagement letters

4

with its clients. The engagement letters at issue in this litigation plainly provide that if CM withdraws from the engagement, then the client only owes CM for any costs advanced. CM had no right to sell its clients or demand consideration beyond reimbursement of costs advanced. For this reason, all of the Trustee's claims fail." *See* Adv. Proc. Doc. 61, at p. 4.

- In opposing the Trustee's motion to stay discovery in the Adversary Proceeding, Manookian PLLC, through its attorney John Spragens, filed a pleading that repeatedly denied that the Adversary Proceeding has any merit, including this statement: "As part of the adversary proceeding, the Trustee sued two law firms and one lawyer making various not only unfounded claims, but claims that are demonstrably false, not subject to reasonable disagreement, and factually impossible." *See* Adv. Proc. Doc. 71, at p. 1.

Because of his multiple prior statements, under penalty of perjury and otherwise, that the Debtor has no substantial assets and that the Trustee's Adversary Proceeding has no validity, Brian Manookian is now estopped from presenting any argument that this might be a surplus case. *Reynolds v. Commissioner of Internal Revenue*, 861 F.2d 469, 472-73 (6th Cir. 1988) (the doctrine of judicial estoppel prevents a party "from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding."). Not only can Mr. Manookian not testify that this is a surplus case, but he is estopped from putting on any evidence or making any argument that it might be a surplus case. He is estopped from even espousing that this might be a surplus estate.

It is not the Trustee's burden to disprove Brian Manookian's standing or to disprove that this will be a surplus case, so her position on the Adversary Proceeding is irrelevant. Rather, it is

5

Mr. Manookian's burden to prove standing and, in order to prove standing, he must show with concrete evidence that there is a reasonable likelihood that this case will be a surplus case. However, there is one major problem: Mr. Manookian, having repeatedly denied that this estate is solvent and having repeatedly stated that the Trustee's Adversary Proceeding has no factual basis, is now estopped from arguing that the estate might have surplus assets or that the Trustee's Adversary Proceeding is now likely to produce surplus assets for the estate. Simply put, he does not even get through the courthouse door to make the surplus argument or put on any evidence about a surplus estate because he has previously and repeatedly argued the opposite position.

Based upon the facts of this case and the unequivocal law regarding standing of the principal of a corporate chapter 7 debtor, Brian Manookian has no standing to object to the Settlement Motion.

WHEREFORE, the Trustee respectfully requests that the Court strike the Manookian Objection on the grounds that he lacks standing in this case and preclude his participation in the September 29, 2021 hearing on the Settlement Motion, or in any future matters in this case.

Respectfully submitted,

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
6100 Tower Circle, Suite 200
Franklin, Tennessee 37067
Tel: (615) 465-6000
phillip@thompsonburton.com

Special Counsel for Chapter 7 Trustee

6

**Certificate of Service**

The undersigned hereby certifies that a copy of the preceding document was electronically filed and served via the Court's ECF system this 24th day of September, 2021.

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
6100 Tower Circle, Suite 200
Franklin, Tennessee 37067
Tel:    (615) 465-6000
phillip@thompsonburton.com

Special Counsel for Chapter 7 Trustee

7

## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CUMMINGS MANOOKIAN, PLLC, | ) | Case No: 3:19-bk-07235 |
| | ) | Chapter 7 |
| | ) | Judge Walker |
| Debtor. | ) | |
| | ) | **Hearing Date: September 17, 2021** |
| | ) | **at 11:00 a.m.** |

**TRUSTEE JEANNE ANN BURTON'S WITNESS AND EXHIBIT LIST FOR
SEPTEMBER 29, 2021 HEARING ON TRUSTEE'S MOTION TO APPROVE
COMPROMISE AND SETTLEMENT**

Comes now Movant, Jeanne Ann Burton, by and through special counsel, and hereby gives notice of the witnesses she may call, and exhibits she may introduce, at the September 17, 2021 hearing on the Trustee's Motion to Approve Compromise and Settlement (Doc. 108) (the "Settlement Motion"), the objection thereto by Grant, Konvalinka & Harrison, P.C. (Doc. 111) (the "GKH Objection"), the objection thereto of Brian Manookian (Doc. 112) (the "Manookian Objection") and the supplement to the Manookian Objection (Doc. 123) (the "Manookian Supplement"):

## WITNESS LIST

1.     <u>Jeanne Ann Burton, Trustee</u>.   If called to testify, Trustee Burton will testify regarding the considerations and justifications for the settlement proposed in the Settlement Motion.  She will also address issues raised in the GKH Objection, Manookian Objection, and Manookian Supplement.

2.     The Trustee reserves the right to call the witnesses identified by any other party and any other witnesses needed to rebut evidence offered by any other party.

# EXHIBIT LIST

1.      All documents previously filed with the Court in this matter, including statements, schedules, proofs of claim, the Settlement Motion, the GKH Objection, the Manookian Objection, the Manookian Supplement, the Trustee's responses to the GKH Objection and the Manookian Objection, and all exhibits to any document previously filed with the Court in this matter.

2.      All documents filed in the *Chase v. Stewart* state court matter including order, appellate opinions, and motions.

3.      All documents filed in Adversary Proceeding No. 3:20-ap-9002, *Burton v. Hagh Law PLLC et al.*

3.      The Trustee reserves the right to introduce any exhibits identified by any other party and any exhibits needed to rebut evidence offered by any other party.

DATED:  September 24, 2021

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
6100 Tower Circle, Suite 200
Franklin, Tennessee 37067
Tel:     (615) 465-6000
phillip@thompsonburton.com

Special Counsel for Chapter 7 Trustee

906

Form hrgnot

# UNITED STATES BANKRUPTCY COURT

## MIDDLE DISTRICT OF TENNESSEE

701 Broadway Room 170
Nashville, TN 37203

Bankruptcy Proceeding No.  3:19−bk−07235
Chapter 7
Judge  Charles M Walker

In Re:
    CUMMINGS MANOOKIAN, PLLC
    45 MUSIC SQUARE WEST
    NASHVILLE, TN 37203
Social Security No.

Employer's Tax I.D. No.
    47−2636732

PLEASE TAKE NOTICE that a hearing will be held :

; via Zoom video; For details, please see www.tnmb.uscourts on 9/29/21 at 01:00 PM

to consider and act upon the following:

*136* − Trustee's Motion for To Strike Brian Manookian's Objection and to Preclude His Participation in the September 29, 2021 Hearing for Lack of Standing. Filed on the behalf of: Trustee JEANNE ANN BURTON (RE: related document(s)112, 123). (YOUNG, PHILLIP)

Dated: 9/24/21                        /s/ TERESA C. AZAN
                                   Clerk, U.S. Bankruptcy Court

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **Case No. 3:19-bk-07235** |
| CUMMINGS MANOOKIAN, PLLC, | ) | **Chapter 7** |
| | ) | **Judge Walker** |
| Debtor. | ) | |
| | ) | |

## BRIAN MANOOKIAN'S WITNESS AND EXHIBIT LIST FOR SEPTEMBER 29, 2021 HEARING ON TRUSTEE'S MOTION TO APPROVE

Brian Manookian, through counsel, gives notice of the witnesses he may call and exhibits he may introduce at the September 29, 2021 hearing on the Trustee's Motion to Approve Compromise and Settlement.

## WITNESS LIST

1.      <u>Brian Manookian, Member, Cummings Manookian.</u>  If called to testify, Brian Manookian will testify regarding his objection to the proposed settlement with the Chase Parties, the underlying Chase Litigation, and the bases for the objections raised in this objection (Doc. 112) and supplement thereto (Doc. 123).  Mr. Manookian will also testify as to his personal knowledge of the Chase Parties' prior and recent offer to settle all claims with Cummings Manookian for a "walk-away."

2.      <u>Jeanne Burton, Trustee.</u>  Mr. Manookian may call Jeanne Burton to testify regarding her investigation of the Chase Claim, her awareness and verification of the Chase "walk-away" offer, and her rationale for proposing the particular terms contained in the proposed Settlement Agreement.

1

3.     Phillip Young, Special Counsel.  Mr. Manookian may call Phillip Young to testify regarding his role as receiver in the Chase State Court litigation as well as his arrangement, and the timing of his arrangement, to receive payments directly from the Chase Parties in that case.

4.     Daniel Horwitz, Attorney.  Mr. Manookian may call Mr. Horwitz regarding the Chase Parties' prior efforts to secure a walk-away settlement with Cummings Manookian.

5.     Mark Hammervold, Attorney.   Mr. Manookian may call Mr. Hammervold regarding the Chase Parties' prior efforts to secure a walk-away settlement with Cummings Manookian.

6.     Mr. Manookian reserves the right to call the witnesses identified by any other party as well as rebuttal witnesses as necessary, including Charlie Malone, Beau Creason, and any of the Chase Parties.


## EXHIBIT LIST

1.     All documents previously filed with the Court in this matter, and particularly any Exhibits to Mr. Manookian's objection and supplement thereto.

2.     All pleadings filed in the *Chase v. Stewart* state court matter as well as the *Chase v. Cummings Manookian* matter.

3.     Transcripts of statements made by Phillip Young in the *Chase v. Cummings Manookian* matter.

4.     Any exhibit identified by any other party and any exhibits necessary for rebuttal.

Date:   September 24, 2021                    Respectfully submitted,


                                              /s/ John Spragens
                                              John Spragens (TN Bar No. 31445)
                                              Spragens Law PLC
                                              311 22nd Ave. N.
                                              Nashville, TN 37203
                                              T: (615) 983-8900
                                              F: (615) 682-8533
                                              john@spragenslaw.com

                                              *Attorney for Manookian PLLC and Brian
                                              Manookian*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed September 24, 2021 and served electronically upon all parties in interest or their counsel as indicated on the receipt issued by the Court's electronic filing system.


                                              /s/ John Spragens

In re:

CUMMINGS MANOOKIAN, PLLC
    Debtor

Case No. 19-07235-CMW

Chapter 7

# CERTIFICATE OF NOTICE

| District/off: 0650-3 | User: kmw2408 | Page 1 of 2 |
|---|---|---|
| Date Rcvd: Sep 22, 2021 | Form ID: pdf001 | Total Noticed: 1 |

The following symbols are used throughout this certificate:

| Symbol | Definition |
|---|---|
| + | Addresses marked '+' were corrected by inserting the ZIP, adding the last four digits to complete the zip +4, or replacing an incorrect ZIP. USPS regulations require that automation-compatible mail display the correct ZIP. |

**Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on Sep 24, 2021:**

| Recip ID | Recipient Name and Address |
|---|---|
| db | + CUMMINGS MANOOKIAN, PLLC, 45 MUSIC SQUARE WEST, NASHVILLE, TN 37203-3205 |

TOTAL: 1

**Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.**
Electronic transmission includes sending notices via email (Email/text and Email/PDF), and electronic data interchange (EDI).

NONE

# BYPASSED RECIPIENTS

The following addresses were not sent this bankruptcy notice due to an undeliverable address, *duplicate of an address listed above, *P duplicate of a preferred address, or ## out of date forwarding orders with USPS.

NONE

# NOTICE CERTIFICATION

I, Joseph Speetjens, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.

Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed .R. Bank. P.2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.

Date: Sep 24, 2021        Signature:      /s/Joseph Speetjens

# CM/ECF NOTICE OF ELECTRONIC FILING

The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email) system on September 22, 2021 at the address(es) listed below:

| Name | Email Address |
|---|---|
| CRAIG VERNON GABBERT, JR | |
| | on behalf of Defendant Hagh Law PLLC cgabbert@bassberry.com bankr@bassberry.com;delores.walker@bassberry.com |
| DANIEL HAYS PURYEAR | |
| | on behalf of Creditor D.F. Chase Inc. dpuryear@puryearlawgroup.com, paralegalgroup@puryearlawgroup.com |
| GLENN BENTON ROSE | |
| | on behalf of Defendant Hagh Law PLLC grose@bassberry.com bankr@bassberry.com |
| HARRY R CASH | |
| | on behalf of Creditor Grant Konvalinka & Harrison, P.C. hcash@gkhpc.com, hdowney@gkhpc.com |
| JEANNE ANN BURTON | |
| | TN24@ecfcbis.com |
| JOHN PATRICK KONVALINKA | |
| | on behalf of Creditor Grant Konvalinka & Harrison, P.C. jkonvalinka@gkhpc.com, jdoherty@gkhpc.com |

JOHN T. SPRAGENS
on behalf of Defendant Hagh Law PLLC JOHN@SPRAGENSLAW.COM  spragenslaw@ecf.courtdrive.com

Jeanne Ann Burton PLLC
jeanne.burton@comcast.net

LEFKOVITZ AND LEFKOVITZ, PLLC
on behalf of Debtor CUMMINGS MANOOKIAN  PLLC slefkovitz@lefkovitz.com,
sllbkecf@gmail.com;khancock@lefkovitz.com;lefkovitzcvlecf@lefkovitz.com;r52946@notify.bestcase.com;mspezia@lefkovitz.c
om

MEGAN REED SELIBER
on behalf of U.S. Trustee US TRUSTEE megan.seliber@usdoj.gov

MICHAEL G ABELOW
on behalf of Creditor INSBANK mabelow@srvhlaw.com  sdossey@srvhlaw.com

PHILLIP G YOUNG
on behalf of Plaintiff Jeanne Ann Burton phillip@thompsonburton.com

PHILLIP L NORTH
on behalf of Creditor Middle Tennessee Pulmonary pn@npr.legal

US TRUSTEE
ustpregion08.na.ecf@usdoj.gov


TOTAL: 14



# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **IN RE:** | ) |
| | ) |
| **CUMMINGS MANOOKIAN, PLLC,** | ) **Case No. 3:19-bk-07235** |
| **Debtor.** | ) **Chapter 7** |
| | ) **Judge Walker** |

## ORDER REGARDING HEARING ON TRUSTEE'S MOTION TO APPROVE COMPROMISE AND SETTLEMENT

On September 17, 2021, the Court continued the hearing on the Trustee's Motion to

Approve Compromise and Settlement (Doc. 108), and the objections thereto filed by Grant,

Konvalinka & Harrison, P.C. (Doc. 111) and by Brian Manookian (Doc. 112 and 124) to
                                                                        at 1:00 p.m.
September 29, 2021. In conjunction with that continued hearing, the Court hereby issues the

following deadlines:

IT IS HEREBY ORDERED that the parties shall file any motions in limine by September

24, 2021.

IT IS FURTHER ORDERED that the parties shall file witness and exhibit list, upload all

exhibits, and file any factual stipulations by Noon on September 27, 2021.

---

**THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY AS INDICATED AT THE TOP OF THE FIRST PAGE**

---

1

Submitted for entry:


/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
6100 Tower Circle, Suite 200
Franklin, TN 37067
Tel: (615) 465-6000
phillip@thompsonburton.com

Counsel for Trustee


/s/ John P. Konvalinka
John P. Konvalinka
Harry R. Cash
Grant Konvalinka & Harrison, P.C.
633 Chestnut Street, Suite 900
Chattanooga, TN 37450-0900
Tel: (423) 756-8400
jkonvalinka@gkhpc.com
hcash@gkhpc.com

Counsel for Grant, Konvalinka & Harrison, P.C.


/s/ John Spragens
John Spragens
Spragens Law PLC
311 22nd Ave. N.
Nashville, TN 37203
Tel: (615) 983-8900
John@spragenslaw.com

Counsel for Brian Manookian

This Order has been electronically
signed.  The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.

In re:

CUMMINGS MANOOKIAN, PLLC
    Debtor

Case No. 19-07235-CMW

Chapter 7

# CERTIFICATE OF NOTICE

| District/off: 0650-3 | User: leq0323 | Page 1 of 2 |
|---|---|---|
| Date Rcvd: Sep 24, 2021 | Form ID: hrgnot | Total Noticed: 22 |

The following symbols are used throughout this certificate:

| Symbol | Definition |
|---|---|
| + | Addresses marked '+' were corrected by inserting the ZIP, adding the last four digits to complete the zip +4, or replacing an incorrect ZIP. USPS regulations require that automation-compatible mail display the correct ZIP. |

**Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on Sep 26, 2021:**

| Recip ID | | Recipient Name and Address |
|---|---|---|
| db | + | CUMMINGS MANOOKIAN, PLLC, 45 MUSIC SQUARE WEST, NASHVILLE, TN 37203-3205 |
| aty | + | CRAIG VERNON GABBERT, JR, BASS, BERRY & SIMS PLC, 150 THIRD AVENUE SOUTH, SUITE 2800, NASHVILLE, TN 37201-2017 |
| aty | + | DANIEL HAYS PURYEAR, PURYEAR LAW GROUP, 104 Woodmont Boulevard, The Woodmont Centre, Suite 201, NASHVILLE, TN 37205-2245 |
| aty | + | GLENN BENTON ROSE, BASS, BERRY & SIMS PLC, 150 THIRD AVENUE SOUTH, SUITE 2800, NASHVILLE, TN 37201-2017 |
| aty | | JOHN PATRICK KONVALINKA, GRANT KONVALINKA & HARRISON PC, 633 CHESTNUT ST STE 900, CHATTANOOGA, TN 37450-0900 |
| aty | + | JOHN T. SPRAGENS, SPRAGENS LAW PLC, 311 22ND AVE N, NASHVILLE, TN 37203-1843 |
| aty | | Jeanne Ann Burton PLLC, 4117 Hillsboro Pk, Ste. 103-116, Nashville, TN 37215 |
| aty | + | LEFKOVITZ AND LEFKOVITZ, PLLC, 618 CHURCH ST STE 410, NASHVILLE, TN 37219-2452 |
| aty | + | MEGAN REED SELIBER, US Trustee's Office, 701 Broadway, Suite 318, Nashville, TN 37203-3966 |
| aty | + | MICHAEL G ABELOW, Sherrard Roe Voigt & Harbison, PLC, 150 3rd Avenue South, Suite 1100, NASHVILLE, TN 37201-2037 |
| aty | + | PHILLIP G YOUNG, Thompson Burton PLLC, One Franklin Park, 6100 Tower Circle, Suite 200, FRANKLIN, TN 37067-1465 |
| aty | + | PHILLIP L NORTH, NORTH PURSELL & RAMOS, 414 UNION STREET, STE 1850, NASHVILLE, TN 37219-1783 |
| intp | | Afsoon Hagh, 45 Music Square W, Nashville, TN 37203-3205 |
| intp | + | BRIAN MANOOKIAN, 45 MUSIC SQUARE WEST, NASHVILLE, TN 37203-3205 |
| cr | + | George Robertson, M.D., 414 Union Street, 1850, Nashville, TN 37219-1783 |
| cr | | Grant, Konvalinka & Harrison, P.C., 633 Chestnut Street, Suite 900, Chattanooga, TN 37450-0900 |
| cr | + | Middle Tennessee Pulmonary, 414 Union Street, Ste. 1850, 1850, Nashville, TN 37219-1783 |
| cr | + | Phillip Family Medical Associates, 414 Union Street, 1850, Nashville, TN 37219-1783 |
| cr | + | Toby Smith, M.D., 414 Union Street, Ste. 1850, 1850, Nashville, TN 37219-1783 |

TOTAL: 19

**Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.**
Electronic transmission includes sending notices via email (Email/text and Email/PDF), and electronic data interchange (EDI). Electronic transmission is in Eastern Standard Time.

| Recip ID | | Notice Type: Email Address | Date/Time | Recipient Name and Address |
|---|---|---|---|---|
| aty | + | Email/Text: hcash@gkhpc.com | Sep 24 2021 22:24:00 | HARRY R CASH, GRANT KONVALINKA & HARRISON PC, 633 CHESTNUT STREET 9TH FLOOR, CHATTANOOGA, TN 37450-4000 |
| tr | | Email/Text: jeanne.burton@comcast.net | Sep 24 2021 22:24:00 | JEANNE ANN BURTON, Jeanne Ann Burton PLLC, 4117 Hillsboro Pk, Suite 103-116, NASHVILLE, TN 37215 |
| ust | | Email/Text: ustpregion08.na.ecf@usdoj.gov | Sep 24 2021 22:24:00 | US TRUSTEE, OFFICE OF THE UNITED STATES TRUSTEE, 701 BROADWAY STE 318, NASHVILLE, TN 37203-3966 |

TOTAL: 3

# BYPASSED RECIPIENTS

**The following addresses were not sent this bankruptcy notice due to an undeliverable address, \*duplicate of an address listed above, \*P duplicate of a preferred address, or ## out of date forwarding orders with USPS.**

NONE

# NOTICE CERTIFICATION

I, Joseph Speetjens, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.

**Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed .R. Bank. P.2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

Date: Sep 26, 2021　　　　　　　Signature:　　　/s/Joseph Speetjens

---

# CM/ECF NOTICE OF ELECTRONIC FILING

The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email) system on September 24, 2021 at the address(es) listed below:

| Name | Email Address |
| --- | --- |
| CRAIG VERNON GABBERT, JR | on behalf of Defendant Hagh Law PLLC cgabbert@bassberry.com  bankr@bassberry.com;delores.walker@bassberry.com |
| DANIEL HAYS PURYEAR | on behalf of Creditor D.F. Chase  Inc. dpuryear@puryearlawgroup.com, paralegalgroup@puryearlawgroup.com |
| GLENN BENTON ROSE | on behalf of Defendant Hagh Law PLLC grose@bassberry.com  bankr@bassberry.com |
| HARRY R CASH | on behalf of Creditor Grant  Konvalinka & Harrison, P.C. hcash@gkhpc.com, hdowney@gkhpc.com |
| JEANNE ANN BURTON | TN24@ecfcbis.com |
| JOHN PATRICK KONVALINKA | on behalf of Creditor Grant  Konvalinka & Harrison, P.C. jkonvalinka@gkhpc.com, jdoherty@gkhpc.com |
| JOHN T. SPRAGENS | on behalf of Defendant Hagh Law PLLC JOHN@SPRAGENSLAW.COM  spragenslaw@ecf.courtdrive.com |
| Jeanne Ann Burton PLLC | jeanne.burton@comcast.net |
| LEFKOVITZ AND LEFKOVITZ, PLLC | on behalf of Debtor CUMMINGS MANOOKIAN  PLLC slefkovitz@lefkovitz.com, sllbkecf@gmail.com;khancock@lefkovitz.com;lefkovitzcvlecf@lefkovitz.com;r52946@notify.bestcase.com;mspezia@lefkovitz.com |
| MEGAN REED SELIBER | on behalf of U.S. Trustee US TRUSTEE megan.seliber@usdoj.gov |
| MICHAEL G ABELOW | on behalf of Creditor INSBANK mabelow@srvhlaw.com  sdossey@srvhlaw.com |
| PHILLIP G YOUNG | on behalf of Plaintiff Jeanne Ann Burton phillip@thompsonburton.com |
| PHILLIP L NORTH | on behalf of Creditor Middle Tennessee Pulmonary pn@npr.legal |
| US TRUSTEE | ustpregion08.na.ecf@usdoj.gov |

TOTAL: 14

Form hrgnot

# UNITED STATES BANKRUPTCY COURT

## MIDDLE DISTRICT OF TENNESSEE

701 Broadway Room 170
Nashville, TN 37203

Bankruptcy Proceeding No.  3:19−bk−07235
Chapter 7
Judge  Charles M Walker

In Re:
  CUMMINGS MANOOKIAN, PLLC
  45 MUSIC SQUARE WEST
  NASHVILLE, TN 37203
Social Security No.

Employer's Tax I.D. No.
  47−2636732

PLEASE TAKE NOTICE that a hearing will be held :

; via Zoom video; For details, please see www.tnmb.uscourts on 9/29/21 at 01:00 PM

to consider and act upon the following:

*136* − Trustee's Motion for To Strike Brian Manookian's Objection and to Preclude His Participation in the September 29, 2021 Hearing for Lack of Standing. Filed on the behalf of: Trustee JEANNE ANN BURTON (RE: related document(s)112, 123). (YOUNG, PHILLIP)

Dated: 9/24/21                                    /s/ TERESA C. AZAN
                                                   Clerk, U.S. Bankruptcy Court

In re:
                                           Case No. 19-07235-CMW

CUMMINGS MANOOKIAN, PLLC
                                           Chapter 7
      Debtor

# CERTIFICATE OF NOTICE

| | | |
|---|---|---|
| District/off: 0650-3 | User: anm0611 | Page 1 of 2 |
| Date Rcvd: Sep 24, 2021 | Form ID: pdf001 | Total Noticed: 2 |

The following symbols are used throughout this certificate:

| Symbol | Definition |
|---|---|
| + | Addresses marked '+' were corrected by inserting the ZIP, adding the last four digits to complete the zip +4, or replacing an incorrect ZIP. USPS regulations require that automation-compatible mail display the correct ZIP. |

**Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on Sep 26, 2021:**

| Recip ID | | Recipient Name and Address |
|---|---|---|
| db | + | CUMMINGS MANOOKIAN, PLLC, 45 MUSIC SQUARE WEST, NASHVILLE, TN 37203-3205 |
| intp | + | BRIAN MANOOKIAN, 45 MUSIC SQUARE WEST, NASHVILLE, TN 37203-3205 |

TOTAL: 2

**Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.**
Electronic transmission includes sending notices via email (Email/text and Email/PDF), and electronic data interchange (EDI).

NONE

# BYPASSED RECIPIENTS

**The following addresses were not sent this bankruptcy notice due to an undeliverable address, \*duplicate of an address listed above, \*P duplicate of a preferred address, or ## out of date forwarding orders with USPS.**

NONE

# NOTICE CERTIFICATION

**I, Joseph Speetjens, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed .R. Bank. P.2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

Date: Sep 26, 2021
                                 Signature:      /s/Joseph Speetjens

---

# CM/ECF NOTICE OF ELECTRONIC FILING

**The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email) system on September 24, 2021 at the address(es) listed below:**

| Name | Email Address |
|---|---|
| CRAIG VERNON GABBERT, JR | |
| | on behalf of Defendant Hagh Law PLLC cgabbert@bassberry.com bankr@bassberry.com;delores.walker@bassberry.com |
| DANIEL HAYS PURYEAR | |
| | on behalf of Creditor D.F. Chase Inc. dpuryear@puryearlawgroup.com, paralegalgroup@puryearlawgroup.com |
| GLENN BENTON ROSE | |
| | on behalf of Defendant Hagh Law PLLC grose@bassberry.com bankr@bassberry.com |
| HARRY R CASH | |
| | on behalf of Creditor Grant Konvalinka & Harrison, P.C. hcash@gkhpc.com, hdowney@gkhpc.com |
| JEANNE ANN BURTON | |
| | TN24@ecfcbis.com |
| JOHN PATRICK KONVALINKA | |

on behalf of Creditor Grant  Konvalinka & Harrison, P.C. jkonvalinka@gkhpc.com, jdoherty@gkhpc.com

JOHN T. SPRAGENS

on behalf of Defendant Hagh Law PLLC JOHN@SPRAGENSLAW.COM  spragenslaw@ecf.courtdrive.com

Jeanne Ann Burton PLLC

jeanne.burton@comcast.net

LEFKOVITZ AND LEFKOVITZ, PLLC

on behalf of Debtor CUMMINGS MANOOKIAN  PLLC slefkovitz@lefkovitz.com,
sllbkecf@gmail.com;khancock@lefkovitz.com;lefkovitzcvlecf@lefkovitz.com;r52946@notify.bestcase.com;mspezia@lefkovitz.com

MEGAN REED SELIBER

on behalf of U.S. Trustee US TRUSTEE megan.seliber@usdoj.gov

MICHAEL G ABELOW

on behalf of Creditor INSBANK mabelow@srvhlaw.com  sdossey@srvhlaw.com

PHILLIP G YOUNG

on behalf of Plaintiff Jeanne Ann Burton phillip@thompsonburton.com

PHILLIP L NORTH

on behalf of Creditor Middle Tennessee Pulmonary pn@npr.legal

US TRUSTEE

ustpregion08.na.ecf@usdoj.gov

TOTAL: 14



Charles M. Walker
U.S. Bankruptcy Judge
Dated: 9/24/2021

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| IN RE: | ) |
| | )    Case No; 3: 19-bk-07235 |
| CUMMINGS MANOOKIAN, PLLC, | )    Chapter 7 |
| | )    Honorable Charles M. Walker |
| Debtor. | ) |
| _____ | ) |

### ORDER SETTING FORTH PROCEDURES
### FOR HEARING ON
### THE TRUSTEE'S MOTION FOR COMPROMISE AND SETTLEMENT

THIS ORDER establishes the format for the hearing set before this Court on

September 29, 2021 on the Trustee's Motion for Compromise and Settlement (ECF #108), and

related matters (ECF 111, 112, 123, 124, and 125).

In order for a party to seek relief in a federal court, the U.S. Constitution requires the

party to establish that it possesses standing to seek such relief. Standing is a mandatory

jurisdictional requirement, and as such, this Court possesses the power to exercise its discretion

to bifurcate jurisdictional issues from the merits of a controversy. Therefore,

IT IS HEREBY ORDERED that the issue of Brian Manookian's standing, as raised in the

Trustee's response to Brian Manookian's Objection to the Trustee's proposed settlement of the

Chase Parties[1], will be bifurcated from the merits of his objection and heard as a preliminary

matter at the September 29, 2021 hearing. The Court will hear all evidence and argument and

rule on the issue before taking up the merits of the settlement and the objections.

### THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY AS
### INDICATED AT THE TOP OF THE FIRST PAGE

_____

[1] Dean Chase, Sandra Chase, and D.F. Chase, Inc. (collectively, the "Chase Parties")

This Order has been electronically
signed. The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF TENNESSEE

IN RE:                                    *
                                          *        CASE NO.:  3:19-bk-07235
CUMMINGS MANOOKIAN, PLLC,                 *
                                          *        CHAPTER 7
            Debtor.                       *

## WITNESS AND EXHIBIT LIST OF GRANT, KONVALINKA & HARRISON, P.C.

Comes Grant, Konvalinka & Harrison, P.C. and submits its notice of witnesses and exhibits which it may call at the September 29, 2021 hearing on the Trustee's Motion to Approve Compromise and Settlement:

## WITNESS LIST

1.      Brian Manookian.  Mr. Manookian may testify regarding his personal knowledge of the Chase litigation, Chase offers to settle all claims with Cummings Manookian and the bases for his objection to the Trustee's proposed settlement.

2.      Any witnesses identified by any other party and/or identified in any other witness lists filed relative to the September 29, 2021 hearing and any other witnesses needed to rebut evidence offered by any other party and/or witnesses testifying at such hearing.

## EXHIBIT LIST

1.      Any exhibits identified by any other party and/or identified in any other exhibit lists filed relative to the September 29, 2021 hearing and any other exhibits needed to rebut evidence offered by any other party and/or witnesses testifying at such hearing.

1

Respectfully submitted,

GRANT KONVALINKA & HARRISON, P.C.

By:     s/John P. Konvalinka
        John P. Konvalinka (BPR #001780)
        Harry R. Cash (BPR #009385)
        633 Chestnut Street, Suite 900
        Chattanooga, TN 37450-0900
        jkonvalinka@gkhpc.com
        hcash@gkhpc.com
        (423) 756-8400
        (423) 756-6518 (*facsimile*)

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2021, a true and exact copy of the foregoing Witness and Exhibit List of Grant, Konvalinka & Harrison, P.C. was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the Notice of Electronic Filing. In addition, a copy was sent by regular U.S. mail with sufficient postage thereon to deliver same to the following:

Jeanne Ann Burton, Trustee
Jeanne Ann Burton, PLLC
4117 Hillsboro Pike, Suite 103-106
Nashville, TN  37215

United States Trustee
701 Broadway
Customs House, Suite 318
Nashville, TN  37203

Phillip G. Young, Jr.
Thompson Burton PLLC
One Franklin Park
6100 Tower Circle, Suite 200
Franklin, TN  37067

                    /s/ John P. Konvalinka

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **IN RE:**         ) | |
| ) | **Case No. 3:19-bk-07235** |
| **CUMMINGS MANOOKIAN, PLLC,**    ) | **Chapter 7** |
| ) | **Judge Walker** |
| **Debtor.**    ) | |
| ) | |

---

## BRIAN MANOOKIAN'S RESPONSE TO TRUSTEE'S LATE-FILED OBJECTION TO MR. MANOOKIAN'S STANDING

---

Brian Manookian, through counsel, files the following response to the Trustee's late-filed supplemental objection to Mr. Manookian's standing in this matter.

As a preliminary matter, it should be clear to this Court that the Trustee and her Special Counsel seek to avoid any substantive evaluation or scrutiny of their proposed payment of $250,000 from the Bankruptcy Estate to the Chase Parties. They do not want the Court to consider that:

- The Chase Parties have already offered a mutual walkway to settle the very same claims for $0 and a concomitant promise from the Debtor not to sue to the Chases;

- Any actual right to monies from the Debtor by the Chase Parties has recently and repeatedly been vacated and rejected the Tennessee Court of Appeals and Tennessee Supreme Court;

- There is a currently pending dispositive motion that will extinguish all claims of the Chase Parties without any need for action on the part of the Trustee other than to wait for its adjudication; and, most troubling,

- Special Counsel is impossibly conflicted (and appears to have potentially already engaged in an impermissible *quid pro quo* arrangement with Chase Parties) in his simultaneous roles as Special Counsel in the Bankruptcy proceeding and Receiver in a State Action.

These are not just material facts as to the propriety of the proposed Chase Settlement; these are determinative facts. But rather than confront these points or attempt to explain the inexplicable, the Trustee asks the Court to simply close its eyes and abdicate its role in considering the proposed settlement on its merits.

Specifically, after repeatedly and affirmatively representing to the Court that *this is a surplus case*, the Trustee now argues that the sole member and owner of the Debtor, Brian Manookian, lacks standing to challenge the proposed Chase Settlement because *this is not a surplus case*. But the Trustee is presently pursuing an Adversary Proceeding in this matter in which she has represented that the Debtor has assets of no less than $1.6 million, a number that far exceeds any claims of liability.

The Trustee's willingness to simultaneously advance these two irreconcilable positions – solely in an effort to avoid the Court being presented with unassailably true information so it can make the most informed decision possible – is telling. Conversely, Mr. Manookian only seeks to present all of the relevant facts to the Court, for the Court to determine which evidence to credit, which evidence to disregard, and to evaluate the proposed Chase Settlement on the merits, after hearing all of the existing information.

The Trustee's attempts to draw a curtain around the objectively irrational terms of her proposed settlement by preventing the sole member of the Debtor, Brian Manookian, from even presenting facts regarding the proposed Settlement should be denied. Specifically, after repeatedly representing to this Court that this is a surplus case, the Trustee's argument that Mr. Manookian

2

lacks standing should be rejected, and the Court should hear from Mr. Manookian. The Court is then free to exercise its judgment and wisdom in weighing all of the facts and evidence in determining the propriety of the proposed Chase Settlement.

Date: September 27, 2021

Respectfully submitted,

*/s/ John Spragens*
John Spragens (TN Bar No. 31445)
Spragens Law PLC
311 22nd Ave. N.
Nashville, TN 37203
T: (615) 983-8900
F: (615) 682-8533
john@spragenslaw.com

*Attorney for Manookian PLLC and Brian Manookian*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed September 27, 2021 and served electronically upon all parties in interest or their counsel as indicated on the receipt issued by the Court's electronic filing system.

*/s/ John Spragens*

# UNITED STATES BANKRUPTCY COURT

## MIDDLE DISTRICT OF TENNESSEE

### Exhibit/Witness List

JEANNE ANN BURTON                                         CASE NO: 3:19-bk-07235

vs.                  Movant

BRIAN MANOOKIAN                                           ADV NO:

                     Respondent

| Presiding Judge | Plaintiff's/Movant's Attorney | Defendant's/Respondent's Attorney |
|---|---|---|
| Charles M Walker | PHILLIP YOUNG | JOHN SPRAGENS |
| **Trial/Hearing Date(s)** | **Court Reporter** | **Courtroom Deputy** |
| 9/29/2021 - 9/29/2021 | Tanja Brewer | Lauren Langston |

| Pltf./Mov. | Def./Resp. | Date Offered | Marked | Stipulated | Admitted | DESCRIPTION OF EXHIBITS * and WITNESSES |
|---|---|---|---|---|---|---|
| x | | 9/30/2021 | | | | Jeanne Ann Burton; Sworn Witness |

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CUMMINGS MANOOKIAN, PLLC, | ) | Case No. 3:19-bk-07235 |
| Debtor. | ) | Chapter 7 |
| | ) | Judge Walker |

## <u>ORDER GRANTING MOTION TO APPROVE COMPROMISE AND SETTLEMENT AND FINDING THAT BRIAN MANOOKIAN LACKS STANDING</u>

Jeanne Ann Burton ("Trustee"), Chapter 7 Trustee in this matter, filed a Motion to Approve Compromise and Settlement (Doc. 108) (the "Settlement Motion") in which she sought to allow Claim No. 5 (the "Claim"), filed by Dean Chase, Sandra Chase, and D.F. Chase, Inc. (collectively, the "Chase Parties") as an unsecured claim in the reduced amount of $250,000.00. Objections were filed by creditor Grant, Konvalinka & Harrison, P.C. (Doc. 111) (the "Konvalinka Objection") and by the former principal of the Debtor, Brian Manookian (Doc. 112) (the "Manookian Objection"). Brian Manookian also filed a supplement to his original objection (Doc. 123). The Trustee filed a Response to the Konvalinka Objection (Doc. 124) and a Response to the Manookian Objection and supplement thereto (Doc. 125).

In her Response to the Manookian Objection, the Trustee alleged that Brian Manookian lacked standing to object to the Settlement Motion. On September 24, 2021, the Court entered an Order Setting Forth Procedures for Hearing on the Trustee's Motion for Compromise and

Settlement (Doc. 135) (the "Procedures Order") in which the Court notified THE parties that it was bifurcating the September 29, 2021 hearing and would be considering standing as a preliminary matter before proceeding to the merits of the Settlement Motion. Also on September 24, 2021, the Trustee filed the Trustee's Motion to Strike Brian Manookian's Objection and to Preclude His Participation in the September 29, 2021 Hearing for Lack of Standing (Doc. 136) (the "Standing Motion"). Brian Manookian filed a response to the Standing Motion on September 27, 2021 (Doc. 144).

The Court conducted a hearing in this matter on September 29, 2021. Pursuant to the Procedures Order, the Court first considered the issue of Brian Manookian's standing. Phillip G. Young, Jr. appeared on behalf of the Trustee and John Spragens appeared on behalf of Brian Manookian. Mr. Manookian was given an opportunity to offer evidence in support of his argument that he had standing in this matter, and he called the Trustee as a witness. No other witnesses or evidence were offered by Mr. Manookian in support of his argument that he had standing.

Following the Court's ruling of the standing issue, the Court considered the Settlement Motion, the Konvalinka Objection, and the Trustee's Response thereto. Phillip G. Young, Jr. appeared on behalf of the Trustee and John Konvalinka appeared on behalf of Grant, Konvalinka & Harrison, P.C. The Trustee testified in support of the Konvalinka Objection and Mr. Konvalinka cross-examined the Trustee. Grant, Konvalinka & Harrison, P.C. asked to call Brian Manookian as a witness but, for the reasons stated orally at the hearing on September 29, 2021, the Court denied the request to examine Mr. Manookian. No other witnesses were offered regarding the Settlement Motion or the Konvalinka Objection.

Based on the Motion, the Konvalinka Objection, the Trustee's Response thereto, the standing arguments raised in the Trustee's response to the Manookian Objection and in the

2

Standing Motion, and the response thereto filed by Brian Manookian; and based on all evidence offered at the September 29, 2021 hearing and the arguments of all counsel at the September 29, 2021; and based on the entire record herein;

**IT IS HEREBY FOUND:**

    A.    Brian Manookian lacks standing to challenge the Settlement Motion filed by the Trustee.

    B.    The Trustee properly exercised her business judgment in reaching the proposed settlement of the Claim filed by the Chase Parties as proposed in the Settlement Motion.

    C.    Pursuant to Federal Bankruptcy Rule 7052, the Court hereby incorporates and adopts all other findings and conclusions stated orally at the hearing on September 29, 2021.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:**

    1.    The Manookian Objection is moot and Brian Manookian lacks standing to challenge the Trustee's Settlement Motion.

    2.    The Konvalinka Objection is overruled.

    3.    The Settlement Motion is approved.

    4.    The terms of the Settlement Agreement attached as an exhibit to the Settlement Motion are hereby approved, and the Trustee is hereby authorized to enter into the Settlement Agreement on behalf of this estate.

    5.    Claim No. 5 filed by the Chase Parties is hereby allowed as a general unsecured claim in the amount of $250,000.00 (the "Allowed Amount").

6.     Claim No. 5 filed by the Chase Parties is hereby disallowed to the extent that it exceeds the Allowed Amount, and the Chase Parties shall have no other or further claims against this estate.

7.     The Court reserves jurisdiction to interpret and enforce the terms of this Order.

<div style="border:1px solid black; text-align:center;">

**THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY AS INDICATED AT THE TOP OF THE FIRST PAGE**

</div>

Submitted for entry:

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
6100 Tower Circle, Suite 200
Franklin, TN 37067
Tel: (615) 465-6000
phillip@thompsonburton.com

Special Counsel to Jeanne Ann Burton, Trustee

4



Charles M. Walker
U.S. Bankruptcy Judge
Dated: 10/1/2021

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **CUMMINGS MANOOKIAN, PLLC,** | ) | **Case No. 3:19-bk-07235** |
| Debtor. | ) | **Chapter 7** |
| | ) | **Judge Walker** |

## ORDER GRANTING MOTION TO APPROVE COMPROMISE AND SETTLEMENT AND FINDING THAT BRIAN MANOOKIAN LACKS STANDING

Jeanne Ann Burton ("Trustee"), Chapter 7 Trustee in this matter, filed a Motion to Approve Compromise and Settlement (Doc. 108) (the "Settlement Motion") in which she sought to allow Claim No. 5 (the "Claim"), filed by Dean Chase, Sandra Chase, and D.F. Chase, Inc. (collectively, the "Chase Parties") as an unsecured claim in the reduced amount of $250,000.00. Objections were filed by creditor Grant, Konvalinka & Harrison, P.C. (Doc. 111) (the "Konvalinka Objection") and by the former principal of the Debtor, Brian Manookian (Doc. 112) (the "Manookian Objection"). Brian Manookian also filed a supplement to his original objection (Doc. 123). The Trustee filed a Response to the Konvalinka Objection (Doc. 124) and a Response to the Manookian Objection and supplement thereto (Doc. 125).

In her Response to the Manookian Objection, the Trustee alleged that Brian Manookian lacked standing to object to the Settlement Motion. On September 24, 2021, the Court entered an Order Setting Forth Procedures for Hearing on the Trustee's Motion for Compromise and

Settlement (Doc. 135) (the "Procedures Order") in which the Court notified THE parties that it was bifurcating the September 29, 2021 hearing and would be considering standing as a preliminary matter before proceeding to the merits of the Settlement Motion. Also on September 24, 2021, the Trustee filed the Trustee's Motion to Strike Brian Manookian's Objection and to Preclude His Participation in the September 29, 2021 Hearing for Lack of Standing (Doc. 136) (the "Standing Motion"). Brian Manookian filed a response to the Standing Motion on September 27, 2021 (Doc. 144).

The Court conducted a hearing in this matter on September 29, 2021. Pursuant to the Procedures Order, the Court first considered the issue of Brian Manookian's standing. Phillip G. Young, Jr. appeared on behalf of the Trustee and John Spragens appeared on behalf of Brian Manookian. Mr. Manookian was given an opportunity to offer evidence in support of his argument that he had standing in this matter, and he called the Trustee as a witness. No other witnesses or evidence were offered by Mr. Manookian in support of his argument that he had standing.

Following the Court's ruling of the standing issue, the Court considered the Settlement Motion, the Konvalinka Objection, and the Trustee's Response thereto. Phillip G. Young, Jr. appeared on behalf of the Trustee and John Konvalinka appeared on behalf of Grant, Konvalinka & Harrison, P.C. The Trustee testified in support of the Konvalinka Objection and Mr. Konvalinka cross-examined the Trustee. Grant, Konvalinka & Harrison, P.C. asked to call Brian Manookian as a witness but, for the reasons stated orally at the hearing on September 29, 2021, the Court denied the request to examine Mr. Manookian. No other witnesses were offered regarding the Settlement Motion or the Konvalinka Objection.

Based on the Motion, the Konvalinka Objection, the Trustee's Response thereto, the standing arguments raised in the Trustee's response to the Manookian Objection and in the

2

Standing Motion, and the response thereto filed by Brian Manookian; and based on all evidence offered at the September 29, 2021 hearing and the arguments of all counsel at the September 29, 2021; and based on the entire record herein;

**IT IS HEREBY FOUND:**

      A.    Brian Manookian lacks standing to challenge the Settlement Motion filed by the Trustee.

      B.    The Trustee properly exercised her business judgment in reaching the proposed settlement of the Claim filed by the Chase Parties as proposed in the Settlement Motion.

      C.    Pursuant to Federal Bankruptcy Rule 7052, the Court hereby incorporates and adopts all other findings and conclusions stated orally at the hearing on September 29, 2021.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:**

      1.    The Manookian Objection is moot and Brian Manookian lacks standing to challenge the Trustee's Settlement Motion.

      2.    The Konvalinka Objection is overruled.

      3.    The Settlement Motion is approved.

      4.    The terms of the Settlement Agreement attached as an exhibit to the Settlement Motion are hereby approved, and the Trustee is hereby authorized to enter into the Settlement Agreement on behalf of this estate.

      5.    Claim No. 5 filed by the Chase Parties is hereby allowed as a general unsecured claim in the amount of $250,000.00 (the "Allowed Amount").

3

6.     Claim No. 5 filed by the Chase Parties is hereby disallowed to the extent that it exceeds the Allowed Amount, and the Chase Parties shall have no other or further claims against this estate.

7.     The Court reserves jurisdiction to interpret and enforce the terms of this Order.

---

**THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY AS INDICATED AT THE TOP OF THE FIRST PAGE**

---

Submitted for entry:

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
6100 Tower Circle, Suite 200
Franklin, TN 37067
Tel: (615) 465-6000
phillip@thompsonburton.com

Special Counsel to Jeanne Ann Burton, Trustee

4

In re:

CUMMINGS MANOOKIAN, PLLC
    Debtor

Case No. 19-07235-CMW

Chapter 7

# CERTIFICATE OF NOTICE

| District/off: 0650-3 | User: anm0611 | Page 1 of 2 |
|---|---|---|
| Date Rcvd: Oct 01, 2021 | Form ID: pdf001 | Total Noticed: 2 |

The following symbols are used throughout this certificate:

| Symbol | Definition |
|---|---|
| + | Addresses marked '+' were corrected by inserting the ZIP, adding the last four digits to complete the zip +4, or replacing an incorrect ZIP. USPS regulations require that automation-compatible mail display the correct ZIP. |

**Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on Oct 03, 2021:**

| Recip ID | | Recipient Name and Address |
|---|---|---|
| db | + | CUMMINGS MANOOKIAN, PLLC, 45 MUSIC SQUARE WEST, NASHVILLE, TN 37203-3205 |
| intp | + | BRIAN MANOOKIAN, 45 MUSIC SQUARE WEST, NASHVILLE, TN 37203-3205 |

TOTAL: 2

**Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.**
Electronic transmission includes sending notices via email (Email/text and Email/PDF), and electronic data interchange (EDI).

NONE

# BYPASSED RECIPIENTS

**The following addresses were not sent this bankruptcy notice due to an undeliverable address, *duplicate of an address listed above, *P duplicate of a preferred address, or ## out of date forwarding orders with USPS.**

NONE

# NOTICE CERTIFICATION

**I, Joseph Speetjens, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed .R. Bank. P.2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

Date: Oct 03, 2021

Signature: _____/s/Joseph Speetjens_____

# CM/ECF NOTICE OF ELECTRONIC FILING

**The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email) system on October 1, 2021 at the address(es) listed below:**

| Name | Email Address |
|---|---|
| CRAIG VERNON GABBERT, JR | |
| | on behalf of Defendant Hagh Law PLLC cgabbert@bassberry.com  bankr@bassberry.com;delores.walker@bassberry.com |
| DANIEL HAYS PURYEAR | |
| | on behalf of Creditor D.F. Chase  Inc. dpuryear@puryearlawgroup.com, paralegalgroup@puryearlawgroup.com |
| GLENN BENTON ROSE | |
| | on behalf of Defendant Hagh Law PLLC grose@bassberry.com  bankr@bassberry.com |
| HARRY R CASH | |
| | on behalf of Creditor Grant  Konvalinka & Harrison, P.C. hcash@gkhpc.com, hdowney@gkhpc.com |
| JEANNE ANN BURTON | |
| | TN24@ecfcbis.com |
| JOHN PATRICK KONVALINKA | |

on behalf of Creditor Grant  Konvalinka & Harrison, P.C. jkonvalinka@gkhpc.com, pcowan@gkhpc.com

JOHN T. SPRAGENS

on behalf of Defendant Hagh Law PLLC JOHN@SPRAGENSLAW.COM  spragenslaw@ecf.courtdrive.com

Jeanne Ann Burton PLLC

jeanne.burton@comcast.net

LEFKOVITZ AND LEFKOVITZ, PLLC

on behalf of Debtor CUMMINGS MANOOKIAN  PLLC slefkovitz@lefkovitz.com,
sllbkecf@gmail.com;khancock@lefkovitz.com;lefkovitzcvlecf@lefkovitz.com;r52946@notify.bestcase.com;mspezia@lefkovitz.com

MEGAN REED SELIBER

on behalf of U.S. Trustee US TRUSTEE megan.seliber@usdoj.gov

MICHAEL G ABELOW

on behalf of Creditor INSBANK mabelow@srvhlaw.com  sdossey@srvhlaw.com

PHILLIP G YOUNG

on behalf of Plaintiff Jeanne Ann Burton phillip@thompsonburton.com

PHILLIP L NORTH

on behalf of Creditor Middle Tennessee Pulmonary pn@npr.legal

US TRUSTEE

ustpregion08.na.ecf@usdoj.gov


TOTAL: 14



Charles M. Walker
U.S. Bankruptcy Judge
Dated: 10/1/2021

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| IN RE: | ) |
| | ) |
| **CUMMINGS MANOOKIAN, PLLC,** | ) **Case No. 3:19-bk-07235** |
| **Debtor.** | ) **Chapter 7** |
| | ) **Judge Walker** |

### <u>ORDER GRANTING MOTION TO APPROVE COMPROMISE AND SETTLEMENT AND FINDING THAT BRIAN MANOOKIAN LACKS STANDING</u>

Jeanne Ann Burton ("Trustee"), Chapter 7 Trustee in this matter, filed a Motion to Approve Compromise and Settlement (Doc. 108) (the "Settlement Motion") in which she sought to allow Claim No. 5 (the "Claim"), filed by Dean Chase, Sandra Chase, and D.F. Chase, Inc. (collectively, the "Chase Parties") as an unsecured claim in the reduced amount of $250,000.00. Objections were filed by creditor Grant, Konvalinka & Harrison, P.C. (Doc. 111) (the "Konvalinka Objection") and by the former principal of the Debtor, Brian Manookian (Doc. 112) (the "Manookian Objection"). Brian Manookian also filed a supplement to his original objection (Doc. 123). The Trustee filed a Response to the Konvalinka Objection (Doc. 124) and a Response to the Manookian Objection and supplement thereto (Doc. 125).

In her Response to the Manookian Objection, the Trustee alleged that Brian Manookian lacked standing to object to the Settlement Motion. On September 24, 2021, the Court entered an Order Setting Forth Procedures for Hearing on the Trustee's Motion for Compromise and

Settlement (Doc. 135) (the "Procedures Order") in which the Court notified THE parties that it was bifurcating the September 29, 2021 hearing and would be considering standing as a preliminary matter before proceeding to the merits of the Settlement Motion. Also on September 24, 2021, the Trustee filed the Trustee's Motion to Strike Brian Manookian's Objection and to Preclude His Participation in the September 29, 2021 Hearing for Lack of Standing (Doc. 136) (the "Standing Motion"). Brian Manookian filed a response to the Standing Motion on September 27, 2021 (Doc. 144).

The Court conducted a hearing in this matter on September 29, 2021. Pursuant to the Procedures Order, the Court first considered the issue of Brian Manookian's standing. Phillip G. Young, Jr. appeared on behalf of the Trustee and John Spragens appeared on behalf of Brian Manookian. Mr. Manookian was given an opportunity to offer evidence in support of his argument that he had standing in this matter, and he called the Trustee as a witness. No other witnesses or evidence were offered by Mr. Manookian in support of his argument that he had standing.

Following the Court's ruling of the standing issue, the Court considered the Settlement Motion, the Konvalinka Objection, and the Trustee's Response thereto. Phillip G. Young, Jr. appeared on behalf of the Trustee and John Konvalinka appeared on behalf of Grant, Konvalinka & Harrison, P.C. The Trustee testified in support of the Konvalinka Objection and Mr. Konvalinka cross-examined the Trustee. Grant, Konvalinka & Harrison, P.C. asked to call Brian Manookian as a witness but, for the reasons stated orally at the hearing on September 29, 2021, the Court denied the request to examine Mr. Manookian. No other witnesses were offered regarding the Settlement Motion or the Konvalinka Objection.

Based on the Motion, the Konvalinka Objection, the Trustee's Response thereto, the standing arguments raised in the Trustee's response to the Manookian Objection and in the

2

Standing Motion, and the response thereto filed by Brian Manookian; and based on all evidence offered at the September 29, 2021 hearing and the arguments of all counsel at the September 29, 2021; and based on the entire record herein;

**IT IS HEREBY FOUND:**

A.      Brian Manookian lacks standing to challenge the Settlement Motion filed by the Trustee.

B.      The Trustee properly exercised her business judgment in reaching the proposed settlement of the Claim filed by the Chase Parties as proposed in the Settlement Motion.

C.      Pursuant to Federal Bankruptcy Rule 7052, the Court hereby incorporates and adopts all other findings and conclusions stated orally at the hearing on September 29, 2021.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:**

1.      The Manookian Objection is moot and Brian Manookian lacks standing to challenge the Trustee's Settlement Motion.

2.      The Konvalinka Objection is overruled.

3.      The Settlement Motion is approved.

4.      The terms of the Settlement Agreement attached as an exhibit to the Settlement Motion are hereby approved, and the Trustee is hereby authorized to enter into the Settlement Agreement on behalf of this estate.

5.      Claim No. 5 filed by the Chase Parties is hereby allowed as a general unsecured claim in the amount of $250,000.00 (the "Allowed Amount").

3

6.     Claim No. 5 filed by the Chase Parties is hereby disallowed to the extent that it exceeds the Allowed Amount, and the Chase Parties shall have no other or further claims against this estate.

7.     The Court reserves jurisdiction to interpret and enforce the terms of this Order.

<div style="border: 1px solid black; padding: 10px; text-align: center;">

**THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY AS INDICATED AT THE TOP OF THE FIRST PAGE**

</div>

Submitted for entry:

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
6100 Tower Circle, Suite 200
Franklin, TN 37067
Tel: (615) 465-6000
phillip@thompsonburton.com

Special Counsel to Jeanne Ann Burton, Trustee

4

This Order has been electronically signed. The Judge's signature and Court's seal appear at the top of the first page.
United States Bankruptcy Court.

940

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | Case No. 3:19-bk-07235 |
| CUMMINGS MANOOKIAN, PLLC, ) | Chapter 7 |
| ) | Judge Walker |
| Debtor. ) | |
| ) | |

## BRIAN MANOOKIAN'S NOTICE OF APPEAL
## AND STATEMENT OF ELECTION

Brian Manookian, through counsel, gives notice of his appeal from the Bankruptcy Court's October 1, 2021 Order (Doc 147). In furtherance of the same, Mr. Manookian states as follows.

**Part 1: Identity of Appellant**

1.      The name of the appellant is Brian Manookian. Mr. Manookian is the sole owner and member of the Debtor, Cummings Manookian, PLLC.

**Part 2: Subject of the Appeal**

2.      Mr. Manookian appeals from the Court's Order on Motion to Approve Compromise and Finding that Brian Manookian Lacks Standing (Doc. 147). The Order was entered on October 1, 2021.

**Part 3: Parties to the Appeal**

3.      The names of the Parties to the Order appealed from as well as the contact information for their attorneys are:

a.  Debtor Cummings Manookian,
    Jay R. Lefkovitz
    Lefkovitz & Lefkovitz, PLLC
    312 East Broad Street, Suite A
    Cookeville, TN 38501
    (931) 528-5297 (T)

1

931-526-6244 (F)
JLefkovitz@lefkovitz.com

b. Trustee Jeanne Anne Burton
   Phillip Young
   One Franklin Park
   6100 Tower Circle, Suite 200
   Franklin, TN 37067
   (615) 465-6008 (T)
   phillip@thompsonburton.com

c. Creditor Grant, Konvalinka & Harrison, P.C.,
   John P. Konvalinka
   Grant, Konvalinka & Harrison, P.C.
   633 Chestnut Street Suite 900 Republic Centre
   Chattanooga, TN  37450-0900
   (423) 756-8400 (T)
   (423) 756-6518 (F)
   jkonvalinka@gkhpc.com

d. Creditor D.F. Chase, Inc.
   Daniel Puryear
   Puryear Law Group
   104 Woodmont Boulevard, Suite 201
   Nashville, TN 37205
   (615) 255-4859 (T)
   (615) 630-6602 (F)
   dpuryear@puryearlawgroup.com

**Part 4: Election to have appeal heard by District Court**

4.     Mr. Manookian elects to have the appeal heard by the United States District Court

rather than by the Bankruptcy Appellate Panel.


Date:   October 14, 2021                          Respectfully submitted,

                                                  /s/ John Spragens
                                                  John Spragens (TN Bar No. 31445)
                                                  Spragens Law PLC
                                                  311 22nd Ave. N.
                                                  Nashville, TN 37203
                                                  T: (615) 983-8900
                                                  F: (615) 682-8533
                                                  john@spragenslaw.com

2

942

Attorney for Manookian PLLC and Brian
Manookian

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed October 14, 2021 and served electronically upon all parties in interest or their counsel as indicated on the receipt issued by the Court's electronic filing system.

/s/ John Spragens

943

IN RE:

Case No. 3:19-bk-07235

CUMMINGS MANOOKIAN, PLLC

    Debtor.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 19, 2021 , the Notice of Appeal, document #149 on the record of the above case, was served by first class mail postage prepaid to the following recipients:

**Cummings Manookian**
Jay R. Lefkovitz
Lefkovitz & Lefkovitz, PLLC
312 East Broad Street, Suite A
Cookeville, TN 38501

**Jeanne Anne Burton**
Phillip Young
One Franklin Park
6100 Tower Circle, Suite 200
Franklin, TN 37067

**Grant, Konvalinka & Harrison, P.C.**
John P. Konvalinka
633 Chestnut Street Suite 900 Republic Centre
Chattanooga, TN 37450-0900

**D.F. Chase, Inc.**
Daniel Puryear
Puryear Law Group
104 Woodmont Boulevard, Suite 201
Nashville, TN 37205

**MEGAN SELIBER**
U.S. TRUSTEE
701 Broadway, Room 318
Nashville, TN  37203

Dated: October 19, 2021          /s/Teresa C. Azan, Clerk of Court

/jjk

# UNITED STATES BANKRUPTCY COURT

## - MIDDLE DISTRICT OF TENNESSEE -

### TRANSCRIPT REQUEST FORM

Please complete one form for each trial or hearing, attach payment (search fee only),
and deliver to Clerk's office at: 701 BROADWAY, ROOM 170, NASHVILLE, TN 37203
or file electronically through CM/ECF.

**1. NAME OF PARTY REQUESTING TRANSCRIPT**

John Spragens

**2. DATE OF ORDER**

10/01/2021

**3. EMAIL ADDRESS**
john@spragenslaw.com

**4. PHONE NUMBER**
615-983-8900

**5. MAILING ADDRESS**

311 22nd Avenue North
Nashville, TN 37203

**6. CASE NUMBER**
3:19-bk-07235

**7. CASE NAME**
Cummings Manookian

**8. JUDGE**
Charles M. Walker

**9. DATE(S) OF HEARING/TRIAL** (If hearing/trial was on multiple days, please fill in all days hearing/trial held)

**From** 09/29/2021        to 09/29/2021

**10. ORDER IS FOR**

☐APPEAL          BANKRUPTCY          ☐ADVERSARY

☐OTHER:_____

**11. PORTIONS REQUESTED** (Indicate the portion of the hearing/trial requested)

Entire Hearing/Trial          ☐Court Ruling Only

Voir Dire          ☐Testimony of (Specify Name):

☐Opening Statement (Plaintiff)

☐Opening Statement (Defendant)          _____

☐Closing Statement (Plaintiff)          _____

Closing Statement (Defendant)          ☐Other: _____

**12. REQUESTED TURNAROUND TIME**

Daily (24-Hour)          ☐7-Day Expedited

☐14-Day Expedited          ☐Standard (30-Day)

**13. NUMBER OF COPIES REQUESTED** (Transcript request includes 1 copy for the Court)    1

*By signing below, I certify that I will pay all charges for the preparation of the transcript, including search fee, deposit, and any additional charges as specified by the assigned transcriptionist.*

/s/ John Spragens          10/21/2021

Signature of Person Ordering          Date

| FOR COURT USE ONLY | DATE | BY |
|---|---|---|
| ORDER RECEIVED BY INTAKE | | |
| SEARCH FEE PAID | | |
| FILE(S) UPLOADED | | |

jjk 3/2017

945

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF TENNESSEE (NASHVILLE)

IN RE:                          .    Case No. 19-07235
                                .    Chapter 7
CUMMINGS MANOOKIAN, PLLC,       .
                                .
                                .
              Debtor.           .
. . . . . . . . . . . . . . .   .

JEANNE ANN BURTON,              .    Adv. No. 20-90002
                                .
              Plaintiff,        .
                                .
     v.                         .
                                .
HAGH LAW, PLLC, et al.,         .    701 Broadway
                                .    Nashville, TN 37203
              Defendants.       .
                                .    Wednesday, September 29, 2021
. . . . . . . . . . . . . . .   .    1:15 p.m.

   TRANSCRIPT OF TRUSTEE'S MOTION TO STRIKE BRIAN MANOOKIAN'S
OBJECTION TO AND TO PRECLUDE HIS PARTICIPATION IN THE SEPTEMBER
         29, 2021 HEARING FOR LACK OF STANDING [136];
          MOTION FOR COMPROMISE AND SETTLEMENT [108];
           BEFORE THE HONORABLE CHARLES M. WALKER
              UNITED STATES BANKRUPTCY COURT JUDGE

TELEPHONIC APPEARANCES:

For Jeanne Ann Burton,    Thompson Burton PLLC
Chapter 7 Trustee:        By:  PHILLIP G. YOUNG, ESQ.
                          One Franklin Park
                          6100 Tower Circle, Suite 200
                          Franklin, TN 37067
                          (615) 465-6008

Chapter 7 Trustee:        Jeanne Ann Burton, PLLC
                          By:  JEANNE ANN BURTON, ESQ.
                          4117 Hillsboro Park, Suite 103-116
                          Nashville, TN 37215
                          (615) 678-6960

APPEARANCES CONTINUED.

Audio Operator:           Tanja Brewer, ECR

Transcription Company:    Access Transcripts, LLC
                          10110 Youngwood Lane
                          Fishers, IN 46048
                          (855) 873-2223
                          www.accesstranscripts.com

     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

For Brian Manookian:        Spragens Law PLC
                            By:  JOHN T. SPRAGENS, ESQ.
                            311 22nd Avenue North
                            Nashville, TN 37203
                            (615) 983-8900

For Grant, Konvalinka       Grant, Konvalinka & Harrison, PC
& Harrison:                 By:  JOHN P. KONVALINKA, ESQ.
                            633 Chestnut Street
                            Chattanooga, TN 37450
                            (423) 756-8400

Also Present:               Bass, Berry & Sims
                            By:  CRAIG V. GABBERT, JR., ESQ.
                            150 Third Avenue South, Suite 2800
                            Nashville, TN 37201
                            (615) 742-6277

**I N D E X**
**9/29/21**

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR BRIAN MANOOKIAN: | | | | |
| Jeanne Ann Burton | 7 | 30 | 39 | 45 |
| | | | | |
| FOR THE TRUSTEE: | | | | |
| Jeanne Ann Burton | 59 | 82 | 102 | -- |

| | Page |
|---|---|
| CLOSING ARGUMENT BY MR. YOUNG | 109 |
| CLOSING ARGUMENT BY MR. KONVALINKA | 111 |

1    (Proceedings commence at 1:15 p.m.)

2         THE CLERK:  Your Honor, the next cases we have are

3  Case Number 20-90002, Burton v. Hagh Law, PLLC.  Case Number

4  19-07235, Cummings Manookian, PLLC.

5         MR. YOUNG:  Good afternoon, Your Honor.  Phillip

6  Young on behalf of the Trustee, Jeannie Burton.

7         MR. SPRAGENS:  Good afternoon, Your Honor.  John

8  Spragens on behalf of Brian Manookian.

9         MR. KONVALINKA:  Good afternoon, Your Honor.  This is

10 John Konvalinka on behalf of Grant, Konvalinka & Harrison.

11        THE COURT:  All right.  Good afternoon.  Obviously,

12 the -- as you've seen from the order the Court entered, we're

13 going to bifurcate today's matters.  The first thing we're

14 going to take up is standing for Mr. Manookian.  And we'll go

15 forward with that matter, unless there is any housekeeping or

16 other questions that any party has for the Court.

17        MR. YOUNG:  Your Honor, Phillip Young here on behalf

18 of the Trustee.  I would like to raise just one issue, and that

19 is the issue of (audio interference) 7 of the Rules of

20 Professional Conduct.  The Court knows I've been listed as a

21 potential witness for Brian Manookian.  I think the Court's

22 ultimately going to find that he lacks standing in (audio

23 interference), but I just need to know that the Court will

24 allow me to argue the standing issue on behalf of the Trustee,

25 despite my name being listed as a possible witness.  If the

1 Court wants to reserve the rest, that's fine, but at least as

2 far as the standing issue, I believe that I need a ruling from

3 the Court that I can proceed on behalf of counsel -- or as

4 counsel for the Trustee, at least as to that portion, and not

5 violate Rule 3.7.

6       THE COURT:  All right.  Because we bifurcated these

7 hearings and standing is the threshold question we need to

8 address, absent objection that the Court would address, the

9 Court will allow you to testify -- or the Court will allow you

10 to represent the Trustee in this phase of the hearing.

11       MR. YOUNG:  Thank you, Your Honor.

12       THE COURT:  All right.  Let's go forward.

13       MR. SPRAGENS:  Your Honor, I would call the Trustee,

14 Jeannie Burton, on behalf of Mr. Manookian.

15       MR. YOUNG:  Your Honor, I think that puts the cart

16 before the horse here.  I think there's an issue about whether

17 or not Mr. Manookian can even call witnesses, as the Court

18 knows, and as we fully briefed, so I'm not going to go over

19 that.  Mr. Manookian has repeatedly taken the position that

20 there is no -- there could be no surplus in this case, because

21 the Trustee causes of action are not valid.  I think the law is

22 pretty well settled that not only can he not testify to the

23 contrary, he can't even make an argument to the contrary.  So

24 the only way he has standing in this case is if he can prove,

25 and it's his burden of proof, a surplus here, and I think that

1 he's judicially estopped from even taking that position.  So I

2 don't believe that Mr. Manookian is even permitted to present

3 testimony in that regard.

4          THE COURT:  Mr. Spragens, if you could respond to

5 that?

6          MR. SPRAGENS:  Yes, Your Honor.  This Court issued an

7 order five days ago stating that you would hear all evidence

8 and argument on the subject of standing.  I believe that the

9 Court is entitled to take evidence on a threshold question such

10 as standing, to the extent of its constitutional implications

11 and due process implications, and if we have the burden of

12 proof, as Mr. Young has asserted repeatedly throughout this

13 proceeding, I think we're entitled to put that proof on before

14 the Court, through examination of witnesses.

15          THE COURT:  And the Court's going to allow

16 Mr. Manookian to call the Trustee.  With everything that you've

17 cited, Mr. Young, if there are consequences down the road, so

18 be it, but part of this -- the whole heart of this is

19 Mr. Manookian having the ability to show that there is excess

20 funds available or likely to be available.  The Trustee is the

21 person who is in charge of the estate and best able to testify

22 to that, so we're going to allow that at this time, and we'll

23 go ahead and swear Ms. Burton in.

24          THE CLERK:  Please raise your right hand.

25          JEANNIE BURTON, BRIAN MANOOKIAN'S WITNESS, SWORN

 1              THE CLERK:  So please state your full name for the

 2  record.

 3              THE WITNESS:  Jeannie Ann Burton.

 4                      DIRECT EXAMINATION

 5  BY MR. SPRAGENS:

 6  Q    Good afternoon, Ms. Burton.  We met some time ago, but my

 7  name is John Spragens, and I represent Brian Manookian in this

 8  matter.  Can you hear me okay today?

 9  A    I can.

10  Q    Obviously, we're on Zoom, so if you have any problems

11  understanding something I've said, just let me know or raise

12  your hand, and I'm happy to repeat it, or fix whatever I've

13  done wrong.  Is that okay?

14  A    Yes, sir.

15  Q    I'm going to have some additional questions for you later,

16  if the Court allows me to ask them, but at this time, I'm going

17  to limit my questions to the topic of whether Mr. Manookian has

18  standing to object to your proposed settlement of the Chase

19  parties' claim.  Do you understand that?

20  A    Yes, sir.

21  Q    Just as a housekeeping matter, you're not any relation to

22  an attorney named Walt Burton of the Thompson Burton Law Firm,

23  are you?

24  A    I am not.

25  Q    And you're the Trustee in this matter?  Is that correct?

1  A     Yes.

2  Q     As the Trustee, you have a fiduciary duty on behalf of

3  Cummings Manookian Law Firm?  Is that correct?

4  A     Correct.

5  Q     You're also an attorney.  Is that right?

6  A     That's correct.

7  Q     You have the right to speak for Cummings Manookian in this

8  proceeding?  Is that fair?

9  A     I do, but I have retained counsel to represent me in this

10  matter.

11  Q     And that counsel is Mr. Young, who's on the Zoom hearing

12  today?

13  A     Yes.

14  Q     You have the authority, with the Court's oversight, to

15  control the assets of Cummings Manookian?  Is that correct?

16  A     That's correct.

17  Q     And as part of your duties as Trustee, you've

18  investigated, to the extent you're able, the assets of Cummings

19  Manookian?

20  A     Yes.

21  Q     Brian Manookian doesn't have any authority to speak on

22  behalf of Cummings Manookian now, does he?

23  A     No.

24  Q     As Trustee, you're familiar with the bankruptcy claims

25  asserted against the Cummings Manookian estate in this

1  proceeding?

2  A    Yes.

3  Q    There's the -- in terms of claims that are active right

4  now, there's the claim asserted by Mr. Konvalinka?  Is that

5  right?

6  A    Correct.

7  Q    And what's the value that you ascribe to that claim?

8  A    I believe it's over $295,000.

9  Q    For purposes of round numbers, I'm going to call it

10  $300,000, but I don't mean to dispute your number there.

11      And what about the Chase parties' claim as you're

12  proposing to settle it right now?  What's the value of that

13  claim?

14  A    They filed a claim for -- a secured claim for 800 -- over

15  $800,000, and I'm proposing to allow the claim at 250,000.

16  Q    And then there's a claim by Ms. McDaniel?  Is that

17  correct?  Do I have the name wrong?  Was there another claim --

18  A    McCarthy?  McCarthy?  I don't --

19  Q    McCarthy, thank you.

20  A    -- recall the first name.

21  Q    And if you recall, what's the value that you've ascribed

22  to the McCarthy claim?

23  A    It's -- I would say, $71,000, or it could be more than

24  that.  It's 10 percent of the recovery of any fee due Cummings

25  Manookian recovered for the benefit of Cummings Manookian in

1  the Fitzgerald case.

2  Q    And we'll talk about the Fitzgerald case in a minute, but

3  are there any other claims that are currently pending against

4  Cummings Manookian?

5  A    Not that are allowed.

6  Q    So if we add up just the ballparking, 300 on behalf of

7  Konvalinka, 250 on behalf of the Chase parties, and 70-ish on

8  behalf of Ms. McCarthy, that adds up to about $620,000.  Is

9  that right?

10 A    Correct.

11 Q    There's no chance that the claim -- that it's more than

12 $750,000, the total value of claims that are currently pending

13 against the bankruptcy estate?

14 A    I'm sorry.  Ask me that again?

15 Q    Is there any chance in your mind that the total value of

16 these claims is greater than $750,000?

17 A    Well, it could be.  You know, if the Chase claim is not

18 allowed at $250,000, and upon a rehearing, they're granted a

19 sanctions judgment for an amount, you know, greater than

20 $250,000, then the claims could be significantly higher.

21 Q    But as of right now, the underlying judgment in the Chase

22 parties -- that the Chase parties' claim is based on, that

23 judgment's been vacated.  Is that right?

24 A    That's right.  So they still have a contingent claim in

25 the case.

1  Q    But currently, there's no judgment against Cummings

2  Manookian.  Is that fair?

3  A    That's correct.  It's been vacated and remanded for

4  rehearing with a new judge.

5  Q    So you think the $250,000 value that you've given to that

6  claim, we agree that the total value of those claims against

7  the bankruptcy estate equals about $620,000?  Is that fair?

8  A    I think that's in the right range.  I don't have my

9  calculator in front of me, but that sounds right.

10 Q    And as you probably know, I went to law school because I

11 can't do math, so that's I need to check my numbers on this.

12      Do you know if the -- if your special counsel, Mr. Young,

13 has attorney's fees, and what they total as of this date?

14 A    I do, and I think it's -- probably now over $100,000.

15 Q    So as of now, 620 plus another 100,000.  Is that fair?

16 A    Correct.

17 Q    Now as the Trustee, you directed the filing of an

18 adversary proceeding on behalf of Cummings Manookian.  Correct?

19 A    Correct.

20 Q    And you reviewed and approved the allegations in the

21 complaint in the adversary proceeding?

22 A    Yes.

23 Q    And you made the allegations in the adversary proceeding

24 because they're true?

25 A    I believe that they are true.

1  Q    In that proceeding, you represented that Cummings

2  Manookian is entitled to payment for attorneys' fees in

3  multiple cases.  Is that right?

4  A    Correct.

5  Q    The one you mentioned earlier, the Fitzgerald case, is

6  that true?

7  A    Correct.

8  Q    And in that case, it's true that Cummings Manookian is

9  entitled to $1.35 million?  Is that right?

10  A    That was the attorney fee that was awarded -- or -- well,

11  not awarded, but that was the attorney fee based on the

12  agreement, contingency fee agreement, with the Fitzgeralds.

13  Q    And your position is that Cummings Manookian is entitled

14  to $1.35 million from that fee?

15  A    Yes.

16  Q    Manookian PLLC, the newer legal entity, it doesn't have

17  any entitlement to the Fitzgerald fee, does it?

18  A    Did you Manookian, PLLC?

19  Q    Yes, ma'am.

20  A    I don't believe so.

21  Q    That's all Cummings Manookian's money, is what I'm trying

22  to get at.

23  A    Yes.

24  Q    You agree that that single $1.35 million fee exceeds all

25  of the claims that have been asserted against Cummings

1  Manookian?

2  A    I have to do my math again, but if the contingent claim of

3  the Chase parties was the seven -- seven or $800,000, then the

4  claims could exceed that amount.

5  Q    So then the claims -- if I've got this right, if we add

6  500,000 to the 250,000 of the Chase parties, that would be

7  750,000 plus 300 for the Konvalinka claims, so that's 1.05

8  million, plus 70,000 for Ms. McCarthy, plus 100,000 for

9  Mr. Young.  Have we gotten to 1.35 million yet?

10  A    Well, there would be Trustee compensation on whatever the

11  amount that the Trustee collects and disburses, so that's

12  dependent on the amount that is recovered for the estate, and

13  then there would be additional attorney fees for the adversary

14  proceeding, and then also if the settlement's not approved, and

15  we go down to state court to start that proceeding over, then

16  the Trustee, I would have to employ counsel to represent the

17  estate in the -- in that proceeding.

18       So there would be attorney fees.  In that, I think I

19  estimated that attorney fees in that instance could be as much

20  as $150,000, and then for the adversary proceeding, depending

21  on whether -- depend -- I think you're getting that, assuming

22  that the Chase claim is not settled.  Then that could be

23  another $100,000 in bankruptcy adversary in fees, because the

24  scope of the litigation would be more, because we might -- we

25  wouldn't know, and I might need more money to pay all the

1 claims.

2    So that was one of the reasons that it made sense to

3 consider, you know, a settlement or some type of liquidation of

4 the Chase claim.

5 Q    Okay.  I want to try to unpack a few of the fees that you

6 just mentioned there.  With respect to Trustee's fees, is there

7 a number in your mind that you're thinking of for the Trustee's

8 fees?

9 A    Well, it is a -- it's a computation, it's a percentage,

10 and I have to have my software to do that, but if I had

11 $800,000 in the case, and the -- that figure is comprised of if

12 I'm successful in the adversary proceeding, and whether I get a

13 judgment for the 1.3 or the 715, I feel comfortable, because

14 the Court and the $715,00 that's on deposit with the Court,

15 that would come into the estate.  I currently have about

16 $85,000 in the estate bank account.

17    So the Trustee's compensation or commission by statute on

18 that would be $43,000.

19 Q    And one thing that's important to note here is that when

20 you're figuring the size of the bankruptcy estate, you're

21 taking into account the adversary proceeding.  Is that correct?

22 A    I don't think I understand your question.

23 Q    Well, these numbers that you've been giving me, including

24 the Trustee's fee that you just mentioned and the attorney's

25 fees, you've included the attorney's fees to prosecute the

1  adversary proceeding.  So --

2  A    Correct.

3  Q    Okay.  So when you look at the bankruptcy estate value,

4  you are taking the adversary proceeding into account, in

5  valuing the estate.  Is that right?

6  A    Correct.  Trying to look at what I think the assets are of

7  the estate, and what I might be able to recover and collect to

8  pay the claims of creditors.  That's my main job.

9  Q    And I'd like to talk about the assets of the estate in

10  just a second, but while we're talking about these fees, you

11  mentioned attorneys' fees, you know, for the Trustee and for

12  the prosecution of the adversary proceeding.  Those fees would

13  be paid to Mr. Young.  Is that correct?

14  A    That is correct.

15  Q    Now, when you mentioned the attorneys to represent

16  Cummings Manookian in the state court proceeding, have you

17  investigated or retained an attorney to represent Cummings

18  Manookian in that proceeding?

19  A    I haven't retained an attorney, but I have estimated what

20  I thought, and the difficulty.  But I've estimated what I

21  thought the attorney fees would be, or could be, in that state

22  court proceeding.

23  Q    Are you aware whether that state court proceeding has been

24  assigned to a judge at this point?

25  A    I do not know.  I don't know.  I know there have been

1  motions filed, several motions already filed, but I don't know

2  if any judge has been assigned.

3  Q    You know there's a motion for summary judgment pending

4  that Mr. Manookian filed in that case?

5  A    I do.

6  Q    When you estimate $150,000 in attorneys' fees to, you know

7  -- to defend Cummings Manookian in the event that that civil

8  contempt judgment were restored, are there particular types of

9  attorneys that you're contemplating hiring, or can anybody do

10 that?

11 A    Well, I would want somebody who has state court

12 experience, somebody who's experienced in Williamson County

13 state court.  It's -- and it would probably -- it would help,

14 because this is one of the difficulties, I only have $85,000 in

15 the case.  The attorney has -- you know, it doesn't work like

16 it does outside of bankruptcy.  I have to get somebody to

17 agree, they have be approved by the bankruptcy court, their

18 compensation will have to be approved by the bankruptcy court,

19 so it's not as though the attorney can just send me a bill each

20 month and me pay it, unless I get some type of permission from

21 the Court to do that.  So it will have to be somebody who has

22 an understanding of what it means to represent a bankruptcy

23 Trustee in a case, because you may not get paid, or you may not

24 get paid until, you know, later in the case, or at the end of

25 the case.

1  Q    Now Mr. Young was the receiver, a court-appointed receiver

2  for the Chase parties in the underlying initial proceeding in

3  the state court.  Is that right?

4  A    Correct.

5  Q    And he's special counsel now to the Trustee in this

6  proceeding.  Is that right?

7  A    Correct.

8  Q    Have you given any thought to hiring him to represent

9  Cummings Manookian in the remanded proceeding?

10  A    Well, I thought about it.  I don't know, you know, that's

11  another big chunk to take on.  I certainly think he would be,

12  you know, capable and competent, but it, you know, frankly we

13  met -- I met with a lot of resistance in wanting him as special

14  counsel.  I think, I don't know, if I asked him to do it, he

15  might do it.  But it's a lot more to add and still not be

16  compensated anything in the case thus far.

17  Q    And have you given any thought to whether he has conflicts

18  of interest in representing various entities in various stages

19  of these proceedings?

20  A    I'm sorry.  Ask me that question again?

21  Q    Have you given any thought to whether he might have a

22  conflict of interest representing Cummings Manookian on remand,

23  and having represented the Chase parties as receiver, and

24  representing the Trustee as special counsel?

25           MR. YOUNG:  Object to form.  He represented that I

1  represent the Chase parties, which is inaccurate.

2         MR. SPRAGENS:  Excuse me.  Let me modify that.

3  BY MR. SPRAGENS:

4  Q    Representing -- being the court-appointed receiver to

5  collect the fee in the underlying state action, as well as

6  being special counsel to the Trustee, and then representing

7  Cummings Manookian on remand, have you given any thought to

8  whether it would be appropriate for him to do all those?

9  A    I haven't really thought it through like that as far as

10  the -- on remand, representing Cummings Manookian in the state

11  court.  I don't know who would -- the Chase parties might very

12  well raise that.  So that's a possibility.  That's a

13  possibility, so --

14  Q    Okay.  So suffice it to say, attorneys' fees in two

15  proceedings totaling $250,000, a Trustee's fees of under

16  $50,000, that gets you to about $300,000 on top of the $720,000

17  you identified earlier, and then as you also stated, if you

18  imagine that the Court restored the full amount of the civil

19  contempt award, that could put you above $1.35 million.  Is

20  that what you're saying?

21  A    It could.  And also, remember, I have to be able to

22  collect 1.3, and so there's 715 that's being held by the

23  Clerk's Office that if I'm successful in the litigation would

24  be paid over to the estate, but the remainder of any other

25  judgment would have to be collected.  You know, we may have to

1 hire -- and that costs money to collect. I don't know if

2 defendant is solvent. I know she's married. If there's issues

3 with, you know, collecting from a dependent who may own things

4 (indiscernible) entirety, so you know, that was another --

5 yeah, another consideration, but certainly, I believe that if

6 I'm -- if the estate is entitled to the 715, it's entitled to

7 1.3, but will I be able to collect that? I don't know. I

8 don't know. I think -- I don't know.

9 Q    Well, you have been receiving payments from Mr. Cummings

10 for his portions of fees that the Trustee has asserted Cummings

11 Manookian is entitled to, right?

12 A    That's right. That's where most -- I guess all of that

13 85,000 has come from.

14 Q    Just in the last couple of weeks, Mr. Cummings has sent

15 you another payment for a case that he settled that you have

16 represented that Cummings Manookian has an interest in. Is

17 that right?

18 A    I haven't received anything, and -- I have received an

19 email that honestly, I was sick last week, and so there's a lot

20 that I haven't been able to catch back up on, but I haven't

21 received any other monies. My recollection is that -- and

22 Mr. Young would be able to correct me if I'm wrong, or you can,

23 if you have the information. I think it's nine or $10,000 and

24 I believe that that may be the end of the cases that

25 Mr. Cummings took over when he left the firm to which Cummings

1  Manookian is entitled to a portion of those fees and costs.

2  Q    In the adversary proceeding, in the complaint, you listed

3  about 16 cases that Cummings Manookian has an interest in, and

4  is owed payment in.  Is that right?

5  A    That's correct.

6  Q    That's in addition to the $1.35 million that you've

7  alleged that Cummings Manookian is entitled to in the

8  Fitzgerald case?

9  A    That's correct.

10 Q    You also agree that Cummings Manookian is entitled to

11 payment for a bunch of physical and intangible assets that

12 you've alleged were used by Manookian PLLC and Afsoon Hagh and

13 Hagh Law.  Is that right?

14 A    That's correct.

15 Q    And you've said they used the premises without paying

16 Cummings Manookian.  Right?

17 A    Correct.

18 Q    They used furniture without paying Cummings Manookian.

19 Right?

20 A    Correct.

21 Q    They used equipment without paying Cummings Manookian?

22 A    Correct.

23 Q    They used intellectual property without paying Cummings

24 Manookian?

25 A    Correct.

1 Q    And there are certain costs that Cummings Manookian is

2 entitled to recover also in excess of the $1.35 million

3 Fitzgerald fee.  Is that right?

4 A    Costs?

5 Q    Yes.

6 A    Possibly.  Obviously, those 12 cases have to be won by --

7 they originated with Cummings and Manookian, but they're all in

8 various stages of litigation, and so whether Cummings Manookian

9 will receive any fee will be dependent upon how those cases

10 eventually pan out over time.

11 Q    But you've alleged in the adversary proceeding that the

12 estate should include the $1.35 million Fitzgerald fee, plus

13 the fees from the 16 cases you listed -- excuse me.  I think

14 it'd be 15 cases in addition to the Fitzgerald case.  Plus

15 premises, furniture, equipment, intellectual property, and

16 other costs.  Is that right?

17 A    Correct.

18 Q    Have you made any estimate of the total value of the

19 premises, the furniture, the intellectual property, and the

20 other attorneys' fees?

21 A    No.

22 Q    No doubt that would be well in excess of $1.35 million?

23 Is that correct?

24 A    I do not know.

25 Q    If the allegations in your case are true, isn't it a

1  virtual certainty that the estate would be worth more than

2  $2 million?

3  A    It's possible.  But we would have to collect.  We'd have

4  to collect those(indiscernible).  You know, that's what the

5  litigation is about, is whether Cummings and Manookian is

6  entitled to fees and in what amount, and it won't be 100

7  percent of -- it may not be 100 percent of those allocations

8  where other attorneys, you know, have worked on cases.  So --

9  and then, collecting.  Collecting those.  But yes, those

10  allegations are there.  And --

11  Q    And you're --

12  A    -- got a good case.

13  Q    And you're so confident that the allegations in the

14  adversary complaint are true, that you've asked this Court to

15  allow you to hire special counsel to prosecute the adversary

16  proceedings so you could prove those claims and find those

17  assets.  Isn't that right?

18  A    I'm confident that we -- that I have a good case, and it

19  is part of my duty as a Trustee is to pursue assets, you know,

20  that I think will produce money to pay creditors.

21  Q    Cummings Manookian is also entitled to pre- and

22  post-judgment interests.  Is that right?

23  A    I'm sorry.  Ask me that again?

24  Q    In the adversary proceeding, you've asserted that Cummings

25  Manookian is entitled to collect pre- and post-judgment

1  interests?

2  A    Yes.

3  Q    Is that right?

4  A    I think.

5  Q    Also punitive damages as a result of their malicious and

6  fraudulent conduct.  Is that right?

7  A    Yes.

8  Q    And Cummings Manookian is entitled to have their

9  attorneys' fees paid as a result of the adversary proceeding.

10 Is that right?

11 A    That's all subject to court approval, but yes.

12 Q    That's what you've alleged?

13 A    Yes.

14 Q    Does Cummins Manookian have any claims against third

15 parties that could increase the value of the estate?

16 A    I'm not -- not that I know of.  I know that there has been

17 some -- in the receivership proceeding, Mark Hammerfold

18 (phonetic) had asked the Court to have the Chase parties pay

19 money that was collected out of his accounts receivable to him

20 now that the judgment was vacated, and I've been monitoring

21 that to see what the outcome of that was, to see if the estate

22 might have any recourse to seek the same relief, but the judge

23 in that case has -- he's stayed that until the Chase litigation

24 is concluded.

25 Q    So just to make sure --

1  A    Other than that, I don't -- other than that -- on -- I

2  don't know of anything else.

3  Q    Make sure I'm understanding.  Mr. Hammerfold was

4  co-counsel and also subject to the civil contempt order in the

5  underlying state court proceeding.  Is that right?

6  A    Correct.

7  Q    And now that that award of damages, or that civil contempt

8  award has been vacated, Mr. Hammerfold is suing the Chase

9  parties, or at least moving the Court to order the Chase

10 parties to return some of the funds to him that they collected

11 on a now vacated judgment.  Is that right?

12 A    Right.  Right.

13 Q    And in fact, Mr. Young, in his role as receiver, collected

14 some of those funds too, didn't he?

15 A    As a receiver, he was collecting the -- he got appointed

16 by the Court to be receiver, and he was collecting the judgment

17 funds.

18 Q    And some of those funds were paid to him in compensating

19 him for his role as receiver?

20 A    I believe he made application to the Court, and was

21 awarded fees.

22 Q    And Cummings Manookian has not filed a similar motion in

23 the state court case.  Is that right?

24 A    No.

25 Q    And you said you're monitoring that?

1 A    I am.  I think there's about $25,000 maybe that was

2 collected from Cummings Manookian.  I think that's about -- I

3 think that's right, because all the other money had been turned

4 over to the bankruptcy estate, so -- I could tell that the

5 judge -- I thought the judge was going to just stay that

6 proceeding until the outcome of the Chase -- what I call the

7 Chase litigation, and so I didn't think that it was worth the

8 expense to the estate to file a similar motion.

9     I think if it turns out that Chase had to return those

10 funds to Mr. Hammerfold, then -- you know, at the time, I was

11 thinking I would make the same request, or file a similar

12 motion, but again, that's -- you know, that will be part of

13 what will be covered in the claims settlement with the Chase

14 parties.

15 Q    Well, in fact, in that settlement, which maybe we'll be

16 allowed to talk about later, Cummings Manookian would be

17 waiving any claims against the Chase parties.  Is that right?

18 A    Right, it's -- would be mutual releases, and Chase would

19 be waiving the reservation of rights that they retained in an

20 order when they turned over $25,000 to the bankruptcy estate

21 that I took the position that was a preference, and so it

22 should be paid over to the bankruptcy estate.  So it has been,

23 but there's an order reserving their rights to claim an

24 execution lien or something else.

25 Q    Did you rely on anyone else to make the decision not to

1  join that motion to attempt to recover the funds that were paid

2  to the Chase parties, or to Mr. Young --

3  A    The --

4  Q    Just let me finish real quick.

5  A    Oh, I'm sorry.  I'm sorry.

6  Q    That's okay.  In the state court proceeding?

7  A    I'm sorry.  Ask me the question again?

8  Q    Did you rely on anyone else's advice in making that

9  determination?

10 A    No.

11 Q    But you don't think that it would give the motion a little

12 bit more force if Cummings Manookian also joined and said, we

13 are also in the same position as Mr. Hammerfold, and would like

14 to recover our funds?

15 A    No, I didn't think that.

16 Q    And in any event do you think that that would increase the

17 value of the bankruptcy estate by about $25,000, if you

18 prevailed on that motion which you have not filed?

19 A    If I prevailed, and collected it, yes.

20 Q    And in any event, the proposed settlement of the Chase

21 parties would moot that whole issue?

22 A    Correct.

23 Q    I'm going to -- I don't want ask you more about the Chase

24 settlement in detail, because I think we need to limit this

25 portion of our conversation to Mr. Manookian's standing.  I do

1  have some other questions for you later about that, but who is
2  the sole member of Cummings Manookian?
3  A    At the time that the bankruptcy petition was filed, it was
4  Brian Manookian.
5  Q    And do you know who it is today?
6  A    Well, it would be Brian Manookian.
7  Q    And if you prevail on your claims on the adversary
8  proceeding, wouldn't Brian Manookian be entitled to the surplus
9  recovered by the Trustee?
10 A    If there was a surplus -- actually, I think it would
11 probably go to -- there's a charging order, and there's some
12 orders in bankruptcy court about that, but obviously, we would
13 be paying that.  I won't pursue that, but the surplus, that
14 would be paid to Brian Manookian or to his creditor that has
15 the charging order against him.
16 Q    And where is that charging order pending?
17 A    In bankruptcy court.  I filed an objection to the claim,
18 there were two claims, actually, because the judgments -- both
19 claims were based on judgments against Mr. Manookian, and
20 possibly others, I can't remember, but Mr. Manookian
21 personally, and not against Cummings Manookian.
22 Q    And what's the total amount subject to the charging order?
23 A    I don't recall.  I don't know.
24 Q    But if you prevailed on your claims in the adversary
25 proceeding, and collected all the 16 attorneys' fees, one of

1 which is $1.35 million, and the value of all the property

2 you've alleged that was stolen from Cummings Manookian, as well

3 as the punitive damages and attorney's fees, and interests that

4 you've alleged Cummings Manookian is entitled to, Mr. Manookian

5 would receive the proceeds of that surplus.  Isn't that true?

6 A    If there was a surplus, then he would receive the surplus.

7 I just don't believe that this is going to be a surplus case,

8 but I'm certainly going to do everything I can to collect all

9 of the assets of the estate, or that are necessary to pay the

10 claims of the creditors.

11 Q    In your believe that this is not to be a surplus case, you

12 don't have an inventory of the hard property, intangible

13 property, and attorneys' fees that Cummings Manookian is

14 entitled to recover?

15 A    I don't.  You know, we're -- we were conducting discovery,

16 and then the discovery's been stayed.  In the adversary

17 proceeding, there's discovery disputes.  I've gotten some

18 information, so, no.  I don't have complete information on all

19 of that.

20 Q    And you've asked to stay the discovery in the adversary

21 proceeding.  Isn't that right?

22 A    Right.  Right.

23 Q    Through your counsel, Mr. Young?

24 A    Correct.

25 Q    And you've done that multiple times?

1 A     I believe so, yeah.  Yes.

2 Q     So that lack -- the lack of an inventory of the actual

3 value of, you know, the assets in the estate, you are at least

4 in part responsible for not having that inventory.  Isn't that

5 fair?

6 A     Well, I think we -- I think I, with the assistance of my

7 counsel, compounded written discovery in again, that we don't

8 have answers to, but I also for the economy and to save the

9 estate attorney -- you know, administrative costs and expenses,

10 to stay all of that pending the resolution of the case claims

11 or whenever the case claim was fixed, so that we -- that I

12 would know how the scope, or how much I needed to proceed

13 against in the adversary proceeding.

14         MR. SPRAGENS:  Your Honor, I want to respect the

15 Court's time and your bifurcation order, and so while I do have

16 some other questions, I think they get more to the merits of

17 the objection, and so I'll pass the witness at this time.

18         THE COURT:  Thank you for monitoring yourself on

19 that.  The Court was going to give you some latitude, and I

20 think you used about as much of it as I was willing to give you

21 on (indiscernible) so appreciate that.

22         Mr. Young?

23         MR. YOUNG:  Yes, Your Honor.  Just for the record,

24 Phillip Young on behalf of the Trustee.

25                     CROSS-EXAMINATION

1  BY MR. YOUNG:

2  Q    Ms. Burton, I want to ask you not hypothetical questions,

3  but questions grounded in reality.  Is Brian Manookian a

4  creditor of this estate?

5  A    No.

6  Q    Did Brian Manookian file a proof of claim in this estate?

7  A    No.

8  Q    Is Brian Manookian listed as a creditor in the schedules?

9  A    No.

10 Q    Who signed those schedules?

11 A    Brian Manookian.

12 Q    What's Mr. Manookian's only role in this case?

13 A    Well, he's the representative of Cummings and Manookian.

14 He signed the bankruptcy schedules, and I believe he's chief

15 manager.  He's the debtor representative.

16 Q    So his only role in this case is as the former principal

17 of the debtor.  Is that right?

18 A    Correct.

19 Q    Can you say with any degree of certainty that this estate

20 will be a surplus estate?

21 A    No.

22 Q    Why not?

23 A    Well, for the reasons that I've already stated.  I can go

24 through that again, but I'd have to pursue the adversaries, go,

25 you know, it's basically, maybe take it in the adversary

1  proceeding sum, and then in the Chase matter.  So I would have

2  to be successful on, you know, all counts of the adversary

3  proceeding, which would obviously incur administrative costs,

4  and then I would have to be able to collect all of -- you know,

5  any award, any judgment, be able to collect that, pay the cost

6  of collection of that.

7      On the Chase side of it, there would be, obviously,

8  attorney fees involved in providing representation to the

9  estate, and if that goes back for -- to start at the very

10 beginning, and, you know, that's no guarantee that there won't

11 be a like judgment, a sanctions judgment in that case again,

12 which would likely go up, you know, on appeal again.

13 Q    So is it safe to say that there are a lot of variables at

14 play in this case?

15 A    Yes.  Yes.

16 Q    There are variables in the amount of claims to the estate.

17 Right?

18 A    Correct.

19 Q    There are variables in administrative expenses of the

20 estate, right?

21 A    Correct.

22 Q    There are variables in litigation, whether you're

23 successful in litigation or not.

24 A    That's correct.

25      MR. SPRAGENS:  Your Honor, I appreciate that you gave

1  me latitude in my examination, but I do object to the leading

2  questions of his own witness.

3           MR. YOUNG:  Your Honor, this is a cross-examination.

4           THE COURT:  (Audio interference) witness, so you

5  called the Trustee.  Mr. Young obviously, you know, this is

6  bankruptcy court, we do allow a little bit of latitude in the

7  interest of time, but allow the witness to testify as best she

8  can.

9           MR. YOUNG:  Yes, Your Honor.

10  BY MR. YOUNG:

11  Q    How much are you currently holding in this estate today?

12  A    85,000, a little over 85,000.

13  Q    Is this a surplus estate today?

14  A    No.

15  Q    Can this be a surplus estate without you being successful

16  in the adversary proceeding?

17  A    No.

18  Q    I want to walk through some numbers.  You've gone through

19  some of these, but I want to walk through these in a way that

20  sort of maybe makes it a little easier for the Court to digest.

21       You said you're holding $85,000.  How much is being held

22  by the Court Clerk?

23  A    715.

24  Q    And as we sit here today, are you entitled today to the

25  $715,000?

1  A    No.

2  Q    What would have to happen in order for you to get this

3  money?

4  A    A judgment in the adversary proceeding.  Or a settlement.

5  If there was a settlement.

6  Q    If the Court grants you those funds, then, the 715 plus

7  the 85, that's about 800,000, right?

8  A    Correct.

9  Q    Okay.  And just repeat for us, how much was the Grant

10 Konvalinka claim?

11 A    Close to 300, 295-something.

12 Q    Is that a secured or an unsecured claim?

13 A    It's an unsecured claim.

14 Q    What about Ronette McCarthy?

15 A    71,500.  Ten percent of -- so it could be 71,5, or it

16 could be 100 and -- what would that be?  Three -- ten percent

17 of the amount that's recovered from the -- in the Fitzgerald

18 case.  Because he was an attorney, a co-counsel, or conferring

19 attorney, or -- in that case.

20 Q    If the Court approves the settlement before it, how much

21 would the Chase claim be allowed as?

22 A    250,000.

23 Q    And would that be secured or unsecured?

24 A    That would be unsecured.

25 Q    And if the Court denies this settlement, will you have

1  extra expenses?

2  A     Yes.

3  Q     And why is that?

4  A     Well, I would have to employ counsel to represent the

5  estate in the state court with respect to the Chase claims, and

6  so that's an expense, and then as I've discussed, there would

7  be additional expense, administrative costs and attorney fees

8  involved in the adversary proceeding, because I wouldn't be

9  able to just limit pursuing the recovery of the Fitzgerald

10 fees.  I would have to pursue, not knowing what the claims

11 were, because they're not fixed, and calculating on the high

12 end of the claims, I would have to -- there would just be a lot

13 more cost in pursuing all of the other assets or causes of

14 action as you will, in that adversary that were raised in the

15 adversary proceeding.

16 Q     And those legal fees.  Would they be unsecured claims or

17 administrative claims?

18 A     They're administrative claims.

19 Q     What priority would they have, vis-a-vis the unsecured

20 claims?

21 A     They get paid before the unsecured claims.

22 Q     I believe you testified earlier -- I think Mr. Konvalinka

23 said that his math was $620,000 roughly unsecured claims if the

24 Chase claim settlement is allowed, and I think you agreed with

25 that number.  Is that right?

1  A    I think that's right.

2  Q    And if you're successful in collecting the 715, in the

3  estate, that 715 plus the 85, that would be about 800,000,

4  right?

5  A    Eight what?

6  Q    About 800,000?

7  A    Yes.

8  Q    If you distribute $800,000, I think you testified to this

9  earlier, what would your Trustee compensation be?

10 A    43,000.

11 Q    And I think you testified earlier that you believe the

12 estate has already incurred legal fees in excess of $100,000?

13 Was that your testimony?

14 A    Correct.

15 Q    How much do you think in legal fees will be spent just to

16 recover the Fitzgerald fees?

17 A    I think in discussing with my counsel, and what --

18 estimate about $50,000.

19 Q    And if you have to pursue all causes of action in the

20 adversary proceeding, that would go up?

21 A    I think -- yes, probably more than double.

22 Q    And then obviously if the Chase claim, the settlement's

23 not allowed, and it goes back to state court, that number could

24 go significantly above 250, right?

25 A    The amount of subsequent judgment?

1  Q    Right.

2  A    Yes.

3  Q    With admin expenses, plus the $620,000 of unsecured

4  claims, do you think that amount is more or less than $800,000?

5  A    Probably more than -- more than 800 -- now, more than

6  $800,000.

7  Q    And you get to the 800 only if you collect the 715 being

8  held by the Court, right?

9  A    Correct.

10 Q    So what would have to happen in order for this to be a

11 surplus case?

12 A    It'd have to be successful really in probably -- well,

13 again, I don't know, because of the -- I would have to pursue

14 all of the claims, all of the other accounts receivable, if you

15 will, in the case to which Cummings and Manookian might be

16 entitled to attorney fees that are -- that they would be

17 entitled to for representation of plaintiffs in lawsuits.

18      So I guess, first of all, all of those would have to be

19 decided in favor of the -- or settled in favor of the

20 plaintiffs, and then Cummings and Manookian and -- or there

21 would be an award of an attorney, not an award, but there's an

22 agreement between the plaintiff and the law firm, Cummings

23 Manookian, about the amount of the percentage of an attorney

24 fee, and then there would have to be a determination then in

25 the adversary, how much of that Cummings and Manookian would be

1  entitled to.  Is it 100 percent?  Is it 50?  Is it some other

2  formula, like there was with Brian Cummings?

3       So all of that, you know, would have to be successful in

4  recovering the attorney fees, and I don't know what those

5  amounts would be, and how much Cummings and Manookian would be

6  entitled to, and then spending the money to get to that, and

7  then, you know, spending the money to collect it if it wasn't

8  voluntarily paid over to the estate.

9       And then on the -- and then in the Chase case, for it to

10 be -- on that, for it to be a surplus case, that claim would

11 have to be disallowed or allow -- or disallowed -- it would

12 have to be a whole lot less, I think, than $800,000, you know,

13 and it could be more.

14 Q    Is litigation ever a certainty in your experience as

15 Trustee?

16 A    No.

17 Q    Litigation expenses?

18 A    No.  No.  I mean, we try to estimate, and, you know, we

19 try to be a good -- good stewards, and, you know, but no.  I

20 mean, things happen, and you have to do what you have to do in

21 your cases.

22 Q    I'm not certain you understood my question.

23 A    Oh.

24 Q    Is litigation expenses -- is it expensive?

25 A    Oh, I'm sorry.  You cut out there for a minute.  Is

1  litigation expensive?  Oh, yes.  Yes.

2  Q    Let's talk about collections for a minute.  In your

3  experience, how difficult is it to collect from individuals?

4  A    It just depends.  I mean, it depends on their insolvent --

5  you know, whether they're solvent or insolvent.  If you have to

6  chase them and their assets, if they're, you know, if they own

7  property jointly with someone else, you know, finding assets,

8  or what the bank accounts are, that sort of thing, so it can be

9  difficult.

10 Q    Do you know whether or not Ms. Afsoon Hagh is solvent?

11 A    I do not.

12 Q    Is she married?

13 A    Yes.

14 Q    In your experience, what's the impact of marital status on

15 collections?

16 A    It makes it a lot harder, because, in the -- you know,

17 what the defendant owns is a survivorship interest in assets,

18 and those -- you know, those aren't very valuable.  You know,

19 it's hard to liquidate jointly owned property, or to sell, you

20 know, a survivorship interest to anybody.

21 Q    Are you aware of any other outstanding sanctions against

22 Ms. Hagh?

23 A    I'm aware that there's a $60,000 sanctions charging or --

24 sanctions judgment, and there's a charging order.

25 Q    In your opinion as a Trustee and as an attorney, how

1  likely is it that you will be able to collect a judgment

2  against Ms. Hagh beyond the $715,000 held by this Court?

3  A    I hate to say it's not likely, but it -- it may not be

4  likely.

5  Q    And then would the estate have to incur legal fees for

6  that collection?

7  A    Yes.  And we would incur -- I would incur legal fees

8  whether we were able to collect it or not, because, you know,

9  you have to try.  You know, you have to -- whether it's

10 post-judgment discovery or whatever, you have to try to

11 collect.

12 Q    Based on all the variables that you've explained today, do

13 you think it's likely that this will be a surplus case?

14 A    I don't.  I don't.

15        MR. YOUNG:  Those are the only questions I have.

16 Thank you, Your Honor.

17        MR. SPRAGENS:  All right, just a couple of quick

18 questions to follow up.

19                  REDIRECT EXAMINATION

20 BY MR. SPRAGENS:

21 Q    Ms. Burton, the cases that you listed in Paragraph 23 of

22 the adversary proceeding, do you know the status of any of

23 those cases now?

24 A    It has been a while since in the course of the adversary

25 proceeding that we have checked the status of those, but we

1  periodically check docket sheets and that sort of thing, so to

2  answer your question, I do not know the status of each one of

3  those cases.

4  Q    And I think you testified earlier that you don't have

5  values assigned to those cases on any internal tracking charts?

6  A    No.

7  Q    So you can't say whether or not Mr. Cummings is about to

8  send you a check for $500,000 or $1 million as a result of one

9  of those cases settling?

10 A    On those -- no.  But I think that's the last of them, of

11 the Cummings, the cases where I would be getting any money from

12 Mr. Cummings.  I think that's a -- I think that was the last

13 one, the one that I'm supposed to be getting.

14 Q    So Cummings Manookian would be entitled to the entire fee

15 in the rest of those cases?

16 A    I don't have a list of those in front of me.  I think --

17 I'm not sure if Mr. Cummings is involved in -- there's the

18 Vanderbilt case.  I'm not sure if Mr. Cummings is involved in

19 that and if any money would be coming through him on that.  But

20 I don't have any -- I don't have any other recollection without

21 looking at records on that.

22 Q    And between the $715,000 in the court clerk's registry and

23 the $85,000 you already hold, you've got, potentially, access

24 to $800,000 in cash, right now.  Is that fair?

25 A    No.  I wish.  I would have to be -- get a judgment in the

1 adversary proceeding where the Court says that the Cummings

2 Manookian, the bankruptcy estate, was entitled to $715,000.

3 Q    Or settlements approved by the Court.  Is that what you

4 testified earlier?

5 A    Right.

6 Q    And that potential for $800,000 is measured against

7 $620,000 in claims right now.  Is that right?

8 A    If the Chase claim is approved, yes.

9 Q    $43,000 in Trustee's fees.

10 A    Yes.

11 Q    $100,000 in legal fees.  Is that right?

12 A    I think it would be more than $100,000, plus the

13 additional attorney fees that were being heard in the adversary

14 proceeding.

15 Q    And what's your estimate of those fees?

16 A    It depends.  Fifty to a hundred or more thousand dollars.

17 It depends, again, is where -- I'm just looking at the

18 Fitzgerald case and funds and --  or have to pursue all the

19 other causes of action, all the other cases, all the other

20 causes of action in the adversary.

21 Q    In your estimate, that I think you testified with

22 Mr. Young, is it would cost you $50,000 to pursue the

23 Fitzgerald fees, to recover $1.35 million.  Is that right?

24 A    To judgment, not the collection of all of that.  But to

25 complete the discovery, 50,000 is what I estimated after

1  talking to Mr. Young.

2  Q    And if you don't do that, as of -- if your legal fees are

3  what they are right now, that would total less than $800,000.

4  Is that right?

5  A    Go back through the numbers.

6  Q    Sure.  So you got $180,000.  That's the difference between

7  620,000 and 800,000, right?

8  A    Right, right.

9  Q    And then between, you know, current Trustee's fees and

10  current legal fees, you got $143,000, right?

11  A    Right.

12  Q    So as you sit here right now, that would leave $37,000.

13  Is that right?

14  A    It would help if I could write things down.  Can we start

15  back over with those numbers?  And then, of course, there's --

16  there are other administrative costs.  There's accountant fees,

17  there's bank fees that come out of the bankruptcy banking

18  account every, every month.

19      But to talk about the just the ones that we have mainly

20  been talking about, the $370,000 in claims that include the

21  Konvalinka and the McCarthy claim, 250,000 if that was

22  approved, that would be the 600-something thousand dollars.

23      Then $50,000 more in the adversary, $43,000.  I feel like

24  I'm leaving out something.  But I, but I think when I was

25  looking at all of the figures, it was like, if I ended up in

1  all of that -- if I collected 800-and-something thousand

2  dollars and I could limit the expenses to around that, then I

3  would be able to pay all the claims in the case if we settled

4  for the $250,000.  But it could be, you know, it may be likely

5  that there could be those additional attorney fees that we

6  talked about.

7  Q     But if the adversary proceeding were conceded today and

8  you didn't have to pay Mr. Young anything further, you've got

9  more at your disposal -- you have $800,000 at your disposal

10 against $743,000 in expenses that you testified to.  Isn't that

11 right?

12 A     So if -- you're saying if we were -- if I was to reach an

13 agreed settlement with the defendants in the lawsuit for

14 $715,000.

15 Q     Yes.

16 A     Okay.  And then so where the $715,000 was paid to the

17 estate, the claims of Chase were --

18 Q     Sorry, before you get there --

19 A     Pardon me?

20 Q     I'm sorry.  Before you get there, plus the $85,000 that

21 you're already holding

22 A     Right.

23 Q     So that totals --

24 A     So that'd be the 800, right?

25 Q     Eight hundred.  So the math problem I'm trying to do is

1 800 minus 620,000, that leaves 180,000, correct?

2 A    I'm totally confused here.

3 Q    The value of the claims, as you've ascribed value to them

4 today, is $300,070-ish, and $250,000.  Would you say --

5 A    Which would be --

6 Q    Total $620,000.

7 A    That's correct.  That's right.

8 Q    So I'll just represent to you that that is $180,000 less

9 than $800,000.

10 A    So then on top of the claims, it'd be 680, and there's

11 100,000 of outstanding, or more outstanding already attorney

12 fees, 43,000 in Trustee compensation.  Yeah, so I think the

13 only thing we would be backing out there was the $50,000 and if

14 we didn't have to incur any of the other money in the adversary

15 proceeding.

16 Q    That's right.  And 620,000 plus 143,000 is less than

17 800,000.

18 A    Yes.

19 Q    So as it stands, if that case were to resolve today in

20 your favor, it would be a surplus.  Wouldn't it?

21 A    Oh no.  I don't know what the accountant fee is going to

22 be.  I don't know that we're -- I don't think we're going to

23 have any tax liability in the case, but I don't know that.

24 Q    But as you sit here today, you can't tell the Court that

25 those fees would total greater than $37,000.  Can you?

1  A    I don't know.  I don't know.

2          MR. SPRAGENS:  I don't have anything further at this

3  time, Your Honor.

4          MR. YOUNG:  Your Honor, may I be permitted to ask

5  just a couple of follow up questions on those kind of new

6  items?

7          THE COURT:  I'll allow it since you're in unchartered

8  territory right now.

9                    RECROSS-EXAMINATION

10 BY MR. YOUNG:

11 Q    Ms. Burton, Mr. Spragens was just asking you about what

12 would happen if this adversary proceeding ended today.  Has

13 there been any sort of suggestion that the defendants would

14 just give you the 715 today?

15 A    No.

16 Q    And in fact, the only way using Mr. Spragens's

17 hypotheticals, that there would be a surplus in this case is if

18 they settled the AP, and if the Chase claim settlement were

19 approved by this Court, which Mr. Manookian has opposed, right?

20 A    Correct.

21          MR. YOUNG:  Those are the only questions I have, Your

22 Honor.

23          THE COURT:  Anything else?

24          MR. SPRAGENS:  No, Your Honor.  I'm happy to argue

25 the standing issue whenever the Court is ready to hear

1  argument.

2        (Witness excused)

3            THE COURT:  All right.  Mr. Young, any additional

4  evidence?

5            MR. YOUNG:  No, Your Honor.  Thank you.

6            THE COURT:  All right.  Proceed.

7            MR. SPRAGENS:  Your Honor, I'm not going to belabor

8  this too much because we've done a lot of math today.  I do

9  think that, you know, by any fair measure, including the

10 testimony that Ms. Burton just gave to Mr. Young, if she has to

11 proceed further, she spends another $50,000, and that's a fee

12 that Mr. Young is giving her.

13           I mean, I a lot of this -- these estimates happen to

14 add up to just beyond what the available funds are, which is a

15 tough position to put an objector to a settlement in when it

16 all adds up to just beyond what the corpus of the estate is as

17 the Trustee has valued it.

18           It is a difficult situation to be in as an objector

19 when the Trustee doesn't have an inventory of the value of the

20 assets in the estate, that she's alleged are worth a lot,

21 including a lot of settlements that could total in the millions

22 of dollars.

23           But she has testified that you know, based on where

24 things stand right now, she's $37,000 shy of the $800,000

25 threshold.  She also testified that she'd have to spend another

1 $50,000 to prosecute the adversary proceeding, just to get the

2 one fee that she says is worth $1.35 million.

3      That's a no-brainer for a plaintiff lawyer like me,

4 at least.  That's a good investment.  And if she does that,

5 then she has increased the value of the estate, of the estate

6 substantially.  It certainly becomes a surplus case at that

7 time.

8      So in my view, whether you calculate it as we sit

9 here today, or you calculate it based on the reasonable

10 expectation of what will happen if all of the allegations that

11 she's made in the adversary proceeding are credited and proved,

12 and she has, you know, now testified under oath that they are

13 true.

14      Then you know, either way, it's a surplus case.

15 Whether it's based on what's been spent to this date, or what

16 will be spent if she pursues the, frankly, millions of dollars

17 of claims that she believed the estate had, or the assets, if

18 she recovered the millions of dollars of assets, that she

19 believed the estate has.

20      The fact that the Trustee doesn't have an inventory

21 of these assets that I can ask her about, after she has put off

22 prosecuting the adversary proceeding all these times, and now

23 seeks to estop us from making arguments about the propriety of

24 the $250,000 settlement, it's a pretty difficult situation

25 further for an interested party to be put in.

1          So the doctrine of standing is not meant to prevent

2    the Court from looking at the substantive issues in a case,

3    whether it's a bankruptcy case, or any other case.  The

4    showing, you know, if it is the plaintiff's burden to show, I

5    put on the Trustee herself, not a friendly witness or Mr.

6    Manookian to testify.

7          I put on the Trustee and asked about her allegations

8    and her valuation of the claims in the estate.  And the best

9    that Mr. Young could get her to say is that she may not be

10   likely to collect the judgment.

11         You know, that's -- we're in a preponderance of the

12   evidence world, and this is a threshold issue of whether the

13   Court is entitled to entertain objection to the propriety of a

14   settlement where, as we can discuss later, perhaps, you know, a

15   zero dollar judgment that was vacated at the highest levels has

16   now -- is being proposed to be settled for $250,000, and there

17   are people involved who have been on different sides of that

18   transaction, all here asking the Court to approve it, and to

19   prevent somebody from raising an objection to it, so the Court

20   doesn't have the opportunity to consider it on its merits.

21         The Doctrine of Judicial Estoppel that Mr. Young

22   raised in his papers is not appropriate here.  It's not meant

23   to estop someone who hasn't affirmatively come into Court and

24   made a bunch of representations about the value of all these

25   assets, and the value of the estate, that the Trustee has, has

1  made.

2          And the Trustee is the one who speaks on behalf of

3  Cummings Manookian.  Mr. Manookian doesn't have the ability to

4  do that right now.  The Trustee is the one who is charged with

5  knowledge of the estate, and the fact that she cannot tell the

6  Court the status of all these cases that Cummings Manookian is

7  entitled to collect fees in and then uses that ignorance as a

8  shield and then further as a sword to try to prevent

9  Mr. Manookian from objecting to a settlement, that is not the

10  way judicial estoppel works.

11          She is the one who's taken positions in this case,

12  and now her argument asks this Court to rely on the opposite

13  positions in this case.  But she's the one who initiated the

14  adversary proceeding and purports to be able to prove all of

15  those and, as she sits here today, still testified that she'll

16  prove all of those.

17          So for all these reasons, I believe that, you know,

18  we've shown that this is a surplus case, it falls into that

19  exception.  It is more likely than not to be a surplus case,

20  and that's whether you measure it at this time, or after Mr.

21  Young pursues the adversary proceeding to its fullest and

22  recovers 1.35 million, or maybe, you know, 10.35 million,

23  depending on what they prove in the adversary case.

24          But it would not be appropriate for them to take one

25  position in the adversary proceeding, and then ask this Court

1 to let them take the opposite position here, and thus not reach

2 the merits on its own objection.

3          I'm happy to answer any questions Your Honor has or

4 just be quiet.

5          THE COURT:  You mentioned judicial estoppel.  Did

6 Mr. Manookian sign the petition?

7          MR. SPRAGENS:  He did sign the petition to initiate

8 the bankruptcy, yes, Your Honor.  That's my understanding.

9          THE COURT:  And with that petition, he made certainly

10 representations about the assets and the value of those assets

11 at that time, on the schedules.  Is that correct as well?

12          MR. SPRAGENS:  Yes.  That's my understanding.

13          MR. YOUNG:  Yes, Your Honor, thank you.  Phillip

14 Young on behalf of the Trustee.  Let me start where the Court

15 left off.  Not only did Mr. Manookian sign the schedules, he

16 doubled down by signing an affidavit in the adversary

17 proceeding saying that the Trustee's cause of action had no

18 value.

19          That they were without merit and I pointed that out

20 in one of our briefs, and we'd ask the Court to take judicial

21 notice of that affidavit, as well as the petition.

22          And I also want to point out that Mr. Spragens is not

23 exactly correct.  The Trustee has never taken a position in

24 this case, that there'd be a surplus.  He's taking the position

25 that there are meritorious claims, and we still take that

1  position.

2        But that's a far cry from saying that there's a

3  surplus and the Trustee walked the Court through that, and

4  through all the variables.  But -- and I'm going to try to

5  short circuit this.  Mr. Manookian simply isn't a creditor in

6  this case.

7        He's the, he's the former principal, the debtor, so

8  there's only two ways he'd get standing.  One is if this issue

9  involves the debtor's exemption.  It clearly does not.  The

10 second is if he proves, that it's his burden to prove, with

11 concrete evidence, that's what the Court said -- the case law

12 says, is he proves with concrete evidence that this is likely

13 to be a surplus estate.

14       And I'll re-raise the issue I raised at the very

15 beginning of this, which is he's estop from even taking that

16 position.  He's not just estop from testifying to that, because

17 he's already testified to the opposite, he's estop from taking

18 that position, from making that argument.

19       We don't think he even gets through the courthouse

20 doors, so to speak, on proving his burden, that this is a

21 surplus estate.

22       Furthermore, the only, the only evidence offered

23 interview he case was the testimony of the Trustee who said

24 bluntly that she does not believe this would be a surplus

25 estate.  She's walked the Court through the -- all the

1  variables.  There are a lot of variables.

2          And as we cited in our plea, I know the Court has

3  read our pleadings, as we cited in our pleadings, case law says

4  when there's contingent litigation like this, you have to

5  discount that greatly.  You can't just say, hey, the Trustee

6  sought $1.3 million, therefore, this is going to be a $1.3

7  million estate.

8          You have to discount that for risk of litigation, for

9  cost of litigation, for risk of collection, for cost of

10  collection, and in a case like this, and maybe especially a

11  case like this, where we've got very litigious parties, where

12  collection of anything beyond 715 is far from guaranteed.

13          The Court needs to take that into consideration when

14  weighing all this, and I think the Trustee's testimony that

15  there is no surplus -- will be no surplus in this case, is spot

16  on and I think it should carry the day.

17          So, Mr. Manookian is not only estopped from arguing

18  that he, that he's got standing because there's going to be a

19  surplus.  In fact, the only proof he put on proved the

20  opposite.

21          So he's neither carried his burden, nor can he

22  overcome the estoppel.  So for that reason, we believe the

23  Court should find that he has no standing.

24          THE COURT:  All right, thank you.  The Court

25  appreciates both parties argument today.  Appreciate the

1  Trustee's testimony.  Hard to be the Trustee when you're

2  testifying against yourself in some respect.  But I appreciate

3  the credibility in the Trustee today.

4          And the Court makes special note of that, that the

5  Trustee's testimony is credible with respect to the uncertainty

6  going forward in the case, and the many factors that go into

7  whether, in fact, certain monies are collected for judgments,

8  are in fact collected.  And so the Court will make special

9  mention of the Trustee's credibility.

10         I examined the papers that have been filed, and we're

11  here today to determine whether Brian Manookian has standing to

12  prosecute his objection to the Trustee's settlement.  After

13  reviewing the case, hearing the testimony from the Trustee and

14  the arguments of counsel, the Court finds that Brian Manookian

15  does not hold a claim against this estate as already expressed

16  by Mr. Young, and confirmed by the papers and pleadings, the

17  petition, statements, and schedules that have been at issue in

18  this case.

19         Mr. Manookian, to date, has not offered any concrete

20  evidence, and I'll use that same word that Mr. Young has used,

21  that this is a surplus case.  What has been shown is there are

22  many variables.  As I've already mentioned, that go into

23  determining the exact monetary value of bankruptcy estate.

24         In this instance, the burden was on Mr. Manookian to

25  produce something tangible and concrete that the Court could

1  rely on in making a determination that the it's a high

2  likelihood that this case would be a surplus case.

3          In fact, what we have is a case that is ripe with

4  potential expenses to pursue assets and obtain judgments, and

5  ultimately, collect money, that clearly has a dollar figure to

6  it.

7          The Bankruptcy Court is well aware through thousands

8  of cases, that a judgment is something, but collecting it is

9  something else.  And in fact, in this case, where there's been

10  no evidence that there will be an easy win on anything, the

11  estimates for legal fees, the Court will take, while they seem

12  quite reasonable, if not underestimated based on what has been

13  seen so far in this case, and what historically Chapter 7

14  Trustees have expended on similar or same cases, to actually

15  collect monetary judgments.

16          So for these reasons, the Court finds that Brian

17  Manookian does not have standing to object to the Trustee's

18  motion for approval of the settlement, with the Chase

19  claimants.  Therefore, that objection is moot.

20          The Court would further point that the Court is

21  addressing that issue in the second phase of this hearing, in

22  which there is a party withstanding, who has objected.  So in

23  fact, Mr. Manookian, he doesn't get his day in court, but the

24  issue gets its day in court.

25          So in fact, even if there were harm to Mr. Manookian,

1  there is no harm to Mr. Manookian because the Court still is

2  addressing the sufficiency of the settlement agreement in which

3  the Trustee is attempting to enter into.

4          With that said, Mr. Young, if you could prepare the

5  appropriate order, which finds Mr. Manookian does not have

6  standing, and that his objection is therefore moot.

7          MR. YOUNG:  Yes, Your Honor.

8          THE COURT:  All right.

9          MR. SPRAGENS:  One housekeeping question about the

10  next part of the hearing.  I would just ask, for the record,

11  that I be allowed to examine any witnesses for the purpose of

12  proper -- for any appeal.  I just wanted to get a ruling from

13  the Court on that.

14          THE COURT:  Court, Mr. Young, I'll let you respond to

15  that.

16          MR. YOUNG:  Your Honor, we would object to that.  The

17  Court's already found that there is no standing.  So Mr.

18  Spragens has no role in this, from this point forward.

19          THE COURT:  The Court will not allow additional

20  questioning since we resolved your client's role in this

21  proceeding.  Then the standing issue, I think, is definitive of

22  your ability to ask questions in the second phase of this

23  hearing.

24          MR. SPRAGENS:  Thank you, Your Honor.

25          MR. YOUNG:  Your Honor, if I may, I'd like a little

1  bit of clarity on one point the Court just raised.  And that is

2  the extent, and I just need to know this so that I can present

3  the appropriate evidence on direct, the extent to which the

4  Court will allow Mr. Konvalinka to essentially argue Mr.

5  Manookian's objection.

6          Obviously, there were very different things raised in

7  the two motions.  So I just need to know if the Court, and

8  frankly, most of the stuff in Mr. Manookian's -- if not all the

9  things in Mr. Manookian's objection are going to be

10 inadmissible under Federal Rule of Evidence 408, but I just

11 need to know what kind of direct -- wants me to go ahead and

12 address the issue in direct, of Mr. Manookian's objection.

13         THE COURT:  Don't construe anything from my comment.

14 I was merely -- the subject is being addressed, not the merits

15 or the particularities that Mr. Manookian raised.  And I think

16 Mr. Konvalinka is well aware that he needs to stick to what

17 he -- what his objections are, since there's been no notice to

18 you as to anything outside of that.

19         We ruled on Mr. Manookian's standing issue.  So we'll

20 take up the objections that are before the Court at this time.

21         MR. SPRAGENS:  And the only reason I raise that, Your

22 Honor, is because on the witness and exhibit list, Mr.

23 Konvalinka filed on Monday, he listed Mr. Manookian as a

24 potential witness, and said that he intended to call Mr.

25 Manookian to testify as to these issues about the prior offers

1  back with the Chase claimants.

2      And so I would just like to note, if the Court's

3  going to let him go beyond the four corners of its own

4  objection, and argue Mr. Manookian's objection, then you know,

5  I need to put on the appropriate evidence.  If the Court's

6  going to require Mr. Konvalinka to stick to the four corners of

7  his own objection, then we can obviously expedite this

8  considerably.

9      THE COURT:  Mr. Manookian's objection is mooted.

10 Therefore, Mr. Konvalinka, your objection is the only objection

11 before the Court.

12     MR. SPRAGENS:  And I hear the Court.  But the only

13 thing I will respond is, so there is notice in the sense that I

14 did give notice of Mr. Manookian's appearance in connection

15 with this matter, as a witness.  And I did not know all the

16 things that were alleged in Mr. Manookian's objection, because

17 I became aware of those when I listed him as a witness.

18     And to suggest that somehow, just because the

19 objection that I filed, which I think is meritorious in and of

20 itself, that I am amenable with regards again, a situation in

21 which I should be allowed to call a witness that I have

22 identified, and have indicated to counsel that I was going to

23 do so.

24     And suggesting I have not done so is incorrect by

25 reason of the facts, that I've actually listed the witness and

1 I've actually listed the topics as well.

2          THE COURT:  And the Court will say you're free to
3 call which witness you want to call, and Mr. Young's free to
4 object to the questions you ask that witness.  And the Court
5 will rule on them, if we have to rule one by one, we'll rule
6 one by one.

7          MR. SPRAGENS:  All right.

8          MR. YOUNG:  Your Honor, I'm ready to proceed with
9 calling Ms. Burton, and I'd suggest to the Court, for
10 efficiency's sake that we proffer her testimony.  I'll offer
11 that to the Court.

12          MR. SPRAGENS:  And Your Honor, I would object to
13 that.  I have not had an opportunity to cross-examination this
14 witness, and I would like to have that opportunity with regard
15 to what her testimony is going to be, as opposed to Mr. Young's
16 testimony.

17          THE COURT:  Well, you'd still have the opportunity to
18 cross examine her, but you're objecting to the proffer all
19 together?

20          MR. SPRAGENS:  Yes, I am.

21          THE COURT:  I will sustain the objection.  Call your
22 witness, Mr. Young.

23          MR. YOUNG:  Thank you, Your Honor.  I'll call Jeanne
24 Burton.  And Your Honor, just as a matter of housekeeping, can
25 I ask Mr. Konvalinka to use his microphone because there's some

1  background noise there.  Thank you.

2          I think Ms. Burton's already been sworn in, so I

3  don't know if she needs to be sworn in again.

4          JEANNE ANN BURTON, TRUSTEE'S WITNESS, SWORN

5          THE COURT:  You're still under oath, Ms. Burton.  We

6  won't re-swear you.  But you are still under oath.

7          THE WITNESS:  Yes, Your Honor.

8          MR. YOUNG:  And again, for the record, my name's

9  Phillip Young.  I'm counsel for Ms. Burton.

10                     DIRECT EXAMINATION

11 BY MR. YOUNG:

12 Q    Ms. Burton, what's your occupation?

13 A    Chapter 7 Trustee and attorney.

14 Q    How long have you been serving as a bankruptcy Trustee in

15 this district?

16 A    Twenty-four years.

17 Q    Were you appointed to serve as the Trustee for Cummins

18 Manookian, PLC?

19 A    Yes.

20 Q    Do you remember when that was?

21 A    November the 6th, 2019.

22 Q    Are you still serving in that capacity today?

23 A    Yes.

24 Q    When you were first appointed Trustee in this case, what

25 were some of the major issues that you identified as central

1  issues in this case?

2  A    There was a judgment that had been entered in favor of

3  what I would call the Chase parties, that was on appeal, and

4  oral argument was set for the Court of Appeals in January,

5  early January, like January 6th, or January 8th, early January.

6        And then there was also a receivership proceeding because

7  while the judgment was on appeal, the collection had not been

8  stayed.  So a receiver had been appointed and there was a

9  contested matter regarding that 715 -- well, actually more than

10 $715,000 because the -- there was going to be a contested

11 proceeding as to whether or not the Court, the State Court

12 would continue to hold those monies or if that would be

13 released.

14 Q    Did the Chase parties ultimately file a claim in this

15 case?

16 A    They did.

17 Q    How much was that claim?

18 A    It was a secured claim for 806-something thousand dollars.

19 Q    And tell the Court what the basis of that claim was.

20 A    It was an award, a contempt and sanctions award which was

21 the amount of the attorney fees that the Chase parties proved

22 were -- that they had expended in revealing who disclosed what

23 was potentially, or they considered, or was confidential

24 information to news media and other, other entities at the

25 time, in a nutshell.

1  Q    Who were the judgment debtors under that sanction
2  judgment?
3  A    Brian Manookian, Cummings Manookian, Mark Hammerfold, and
4  Mr. Hammerfold's law firm.  I think it was Hammerfold, LLC.
5  Q    Did you review any documents to inform yourself about the
6  sanctions judgment?
7  A    Yes.
8  Q    What documents did you review?
9  A    All the documents that were available off of the Court of
10 Appeals website.  The Cummings Manookian, and Brian Manookian's
11 brief, appellate brief.  The Chase parties brief.  I did review
12 the State Court judgment order.
13 Q    You just mentioned the Court of Appeals.  When the case
14 first got filed, were you aware that the sanctions judgment had
15 been appealed to the Court of Appeals?
16 A    Yes, because I was contacted about was I going to be
17 released on this day for that to go forward, because oral
18 argument was set in January, and the case was filed in
19 November.
20 Q    Had exaction on the sanctions judgment been stayed?
21 A    No.
22 Q    Had Cummings Manookian appealed the sanctions judgment?
23 A    It did not.  It didn't.  That was one of the things --
24      MR. SPRAGENS:  Objection, Your Honor, as to
25 foundation and as to her know with regard to that.

1          MR. YOUNG:  I'm sorry, Your Honor, I didn't hear your
2    response.
3          THE COURT:  And your response to the objection?
4          MR. YOUNG:  Yes.  I'm asking her about her, if she
5    was involved in this as the Trustee for one of the judgment
6    debtors and I'm asking her whether she was aware whether or not
7    they had appealed the sanctions judgment.
8          THE COURT:  As a panel Trustee in charge of this
9    case, she's in the best position, and clearly has knowledge, so
10   I'll allow the testimony.
11         MR. SPRAGENS:  Again, just let me note for the record
12   that I do object and there is obviously an appeal that was
13   filed on behalf of Cummings Manookian, as evidenced by the
14   notice of appeal that was filed.
15         MR. YOUNG:  I'll continue.
16   BY MR. YOUNG:
17   Q    Ms. Burton, you already answered that question.  What
18   about Brian Manookian?  Had he appealed the sanctions judgment?
19   A    He did.  And I communicated with Mr. Konvalinka because it
20   appeared that Cummings Manookian, and Brian Manookian appealed
21   the order, one of the orders for recusal.
22         But only Brian Manookian appealed the sanctions judgment
23   and Mr. Konvalinka, who represented Cummings and Manookian at
24   -- during part of that, and actually, an attorney in that
25   appeal, until he withdrew.  He said he didn't recall.

1  Q    Did the Court of Appeals -- well, let me go back.  He
2  didn't recall what?
3  A    He didn't recall if the, if the Cummings Manookian
4  appealed the sanctions judgment.
5  Q    Did the Court of Appeals ultimately make a ruling on the
6  sanctions judgment?
7  A    Not on the -- well, not really on the sanctions judgment.
8  It ruled that the judge should have recused himself and based
9  on that, they vacated the sanctions judgment, for it to go
10 back, be assigned to a new judge and reheard.
11 Q    And when was that order issued by the Court of Appeals?
12 A    February 20, '21 maybe.  I think that's right.
13 Q    Did the Court of Appeals make any finding regarding
14 whether the sanctions were actually warranted?
15 A    No.
16 Q    Did any part appeal the Court of Appeals' decision to the
17 Supreme Court?
18 A    The Chase parties did.
19 Q    And did the Supreme Court accept cert?
20 A    It did not.
21 Q    So now that the judgment's been vacated, what's your
22 understanding of what's going to happen to the sanction issue
23 involving the Chase partners?
24 A    A new judge --
25        MR. SPRAGENS:  Again, Your Honor.  I object to

1 hearsay and foundation.

2         MR. YOUNG:  Your Honor, I'm asking her opinion as a

3 lawyer and Chapter 7 Trustee records, in the interest of (audio

4 gap).

5         THE COURT:  I will allow the testimony.

6 BY MR. YOUNG:

7 Q    Let me ask that question again, Ms. Burton.  Now that the

8 judgment's been vacated, what's your understanding of what's

9 going to happen to the sanctions issue involving the Chase

10 parties?

11 A    That the -- that a new judge will be appointed and it will

12 start basically all over from the beginning.  I think there was

13 a, there was a motion to rehear, or for clarification filed by

14 the Chase parties about -- well, there's something about

15 retroactive vacation of the, of the judgment.  But anyway, the

16 Court of Appeals from what -- the way I read the order, was

17 that it would go back and start over.  That the new judge would

18 need to see new witnesses, you know, not just decide something

19 on the record, review of the record and make a decision.  That

20 it would start over.

21 Q    To the best of your knowledge, has a new judge been

22 appointed?

23 A    I know things have been filed, but I don't know anything

24 about a new judge being appointed yet.

25 Q    Do you know how long it took to try the sanctions issue

1  originally?

2  A    I think just the sanctions issue, which is a, kind of a

3  case within another case, I think that was over two and a half

4  years, two years, two and a half years.

5  Q    Based on that and your experience in this case, do you

6  think the rehearing is likely to be lengthy?

7  A    I'm sorry.  I --

8  Q    Let me ask the question again.  Based on that, and based

9  on your involvement in this case, do you expect the rehearing

10 to be lengthy litigation?

11 A    I think, I mean, I do, unless the parties decide something

12 different.  But I don't, I don't expect that to happen, so I do

13 expect that it will start over from the very beginning.

14 Q    I want to ask about your process of reviewing claims in

15 this case.  When did you start reviewing claims in this case?

16 A    Well, I reviewed claims when they're filed.  You know, I

17 always take a look at them and see if there's, you know, if

18 they're lacking something or you know, there's no attachment,

19 or anything like that.

20     But I really started addressing the claims once, once the

21 Court of Appeals vacated the judgment, because now, the Chase

22 claim was not, it wasn't liquidated, and so I started, you

23 know, trying to figure out, okay, what are we going to do about

24 that.  What are the other claims that should be allowed?

25     I already knew that there were claim objections that, that

1  needed to be filed and those objections resolved.

2  Q    And approximately when did you start that evaluation?

3  A    It was probably March.  It was after the appellate court.

4  I think the objections that I filed were in May, but I started

5  looking at all of that probably March, March, April.

6  Q    And so you did file some claim objections in this case.

7  A    Correct.

8  Q    When did you first begin discussing a potential settlement

9  with counsel for the Chase parties?

10 A    It was early April.

11 Q    So had the Court of Appeals ruled at that time?

12 A    It had.

13 Q    Had the Supreme Court ruled at that time?

14 A    No.

15 Q    In your opinion, did you think --

16 A    No, but it hadn't been appealed to the Supreme, the

17 Supreme Court yet at that, at that time

18 Q    So this was after the Court of Appeals had ruled, but

19 before any brief had been filed with the Supreme Court, right?

20 A    Yes.  When I first started discussing settlement, yes.

21 Q    At that time, did you think it was likely that the Supreme

22 Court would overturn the Court of Appeals decision?

23 A    No.  I didn't.  I didn't.

24 Q    So in your settlement discussions, did you ever make the

25 presumption that the Supreme Court was going to take cert?

1  A    I think it was generally thought that, at least from my

2  perspective, that the Supreme Court, I can't say for the Chase

3  parties, but that the Supreme Court would not.  But it could

4  have, but I didn't think so.  It seems kind of a little low bar

5  that the, that just the appearance of bias was enough to

6  reverse a recusal order, and vacate the judgment.

7       There were some interesting issues.  There were other

8  issues but I generally did not think that the Supreme Court

9  would accept cert.

10 Q    And just for clarity, that was, that was your opinion, not

11 necessarily anybody else's.

12 A    Correct.  Correct.

13 Q    Who had the majority of the settlement discussions with

14 the Chase parties?

15 A    I did.

16 Q    Directly?

17 A    Not with the Chase parties, but with their attorney.

18 Q    Who did you talk to?

19 A    Dan Puryear and Charlie Malone.

20 Q    When did ask special counsel to get involved in those

21 discussions?

22 A    Really when it came time to like formalize the settlement

23 offer and what the terms of the settlement would be, I guess

24 you'd say when we get ready to, to paper it, or to make, you

25 know, the final offer of settlement.

1  Q    You had already made the decision at that point.

2  A    That's correct.

3  Q    Who made the decision to offer to allow the Chase claimant

4  $250,000?

5  A    I did.

6  Q    And who communicated that to counsel for the Chase

7  parties?

8  A    The formal offer came from me, but I had had discussions

9  with the attorneys for the Chase parties about it.

10 Q    And did counsel assist you in drafting that settlement?

11 A    Yes, she did.

12 Q    Let's talk about the terms of that settlement.  You're

13 proposing to allow the Chase claim what amount?

14 A    $250,000.

15 Q    Is that a secured claim or an unsecured claim?

16 A    As an unsecured claim.

17 Q    How was the claim filed?  Secured or unsecured?

18 A    It was filed as a secured claim.

19 Q    And are mutual waivers included in the settlement

20 agreement?

21 A    Yes.

22 Q    Can you explain to the Court why it was important for you

23 to get a waiver from the Chase parties?

24 A    Well, it's just always good practice, you know, when

25 you're -- just like in any settlement, you don't always know

1   what possibly might be out there, what somebody might come up

2   with, and every settlement agreement that I have been presented

3   with in my time as Trustee, always asks for release of the

4   other party, and I just always make sure that it's a mutual

5   release of the, of the parties.

6        But I also want to do it to, you know, include anything

7   else that would, that would come up, or that was pending in a

8   case, like the order that reserves their rights to challenge

9   whether or not $25,000 that was paid to the estate, that I

10  claimed was a preference.

11       They reserved their rights to dispute that, but did agree

12  that it could be turned over to the bankruptcy estate.

13  Q    So getting a release of that reservation rights, did you

14  consider that to be beneficial to the estate?

15  A    It was.

16  Q    I want to discuss with you what factors you considered

17  when agreeing to the proposed settlement.  Just walk the Court

18  through some of the factors that you considered.

19  A    Okay.  So you're looking at assets, we've kind of been

20  through that, what you think your assets are.  And then what

21  the claims are, and you know, what the cost of everything is,

22  and trying to maximize or be able to make, you know, a, a

23  meaningful, try to make a meaningful distribution to the

24  creditors.

25       And so there were, there were several things.  There was,

1 obviously, the Chase claim did not -- was -- did not get

2 liquidated, and so it's going back, and the estate was, in

3 order to have to have counsel, and in that matter, to take the

4 interest of the estate and really the other creditors because

5 you know, that had claims, that had allowed claims.

6      And to maximize what, you know, what I would be able to

7 pay creditors.  And what amount, that Mr. Konvalinka made a

8 statement about, the numbers were so close, well, it's because

9 I'm trying to figure out what the, you know, what exactly these

10 expenses would be.

11      What did I think that they, you know, the least amount

12 that I would be willing to offer to the Chase parties to settle

13 a disputed claim, and still be able to pay the claims of the

14 other, the other allowed, the other allowed claims.

15      And so you know, 250 kind of came up, you know, with that.

16 Kind of lined all of that up, but also taking into

17 consideration that, that State Court litigation and what the

18 cost would be, and what the risk would be, that there can be

19 another hefty sanctions judgment against Mr. Manookian and

20 Cummings Manookian, that would just, you know.

21      And then they're the biggest creditor in the case with the

22 lion's share of the money going to them, and you would have --

23 now would have, you know, incurred all of those expenses, and

24 since we talked about, you know, how that impacted -- would

25 have impacted the adversary expenses in that case, as it went

1  forward.

2       And you know, and the big elephant in the room, I had

3  $85,000 in the case, and already over $100,000 in just attorney

4  fees, not to mention Trustee compensation.  I still had to

5  hire, you know, employ an accountant and all of those things,

6  just getting administrative costs.

7       And then having to consider employing counsel to represent

8  the estate in that State Court action, and how to compensate

9  that attorney and, you know, when.  Find somebody that would

10 agree to that.

11       So yeah, I think that that's pretty much the -- sorry if

12 that was jumbled, but that was sort of my thought process of

13 all of it.

14 Q    No, that's fine.  One of the things you mentioned just a

15 minute ago was risk.  Did you consider the likelihood of

16 whether you thought a new judge would issue sanctions against

17 Brian Manookian and Cummings Manookian?

18 A    I did.

19 Q    What was your conclusion?

20 A    Anything can happen, but looking at the briefs, the

21 appellate briefs of both parties, and the, the State Court

22 order, and the Court of Appeals order, you know, that says, you

23 know, it didn't make any comment about the sanctions.

24       The Court did say that the judge had done a thorough or

25 complete analysis of the very serious allegations.  And that

1 the judge had been exceedingly, or extraordinarily patient with
2 the parties.

3      And so I just -- the facts are going to be the same.  I
4 think everybody, when you go back and retry something,
5 everybody's trying to up their game, and you know, cover things
6 that may not have been covered before.

7      But in my view, it was likely that a new judge would issue
8 a similar sanctions judgment.  That's a risk, that was the
9 risk.

10 Q    In your view, is there any chance that the sanctions
11 amount could increase at the rehearing?

12 A    Well, it could, but I mean it could because based on
13 attorney fees that the Chase parties had expended in proving
14 the grounds for the sanctions, obviously, they had incurred,
15 you know, other attorney fees after that, after that time.

16      So I don't know if the Court -- it's possible, but I don't
17 know if the Court would allow them their additional, additional
18 fees or not.  But it's a possibility.

19 Q    In your view, after considering all this that you just
20 described to the Court, do you think there's a substantial risk
21 that the sanctions awarded as Cummings Manookian could exceed
22 250,000 on rehearing?

23 A    I think it could have.  I think it could have.

24 Q    Did you give any -- well, I think you mentioned earlier
25 that you considered expenses that might be involved to the

1  estate regarding the rehearing, right?

2  A    Right.

3  Q    What was your conclusion about what expenses could be for

4  the rehearing?

5  A    Well, litigation is very expensive.  That was, you know,

6  both parties, the Chase parties and the Manookian parties, and

7  Hammerfold, that you know, it was, it was very, it was very

8  aggressively litigated by, by both sides, and I think it's safe

9  to assume that it would be again, and that, you know, it would

10 be, it would be expensive for everybody again.

11     It would be expensive for the Trustee to employ an

12 attorney.  There'd be a long, you know, it'd be, probably be

13 another long period of time.  I don't know if it'd be two and

14 a half years, but I think it would be substantial.

15     And that was, sorry if I digress, that was another

16 consideration in trying to work out a settlement with the Chase

17 parties was the efficient administration of the estate, and the

18 time to get the estate that administration concluded, and

19 distribution to creditors.

20     But anyway, it would be expensive, and --

21 Q    I want to come back to the efficient administration issue

22 in just a minute.  But I want to say on sort of the expense

23 issue with regard to the rehearing.  Did you come up with an

24 estimate, a legal expense estimate of what it would cost to

25 rehear the case?

1  A     I estimated about $150,000.

2  Q     Would you have to retain special counsel to represent you
3  in that case?

4  A     Yes.

5  Q     That would have to be approved by the Court?

6  A     Yes.

7  Q     How much does the estate currently have in its bank
8  account?

9  A     $85, $86,000.

10 Q     And you already have attorney fees that the estate will
11 owe in this case.  Is that right?

12 A     Yes.

13 Q     How would you pay for counsel in the State Court?

14 A     That's a good question.  I would have to work out an
15 agreement with that attorney, my other counsel, my other
16 professionals in the, in the case, because you know, there are
17 already fees that have been incurred, and so it would probably
18 have to be an attorney who was, you know, willing to, to fund
19 the way and payment, obviously, it's not the type of setting
20 that somebody -- it's not something that would be taken on a
21 contingency fee basis.

22       It would be an hourly rate type thing.  So it would be --
23 I try to do what I have to do, but it would be difficult.

24 Q     You mentioned earlier that you considered the efficient
25 administration of the estate, and I think in that testifying,

1 you mentioned how long it might take to make distributions.  Is

2 that fair?

3 A    Right.  Right.

4 Q    Did you consider the impact on the pending adversary

5 proceedings as part of that?

6 A    I did.

7 Q    What was your conclusion?  Talk to the Court.

8 A    Yeah.  Those from a time standpoint, and also from a you

9 know, expense standpoint, that the Chase claim is uncertain,

10 and it's being litigated, then if we are, you know, if the

11 parties in the court decide we're going forward with the

12 adversary litigation, then you know, I don't know, I don't know

13 how much money I need, you know, to pay 100 percent case.

14     So I would -- there would just be more expense in pursuing

15 all the other causes of action and collecting.  If I was

16 successful in those.

17     Yeah, but first considering, obviously, you've got -- I

18 would have to be successful in getting a judgment in the -- in

19 Fitzgerald, with regard to the Fitzgerald account receivable.

20 Q    And would it be easier on your administration at that

21 adversary proceeding, if the settlement's approved?

22 A    Easier is a relative term.  But yes, obviously.  I can't

23 always anticipate what's going to happen in the adversary but

24 yes, as far as the discovery, you know, you would have to be

25 deposed, and you know, just from a discovery standpoint, yes, I

1  think it would be -- it would take less time and be less

2  expensive.

3  Q     If the proposed settlement is rejected, what's your

4  opinion of the impact that will have on the time and the

5  expense associated with the adversary proceeding?

6  A     I think it's going to, you know, a lot more expensive for

7  the reasons that I've already discussed, and I can, I can go

8  into those again, but just more expensive, more discovery, more

9  you know, because there'd be other, you know, other cases,

10 other accounts receivable.

11      And also you got to wait for those other cases to settle

12 out or for a judgment to be obtained, because you know,

13 Cummings Manookian is not the, the current attorney of record

14 in those, in those cases.

15      So not only do you have to determine -- there has to be

16 some type of fee for their, you know, then to be a

17 determination of how much of that in Cummings and Manookian

18 entitled, entitled to.

19 Q     And you testified about risk, and you testified about

20 expenses.  And you testified that you considered the efficiency

21 of the administration of the estate.  After having considered

22 all those factors, what's your business judgment concerning the

23 proposed settlement?

24 A     I think the proposed settlement is in the best interest of

25 the estate and of the creditors of the estate.

1  Q    I want to ask you some specific questions about the

2  objection filed by Grant Konvalinka in this case.  Have you

3  reviewed that objection?

4  A    I have.

5  Q    Explain to the Court what your understanding of the nature

6  of that objection is.

7  A    Is that there's a possibility that Cummings Manookian

8  would -- if there is a sanction judgment awarded by the new

9  judge upon a rehearing that Cummings Manookian may not be

10 responsible for that or the actions of Brian Manookian.

11 Q    In your opinion, as an attorney and the Trustee, what do

12 you think the likelihood is the state court would decide that

13 Cummings Manookian is not responsible for Mr. Manookian's

14 actions?

15      MR. KONVALINKA:  Objection, Your Honor.  It calls for

16 qualifying her as an expert.  I think we need a little

17 clarification as to her experience with regard to this

18 particular topic.

19      MR. YOUNG:  I can clarify that I believe, to take

20 care of that issue, Your Honor.

21 BY MR. YOUNG:

22 Q    As the Trustee of Cummings Manookian, what's your opinion

23 of the likelihood that the state court will find that Cummings

24 Manookian is not responsible for Brian Manookian's actions?

25      MR. KONVALINKA:  (Indiscernible) my objection, Judge,

1  as well, because I don't think there's a foundation laid.

2          THE COURT:  All right.  The Court's going to allow

3  it.  She's the Trustee in the case.  She's an attorney and has

4  been on the panel for 24 years.  So, clearly, she can form an

5  opinion and should form an opinion as part of her fiduciary

6  duty as administering this estate.  So the Court's going to

7  allow that testimony.

8          THE WITNESS:  As you pointed out, Mr. Young,

9  obviously, they've the right, you know, to make that argument.

10 But I don't think that would be successful.  The -- Mr.

11 Manookian was one of two members of Cummings Manookian.

12 Cummings Manookian was the law firm in this matter.  And Mr.

13 Manookian was signing the pleadings.  He was, you know, he was

14 involved in it -- in everything within that sanctioned

15 proceeding.

16 So it's not like, you know, a case where maybe we have a big

17 firm where some attorney goes rogue or, you know, does

18 something that everybody else doesn't know about.  So based on

19 that, I didn't consider that to be a valid or successful

20 argument.  And in the end, as the judge said, "You're arguing

21 against yourself."  But I don't see that happening.

22 And the file court judge, of course, you know, the court

23 appeals said there was a recusal that the trial court judge did

24 make a finding that in issuing the sanction judgment against

25 Cummings Manookian, that Mr. Manookian was acting on its

1  behalf.

2  BY MR. YOUNG:

3  Q    Was Mr. Manookian authorized to make decisions on behalf

4  of Cummings Manookian?

5  A    Yes.

6         MR. KONVALINKA:  And, Your Honor, let me object to

7  the foundation with regard to that as to what knowledge she

8  would have with regard to what Mr. Manookian was authorized to

9  do.

10        MR. YOUNG:  Your Honor, she's the Trustee for the

11 entity we're asking about.

12        THE COURT:  I think if you ask the question based off

13 of her perspective as a Trustee.  But just asking a question

14 without some foundation, I think Mr. Konvalinka's correct.  And

15 narrow it to what you're trying to ask as far as period and how

16 she came to know that information.

17        MR. YOUNG:  Sure, Your Honor.  I can set that up.

18 BY MR. YOUNG:

19 Q    Ms. Burton, who signed the petition in this case?

20 A    Brian Manookian.

21 Q    From your review of records associated with this case, did

22 you find that Brian Manookian made financial decisions on

23 behalf of the law firm?

24 A    Yes.  He would -- you're talking about in the bankruptcy

25 case?

1  Q    Prior to the bankruptcy case.

2  A    Right.  He was listed as the chief, I think, the chief

3  managing officer in the -- on the bankruptcy petition.

4  Q    You mentioned a few minutes ago that the state court judge

5  made a finding that Mr. Manookian was Cummings Manookian's

6  agent.  Do you know any basis for a new fact-finder to reach a

7  different conclusion?

8  A    No.

9  Q    Are the facts still the same?

10 A    Yes.  I would say.  Yes.

11 Q    Are you aware that the Grant Konvalinka objection also

12 questions why you would allow the Chase claim at 250,000 is

13 you'd estimate the cost of defense to be $150,000?

14 A    Yes.

15 Q    Are there other factors that went into your

16 decision-making beyond simply the cost of defense?

17 A    I was trying to get that claim paid, you know.  I mean, in

18 a perfect case scenario, I would be able -- I would have close

19 to enough money to pay the claim.  So I took that into

20 consideration that in addition to the, you know, 150,000, that

21 was just one claim of that because that was just estimated

22 attorney fees that it would cost in that.

23 And also, allaying the risk of a substantial sanction judgment

24 being awarded, which would then be, you know, a bigger claim

25 and reduce the claims including the Konvalinka claim and the

1  McCarthy claim.  And then also the impact on -- the potential

2  impact on the expense in the adversary proceeding.  All of

3  which those expenses are administrative expenses that get paid

4  ahead of any unsecured claims.

5  Q    And would that include the Grant Konvalinka claim that

6  would be subordinate to administrative claims?

7  A    Yes.

8  Q    Are you also aware that Grant Konvalinka mentioned in a

9  footnote that it might be willing to represent the estate with

10 some litigation cap?

11 A    Yes.

12 Q    Has any offer like that been extended to you?

13 A    No.

14 Q    Do you have any details on how that might work?

15 A    No.

16 Q    Or whether they would be willing to do that?

17 A    No.  Other than what Mr. Konvalinka put in his footnote.

18 Q    Or whether you would be willing to retain them in that

19 matter?

20 A    That's correct.

21       MR. YOUNG:  Your Honor, I think those are the only

22 questions I have with this one reservation.  I'd like to

23 reserve the right to question her again regarding any issue

24 that might come up regarding the Brian Manookian objection if

25 the Court allows that testimony.  But beyond that, that's the

1  extent of my direct examination.

2             MR. KONVALINKA:  And, Your Honor, at this time, could

3  I take a three to five-minute break and come back?  I just need

4  to step across the hall.

5             THE COURT:  Let's go ahead and take -- we've been at

6  this for a while.  Let's take a ten-minute break.  We'll come

7  back at -- well, that's seven minutes.  Let's keep it even and

8  come back at 3:30.

9        (Recess taken at 3:23 p.m.)

10        (Proceedings resumed at 3:31 p.m.)

11             THE CLERK:  Court is back in session.

12             MR. KONVALINKA:  May I proceed?

13             THE COURT:  Okay.  Just for everyone's edification

14  here.  I've got a hard stop at 4:30.  And I'll need to make

15  about a 30-minute break, hopefully, less than that at 4:30.

16  And then we'll come back if we're not done, and we'll go until

17  at least 5:30 or 6 tonight unless the parties want to go

18  longer.

19             And you may --

20                      CROSS-EXAMINATION

21  BY MR. KONVALINKA:

22  Q   Ms. Burton, with regard to the court of appeals, let me

23             MR. KONVALINKA:  Your Honor, can I -- I think -- am I

24  entitled to share something on the screen?

25             THE COURT:  I don't know what you're sharing.

1          MR. KONVALINKA:  Well, it's the court of appeals

2    opinion, the first page of it.

3          THE COURT:  Any objection?

4          MR. YOUNG:  Your Honor, I'm not going to object even

5    though this party didn't upload it.  I uploaded it, so no

6    objection.

7          THE COURT:  Mr. Konvalinka.

8          MR. KONVALINKA:  All right.  So I don't see any share

9    button on my screen.  I apologize, so.

10          THE COURT:  I think we'll have to make you some type

11    of co-host.

12          MR. KONVALINKA:  Oh.

13          THE CLERK: Your Honor, he should be able to, at the

14    bottom of his screen, share his screen.

15          Try --

16          MR. KONVALINKA:  Okay.  I think I've -- all right.

17    Let me try this.

18          THE CLERK:  Just, please, make sure you just share

19    what you're trying to share, not your entire computer.

20    BY MR. KONVALINKA:

21    Q    And do you see, on your screen, Ms. Burton, in the Court

22    of Appeals of Tennessee at Nashville, January 7, the 2020

23    session?

24    A    I see that top -- the top part of it, but I don't see the

25    whole page.

1  Q    Okay.  Well, it was filed on February 4.  Is this what you

2  -- a portion of what you viewed in connection with making your

3  determinations?

4  A    Can you (audio interference)?

5  Q    Sure.  And I don't know if you can scroll?  Oh, I have to

6  scroll, but this is --

7  A    Can you reduce the percentage of it, so I can -- I don't

8  know if that's going to make it too small, but can you do that

9  so I can see the whole document?

10 Q    No.  I can't do the whole document, but I can scroll if

11 you want.

12 A    Okay.

13 Q    Let me know when you're finished reading that, and I'll

14 scroll to the next -- I'll scroll below.

15 A    Okay.  Go back up to the top so I can see the court of

16 appeals.  Okay.  I see that.

17 Q    And did you read that first paragraph, or do you want me

18 to go --

19 A    Yeah.  You can go.  I did.

20 Q    Okay.  That's fine.

21 A    Yes.

22 Q    Okay.  Do you recognize what's shown on the screen, the

23 first page of the court of appeals decision that you read in

24 making your review?

25 A    Yes.  you

1 Q    Now, if you will look, do you see where it states Brian P.

2 Manookian?

3 A    Yes.

4 Q    And he was there on behalf -- he was recognized as Brian

5 P. Manookian for the appellant, Cummings Manookian, PLLC.

6 Isn't that correct?

7 A    Correct.

8 Q    And he's referred to as an appellant.  Is he not?

9 A    Yes.

10 Q    And so based upon your earlier testimony in which you said

11 they were not part of the appeal, isn't it a fair statement

12 that at least that the court of appeals recognized him as an

13 appellant?

14 A    The court of appeals prepared that.  And they were an

15 appellant in the recusal of the -- the recusal issue, which is

16 what the court was ruling on there.

17 Q    And it also -- they aired the contempt and damage orders

18 too, did they not in this same opinion?

19 A    Right.  Because as you say, where it says, "and because

20 retroactive recusal is appropriately also vacated in the

21 contempt and damages orders."

22 Q    So, again, with regard to this particular appeal, with

23 regards to the issue of recusal in connection with it.  It

24 resulted in the vacation of the award that was against Cummings

25 Manookian, PLLC, who was -- which was an appellant in

1  connection with this proceeding, correct?

2  A    That's a good question because the --

3         MR. KONVALINKA:  And objection.

4  BY MR. KONVALINKA:

5  Q    It's yes, no, I don't know, ma'am.  That's it.  I'm not

6  asking for speculation.

7  A    Oh.  I'm sorry.  I don't know the answer to that because

8  the Chase parties raised the fact that the debtor did not

9  appeal the sanctions judgment.  But I think everybody was

10 pretty much in agreement that because the, you know, or what I

11 -- my position was that because Cummings Manookian appealed the

12 recusal matter.  Part of that -- the sanctions judgment was set

13 aside.  I didn't think they had much of an argument that this

14 did not impact the judgment against Cummings Manookian.  I

15 think it did.

16 Q    And with regard to the finding of the trial court that

17 Cummings Manookian was an agent, did you ascertain whether or

18 not there was any argument made by Cummings Manookian in

19 connection with that trial court proceeding that Mr. Manookian

20 is -- was, in fact, in contempt was acting outside of his scope

21 as an agent of Cummings Manookian, PLLC?  Did you see that

22 issue was even addressed?

23 A    No.  I did not.

24 Q    Then the person that was representing Cummings Manookian,

25 you said, in connection with that trial court proceeding was,

1  in fact, Mr. Manookian?  Is that correct?

2  A    Mr. Manookian and Brian Cummings were both listed as

3  counsel for Cummings --

4  Q    No.  What I'm -- I'm sorry.  I apologize.  I interrupted

5  you.  Go ahead.

6  A    That's okay.

7  Q    All right.  And so what I'm asking is with regard to the

8  appearance in connection with the contempt proceeding.  Are you

9  aware whether anybody even appeared on behalf of Cummings

10 Manookian, PLLC?

11 A    I believe Brian Manookian did.

12 Q    Did you review the transcript of the proceedings in making

13 your determination?

14 A    Not the transcript of the proceedings.  No.  The state

15 court opinion cited two portions of the transcript.  And so did

16 the, you know, the briefs that I read.  But I did not read the

17 full transcript.

18 Q    You were aware, though, there was a transcript, correct?

19 A    I assume there was.  Yes.

20 Q    But you said there were citations or references to it,

21 correct?

22 A    Right.  Right.

23 Q    And so, and again, are you aware that Brian Manookian only

24 appeared on behalf of himself and not on behalf of Cummings

25 Manookian, PLLC?

1  A    I am not aware of that.

2  Q    But would you have access to the transcript to review it?

3  A    I didn't request it.

4  Q    And I'm -- ma'am, I'd like an answer to my question.  It's

5  just fairly simple (indiscernible).  Did you have access to it,

6  ma'am?

7  A    I assume that I could have tried to obtain the transcript.

8  I know there were some things -- I, yeah, I think I could have.

9  Q    In making your determination with regard to the claim, I

10 think you testified that these parties are fairly litigious.

11 Is that what I'm -- is that what I understand your testimony to

12 be?

13 A    They're both very aggressive in their, you know -- very

14 aggressive in their respective positions.  I don't think either

15 one of them would back down from anything.

16 Q    Well, for example, in the adversary proceeding, if for

17 whatever reason the adversary proceeding is adverse to those

18 people -- that you obtain a favorable judgment on behalf of the

19 bankruptcy.  What is your -- what is the estimate that you have

20 as to how long an appeal process would be from that adversary

21 proceeding?

22           MR. YOUNG:  Object as to relevance.  I'm not sure

23 what that has to do with this, Your Honor.

24           MR. KONVALINKA:  May I respond, Your Honor?

25           THE COURT:  You can, yes, respond.

1    MR. KONVALINKA:  My response is fairly simple, Your

2    Honor.  One of the big things that we are addressing here today

3    is the efficiency of the administration of this estate.  I

4    think I'm entitled to extol with regard to this particular

5    witness whether she's actually considered -- regardless of what

6    the outcome of this particular matter is, there is going to be

7    a continued inefficiency if you have litigious parties who

8    appeal the adversary proceeding and let's just say even this

9    determination today as to standing.  We're going to be at this

10   process for some time, is all I'm trying to establish.

11   THE COURT:  Again, I think ask your question again,

12   because

13   MR. KONVALINKA:  Okay.  Let me just restate it and

14   maybe do a little better.

15   BY MR. KONVALINKA:

16   Q    Ms. Burton, with regard to a determination in the

17   adversary proceeding, if you are favorable in the outcome with

18   regard to that, do you or do you not anticipate that there is

19   going to be an appeal?

20   A    I hadn't considered that.  I wouldn't be surprised, but

21   there could be.  But I haven't considered that.

22   Q    And isn't that one of the things in connection with the

23   efficiency of the administration of this estate, isn't it

24   something that you should consider in the sense that if, in

25   fact, there's going to be an elongated or an extended period of

1    time with regard to the adversary proceeding.  Isn't that going

2    to increase the cost as well?

3    A    Yes.  Obviously, it would.  Yes.

4    Q    And based upon what your opinion as to the nature of these

5    parties insofar as an approach to litigation, how -- based upon

6    your experience, how long would that appeal take?

7    A    And you're talking about the appeal if I was successful in

8    the adversary proceeding?

9    Q    Yes, ma'am.

10   A    I would ask my counsel that question.  But I think it

11   could take, you know, it wouldn't surprise me if it took at

12   least a year for an appeal.

13   Q    And --

14   A    I really don't know the answer to that question.

15   Q    -- you don't have an opinion on that particular issue.

16   You haven't considered that particular issue.  Is that a fair

17   statement?

18   A    I haven't.  No.  I have not.  I've been focused on trying

19   to get a recovery in the adversary proceeding and collecting

20   it.

21   Q    Well, in your discussions with the case parties with

22   regard to some -- did you discuss with them whether there had

23   been any other attempts at settlement?

24            MR. YOUNG:  Objection as to admissibility under

25   Federal Rule of Evidence 408.

1          MR. KONVALINKA:  And I'm sorry, Your Honor, you're

2   muted, and I didn't hear you.

3          THE COURT:  Response?

4          MR. KONVALINKA:  Yes.  First of all, I'm not asking

5   for the content of the settlement negotiations, Judge.  All I'm

6   asking for is whether there have been -- whether there was an

7   inquiry made that there had been attempts to settle with regard

8   to that.  I would also submit that under Rule 408.  This is not

9   a suggestion that I'm going to -- first of all, I want to know

10  if she made due inquiry with regard to prior settlement

11  negotiations.  And if she did or she did not, I think that may

12  be relevant to this proceeding in making a determination based

13  upon her opinion as to what would be in the best interest of

14  the bankruptcy estate.

15         Second of all, I would tell you that with regard to

16  the actual Rule 408 issue that deals with when you're in a

17  case, and you're -- and you have discussions between parties as

18  to settlement negotiations, and you're trying to enforce that

19  and duly precluded from doing that.  Under Rule 408, there is

20  an exception to the rule, if there's an extrinsic belief for

21  introducing this proof in connection with this proceeding, that

22  I should be permitted to do so because it's not evidence of the

23  settlement negotiation in connection with this case.  It is a

24  settlement negotiation in another case.  And so this, again, I

25  think that's something that she should have considered, but I

1  don't know if she did or she did not until I make an inquiry.

2          THE COURT:  And the Court will allow the limited

3  question that you posed would result with respect to the actual

4  whether there were or not what's the substance.

5  BY MR. KONVALINKA:

6  Q    So, Ms. Burton, if you would just answer my questions and

7  without much explanation so I don't get outside of what the

8  Court's scope is.  Were there discussions with the Chase

9  parties about prior negotiations that they had had with any of

10 the other parties concerning the settlement of their claims

11 against them?

12 A    No.

13 Q    So you did not make any inquiry of them?

14 A    No.  Not specifically about that.

15 Q    With regard to -- and you made some mention of the

16 pertinent that I can put in my objection, did you ever make

17 inquiry of me or others at the Grant Konvalinka and Harrison

18 firm?  Or your lawyer -- ask your lawyer to -- as to what basis

19 the family would be willing to proceed?

20 A    No.

21 Q    So just so I'm clear, it's my understanding that -- are

22 you suggesting that it's your opinion as an attorney and a

23 Trustee that if someone is acting in a contemptuous nature with

24 regard to an order that he or she would be acting within the

25 scope of their agency or employment?

1  A     I'm sorry.  Ask me that again?

2  Q     Sure.  Maybe I misheard you.  But you proffered -- you

3  offered an opinion in response to one of Mr. Young's questions

4  that you didn't think the result would be any different with

5  regard to the retrying of this case in Wilson (phonetic) County

6  based upon your role as the Trustee and your experience as a

7  lawyer.  Is that not a fair statement?

8  A     Correct.

9  Q     And so what I'm trying to understand is to do that, are

10 you as the Trustee and as an attorney suggesting that if

11 someone is acting in contempt in direct violation of a court

12 order that they would be acting on behalf of a professional

13 corporation as its agent and employee, which will be attributed

14 to them.  Is that what I understand?

15 A     I think so.

16 Q     And do you have any case law, other than the ruling of

17 this particular Court, that supports that, ma'am, that you

18 reviewed?

19        MR. YOUNG:  Objection, Your Honor.  Asking for a

20 legal conclusion, not a factual conclusion.

21        MR. KONVALINKA:  Your Honor, I think she's expressed

22 it.  Let me.  Let me state my response if I may.  Your Honor,

23 you can offer an opinion as to the Trustee.  And you can offer

24 an opinion as an attorney with regard to her review of a court

25 of appeals decision.  A review of a trial court's ruling all

1  without even a claim that there was a statement contained
2  within the record other than the judge's ruling that Mr.
3  Manookian was acting within the scope of his authority on
4  behalf of the PC.  And so I think I'm entitled to cross-examine
5  her with regard to that.

6          MR. YOUNG:  Your Honor, actually, Mr. Konvalinka
7  objected to her testimony as an attorney, to her testimony as
8  that of the Trustee of Cummings Manookian.  And now he's asking
9  her for case law.

10         THE COURT:  Her role in this case as a Trustee,
11 although she does, obviously, carry the experience of her
12 attorney knowledge.  As a Trustee, she can testify and should
13 testify as to the steps she reasonably made.  So I'll allow the
14 question.

15         MR. KONVALINKA:  Let me restate it for the record in
16 light of the Court's comment (phonetic), if I may, so I make it
17 correct.

18 BY MR. KONVALINKA:
19 Q   So, Ms. Burton, as a Trustee for this bankruptcy estate of
20 Cummings Manookian, PLLC.  Is it a fair statement that it is
21 your considered opinion that when someone is acting in
22 contempt, a direct contempt of a court order that they're
23 acting within the scope of their agency and employment by that
24 PLLC?

25         MR. YOUNG:  Objection, Your Honor.  Asked and

1  answered.

2          THE COURT:  I'm going to let her answer the question

3  again.

4          THE WITNESS:  Mr. Manookian claims that he wasn't in

5  contempt with the things that he did.  The court determined

6  that he was in contempt but that -- when that was raised in

7  your objection, I did consult with my attorney on that.  And

8  Mr. Young did some research on that which I believe is

9  contained in our response in Mr. Young's argument.

10 BY MR. KONVALINKA:

11 Q    Is that a yes, no, I don't know, ma'am?  I'm just asking a

12 question.

13 A    That's my response.

14 Q    So you don't know, or you do know?

15 A    I relied on my attorney.

16 Q    So to make sure I understand, for the purposes of the

17 record, you as Trustee did not form an independent opinion with

18 regard to the decision whether it was going to be a ruling by

19 the court in the new case that was being filed.  But you relied

20 upon Counsel's opinion with regard to that.  Is that a fair

21 statement?

22 A    No.  No.  No.  I rely -- I seek the counsel of my attorney

23 and -- but that doesn't mean that we don't have conversations

24 about things that -- after reviewing his -- what he researched

25 and talking to him about it.  I reached that conclusion on my

1  own.

2  Q    Now, if there is, for example -- what would you estimate,

3  based upon your experience as a Trustee, the cost of an appeal

4  with regard to if there's an appeal of the -- if there's a

5  favorable ruling in your favor with regard to that adversary

6  proceeding that might last a year.  What would be your estimate

7  as to the cost that would relate to that for the bankruptcy

8  estate?

9          MR. YOUNG:  Objection as to relevance.

10         MR. KONVALINKA:  Again, Your Honor, I think that I'm

11  entitled to show -- they continue to suggest that this is in

12  the best interest of the estate with regard -- because of all

13  the relative costs that is associated with the decision of the

14  Chase parties.  I think it's also important to understand what

15  is happening with regard to the adverse proceeding and the

16  costs that are associated with that because it's been suggested

17  that the costs are a certain number based upon the examination

18  by Mr. Young and (indiscernible) by the examination of

19  Mr. Spragens that I don't think is accurate.

20         THE COURT:  If it goes to the Trustee's

21  administration of the case, if the Trustee knows the answer,

22  she can answer the question.

23         THE WITNESS:  I haven't discussed that or evaluated

24  that, but I would -- I don't know, another $50,000 to $100,000

25  for an appeal.  And, again, I may be underestimating.  That

1  would be an estimate.

2  BY MR. KONVALINKA:

3  Q    Well, when there was a vacation of the -- vacating of the

4  award by the Supreme Court, did you contact the Chase parties

5  again to make a determination as to whether or not the amount

6  of the claim should be reduced in connection with the

7  settlement?

8  A    I was contacted by the Chase parties to discuss the relief

9  from stay issue.  And so that's kind of how all of the

10 discussions started from there.

11 Q    Okay.  Well, I guess I didn't articulate my question

12 correctly -- well enough.  What I'm interested in is when you

13 started, and you did the negotiations with the Chase parties,

14 there was no decision by the Supreme Court -- or excuse me, by

15 the court of appeals, that there would be a vacated the order,

16 correct?

17 A    No.  No.  This was after the court of appeals had vacated

18 the order.

19 Q    Okay.  And was it after the decision by the Supreme Court

20 to deny the vacating -- to deny the appeal?

21 A    No.  It was in between.

22 Q    So was there any revisiting of this issue since it was not

23 yet filed or approved with regard to the determination by the

24 Supreme Court by yourself?

25 A    I'm sorry.  Ask me that again?

1  Q    Sure.  I'm sorry.  It's probably a bad question.  With

2  regard to your role as Trustee, did you undertake to make any

3  further inquiry of the persons that you had been negotiating

4  with when you had then an adverse determination as to the

5  recognition of the application for the Supreme Court to

6  reconsider the case?

7  A    I'm not sure I under your question, but in between the

8  time that the order vacated the judgment and, actually, before

9  the appeal was filed or close to that time, I had discussions

10  with the Chase parties about several things, including their

11  claim.  I won't say several things.  About the claim

12  (indiscernible).

13  Q    So was there any revisiting of the amount of the

14  settlement at all as a result of the determination of the

15  Supreme Court not to accept the appeal?  Were there any

16  discussions about that?

17  A    No.  Because the settlement was not finalized or formally

18  memorialized at that point.  It had been discussed.

19  Q    And you have as a number of -- strike that.  Did you make

20  a determination as to what the number should be with regard to

21  the $250,000 amount?

22  A    I did.

23  Q    And was there any further counter made by the Chase folks

24  when you had suggested the $250,000?

25        MR. YOUNG:  Object under Federal Rule of Evidence

1  408.

2          MR. KONVALINKA:  Again, Your Honor, I'm not asking

3  about the content.  I'm just asking if there was any

4  discussion.

5          THE COURT:  Because we need to move on with this

6  detail, the Trustee who is operating as the Trustee can talk

7  about the facts and what the Trustee did to establish the

8  amount that's relevant to the Trustee's business judgment.  But

9  let's keep this for where we are.

10          We're talking about the Trustee's business judgment

11  and whether it was sound.  And I think the question as proposed

12  does go somewhat to the business judgment, but it's straying

13  close into matters that aren't necessarily relevant to the

14  business judgment of the Trustee, but we'll allow this one so

15  that we can get past what the Trustee did in establishing the

16  amount of the settlement.

17          MR. KONVALINKA:  Thank you, Your Honor.

18  BY MR. KONVALINKA:

19  Q    Do I need to repeat the question, ma'am?

20  A    Yes, please.

21  Q    After you suggest the number of $250,000, were there any

22  other discussions with the Chase parties in connection with

23  that amount?  I just want to know if there were discussions at

24  this point, not what the contents of the discussion was.

25  A    Yes, there were discussions.

1  Q    And over what period of time?

2  A    Probably -- the discussions started in April and the

3  settlement agreement that was attached to the motion was

4  executed by the Chase parties in June, so -- so sometime

5  between April and June, obviously.

6  Q    And again, just for the purposes of the record, we're

7  referring to April and June of 2021.  Is that a fair statement?

8  A    Correct.

9  Q    And so are you suggesting to the Court that in your

10  business judgment that this case is going to be resolved

11  quicker and more efficiently by reason of your agreement to

12  this claim, as opposed to having other parties that may be

13  adversely affected by this that may take appellate action?

14  A    What case are you talking about?  Are you talking about

15  the state court matter or the adversary --

16  Q    No, I'm -- I'm asking this question.  You suggested to the

17  Court in your business judgment as the Trustee, you're making a

18  determination for the efficient administration of this estate

19  to save time with regard to the proposed -- the litigation that

20  is involved in the Chase matter and the expense that would be

21  involved in participating in the Chase matter, that it is in

22  the best interest of the bankruptcy estate.

23      And I'm just saying at the same time I'm not sure that you

24  considered what the adverse reaction of the other parties would

25  be with regard to that, in making that determination, and that

1  you're somewhat in a Catch 22 with regard to this in the sense

2  that you're going to have a similar expense and a similar

3  period of time that's expended with regard to those people that

4  you've already identified as being litigious in nature.  Is

5  that not true?

6  A    If this settlement is approved, then Cummings Manookian

7  won't be -- the estate won't be involved in the state court

8  proceeding.  I won't be employing an attorney.  I won't be --

9  you know, they will proceed however they wish to proceed, you

10 know, against the other parties, but not against Cummings and

11 Manookian.

12 Q    But again -- so those people that are involved in this

13 particular administration of the estate, with regard to the

14 adversary proceeding, whatever in connection with that, they

15 may -- you may be in the same position with regard to them and

16 that you're going to be having a long time of addressing that

17 issue in connection with the administration of this bankruptcy

18 estate.  Are you not?

19 A    I don't know that it will be as long, because as we -- as

20 I testified before, it may shorten the period of time in the

21 litigation of the adversary proceeding, you know, not counting

22 any kind of appeal.  So I do think it will be a shorter period

23 of time than if the adversary proceeding or litigation of that

24 is more extensive.

25 Q    What is the dates you have set for trial for that

1  adversary proceeding?

2  A    I do -- there's not an adversary -- there's a pretrial

3  conference after this.  There's not a trial date yet -- or

4  motions for summary judgment, that sort of thing.

5           MR. KONVALINKA:  Your Honor, I pass the witness.

6           MR. SPRAGENS:  Your Honor, I'm sorry.  Before Mr.

7  Young begins, I wanted to make the Court available -- I mean

8  aware that I spoke to Mr. Manookian, who is standing by

9  pursuant to a subpoena.  I was letting him know about the

10 Court's schedule, and he informed me that at five o'clock he

11 has a hard stop to -- it's for child care reasons, frankly.

12          So I wanted to let the Court know that, in case there

13 is an opportunity to take him out of turn or something.  But I

14 didn't want to interrupt Mr. Konvalinka's examination.

15          THE COURT:  Thank you.  Again, I'll have a hard stop

16 at 4:30.  So we can get done what we can get done, and we can

17 either come back tomorrow morning or another day, Friday, if we

18 can't finish up today.

19          MR. SPRAGENS:  Thank you, Your Honor.

20          MR. YOUNG:  Your Honor, if I may, just one brief

21 follow-up question for Ms. Burton.

22                      REDIRECT EXAMINATION

23 BY MR. YOUNG:

24 Q    Mr. Konvalinka asked you a number of questions about a

25 hypothetical appeal of the adversary proceeding and time and

1 expense associated with that.  Regardless of whether or not

2 there's appeal, wouldn't that be in addition to the cost and

3 time for a rehearing?

4 A    I'm sorry.  Ask me that again.

5 Q    If there is an appeal and there's money spent on the

6 appeal --

7 A    Of the adversary?

8 Q    Of the adversary proceeding.  Wouldn't that be additional

9 to any expense that would be spent on the rehearing?

10 A    In the state court proceeding?

11 Q    Right.

12 A    Yes.  Yes.

13 Q    So what you're trying to do is to keep the estate from

14 having to spend more money.

15 A    Right.

16         MR. YOUNG:  No further questions.

17         MR. KONVALINKA:  I have no further questions,

18 Your Honor.

19         THE COURT:  All right.  Next witness then.

20     (Witness excused)

21         MR. KONVALINKA:  I would call Mr. Manookian.

22         MR. YOUNG:  Well, Your Honor, I need to formally

23 close our side first, and then I'll object to the calling of

24 Mr. Manookian on two grounds:  One, it's beyond the corners of

25 Mr. Konvalinka's objection; and secondly, because all of his

evidence that Mr. Konvalinka lists on the witness and exhibit

list would be prohibited by Rule 408 of the Federal Rules of

Evidence.

MR. KONVALINKA:  Do you want me to respond to that

now, Your Honor?

THE COURT:  Go ahead and respond.

MR. KONVALINKA:  Well, first of all, there's

obviously a disputed issue of facts with regard to who was the

appellant and whether or not they were appealing the judgment

on behalf of Cummings Manookian.  I think that obviously

Mr. Manookian would be somewhat familiar with that since he's

listed as the attorney of record in connection with the

Tennessee Court of Appeals case in this matter.

I think, similarly, he would be able to tell us

whether or not he even raised the issue as to whether there was

a contempt -- a defense based on the lack of agency or acting

outside the scope of agency with regard to the entity itself at

the time of the lower court ruling in connection with this

matter, because I don't believe there was.

So, at least with regard to those issues, they are

directly on point with regard to this.  And again, with regard

to the other issues as described by Mr. Young, I know -- as the

Court's already previously said that I hadn't notified him

because I didn't put it in my objection, but I did put him in

my witness list and I did put down the areas and topics that

1  are really based upon, in part, Mr. Manookian's objection.

2  It's not everything that's in his objection; but at the same

3  time, it's irrelevant to this proceeding.

4          MR. YOUNG:  Your Honor, if I may briefly respond with

5  regard to the first couple of issues, those weren't in the

6  witness and exhibit list.  They weren't listed.  The only thing

7  that Mr. Manookian's testimony was listed as relevant was with

8  regard to the alleged walkaway offer, which would clearly be

9  subject to 408.

10          In fact, the letter that's attached to

11  Mr. Manookian's objection says very clearly at the top that

12  it's subject to 408.  So I think the only issues that he would

13  testify to are not admissible and is inefficient for this Court

14  to consider.

15          THE COURT:  All right.  And of course, this is just

16  the ground we were trying to prevent with bifurcating the

17  proceeding.  Mr. Manookian, his objection is not at issue,

18  based on the likelihood of conflating and confusing the issues

19  that are before the Court -- and remember, we're here on an

20  objection to the proposed settlement that's subject to the

21  business judgment rule, which is a high standard.

22          If any of the testimony that Mr. Manookian would

23  offer would be determined above that, the Court finds it very

24  unlikely that that in fact would be the case.  But because of

25  the scope of what you want to go into, the Court finds it's

1  more likely to be prejudicial than valuable to the Court.

2  So the Court is not going to allow Mr. Manookian to

3  testify unless it were very, very limited.  And to this point,

4  Mr. Konvalinka, you've not offered me a sufficiently tight

5  scope of testimony that you want him to offer.  You want him to

6  testify about his objection, which in fact go beyond what the

7  Court is willing to allow today.

8  You can attempt to tighten it up, but the Court is

9  not going to let Mr. Manookian backdoor his way into this

10  proceeding, based on my prior rulings that he does not have

11  standing.

12  MR. KONVALINKA:  May I proceed, Your Honor?

13  THE COURT:  You can express to the Court the scope

14  that you are going to examine Mr. Manookian.

15  MR. KONVALINKA:  Well, one of the first things I'm

16  going to be asking him about is in fact what happened with

17  regards to the trial court proceeding, with regard to the

18  agency issue, which I previously raised, and it's raised in my

19  objection.  That's (indiscernible) question and whether or not

20  Cummings Manookian did, in fact, appeal.  Not only does it go

21  to sort of the merits of the litigation, it also goes somewhat

22  to the Trustee's duty to review this stuff and based her

23  opinion on this, she didn't consider those things.  And I think

24  that's relevant, as well.

25  MR. YOUNG:  Your Honor, if I may, none of those

1  issues were disclosed in the witness and exhibit list

2  associated with Mr. Manookian.

3      MR. KONVALINKA:  And I'd respectfully disagree,

4  Your Honor, in the sense that we did say that there should be

5  no award against Cummings Manookian because Mr. Manookian, to

6  the extent that he is found to be acting in contempt, would be

7  outside the scope of his agency and employment.  And we

8  definitely raised that, and it's relevant for that purposes.

9  And we also raised the issue that if he's not found in contempt

10 for anything, that, in fact, there would be no sanctions award.

11 So I think it is relevant for both of those purposes, because

12 we raised those in our objection.

13     MR. YOUNG:  And Your Honor, what I was trying to say

14 is that it's not in the witness and exhibit list.  If the Court

15 will look at the witness and exhibit list, the exclusive

16 reasons why Mr. Konvalinka listed potential testimony from

17 Mr. Manookian all had to do with his objection and this

18 purported walkway agreement.

19     MR. KONVALINKA:  Well, I disagree with that statement

20 as well, Your Honor.  If you look at the witness list, it

21 states in  pertinent part Brian Manookian, Mr. Manookian, may

22 testify regarding his personal knowledge of the Chase

23 litigation.

24     That is clearly the very thing that I just discussed

25 with the Court, and the very thing that I elucidated with

1  regard to what I was going to be asking this witness.  To

2  suggest otherwise is an incorrect apprehension of what is

3  contained in my witness list.

4        THE COURT:  We've gone back and forth enough.  The

5  Court is going to bar Mr. Manookian from testifying.  It's not

6  additive to where we are in this process, and the Court is

7  going to bar him from testifying to any matters related to the

8  litigation.  It would be speculative on his part, as well, just

9  the same as it would be speculative from any party to

10  prospectively predict what was going to happen in litigation.

11        So based on the ruling of standing, the Court doesn't

12  find the testimony of Mr. Manookian to be of probative value,

13  and to be more prejudicial and confusing if we allow him to

14  testify.  So the Court is going to sustain the objection of Mr.

15  Young, and Mr. Manookian will not testify today.

16        MR. MANOOKIAN:  I assume I'm being excused at this

17  point?

18        THE COURT:  Yes, sir.  You're free to go.

19        MR. MANOOKIAN:  Thank you very much.

20        THE COURT:  Mr. Konvalinka.

21        MR. KONVALINKA:  Yes, Your Honor.  I assume -- is

22  Mr. Young through, because he said he wanted to -- he was not

23  through, but he did want to raise those two issues, so --

24        MR. YOUNG:  No, Your Honor.  I'm sorry if there was

25  any confusion.  I'm done with my proof and I thought we had

1 moved on to Mr. Konvalinka's proof.

2          MR. KONVALINKA:  I have no further proof at this

3 time, Your Honor.

4          THE COURT:  All right.  Well, let's go ahead with

5 argument to wrap things up on issues that you want me to look

6 at.

7          MR. YOUNG:  Your Honor, I'm going to be very brief,

8 because I know the Court's read the briefs and has listened to

9 the Trustee's testimony.  Really the only thing I want to do is

10 reiterate that a Trustee (audio interference) deference to her

11 business judgment in the administration of an estate.  As we

12 cited in our settlement motion, courts have found that

13 compromises just like this are favored in bankruptcy in order

14 to increase efficiency and to minimize cost to the estate.

15          A Trustee doesn't need to prove that her settlement

16 is better than anything else that can be achieved, only that

17 the settlement falls within the reasonable range of

18 possibilities.  We cited the Penn Central Transportation case

19 in the Third Circuit in our settlement motion for that

20 proposition.

21          Case law is clear that neither the Court nor any

22 other party should substitute their business judgment for that

23 of the Trustee.  In this case, the Trustee's exercised her

24 reasonable business judgment in reaching the decision to allow

25 the Chase claim as an unsecured claim in the amount of

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1 $250,000.

2        She testified that she considered a number of
3 factors including the likelihood that the state court would
4 reimpose a substantial (audio interference) judgment against
5 Cummings Manookian, the time and legal expense that would be
6 required to see a rehearing through to its conclusion, and the
7 impacts that settling this claim versus it remaining
8 unliquidated would have on the administration of this estate
9 and the progress of the adversary proceeding.

10        The testimony showed that when looking at litigation
11 risk, the expense of litigation, the time that would be
12 involved to try this claim in state court, and the effects of
13 all that, that the settlement is in the best interest of the
14 estate and its creditors.

15        Her testimony also showed why the objection -- the
16 remaining objection lacks merit.  She testified that she did
17 not believe that it was likely that a court would find that
18 Mr. Manookian was not the agent of Cummings Manookian,
19 considering that the state court had already previously made
20 that finding before.

21        Trustee properly exercised her business judgment in
22 reaching this settlement, as this Court should expect her to
23 do.  She's done exactly what the Court -- what the Bankruptcy
24 Court required -- Bankruptcy Code requires her to do and what
25 this Court would expect her to do.

1    She's properly considered all factors, she's weighed

2    them, and determined that it's in the estate's best interest to

3    settle this Chase claim.  As such, the Trustee respectfully

4    requests that the Court grant her motion to approve the

5    compromise and settlement, and overrule any remaining

6    objections.  And that's all I have, Your Honor.

7            THE COURT:  All right.  Thank you.

8            Mr. Konvalinka.

9            MR. KONVALINKA:  I also will be brief.  It's quite

10   simple.  The Trustee misapprehended the issue, as just was

11   articulated by Mr. Young.  The issue is not whether

12   Mr. Manookian was the agent of Cummings Manookian.  The issue

13   is whether, to the extent that he was an agent, was he acting

14   within it scope of his agency on behalf of the entity at the

15   time that he -- his conduct was such that it could be

16   interpreted to be contempt of court, which is a direct

17   violation of a court order.

18           That's the issue.  And if he is not in violation,

19   obviously there could be nothing awarded against Cummings

20   Manookian.  If he is found to be in contempt -- and that's

21   acting outside the scope of any agency or employment that he

22   would have with the entity itself.  To suggest the issue is

23   just merely whether he's an agent misconstrues or misapprehends

24   what the real issue is when making a decision on behalf of the

25   Trustee in connection with this matter.

1       And also what has been demonstrated in connection
2  with this particular proceeding, it's also in consideration
3  that there was no consideration as to what -- if there is a
4  settlement, to which parties object, that there is going to be
5  a process involved and litigation and expense as well, all of
6  which suggests there should have at least been the exploration
7  of would there be an opportunity out there that would be
8  willing to take this case on behalf of Cummings Manookian, to
9  the extent that there is a case, and handled in a state court
10 for a lesser amount than $150,000, and maybe cap a fee.  None
11 of that was done.  It was actually suggested by myself in
12 connection with this matter.  So none of that was explored, and
13 I think that those are errors that have been made in making
14 this business judgment.  That's all I have.

15      THE COURT:  All right.  Thank you.  The Court is
16 prepared to rule.  I'll just need a moment, but I'm going to
17 rule in about one minute, so please stand (audio
18 interference) --

19      All right.  The Court, first of all, would like to
20 thank both parties for what has been a well-argued proceeding
21 today.  We're here to determine the objection of Grant
22 Konvalinka to the Trustee's motion for approval of compromise
23 and settlement.

24      As has been stated several times today, the business
25 judgment rule grants substantial deference to the Chapter 7

113

Trustee.  That deference exceeds quite far.  In fact, many Courts have said that short of bad faith or whim that the Trustee wins.

This Court expects more than that based off of the case law and the particularities of this case, the complexity, expense, and likely duration being the key issues here, which the Trustee did articulate were taken into account in formulating the basis and the amount of the settlement.

We have here a Trustee who's been on the panel for 24 years.  We have a Trustee who took into account the risk. We have a Trustee who had an estate that was by her testimony administratively insolvent, with $85,000 of cash, and expenses exceeding $100,000.  We have a Trustee who's actually articulated the likelihood that there would be litigation that would be long in duration, expensive, and run up bills for the estate without actually having money to pay those bills for the professional fees.

Those alone would be enough to satisfy the business judgment rule given the Trustee has a duty, a fiduciary duty, to ensure some recovery for the creditors.  In this case, based off what's in the estate now, the only recovery would be for professionals.

So the settlement is not only a good thing for the estate, but the Trustee has articulated that, based off the assets claims and costs, and the goal being a meaningful

1    distribution -- and the Trustee specifically used the words "to

2    protect" the other creditors.

3         The Trustee has clearly articulated that her business

4    judgment is not one based in whim or folly, but one that's

5    based on the facts in this particular case.  There have been

6    issues raised as to whether the Trustee would examine every

7    possible option or every circumstance.  Well, that's not the

8    test.  The test is this Trustee's particular business judgment

9    with the facts as she sees the facts.

10        Clearly, there's been nothing articulated that this

11   Trustee is not competent, capable, and suited to make these

12   type of decisions.  The facts in this case show that the

13   Trustee has done due diligence, examined the record of the

14   proceedings, and made a decision to settle this matter for

15   $250,000.  That decision is not subject to review on the

16   business judgment rule because the Trustee has clearly

17   articulated a basis for making that decision which relies on

18   her experience and her review of this particular case.

19        So the Court, having heard argument of Counsel, finds

20   that the creditor has failed to overcome the substantial

21   deference given to the Trustee's business judgment, and

22   therefore the objection is overruled.

23        As part of this hearing strayed into Mr. Manookian

24   and his objection, the Court will note that even if

25   Mr. Manookian had standing to object, nothing in his pleadings

1  or the evidence submitted would amount to a challenge to the

2  Trustee's business judgment.  However, that's not necessary to

3  rule on his objection based off my previous ruling on standing.

4          So, Mr. Young, if you could prepare an order to that

5  effect.

6          MR. YOUNG:  I will, Your Honor.  Thank you.

7          THE COURT:  All right.  Any questions?

8          MR. KONVALINKA:  Not from me, Your Honor.

9          THE COURT:  All right.  Thank you.

10          MR. YOUNG:  Your Honor, I believe we also have a

11  pretrial conference.  It might be possible for us to do this in

12  the next five minutes, because frankly the -- now that, based

13  on this ruling, I think we're ready to move that pretrial

14  matter forward.

15          I would suggest the following deadlines, and subject

16  to any comments --

17          MR. KONVALINKA:  Your Honor, may I be excused from

18  this?  I'm sorry.  I don't think I'm a participant.

19          THE COURT:  Yes, sir.  Thank you.

20          MR. YOUNG:  I believe it's going to take us

21  approximately 60 days to get through issues regarding written

22  discovery -- that's outstanding written discovery that has not

23  been fully responded to, that we need to follow up on and

24  perhaps get the Court involved in, but also perhaps there's

25  issuance of other written discovery that could shorten the

1  number of depositions that we'd need in this case.

2         So what I would suggest is that between now and

3  November 30th that the parties participate in written discovery

4  for depositions to open on December 1, to be concluded by

5  March 31.  I would normally probably only ask 90 days instead

6  of 120 days for these depositions, but with the holidays

7  intervening, I think it's -- and the number of depositions that

8  might be taken, I think it's smarter to ask for 120 days.

9         And then I would suggest that we set motion for

10 summary judgment deadlines, you know, any dispositive motions

11 beginning a couple of weeks thereafter.  So sometime in mid

12 April, then with two weeks for responses, one week for reply,

13 and then a hearing to follow.  That would be my suggestion as

14 to how to get this thing moving and try to bring this adversary

15 proceeding to a conclusion.

16        MR. SPRAGENS:  Your Honor, I apologize for my

17 informality.  I'm caught having thought my portion of the

18 hearing was over.  Let me just note that this is the first time

19 I've heard of these deadlines.  They don't strike me as too

20 objectionable, but I would like the opportunity to confer with

21 my client, and we can file something jointly with Mr. Young.

22        THE COURT:  All right.  The Court is more than happy

23 to entertain -- the deadlines sound more than reasonable to the

24 Court.  And if the parties would confer, you can either return

25 our worksheet or submit an order with -- leaving the actual

1  trial date blank.  If you can manage all the other dates -- and
2  the response and the reply deadlines -- if you can manage those
3  based off the framework that Mr. Young has articulated, the
4  Court would then insert the trial date and we'd be set to go
5  forward.

6        MR. YOUNG:  Your Honor, no, I'm happy to consult with
7  Mr. Spragens and Mr. Gabbert on that.  And obviously, if
8  there's an issue, we'll notify the Court and try to get back on
9  the Court's docket as soon as possible.  But hopefully there
10 will be no issue.

11       THE COURT:  Thank you.  Again --

12       MR. GABBERT:  That works for me, Judge.

13       THE COURT:  All right.  Thank you, Mr. Gabbert.
14 (Audio interference) without you saying something.

15       MR. SPRAGENS:  Your Honor, I'd like the record to
16 reflect that Mr. Gabbert's probably not wearing a tie either.

17       MR. GABBERT:  Actually, I am.  But I will say I am in
18 shorts.

19       MR. SPRAGENS:  Par for the course, sir.  Par for the
20 course.

21       THE COURT:  All right.  Again, thanks today.  The
22 Court does appreciate the professionalism that counsel on all
23 sides has argued today.  These are tough issues, but hopefully
24 we can move forward and get some resolution of this case, and
25 the Trustee can continue to administer this case and get the

1  results for the creditors.  So appreciate all the parties to

2  date.

3          UNIDENTIFIED:  Thank you, Your Honor.

4          UNIDENTIFIED:  Thank you, Your Honor.

5          MR. GABBERT:  Thank you, Judge.

6          UNIDENTIFIED:  Thank you, Your Honor.

7          THE COURT:  We'll be adjourned.

8      (Proceedings concluded at 4:29 p.m.)

9                      *  *  *  *  *

10

11

12

13

14              **C E R T I F I C A T I O N**

15

16          I, Alicia Jarrett, court-approved transcriber, hereby

17  certify that the foregoing is a correct transcript from the

18  official electronic sound recording of the proceedings in the

19  above-entitled matter.

20

21

22

23  _Alicia J. Jarrett_

24  ALICIA JARRETT, AAERT NO. 428     DATE: October 25, 2021

25  ACCESS TRANSCRIPTS, LLC


ACCESS TRANSCRIPTS, LLC    ⚖    1-855-USE-ACCESS (873-2223)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **IN RE:** ) | |
| ) | **Case No. 3:21-cv-00797** |
| **CUMMINGS MANOOKIAN, PLLC,** ) | |
| ) | **Judge Waverly D. Crenshaw, Jr.** |
| **Debtor.** ) | **Magistrate Judge Alistair E. Newbern** |
| ) | |

---

### APPELLANT BRIAN MANOOKIAN'S STATEMENT OF THE ISSUES TO BE PRESENTED AND DESIGNATION OF ITEMS TO BE INCLUDED IN APPELLATE RECORD

---

Pursuant to Federal Rule of Bankruptcy Procedure 8009, Appellant Brian Manookian ("Appellant") hereby files this Statement of the Issues to be Presented and Designation of Items to be Included in Appellate Record.

**Issues To Be Presented**

Whether the Bankruptcy Court erred in approving the Trustee's motion to settle a claim for $250,000 after the underlying judgment was vacated, opposing counsel in the underlying case offered to settle it for $0, the Trustee failed to investigate the claim, and the Trustee's special counsel had an irreconcilable conflict of interest based on his involvement as receiver in the underlying action; and

Whether the Bankruptcy Court erred in finding that Appellant lacked standing to object to the Trustee's motion to settle the foregoing claim.

**Designation of Items To Be Included in Appellate Record**

The appellate record consists of the following:

1.      All docket entries in the bankruptcy proceeding (No. 3:19-bk-07235) and related adversary proceeding (No. 3:20-ap-90002), specifically including bankruptcy proceeding docket

entries 108, 112, 123, 124, 125, 131, 135, 136, 144, and 147, and adversary proceeding docket

entries 1, 2, 7, 10, 15, 68, 71, and 73, and all attachments thereto; and

      2.      Transcript of September 29, 2021 hearing (attached as Exhibit 1).

Date:   October 28, 2021              Respectfully submitted,

                                       */s/ John Spragens*
                                       John Spragens (TN Bar No. 31445)
                                       Spragens Law PLC
                                       311 22nd Ave. N.
                                       Nashville, TN 37203
                                       T: (615) 983-8900
                                       F: (615) 682-8533
                                       john@spragenslaw.com

                                       *Attorney for Manookian PLLC and Brian*
                                       *Manookian*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that the foregoing Statement of the Issues to be Presented and Designation of Items to be Included in Appellate Record was filed October 28, 2021 and served electronically upon the following parties in interest as indicated on the receipt issued by the Court's electronic filing system:

Jay R. Lefkovitz
Lefkovitz & Lefkovitz, PLLC
312 East Broad Street, Suite A
Cookeville, TN 38501
(931) 528-5297 (T)
931-526-6244 (F)
JLefkovitz@lefkovitz.com

*Counsel for Debtor Cummings Manookian*

Phillip Young
One Franklin Park
6100 Tower Circle, Suite 200
Franklin, TN 37067
(615) 465-6008 (T)
phillip@thompsonburton.com

*Counsel for Trustee Jeanne Anne Burton*

John P. Konvalinka
Grant, Konvalinka & Harrison, P.C.
633 Chestnut Street Suite 900 Republic Centre
Chattanooga, TN 37450-0900
(423) 756-8400 (T)
(423) 756-6518 (F)
jkonvalinka@gkhpc.com

*Counsel for Creditor Grant, Konvalinka & Harrison, P.C.*

Daniel Puryear
Puryear Law Group
104 Woodmont Boulevard, Suite 201
Nashville, TN 37205
(615) 255-4859 (T)
(615) 630-6602 (F)
dpuryear@puryearlawgroup.com

*Counsel for Creditor D.F. Chase, Inc.*

*/s/ John Spragens*

3

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF TENNESSEE (NASHVILLE)

| | | |
|---|---|---|
| IN RE: | . | Case No. 19-07235 |
| | . | Chapter 7 |
| CUMMINGS MANOOKIAN, PLLC, | . | |
| | . | |
| | . | |
| Debtor. | . | |
| . . . . . . . . . . . . . . | . | |
| JEANNE ANN BURTON, | . | Adv. No. 20-90002 |
| | . | |
| Plaintiff, | . | |
| | . | |
| v. | . | |
| | . | |
| HAGH LAW, PLLC, et al., | . | 701 Broadway |
| | . | Nashville, TN 37203 |
| Defendants. | . | |
| | . | Wednesday, September 29, 2021 |
| . . . . . . . . . . . . . . | . | 1:15 p.m. |

TRANSCRIPT OF TRUSTEE'S MOTION TO STRIKE BRIAN MANOOKIAN'S
OBJECTION TO AND TO PRECLUDE HIS PARTICIPATION IN THE SEPTEMBER
29, 2021 HEARING FOR LACK OF STANDING [136];
MOTION FOR COMPROMISE AND SETTLEMENT [108];
BEFORE THE HONORABLE CHARLES M. WALKER
UNITED STATES BANKRUPTCY COURT JUDGE

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For Jeanne Ann Burton, Chapter 7 Trustee: | Thompson Burton PLLC<br>By: PHILLIP G. YOUNG, ESQ.<br>One Franklin Park<br>6100 Tower Circle, Suite 200<br>Franklin, TN 37067<br>(615) 465-6008 |
| Chapter 7 Trustee: | Jeanne Ann Burton, PLLC<br>By: JEANNE ANN BURTON, ESQ.<br>4117 Hillsboro Park, Suite 103-116<br>Nashville, TN 37215<br>(615) 678-6960 |

APPEARANCES CONTINUED.

| | |
|---|---|
| Audio Operator: | Tanja Brewer, ECR |
| Transcription Company: | Access Transcripts, LLC<br>10110 Youngwood Lane<br>Fishers, IN 46048<br>(855) 873-2223<br>www.accesstranscripts.com |

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

For Brian Manookian:        Spragens Law PLC
                            By:   JOHN T. SPRAGENS, ESQ.
                            311 22nd Avenue North
                            Nashville, TN 37203
                            (615) 983-8900

For Grant, Konvalinka       Grant, Konvalinka & Harrison, PC
& Harrison:                 By:   JOHN P. KONVALINKA, ESQ.
                            633 Chestnut Street
                            Chattanooga, TN 37450
                            (423) 756-8400

Also Present:               Bass, Berry & Sims
                            By:   CRAIG V. GABBERT, JR., ESQ.
                            150 Third Avenue South, Suite 2800
                            Nashville, TN 37201
                            (615) 742-6277

**I N D E X**
**9/29/21**

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR BRIAN MANOOKIAN: | | | | |
| Jeanne Ann Burton | 7 | 30 | 39 | 45 |
| | | | | |
| FOR THE TRUSTEE: | | | | |
| Jeanne Ann Burton | 59 | 82 | 102 | -- |

| | Page |
|---|---|
| CLOSING ARGUMENT BY MR. YOUNG | 109 |
| CLOSING ARGUMENT BY MR. KONVALINKA | 111 |

1    (Proceedings commence at 1:15 p.m.)

2        THE CLERK:  Your Honor, the next cases we have are

3    Case Number 20-90002, Burton v. Hagh Law, PLLC.  Case Number

4    19-07235, Cummings Manookian, PLLC.

5        MR. YOUNG:  Good afternoon, Your Honor.  Phillip

6    Young on behalf of the Trustee, Jeannie Burton.

7        MR. SPRAGENS:  Good afternoon, Your Honor.  John

8    Spragens on behalf of Brian Manookian.

9        MR. KONVALINKA:  Good afternoon, Your Honor.  This is

10   John Konvalinka on behalf of Grant, Konvalinka & Harrison.

11       THE COURT:  All right.  Good afternoon.  Obviously,

12   the -- as you've seen from the order the Court entered, we're

13   going to bifurcate today's matters.  The first thing we're

14   going to take up is standing for Mr. Manookian.  And we'll go

15   forward with that matter, unless there is any housekeeping or

16   other questions that any party has for the Court.

17       MR. YOUNG:  Your Honor, Phillip Young here on behalf

18   of the Trustee.  I would like to raise just one issue, and that

19   is the issue of (audio interference) 7 of the Rules of

20   Professional Conduct.  The Court knows I've been listed as a

21   potential witness for Brian Manookian.  I think the Court's

22   ultimately going to find that he lacks standing in (audio

23   interference), but I just need to know that the Court will

24   allow me to argue the standing issue on behalf of the Trustee,

25   despite my name being listed as a possible witness.  If the

1  Court wants to reserve the rest, that's fine, but at least as

2  far as the standing issue, I believe that I need a ruling from

3  the Court that I can proceed on behalf of counsel -- or as

4  counsel for the Trustee, at least as to that portion, and not

5  violate Rule 3.7.

6          THE COURT:  All right.  Because we bifurcated these

7  hearings and standing is the threshold question we need to

8  address, absent objection that the Court would address, the

9  Court will allow you to testify -- or the Court will allow you

10 to represent the Trustee in this phase of the hearing.

11         MR. YOUNG:  Thank you, Your Honor.

12         THE COURT:  All right.  Let's go forward.

13         MR. SPRAGENS:  Your Honor, I would call the Trustee,

14 Jeannie Burton, on behalf of Mr. Manookian.

15         MR. YOUNG:  Your Honor, I think that puts the cart

16 before the horse here.  I think there's an issue about whether

17 or not Mr. Manookian can even call witnesses, as the Court

18 knows, and as we fully briefed, so I'm not going to go over

19 that.  Mr. Manookian has repeatedly taken the position that

20 there is no -- there could be no surplus in this case, because

21 the Trustee causes of action are not valid.  I think the law is

22 pretty well settled that not only can he not testify to the

23 contrary, he can't even make an argument to the contrary.  So

24 the only way he has standing in this case is if he can prove,

25 and it's his burden of proof, a surplus here, and I think that

1 he's judicially estopped from even taking that position.  So I

2 don't believe that Mr. Manookian is even permitted to present

3 testimony in that regard.

4 　　　　　THE COURT:  Mr. Spragens, if you could respond to

5 that?

6 　　　　　MR. SPRAGENS:  Yes, Your Honor.  This Court issued an

7 order five days ago stating that you would hear all evidence

8 and argument on the subject of standing.  I believe that the

9 Court is entitled to take evidence on a threshold question such

10 as standing, to the extent of its constitutional implications

11 and due process implications, and if we have the burden of

12 proof, as Mr. Young has asserted repeatedly throughout this

13 proceeding, I think we're entitled to put that proof on before

14 the Court, through examination of witnesses.

15 　　　　　THE COURT:  And the Court's going to allow

16 Mr. Manookian to call the Trustee.  With everything that you've

17 cited, Mr. Young, if there are consequences down the road, so

18 be it, but part of this -- the whole heart of this is

19 Mr. Manookian having the ability to show that there is excess

20 funds available or likely to be available.  The Trustee is the

21 person who is in charge of the estate and best able to testify

22 to that, so we're going to allow that at this time, and we'll

23 go ahead and swear Ms. Burton in.

24 　　　　　THE CLERK:  Please raise your right hand.

25 　　　　　JEANNIE BURTON, BRIAN MANOOKIAN'S WITNESS, SWORN

1          THE CLERK:  So please state your full name for the

2   record.

3          THE WITNESS:  Jeannie Ann Burton.

4                       DIRECT EXAMINATION

5   BY MR. SPRAGENS:

6   Q    Good afternoon, Ms. Burton.  We met some time ago, but my

7   name is John Spragens, and I represent Brian Manookian in this

8   matter.  Can you hear me okay today?

9   A    I can.

10  Q    Obviously, we're on Zoom, so if you have any problems

11  understanding something I've said, just let me know or raise

12  your hand, and I'm happy to repeat it, or fix whatever I've

13  done wrong.  Is that okay?

14  A    Yes, sir.

15  Q    I'm going to have some additional questions for you later,

16  if the Court allows me to ask them, but at this time, I'm going

17  to limit my questions to the topic of whether Mr. Manookian has

18  standing to object to your proposed settlement of the Chase

19  parties' claim.  Do you understand that?

20  A    Yes, sir.

21  Q    Just as a housekeeping matter, you're not any relation to

22  an attorney named Walt Burton of the Thompson Burton Law Firm,

23  are you?

24  A    I am not.

25  Q    And you're the Trustee in this matter?  Is that correct?

1  A    Yes.

2  Q    As the Trustee, you have a fiduciary duty on behalf of

3  Cummings Manookian Law Firm?  Is that correct?

4  A    Correct.

5  Q    You're also an attorney.  Is that right?

6  A    That's correct.

7  Q    You have the right to speak for Cummings Manookian in this

8  proceeding?  Is that fair?

9  A    I do, but I have retained counsel to represent me in this

10 matter.

11 Q    And that counsel is Mr. Young, who's on the Zoom hearing

12 today?

13 A    Yes.

14 Q    You have the authority, with the Court's oversight, to

15 control the assets of Cummings Manookian?  Is that correct?

16 A    That's correct.

17 Q    And as part of your duties as Trustee, you've

18 investigated, to the extent you're able, the assets of Cummings

19 Manookian?

20 A    Yes.

21 Q    Brian Manookian doesn't have any authority to speak on

22 behalf of Cummings Manookian now, does he?

23 A    No.

24 Q    As Trustee, you're familiar with the bankruptcy claims

25 asserted against the Cummings Manookian estate in this

1  proceeding?

2  A    Yes.

3  Q    There's the -- in terms of claims that are active right

4  now, there's the claim asserted by Mr. Konvalinka?  Is that

5  right?

6  A    Correct.

7  Q    And what's the value that you ascribe to that claim?

8  A    I believe it's over $295,000.

9  Q    For purposes of round numbers, I'm going to call it

10 $300,000, but I don't mean to dispute your number there.

11      And what about the Chase parties' claim as you're

12 proposing to settle it right now?  What's the value of that

13 claim?

14 A    They filed a claim for -- a secured claim for 800 -- over

15 $800,000, and I'm proposing to allow the claim at 250,000.

16 Q    And then there's a claim by Ms. McDaniel?  Is that

17 correct?  Do I have the name wrong?  Was there another claim --

18 A    McCarthy?  McCarthy?  I don't --

19 Q    McCarthy, thank you.

20 A    -- recall the first name.

21 Q    And if you recall, what's the value that you've ascribed

22 to the McCarthy claim?

23 A    It's -- I would say, $71,000, or it could be more than

24 that.  It's 10 percent of the recovery of any fee due Cummings

25 Manookian recovered for the benefit of Cummings Manookian in

1  the Fitzgerald case.

2  Q    And we'll talk about the Fitzgerald case in a minute, but

3  are there any other claims that are currently pending against

4  Cummings Manookian?

5  A    Not that are allowed.

6  Q    So if we add up just the ballparking, 300 on behalf of

7  Konvalinka, 250 on behalf of the Chase parties, and 70-ish on

8  behalf of Ms. McCarthy, that adds up to about $620,000.  Is

9  that right?

10 A    Correct.

11 Q    There's no chance that the claim -- that it's more than

12 $750,000, the total value of claims that are currently pending

13 against the bankruptcy estate?

14 A    I'm sorry.  Ask me that again?

15 Q    Is there any chance in your mind that the total value of

16 these claims is greater than $750,000?

17 A    Well, it could be.  You know, if the Chase claim is not

18 allowed at $250,000, and upon a rehearing, they're granted a

19 sanctions judgment for an amount, you know, greater than

20 $250,000, then the claims could be significantly higher.

21 Q    But as of right now, the underlying judgment in the Chase

22 parties -- that the Chase parties' claim is based on, that

23 judgment's been vacated.  Is that right?

24 A    That's right.  So they still have a contingent claim in

25 the case.

1  Q    But currently, there's no judgment against Cummings
2  Manookian.  Is that fair?
3  A    That's correct.  It's been vacated and remanded for
4  rehearing with a new judge.
5  Q    So you think the $250,000 value that you've given to that
6  claim, we agree that the total value of those claims against
7  the bankruptcy estate equals about $620,000?  Is that fair?
8  A    I think that's in the right range.  I don't have my
9  calculator in front of me, but that sounds right.
10 Q    And as you probably know, I went to law school because I
11 can't do math, so that's I need to check my numbers on this.
12     Do you know if the -- if your special counsel, Mr. Young,
13 has attorney's fees, and what they total as of this date?
14 A    I do, and I think it's -- probably now over $100,000.
15 Q    So as of now, 620 plus another 100,000.  Is that fair?
16 A    Correct.
17 Q    Now as the Trustee, you directed the filing of an
18 adversary proceeding on behalf of Cummings Manookian.  Correct?
19 A    Correct.
20 Q    And you reviewed and approved the allegations in the
21 complaint in the adversary proceeding?
22 A    Yes.
23 Q    And you made the allegations in the adversary proceeding
24 because they're true?
25 A    I believe that they are true.

1  Q    In that proceeding, you represented that Cummings

2  Manookian is entitled to payment for attorneys' fees in

3  multiple cases.  Is that right?

4  A    Correct.

5  Q    The one you mentioned earlier, the Fitzgerald case, is

6  that true?

7  A    Correct.

8  Q    And in that case, it's true that Cummings Manookian is

9  entitled to $1.35 million?  Is that right?

10  A    That was the attorney fee that was awarded -- or -- well,

11  not awarded, but that was the attorney fee based on the

12  agreement, contingency fee agreement, with the Fitzgeralds.

13  Q    And your position is that Cummings Manookian is entitled

14  to $1.35 million from that fee?

15  A    Yes.

16  Q    Manookian PLLC, the newer legal entity, it doesn't have

17  any entitlement to the Fitzgerald fee, does it?

18  A    Did you Manookian, PLLC?

19  Q    Yes, ma'am.

20  A    I don't believe so.

21  Q    That's all Cummings Manookian's money, is what I'm trying

22  to get at.

23  A    Yes.

24  Q    You agree that that single $1.35 million fee exceeds all

25  of the claims that have been asserted against Cummings

1 Manookian?

2 A    I have to do my math again, but if the contingent claim of

3 the Chase parties was the seven -- seven or $800,000, then the

4 claims could exceed that amount.

5 Q    So then the claims -- if I've got this right, if we add

6 500,000 to the 250,000 of the Chase parties, that would be

7 750,000 plus 300 for the Konvalinka claims, so that's 1.05

8 million, plus 70,000 for Ms. McCarthy, plus 100,000 for

9 Mr. Young.  Have we gotten to 1.35 million yet?

10 A    Well, there would be Trustee compensation on whatever the

11 amount that the Trustee collects and disburses, so that's

12 dependent on the amount that is recovered for the estate, and

13 then there would be additional attorney fees for the adversary

14 proceeding, and then also if the settlement's not approved, and

15 we go down to state court to start that proceeding over, then

16 the Trustee, I would have to employ counsel to represent the

17 estate in the -- in that proceeding.

18      So there would be attorney fees.  In that, I think I

19 estimated that attorney fees in that instance could be as much

20 as $150,000, and then for the adversary proceeding, depending

21 on whether -- depend -- I think you're getting that, assuming

22 that the Chase claim is not settled.  Then that could be

23 another $100,000 in bankruptcy adversary in fees, because the

24 scope of the litigation would be more, because we might -- we

25 wouldn't know, and I might need more money to pay all the

1  claims.

2       So that was one of the reasons that it made sense to

3  consider, you know, a settlement or some type of liquidation of

4  the Chase claim.

5  Q    Okay.  I want to try to unpack a few of the fees that you

6  just mentioned there.  With respect to Trustee's fees, is there

7  a number in your mind that you're thinking of for the Trustee's

8  fees?

9  A    Well, it is a -- it's a computation, it's a percentage,

10 and I have to have my software to do that, but if I had

11 $800,000 in the case, and the -- that figure is comprised of if

12 I'm successful in the adversary proceeding, and whether I get a

13 judgment for the 1.3 or the 715, I feel comfortable, because

14 the Court and the $715,00 that's on deposit with the Court,

15 that would come into the estate.  I currently have about

16 $85,000 in the estate bank account.

17      So the Trustee's compensation or commission by statute on

18 that would be $43,000.

19 Q    And one thing that's important to note here is that when

20 you're figuring the size of the bankruptcy estate, you're

21 taking into account the adversary proceeding.  Is that correct?

22 A    I don't think I understand your question.

23 Q    Well, these numbers that you've been giving me, including

24 the Trustee's fee that you just mentioned and the attorney's

25 fees, you've included the attorney's fees to prosecute the

1  adversary proceeding.  So --

2  A     Correct.

3  Q     Okay.  So when you look at the bankruptcy estate value,

4  you are taking the adversary proceeding into account, in

5  valuing the estate.  Is that right?

6  A     Correct.  Trying to look at what I think the assets are of

7  the estate, and what I might be able to recover and collect to

8  pay the claims of creditors.  That's my main job.

9  Q     And I'd like to talk about the assets of the estate in

10 just a second, but while we're talking about these fees, you

11 mentioned attorneys' fees, you know, for the Trustee and for

12 the prosecution of the adversary proceeding.  Those fees would

13 be paid to Mr. Young.  Is that correct?

14 A     That is correct.

15 Q     Now, when you mentioned the attorneys to represent

16 Cummings Manookian in the state court proceeding, have you

17 investigated or retained an attorney to represent Cummings

18 Manookian in that proceeding?

19 A     I haven't retained an attorney, but I have estimated what

20 I thought, and the difficulty.  But I've estimated what I

21 thought the attorney fees would be, or could be, in that state

22 court proceeding.

23 Q     Are you aware whether that state court proceeding has been

24 assigned to a judge at this point?

25 A     I do not know.  I don't know.  I know there have been

1   motions filed, several motions already filed, but I don't know

2   if any judge has been assigned.

3   Q     You know there's a motion for summary judgment pending

4   that Mr. Manookian filed in that case?

5   A     I do.

6   Q     When you estimate $150,000 in attorneys' fees to, you know

7   -- to defend Cummings Manookian in the event that that civil

8   contempt judgment were restored, are there particular types of

9   attorneys that you're contemplating hiring, or can anybody do

10  that?

11  A     Well, I would want somebody who has state court

12  experience, somebody who's experienced in Williamson County

13  state court.  It's -- and it would probably -- it would help,

14  because this is one of the difficulties, I only have $85,000 in

15  the case.  The attorney has -- you know, it doesn't work like

16  it does outside of bankruptcy.  I have to get somebody to

17  agree, they have be approved by the bankruptcy court, their

18  compensation will have to be approved by the bankruptcy court,

19  so it's not as though the attorney can just send me a bill each

20  month and me pay it, unless I get some type of permission from

21  the Court to do that.  So it will have to be somebody who has

22  an understanding of what it means to represent a bankruptcy

23  Trustee in a case, because you may not get paid, or you may not

24  get paid until, you know, later in the case, or at the end of

25  the case.

1  Q    Now Mr. Young was the receiver, a court-appointed receiver

2  for the Chase parties in the underlying initial proceeding in

3  the state court.  Is that right?

4  A    Correct.

5  Q    And he's special counsel now to the Trustee in this

6  proceeding.  Is that right?

7  A    Correct.

8  Q    Have you given any thought to hiring him to represent

9  Cummings Manookian in the remanded proceeding?

10  A    Well, I thought about it.  I don't know, you know, that's

11  another big chunk to take on.  I certainly think he would be,

12  you know, capable and competent, but it, you know, frankly we

13  met -- I met with a lot of resistance in wanting him as special

14  counsel.  I think, I don't know, if I asked him to do it, he

15  might do it.  But it's a lot more to add and still not be

16  compensated anything in the case thus far.

17  Q    And have you given any thought to whether he has conflicts

18  of interest in representing various entities in various stages

19  of these proceedings?

20  A    I'm sorry.  Ask me that question again?

21  Q    Have you given any thought to whether he might have a

22  conflict of interest representing Cummings Manookian on remand,

23  and having represented the Chase parties as receiver, and

24  representing the Trustee as special counsel?

25            MR. YOUNG:  Object to form.  He represented that I

1  represent the Chase parties, which is inaccurate.

2           MR. SPRAGENS:  Excuse me.  Let me modify that.

3  BY MR. SPRAGENS:

4  Q    Representing -- being the court-appointed receiver to

5  collect the fee in the underlying state action, as well as

6  being special counsel to the Trustee, and then representing

7  Cummings Manookian on remand, have you given any thought to

8  whether it would be appropriate for him to do all those?

9  A    I haven't really thought it through like that as far as

10 the -- on remand, representing Cummings Manookian in the state

11 court.  I don't know who would -- the Chase parties might very

12 well raise that.  So that's a possibility.  That's a

13 possibility, so --

14 Q    Okay.  So suffice it to say, attorneys' fees in two

15 proceedings totaling $250,000, a Trustee's fees of under

16 $50,000, that gets you to about $300,000 on top of the $720,000

17 you identified earlier, and then as you also stated, if you

18 imagine that the Court restored the full amount of the civil

19 contempt award, that could put you above $1.35 million.  Is

20 that what you're saying?

21 A    It could.  And also, remember, I have to be able to

22 collect 1.3, and so there's 715 that's being held by the

23 Clerk's Office that if I'm successful in the litigation would

24 be paid over to the estate, but the remainder of any other

25 judgment would have to be collected.  You know, we may have to

1  hire -- and that costs money to collect.  I don't know if

2  defendant is solvent.  I know she's married.  If there's issues

3  with, you know, collecting from a dependent who may own things

4  (indiscernible) entirety, so you know, that was another --

5  yeah, another consideration, but certainly, I believe that if

6  I'm -- if the estate is entitled to the 715, it's entitled to

7  1.3, but will I be able to collect that?  I don't know.  I

8  don't know.  I think -- I don't know.

9  Q    Well, you have been receiving payments from Mr. Cummings

10 for his portions of fees that the Trustee has asserted Cummings

11 Manookian is entitled to, right?

12 A    That's right.  That's where most -- I guess all of that

13 85,000 has come from.

14 Q    Just in the last couple of weeks, Mr. Cummings has sent

15 you another payment for a case that he settled that you have

16 represented that Cummings Manookian has an interest in.  Is

17 that right?

18 A    I haven't received anything, and -- I have received an

19 email that honestly, I was sick last week, and so there's a lot

20 that I haven't been able to catch back up on, but I haven't

21 received any other monies.  My recollection is that -- and

22 Mr. Young would be able to correct me if I'm wrong, or you can,

23 if you have the information.  I think it's nine or $10,000 and

24 I believe that that may be the end of the cases that

25 Mr. Cummings took over when he left the firm to which Cummings

1  Manookian is entitled to a portion of those fees and costs.

2  Q    In the adversary proceeding, in the complaint, you listed

3  about 16 cases that Cummings Manookian has an interest in, and

4  is owed payment in.  Is that right?

5  A    That's correct.

6  Q    That's in addition to the $1.35 million that you've

7  alleged that Cummings Manookian is entitled to in the

8  Fitzgerald case?

9  A    That's correct.

10 Q    You also agree that Cummings Manookian is entitled to

11 payment for a bunch of physical and intangible assets that

12 you've alleged were used by Manookian PLLC and Afsoon Hagh and

13 Hagh Law.  Is that right?

14 A    That's correct.

15 Q    And you've said they used the premises without paying

16 Cummings Manookian.  Right?

17 A    Correct.

18 Q    They used furniture without paying Cummings Manookian.

19 Right?

20 A    Correct.

21 Q    They used equipment without paying Cummings Manookian?

22 A    Correct.

23 Q    They used intellectual property without paying Cummings

24 Manookian?

25 A    Correct.

1  Q    And there are certain costs that Cummings Manookian is

2  entitled to recover also in excess of the $1.35 million

3  Fitzgerald fee.  Is that right?

4  A    Costs?

5  Q    Yes.

6  A    Possibly.  Obviously, those 12 cases have to be won by --

7  they originated with Cummings and Manookian, but they're all in

8  various stages of litigation, and so whether Cummings Manookian

9  will receive any fee will be dependent upon how those cases

10 eventually pan out over time.

11 Q    But you've alleged in the adversary proceeding that the

12 estate should include the $1.35 million Fitzgerald fee, plus

13 the fees from the 16 cases you listed -- excuse me.  I think

14 it'd be 15 cases in addition to the Fitzgerald case.  Plus

15 premises, furniture, equipment, intellectual property, and

16 other costs.  Is that right?

17 A    Correct.

18 Q    Have you made any estimate of the total value of the

19 premises, the furniture, the intellectual property, and the

20 other attorneys' fees?

21 A    No.

22 Q    No doubt that would be well in excess of $1.35 million?

23 Is that correct?

24 A    I do not know.

25 Q    If the allegations in your case are true, isn't it a

1 virtual certainty that the estate would be worth more than
2 $2 million?
3 A    It's possible.  But we would have to collect.  We'd have
4 to collect those(indiscernible).  You know, that's what the
5 litigation is about, is whether Cummings and Manookian is
6 entitled to fees and in what amount, and it won't be 100
7 percent of -- it may not be 100 percent of those allocations
8 where other attorneys, you know, have worked on cases.  So --
9 and then, collecting.  Collecting those.  But yes, those
10 allegations are there.  And --
11 Q    And you're --
12 A    -- got a good case.
13 Q    And you're so confident that the allegations in the
14 adversary complaint are true, that you've asked this Court to
15 allow you to hire special counsel to prosecute the adversary
16 proceedings so you could prove those claims and find those
17 assets.  Isn't that right?
18 A    I'm confident that we -- that I have a good case, and it
19 is part of my duty as a Trustee is to pursue assets, you know,
20 that I think will produce money to pay creditors.
21 Q    Cummings Manookian is also entitled to pre- and
22 post-judgment interests.  Is that right?
23 A    I'm sorry.  Ask me that again?
24 Q    In the adversary proceeding, you've asserted that Cummings
25 Manookian is entitled to collect pre- and post-judgment

1  interests?

2  A    Yes.

3  Q    Is that right?

4  A    I think.

5  Q    Also punitive damages as a result of their malicious and

6  fraudulent conduct.  Is that right?

7  A    Yes.

8  Q    And Cummings Manookian is entitled to have their

9  attorneys' fees paid as a result of the adversary proceeding.

10 Is that right?

11 A    That's all subject to court approval, but yes.

12 Q    That's what you've alleged?

13 A    Yes.

14 Q    Does Cummins Manookian have any claims against third

15 parties that could increase the value of the estate?

16 A    I'm not -- not that I know of.  I know that there has been

17 some -- in the receivership proceeding, Mark Hammerfold

18 (phonetic) had asked the Court to have the Chase parties pay

19 money that was collected out of his accounts receivable to him

20 now that the judgment was vacated, and I've been monitoring

21 that to see what the outcome of that was, to see if the estate

22 might have any recourse to seek the same relief, but the judge

23 in that case has -- he's stayed that until the Chase litigation

24 is concluded.

25 Q    So just to make sure --

1  A    Other than that, I don't -- other than that -- on -- I

2  don't know of anything else.

3  Q    Make sure I'm understanding.  Mr. Hammerfold was

4  co-counsel and also subject to the civil contempt order in the

5  underlying state court proceeding.  Is that right?

6  A    Correct.

7  Q    And now that that award of damages, or that civil contempt

8  award has been vacated, Mr. Hammerfold is suing the Chase

9  parties, or at least moving the Court to order the Chase

10 parties to return some of the funds to him that they collected

11 on a now vacated judgment.  Is that right?

12 A    Right.  Right.

13 Q    And in fact, Mr. Young, in his role as receiver, collected

14 some of those funds too, didn't he?

15 A    As a receiver, he was collecting the -- he got appointed

16 by the Court to be receiver, and he was collecting the judgment

17 funds.

18 Q    And some of those funds were paid to him in compensating

19 him for his role as receiver?

20 A    I believe he made application to the Court, and was

21 awarded fees.

22 Q    And Cummings Manookian has not filed a similar motion in

23 the state court case.  Is that right?

24 A    No.

25 Q    And you said you're monitoring that?

1  A    I am.  I think there's about $25,000 maybe that was
2  collected from Cummings Manookian.  I think that's about -- I
3  think that's right, because all the other money had been turned
4  over to the bankruptcy estate, so -- I could tell that the
5  judge -- I thought the judge was going to just stay that
6  proceeding until the outcome of the Chase -- what I call the
7  Chase litigation, and so I didn't think that it was worth the
8  expense to the estate to file a similar motion.

9      I think if it turns out that Chase had to return those
10 funds to Mr. Hammerfold, then -- you know, at the time, I was
11 thinking I would make the same request, or file a similar
12 motion, but again, that's -- you know, that will be part of
13 what will be covered in the claims settlement with the Chase
14 parties.

15 Q    Well, in fact, in that settlement, which maybe we'll be
16 allowed to talk about later, Cummings Manookian would be
17 waiving any claims against the Chase parties.  Is that right?
18 A    Right, it's -- would be mutual releases, and Chase would
19 be waiving the reservation of rights that they retained in an
20 order when they turned over $25,000 to the bankruptcy estate
21 that I took the position that was a preference, and so it
22 should be paid over to the bankruptcy estate.  So it has been,
23 but there's an order reserving their rights to claim an
24 execution lien or something else.

25 Q    Did you rely on anyone else to make the decision not to

1  join that motion to attempt to recover the funds that were paid

2  to the Chase parties, or to Mr. Young --

3  A     The --

4  Q     Just let me finish real quick.

5  A     Oh, I'm sorry.  I'm sorry.

6  Q     That's okay.  In the state court proceeding?

7  A     I'm sorry.  Ask me the question again?

8  Q     Did you rely on anyone else's advice in making that

9  determination?

10 A     No.

11 Q     But you don't think that it would give the motion a little

12 bit more force if Cummings Manookian also joined and said, we

13 are also in the same position as Mr. Hammerfold, and would like

14 to recover our funds?

15 A     No, I didn't think that.

16 Q     And in any event do you think that that would increase the

17 value of the bankruptcy estate by about $25,000, if you

18 prevailed on that motion which you have not filed?

19 A     If I prevailed, and collected it, yes.

20 Q     And in any event, the proposed settlement of the Chase

21 parties would moot that whole issue?

22 A     Correct.

23 Q     I'm going to -- I don't want ask you more about the Chase

24 settlement in detail, because I think we need to limit this

25 portion of our conversation to Mr. Manookian's standing.  I do

1  have some other questions for you later about that, but who is

2  the sole member of Cummings Manookian?

3  A    At the time that the bankruptcy petition was filed, it was

4  Brian Manookian.

5  Q    And do you know who it is today?

6  A    Well, it would be Brian Manookian.

7  Q    And if you prevail on your claims on the adversary

8  proceeding, wouldn't Brian Manookian be entitled to the surplus

9  recovered by the Trustee?

10  A    If there was a surplus -- actually, I think it would

11  probably go to -- there's a charging order, and there's some

12  orders in bankruptcy court about that, but obviously, we would

13  be paying that.  I won't pursue that, but the surplus, that

14  would be paid to Brian Manookian or to his creditor that has

15  the charging order against him.

16  Q    And where is that charging order pending?

17  A    In bankruptcy court.  I filed an objection to the claim,

18  there were two claims, actually, because the judgments -- both

19  claims were based on judgments against Mr. Manookian, and

20  possibly others, I can't remember, but Mr. Manookian

21  personally, and not against Cummings Manookian.

22  Q    And what's the total amount subject to the charging order?

23  A    I don't recall.  I don't know.

24  Q    But if you prevailed on your claims in the adversary

25  proceeding, and collected all the 16 attorneys' fees, one of

1  which is $1.35 million, and the value of all the property

2  you've alleged that was stolen from Cummings Manookian, as well

3  as the punitive damages and attorney's fees, and interests that

4  you've alleged Cummings Manookian is entitled to, Mr. Manookian

5  would receive the proceeds of that surplus.  Isn't that true?

6  A    If there was a surplus, then he would receive the surplus.

7  I just don't believe that this is going to be a surplus case,

8  but I'm certainly going to do everything I can to collect all

9  of the assets of the estate, or that are necessary to pay the

10 claims of the creditors.

11 Q    In your believe that this is not to be a surplus case, you

12 don't have an inventory of the hard property, intangible

13 property, and attorneys' fees that Cummings Manookian is

14 entitled to recover?

15 A    I don't.  You know, we're -- we were conducting discovery,

16 and then the discovery's been stayed.  In the adversary

17 proceeding, there's discovery disputes.  I've gotten some

18 information, so, no.  I don't have complete information on all

19 of that.

20 Q    And you've asked to stay the discovery in the adversary

21 proceeding.  Isn't that right?

22 A    Right.  Right.

23 Q    Through your counsel, Mr. Young?

24 A    Correct.

25 Q    And you've done that multiple times?

1 A    I believe so, yeah.  Yes.

2 Q    So that lack -- the lack of an inventory of the actual

3 value of, you know, the assets in the estate, you are at least

4 in part responsible for not having that inventory.  Isn't that

5 fair?

6 A    Well, I think we -- I think I, with the assistance of my

7 counsel, compounded written discovery in again, that we don't

8 have answers to, but I also for the economy and to save the

9 estate attorney -- you know, administrative costs and expenses,

10 to stay all of that pending the resolution of the case claims

11 or whenever the case claim was fixed, so that we -- that I

12 would know how the scope, or how much I needed to proceed

13 against in the adversary proceeding.

14        MR. SPRAGENS:  Your Honor, I want to respect the

15 Court's time and your bifurcation order, and so while I do have

16 some other questions, I think they get more to the merits of

17 the objection, and so I'll pass the witness at this time.

18        THE COURT:  Thank you for monitoring yourself on

19 that.  The Court was going to give you some latitude, and I

20 think you used about as much of it as I was willing to give you

21 on (indiscernible) so appreciate that.

22        Mr. Young?

23        MR. YOUNG:  Yes, Your Honor.  Just for the record,

24 Phillip Young on behalf of the Trustee.

25                    CROSS-EXAMINATION

1  BY MR. YOUNG:

2  Q     Ms. Burton, I want to ask you not hypothetical questions,

3  but questions grounded in reality.  Is Brian Manookian a

4  creditor of this estate?

5  A     No.

6  Q     Did Brian Manookian file a proof of claim in this estate?

7  A     No.

8  Q     Is Brian Manookian listed as a creditor in the schedules?

9  A     No.

10 Q     Who signed those schedules?

11 A     Brian Manookian.

12 Q     What's Mr. Manookian's only role in this case?

13 A     Well, he's the representative of Cummings and Manookian.

14 He signed the bankruptcy schedules, and I believe he's chief

15 manager.  He's the debtor representative.

16 Q     So his only role in this case is as the former principal

17 of the debtor.  Is that right?

18 A     Correct.

19 Q     Can you say with any degree of certainty that this estate

20 will be a surplus estate?

21 A     No.

22 Q     Why not?

23 A     Well, for the reasons that I've already stated.  I can go

24 through that again, but I'd have to pursue the adversaries, go,

25 you know, it's basically, maybe take it in the adversary

1  proceeding sum, and then in the Chase matter.  So I would have

2  to be successful on, you know, all counts of the adversary

3  proceeding, which would obviously incur administrative costs,

4  and then I would have to be able to collect all of -- you know,

5  any award, any judgment, be able to collect that, pay the cost

6  of collection of that.

7      On the Chase side of it, there would be, obviously,

8  attorney fees involved in providing representation to the

9  estate, and if that goes back for -- to start at the very

10 beginning, and, you know, that's no guarantee that there won't

11 be a like judgment, a sanctions judgment in that case again,

12 which would likely go up, you know, on appeal again.

13 Q    So is it safe to say that there are a lot of variables at

14 play in this case?

15 A    Yes.  Yes.

16 Q    There are variables in the amount of claims to the estate.

17 Right?

18 A    Correct.

19 Q    There are variables in administrative expenses of the

20 estate, right?

21 A    Correct.

22 Q    There are variables in litigation, whether you're

23 successful in litigation or not.

24 A    That's correct.

25        MR. SPRAGENS:  Your Honor, I appreciate that you gave

1  me latitude in my examination, but I do object to the leading

2  questions of his own witness.

3          MR. YOUNG:  Your Honor, this is a cross-examination.

4          THE COURT:  (Audio interference) witness, so you

5  called the Trustee.  Mr. Young obviously, you know, this is

6  bankruptcy court, we do allow a little bit of latitude in the

7  interest of time, but allow the witness to testify as best she

8  can.

9          MR. YOUNG:  Yes, Your Honor.

10 BY MR. YOUNG:

11 Q    How much are you currently holding in this estate today?

12 A    85,000, a little over 85,000.

13 Q    Is this a surplus estate today?

14 A    No.

15 Q    Can this be a surplus estate without you being successful

16 in the adversary proceeding?

17 A    No.

18 Q    I want to walk through some numbers.  You've gone through

19 some of these, but I want to walk through these in a way that

20 sort of maybe makes it a little easier for the Court to digest.

21     You said you're holding $85,000.  How much is being held

22 by the Court Clerk?

23 A    715.

24 Q    And as we sit here today, are you entitled today to the

25 $715,000?

1  A    No.

2  Q    What would have to happen in order for you to get this

3  money?

4  A    A judgment in the adversary proceeding.  Or a settlement.

5  If there was a settlement.

6  Q    If the Court grants you those funds, then, the 715 plus

7  the 85, that's about 800,000, right?

8  A    Correct.

9  Q    Okay.  And just repeat for us, how much was the Grant

10 Konvalinka claim?

11 A    Close to 300, 295-something.

12 Q    Is that a secured or an unsecured claim?

13 A    It's an unsecured claim.

14 Q    What about Ronette McCarthy?

15 A    71,500.  Ten percent of -- so it could be 71,5, or it

16 could be 100 and -- what would that be?  Three -- ten percent

17 of the amount that's recovered from the -- in the Fitzgerald

18 case.  Because he was an attorney, a co-counsel, or conferring

19 attorney, or -- in that case.

20 Q    If the Court approves the settlement before it, how much

21 would the Chase claim be allowed as?

22 A    250,000.

23 Q    And would that be secured or unsecured?

24 A    That would be unsecured.

25 Q    And if the Court denies this settlement, will you have

1  extra expenses?

2  A     Yes.

3  Q     And why is that?

4  A     Well, I would have to employ counsel to represent the

5  estate in the state court with respect to the Chase claims, and

6  so that's an expense, and then as I've discussed, there would

7  be additional expense, administrative costs and attorney fees

8  involved in the adversary proceeding, because I wouldn't be

9  able to just limit pursuing the recovery of the Fitzgerald

10 fees.  I would have to pursue, not knowing what the claims

11 were, because they're not fixed, and calculating on the high

12 end of the claims, I would have to -- there would just be a lot

13 more cost in pursuing all of the other assets or causes of

14 action as you will, in that adversary that were raised in the

15 adversary proceeding.

16 Q     And those legal fees.  Would they be unsecured claims or

17 administrative claims?

18 A     They're administrative claims.

19 Q     What priority would they have, vis-a-vis the unsecured

20 claims?

21 A     They get paid before the unsecured claims.

22 Q     I believe you testified earlier -- I think Mr. Konvalinka

23 said that his math was $620,000 roughly unsecured claims if the

24 Chase claim settlement is allowed, and I think you agreed with

25 that number.  Is that right?

1  A    I think that's right.

2  Q    And if you're successful in collecting the 715, in the

3  estate, that 715 plus the 85, that would be about 800,000,

4  right?

5  A    Eight what?

6  Q    About 800,000?

7  A    Yes.

8  Q    If you distribute $800,000, I think you testified to this

9  earlier, what would your Trustee compensation be?

10 A    43,000.

11 Q    And I think you testified earlier that you believe the

12 estate has already incurred legal fees in excess of $100,000?

13 Was that your testimony?

14 A    Correct.

15 Q    How much do you think in legal fees will be spent just to

16 recover the Fitzgerald fees?

17 A    I think in discussing with my counsel, and what --

18 estimate about $50,000.

19 Q    And if you have to pursue all causes of action in the

20 adversary proceeding, that would go up?

21 A    I think -- yes, probably more than double.

22 Q    And then obviously if the Chase claim, the settlement's

23 not allowed, and it goes back to state court, that number could

24 go significantly above 250, right?

25 A    The amount of subsequent judgment?

1  Q    Right.

2  A    Yes.

3  Q    With admin expenses, plus the $620,000 of unsecured

4  claims, do you think that amount is more or less than $800,000?

5  A    Probably more than -- more than 800 -- now, more than

6  $800,000.

7  Q    And you get to the 800 only if you collect the 715 being

8  held by the Court, right?

9  A    Correct.

10 Q    So what would have to happen in order for this to be a

11 surplus case?

12 A    It'd have to be successful really in probably -- well,

13 again, I don't know, because of the -- I would have to pursue

14 all of the claims, all of the other accounts receivable, if you

15 will, in the case to which Cummings and Manookian might be

16 entitled to attorney fees that are -- that they would be

17 entitled to for representation of plaintiffs in lawsuits.

18     So I guess, first of all, all of those would have to be

19 decided in favor of the -- or settled in favor of the

20 plaintiffs, and then Cummings and Manookian and -- or there

21 would be an award of an attorney, not an award, but there's an

22 agreement between the plaintiff and the law firm, Cummings

23 Manookian, about the amount of the percentage of an attorney

24 fee, and then there would have to be a determination then in

25 the adversary, how much of that Cummings and Manookian would be

1  entitled to.  Is it 100 percent?  Is it 50?  Is it some other

2  formula, like there was with Brian Cummings?

3       So all of that, you know, would have to be successful in

4  recovering the attorney fees, and I don't know what those

5  amounts would be, and how much Cummings and Manookian would be

6  entitled to, and then spending the money to get to that, and

7  then, you know, spending the money to collect it if it wasn't

8  voluntarily paid over to the estate.

9       And then on the -- and then in the Chase case, for it to

10 be -- on that, for it to be a surplus case, that claim would

11 have to be disallowed or allow -- or disallowed -- it would

12 have to be a whole lot less, I think, than $800,000, you know,

13 and it could be more.

14 Q    Is litigation ever a certainty in your experience as

15 Trustee?

16 A    No.

17 Q    Litigation expenses?

18 A    No.  No.  I mean, we try to estimate, and, you know, we

19 try to be a good -- good stewards, and, you know, but no.  I

20 mean, things happen, and you have to do what you have to do in

21 your cases.

22 Q    I'm not certain you understood my question.

23 A    Oh.

24 Q    Is litigation expenses -- is it expensive?

25 A    Oh, I'm sorry.  You cut out there for a minute.  Is

1  litigation expensive?  Oh, yes.  Yes.

2  Q    Let's talk about collections for a minute.  In your

3  experience, how difficult is it to collect from individuals?

4  A    It just depends.  I mean, it depends on their insolvent --

5  you know, whether they're solvent or insolvent.  If you have to

6  chase them and their assets, if they're, you know, if they own

7  property jointly with someone else, you know, finding assets,

8  or what the bank accounts are, that sort of thing, so it can be

9  difficult.

10 Q    Do you know whether or not Ms. Afsoon Hagh is solvent?

11 A    I do not.

12 Q    Is she married?

13 A    Yes.

14 Q    In your experience, what's the impact of marital status on

15 collections?

16 A    It makes it a lot harder, because, in the -- you know,

17 what the defendant owns is a survivorship interest in assets,

18 and those -- you know, those aren't very valuable.  You know,

19 it's hard to liquidate jointly owned property, or to sell, you

20 know, a survivorship interest to anybody.

21 Q    Are you aware of any other outstanding sanctions against

22 Ms. Hagh?

23 A    I'm aware that there's a $60,000 sanctions charging or --

24 sanctions judgment, and there's a charging order.

25 Q    In your opinion as a Trustee and as an attorney, how

1  likely is it that you will be able to collect a judgment

2  against Ms. Hagh beyond the $715,000 held by this Court?

3  A    I hate to say it's not likely, but it -- it may not be

4  likely.

5  Q    And then would the estate have to incur legal fees for

6  that collection?

7  A    Yes.  And we would incur -- I would incur legal fees

8  whether we were able to collect it or not, because, you know,

9  you have to try.  You know, you have to -- whether it's

10 post-judgment discovery or whatever, you have to try to

11 collect.

12 Q    Based on all the variables that you've explained today, do

13 you think it's likely that this will be a surplus case?

14 A    I don't.  I don't.

15       MR. YOUNG:  Those are the only questions I have.

16 Thank you, Your Honor.

17       MR. SPRAGENS:  All right, just a couple of quick

18 questions to follow up.

19               REDIRECT EXAMINATION

20 BY MR. SPRAGENS:

21 Q    Ms. Burton, the cases that you listed in Paragraph 23 of

22 the adversary proceeding, do you know the status of any of

23 those cases now?

24 A    It has been a while since in the course of the adversary

25 proceeding that we have checked the status of those, but we

1  periodically check docket sheets and that sort of thing, so to

2  answer your question, I do not know the status of each one of

3  those cases.

4  Q    And I think you testified earlier that you don't have

5  values assigned to those cases on any internal tracking charts?

6  A    No.

7  Q    So you can't say whether or not Mr. Cummings is about to

8  send you a check for $500,000 or $1 million as a result of one

9  of those cases settling?

10  A    On those -- no.  But I think that's the last of them, of

11  the Cummings, the cases where I would be getting any money from

12  Mr. Cummings.  I think that's a -- I think that was the last

13  one, the one that I'm supposed to be getting.

14  Q    So Cummings Manookian would be entitled to the entire fee

15  in the rest of those cases?

16  A    I don't have a list of those in front of me.  I think --

17  I'm not sure if Mr. Cummings is involved in -- there's the

18  Vanderbilt case.  I'm not sure if Mr. Cummings is involved in

19  that and if any money would be coming through him on that.  But

20  I don't have any -- I don't have any other recollection without

21  looking at records on that.

22  Q    And between the $715,000 in the court clerk's registry and

23  the $85,000 you already hold, you've got, potentially, access

24  to $800,000 in cash, right now.  Is that fair?

25  A    No.  I wish.  I would have to be -- get a judgment in the

1 adversary proceeding where the Court says that the Cummings

2 Manookian, the bankruptcy estate, was entitled to $715,000.

3 Q    Or settlements approved by the Court.  Is that what you

4 testified earlier?

5 A    Right.

6 Q    And that potential for $800,000 is measured against

7 $620,000 in claims right now.  Is that right?

8 A    If the Chase claim is approved, yes.

9 Q    $43,000 in Trustee's fees.

10 A    Yes.

11 Q    $100,000 in legal fees.  Is that right?

12 A    I think it would be more than $100,000, plus the

13 additional attorney fees that were being heard in the adversary

14 proceeding.

15 Q    And what's your estimate of those fees?

16 A    It depends.  Fifty to a hundred or more thousand dollars.

17 It depends, again, is where -- I'm just looking at the

18 Fitzgerald case and funds and --  or have to pursue all the

19 other causes of action, all the other cases, all the other

20 causes of action in the adversary.

21 Q    In your estimate, that I think you testified with

22 Mr. Young, is it would cost you $50,000 to pursue the

23 Fitzgerald fees, to recover $1.35 million.  Is that right?

24 A    To judgment, not the collection of all of that.  But to

25 complete the discovery, 50,000 is what I estimated after

1  talking to Mr. Young.

2  Q    And if you don't do that, as of -- if your legal fees are

3  what they are right now, that would total less than $800,000.

4  Is that right?

5  A    Go back through the numbers.

6  Q    Sure.  So you got $180,000.  That's the difference between

7  620,000 and 800,000, right?

8  A    Right, right.

9  Q    And then between, you know, current Trustee's fees and

10 current legal fees, you got $143,000, right?

11 A    Right.

12 Q    So as you sit here right now, that would leave $37,000.

13 Is that right?

14 A     It would help if I could write things down.  Can we start

15 back over with those numbers?  And then, of course, there's --

16 there are other administrative costs.  There's accountant fees,

17 there's bank fees that come out of the bankruptcy banking

18 account every, every month.

19    But to talk about the just the ones that we have mainly

20 been talking about, the $370,000 in claims that include the

21 Konvalinka and the McCarthy claim, 250,000 if that was

22 approved, that would be the 600-something thousand dollars.

23    Then $50,000 more in the adversary, $43,000.  I feel like

24 I'm leaving out something.  But I, but I think when I was

25 looking at all of the figures, it was like, if I ended up in

1  all of that -- if I collected 800-and-something thousand

2  dollars and I could limit the expenses to around that, then I

3  would be able to pay all the claims in the case if we settled

4  for the $250,000.  But it could be, you know, it may be likely

5  that there could be those additional attorney fees that we

6  talked about.

7  Q    But if the adversary proceeding were conceded today and

8  you didn't have to pay Mr. Young anything further, you've got

9  more at your disposal -- you have $800,000 at your disposal

10 against $743,000 in expenses that you testified to.  Isn't that

11 right?

12 A    So if -- you're saying if we were -- if I was to reach an

13 agreed settlement with the defendants in the lawsuit for

14 $715,000.

15 Q    Yes.

16 A    Okay.  And then so where the $715,000 was paid to the

17 estate, the claims of Chase were --

18 Q    Sorry, before you get there --

19 A    Pardon me?

20 Q    I'm sorry.  Before you get there, plus the $85,000 that

21 you're already holding

22 A    Right.

23 Q    So that totals --

24 A    So that'd be the 800, right?

25 Q    Eight hundred.  So the math problem I'm trying to do is

1  800 minus 620,000, that leaves 180,000, correct?

2  A    I'm totally confused here.

3  Q    The value of the claims, as you've ascribed value to them

4  today, is $300,070-ish, and $250,000.  Would you say --

5  A    Which would be --

6  Q    Total $620,000.

7  A    That's correct.  That's right.

8  Q    So I'll just represent to you that that is $180,000 less

9  than $800,000.

10 A    So then on top of the claims, it'd be 680, and there's

11 100,000 of outstanding, or more outstanding already attorney

12 fees, 43,000 in Trustee compensation.  Yeah, so I think the

13 only thing we would be backing out there was the $50,000 and if

14 we didn't have to incur any of the other money in the adversary

15 proceeding.

16 Q    That's right.  And 620,000 plus 143,000 is less than

17 800,000.

18 A    Yes.

19 Q    So as it stands, if that case were to resolve today in

20 your favor, it would be a surplus.  Wouldn't it?

21 A    Oh no.  I don't know what the accountant fee is going to

22 be.  I don't know that we're -- I don't think we're going to

23 have any tax liability in the case, but I don't know that.

24 Q    But as you sit here today, you can't tell the Court that

25 those fees would total greater than $37,000.  Can you?

1  A    I don't know.  I don't know.

2          MR. SPRAGENS:  I don't have anything further at this

3  time, Your Honor.

4          MR. YOUNG:  Your Honor, may I be permitted to ask

5  just a couple of follow up questions on those kind of new

6  items?

7          THE COURT:  I'll allow it since you're in unchartered

8  territory right now.

9                    RECROSS-EXAMINATION

10  BY MR. YOUNG:

11  Q    Ms. Burton, Mr. Spragens was just asking you about what

12  would happen if this adversary proceeding ended today.  Has

13  there been any sort of suggestion that the defendants would

14  just give you the 715 today?

15  A    No.

16  Q    And in fact, the only way using Mr. Spragens's

17  hypotheticals, that there would be a surplus in this case is if

18  they settled the AP, and if the Chase claim settlement were

19  approved by this Court, which Mr. Manookian has opposed, right?

20  A    Correct.

21          MR. YOUNG:  Those are the only questions I have, Your

22  Honor.

23          THE COURT:  Anything else?

24          MR. SPRAGENS:  No, Your Honor.  I'm happy to argue

25  the standing issue whenever the Court is ready to hear

1    argument.

2          (Witness excused)

3          THE COURT:  All right.  Mr. Young, any additional

4    evidence?

5          MR. YOUNG:  No, Your Honor.  Thank you.

6          THE COURT:  All right.  Proceed.

7          MR. SPRAGENS:  Your Honor, I'm not going to belabor

8    this too much because we've done a lot of math today.  I do

9    think that, you know, by any fair measure, including the

10   testimony that Ms. Burton just gave to Mr. Young, if she has to

11   proceed further, she spends another $50,000, and that's a fee

12   that Mr. Young is giving her.

13         I mean, I a lot of this -- these estimates happen to

14   add up to just beyond what the available funds are, which is a

15   tough position to put an objector to a settlement in when it

16   all adds up to just beyond what the corpus of the estate is as

17   the Trustee has valued it.

18         It is a difficult situation to be in as an objector

19   when the Trustee doesn't have an inventory of the value of the

20   assets in the estate, that she's alleged are worth a lot,

21   including a lot of settlements that could total in the millions

22   of dollars.

23         But she has testified that you know, based on where

24   things stand right now, she's $37,000 shy of the $800,000

25   threshold.  She also testified that she'd have to spend another

1  $50,000 to prosecute the adversary proceeding, just to get the
2  one fee that she says is worth $1.35 million.
3        That's a no-brainer for a plaintiff lawyer like me,
4  at least.  That's a good investment.  And if she does that,
5  then she has increased the value of the estate, of the estate
6  substantially.  It certainly becomes a surplus case at that
7  time.
8        So in my view, whether you calculate it as we sit
9  here today, or you calculate it based on the reasonable
10  expectation of what will happen if all of the allegations that
11  she's made in the adversary proceeding are credited and proved,
12  and she has, you know, now testified under oath that they are
13  true.
14        Then you know, either way, it's a surplus case.
15  Whether it's based on what's been spent to this date, or what
16  will be spent if she pursues the, frankly, millions of dollars
17  of claims that she believed the estate had, or the assets, if
18  she recovered the millions of dollars of assets, that she
19  believed the estate has.
20        The fact that the Trustee doesn't have an inventory
21  of these assets that I can ask her about, after she has put off
22  prosecuting the adversary proceeding all these times, and now
23  seeks to estop us from making arguments about the propriety of
24  the $250,000 settlement, it's a pretty difficult situation
25  further for an interested party to be put in.

1       So the doctrine of standing is not meant to prevent

2   the Court from looking at the substantive issues in a case,

3   whether it's a bankruptcy case, or any other case.  The

4   showing, you know, if it is the plaintiff's burden to show, I

5   put on the Trustee herself, not a friendly witness or Mr.

6   Manookian to testify.

7       I put on the Trustee and asked about her allegations

8   and her valuation of the claims in the estate.  And the best

9   that Mr. Young could get her to say is that she may not be

10  likely to collect the judgment.

11      You know, that's -- we're in a preponderance of the

12  evidence world, and this is a threshold issue of whether the

13  Court is entitled to entertain objection to the propriety of a

14  settlement where, as we can discuss later, perhaps, you know, a

15  zero dollar judgment that was vacated at the highest levels has

16  now -- is being proposed to be settled for $250,000, and there

17  are people involved who have been on different sides of that

18  transaction, all here asking the Court to approve it, and to

19  prevent somebody from raising an objection to it, so the Court

20  doesn't have the opportunity to consider it on its merits.

21      The Doctrine of Judicial Estoppel that Mr. Young

22  raised in his papers is not appropriate here.  It's not meant

23  to estop someone who hasn't affirmatively come into Court and

24  made a bunch of representations about the value of all these

25  assets, and the value of the estate, that the Trustee has, has

1  made.

2      And the Trustee is the one who speaks on behalf of

3  Cummings Manookian.  Mr. Manookian doesn't have the ability to

4  do that right now.  The Trustee is the one who is charged with

5  knowledge of the estate, and the fact that she cannot tell the

6  Court the status of all these cases that Cummings Manookian is

7  entitled to collect fees in and then uses that ignorance as a

8  shield and then further as a sword to try to prevent

9  Mr. Manookian from objecting to a settlement, that is not the

10  way judicial estoppel works.

11      She is the one who's taken positions in this case,

12  and now her argument asks this Court to rely on the opposite

13  positions in this case.  But she's the one who initiated the

14  adversary proceeding and purports to be able to prove all of

15  those and, as she sits here today, still testified that she'll

16  prove all of those.

17      So for all these reasons, I believe that, you know,

18  we've shown that this is a surplus case, it falls into that

19  exception.  It is more likely than not to be a surplus case,

20  and that's whether you measure it at this time, or after Mr.

21  Young pursues the adversary proceeding to its fullest and

22  recovers 1.35 million, or maybe, you know, 10.35 million,

23  depending on what they prove in the adversary case.

24      But it would not be appropriate for them to take one

25  position in the adversary proceeding, and then ask this Court

1 to let them take the opposite position here, and thus not reach

2 the merits on its own objection.

3        I'm happy to answer any questions Your Honor has or

4 just be quiet.

5        THE COURT:  You mentioned judicial estoppel.  Did

6 Mr. Manookian sign the petition?

7        MR. SPRAGENS:  He did sign the petition to initiate

8 the bankruptcy, yes, Your Honor.  That's my understanding.

9        THE COURT:  And with that petition, he made certainly

10 representations about the assets and the value of those assets

11 at that time, on the schedules.  Is that correct as well?

12        MR. SPRAGENS:  Yes.  That's my understanding.

13        MR. YOUNG:  Yes, Your Honor, thank you.  Phillip

14 Young on behalf of the Trustee.  Let me start where the Court

15 left off.  Not only did Mr. Manookian sign the schedules, he

16 doubled down by signing an affidavit in the adversary

17 proceeding saying that the Trustee's cause of action had no

18 value.

19        That they were without merit and I pointed that out

20 in one of our briefs, and we'd ask the Court to take judicial

21 notice of that affidavit, as well as the petition.

22        And I also want to point out that Mr. Spragens is not

23 exactly correct.  The Trustee has never taken a position in

24 this case, that there'd be a surplus.  He's taking the position

25 that there are meritorious claims, and we still take that

1  position.

2          But that's a far cry from saying that there's a

3  surplus and the Trustee walked the Court through that, and

4  through all the variables.  But -- and I'm going to try to

5  short circuit this.  Mr. Manookian simply isn't a creditor in

6  this case.

7          He's the, he's the former principal, the debtor, so

8  there's only two ways he'd get standing.  One is if this issue

9  involves the debtor's exemption.  It clearly does not.  The

10 second is if he proves, that it's his burden to prove, with

11 concrete evidence, that's what the Court said -- the case law

12 says, is he proves with concrete evidence that this is likely

13 to be a surplus estate.

14         And I'll re-raise the issue I raised at the very

15 beginning of this, which is he's estop from even taking that

16 position.  He's not just estop from testifying to that, because

17 he's already testified to the opposite, he's estop from taking

18 that position, from making that argument.

19         We don't think he even gets through the courthouse

20 doors, so to speak, on proving his burden, that this is a

21 surplus estate.

22         Furthermore, the only, the only evidence offered

23 interview he case was the testimony of the Trustee who said

24 bluntly that she does not believe this would be a surplus

25 estate.  She's walked the Court through the -- all the

1  variables.  There are a lot of variables.

2          And as we cited in our plea, I know the Court has

3  read our pleadings, as we cited in our pleadings, case law says

4  when there's contingent litigation like this, you have to

5  discount that greatly.  You can't just say, hey, the Trustee

6  sought $1.3 million, therefore, this is going to be a $1.3

7  million estate.

8          You have to discount that for risk of litigation, for

9  cost of litigation, for risk of collection, for cost of

10 collection, and in a case like this, and maybe especially a

11 case like this, where we've got very litigious parties, where

12 collection of anything beyond 715 is far from guaranteed.

13         The Court needs to take that into consideration when

14 weighing all this, and I think the Trustee's testimony that

15 there is no surplus -- will be no surplus in this case, is spot

16 on and I think it should carry the day.

17         So, Mr. Manookian is not only estopped from arguing

18 that he, that he's got standing because there's going to be a

19 surplus.  In fact, the only proof he put on proved the

20 opposite.

21         So he's neither carried his burden, nor can he

22 overcome the estoppel.  So for that reason, we believe the

23 Court should find that he has no standing.

24         THE COURT:  All right, thank you.  The Court

25 appreciates both parties argument today.  Appreciate the

1  Trustee's testimony.  Hard to be the Trustee when you're

2  testifying against yourself in some respect.  But I appreciate

3  the credibility in the Trustee today.

4         And the Court makes special note of that, that the

5  Trustee's testimony is credible with respect to the uncertainty

6  going forward in the case, and the many factors that go into

7  whether, in fact, certain monies are collected for judgments,

8  are in fact collected.  And so the Court will make special

9  mention of the Trustee's credibility.

10         I examined the papers that have been filed, and we're

11  here today to determine whether Brian Manookian has standing to

12  prosecute his objection to the Trustee's settlement.  After

13  reviewing the case, hearing the testimony from the Trustee and

14  the arguments of counsel, the Court finds that Brian Manookian

15  does not hold a claim against this estate as already expressed

16  by Mr. Young, and confirmed by the papers and pleadings, the

17  petition, statements, and schedules that have been at issue in

18  this case.

19         Mr. Manookian, to date, has not offered any concrete

20  evidence, and I'll use that same word that Mr. Young has used,

21  that this is a surplus case.  What has been shown is there are

22  many variables.  As I've already mentioned, that go into

23  determining the exact monetary value of bankruptcy estate.

24         In this instance, the burden was on Mr. Manookian to

25  produce something tangible and concrete that the Court could

1  rely on in making a determination that the it's a high

2  likelihood that this case would be a surplus case.

3          In fact, what we have is a case that is ripe with

4  potential expenses to pursue assets and obtain judgments, and

5  ultimately, collect money, that clearly has a dollar figure to

6  it.

7          The Bankruptcy Court is well aware through thousands

8  of cases, that a judgment is something, but collecting it is

9  something else.  And in fact, in this case, where there's been

10 no evidence that there will be an easy win on anything, the

11 estimates for legal fees, the Court will take, while they seem

12 quite reasonable, if not underestimated based on what has been

13 seen so far in this case, and what historically Chapter 7

14 Trustees have expended on similar or same cases, to actually

15 collect monetary judgments.

16         So for these reasons, the Court finds that Brian

17 Manookian does not have standing to object to the Trustee's

18 motion for approval of the settlement, with the Chase

19 claimants.  Therefore, that objection is moot.

20         The Court would further point that the Court is

21 addressing that issue in the second phase of this hearing, in

22 which there is a party withstanding, who has objected.  So in

23 fact, Mr. Manookian, he doesn't get his day in court, but the

24 issue gets its day in court.

25         So in fact, even if there were harm to Mr. Manookian,

1   there is no harm to Mr. Manookian because the Court still is

2   addressing the sufficiency of the settlement agreement in which

3   the Trustee is attempting to enter into.

4           With that said, Mr. Young, if you could prepare the

5   appropriate order, which finds Mr. Manookian does not have

6   standing, and that his objection is therefore moot.

7           MR. YOUNG:  Yes, Your Honor.

8           THE COURT:  All right.

9           MR. SPRAGENS:  One housekeeping question about the

10  next part of the hearing.  I would just ask, for the record,

11  that I be allowed to examine any witnesses for the purpose of

12  proper -- for any appeal.  I just wanted to get a ruling from

13  the Court on that.

14          THE COURT:  Court, Mr. Young, I'll let you respond to

15  that.

16          MR. YOUNG:  Your Honor, we would object to that.  The

17  Court's already found that there is no standing.  So Mr.

18  Spragens has no role in this, from this point forward.

19          THE COURT:  The Court will not allow additional

20  questioning since we resolved your client's role in this

21  proceeding.  Then the standing issue, I think, is definitive of

22  your ability to ask questions in the second phase of this

23  hearing.

24          MR. SPRAGENS:  Thank you, Your Honor.

25          MR. YOUNG:  Your Honor, if I may, I'd like a little

1  bit of clarity on one point the Court just raised.  And that is

2  the extent, and I just need to know this so that I can present

3  the appropriate evidence on direct, the extent to which the

4  Court will allow Mr. Konvalinka to essentially argue Mr.

5  Manookian's objection.

6        Obviously, there were very different things raised in

7  the two motions.  So I just need to know if the Court, and

8  frankly, most of the stuff in Mr. Manookian's -- if not all the

9  things in Mr. Manookian's objection are going to be

10 inadmissible under Federal Rule of Evidence 408, but I just

11 need to know what kind of direct -- wants me to go ahead and

12 address the issue in direct, of Mr. Manookian's objection.

13        THE COURT:  Don't construe anything from my comment.

14 I was merely -- the subject is being addressed, not the merits

15 or the particularities that Mr. Manookian raised.  And I think

16 Mr. Konvalinka is well aware that he needs to stick to what

17 he -- what his objections are, since there's been no notice to

18 you as to anything outside of that.

19        We ruled on Mr. Manookian's standing issue.  So we'll

20 take up the objections that are before the Court at this time.

21        MR. SPRAGENS:  And the only reason I raise that, Your

22 Honor, is because on the witness and exhibit list, Mr.

23 Konvalinka filed on Monday, he listed Mr. Manookian as a

24 potential witness, and said that he intended to call Mr.

25 Manookian to testify as to these issues about the prior offers

1  back with the Chase claimants.

2      And so I would just like to note, if the Court's

3  going to let him go beyond the four corners of its own

4  objection, and argue Mr. Manookian's objection, then you know,

5  I need to put on the appropriate evidence.  If the Court's

6  going to require Mr. Konvalinka to stick to the four corners of

7  his own objection, then we can obviously expedite this

8  considerably.

9      THE COURT:  Mr. Manookian's objection is mooted.

10 Therefore, Mr. Konvalinka, your objection is the only objection

11 before the Court.

12     MR. SPRAGENS:  And I hear the Court.  But the only

13 thing I will respond is, so there is notice in the sense that I

14 did give notice of Mr. Manookian's appearance in connection

15 with this matter, as a witness.  And I did not know all the

16 things that were alleged in Mr. Manookian's objection, because

17 I became aware of those when I listed him as a witness.

18     And to suggest that somehow, just because the

19 objection that I filed, which I think is meritorious in and of

20 itself, that I am amenable with regards again, a situation in

21 which I should be allowed to call a witness that I have

22 identified, and have indicated to counsel that I was going to

23 do so.

24     And suggesting I have not done so is incorrect by

25 reason of the facts, that I've actually listed the witness and

1 I've actually listed the topics as well.

2 THE COURT: And the Court will say you're free to
3 call which witness you want to call, and Mr. Young's free to
4 object to the questions you ask that witness. And the Court
5 will rule on them, if we have to rule one by one, we'll rule
6 one by one.

7 MR. SPRAGENS: All right.

8 MR. YOUNG: Your Honor, I'm ready to proceed with
9 calling Ms. Burton, and I'd suggest to the Court, for
10 efficiency's sake that we proffer her testimony. I'll offer
11 that to the Court.

12 MR. SPRAGENS: And Your Honor, I would object to
13 that. I have not had an opportunity to cross-examination this
14 witness, and I would like to have that opportunity with regard
15 to what her testimony is going to be, as opposed to Mr. Young's
16 testimony.

17 THE COURT: Well, you'd still have the opportunity to
18 cross examine her, but you're objecting to the proffer all
19 together?

20 MR. SPRAGENS: Yes, I am.

21 THE COURT: I will sustain the objection. Call your
22 witness, Mr. Young.

23 MR. YOUNG: Thank you, Your Honor. I'll call Jeanne
24 Burton. And Your Honor, just as a matter of housekeeping, can
25 I ask Mr. Konvalinka to use his microphone because there's some

1  background noise there.  Thank you.

2          I think Ms. Burton's already been sworn in, so I

3  don't know if she needs to be sworn in again.

4          JEANNE ANN BURTON, TRUSTEE'S WITNESS, SWORN

5          THE COURT:  You're still under oath, Ms. Burton.  We

6  won't re-swear you.  But you are still under oath.

7          THE WITNESS:  Yes, Your Honor.

8          MR. YOUNG:  And again, for the record, my name's

9  Phillip Young.  I'm counsel for Ms. Burton.

10                      DIRECT EXAMINATION

11 BY MR. YOUNG:

12 Q    Ms. Burton, what's your occupation?

13 A    Chapter 7 Trustee and attorney.

14 Q    How long have you been serving as a bankruptcy Trustee in

15 this district?

16 A    Twenty-four years.

17 Q    Were you appointed to serve as the Trustee for Cummins

18 Manookian, PLC?

19 A    Yes.

20 Q    Do you remember when that was?

21 A    November the 6th, 2019.

22 Q    Are you still serving in that capacity today?

23 A    Yes.

24 Q    When you were first appointed Trustee in this case, what

25 were some of the major issues that you identified as central

1  issues in this case?

2  A    There was a judgment that had been entered in favor of

3  what I would call the Chase parties, that was on appeal, and

4  oral argument was set for the Court of Appeals in January,

5  early January, like January 6th, or January 8th, early January.

6       And then there was also a receivership proceeding because

7  while the judgment was on appeal, the collection had not been

8  stayed.  So a receiver had been appointed and there was a

9  contested matter regarding that 715 -- well, actually more than

10 $715,000 because the -- there was going to be a contested

11 proceeding as to whether or not the Court, the State Court

12 would continue to hold those monies or if that would be

13 released.

14 Q    Did the Chase parties ultimately file a claim in this

15 case?

16 A    They did.

17 Q    How much was that claim?

18 A    It was a secured claim for 806-something thousand dollars.

19 Q    And tell the Court what the basis of that claim was.

20 A    It was an award, a contempt and sanctions award which was

21 the amount of the attorney fees that the Chase parties proved

22 were -- that they had expended in revealing who disclosed what

23 was potentially, or they considered, or was confidential

24 information to news media and other, other entities at the

25 time, in a nutshell.

1  Q    Who were the judgment debtors under that sanction

2  judgment?

3  A    Brian Manookian, Cummings Manookian, Mark Hammerfold, and

4  Mr. Hammerfold's law firm.  I think it was Hammerfold, LLC.

5  Q    Did you review any documents to inform yourself about the

6  sanctions judgment?

7  A    Yes.

8  Q    What documents did you review?

9  A    All the documents that were available off of the Court of

10 Appeals website.  The Cummings Manookian, and Brian Manookian's

11 brief, appellate brief.  The Chase parties brief.  I did review

12 the State Court judgment order.

13 Q    You just mentioned the Court of Appeals.  When the case

14 first got filed, were you aware that the sanctions judgment had

15 been appealed to the Court of Appeals?

16 A    Yes, because I was contacted about was I going to be

17 released on this day for that to go forward, because oral

18 argument was set in January, and the case was filed in

19 November.

20 Q    Had exaction on the sanctions judgment been stayed?

21 A    No.

22 Q    Had Cummings Manookian appealed the sanctions judgment?

23 A    It did not.  It didn't.  That was one of the things --

24      MR. SPRAGENS:  Objection, Your Honor, as to

25 foundation and as to her know with regard to that.

1          MR. YOUNG:  I'm sorry, Your Honor, I didn't hear your
2    response.

3          THE COURT:  And your response to the objection?

4          MR. YOUNG:  Yes.  I'm asking her about her, if she
5    was involved in this as the Trustee for one of the judgment
6    debtors and I'm asking her whether she was aware whether or not
7    they had appealed the sanctions judgment.

8          THE COURT:  As a panel Trustee in charge of this
9    case, she's in the best position, and clearly has knowledge, so
10   I'll allow the testimony.

11         MR. SPRAGENS:  Again, just let me note for the record
12   that I do object and there is obviously an appeal that was
13   filed on behalf of Cummings Manookian, as evidenced by the
14   notice of appeal that was filed.

15         MR. YOUNG:  I'll continue.

16   BY MR. YOUNG:

17   Q    Ms. Burton, you already answered that question.  What
18   about Brian Manookian?  Had he appealed the sanctions judgment?

19   A    He did.  And I communicated with Mr. Konvalinka because it
20   appeared that Cummings Manookian, and Brian Manookian appealed
21   the order, one of the orders for recusal.

22         But only Brian Manookian appealed the sanctions judgment
23   and Mr. Konvalinka, who represented Cummings and Manookian at
24   -- during part of that, and actually, an attorney in that
25   appeal, until he withdrew.  He said he didn't recall.

1  Q    Did the Court of Appeals -- well, let me go back.  He

2  didn't recall what?

3  A    He didn't recall if the, if the Cummings Manookian

4  appealed the sanctions judgment.

5  Q    Did the Court of Appeals ultimately make a ruling on the

6  sanctions judgment?

7  A    Not on the -- well, not really on the sanctions judgment.

8  It ruled that the judge should have recused himself and based

9  on that, they vacated the sanctions judgment, for it to go

10  back, be assigned to a new judge and reheard.

11  Q    And when was that order issued by the Court of Appeals?

12  A    February 20, '21 maybe.  I think that's right.

13  Q    Did the Court of Appeals make any finding regarding

14  whether the sanctions were actually warranted?

15  A    No.

16  Q    Did any part appeal the Court of Appeals' decision to the

17  Supreme Court?

18  A    The Chase parties did.

19  Q    And did the Supreme Court accept cert?

20  A    It did not.

21  Q    So now that the judgment's been vacated, what's your

22  understanding of what's going to happen to the sanction issue

23  involving the Chase partners?

24  A    A new judge --

25        MR. SPRAGENS:  Again, Your Honor.  I object to

1  hearsay and foundation.

2          MR. YOUNG:  Your Honor, I'm asking her opinion as a

3  lawyer and Chapter 7 Trustee records, in the interest of (audio

4  gap).

5          THE COURT:  I will allow the testimony.

6  BY MR. YOUNG:

7  Q    Let me ask that question again, Ms. Burton.  Now that the

8  judgment's been vacated, what's your understanding of what's

9  going to happen to the sanctions issue involving the Chase

10 parties?

11 A    That the -- that a new judge will be appointed and it will

12 start basically all over from the beginning.  I think there was

13 a, there was a motion to rehear, or for clarification filed by

14 the Chase parties about -- well, there's something about

15 retroactive vacation of the, of the judgment.  But anyway, the

16 Court of Appeals from what -- the way I read the order, was

17 that it would go back and start over.  That the new judge would

18 need to see new witnesses, you know, not just decide something

19 on the record, review of the record and make a decision.  That

20 it would start over.

21 Q    To the best of your knowledge, has a new judge been

22 appointed?

23 A    I know things have been filed, but I don't know anything

24 about a new judge being appointed yet.

25 Q    Do you know how long it took to try the sanctions issue

1 originally?

2 A    I think just the sanctions issue, which is a, kind of a

3 case within another case, I think that was over two and a half

4 years, two years, two and a half years.

5 Q    Based on that and your experience in this case, do you

6 think the rehearing is likely to be lengthy?

7 A    I'm sorry.  I --

8 Q    Let me ask the question again.  Based on that, and based

9 on your involvement in this case, do you expect the rehearing

10 to be lengthy litigation?

11 A    I think, I mean, I do, unless the parties decide something

12 different.  But I don't, I don't expect that to happen, so I do

13 expect that it will start over from the very beginning.

14 Q    I want to ask about your process of reviewing claims in

15 this case.  When did you start reviewing claims in this case?

16 A    Well, I reviewed claims when they're filed.  You know, I

17 always take a look at them and see if there's, you know, if

18 they're lacking something or you know, there's no attachment,

19 or anything like that.

20       But I really started addressing the claims once, once the

21 Court of Appeals vacated the judgment, because now, the Chase

22 claim was not, it wasn't liquidated, and so I started, you

23 know, trying to figure out, okay, what are we going to do about

24 that.  What are the other claims that should be allowed?

25       I already knew that there were claim objections that, that

1  needed to be filed and those objections resolved.

2  Q    And approximately when did you start that evaluation?

3  A    It was probably March.  It was after the appellate court.

4  I think the objections that I filed were in May, but I started

5  looking at all of that probably March, March, April.

6  Q    And so you did file some claim objections in this case.

7  A    Correct.

8  Q    When did you first begin discussing a potential settlement

9  with counsel for the Chase parties?

10 A    It was early April.

11 Q    So had the Court of Appeals ruled at that time?

12 A    It had.

13 Q    Had the Supreme Court ruled at that time?

14 A    No.

15 Q    In your opinion, did you think --

16 A    No, but it hadn't been appealed to the Supreme, the

17 Supreme Court yet at that, at that time

18 Q    So this was after the Court of Appeals had ruled, but

19 before any brief had been filed with the Supreme Court, right?

20 A    Yes.  When I first started discussing settlement, yes.

21 Q    At that time, did you think it was likely that the Supreme

22 Court would overturn the Court of Appeals decision?

23 A    No.  I didn't.  I didn't.

24 Q    So in your settlement discussions, did you ever make the

25 presumption that the Supreme Court was going to take cert?

1  A    I think it was generally thought that, at least from my

2  perspective, that the Supreme Court, I can't say for the Chase

3  parties, but that the Supreme Court would not.  But it could

4  have, but I didn't think so.  It seems kind of a little low bar

5  that the, that just the appearance of bias was enough to

6  reverse a recusal order, and vacate the judgment.

7       There were some interesting issues.  There were other

8  issues but I generally did not think that the Supreme Court

9  would accept cert.

10  Q    And just for clarity, that was, that was your opinion, not

11  necessarily anybody else's.

12  A    Correct.  Correct.

13  Q    Who had the majority of the settlement discussions with

14  the Chase parties?

15  A    I did.

16  Q    Directly?

17  A    Not with the Chase parties, but with their attorney.

18  Q    Who did you talk to?

19  A    Dan Puryear and Charlie Malone.

20  Q    When did ask special counsel to get involved in those

21  discussions?

22  A    Really when it came time to like formalize the settlement

23  offer and what the terms of the settlement would be, I guess

24  you'd say when we get ready to, to paper it, or to make, you

25  know, the final offer of settlement.

1  Q    You had already made the decision at that point.

2  A    That's correct.

3  Q    Who made the decision to offer to allow the Chase claimant

4  $250,000?

5  A    I did.

6  Q    And who communicated that to counsel for the Chase

7  parties?

8  A    The formal offer came from me, but I had had discussions

9  with the attorneys for the Chase parties about it.

10  Q    And did counsel assist you in drafting that settlement?

11  A    Yes, she did.

12  Q    Let's talk about the terms of that settlement.  You're

13  proposing to allow the Chase claim what amount?

14  A    $250,000.

15  Q    Is that a secured claim or an unsecured claim?

16  A    As an unsecured claim.

17  Q    How was the claim filed?  Secured or unsecured?

18  A    It was filed as a secured claim.

19  Q    And are mutual waivers included in the settlement

20  agreement?

21  A    Yes.

22  Q    Can you explain to the Court why it was important for you

23  to get a waiver from the Chase parties?

24  A    Well, it's just always good practice, you know, when

25  you're -- just like in any settlement, you don't always know

1  what possibly might be out there, what somebody might come up

2  with, and every settlement agreement that I have been presented

3  with in my time as Trustee, always asks for release of the

4  other party, and I just always make sure that it's a mutual

5  release of the, of the parties.

6      But I also want to do it to, you know, include anything

7  else that would, that would come up, or that was pending in a

8  case, like the order that reserves their rights to challenge

9  whether or not $25,000 that was paid to the estate, that I

10 claimed was a preference.

11     They reserved their rights to dispute that, but did agree

12 that it could be turned over to the bankruptcy estate.

13 Q   So getting a release of that reservation rights, did you

14 consider that to be beneficial to the estate?

15 A   It was.

16 Q   I want to discuss with you what factors you considered

17 when agreeing to the proposed settlement.  Just walk the Court

18 through some of the factors that you considered.

19 A   Okay.  So you're looking at assets, we've kind of been

20 through that, what you think your assets are.  And then what

21 the claims are, and you know, what the cost of everything is,

22 and trying to maximize or be able to make, you know, a, a

23 meaningful, try to make a meaningful distribution to the

24 creditors.

25     And so there were, there were several things.  There was,

 1 obviously, the Chase claim did not -- was -- did not get

 2 liquidated, and so it's going back, and the estate was, in

 3 order to have to have counsel, and in that matter, to take the

 4 interest of the estate and really the other creditors because

 5 you know, that had claims, that had allowed claims.

 6     And to maximize what, you know, what I would be able to

 7 pay creditors.  And what amount, that Mr. Konvalinka made a

 8 statement about, the numbers were so close, well, it's because

 9 I'm trying to figure out what the, you know, what exactly these

10 expenses would be.

11     What did I think that they, you know, the least amount

12 that I would be willing to offer to the Chase parties to settle

13 a disputed claim, and still be able to pay the claims of the

14 other, the other allowed, the other allowed claims.

15     And so you know, 250 kind of came up, you know, with that.

16 Kind of lined all of that up, but also taking into

17 consideration that, that State Court litigation and what the

18 cost would be, and what the risk would be, that there can be

19 another hefty sanctions judgment against Mr. Manookian and

20 Cummings Manookian, that would just, you know.

21     And then they're the biggest creditor in the case with the

22 lion's share of the money going to them, and you would have --

23 now would have, you know, incurred all of those expenses, and

24 since we talked about, you know, how that impacted -- would

25 have impacted the adversary expenses in that case, as it went

1  forward.

2      And you know, and the big elephant in the room, I had

3  $85,000 in the case, and already over $100,000 in just attorney

4  fees, not to mention Trustee compensation.  I still had to

5  hire, you know, employ an accountant and all of those things,

6  just getting administrative costs.

7      And then having to consider employing counsel to represent

8  the estate in that State Court action, and how to compensate

9  that attorney and, you know, when.  Find somebody that would

10 agree to that.

11     So yeah, I think that that's pretty much the -- sorry if

12 that was jumbled, but that was sort of my thought process of

13 all of it.

14 Q    No, that's fine.  One of the things you mentioned just a

15 minute ago was risk.  Did you consider the likelihood of

16 whether you thought a new judge would issue sanctions against

17 Brian Manookian and Cummings Manookian?

18 A    I did.

19 Q    What was your conclusion?

20 A    Anything can happen, but looking at the briefs, the

21 appellate briefs of both parties, and the, the State Court

22 order, and the Court of Appeals order, you know, that says, you

23 know, it didn't make any comment about the sanctions.

24     The Court did say that the judge had done a thorough or

25 complete analysis of the very serious allegations.  And that

1 the judge had been exceedingly, or extraordinarily patient with

2 the parties.

3      And so I just -- the facts are going to be the same.  I

4 think everybody, when you go back and retry something,

5 everybody's trying to up their game, and you know, cover things

6 that may not have been covered before.

7      But in my view, it was likely that a new judge would issue

8 a similar sanctions judgment.  That's a risk, that was the

9 risk.

10 Q    In your view, is there any chance that the sanctions

11 amount could increase at the rehearing?

12 A    Well, it could, but I mean it could because based on

13 attorney fees that the Chase parties had expended in proving

14 the grounds for the sanctions, obviously, they had incurred,

15 you know, other attorney fees after that, after that time.

16      So I don't know if the Court -- it's possible, but I don't

17 know if the Court would allow them their additional, additional

18 fees or not.  But it's a possibility.

19 Q    In your view, after considering all this that you just

20 described to the Court, do you think there's a substantial risk

21 that the sanctions awarded as Cummings Manookian could exceed

22 250,000 on rehearing?

23 A    I think it could have.  I think it could have.

24 Q    Did you give any -- well, I think you mentioned earlier

25 that you considered expenses that might be involved to the

1 estate regarding the rehearing, right?

2 A    Right.

3 Q    What was your conclusion about what expenses could be for

4 the rehearing?

5 A    Well, litigation is very expensive.  That was, you know,

6 both parties, the Chase parties and the Manookian parties, and

7 Hammerfold, that you know, it was, it was very, it was very

8 aggressively litigated by, by both sides, and I think it's safe

9 to assume that it would be again, and that, you know, it would

10 be, it would be expensive for everybody again.

11    It would be expensive for the Trustee to employ an

12 attorney.  There'd be a long, you know, it'd be, probably be

13 another long period of time.  I don't know if it'd be two and

14 a half years, but I think it would be substantial.

15    And that was, sorry if I digress, that was another

16 consideration in trying to work out a settlement with the Chase

17 parties was the efficient administration of the estate, and the

18 time to get the estate that administration concluded, and

19 distribution to creditors.

20    But anyway, it would be expensive, and --

21 Q    I want to come back to the efficient administration issue

22 in just a minute.  But I want to say on sort of the expense

23 issue with regard to the rehearing.  Did you come up with an

24 estimate, a legal expense estimate of what it would cost to

25 rehear the case?

1  A    I estimated about $150,000.

2  Q    Would you have to retain special counsel to represent you

3  in that case?

4  A    Yes.

5  Q    That would have to be approved by the Court?

6  A    Yes.

7  Q    How much does the estate currently have in its bank

8  account?

9  A    $85, $86,000.

10 Q    And you already have attorney fees that the estate will

11 owe in this case.  Is that right?

12 A    Yes.

13 Q    How would you pay for counsel in the State Court?

14 A    That's a good question.  I would have to work out an

15 agreement with that attorney, my other counsel, my other

16 professionals in the, in the case, because you know, there are

17 already fees that have been incurred, and so it would probably

18 have to be an attorney who was, you know, willing to, to fund

19 the way and payment, obviously, it's not the type of setting

20 that somebody -- it's not something that would be taken on a

21 contingency fee basis.

22      It would be an hourly rate type thing.  So it would be --

23 I try to do what I have to do, but it would be difficult.

24 Q    You mentioned earlier that you considered the efficient

25 administration of the estate, and I think in that testifying,

1  you mentioned how long it might take to make distributions.  Is
2  that fair?
3  A    Right.  Right.
4  Q    Did you consider the impact on the pending adversary
5  proceedings as part of that?
6  A    I did.
7  Q    What was your conclusion?  Talk to the Court.
8  A    Yeah.  Those from a time standpoint, and also from a you
9  know, expense standpoint, that the Chase claim is uncertain,
10 and it's being litigated, then if we are, you know, if the
11 parties in the court decide we're going forward with the
12 adversary litigation, then you know, I don't know, I don't know
13 how much money I need, you know, to pay 100 percent case.
14     So I would -- there would just be more expense in pursuing
15 all the other causes of action and collecting.  If I was
16 successful in those.
17     Yeah, but first considering, obviously, you've got -- I
18 would have to be successful in getting a judgment in the -- in
19 Fitzgerald, with regard to the Fitzgerald account receivable.
20 Q    And would it be easier on your administration at that
21 adversary proceeding, if the settlement's approved?
22 A    Easier is a relative term.  But yes, obviously.  I can't
23 always anticipate what's going to happen in the adversary but
24 yes, as far as the discovery, you know, you would have to be
25 deposed, and you know, just from a discovery standpoint, yes, I

1  think it would be -- it would take less time and be less

2  expensive.

3  Q    If the proposed settlement is rejected, what's your

4  opinion of the impact that will have on the time and the

5  expense associated with the adversary proceeding?

6  A    I think it's going to, you know, a lot more expensive for

7  the reasons that I've already discussed, and I can, I can go

8  into those again, but just more expensive, more discovery, more

9  you know, because there'd be other, you know, other cases,

10  other accounts receivable.

11      And also you got to wait for those other cases to settle

12  out or for a judgment to be obtained, because you know,

13  Cummings Manookian is not the, the current attorney of record

14  in those, in those cases.

15      So not only do you have to determine -- there has to be

16  some type of fee for their, you know, then to be a

17  determination of how much of that in Cummings and Manookian

18  entitled, entitled to.

19  Q    And you testified about risk, and you testified about

20  expenses.  And you testified that you considered the efficiency

21  of the administration of the estate.  After having considered

22  all those factors, what's your business judgment concerning the

23  proposed settlement?

24  A    I think the proposed settlement is in the best interest of

25  the estate and of the creditors of the estate.

1  Q    I want to ask you some specific questions about the

2  objection filed by Grant Konvalinka in this case.  Have you

3  reviewed that objection?

4  A    I have.

5  Q    Explain to the Court what your understanding of the nature

6  of that objection is.

7  A    Is that there's a possibility that Cummings Manookian

8  would -- if there is a sanction judgment awarded by the new

9  judge upon a rehearing that Cummings Manookian may not be

10 responsible for that or the actions of Brian Manookian.

11 Q    In your opinion, as an attorney and the Trustee, what do

12 you think the likelihood is the state court would decide that

13 Cummings Manookian is not responsible for Mr. Manookian's

14 actions?

15          MR. KONVALINKA:  Objection, Your Honor.  It calls for

16 qualifying her as an expert.  I think we need a little

17 clarification as to her experience with regard to this

18 particular topic.

19          MR. YOUNG:  I can clarify that I believe, to take

20 care of that issue, Your Honor.

21 BY MR. YOUNG:

22 Q    As the Trustee of Cummings Manookian, what's your opinion

23 of the likelihood that the state court will find that Cummings

24 Manookian is not responsible for Brian Manookian's actions?

25          MR. KONVALINKA:  (Indiscernible) my objection, Judge,

1  as well, because I don't think there's a foundation laid.

2           THE COURT:  All right.  The Court's going to allow

3  it.  She's the Trustee in the case.  She's an attorney and has

4  been on the panel for 24 years.  So, clearly, she can form an

5  opinion and should form an opinion as part of her fiduciary

6  duty as administering this estate.  So the Court's going to

7  allow that testimony.

8           THE WITNESS:  As you pointed out, Mr. Young,

9  obviously, they've the right, you know, to make that argument.

10 But I don't think that would be successful.  The -- Mr.

11 Manookian was one of two members of Cummings Manookian.

12 Cummings Manookian was the law firm in this matter.  And Mr.

13 Manookian was signing the pleadings.  He was, you know, he was

14 involved in it -- in everything within that sanctioned

15 proceeding.

16 So it's not like, you know, a case where maybe we have a big

17 firm where some attorney goes rogue or, you know, does

18 something that everybody else doesn't know about.  So based on

19 that, I didn't consider that to be a valid or successful

20 argument.  And in the end, as the judge said, "You're arguing

21 against yourself."  But I don't see that happening.

22 And the file court judge, of course, you know, the court

23 appeals said there was a recusal that the trial court judge did

24 make a finding that in issuing the sanction judgment against

25 Cummings Manookian, that Mr. Manookian was acting on its

1  behalf.

2  BY MR. YOUNG:

3  Q    Was Mr. Manookian authorized to make decisions on behalf

4  of Cummings Manookian?

5  A    Yes.

6        MR. KONVALINKA:  And, Your Honor, let me object to

7  the foundation with regard to that as to what knowledge she

8  would have with regard to what Mr. Manookian was authorized to

9  do.

10        MR. YOUNG:  Your Honor, she's the Trustee for the

11  entity we're asking about.

12        THE COURT:  I think if you ask the question based off

13  of her perspective as a Trustee.  But just asking a question

14  without some foundation, I think Mr. Konvalinka's correct.  And

15  narrow it to what you're trying to ask as far as period and how

16  she came to know that information.

17        MR. YOUNG:  Sure, Your Honor.  I can set that up.

18  BY MR. YOUNG:

19  Q    Ms. Burton, who signed the petition in this case?

20  A    Brian Manookian.

21  Q    From your review of records associated with this case, did

22  you find that Brian Manookian made financial decisions on

23  behalf of the law firm?

24  A    Yes.  He would -- you're talking about in the bankruptcy

25  case?

1  Q     Prior to the bankruptcy case.

2  A     Right.  He was listed as the chief, I think, the chief

3  managing officer in the -- on the bankruptcy petition.

4  Q     You mentioned a few minutes ago that the state court judge

5  made a finding that Mr. Manookian was Cummings Manookian's

6  agent.  Do you know any basis for a new fact-finder to reach a

7  different conclusion?

8  A     No.

9  Q     Are the facts still the same?

10 A     Yes.  I would say.  Yes.

11 Q     Are you aware that the Grant Konvalinka objection also

12 questions why you would allow the Chase claim at 250,000 is

13 you'd estimate the cost of defense to be $150,000?

14 A     Yes.

15 Q     Are there other factors that went into your

16 decision-making beyond simply the cost of defense?

17 A     I was trying to get that claim paid, you know.  I mean, in

18 a perfect case scenario, I would be able -- I would have close

19 to enough money to pay the claim.  So I took that into

20 consideration that in addition to the, you know, 150,000, that

21 was just one claim of that because that was just estimated

22 attorney fees that it would cost in that.

23 And also, allaying the risk of a substantial sanction judgment

24 being awarded, which would then be, you know, a bigger claim

25 and reduce the claims including the Konvalinka claim and the

1  McCarthy claim.  And then also the impact on -- the potential

2  impact on the expense in the adversary proceeding.  All of

3  which those expenses are administrative expenses that get paid

4  ahead of any unsecured claims.

5  Q    And would that include the Grant Konvalinka claim that

6  would be subordinate to administrative claims?

7  A    Yes.

8  Q    Are you also aware that Grant Konvalinka mentioned in a

9  footnote that it might be willing to represent the estate with

10 some litigation cap?

11 A    Yes.

12 Q    Has any offer like that been extended to you?

13 A    No.

14 Q    Do you have any details on how that might work?

15 A    No.

16 Q    Or whether they would be willing to do that?

17 A    No.  Other than what Mr. Konvalinka put in his footnote.

18 Q    Or whether you would be willing to retain them in that

19 matter?

20 A    That's correct.

21       MR. YOUNG:  Your Honor, I think those are the only

22 questions I have with this one reservation.  I'd like to

23 reserve the right to question her again regarding any issue

24 that might come up regarding the Brian Manookian objection if

25 the Court allows that testimony.  But beyond that, that's the

1    extent of my direct examination.

2            MR. KONVALINKA:  And, Your Honor, at this time, could

3    I take a three to five-minute break and come back?  I just need

4    to step across the hall.

5            THE COURT:  Let's go ahead and take -- we've been at

6    this for a while.  Let's take a ten-minute break.  We'll come

7    back at -- well, that's seven minutes.  Let's keep it even and

8    come back at 3:30.

9        (Recess taken at 3:23 p.m.)

10       (Proceedings resumed at 3:31 p.m.)

11           THE CLERK:  Court is back in session.

12           MR. KONVALINKA:  May I proceed?

13           THE COURT:  Okay.  Just for everyone's edification

14   here.  I've got a hard stop at 4:30.  And I'll need to make

15   about a 30-minute break, hopefully, less than that at 4:30.

16   And then we'll come back if we're not done, and we'll go until

17   at least 5:30 or 6 tonight unless the parties want to go

18   longer.

19           And you may --

20                          CROSS-EXAMINATION

21   BY MR. KONVALINKA:

22   Q    Ms. Burton, with regard to the court of appeals, let me

23           MR. KONVALINKA:  Your Honor, can I -- I think -- am I

24   entitled to share something on the screen?

25           THE COURT:  I don't know what you're sharing.

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

1          MR. KONVALINKA:  Well, it's the court of appeals

2  opinion, the first page of it.

3          THE COURT:  Any objection?

4          MR. YOUNG:  Your Honor, I'm not going to object even

5  though this party didn't upload it.  I uploaded it, so no

6  objection.

7          THE COURT:  Mr. Konvalinka.

8          MR. KONVALINKA:  All right.  So I don't see any share

9  button on my screen.  I apologize, so.

10         THE COURT:  I think we'll have to make you some type

11 of co-host.

12         MR. KONVALINKA:  Oh.

13         THE CLERK: Your Honor, he should be able to, at the

14 bottom of his screen, share his screen.

15         Try --

16         MR. KONVALINKA:  Okay.  I think I've -- all right.

17 Let me try this.

18         THE CLERK:  Just, please, make sure you just share

19 what you're trying to share, not your entire computer.

20 BY MR. KONVALINKA:

21 Q    And do you see, on your screen, Ms. Burton, in the Court

22 of Appeals of Tennessee at Nashville, January 7, the 2020

23 session?

24 A    I see that top -- the top part of it, but I don't see the

25 whole page.

1  Q    Okay.  Well, it was filed on February 4.  Is this what you

2  -- a portion of what you viewed in connection with making your

3  determinations?

4  A    Can you (audio interference)?

5  Q    Sure.  And I don't know if you can scroll?  Oh, I have to

6  scroll, but this is --

7  A    Can you reduce the percentage of it, so I can -- I don't

8  know if that's going to make it too small, but can you do that

9  so I can see the whole document?

10 Q    No.  I can't do the whole document, but I can scroll if

11 you want.

12 A    Okay.

13 Q    Let me know when you're finished reading that, and I'll

14 scroll to the next -- I'll scroll below.

15 A    Okay.  Go back up to the top so I can see the court of

16 appeals.  Okay.  I see that.

17 Q    And did you read that first paragraph, or do you want me

18 to go --

19 A    Yeah.  You can go.  I did.

20 Q    Okay.  That's fine.

21 A    Yes.

22 Q    Okay.  Do you recognize what's shown on the screen, the

23 first page of the court of appeals decision that you read in

24 making your review?

25 A    Yes.  you

1 Q    Now, if you will look, do you see where it states Brian P.

2 Manookian?

3 A    Yes.

4 Q    And he was there on behalf -- he was recognized as Brian

5 P. Manookian for the appellant, Cummings Manookian, PLLC.

6 Isn't that correct?

7 A    Correct.

8 Q    And he's referred to as an appellant.  Is he not?

9 A    Yes.

10 Q   And so based upon your earlier testimony in which you said

11 they were not part of the appeal, isn't it a fair statement

12 that at least that the court of appeals recognized him as an

13 appellant?

14 A    The court of appeals prepared that.  And they were an

15 appellant in the recusal of the -- the recusal issue, which is

16 what the court was ruling on there.

17 Q    And it also -- they aired the contempt and damage orders

18 too, did they not in this same opinion?

19 A    Right.  Because as you say, where it says, "and because

20 retroactive recusal is appropriately also vacated in the

21 contempt and damages orders."

22 Q    So, again, with regard to this particular appeal, with

23 regards to the issue of recusal in connection with it.  It

24 resulted in the vacation of the award that was against Cummings

25 Manookian, PLLC, who was -- which was an appellant in

1 connection with this proceeding, correct?

2 A    That's a good question because the --

3         MR. KONVALINKA:  And objection.

4 BY MR. KONVALINKA:

5 Q    It's yes, no, I don't know, ma'am.  That's it.  I'm not

6 asking for speculation.

7 A    Oh.  I'm sorry.  I don't know the answer to that because

8 the Chase parties raised the fact that the debtor did not

9 appeal the sanctions judgment.  But I think everybody was

10 pretty much in agreement that because the, you know, or what I

11 -- my position was that because Cummings Manookian appealed the

12 recusal matter.  Part of that -- the sanctions judgment was set

13 aside.  I didn't think they had much of an argument that this

14 did not impact the judgment against Cummings Manookian.  I

15 think it did.

16 Q    And with regard to the finding of the trial court that

17 Cummings Manookian was an agent, did you ascertain whether or

18 not there was any argument made by Cummings Manookian in

19 connection with that trial court proceeding that Mr. Manookian

20 is -- was, in fact, in contempt was acting outside of his scope

21 as an agent of Cummings Manookian, PLLC?  Did you see that

22 issue was even addressed?

23 A    No.  I did not.

24 Q    Then the person that was representing Cummings Manookian,

25 you said, in connection with that trial court proceeding was,

1  in fact, Mr. Manookian?  Is that correct?

2  A    Mr. Manookian and Brian Cummings were both listed as

3  counsel for Cummings --

4  Q    No.  What I'm -- I'm sorry.  I apologize.  I interrupted

5  you.  Go ahead.

6  A    That's okay.

7  Q    All right.  And so what I'm asking is with regard to the

8  appearance in connection with the contempt proceeding.  Are you

9  aware whether anybody even appeared on behalf of Cummings

10 Manookian, PLLC?

11 A    I believe Brian Manookian did.

12 Q    Did you review the transcript of the proceedings in making

13 your determination?

14 A    Not the transcript of the proceedings.  No.  The state

15 court opinion cited two portions of the transcript.  And so did

16 the, you know, the briefs that I read.  But I did not read the

17 full transcript.

18 Q    You were aware, though, there was a transcript, correct?

19 A    I assume there was.  Yes.

20 Q    But you said there were citations or references to it,

21 correct?

22 A    Right.  Right.

23 Q    And so, and again, are you aware that Brian Manookian only

24 appeared on behalf of himself and not on behalf of Cummings

25 Manookian, PLLC?

1  A    I am not aware of that.

2  Q    But would you have access to the transcript to review it?

3  A    I didn't request it.

4  Q    And I'm -- ma'am, I'd like an answer to my question.  It's

5  just fairly simple (indiscernible).  Did you have access to it,

6  ma'am?

7  A    I assume that I could have tried to obtain the transcript.

8  I know there were some things -- I, yeah, I think I could have.

9  Q    In making your determination with regard to the claim, I

10 think you testified that these parties are fairly litigious.

11 Is that what I'm -- is that what I understand your testimony to

12 be?

13 A    They're both very aggressive in their, you know -- very

14 aggressive in their respective positions.  I don't think either

15 one of them would back down from anything.

16 Q    Well, for example, in the adversary proceeding, if for

17 whatever reason the adversary proceeding is adverse to those

18 people -- that you obtain a favorable judgment on behalf of the

19 bankruptcy.  What is your -- what is the estimate that you have

20 as to how long an appeal process would be from that adversary

21 proceeding?

22        MR. YOUNG:  Object as to relevance.  I'm not sure

23 what that has to do with this, Your Honor.

24        MR. KONVALINKA:  May I respond, Your Honor?

25        THE COURT:  You can, yes, respond.

1          MR. KONVALINKA:  My response is fairly simple, Your

2     Honor.  One of the big things that we are addressing here today

3     is the efficiency of the administration of this estate.  I

4     think I'm entitled to extol with regard to this particular

5     witness whether she's actually considered -- regardless of what

6     the outcome of this particular matter is, there is going to be

7     a continued inefficiency if you have litigious parties who

8     appeal the adversary proceeding and let's just say even this

9     determination today as to standing.  We're going to be at this

10    process for some time, is all I'm trying to establish.

11         THE COURT:  Again, I think ask your question again,

12    because

13         MR. KONVALINKA:  Okay.  Let me just restate it and

14    maybe do a little better.

15    BY MR. KONVALINKA:

16    Q    Ms. Burton, with regard to a determination in the

17    adversary proceeding, if you are favorable in the outcome with

18    regard to that, do you or do you not anticipate that there is

19    going to be an appeal?

20    A    I hadn't considered that.  I wouldn't be surprised, but

21    there could be.  But I haven't considered that.

22    Q    And isn't that one of the things in connection with the

23    efficiency of the administration of this estate, isn't it

24    something that you should consider in the sense that if, in

25    fact, there's going to be an elongated or an extended period of

1  time with regard to the adversary proceeding.  Isn't that going

2  to increase the cost as well?

3  A    Yes.  Obviously, it would.  Yes.

4  Q    And based upon what your opinion as to the nature of these

5  parties insofar as an approach to litigation, how -- based upon

6  your experience, how long would that appeal take?

7  A    And you're talking about the appeal if I was successful in

8  the adversary proceeding?

9  Q    Yes, ma'am.

10  A    I would ask my counsel that question.  But I think it

11  could take, you know, it wouldn't surprise me if it took at

12  least a year for an appeal.

13  Q    And --

14  A    I really don't know the answer to that question.

15  Q    -- you don't have an opinion on that particular issue.

16  You haven't considered that particular issue.  Is that a fair

17  statement?

18  A    I haven't.  No.  I have not.  I've been focused on trying

19  to get a recovery in the adversary proceeding and collecting

20  it.

21  Q    Well, in your discussions with the case parties with

22  regard to some -- did you discuss with them whether there had

23  been any other attempts at settlement?

24        MR. YOUNG:  Objection as to admissibility under

25  Federal Rule of Evidence 408.

1    MR. KONVALINKA:  And I'm sorry, Your Honor, you're

2 muted, and I didn't hear you.

3    THE COURT:  Response?

4    MR. KONVALINKA:  Yes.  First of all, I'm not asking

5 for the content of the settlement negotiations, Judge.  All I'm

6 asking for is whether there have been -- whether there was an

7 inquiry made that there had been attempts to settle with regard

8 to that.  I would also submit that under Rule 408.  This is not

9 a suggestion that I'm going to -- first of all, I want to know

10 if she made due inquiry with regard to prior settlement

11 negotiations.  And if she did or she did not, I think that may

12 be relevant to this proceeding in making a determination based

13 upon her opinion as to what would be in the best interest of

14 the bankruptcy estate.

15    Second of all, I would tell you that with regard to

16 the actual Rule 408 issue that deals with when you're in a

17 case, and you're -- and you have discussions between parties as

18 to settlement negotiations, and you're trying to enforce that

19 and duly precluded from doing that.  Under Rule 408, there is

20 an exception to the rule, if there's an extrinsic belief for

21 introducing this proof in connection with this proceeding, that

22 I should be permitted to do so because it's not evidence of the

23 settlement negotiation in connection with this case.  It is a

24 settlement negotiation in another case.  And so this, again, I

25 think that's something that she should have considered, but I

1 don't know if she did or she did not until I make an inquiry.

2        THE COURT:  And the Court will allow the limited

3 question that you posed would result with respect to the actual

4 whether there were or not what's the substance.

5 BY MR. KONVALINKA:

6 Q    So, Ms. Burton, if you would just answer my questions and

7 without much explanation so I don't get outside of what the

8 Court's scope is.  Were there discussions with the Chase

9 parties about prior negotiations that they had had with any of

10 the other parties concerning the settlement of their claims

11 against them?

12 A    No.

13 Q    So you did not make any inquiry of them?

14 A    No.  Not specifically about that.

15 Q    With regard to -- and you made some mention of the

16 pertinent that I can put in my objection, did you ever make

17 inquiry of me or others at the Grant Konvalinka and Harrison

18 firm?  Or your lawyer -- ask your lawyer to -- as to what basis

19 the family would be willing to proceed?

20 A    No.

21 Q    So just so I'm clear, it's my understanding that -- are

22 you suggesting that it's your opinion as an attorney and a

23 Trustee that if someone is acting in a contemptuous nature with

24 regard to an order that he or she would be acting within the

25 scope of their agency or employment?

1  A    I'm sorry.  Ask me that again?

2  Q    Sure.  Maybe I misheard you.  But you proffered -- you

3  offered an opinion in response to one of Mr. Young's questions

4  that you didn't think the result would be any different with

5  regard to the retrying of this case in Wilson (phonetic) County

6  based upon your role as the Trustee and your experience as a

7  lawyer.  Is that not a fair statement?

8  A    Correct.

9  Q    And so what I'm trying to understand is to do that, are

10 you as the Trustee and as an attorney suggesting that if

11 someone is acting in contempt in direct violation of a court

12 order that they would be acting on behalf of a professional

13 corporation as its agent and employee, which will be attributed

14 to them.  Is that what I understand?

15 A    I think so.

16 Q    And do you have any case law, other than the ruling of

17 this particular Court, that supports that, ma'am, that you

18 reviewed?

19         MR. YOUNG:  Objection, Your Honor.  Asking for a

20 legal conclusion, not a factual conclusion.

21         MR. KONVALINKA:  Your Honor, I think she's expressed

22 it.  Let me.  Let me state my response if I may.  Your Honor,

23 you can offer an opinion as to the Trustee.  And you can offer

24 an opinion as an attorney with regard to her review of a court

25 of appeals decision.  A review of a trial court's ruling all

1  without even a claim that there was a statement contained

2  within the record other than the judge's ruling that Mr.

3  Manookian was acting within the scope of his authority on

4  behalf of the PC.  And so I think I'm entitled to cross-examine

5  her with regard to that.

6          MR. YOUNG:  Your Honor, actually, Mr. Konvalinka

7  objected to her testimony as an attorney, to her testimony as

8  that of the Trustee of Cummings Manookian.  And now he's asking

9  her for case law.

10          THE COURT:  Her role in this case as a Trustee,

11  although she does, obviously, carry the experience of her

12  attorney knowledge.  As a Trustee, she can testify and should

13  testify as to the steps she reasonably made.  So I'll allow the

14  question.

15          MR. KONVALINKA:  Let me restate it for the record in

16  light of the Court's comment (phonetic), if I may, so I make it

17  correct.

18  BY MR. KONVALINKA:

19  Q    So, Ms. Burton, as a Trustee for this bankruptcy estate of

20  Cummings Manookian, PLLC.  Is it a fair statement that it is

21  your considered opinion that when someone is acting in

22  contempt, a direct contempt of a court order that they're

23  acting within the scope of their agency and employment by that

24  PLLC?

25          MR. YOUNG:  Objection, Your Honor.  Asked and

1  answered.

2          THE COURT:  I'm going to let her answer the question

3  again.

4          THE WITNESS:  Mr. Manookian claims that he wasn't in

5  contempt with the things that he did.  The court determined

6  that he was in contempt but that -- when that was raised in

7  your objection, I did consult with my attorney on that.  And

8  Mr. Young did some research on that which I believe is

9  contained in our response in Mr. Young's argument.

10 BY MR. KONVALINKA:

11 Q    Is that a yes, no, I don't know, ma'am?  I'm just asking a

12 question.

13 A    That's my response.

14 Q    So you don't know, or you do know?

15 A    I relied on my attorney.

16 Q    So to make sure I understand, for the purposes of the

17 record, you as Trustee did not form an independent opinion with

18 regard to the decision whether it was going to be a ruling by

19 the court in the new case that was being filed.  But you relied

20 upon Counsel's opinion with regard to that.  Is that a fair

21 statement?

22 A    No.  No.  No.  I rely -- I seek the counsel of my attorney

23 and -- but that doesn't mean that we don't have conversations

24 about things that -- after reviewing his -- what he researched

25 and talking to him about it.  I reached that conclusion on my

1  own.

2  Q    Now, if there is, for example -- what would you estimate,

3  based upon your experience as a Trustee, the cost of an appeal

4  with regard to if there's an appeal of the -- if there's a

5  favorable ruling in your favor with regard to that adversary

6  proceeding that might last a year.  What would be your estimate

7  as to the cost that would relate to that for the bankruptcy

8  estate?

9          MR. YOUNG:  Objection as to relevance.

10          MR. KONVALINKA:  Again, Your Honor, I think that I'm

11  entitled to show -- they continue to suggest that this is in

12  the best interest of the estate with regard -- because of all

13  the relative costs that is associated with the decision of the

14  Chase parties.  I think it's also important to understand what

15  is happening with regard to the adverse proceeding and the

16  costs that are associated with that because it's been suggested

17  that the costs are a certain number based upon the examination

18  by Mr. Young and (indiscernible) by the examination of

19  Mr. Spragens that I don't think is accurate.

20          THE COURT:  If it goes to the Trustee's

21  administration of the case, if the Trustee knows the answer,

22  she can answer the question.

23          THE WITNESS:  I haven't discussed that or evaluated

24  that, but I would -- I don't know, another $50,000 to $100,000

25  for an appeal.  And, again, I may be underestimating.  That

1  would be an estimate.

2  BY MR. KONVALINKA:

3  Q    Well, when there was a vacation of the -- vacating of the

4  award by the Supreme Court, did you contact the Chase parties

5  again to make a determination as to whether or not the amount

6  of the claim should be reduced in connection with the

7  settlement?

8  A    I was contacted by the Chase parties to discuss the relief

9  from stay issue.  And so that's kind of how all of the

10 discussions started from there.

11 Q    Okay.  Well, I guess I didn't articulate my question

12 correctly -- well enough.  What I'm interested in is when you

13 started, and you did the negotiations with the Chase parties,

14 there was no decision by the Supreme Court -- or excuse me, by

15 the court of appeals, that there would be a vacated the order,

16 correct?

17 A    No.  No.  This was after the court of appeals had vacated

18 the order.

19 Q    Okay.  And was it after the decision by the Supreme Court

20 to deny the vacating -- to deny the appeal?

21 A    No.  It was in between.

22 Q    So was there any revisiting of this issue since it was not

23 yet filed or approved with regard to the determination by the

24 Supreme Court by yourself?

25 A    I'm sorry.  Ask me that again?

1  Q    Sure.  I'm sorry.  It's probably a bad question.  With

2  regard to your role as Trustee, did you undertake to make any

3  further inquiry of the persons that you had been negotiating

4  with when you had then an adverse determination as to the

5  recognition of the application for the Supreme Court to

6  reconsider the case?

7  A    I'm not sure I under your question, but in between the

8  time that the order vacated the judgment and, actually, before

9  the appeal was filed or close to that time, I had discussions

10  with the Chase parties about several things, including their

11  claim.  I won't say several things.  About the claim

12  (indiscernible).

13  Q    So was there any revisiting of the amount of the

14  settlement at all as a result of the determination of the

15  Supreme Court not to accept the appeal?  Were there any

16  discussions about that?

17  A    No.  Because the settlement was not finalized or formally

18  memorialized at that point.  It had been discussed.

19  Q    And you have as a number of -- strike that.  Did you make

20  a determination as to what the number should be with regard to

21  the $250,000 amount?

22  A    I did.

23  Q    And was there any further counter made by the Chase folks

24  when you had suggested the $250,000?

25           MR. YOUNG:  Object under Federal Rule of Evidence

1  408.

2        MR. KONVALINKA:  Again, Your Honor, I'm not asking

3  about the content.  I'm just asking if there was any

4  discussion.

5        THE COURT:  Because we need to move on with this

6  detail, the Trustee who is operating as the Trustee can talk

7  about the facts and what the Trustee did to establish the

8  amount that's relevant to the Trustee's business judgment.  But

9  let's keep this for where we are.

10        We're talking about the Trustee's business judgment

11  and whether it was sound.  And I think the question as proposed

12  does go somewhat to the business judgment, but it's straying

13  close into matters that aren't necessarily relevant to the

14  business judgment of the Trustee, but we'll allow this one so

15  that we can get past what the Trustee did in establishing the

16  amount of the settlement.

17        MR. KONVALINKA:  Thank you, Your Honor.

18  BY MR. KONVALINKA:

19  Q    Do I need to repeat the question, ma'am?

20  A    Yes, please.

21  Q    After you suggest the number of $250,000, were there any

22  other discussions with the Chase parties in connection with

23  that amount?  I just want to know if there were discussions at

24  this point, not what the contents of the discussion was.

25  A    Yes, there were discussions.

1  Q    And over what period of time?

2  A    Probably -- the discussions started in April and the

3  settlement agreement that was attached to the motion was

4  executed by the Chase parties in June, so -- so sometime

5  between April and June, obviously.

6  Q    And again, just for the purposes of the record, we're

7  referring to April and June of 2021.  Is that a fair statement?

8  A    Correct.

9  Q    And so are you suggesting to the Court that in your

10 business judgment that this case is going to be resolved

11 quicker and more efficiently by reason of your agreement to

12 this claim, as opposed to having other parties that may be

13 adversely affected by this that may take appellate action?

14 A    What case are you talking about?  Are you talking about

15 the state court matter or the adversary --

16 Q    No, I'm -- I'm asking this question.  You suggested to the

17 Court in your business judgment as the Trustee, you're making a

18 determination for the efficient administration of this estate

19 to save time with regard to the proposed -- the litigation that

20 is involved in the Chase matter and the expense that would be

21 involved in participating in the Chase matter, that it is in

22 the best interest of the bankruptcy estate.

23     And I'm just saying at the same time I'm not sure that you

24 considered what the adverse reaction of the other parties would

25 be with regard to that, in making that determination, and that

you're somewhat in a Catch 22 with regard to this in the sense
that you're going to have a similar expense and a similar
period of time that's expended with regard to those people that
you've already identified as being litigious in nature.  Is
that not true?

A    If this settlement is approved, then Cummings Manookian
won't be -- the estate won't be involved in the state court
proceeding.  I won't be employing an attorney.  I won't be --
you know, they will proceed however they wish to proceed, you
know, against the other parties, but not against Cummings and
Manookian.

Q    But again -- so those people that are involved in this
particular administration of the estate, with regard to the
adversary proceeding, whatever in connection with that, they
may -- you may be in the same position with regard to them and
that you're going to be having a long time of addressing that
issue in connection with the administration of this bankruptcy
estate.  Are you not?

A    I don't know that it will be as long, because as we -- as
I testified before, it may shorten the period of time in the
litigation of the adversary proceeding, you know, not counting
any kind of appeal.  So I do think it will be a shorter period
of time than if the adversary proceeding or litigation of that
is more extensive.

Q    What is the dates you have set for trial for that

1  adversary proceeding?

2  A    I do -- there's not an adversary -- there's a pretrial

3  conference after this.  There's not a trial date yet -- or

4  motions for summary judgment, that sort of thing.

5        MR. KONVALINKA:  Your Honor, I pass the witness.

6        MR. SPRAGENS:  Your Honor, I'm sorry.  Before Mr.

7  Young begins, I wanted to make the Court available -- I mean

8  aware that I spoke to Mr. Manookian, who is standing by

9  pursuant to a subpoena.  I was letting him know about the

10 Court's schedule, and he informed me that at five o'clock he

11 has a hard stop to -- it's for child care reasons, frankly.

12       So I wanted to let the Court know that, in case there

13 is an opportunity to take him out of turn or something.  But I

14 didn't want to interrupt Mr. Konvalinka's examination.

15       THE COURT:  Thank you.  Again, I'll have a hard stop

16 at 4:30.  So we can get done what we can get done, and we can

17 either come back tomorrow morning or another day, Friday, if we

18 can't finish up today.

19       MR. SPRAGENS:  Thank you, Your Honor.

20       MR. YOUNG:  Your Honor, if I may, just one brief

21 follow-up question for Ms. Burton.

22                    REDIRECT EXAMINATION

23 BY MR. YOUNG:

24 Q    Mr. Konvalinka asked you a number of questions about a

25 hypothetical appeal of the adversary proceeding and time and

1  expense associated with that.  Regardless of whether or not

2  there's appeal, wouldn't that be in addition to the cost and

3  time for a rehearing?

4  A    I'm sorry.  Ask me that again.

5  Q    If there is an appeal and there's money spent on the

6  appeal --

7  A    Of the adversary?

8  Q    Of the adversary proceeding.  Wouldn't that be additional

9  to any expense that would be spent on the rehearing?

10 A    In the state court proceeding?

11 Q    Right.

12 A    Yes.  Yes.

13 Q    So what you're trying to do is to keep the estate from

14 having to spend more money.

15 A    Right.

16         MR. YOUNG:  No further questions.

17         MR. KONVALINKA:  I have no further questions,

18 Your Honor.

19         THE COURT:  All right.  Next witness then.

20     (Witness excused)

21         MR. KONVALINKA:  I would call Mr. Manookian.

22         MR. YOUNG:  Well, Your Honor, I need to formally

23 close our side first, and then I'll object to the calling of

24 Mr. Manookian on two grounds:  One, it's beyond the corners of

25 Mr. Konvalinka's objection; and secondly, because all of his

1 evidence that Mr. Konvalinka lists on the witness and exhibit

2 list would be prohibited by Rule 408 of the Federal Rules of

3 Evidence.

4       MR. KONVALINKA:  Do you want me to respond to that

5 now, Your Honor?

6       THE COURT:  Go ahead and respond.

7       MR. KONVALINKA:  Well, first of all, there's

8 obviously a disputed issue of facts with regard to who was the

9 appellant and whether or not they were appealing the judgment

10 on behalf of Cummings Manookian.  I think that obviously

11 Mr. Manookian would be somewhat familiar with that since he's

12 listed as the attorney of record in connection with the

13 Tennessee Court of Appeals case in this matter.

14       I think, similarly, he would be able to tell us

15 whether or not he even raised the issue as to whether there was

16 a contempt -- a defense based on the lack of agency or acting

17 outside the scope of agency with regard to the entity itself at

18 the time of the lower court ruling in connection with this

19 matter, because I don't believe there was.

20       So, at least with regard to those issues, they are

21 directly on point with regard to this.  And again, with regard

22 to the other issues as described by Mr. Young, I know -- as the

23 Court's already previously said that I hadn't notified him

24 because I didn't put it in my objection, but I did put him in

25 my witness list and I did put down the areas and topics that

1 are really based upon, in part, Mr. Manookian's objection.

2 It's not everything that's in his objection; but at the same

3 time, it's irrelevant to this proceeding.

4       MR. YOUNG:  Your Honor, if I may briefly respond with

5 regard to the first couple of issues, those weren't in the

6 witness and exhibit list.  They weren't listed.  The only thing

7 that Mr. Manookian's testimony was listed as relevant was with

8 regard to the alleged walkaway offer, which would clearly be

9 subject to 408.

10       In fact, the letter that's attached to

11 Mr. Manookian's objection says very clearly at the top that

12 it's subject to 408.  So I think the only issues that he would

13 testify to are not admissible and is inefficient for this Court

14 to consider.

15       THE COURT:  All right.  And of course, this is just

16 the ground we were trying to prevent with bifurcating the

17 proceeding.  Mr. Manookian, his objection is not at issue,

18 based on the likelihood of conflating and confusing the issues

19 that are before the Court -- and remember, we're here on an

20 objection to the proposed settlement that's subject to the

21 business judgment rule, which is a high standard.

22       If any of the testimony that Mr. Manookian would

23 offer would be determined above that, the Court finds it very

24 unlikely that that in fact would be the case.  But because of

25 the scope of what you want to go into, the Court finds it's

1 more likely to be prejudicial than valuable to the Court.

2          So the Court is not going to allow Mr. Manookian to

3 testify unless it were very, very limited.  And to this point,

4 Mr. Konvalinka, you've not offered me a sufficiently tight

5 scope of testimony that you want him to offer.  You want him to

6 testify about his objection, which in fact go beyond what the

7 Court is willing to allow today.

8          You can attempt to tighten it up, but the Court is

9 not going to let Mr. Manookian backdoor his way into this

10 proceeding, based on my prior rulings that he does not have

11 standing.

12          MR. KONVALINKA:  May I proceed, Your Honor?

13          THE COURT:  You can express to the Court the scope

14 that you are going to examine Mr. Manookian.

15          MR. KONVALINKA:  Well, one of the first things I'm

16 going to be asking him about is in fact what happened with

17 regards to the trial court proceeding, with regard to the

18 agency issue, which I previously raised, and it's raised in my

19 objection.  That's (indiscernible) question and whether or not

20 Cummings Manookian did, in fact, appeal.  Not only does it go

21 to sort of the merits of the litigation, it also goes somewhat

22 to the Trustee's duty to review this stuff and based her

23 opinion on this, she didn't consider those things.  And I think

24 that's relevant, as well.

25          MR. YOUNG:  Your Honor, if I may, none of those

issues were disclosed in the witness and exhibit list
associated with Mr. Manookian.

MR. KONVALINKA: And I'd respectfully disagree,
Your Honor, in the sense that we did say that there should be
no award against Cummings Manookian because Mr. Manookian, to
the extent that he is found to be acting in contempt, would be
outside the scope of his agency and employment. And we
definitely raised that, and it's relevant for that purposes.
And we also raised the issue that if he's not found in contempt
for anything, that, in fact, there would be no sanctions award.
So I think it is relevant for both of those purposes, because
we raised those in our objection.

MR. YOUNG: And Your Honor, what I was trying to say
is that it's not in the witness and exhibit list. If the Court
will look at the witness and exhibit list, the exclusive
reasons why Mr. Konvalinka listed potential testimony from
Mr. Manookian all had to do with his objection and this
purported walkway agreement.

MR. KONVALINKA: Well, I disagree with that statement
as well, Your Honor. If you look at the witness list, it
states in  pertinent part Brian Manookian, Mr. Manookian, may
testify regarding his personal knowledge of the Chase
litigation.

That is clearly the very thing that I just discussed
with the Court, and the very thing that I elucidated with

1   regard to what I was going to be asking this witness.  To

2   suggest otherwise is an incorrect apprehension of what is

3   contained in my witness list.

4           THE COURT:  We've gone back and forth enough.  The

5   Court is going to bar Mr. Manookian from testifying.  It's not

6   additive to where we are in this process, and the Court is

7   going to bar him from testifying to any matters related to the

8   litigation.  It would be speculative on his part, as well, just

9   the same as it would be speculative from any party to

10  prospectively predict what was going to happen in litigation.

11          So based on the ruling of standing, the Court doesn't

12  find the testimony of Mr. Manookian to be of probative value,

13  and to be more prejudicial and confusing if we allow him to

14  testify.  So the Court is going to sustain the objection of Mr.

15  Young, and Mr. Manookian will not testify today.

16          MR. MANOOKIAN:  I assume I'm being excused at this

17  point?

18          THE COURT:  Yes, sir.  You're free to go.

19          MR. MANOOKIAN:  Thank you very much.

20          THE COURT:  Mr. Konvalinka.

21          MR. KONVALINKA:  Yes, Your Honor.  I assume -- is

22  Mr. Young through, because he said he wanted to -- he was not

23  through, but he did want to raise those two issues, so --

24          MR. YOUNG:  No, Your Honor.  I'm sorry if there was

25  any confusion.  I'm done with my proof and I thought we had

1  moved on to Mr. Konvalinka's proof.

2          MR. KONVALINKA:  I have no further proof at this

3  time, Your Honor.

4          THE COURT:  All right.  Well, let's go ahead with

5  argument to wrap things up on issues that you want me to look

6  at.

7          MR. YOUNG:  Your Honor, I'm going to be very brief,

8  because I know the Court's read the briefs and has listened to

9  the Trustee's testimony.  Really the only thing I want to do is

10 reiterate that a Trustee (audio interference) deference to her

11 business judgment in the administration of an estate.  As we

12 cited in our settlement motion, courts have found that

13 compromises just like this are favored in bankruptcy in order

14 to increase efficiency and to minimize cost to the estate.

15         A Trustee doesn't need to prove that her settlement

16 is better than anything else that can be achieved, only that

17 the settlement falls within the reasonable range of

18 possibilities.  We cited the Penn Central Transportation case

19 in the Third Circuit in our settlement motion for that

20 proposition.

21         Case law is clear that neither the Court nor any

22 other party should substitute their business judgment for that

23 of the Trustee.  In this case, the Trustee's exercised her

24 reasonable business judgment in reaching the decision to allow

25 the Chase claim as an unsecured claim in the amount of

1  $250,000.

2          She testified that she considered a number of
3  factors including the likelihood that the state court would
4  reimpose a substantial (audio interference) judgment against
5  Cummings Manookian, the time and legal expense that would be
6  required to see a rehearing through to its conclusion, and the
7  impacts that settling this claim versus it remaining
8  unliquidated would have on the administration of this estate
9  and the progress of the adversary proceeding.

10         The testimony showed that when looking at litigation
11 risk, the expense of litigation, the time that would be
12 involved to try this claim in state court, and the effects of
13 all that, that the settlement is in the best interest of the
14 estate and its creditors.

15         Her testimony also showed why the objection -- the
16 remaining objection lacks merit.  She testified that she did
17 not believe that it was likely that a court would find that
18 Mr. Manookian was not the agent of Cummings Manookian,
19 considering that the state court had already previously made
20 that finding before.

21         Trustee properly exercised her business judgment in
22 reaching this settlement, as this Court should expect her to
23 do.  She's done exactly what the Court -- what the Bankruptcy
24 Court required -- Bankruptcy Code requires her to do and what
25 this Court would expect her to do.

1     She's properly considered all factors, she's weighed

2   them, and determined that it's in the estate's best interest to

3   settle this Chase claim.  As such, the Trustee respectfully

4   requests that the Court grant her motion to approve the

5   compromise and settlement, and overrule any remaining

6   objections.  And that's all I have, Your Honor.

7          THE COURT:  All right.  Thank you.

8          Mr. Konvalinka.

9          MR. KONVALINKA:  I also will be brief.  It's quite

10  simple.  The Trustee misapprehended the issue, as just was

11  articulated by Mr. Young.  The issue is not whether

12  Mr. Manookian was the agent of Cummings Manookian.  The issue

13  is whether, to the extent that he was an agent, was he acting

14  within it scope of his agency on behalf of the entity at the

15  time that he -- his conduct was such that it could be

16  interpreted to be contempt of court, which is a direct

17  violation of a court order.

18         That's the issue.  And if he is not in violation,

19  obviously there could be nothing awarded against Cummings

20  Manookian.  If he is found to be in contempt -- and that's

21  acting outside the scope of any agency or employment that he

22  would have with the entity itself.  To suggest the issue is

23  just merely whether he's an agent misconstrues or misapprehends

24  what the real issue is when making a decision on behalf of the

25  Trustee in connection with this matter.

ACCESS TRANSCRIPTS, LLC        1-855-USE-ACCESS (873-2223)

1        And also what has been demonstrated in connection

2   with this particular proceeding, it's also in consideration

3   that there was no consideration as to what -- if there is a

4   settlement, to which parties object, that there is going to be

5   a process involved and litigation and expense as well, all of

6   which suggests there should have at least been the exploration

7   of would there be an opportunity out there that would be

8   willing to take this case on behalf of Cummings Manookian, to

9   the extent that there is a case, and handled in a state court

10  for a lesser amount than $150,000, and maybe cap a fee.  None

11  of that was done.  It was actually suggested by myself in

12  connection with this matter.  So none of that was explored, and

13  I think that those are errors that have been made in making

14  this business judgment.  That's all I have.

15        THE COURT:  All right.  Thank you.  The Court is

16  prepared to rule.  I'll just need a moment, but I'm going to

17  rule in about one minute, so please stand (audio

18  interference) --

19        All right.  The Court, first of all, would like to

20  thank both parties for what has been a well-argued proceeding

21  today.  We're here to determine the objection of Grant

22  Konvalinka to the Trustee's motion for approval of compromise

23  and settlement.

24        As has been stated several times today, the business

25  judgment rule grants substantial deference to the Chapter 7

1   Trustee.  That deference exceeds quite far.  In fact, many
2   Courts have said that short of bad faith or whim that the
3   Trustee wins.
4          This Court expects more than that based off of the
5   case law and the particularities of this case, the complexity,
6   expense, and likely duration being the key issues here, which
7   the Trustee did articulate were taken into account in
8   formulating the basis and the amount of the settlement.
9          We have here a Trustee who's been on the panel for
10  24 years.  We have a Trustee who took into account the risk.
11  We have a Trustee who had an estate that was by her testimony
12  administratively insolvent, with $85,000 of cash, and expenses
13  exceeding $100,000.  We have a Trustee who's actually
14  articulated the likelihood that there would be litigation that
15  would be long in duration, expensive, and run up bills for the
16  estate without actually having money to pay those bills for the
17  professional fees.
18         Those alone would be enough to satisfy the business
19  judgment rule given the Trustee has a duty, a fiduciary duty,
20  to ensure some recovery for the creditors.  In this case, based
21  off what's in the estate now, the only recovery would be for
22  professionals.
23         So the settlement is not only a good thing for the
24  estate, but the Trustee has articulated that, based off the
25  assets claims and costs, and the goal being a meaningful

1  distribution -- and the Trustee specifically used the words "to

2  protect" the other creditors.

3        The Trustee has clearly articulated that her business

4  judgment is not one based in whim or folly, but one that's

5  based on the facts in this particular case.  There have been

6  issues raised as to whether the Trustee would examine every

7  possible option or every circumstance.  Well, that's not the

8  test.  The test is this Trustee's particular business judgment

9  with the facts as she sees the facts.

10        Clearly, there's been nothing articulated that this

11  Trustee is not competent, capable, and suited to make these

12  type of decisions.  The facts in this case show that the

13  Trustee has done due diligence, examined the record of the

14  proceedings, and made a decision to settle this matter for

15  $250,000.  That decision is not subject to review on the

16  business judgment rule because the Trustee has clearly

17  articulated a basis for making that decision which relies on

18  her experience and her review of this particular case.

19        So the Court, having heard argument of Counsel, finds

20  that the creditor has failed to overcome the substantial

21  deference given to the Trustee's business judgment, and

22  therefore the objection is overruled.

23        As part of this hearing strayed into Mr. Manookian

24  and his objection, the Court will note that even if

25  Mr. Manookian had standing to object, nothing in his pleadings

1  or the evidence submitted would amount to a challenge to the

2  Trustee's business judgment.  However, that's not necessary to

3  rule on his objection based off my previous ruling on standing.

4         So, Mr. Young, if you could prepare an order to that

5  effect.

6         MR. YOUNG:  I will, Your Honor.  Thank you.

7         THE COURT:  All right.  Any questions?

8         MR. KONVALINKA:  Not from me, Your Honor.

9         THE COURT:  All right.  Thank you.

10         MR. YOUNG:  Your Honor, I believe we also have a

11  pretrial conference.  It might be possible for us to do this in

12  the next five minutes, because frankly the -- now that, based

13  on this ruling, I think we're ready to move that pretrial

14  matter forward.

15         I would suggest the following deadlines, and subject

16  to any comments --

17         MR. KONVALINKA:  Your Honor, may I be excused from

18  this?  I'm sorry.  I don't think I'm a participant.

19         THE COURT:  Yes, sir.  Thank you.

20         MR. YOUNG:  I believe it's going to take us

21  approximately 60 days to get through issues regarding written

22  discovery -- that's outstanding written discovery that has not

23  been fully responded to, that we need to follow up on and

24  perhaps get the Court involved in, but also perhaps there's

25  issuance of other written discovery that could shorten the

1  number of depositions that we'd need in this case.

2        So what I would suggest is that between now and

3  November 30th that the parties participate in written discovery

4  for depositions to open on December 1, to be concluded by

5  March 31.  I would normally probably only ask 90 days instead

6  of 120 days for these depositions, but with the holidays

7  intervening, I think it's -- and the number of depositions that

8  might be taken, I think it's smarter to ask for 120 days.

9        And then I would suggest that we set motion for

10 summary judgment deadlines, you know, any dispositive motions

11 beginning a couple of weeks thereafter.  So sometime in mid

12 April, then with two weeks for responses, one week for reply,

13 and then a hearing to follow.  That would be my suggestion as

14 to how to get this thing moving and try to bring this adversary

15 proceeding to a conclusion.

16        MR. SPRAGENS:  Your Honor, I apologize for my

17 informality.  I'm caught having thought my portion of the

18 hearing was over.  Let me just note that this is the first time

19 I've heard of these deadlines.  They don't strike me as too

20 objectionable, but I would like the opportunity to confer with

21 my client, and we can file something jointly with Mr. Young.

22        THE COURT:  All right.  The Court is more than happy

23 to entertain -- the deadlines sound more than reasonable to the

24 Court.  And if the parties would confer, you can either return

25 our worksheet or submit an order with -- leaving the actual

1  trial date blank.  If you can manage all the other dates -- and
2  the response and the reply deadlines -- if you can manage those
3  based off the framework that Mr. Young has articulated, the
4  Court would then insert the trial date and we'd be set to go
5  forward.

6          MR. YOUNG:  Your Honor, no, I'm happy to consult with
7  Mr. Spragens and Mr. Gabbert on that.  And obviously, if
8  there's an issue, we'll notify the Court and try to get back on
9  the Court's docket as soon as possible.  But hopefully there
10 will be no issue.

11         THE COURT:  Thank you.  Again --

12         MR. GABBERT:  That works for me, Judge.

13         THE COURT:  All right.  Thank you, Mr. Gabbert.
14 (Audio interference) without you saying something.

15         MR. SPRAGENS:  Your Honor, I'd like the record to
16 reflect that Mr. Gabbert's probably not wearing a tie either.

17         MR. GABBERT:  Actually, I am.  But I will say I am in
18 shorts.

19         MR. SPRAGENS:  Par for the course, sir.  Par for the
20 course.

21         THE COURT:  All right.  Again, thanks today.  The
22 Court does appreciate the professionalism that counsel on all
23 sides has argued today.  These are tough issues, but hopefully
24 we can move forward and get some resolution of this case, and
25 the Trustee can continue to administer this case and get the

1  results for the creditors.  So appreciate all the parties to

2  date.

3          UNIDENTIFIED:  Thank you, Your Honor.

4          UNIDENTIFIED:  Thank you, Your Honor.

5          MR. GABBERT:  Thank you, Judge.

6          UNIDENTIFIED:  Thank you, Your Honor.

7          THE COURT:  We'll be adjourned.

8      (Proceedings concluded at 4:29 p.m.)

9                      * * * * *

10

11

12

13

14              **C E R T I F I C A T I O N**

15

16          I, Alicia Jarrett, court-approved transcriber, hereby

17  certify that the foregoing is a correct transcript from the

18  official electronic sound recording of the proceedings in the

19  above-entitled matter.

20

21

22

23  

24  ALICIA JARRETT, AAERT NO. 428      DATE: October 25, 2021

25  ACCESS TRANSCRIPTS, LLC

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **CUMMINGS MANOOKIAN, PLLC,** | ) | Case No. 3:19-bk-07235 |
| Debtor. | ) | Chapter 7 |
| | ) | Judge Walker |

## APPELLEE CHAPTER 7 TRUSTEE, JEANNE ANN BURTON'S DESIGNATION OF ADDITIONAL ITEMS TO BE INCLUDED IN RECORD ON APPEAL

Comes now, Appellee Jeanne Ann Burton, Chapter 7 Trustee, pursuant to Rule 8009 of the Federal Rules of Bankruptcy Procedure, and hereby designates the following additional items to be included in the record on Brian Manookian's appeal of the Bankruptcy Court's Order Granting Motion to Approve Compromise and Settlement and Finding that Brian Manookian Lacks Standing (Doc. 147) entered in the above captioned case on October 1, 2021.

## DESIGNATION OF ADDITIONAL ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

| Date | Docket No. | Description |
|---|---|---|
| 11/18/19 | 6 | Application of Trustee to Employ Special Counsel |
| 12/9/19 | 14 | Brian Manookian's Opposition and Objection to Motion of Trustee to Employ Special Counsel |
| 12/17/19 | 16 | Supplemental Authority on Standing Related to Application of Trustee to Employ Special Counsel |
| 12/19/19 | 18 | Brian Manookian's Supplemental Reply in Opposition to Motion of Trustee to Employ Special Counsel |
| 12/20/19 | 19 | Trustee's Response to Brian Manookian's Supplemental Reply |
| 12/20/19 | 20 | Order |
| 12/21/19 | 21 | Supplement to Application of Trustee to Employ Special Counsel |

| | | |
|---|---|---|
| 12/23/19 | 23 | Order Overruling Objection and Employing Thompson Burton PLLC as Special Counsel |
| 12/23/19 | 24 | Brian Manookian's Request for Leave to Respond in Opposition and Objection to Supplemental Application of Trustee to Employ Special Counsel |
| 12/26/19 | 26 | Order Denying Request for Leave to Respond |
| 9/15/21 | 126 | Trustee Jeanne Ann Burton's Witness and Exhibit List for September 17, 2021 Hearing on Trustee's Motion to Approve Compromise and Settlement |
| 9/15/21 | 127 | Brian Manookian's Witness and Exhibit List for September 17, 2021 Hearing on Trustee's Motion to Approve |
| 9/24/21 | 137 | Trustee Jeanne Ann Burton's Witness and Exhibit List for September 29, 2021 Hearing on Trustee's Motion to Approve Compromise and Settlement |
| 9/24/21 | 139 | Brian Manookian's Witness and Exhibit List for September 29, 2021 Hearing on Trustee's Motion to Approve |
| 9/27/21 | 143 | Witness and Exhibit List of Grant, Konvalinka & Harrison, P.C. |

Dated this 5th of November, 2021.

Respectfully submitted,

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
6100 Tower Circle, Suite 200
Franklin, TN 37067
615-465-6008
phillip@thompsonburton.com

Special Counsel for Chapter 7
Trustee

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that this pleading base been served electronically on this 5th day of November, 2021, to all persons with electronic filing privileges in this case, including John Spragens, counsel for the Appellant.

/s/ Phillip G. Young
Phillip G. Young

2

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CUMMINGS MANOOKIAN, PLLC, | ) | **Case No. 3:19-bk-07235** |
| Debtor. | ) | **Chapter 7** |
| | ) | **Judge Walker** |
| JEANNE ANN BURTON, TRUSTEE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HAGH LAW, PLLC; AFSOON | ) | |
| HAGH; MANOOKIAN, PLLC; and | ) | |
| FIRST-CITIZENS BANK & TRUST | ) | |
| COMPANY, | ) | |
| Defendants. | ) | |
| | ) | **Adv. Proc. No. 3:20-ap-90002** |

---

## MOTION TO COMPEL
## DISCOVERY RESPONSES FROM MANOOKIAN, PLLC

Pursuant to Federal Rules of Bankruptcy Procedure 9014(c) and 7037, Jeanne Ann Burton, Chapter 7 Trustee and Plaintiff herein (the "Trustee"), respectfully moves to compel responses to Plaintiff's First Set of Interrogatories Propounded to Defendant Manookian, PLLC (the "Interrogatories") and Plaintiff's First Requests for Production of Documents Propounded to Defendant Manookian, PLLC (the "Requests") propounded to Manookian, PLLC ("Manookian Law") on November 24, 2020.

On November 24, 2020, the Trustee served interrogatories, requests for document production, and requests for admission on Manookian Law.[1]  Pursuant to the Federal Rules of Civil Procedure and the Bankruptcy Rules, responses to this discovery were due on

---

[1] Those documents are attached as collective <u>Exhibit 1</u>.

December 24, 2020.  Due to the holidays, and upon request by counsel for Manookian Law, the Trustee extended the response deadline for this written discovery to January 28, 2021.

On January 26, 2021, Manookian Law served responses to the Interrogatories, Requests, and the requests for admission.  The responses are attached as collective <u>Exhibit 2.</u>  The Trustee deemed Manookian Law's responses to the requests for admission adequate, but viewed Manookian Law's responses to the Interrogatories and Requests as seriously deficient.  Because the Court had stayed discovery in this matter for a number of months, the Trustee took no action on the deficiencies in Manookian Law's responses to the Interrogatories and Requests until October 29, 2021.  On that day, the Trustee sent a letter (the "Meet and Confer Letter") to counsel for Manookian Law identifying the deficiencies in the responses to the Interrogatories and Requests.  A copy of the Meet and Confer Letter is attached hereto as <u>Exhibit 3.</u>  Notably, because Manookian Law had previously taken the position that certain documents would not be produced absent a protective order, the Trustee included a proposed protective order with the Meet and Confer Letter.

The Trustee sought more full and adequate responses to the Interrogatories and Requests by November 12, 2021.  On November 12, 2021, counsel for Manookian Law responded to the Meet and Confer Letter in writing (the "Response").  The Response is attached hereto as <u>Exhibit 4.</u>  In essence, the Response made clear that Manookian Law stands by its prior discovery responses, declined to provide any updated responses, but invited the Trustee's counsel to initiate a conference call with counsel for Manookian Law and Brian Manookian, individually.  Counsel of the Trustee replied to the Response on

November 16, 2021 (the "Reply"). In the Reply, the Trustee declined the invitation to conduct a call with counsel for Manookian Law and his client, but expressed a willingness to conduct a call involving counsel only. Despite requesting a response by November 29, 2021, counsel for Manookian Law did not respond until December 3, 2021. In an email dated December 3, 2021, counsel for Manookian Law agreed to have a telephone call that involved counsel only. On December 7, 2021, counsel for the Trustee initiated that call and explained more fully the deficiencies with Manookian Law's responses. Counsel for Manookian Law agreed to consult with his client and inform the Trustee's counsel of their position. As of the date of this motion, no further communication has been received by the Trustee or her counsel

Unfortunately, despite the passage of over thirteen (13) months and despite a Meet and Confer letter, several of Manookian Law's responses to the Interrogatories and Requests remain deficient. More specifically, the Trustee identifies the following continuing deficiencies with the amended responses:

- Interrogatory 5: Interrogatory 5 asks Manookian Law to identify from which specific cases it claims entitlement to some attorneys' fee, and in what amount. Manookian Law's response to Interrogatory 5 states that no fee is due it from most of the listed cases but states that the fees are "to be determined" in two cases, *Fitzgerald v. Osborn* and *Shoemaker v. Vanderbilt Medical.* Both of those cases have now settled and the Trustee is entitled to know whether Manookian Law claims entitlement to any fees therefrom. Manookian Law should be compelled to fully respond to

Interrogatory 5 and specifically identify in what fees, if any, it claims an interest.

- Interrogatory 8:  Interrogatory 8 asks Manookian Law to state the legal and/or factual support for its claims to fees in certain cases identified in the responses to Interrogatory 5.  Interrogatory 8 specifically requests "reference to any communication establishing the amounts to which the Defendant claims entitlement."  Manookian Law does not identify the legal or factual support for any claim to fees, nor does it identify any documents. Manookian Law should be compelled to specifically identify the communications with clients or other counsel that are responsive to this interrogatory.

- Request 1:  Request 1 seeks production of any document or communication that Manookian Law alleges supports the denials in its answer.  Despite Manookian Law's repeated allegations that it is in possession of information that would disprove the Trustee's allegations (such as, for example, video from the law offices of the Debtor and data regarding key swipes at the offices of the Debtor), Manookian Law has refused to provide any documents in response to this Request.  Manookian Law should be compelled to respond to this Request and, to the extent it does not, it should be prohibited from producing any such document or information as evidence before this Court.

- Request 3:  Request 3 seeks every document or communication that evidences the creation of an attorney/client relationship between

Manookian Law and plaintiffs to certain cases identified specifically in the Requests and Interrogatories. Manookian Law has refused to produce these documents on the grounds of attorney-client privilege (although engagement letters are not privileged). Manookian Law offers to produce these engagement letters "subject to entry of a suitable protective order", which the Trustee has provided. Manookian Law should be compelled to produce these requested documents and communications with certain former clients of the Debtor.

- Request 4: Request 4 seeks the production of documents or communications that evidence the termination of any attorney/client relationship between Manookian Law and any party to the cases specifically identified in the Requests. Manookian Law has refused to produce these documents on the grounds of attorney-client privilege (although disengagement letters are not privileged). Manookian Law offers to produce these communications "subject to entry of a suitable protective order", which the Trustee has provided. Manookian Law should be compelled to produce these requested documents and communications with certain former clients of the Debtor.

- Request 5: Request 5 seeks the production of every document that supports its response to Interrogatory 5, namely the percentage of fees to which Manookian Law claims an interest in certain cases. Again, Manookian Law has refused to produce these documents. If Manookian Law's objection is one of privilege, the Trustee has proposed a protective order but Manookian

Law has not responded.  Manookian Law should be compelled to produce all documents responsive to Request 5.

- Request 8:  Request 8 seeks the production of all documents and communications that relate or refer to the *Fitzgerald v. Osborn* case, including correspondence with defense counsel in that case.  Manookian Law objects, noting that "[t]he entity Manookian PLLC did not correspond with counsel for the Defendants in the Fitzgerald matter."  Manookian Law seems to take the position in this case that it, and not the Debtor, performed substantial services on behalf of the plaintiff in that matter.  In order to prove or disprove that allegation, the Trustee is entitled to review all documents and communications between Manookian Law and counsel for the Defendants.  Since Manookian Law was formed in January 2019, and the Fitzgerald matter was settled in August 2019, there should be a finite set of documents that are responsive to this request.  Manookian Law should be compelled to produce all documents responsive to this request without hiding behind a false distinction between Manookian Law as an entity and Brian Manookian, its sole member.  Manookian Law also claims that correspondence with defense counsel in that matter might be privileged; the Trustee is unaware of any privilege that would extend to communications between opposing counsel.  Manookian Law should be compelled to produce the requested documents.

For the reasons outlined above, the Trustee requests that the Court compel Manookian Law to respond to the outstanding Interrogatories and Requests listed in this

Motion.[2]  The Trustee further requests that the Court award the estate its attorney's fees incurred in connection with this Motion.[3]  Since this is not an emergency matter, the Trustee asks the Court to set a hearing on this matter after January 1, 2022 in order to accommodate the holiday schedules of all parties.  Alternatively, if the Court prefers, the Trustee would be amenable to discussing this issue at the pretrial conference currently scheduled in this matter on February 2, 2022.

Dated: December 20, 2021

Respectfully Submitted,

*/s/ Phillip G. Young, Jr.*
Phillip G. Young, Jr.
Thompson Burton PLLC
One Franklin Park
6100 Tower Circle, Suite 200
Franklin, TN 37067
Tel:    615.465.6008
Fax:    615.807.3048
Email:  phillip@thompsonburton.com

Special Counsel to Trustee

---

[2] *See* Fed. R. Civ. P 37(a)(3)(B)(iii) & (iv)).
[3] *See* Fed. R. Civ. P. 37(a)(5)(A).

**RULE 37 CERTIFICATION**

I certify that I, in good faith, conferred or attempted to confer with Manookian Law's counsel in an effort to obtain discovery responses without court action. Specifically, on October 29, 2021 I sent counsel for Manookian Law a detailed "Meet and Confer Letter". Further written correspondence between counsel occurred on November 12, 2021, November 16, 2021, and December 3, 2021. I telephoned Manookian Law's counsel on December 7, 2021 attempting to resolve this dispute. Despite these attempts, and despite conversations regarding necessary discovery over the past year, Manookian Law has failed to adequately respond to the discovery as detailed in this Motion.

/s/ Phillip G. Young, Jr.

**Certificate of Service**

The undersigned hereby certifies that a true and exact copy of the foregoing has been served via electronic notice/ECF and/or United States Mail, first class, postage prepaid, to the following persons:

John Spragens
Spragens Law, PLC
311 22nd Avenue, North
Nashville, TN 37203

This 20th day of December, 2021.

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.

# THOMPSON BURTON PLLC

ATTORNEYS AT LAW
A PROFESSIONAL LIMITED LIABILITY COMPANY

One Franklin Park
6100 Tower Circle, Suite 200
Franklin, Tennessee 37067
www.thompsonburton.com

Phillip G. Young
phillip@thompsonburton.com

Direct Dial: 615-465-6008

November 24, 2020

VIA U.S. MAIL AND ELECTRONIC MAIL

John Tate Spragens
Spragens Law PLC
311 22nd Ave N
Nashville, TN 37203
John@spragenslaw.com

      **Re:**    ***Burton v. Hagh Law, PLLC et al.***
             **Discovery Propounded to Manookian, PLLC**

Dear John:

    Please find enclosed discovery propounded to your client, Manookian, PLLC, by my client, Jeanne Ann Burton, Trustee. Please contact me with any questions.

                Sincerely,

                *[signature]*

1

1196

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

IN RE: )
)
CUMMINGS MANOOKIAN, PLLC, ) Case No. 3:19-bk-07235
    Debtor. ) Chapter 7
) Judge Walker
JEANNE ANN BURTON, TRUSTEE, )
    Plaintiff, )
)
v. )
)
HAGH LAW, PLLC; AFSOON HAGH; )
MANOOKIAN, PLLC; and FIRST- )
CITIZENS BANK & TRUST )
COMPANY, )
    Defendants. )
) Adv. Proc. No. 3:20-ap-90002

## PLAINTIFF'S FIRST SET OF INTERROGATORIES
## PROPOUNDED TO DEFENDANT MANOOKIAN, PLLC

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff Jeanne Ann Burton, Trustee ("Trustee"), propounds these Interrogatories (the "Interrogatories") to Defendant Manookian, PLLC ("Defendant") and requests that Defendant respond to the following Interrogatories, separately and fully, under oath and within the time provided by law.

## DEFINITIONS

In construing these discovery requests, the following definitions shall apply:

A. *"And"* as well as *"or"* shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these discovery requests any information that might otherwise be construed as outside their scope.

B.     *"Answer"* means the Answer by Defendant in this matter and/or any amendments to it.

C.     *"CM Cases"* means the following lawsuits initiated by Cummings Manookian, PLC as counsel for the plaintiffs:

| Case Name | Court |
| --- | --- |
| Bailey v. HCA | Davidson Circuit |
| Balay v. Hutson et al | Davidson Circuit |
| Beckworth v. LBMC | Williamson Circuit |
| Brooks v. Reinking | Davidson Circuit |
| Dyer v. Vanderbilt Imaging | Davidson Circuit |
| Fitzgerald v. Osborn | Williamson Circuit |
| Knapp v. Ripley | Davidson Circuit |
| Manookian v. Pennsylvania Higher Education et al | Davidson Circuit |
| Miller v. Vanderbilt Medical | Davidson Circuit |
| Ruffino v. Archer | M.D. Tenn. |
| Salas v. Rosdeutscher et al | Davidson Circuit |
| Shoemaker v. Vanderbilt Medical | Davidson Circuit |
| Thompson v. Sidrys | Putnam Circuit |
| Waldron v. Monroe County | Monroe Circuit |
| Wheeler Bonding Co. v. Parks | Davidson Circuit |
| Wolf v. Mid-Cumberland Resources Agency | Rutherford Circuit |

D.     *"Communication(s)"* includes any transfer of information, ideas, opinions or thoughts by any means, written, oral or otherwise, at any time or place under any circumstances and is not limited to transfers between persons, but includes other transfers, such as records and memoranda to file, any written letter, memorandum, or other document that was sent by one or more individuals to another or others; any telephone calls between one or more individuals and another or others, whether or not the call was by chance or prearranged, formal or informal; and any conversation or meeting between one or more individuals and another, whether or not the contact was by chance or prearranged, formal or informal.

2

E.     *"Complaint"* means the Complaint filed by the Trustee in this matter and/or any amendments to it.

F.     *"Court"* means the United States Bankruptcy Court for the Middle District of Tennessee.

G.     *"Date"* means the exact year, month and date, if known, or, if not known, your best approximation of the year, month and date.

H.     *"Document"* means the original and each non-identical copy of any writing, tape, disk, recording or other item on which or from which information, communications or data may be perceived or obtained, including, but not limited to, financial statements, tax returns, correspondence, notes memoranda, reports, work papers, phone messages, analysis, books, records, real estate tax bills, real estate assessment letters, surveys, appraisals, journals, statements, invoices, computer programs, computer printouts, canceled checks, bank statements, court pleadings, mortgages, guarantees, promissory notes, and any other writings, recordings, photographs, originals, and duplicates, however produced or reproduced, and all drafts, versions, and copies of these documents.

I.     *"Including"* means "including, but not limited", *"includes"* means "includes, but not limited to."

J.     *"Identity"*, when used with respect to a person, requires you to provide information sufficient to allow the service of a subpoena, including, but not limited to, the person's name; last-known residence address and telephone number; and occupation, employer, business address, and telephone number.

K.     *"Identify"*, when used with respect to a business entity, requires you to provide information sufficient to allow the service of a subpoena, including, but not limited to, stating the

3

1199

business entity's name; last-known address and telephone number; and those persons employed or formerly employed by the business entity and believed to be the most knowledgeable about the business entity.

L.    *"Identify"*, when used with respect to a fact or event, requires you to state the fact or event with reasonable particularity, its date, the identity of each person believed to be the most knowledgeable with respect to the fact or event, and the identity of any other person believed to be the most knowledgeable with respect to the fact or event.

M.    *"Identify"*, when used with respect to a document requires you to provide a description of the document with sufficient particularity so as to provide the basis for a request for production or a subpoena; a description of the type or document, a description of the general subject matter of the document; the date of the document; all authors, addresses and recipients of the document, and the location of the document. It is sufficient to produce the document itself if you identify the Interrogatory to which it relates and its location.

N.    *"Persons"* means, without limiting the generality of its meaning, natural persons, groups of natural persons (such as committee or board of directors), corporations, partnerships, associations, joint ventures, and any other unincorporated business, governmental, public, or societal entity.

O.    *"Property"* means any and all property, real or personal, tangible or intangible or any right, title or interest in any property.

P.    *"Relate"*, *"relating to"*, *"refer to"*, *"referencing"*, *"regarding"*, *"pertain"* and *"pertaining to"* means to be legally, logically, factually, or in any way connected to, in whole or in part, the matter discussed.

4

Q.    *"You"* or *"Your"* means Defendant and its members, agents, employees or representatives.

## INSTRUCTIONS

1.    When asked to identify a document, state: (a) its location; (b) the location of all copies of the documents that are not identical duplicates of the original; (c) the name and title of each person presently in charge of the custody and maintenance of the original and all non-identical copies; (d) the date of the original and all non-identical copies; (e) the author and signatories of the original and all non-identical copies; (f) its length; (g) the original document's content and how each non-identical copy differs from the original; and (h) each person who received the original or a copy of the document. If the document is available only in machine-readable form, state the form in which the document is available and the type of machine required to read the document. If the document was, but no longer is, in your possession, custody or control, state or identify: (a) what disposition was made of the document; (b) the date of the disposition, and (c) each person that either authorized or has knowledge of the disposition.

2.    When asked to identify a natural person, state his or her: (a) name; (b) title or position; (c) present or last known business address; (d) present or last known home address; (e) present or last known business telephone number; (f) present or last known home and/or mobile telephone number. If the person no longer is employed by the person for which he/she engaged in the activity that is the subject of the interrogatory, state the date on which he/she left the employment of the person and his/her title or position when he/she engaged in the activity that is the subject of the interrogatory.

3.    When asked to identify a non-natural person, state: (a) the full name of the entity; (b) the address of its principal place of business; (c) the telephone number of its principal place of

5

business; (d) the name and title of each person who (1) is or was an officer, director, general partner, limited partner, member or beneficiary of the organization, or (2) represented the organization with respect to the subject matter stated in the interrogatory; and (e) the relationship of the entity to the parties to this proceeding; and (f) the name, address and phone number of any attorney who has contacted the Defendants or the Defendants' agents on behalf of said entity.

4.     When asked to identify a transfer of property, state: (a) the date and amount (in dollars if made in cash or as a measure of the fair market value of other property transferred, if other than cash) of the transfer; (b) the mode of the transfer (such as by check, cash, other property, memorandum, book entry or other method of transfer); (c) each person who has or is believed to have first-hand knowledge of the transfer; (d) the account the property was transferred from; and (e) identify each document relating to the transfer pursuant to the above Instruction No. 1.

5.     When asked to identify a communication, state: (a) the date, time and place of the communication; (b) the form of the communication (such as memorandum, letter, or conversation); (c) each person who has or is believed to have first-hand knowledge of the communication; (d) the substance of the communication; and (e) each document relating to the communication.

6.     Whenever appropriate, the singular and plural forms of words shall be interpreted interchangeably so as to bring within the scope of these requests any matter which might otherwise be construed to outside their scope.

7.     When asked to state each and every basis for a given proposition or allegation, state or identify; (a) each person who has or purports to have knowledge of the facts underlying the proposition or allegation; (b) each document used or relied upon to formulate, or which supports

6

1202

or substantiates, the allegation or proposition; and (c) the rationale and each fact supporting the allegation or proposition.

      8.     With respect to each document or communication that the Defendant does not produce or divulge based upon any claim or privilege or for any other reason, state: (a) the name and address of the originator or sender of the document or communication; (b) the name and address of the author of the document or communication; (c) the name and address of each person to whom the document was directed or addressed; (d) the name and address of each person to whom a copy of the document was directed or sent; (e) the name and address of each person to whom has seen the document, any copy of the document, participated in communications about the document, or participated in the communication; (f) the job title of each person listed in items (a) through (e) above; (g) the date of the document or communication; (h) the length of the document or communication; (i) whether the document or communication contained any attachments, exhibits or appendices; (j) a general description or the nature and subject matter of the document or communication; (k) the present custodian of the document or communication; (l) the date that the document, or a copy of it bears; and (m) the reason the document or communication was not produced.

      9.     You shall make any objections you might have to this discovery request in writing and deliver those written objections to the offices of Thompson Burton, PLLC, ATTN: Phillip Young, 6100 Tower Circle, Suite 200, Franklin, Tennessee 37067, or at such place as may be agreed upon by the parties, on or before 30 days of the date of this discovery was served.

      10.    You are asked to state each and every basis to support the answers to the Interrogatories set forth below.

11.     These Interrogatories are intended to be continuing and you are obligated to amend your responses to them on a timely basis as more information becomes available to you or your counsel to the full extent required by applicable rules and case law.

## INTERROGATORIES

1.      Identify each person that provided any information used to answer these Interrogatories.

**Response:**


2.      Identify each person that has knowledge of any of the contentions, denials and/or defenses alleged in the Answer.

**Response:**


3.      Identify each document that relates in any way to the contentions, denials and/or defenses in the Answer.

**Response:**


4.      Identify each written or oral communication that relates in any way to the contentions, denials and/or defenses in the Answer.

**Response:**

8

5.    State what amounts (by dollar amount or percentage of recovery) that the Defendant alleges it is entitled to from each of the CM Cases.

**Response:**


6.    List all telephone numbers, websites, email addresses, and physical addresses used by the Defendant since January 1, 2018, and include the dates of the Defendant's use.

**Response:**


7.    List all members and employees of the Defendant, and include the dates of each individual's involvement with the Defendant.

**Response:**


8.    State the legal and/or factual support for the Defendant's response to Interrogatory No. 5 including, without limitation, reference to any communication establishing the amounts to which the Defendant claims entitlement.

**Response:**

9.      Identify each person or entity whom the Defendant expects to call as an expert witness at a trial in this matter, and state the subject matter on which the expert is expected to testify, the substance of that expert's opinions, and a summary of the grounds for each opinion.

**Response:**

10.     Identify each person or entity whom the Defendant expects to call as a fact witness at a trial in this matter, and state the subject matter on which such witness is expected to testify, and provide the contact information for each such witness.

**Response:**

11.     For each Request for Admission (served concurrently) that you do not answer with an unqualified admission, please state all facts upon which you base your answer.

**Response:**

Dated this 24th day of November, 2020.

By:      /s/ Phillip G. Young, Jr.
         Phillip G. Young, Jr. (021087)
         Thompson Burton PLLC
         6100 Tower Circle, Suite 200
         Franklin, Tennessee 37067
         Tel:     (615) 465-6008
         Fax:     (615) 807-3048
         phillip@thompsonburton.com

         Attorneys for Jeanne Ann Burton, Trustee

10

## OATH

STATE OF TENNESSEE

COUNTY OF DAVIDSON

     _____, as the corporate representative of Manookian PLLC, being first duly sworn, states that the responses to the foregoing Interrogatories are true and correct to the best of his/her knowledge, information and belief.

_____

     Personally appeared before me, the undersigned, a Notary Public in and for said County and State, _____, the within name person, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who acknowledged that he/she executed the within instrument for the purposes therein contained.

     Witness my hand and official seal at _____, Tennessee, this the \_\_\_ day of _____, 2020.

_____
Notary Public
My Commission Expires: _____

1207

## CERTIFICATE OF SERVICE

As is evidenced by my signature below, I certify that a true and exact copy of the foregoing document has been forwarded by United State Mail, first class, with sufficient postage, on this the 24th day of November, 2020, to the following parties:

John Tate Spragens
Spragens Law PLC
311 22nd Ave N
Nashville, TN 37203
john@spragenslaw.com

*Attorneys for Manookian, PLLC*

By:    /s/ Phillip G. Young, Jr.
       Phillip G. Young, Jr.

1208

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| IN RE: | ) |
| | ) |
| CUMMINGS MANOOKIAN, PLLC, | ) **Case No. 3:19-bk-07235** |
| Debtor. | ) **Chapter 7** |
| | ) **Judge Walker** |
| JEANNE ANN BURTON, TRUSTEE, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| HAGH LAW, PLLC; AFSOON HAGH; | ) |
| MANOOKIAN, PLLC; and FIRST- | ) |
| CITIZENS BANK & TRUST | ) |
| COMPANY, | ) |
| Defendants. | ) |
| | ) **Adv. Proc. No. 3:20-ap-90002** |

### PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS PROPOUNDED TO DEFENDANT MANOOKIAN, PLLC

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Plaintiff Jeanne Ann Burton, Trustee ("Trustee"), propounds these Requests for Production of Documents (the "Requests") to Defendant Manookian, PLLC ("Defendant").

### DEFINITIONS

In construing these discovery requests, the following definitions shall apply:

A.     *"And"* as well as *"or"* shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these discovery requests any information that might otherwise be construed as outside their scope.

B.     *"Answer"* means the Answer filed by Defendant in this matter and/or any amendments to it.

C.     *"CM Cases"* means the following lawsuits initiated by Cummings Manookian,

PLC as counsel for the plaintiffs:

| Case Name | Court |
| --- | --- |
| Bailey v. HCA | Davidson Circuit |
| Balay v. Hutson et al | Davidson Circuit |
| Beckworth v. LBMC | Williamson Circuit |
| Brooks v. Reinking | Davidson Circuit |
| Dyer v. Vanderbilt Imaging | Davidson Circuit |
| Fitzgerald v. Osborn | Williamson Circuit |
| Knapp v. Ripley | Davidson Circuit |
| Manookian v. Pennsylvania Higher Education et al | Davidson Circuit |
| Miller v. Vanderbilt Medical | Davidson Circuit |
| Ruffino v. Archer | M.D. Tenn. |
| Salas v. Rosdeutscher et al | Davidson Circuit |
| Shoemaker v. Vanderbilt Medical | Davidson Circuit |
| Thompson v. Sidrys | Putnam Circuit |
| Waldron v. Monroe County | Monroe Circuit |
| Wheeler Bonding Co. v. Parks | Davidson Circuit |
| Wolf v. Mid-Cumberland Resources Agency | Rutherford Circuit |

D.     *"Communication(s)"* includes any transfer of information, ideas, opinions or

thoughts by any means, written, oral or otherwise, at any time or place under any circumstances

and is not limited to transfers between persons, but includes other transfers, such as records and

memoranda to file, any written letter, memorandum, or other document that was sent by one or

more individuals to another or others; any telephone calls between one or more individuals and

another or others, whether or not the call was by chance or prearranged, formal or informal; and

any conversation or meeting between one or more individuals and another, whether or not the

contact was by chance or prearranged, formal or informal.

E.     *"Complaint"* means the Complaint filed by Trustee in this matter and/or any

amendments to it.

2

1210

F. *"Court"* means the United States Bankruptcy Court for the Middle District of Tennessee.

G. *"Date"* means the exact year, month and date, if known, or, if not known, your best approximation of the year, month and date.

H. *"Document"* means the original and each non-identical copy of any writing, tape, disk, recording or other item on which or from which information, communications or data may be perceived or obtained, including, but not limited to, financial statements, tax returns, correspondence, notes memoranda, reports, work papers, phone messages, analysis, books, records, real estate tax bills, real estate assessment letters, surveys, appraisals, journals, statements, invoices, computer programs, computer printouts, canceled checks, bank statements, court pleadings, mortgages, guarantees, promissory notes, and any other writings, recordings, photographs, originals, and duplicates, however produced or reproduced, and all drafts, versions, and copies of these documents.

I. *"Including"* means "including, but not limited", *"includes"* means "includes, but not limited to."

J. *"Identity"*, when used with respect to a person, requires you to provide information sufficient to allow the service of a subpoena, including, but not limited to, the person's name; last-known residence address and telephone number; and occupation, employer, business address, and telephone number.

K. *"Identify"*, when used with respect to a business entity, requires you to provide information sufficient to allow the service of a subpoena, including, but not limited to, stating the business entity's name; last-known address and telephone number; and those persons employed or

3

formerly employed by the business entity and believed to be the most knowledgeable about the business entity.

L.     *"Identify"*, when used with respect to a fact or event, requires you to state the fact or event with reasonable particularity, its date, the identity of each person believed to be the most knowledgeable with respect to the fact or event, and the identity of any other person believed to be the most knowledgeable with respect to the fact or event.

M.     *"Identify"*, when used with respect to a document requires you to provide a description of the document with sufficient particularity so as to provide the basis for a request for production or a subpoena; a description of the type or document, a description of the general subject matter of the document; the date of the document; all authors, addresses and recipients of the document, and the location of the document. It is sufficient to produce the document itself if you identify the Interrogatory to which it relates and its location.

N.     *"Persons"* means, without limiting the generality of its meaning, natural persons, groups of natural persons (such as committee or board of directors), corporations, partnerships, associations, joint ventures, and any other unincorporated business, governmental, public, or societal entity.

O.     *"Property"* means any and all property, real or personal, tangible or intangible or any right, title or interest in any property.

P.     *"Relate"*, *"relating to"*, *"refer to"*, *"referencing"*, *"regarding"*, *"pertain"* and *"pertaining to"* means to be legally, logically, factually, or in any way connected to, in whole or in part, the matter discussed.

Q.     *"You"* or *"Your"* means Defendant and its members, agents, employees or representatives.

4

1.      As required by law, your responses should supply documents not only in your possession, custody, or control, but also such information and documents which are available to all other persons acting on your behalf in this case.

2.      If you claim privilege for any document or any communication encompassed by this discovery, set forth the basis for such claim of privilege and give a sufficient description to identify, specifically, each document or communication, the authors and the persons to whom it was addressed and/or copies, and the basis for your claim of privilege.

3.      When this discovery calls for a document which, while known to you, is not in your possession or control, identify its present location and custodian if known, or otherwise its last known location and custodian.

4.      Where the context in the discovery makes it appropriate, each singular word shall include its plural and each plural word shall include its singular. The words "any," "and," and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery all responses which might otherwise be construed to be outside its scope. Each of the following words includes the meaning of every other word: "each," "every," "all," and "any." The present tense shall be construed to include the past tense, and the past tense shall be construed to include the present tense.

5.      This discovery is continuing in nature, and you are requested to supplement your response to any request promptly after receiving or obtaining any further documents responsive to any request herein. You are also requested to produce additional responsive documents within fourteen (14) days upon discovery of said documents.

## REQUESTS FOR PRODUCTION

1.     Please produce every Document or Communication that you allege supports your denials in the Answer.

**Response:**


2.     Please produce every Document or Communication that evidences any lease of real property by which Defendant is tenant.

**Response:**


3.     Please produce every Document or Communication that evidences the creation of an attorney/client relationship between Defendant and any party to the CM Cases, including but not limited to engagement letters.

**Response:**


4.     Please produce every Document or Communication that evidences the termination of an attorney/client relationship between Defendant and any party to the CM Cases, including but not limited to disengagement letters..

**Response:**


5.     Please produce every Document or Communication that supports your response to Interrogatory 5, served contemporaneously herewith.

6

**Response:**

6.     Please produce copies of every Document or Communication that evidences an expense advanced by Defendant in any of the CM Cases.

**Response:**

7.     Please produce copies of all Documents and Communications that relate to the creation, operation, or corporate structure of Defendant, including but not limited to corporate formation documents and operating agreements.

**Response:**

8.     Please produce copies of all Documents and Communications that relate or refer to the *Fitzgerald v. Osborn* case in the Circuit Court for Williamson County, Tennessee, including but not limited to correspondence between you and counsel for the defendants in that matter.

**Response:**

9.     Please produce any and all Documents you intend to introduce as exhibits at the trial of this matter.

**Response:**

10.    For each Request for Admission (served concurrently) that you do not answer with an unqualified admission, please produce any and all Documents that support your response.

**Response:**

11.    Please produce any Document referenced in your responses to Plaintiff's First Set of Interrogatories Propounded to Defendant, to the extent not already produced in response to other Requests for Production.

**Response:**

Dated this 24th day of November, 2020.

By:    /s/ Phillip G. Young, Jr.
        Phillip G. Young, Jr. (021087)
        Thompson Burton PLLC
        6100 Tower Circle, Suite 200
        Franklin, Tennessee 37067
        Tel:    (615) 465-6008
        Fax:    (615) 807-3048
        phillip@thompsonburton.com

        Attorneys for Jeanne Ann Burton, Trustee

8

1216

## CERTIFICATE OF SERVICE

As is evidenced by my signature below, I certify that a true and exact copy of the foregoing document has been forwarded by United State Mail, first class, with sufficient postage, on this the 24th day of November, 2020, to the following parties:

John Tate Spragens
Spragens Law PLC
311 22nd Ave N
Nashville, TN 37203
john@spragenslaw.com

*Attorneys for Manookian, PLLC*

By: /s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.

1217

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| IN RE: | ) |
| | ) |
| **CUMMINGS MANOOKIAN, PLLC,** | ) **Case No. 3:19-bk-07235** |
| Debtor. | ) **Chapter 7** |
| | ) **Judge Walker** |
| **JEANNE ANN BURTON, TRUSTEE,** | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| **HAGH LAW, PLLC; AFSOON HAGH;** | ) |
| **MANOOKIAN, PLLC; and FIRST-** | ) |
| **CITIZENS BANK & TRUST** | ) |
| **COMPANY,** | ) |
| Defendants. | ) |
| | ) **Adv. Proc. No. 3:20-ap-90002** |

## REQUESTS FOR ADMISSION PROPOUNDED TO MANOOKIAN, PLLC

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, Plaintiff Jeanne Ann Burton, Trustee ("Trustee"), propounds these Requests for Admission (the "Requests") to Defendant Manookian, PLLC ("Defendant").

## DEFINITIONS

In construing these discovery requests, the following definitions shall apply:

A.     *"And"* as well as *"or"* shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these discovery requests any information that might otherwise be construed as outside their scope.

B.     *"Answer"* means the Answer filed by Defendant in this matter and/or any amendments to it.

C.     *"Communication(s)"* includes any transfer of information, ideas, opinions or thoughts by any means, written, oral or otherwise, at any time or place under any circumstances

and is not limited to transfers between persons, but includes other transfers, such as records and memoranda to file, any written letter, memorandum, or other document that was sent by one or more individuals to another or others; any telephone calls between one or more individuals and another or others, whether or not the call was by chance or prearranged, formal or informal; and any conversation or meeting between one or more individuals and another, whether or not the contact was by chance or prearranged, formal or informal.

D.      *"Complaint"* means the Complaint filed by the Trustee in this matter and/or any amendments to it.

E.      *"Court"* means the United States Bankruptcy Court for the Middle District of Tennessee.

F.      *"Date"* means the exact year, month and date, if known, or, if not known, your best approximation of the year, month and date.

G.      *"Document"* means the original and each non-identical copy of any writing, tape, disk, recording or other item on which or from which information, communications or data may be perceived or obtained, including, but not limited to, financial statements, tax returns, correspondence, notes memoranda, reports, work papers, phone messages, analysis, books, records, real estate tax bills, real estate assessment letters, surveys, appraisals, journals, statements, invoices, computer programs, computer printouts, canceled checks, bank statements, court pleadings, mortgages, guarantees, promissory notes, and any other writings, recordings, photographs, originals, and duplicates, however produced or reproduced, and all drafts, versions, and copies of these documents.

H.      *"Including"* means "including, but not limited", *"includes"* means "includes, but not limited to."

2

I.      *"Identity"*, when used with respect to a person, requires you to provide information sufficient to allow the service of a subpoena, including, but not limited to, the person's name; last-known residence address and telephone number; and occupation, employer, business address, and telephone number.

J.      *"Identify"*, when used with respect to a business entity, requires you to provide information sufficient to allow the service of a subpoena, including, but not limited to, stating the business entity's name; last-known address and telephone number; and those persons employed or formerly employed by the business entity and believed to be the most knowledgeable about the business entity.

K.      *"Identify"*, when used with respect to a fact or event, requires you to state the fact or event with reasonable particularity, its date, the identity of each person believed to be the most knowledgeable with respect to the fact or event, and the identity of any other person believed to be the most knowledgeable with respect to the fact or event.

L.      *"Identify"*, when used with respect to a document requires you to provide a description of the document with sufficient particularity so as to provide the basis for a request for production or a subpoena; a description of the type or document, a description of the general subject matter of the document; the date of the document; all authors, addresses and recipients of the document, and the location of the document. It is sufficient to produce the document itself if you identify the Interrogatory to which it relates and its location.

M.      *"Persons"* means, without limiting the generality of its meaning, natural persons, groups of natural persons (such as committee or board of directors), corporations, partnerships, associations, joint ventures, and any other unincorporated business, governmental, public, or societal entity.

3

N.     *"Property"* means any and all property, real or personal, tangible or intangible or any right, title or interest in any property.

O.     *"Relate"*, *"relating to"*, *"refer to"*, *"referencing"*, *"regarding"*, *"pertain"* and *"pertaining to"* means to be legally, logically, factually, or in any way connected to, in whole or in part, the matter discussed.

P.     *"You"* or *"Your"* means Defendant and its members, agents, employees or representatives.

## INSTRUCTIONS

1.     These Requests shall be deemed continuing and you shall promptly supply, by way of supplemental answers, any and all information that may become known prior to the trial of this action this is additionally responsive or necessary to maintain the accuracy of answers previously served.

2.     If you fail to comply with the provisions of Rule 36 of the Federal Rules of Civil Procedure with respect to any admission, the matter with respect to which an admission is requested will be deemed admitted.

3.     In accordance with Federal Rule of Civil Procedure 36, you must supply an answer to any request for admission not unequivocally admitted that specifically denies the matter or sets forth in detail the reasons why the answering party cannot truthfully admit or deny the matter. If only a portion of the request for admission should, in good faith, be denied, you must specify so much of the matter that is true and qualify or deny the remainder.

## REQUESTS FOR ADMISSION

4

1.    Admit that you maintained a law office at 45 Music Square West, Nashville, Tennessee 37203 from at least December 1, 2018 to present.

**Response:**


2.    Admit that you utilized furniture, equipment, computers and other property belonging to Cummings Manookian, PLC located at 45 Music Square West, Nashville, Tennessee 37203 from at least December 1, 2018 to present.

**Response:**


3.    Admit that you utilized websites, email addresses and telephone numbers belonging to Cummings Manookian, PLC from at least December 1, 2018 to present.

**Response:**


4.    Admit that you have paid no rent to Cummings Manookian, PLC for use of the office space at 45 Music Square West, Nashville, Tennessee 37203.

**Response:**


5.    Admit that you have paid no consideration to Cummings Manookian, PLC for use of furniture, equipment, computers and other property belonging to Cummings Manookian, PLC located at 45 Music Square West, Nashville, Tennessee 37203.

**Response:**

6.      Admit that you have paid no consideration to Cummings Manookian, PLC for use of websites, email addresses and telephone numbers belonging to Cummings Manookian, PLC.

**Response:**


7.      Admit that Brian Manookian is Defendant's only member.

**Response:**


Dated this 24th day of November, 2020.


By:     /s/ Phillip G. Young, Jr.
         Phillip G. Young, Jr. (021087)
         Thompson Burton PLLC
         6100 Tower Circle, Suite 200
         Franklin, Tennessee 37067
         Tel:    (615) 465-6008
         Fax:    (615) 807-3048
         phillip@thompsonburton.com

         Attorneys for Jeanne Ann Burton, Trustee

6

1223

# OATH

STATE OF TENNESSEE

COUNTY OF _____

       _____, as corporate representative of Manookiann PLLC, being first duly sworn, states that the answers to the foregoing Requests for Admission are true and correct to the best of his/her knowledge, information and belief.

_____

      Personally appeared before me, the undersigned, a Notary Public in and for said County and State, _____, the within name person, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who acknowledged that he/she executed the within instrument for the purposes therein contained.

      Witness my hand and official seal at _____, Tennessee, this the ___ day of _____, 2020.

_____
Notary Public
My Commission Expires: _____

7

<u>**CERTIFICATE OF SERVICE**</u>

As is evidenced by my signature below, I certify that a true and exact copy of the foregoing document has been forwarded by United State Mail, first class, with sufficient postage, on this the 24th day of November, 2020, to the following parties:

John Tate Spragens
Spragens Law PLC
311 22nd Ave N
Nashville, TN 37203
john@spragenslaw.com

*Attorneys for Manookian, PLLC*

<div style="text-align: right;">

By:    /s/ Phillip G. Young, Jr.
       Phillip G. Young, Jr.

</div>

1225

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CUMMINGS MANOOKIAN, | ) | Case No. 3:19-bk-07235 |
| PLLC, | ) | Chapter 7 |
|     Debtor. | ) | Judge Walker |
| | ) | |
| JEANNE ANN BURTON, | ) | |
| TRUSTEE, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HAGH LAW, PLLC; AFSOON | ) | |
| HAGH; MANOOKIAN, PLLC; | ) | |
| and FIRST-CITIZENS BANK & | ) | |
| TRUST COMPANY, | ) | Adv. Proc. No. 3:20-ap-90002 |
|     Defendants. | | |

## MANOOKIAN, PLLC'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

1.    Identify each person that provided any information used to answer these Interrogatories.

**Response:** **Brian Manookian**

2.    Identify each person that has knowledge of any of the contentions, denials and/or defenses alleged in the Answer.

**Response:  Objection, this interrogatory is overly broad.  To the extent the Plaintiff wishes to identify specific contentions, denials, or defenses, Defendant is happy to address them on an individual basis.  Otherwise, Brian Manookian generally has knowledge of the matters addressed in the Answer.**

3.    Identify each document that relates in any way to the contentions, denials and/or defenses in the Answer.

**Response:  Objection.  This interrogatory is so absurdly overbroad as to defy response.  To the extent the Plaintiff wishes Defendant to expound upon a specifically identified "contention, denial, and / or defense," Defendant is happy to do so.**

4.    Identify each written or oral communication that relates in any way to the contentions, denials and/or defenses in the Answer.

**Response:  Objection.  This interrogatory is so absurdly overbroad as to defy response.  To the extent the Plaintiff wishes Defendant to expound upon a specifically identified "contention, denial, and / or defense," Defendant is happy**

2

to do so. Additionally, this interrogatory calls for the disclosure of attorney-client communications and communications that would be subject to the work-product privilege.

5.    State what amounts (by dollar amount or percentage of recovery) that the Defendant alleges it is entitled to from each of the CM Cases.

**Response:   Manookian PLLC disputes that there are "CM Cases" to the extent the Plaintiff mistakenly believes that plaintiff's cases or plaintiff's rights of actions belong to law firms or lawyers as opposed to the client.  To the extent Plaintiff is inquiring into Manookian PLLC's entitlement to payment from the following cases, Manookian PLLC answers as follows:**

| Case Name | |
|---|---|
| Bailey v. HCA | None |
| Balay v. Hutson et al | None |
| Beckworth v. LBMC | None |
| Brooks v. Reinking | None |
| Dyer v. Vanderbilt Imaging | None |
| Fitzgerald v. Osborn | To be determined. |
| Knapp v. Ripley | None |
| Manookian v. Pennsylvania Higher Education et al | None |
| Miller v. Vanderbilt Medical | None |
| Ruffino v. Archer | None |
| Salas v. Rosdeutscher et al | None |
| Shoemaker v. Vanderbilt Medical | To be determined. |
| Thompson v. Sidrys | None |
| Waldron v. Monroe County | None |
| Wheeler Bonding Co. v. Parks | None |
| Wolf v. Mid-Cumberland Resources Agency | None |

3

6.     List all telephone numbers, websites, email addresses, and physical addresses used by the Defendant since January 1, 2018, and include the dates of the Defendant's use.

**Response: Manookian PLLC does not utilize a website, email addresses, telephone numbers, or a physical address as it is not an operating entity.**

7.     List all members and employees of the Defendant, and include the dates of each individual's involvement with the Defendant.

**Response: Brian Manookian (1/14/2019 -10/06/2020)**

8.     State the legal and/or factual support for the Defendant's response to Interrogatory No. 5 including, without limitation, reference to any communication establishing the amounts to which the Defendant claims entitlement.

**Response: For the cases in which Defendant answered "none," Manookian PLC as an entity has no contractual relationship with or did no work for the Plaintiff. For the remaining cases, the cases either has not concluded and thus the contingency upon which payment is conditioned has not occurred, or Manookian PLC may be entitled to some portion of a fee but has not made a claim to it.**

4

9.    Identify each person or entity whom the Defendant expects to call as an expert witness at a trial in this matter, and state the subject matter on which the expert is expected to testify, the substance of that expert's opinions, and a summary of the grounds for each opinion.

**Response:  Defendant has not made decisions yet as to who it expects to call at trial and likely will not do so until after deposing Jeanne Burton and Phillip Young to determine the bases for their claims and allegations and the testimony necessary to rebut Plaintiff's proof, if any.**

10.    Identify each person or entity whom the Defendant expects to call as a fact witness at a trial in this matter, and state the subject matter on which such witness is expected to testify, and provide the contact information for each such witness.

**Response:  Defendant has not made decisions yet as to who it expects to call at trial and likely will not do so until after deposing Jeanne Burton and Phillip Young to determine the bases for their claims and allegations and the testimony necessary to rebut Plaintiff's proof, if any.**

5

11.    For each Request for Admission (served concurrently) that you do not answer with an unqualified admission, please state all facts upon which you base your answer.

**Response:    Objection.    This is not an appropriate interrogatory. Generally, if Defendant denied a Request for Admission, the basis for the denial is that the proffered fact was not true.    If Plaintiff would like Defendant to expound on any particular denial, Defendant is happy to do so upon submission of a specific interrogatory.**

Respectfully Submitted,

/s John Spragens          /

John Spragens

1231

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this document has been served by fax on the following on January 26, 2021:

Phillip G. Young, Jr. (021087)
Thompson Burton PLLC
6100 Tower Circle, Suite 200
Franklin, Tennessee 37067
Tel:  (615) 465-6008
Fax:  (615) 807-3048
phillip@thompsonburton.com
Attorneys for Jeanne Ann Burton, Trustee

/s John Spragens         /

JOHN SPRAGENS

7

1232

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CUMMINGS MANOOKIAN, | ) | Case No. 3:19-bk-07235 |
| PLLC, | ) | Chapter 7 |
|     Debtor. | ) | Judge Walker |
| | ) | |
| JEANNE ANN BURTON, | ) | |
| TRUSTEE, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HAGH LAW, PLLC; AFSOON | ) | |
| HAGH; MANOOKIAN, PLLC; | ) | |
| and FIRST-CITIZENS BANK & | ) | |
| TRUST COMPANY, | ) | Adv. Proc. No. 3:20-ap-90002 |
|     Defendants. | ) | |

## MANOOKIAN, PLLC'S RESPONSES TO
## PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION

1.      Please produce every Document or Communication that you allege supports your denials in the Answer.

**Response: Objection.  This Request is absurdly overly broad and so general in nature as to defy good-faith response.  To the extent that Plaintiff chooses to identify a specific denial for which it seeks documentary support, the Defendant will evaluate such on a request-by-request basis.**

2.     Please produce every Document or Communication that evidences any lease of real property by which Defendant is tenant.

**Response: Defendant has no documents or materials responsive to this request.**

3.     Please produce every Document or Communication that evidences the creation of an attorney/client relationship between Defendant and any party to the CM Cases, including but not limited to engagement letters.

**Response: Objection.  Defendant believes these materials may be attorney-client privileged.  Subject to that objection, Defendant will permit inspection and related activities upon entry of a suitable protective order which Defendant believes can easily be reached by agreement.**

4.     Please produce every Document or Communication that evidences the termination of an attorney/client relationship between Defendant and any party to the CM Cases, including but not limited to disengagement letters.

**Response: Objection.  Defendant believes these materials may be attorney-client privileged.  Subject to that objection, Defendant will permit**

inspection and related activities upon entry of a suitable protective order which Defendant believes can easily be reached by agreement.

5.    Please produce every Document or Communication that supports your response to Interrogatory 5, served contemporaneously herewith.

**Response: Objection.   This Request is overly broad and unduly burdensome.  Defendant will nevertheless attempt to respond.  For the cases in which Manookian PLLC does not claim entitlement to a fee, there would be no document or communication supporting that contention precisely because Manookian PLLC did no work on the matter and/or had no contractual relationship with the client.   In fact, Manookian PLLC does not recognize certain of the cases and believes it may have never even interacted with the client.  To the extent any non-privileged, responsive documents exist, inspection and related activities will be permitted as requested.**

6.    Please produce copies of every Document or Communication that evidences an expense advanced by Defendant in any of the CM Cases.

**Response:  Manookian PLLC has not advanced any expenses on any case to its knowledge.**

3

7. Please produce copies of all Documents and Communications that relate to the creation, operation, or corporate structure of Defendant, including but not limited to corporate formation documents and operating agreements.

**Response: Objection. This Request is overly broad, unduly burdensome, and impossibly vague. Every document and communication "related" to the "operation" of Manookian PLLC would conceivably comprise of every piece of mail, incoming or outgoing, received by Defendant at any time and for any purpose. Notwithstanding the foregoing objection, documents related to the creation and formation of Manookian PLLC are available directly from the Tennessee Secretary of State. For other non-privileged, responsive materials such as articles of incorporation, inspection and related activities will be permitted as requested.**

8. Please produce copies of all Documents and Communications that relate or refer to the *Fitzgerald v. Osborn* case in the Circuit Court for Williamson County, Tennessee, including but not limited to correspondence between you and counsel for the defendants in that matter.

4

**Response: Objection.** This Request is overly broad, unduly burdensome, and further requests materials that are attorney-client privileged and confidential under the work-product doctrine. Notwithstanding the foregoing, the pleadings in the *Fitzgerald* matter are available from the Williamson County Circuit Court Clerk. The entity Manookian PLLC did not correspond with counsel for the Defendants in the *Fitzgerald* matter.

9.    Please produce any and all Documents you intend to introduce as exhibits at the trial of this matter.

**Response:    Defendant has not made determinations as to which documents it intends to introduce as exhibits in the trial of this matter and likely will not do so until after deposing Jeanne Burton and Phillip Young to determine the adequacy of Plaintiff's proof that requires rebuttal.**

10.    For each Request for Admission (served concurrently) that you do not answer with an unqualified admission, please produce any and all Documents that support your response.

5

Response: Objection. This is not an appropriate Request. To the extent Plaintiff seeks documentary support for a specific denial, Plaintiff is able to evaluate the same on a request by request basis.

11.     Please produce any Document referenced in your responses to Plaintiff's First Set of Interrogatories Propounded to Defendant, to the extent not already produced in response to other Requests for Production.

Response: Defendant did not reference any document in its responses to Plaintiff's First Set of Interrogatories, therefore no production is required in response to this Request.

Respectfully Submitted,

/s John Spragens          /

John Spragens

1238

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this document has been served by fax on the following on January 26, 2021:

Phillip G. Young, Jr. (021087)
Thompson Burton PLLC
6100 Tower Circle, Suite 200
Franklin, Tennessee 37067
Tel: (615) 465-6008
Fax: (615) 807-3048
phillip@thompsonburton.com
Attorneys for Jeanne Ann Burton, Trustee

/s John Spragens        /

JOHN SPRAGENS

7

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CUMMINGS MANOOKIAN, | ) | Case No. 3:19-bk-07235 |
| PLLC, | ) | Chapter 7 |
|     Debtor. | ) | Judge Walker |
| | ) | |
| JEANNE ANN BURTON, | ) | |
| TRUSTEE, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HAGH LAW, PLLC; AFSOON | ) | |
| HAGH; MANOOKIAN, PLLC; | ) | |
| and FIRST-CITIZENS BANK & | ) | |
| TRUST COMPANY, | ) | Adv. Proc. No. 3:20-ap-90002 |
|     Defendants. | ) | |

## MANOOKIAN PLLC'S RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION

1.    Admit that you maintained a law office at 45 Music Square West, Nashville, Tennessee 37203 from at least December 1, 2018 to present.

**Response: DENIED.**

2.    Admit that you utilized furniture, equipment, computers and other property belonging to Cummings Manookian, PLC located at 45 Music Square West, Nashville, Tennessee 37203 from at least December 1, 2018 to present.

**Response: DENIED.**

3.     Admit that you utilized websites, email addresses and telephone numbers belonging to Cummings Manookian, PLC from at least December 1, 2018 to present.

**Response:  DENIED,**

4.     Admit that you have paid no rent to Cummings Manookian, PLC for use of the office space at 45 Music Square West, Nashville, Tennessee 37203.

**Response:  ADMITTED.  CUMMINGS MANOOKIAN, PLC DOES NOT OWN OR HAVE ANY OWNERSHIP INTEREST IN 45 MUSIC SQUARE WEST, NASHVILLE, TENNESSEE 37203.  THAT PROPERTY IS OWNED BY 45 MSW PARTNERS.**

5.     Admit that you have paid no consideration to Cummings Manookian, PLC for use of furniture, equipment, computers and other property belonging to Cummings Manookian, PLC located at 45 Music Square West, Nashville, Tennessee 37203.

**Response:  ADMITTED, AS MANOOKIAN PLLC HAS NOT USED ANY FURNITURE, EQUIPMENT, COMPUTERS OR OTHER PROPERTY BELONGINING TO CUMMINGS MANOOKIAN, PLC LOCATED AT 45 MUSIC SQUARE WEST, NASHVILLE, TENNESEE 37203.**

1241

6.    Admit that you have paid no consideration to Cummings Manookian, PLC for use of websites, email addresses and telephone numbers belonging to Cummings Manookian, PLC.

**Response: ADMITTED, AS MANOOKIAN PLLC HAS NOT USED ANY WEBSITE, EMAIL ADDRESS, OR TELEPHONE NUMBER BELONGING TO CUMMINGS MANOOKIAN, PLC.**

7.    Admit that Brian Manookian is Defendant's only member.

**Response: ADMITTED**

Respectfully Submitted,

/s John Spragens            /

John Spragens

1242

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this document has been served by fax on the following on January 26, 2021:

Phillip G. Young, Jr. (021087)
Thompson Burton PLLC
6100 Tower Circle, Suite 200
Franklin, Tennessee 37067
Tel: (615) 465-6008
Fax: (615) 807-3048
phillip@thompsonburton.com

Attorneys for Jeanne Ann Burton, Trustee

/s John Spragens        /

JOHN SPRAGENS

4

# THOMPSON BURTON PLLC

ATTORNEYS AT LAW
A PROFESSIONAL LIMITED LIABILITY COMPANY

One Franklin Park
6100 Tower Circle, Suite 200
Franklin, Tennessee 37067
www.thompsonburton.com

Phillip G. Young
phillip@thompsonburton.com

Direct Dial: 615-465-6008

October 29, 2021

John Spragens
Spragens Law, PLC
311 22nd Avenue, North
Nashville, TN 37203
john@spragenslaw.com

> **Re:**   *Burton v. Hagh Law PLLC et al.*
> **United States Bankruptcy Court for the Middle District of Tennessee**
> **Case No. 3:20-ap-90002**

Dear John:

As you know, this firm represents Jeanne Ann Burton, Chapter 7 Trustee and Plaintiff in the above-referenced matter. I am sending this letter pursuant to Rule 37 of the Federal Rule of Civil Procedures as a good faith attempt to resolve discovery disputes prior to the filing of a motion to compel.

On or about January 26, 2021, you sent me Manookian PLLC's Responses to Plaintiff's First Requests for Production ("Request for Production Responses") and Manookian PLLC's Responses to Plaintiff's First Set of Interrogatories ("Interrogatory Responses") (collectively, "Discovery Responses"). I have had an opportunity to review your Discovery Responses with the Trustee. Unfortunately, they are deficient in several important respects.

More specifically, Manookian PLLC has failed to adequately respond to the following Interrogatories: Nos. 5 & 8. The Trustee is entitled to know what percentage fee, if any, that Manookian PLLC is seeking with regard to each case listed in Interrogatory No. 5 and the basis for any such claim. Additionally, Manookian PLLC's Request for Production Responses to the following Requests were deficient: 1, 3, 4, 5, and 8. To the extent that Manookian PLLC claims that any documents should be subject to a protective order, a proposed protective order is enclosed herewith.

By this letter, the Trustee requests that you more fully, completely and appropriately address these issues by no later than November 12, 2021. If you have failed to appropriately

1

supplement your responses by that date, the Trustee will have no choice but to file a motion to compel responses with the Court.

The Trustee intends to respond to your letter dated October 21, 2021, by separate letter prior to November 5, 2021.

Sincerely,

Phillip G. Young, Jr.

cc:    Jeanne Ann Burton, Trustee

2

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **CUMMINGS MANOOKIAN, PLLC,** | ) | **Case No. 3:19-bk-07235** |
| Debtor. | ) | **Chapter 7** |
| | ) | **Judge Walker** |
| **JEANNE ANN BURTON, TRUSTEE,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **HAGH LAW, PLLC; AFSOON HAGH;** | ) | |
| **MANOOKIAN, PLLC; and FIRST-** | ) | |
| **CITIZENS BANK & TRUST** | ) | |
| **COMPANY,** | ) | |
| Defendants. | ) | |
| | ) | **Adv. Proc. No. 3:20-ap-90002** |

## PROTECTIVE ORDER

Plaintiff Jeanne Ann Burton, Trustee and Defendants Hagh Law, PLLC, Afsoon Hagh, and Manookian, PLLC (each of the foregoing, a "Party," and collectively, the "Parties") anticipate that certain of their confidential business and/or client records, as well as those of non-parties, may be produced in discovery in the above-captioned action (the "Action") and that such confidential records must be protected from further disclosure. Pursuant to Federal Rule of Civil Procedure 26(c), made applicable to this matter by Bankruptcy Rule 7026, the Court finds good cause for entry of this Stipulated Protective Order ("Protective Order") to provide such protection according to the terms and conditions set forth below. To expedite the flow of discovery material and the litigation

of this case, facilitate the prompt resolution of disputes over confidentiality, and adequately protect material entitled to be kept confidential, it is, by agreement of the Parties, STIPULATED and ORDERED that:

1.    This Protective Order shall apply to all documents, electronically stored information (ESI), materials, and information disclosed, filed or served in this Action pursuant to the Federal Rules of Civil Procedure or the Local Rules, including without limitation, documents and data produced by any Party or non-party, answers to interrogatories, responses to requests for production, responses to requests for admission, expert disclosures, and deposition testimony.

2.    As used in this Protective Order, "document" and "electronically stored information" are defined as provided in Federal Rule of Civil Procedure 34(a)(1)(A).

3.    As used in this Protective Order, "Confidential Information" is information that the designating Party or non-party believes in good faith is not in the public domain and which constitutes, contains or reflects confidential business, research, development, commercial, financial, or personal information, such as confidential business or client information.

4.    Any document that contains confidential, proprietary, or personal financial or health information may be designated as Confidential by stamping the term "CONFIDENTIAL" clearly and conspicuously on the face of each document containing such information or in the metadata of the document if produced in native format. For a multi-page document, each page containing Confidential Information shall be stamped separately.

5.    All documents and materials produced in the Action shall be used solely for the purposes of preparing for and conducting pre-trial, trial, and post-trial proceedings in this Action, and not for any other purpose, and such documents shall not be disclosed to any person or entity except as provided in this Protective Order.

6. Documents containing Confidential Information shall not be disclosed without the consent of the producing Party or further Order of the Court, *except that* such information may be disclosed to:

(i) the Parties in this Action to the extent reasonably necessary to allow them to assist in the preparation or conduct of pre-trial, trial, and post-trial proceedings in this Action;

(ii) counsel of record for the Parties in this Action, and the personnel who are directly employed or retained by counsel of record for the purpose of assisting with, or working on, this Action;

(iii) expert witnesses and consultants, such as e-discovery vendors, who are retained in connection with this Action, to the extent such disclosure is necessary for preparation for trial or other proceedings in this Action;

(iv) the Court and its officers, including stenographic reporters and videographers engaged to transcribe or record court proceedings and sworn testimony in this Action; and

(v) other persons by written agreement of the Parties or by order of the Court.

7. Prior to disclosing any Confidential Information to any person listed above (other than counsel of record and their employees, court personnel, and stenographic reporters), counsel shall provide such person with a copy of this Protective Order and obtain from such person an executed copy of the Acknowledgement of Stipulated Protective Order attached hereto as Exhibit A, which states that he/she has read this Protective Order and agrees to be bound by its provisions. All such acknowledgments shall be retained by counsel and shall be subject to *in camera* review by the Court if good cause for review is demonstrated by opposing counsel.

8. Documents and other information produced by non-parties shall be treated as Confidential Information for fourteen (14) days after such documents and information are produced, during which time any Party may designate any document or information as Confidential Information by letter to all other Parties in the Action.

9.     Deposition transcripts in this Action shall be treated as Confidential Information until thirty (30) days after receipt of a final copy of the transcript, during which time any Party (or non-party deponent) may designate any portion or all of any transcript as Confidential Information by letter to all other Parties in the Action. Additionally, any Party or non-party participating in a deposition may designate any portions of the transcript of the deposition as Confidential Information during the recording of such deposition. No person shall be present during portions of the depositions designated as "CONFIDENTIAL" unless such person is an authorized recipient of Confidential Information pursuant to this Protective Order.

10.     A Party may object to the designation of particular Confidential Information by giving written notice to the Party designating the disputed information. The written notice shall identify the information to which the objection is made. If the Parties cannot consensually resolve the objection within ten (10) business days after the time the notice is received, it shall be the obligation of the Party objecting to the designation of the information as Confidential Information to file an appropriate motion requesting that the Court determine whether the disputed information should be subject to the terms of this Protective Order. If such a motion is timely filed, the disputed information shall be treated as Confidential Information under the terms of this Protective Order until the Court rules on the motion. In connection with a motion filed under this provision, the Party designating the information as Confidential Information shall bear the burden of establishing that good cause exists for the disputed information to be so treated.

11.     All Confidential Information designated as such that is contained within any document, including without limitation pleadings, briefs, deposition transcripts, and deposition exhibits, shall, if possible and feasible, be redacted by the Party seeking to file such prior to filing the document with the Court or, in the alternative, filed under seal, unless the Parties otherwise

4

1249

agree. In the event that any Confidential Information is filed with the Court by any Party, including pages from motions, briefs, memorandum, or other pleadings containing or referencing (in such manner that the Confidential Information may be revealed thereby), the Confidential Information shall be redacted by the filing Party or, upon motion and with leave of Court, filed under seal unless otherwise agreed by the Parties. If a Party believes Confidential Information has been mistakenly filed with or in a pleading, such Party may, at the Party's own cost and expense, move that it be filed under seal.

12. Except as provided in paragraph 11, material constituting or revealing Confidential Information, when filed with the Court in this action for any reason, shall be filed under seal. The Party wishing to file any Confidential Information with the Court must first move to have the information filed under seal in accordance with the procedure mandated by the local rules.

13. Upon termination or resolution of this Action, the Parties shall within sixty (60) days return to the producing Party all materials marked "CONFIDENTIAL" (and any copies thereof) or destroy them. Upon written request, counsel for each Party shall furnish a certificate of compliance that all Confidential Information produced to the Party, as well as all summaries, excerpts, or copies of such materials, have been returned or destroyed.

14. The termination of proceedings in this Action shall not relieve the Parties from the obligation of maintaining the confidentiality of all Confidential Information that is received or disclosed pursuant to this Protective Order.

15. The inadvertent production of any document protected from discovery by the attorney-client privilege, the work-product doctrine, or other applicable privilege or immunity shall not constitute a waiver of the privilege or protection, either as to the produced document or any other documents, or otherwise affect the right to withhold such document(s) from production

1250

as privileged or otherwise protected from discovery. In the event that any privileged or protected document(s) is produced during discovery in this Action, the Party or non-party claiming the privilege or protection may notify all Parties in writing of the inadvertent disclosure and request the destruction of such document(s). If the Receiving Party discovers an obviously privileged document, in particular one containing counsel of record in this case as a sender or recipient, it will immediately notify the Producing Party of the document and return or destroy all copies of the document. If a request is made in good faith to return any such inadvertently produced document(s), the Party(ies) or non-party(ies) that received the document(s) shall within five (5) business days of receipt of such request, confirm in writing that it has destroyed all copies thereof and deleted any copy of the documents, or any portion thereof, from any word processing or data base tape or disk it maintains, and that it has destroyed any work product that incorporates such document or information. The status of the document(s) as privileged or otherwise protected from discovery shall be deemed to be restored upon the making of such a request. If, however, the Party claiming privilege either (i) expresses the intent to use such document (or information contained therein) at a hearing, deposition, or trial, or (ii) uses such document (or information contained therein) at a hearing, deposition, or trial, that Party's right to assert the privilege or protection and to request destruction of the document(s) shall be foreclosed. Compliance with this paragraph shall not be deemed to prejudice the rights of any other Party to seek an order from the Court directing production of the information or document on the ground that the claimed privilege, protection, or immunity is invalid; provided, however, that mere inadvertent production of the information or document in the course of this Action shall not be a ground for asserting waiver of the privilege, protection, or immunity.

16.     Nothing in this Protective Order shall affect the admissibility of any evidence at a trial or hearing in this case.

17.     This Protective Order may be modified by the Court at any time for good cause shown following notice to the Parties and an opportunity for them to be heard.

> **THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY AS INDICATED AT THE TOP OF THE FIRST PAGE**

**AGREED:**

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
6100 Tower Circle, Suite 200
Franklin, TN 37067
Tel: (615) 465-6000
phillip@thompsonburton.com

Special Counsel to Jeanne Ann Burton, Trustee

/s/
Craig V. Gabbert, Jr.
Bass, Berry & Sims, PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
Tel: (615) 742-6277
cgabbert@bassberry.com

Counsel to Afsoon Hagh and Hagh Law, PLLC

/s/
John T. Spragens
Spragens Law PLC
311 22nd Ave. N.
Nashville, TN 37203
Tel: (615) 983-8900
john@spragenslaw.com

Counsel to Manookian PLLC

# SPRAGENS LAW

November 12, 2021

**Via email to: phillip@thompsonburton.com**

Phillip G. Young, Jr., Esq.
Thompson Burton PLLC
One Franklin Park
6100 Tower Circle, Suite 200
Franklin, TN 37067

Dear Phillip:

   I write to respond to your October 29, 2021 letter, in which you ask Manookian PLLC to supplement its responses to interrogatory nos. 5 & 8 and request for production nos. 1, 3, 4, 5, & 8.

   We have reviewed our responses in good faith and believe that they fully reflect the information available to Manookian PLLC with respect to each interrogatory or request. That said—and in the spirit of satisfying our obligations to meet and confer about any discovery disputes—I would suggest we schedule a telephone call to discuss your requests, and our responses and objections thereto, so that we can explain our position on each interrogatory and request. I will have Mr. Manookian on the call to respond to any questions you have in furtherance of this dispute resolution process. Hopefully we can resolve, or at least narrow the scope of, our discovery dispute before seeking court intervention.

   We can be available for such a call any weekday between November 16 and 23. Please let us know what suits your schedule.

Very truly yours,

John Spragens

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **CUMMINGS MANOOKIAN, PLLC,** | ) | **Case No. 3:19-bk-07235** |
| Debtor. | ) | **Chapter 7** |
| | ) | **Judge Walker** |
| **JEANNE ANN BURTON, TRUSTEE,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **HAGH LAW, PLLC; AFSOON** | ) | |
| **HAGH; MANOOKIAN, PLLC; and** | ) | |
| **FIRST-CITIZENS BANK & TRUST** | ) | |
| **COMPANY,** | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | **Adv. Proc. No. 3:20-ap-90002** |

## MOTION TO COMPEL DISCOVERY RESPONSES FROM HAGH LAW, PLLC

Pursuant to Federal Rules of Bankruptcy Procedure 9014(c) and 7037, Jeanne Ann Burton, Chapter 7 Trustee and Plaintiff herein (the "Trustee"), respectfully moves to compel responses to Plaintiff's First Set of Interrogatories Propounded to Defendant Hagh Law, PLLC (the "Interrogatories") and Plaintiff's First Requests for Production of Documents Propounded to Defendant Hagh Law, PLLC (the "Requests") propounded to Hagh Law, PLLC ("Hagh Law") on November 24, 2020.

On November 24, 2020, the Trustee served interrogatories, requests for document production, and requests for admission on Hagh Law.[1] Pursuant to the Federal Rules of Civil Procedure and the Bankruptcy Rules, responses to this discovery were due on

---

[1] Those documents are attached as collective <u>Exhibit 1</u>.

December 24, 2020. Due to the holidays, and upon request by counsel for Hagh Law, the Trustee extended the response deadline for this written discovery to January 28, 2021.

On January 28, 2021, Hagh Law served responses to the Interrogatories, Requests, and the requests for admission. The responses are attached as collective <u>Exhibit 2.</u> The Trustee deemed Hagh Law's responses to the requests for admission adequate, but viewed Hagh Law's responses to the Interrogatories and Requests as seriously deficient. Because the Court had stayed discovery in this matter for a number of months, the Trustee took no action on the deficiencies in Hagh Law's responses to the Interrogatories and Requests until October 29, 2021. On that day, the Trustee sent a letter (the "Meet and Confer Letter") to counsel for Hagh Law identifying the deficiencies in the responses to the Interrogatories and Requests. A copy of the Meet and Confer Letter is attached hereto as <u>Exhibit 3.</u> Notably, because Hagh Law had previously taken the position that certain documents would not be produced absent a protective order, the Trustee included a proposed protective order with the Meet and Confer Letter.

The Trustee sought more full and adequate responses to the Interrogatories and Requests by November 12, 2021. On November 4, 2021, counsel for Hagh Law asked for additional time to respond to the Meet and Confer Letter. Counsel for the Trustee agreed to an extension to November 30, 2021. On November 30, 2021, Hagh Law served amended responses to the Interrogatories and Requests on the Trustee. Those amended responses are attached hereto as <u>Exhibit 4.</u>

Unfortunately, despite the passage of over thirteen (13) months and despite a Meet and Confer letter, several of Hagh Law's responses to the Interrogatories and Requests

remain deficient.[2]  More specifically, the Trustee identifies the following continuing deficiencies with the amended responses:

- Interrogatory 8:  Interrogatory 8 asks Hagh Law to state the legal and/or factual support for its claims to fees in certain cases identified in the responses to Interrogatory 5.  Interrogatory 8 specifically requests "reference to any communication establishing the amounts to which the Defendant claims entitlement."  Hagh Law's amended responses does not specifically identify those communications, instead choosing to broadly reference "written engagement letters" and agreements for fee sharing.  It concludes:  "Copies of these documents will be made available for inspection upon entry of an appropriate protective order."  The responses fail to specifically identify any communications which give rise to a right to compensation in the cases identified in the amended response to Interrogatory 5.  Moreover, despite being provided with a draft protective order, Hagh Law has failed to produce the communications responsive to this Interrogatory and Request 5.  Hagh Law should be compelled to specifically identify the communications with clients or other counsel that are responsive to this interrogatory.

- Request 1:  Request 1 seeks production of any document or communication that Hagh Law alleges supports the denials in its answer.  Despite Hagh Law's repeated allegations that it is in possession of information that would

---

[2] The amended responses to the Interrogatories did resolve the Trustee's issues regarding Interrogatory 5, and the amended responses to the Requests resolved the Trustee's issues regarding Requests 2, 4 and 7.

disprove the Trustee's allegations (such as, for example, video from the law offices of the Debtor and data regarding key swipes at the offices of the Debtor), Hagh Law has refused to provide any documents in response to this Request. Hagh Law should be compelled to respond to this Request and, to the extent it does not, it should be prohibited from producing any such document or information as evidence before this Court.

- Request 3: Request 3 seeks every document or communication that evidences the creation of an attorney/client relationship between Hagh Law and plaintiffs to certain cases identified specifically in the Requests and Interrogatories. Hagh Law has repeatedly alleged that it has written engagement letters with these parties, but has repeatedly refused to produce them. In response to Request 3, Hagh Law again refuses to produce these documents on the grounds of attorney-client privilege (although engagement letters are not privileged) and/or because the request is unduly burdensome (even though the Request identifies specific cases). Hagh Law again offers to produce these engagement letters "subject to entry of a suitable protective order", which the Trustee has provided. Hagh Law should be compelled to produce these requested documents and communications with certain former clients of the Debtor.

- Request 5: Request 5 seeks the production of every document that supports its response to Interrogatory 5, namely the percentage of fees to which Hagh Law claims an interest in certain cases. Again, Hagh Law refuses to produce these documents without a "suitable protective order", which the

Trustee has proposed but to which Hagh Law has not responded. Hagh Law should be compelled to produce all documents responsive to Request 5.

- Request 8: Request 8 seeks the production of all documents and communications that relate or refer to the *Fitzgerald v. Osborn* case, including correspondence with defense counsel in that case. Hagh Law objects, noting that "[t]he entity Hagh Law did not correspond with counsel for the Defendants in the Fitzgerald matter." Hagh Law has repeatedly taken the position in this case that it, and not the Debtor, performed substantial services on behalf of the plaintiff in that matter. In order to prove or disprove that allegation, the Trustee is entitled to review all documents and communications between Hagh Law and counsel for the Defendants. Since Hagh Law was formed in March 2019, and the Fitzgerald matter was settled in August 2019, there should be a finite set of documents that are responsive to this request. Hagh Law should be compelled to produce all documents responsive to this request without drawing a false distinction between Hagh Law as an entity and Afsoon Hagh, its sole member.

- Request 9: Request 9 seeks banks statements that show where funds from the settlement of the Fittzgerald matter were deposited, transferred or held since August 1, 2019. Hagh Law objects, claiming that Trustee's counsel is in possession of all such statements. However, the Trustee and her counsel are only in possession of a highly redacted bank statement that was previously produced by Brian Manookian, not by the account holder Hagh Law. The Trustee believes she is entitled to an unredacted copy of this bank

statement, to be produced by Hagh Law, so that she can ensure its veracity.

Hagh Law should be compelled to produce all responsive documents.

For the reasons outlined above, the Trustee requests that the Court compel Hagh Law to respond to the outstanding Interrogatories and Requests listed in this Motion.[3] The Trustee further requests that the Court award the estate its attorney's fees incurred in connection with this Motion.[4] Since this is not an emergency matter, the Trustee asks the Court to set a hearing on this matter after January 1, 2022 in order to accommodate the holiday schedules of all parties. Alternatively, if the Court prefers, the Trustee would be amenable to discussing this issue at the pretrial conference currently scheduled in this matter on February 2, 2022.

Dated: December 20, 2021

Respectfully Submitted,

*/s/ Phillip G. Young, Jr.*
Phillip G. Young, Jr.
Thompson Burton PLLC
One Franklin Park
6100 Tower Circle, Suite 200
Franklin, TN 37067
Tel:     615.465.6008
Fax:    615.807.3048
Email: phillip@thompsonburton.com

Special Counsel to Trustee

---

[3] *See* Fed. R. Civ. P 37(a)(3)(B)(iii) & (iv)).
[4] *See* Fed. R. Civ. P. 37(a)(5)(A).

## RULE 37 CERTIFICATION

I certify that I, in good faith, conferred or attempted to confer with Hagh Law's counsel in an effort to obtain discovery responses without court action. Specifically, on October 29, 2021 I sent counsel for Hagh Law a detailed "Meet and Confer Letter". Despite this attempt, and despite conversations regarding necessary discovery over the past year, Hagh Law has failed to adequately respond to the discovery as detailed in this Motion.

/s/ Phillip G. Young, Jr.

## Certificate of Service

The undersigned hereby certifies that a true and exact copy of the foregoing has been served via electronic notice/ECF and/or United States Mail, first class, postage prepaid, to the following persons:

Craig V. Gabbert, Jr.
Bass, Berry & Sims PLC
150 Third Ave. South, Suite 2800
Nashville, TN 37201

This 20th day of December, 2021.

*/s/ Phillip G. Young, Jr.*
Phillip G. Young, Jr.

# THOMPSON BURTON PLLC

**ATTORNEYS AT LAW**
A PROFESSIONAL LIMITED LIABILITY COMPANY

One Franklin Park
6100 Tower Circle, Suite 200
Franklin, Tennessee 37067
www.thompsonburton.com

Phillip G. Young
phillip@thompsonburton.com

Direct Dial: 615-465-6008

November 24, 2020

VIA U.S. MAIL AND ELECTRONIC MAIL

Craig V. Gabbert, Jr.
Bass, Berry & Sims PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
cgabbert@bassberry.com

> **Re:**  *Burton v. Hagh Law, PLLC et al.*
> **Discovery Propounded to Afsoon Hagh and Hagh Law, PLLC**

Dear Craig:

Please find enclosed discovery propounded to your clients, Afsoon Hagh and Hagh Law, PLLC, by my client, Jeanne Ann Burton, Trustee. Please contact me with any questions.

Sincerely,

1

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| IN RE: | ) |
| | ) |
| CUMMINGS MANOOKIAN, PLLC, | )    **Case No. 3:19-bk-07235** |
|      Debtor. | )    **Chapter 7** |
| | )    **Judge Walker** |
| JEANNE ANN BURTON, TRUSTEE, | ) |
|      Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| HAGH LAW, PLLC; AFSOON HAGH; | ) |
| MANOOKIAN, PLLC; and FIRST- | ) |
| CITIZENS BANK & TRUST | ) |
| COMPANY, | ) |
|      Defendants. | ) |
| | )    **Adv. Proc. No. 3:20-ap-90002** |

## PLAINTIFF'S FIRST SET OF INTERROGATORIES
## PROPOUNDED TO DEFENDANT HAGH LAW, PLLC

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff Jeanne Ann Burton, Trustee ("Trustee"), propounds these Interrogatories (the "Interrogatories") to Defendant Hagh Law, PLLC ("Defendant") and requests that Defendant respond to the following Interrogatories, separately and fully, under oath and within the time provided by law.

## DEFINITIONS

In construing these discovery requests, the following definitions shall apply:

A.     *"And"* as well as *"or"* shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these discovery requests any information that might otherwise be construed as outside their scope.

B.    *"Answer"* means the Answer by Defendant in this matter and/or any amendments to it.

C.    *"CM Cases"* means the following lawsuits initiated by Cummings Manookian, PLC as counsel for the plaintiffs:

| Case Name | Court |
|---|---|
| Bailey v. HCA | Davidson Circuit |
| Balay v. Hutson et al | Davidson Circuit |
| Beckworth v. LBMC | Williamson Circuit |
| Brooks v. Reinking | Davidson Circuit |
| Dyer v. Vanderbilt Imaging | Davidson Circuit |
| Fitzgerald v. Osborn | Williamson Circuit |
| Knapp v. Ripley | Davidson Circuit |
| Manookian v. Pennsylvania Higher Education et al | Davidson Circuit |
| Miller v. Vanderbilt Medical | Davidson Circuit |
| Ruffino v. Archer | M.D. Tenn. |
| Salas v. Rosdeutscher et al | Davidson Circuit |
| Shoemaker v. Vanderbilt Medical | Davidson Circuit |
| Thompson v. Sidrys | Putnam Circuit |
| Waldron v. Monroe County | Monroe Circuit |
| Wheeler Bonding Co. v. Parks | Davidson Circuit |
| Wolf v. Mid-Cumberland Resources Agency | Rutherford Circuit |

D.    *"Communication(s)"* includes any transfer of information, ideas, opinions or thoughts by any means, written, oral or otherwise, at any time or place under any circumstances and is not limited to transfers between persons, but includes other transfers, such as records and memoranda to file, any written letter, memorandum, or other document that was sent by one or more individuals to another or others; any telephone calls between one or more individuals and another or others, whether or not the call was by chance or prearranged, formal or informal; and any conversation or meeting between one or more individuals and another, whether or not the contact was by chance or prearranged, formal or informal.

2

1263

E.      *"Complaint"* means the Complaint filed by the Trustee in this matter and/or any amendments to it.

F.      *"Court"* means the United States Bankruptcy Court for the Middle District of Tennessee.

G.      *"Date"* means the exact year, month and date, if known, or, if not known, your best approximation of the year, month and date.

H.      *"Document"* means the original and each non-identical copy of any writing, tape, disk, recording or other item on which or from which information, communications or data may be perceived or obtained, including, but not limited to, financial statements, tax returns, correspondence, notes memoranda, reports, work papers, phone messages, analysis, books, records, real estate tax bills, real estate assessment letters, surveys, appraisals, journals, statements, invoices, computer programs, computer printouts, canceled checks, bank statements, court pleadings, mortgages, guarantees, promissory notes, and any other writings, recordings, photographs, originals, and duplicates, however produced or reproduced, and all drafts, versions, and copies of these documents.

I.      *"Including"* means "including, but not limited", *"includes"* means "includes, but not limited to."

J.      *"Identity"*, when used with respect to a person, requires you to provide information sufficient to allow the service of a subpoena, including, but not limited to, the person's name; last-known residence address and telephone number; and occupation, employer, business address, and telephone number.

K.      *"Identify"*, when used with respect to a business entity, requires you to provide information sufficient to allow the service of a subpoena, including, but not limited to, stating the

1264

business entity's name; last-known address and telephone number; and those persons employed or formerly employed by the business entity and believed to be the most knowledgeable about the business entity.

L.    *"Identify"*, when used with respect to a fact or event, requires you to state the fact or event with reasonable particularity, its date, the identity of each person believed to be the most knowledgeable with respect to the fact or event, and the identity of any other person believed to be the most knowledgeable with respect to the fact or event.

M.    *"Identify"*, when used with respect to a document requires you to provide a description of the document with sufficient particularity so as to provide the basis for a request for production or a subpoena; a description of the type or document, a description of the general subject matter of the document; the date of the document; all authors, addresses and recipients of the document, and the location of the document. It is sufficient to produce the document itself if you identify the Interrogatory to which it relates and its location.

N.    *"Persons"* means, without limiting the generality of its meaning, natural persons, groups of natural persons (such as committee or board of directors), corporations, partnerships, associations, joint ventures, and any other unincorporated business, governmental, public, or societal entity.

O.    *"Property"* means any and all property, real or personal, tangible or intangible or any right, title or interest in any property.

P.    *"Relate"*, *"relating to"*, *"refer to"*, *"referencing"*, *"regarding"*, *"pertain"* and *"pertaining to"* means to be legally, logically, factually, or in any way connected to, in whole or in part, the matter discussed.

4

Q.    *"You"* or *"Your"* means Defendant and its members, agents, employees or representatives.

## INSTRUCTIONS

1.    When asked to identify a document, state: (a) its location; (b) the location of all copies of the documents that are not identical duplicates of the original; (c) the name and title of each person presently in charge of the custody and maintenance of the original and all non-identical copies; (d) the date of the original and all non-identical copies; (e) the author and signatories of the original and all non-identical copies; (f) its length; (g) the original document's content and how each non-identical copy differs from the original; and (h) each person who received the original or a copy of the document. If the document is available only in machine-readable form, state the form in which the document is available and the type of machine required to read the document. If the document was, but no longer is, in your possession, custody or control, state or identify: (a) what disposition was made of the document; (b) the date of the disposition, and (c) each person that either authorized or has knowledge of the disposition.

2.    When asked to identify a natural person, state his or her: (a) name; (b) title or position; (c) present or last known business address; (d) present or last known home address; (e) present or last known business telephone number; (f) present or last known home and/or mobile telephone number. If the person no longer is employed by the person for which he/she engaged in the activity that is the subject of the interrogatory, state the date on which he/she left the employment of the person and his/her title or position when he/she engaged in the activity that is the subject of the interrogatory.

3.    When asked to identify a non-natural person, state: (a) the full name of the entity; (b) the address of its principal place of business; (c) the telephone number of its principal place of

1266

business; (d) the name and title of each person who (1) is or was an officer, director, general partner, limited partner, member or beneficiary of the organization, or (2) represented the organization with respect to the subject matter stated in the interrogatory; and (e) the relationship of the entity to the parties to this proceeding; and (f) the name, address and phone number of any attorney who has contacted the Defendants or the Defendants' agents on behalf of said entity.

4. When asked to identify a transfer of property, state: (a) the date and amount (in dollars if made in cash or as a measure of the fair market value of other property transferred, if other than cash) of the transfer; (b) the mode of the transfer (such as by check, cash, other property, memorandum, book entry or other method of transfer); (c) each person who has or is believed to have first-hand knowledge of the transfer; (d) the account the property was transferred from; and (e) identify each document relating to the transfer pursuant to the above Instruction No. 1.

5. When asked to identify a communication, state: (a) the date, time and place of the communication; (b) the form of the communication (such as memorandum, letter, or conversation); (c) each person who has or is believed to have first-hand knowledge of the communication; (d) the substance of the communication; and (e) each document relating to the communication.

6. Whenever appropriate, the singular and plural forms of words shall be interpreted interchangeably so as to bring within the scope of these requests any matter which might otherwise be construed to outside their scope.

7. When asked to state each and every basis for a given proposition or allegation, state or identify; (a) each person who has or purports to have knowledge of the facts underlying the proposition or allegation; (b) each document used or relied upon to formulate, or which supports

6

or substantiates, the allegation or proposition; and (c) the rationale and each fact supporting the allegation or proposition.

8.      With respect to each document or communication that the Defendant does not produce or divulge based upon any claim or privilege or for any other reason, state: (a) the name and address of the originator or sender of the document or communication; (b) the name and address of the author of the document or communication; (c) the name and address of each person to whom the document was directed or addressed; (d) the name and address of each person to whom a copy of the document was directed or sent; (e) the name and address of each person to whom has seen the document, any copy of the document, participated in communications about the document, or participated in the communication; (f) the job title of each person listed in items (a) through (e) above; (g) the date of the document or communication; (h) the length of the document or communication; (i) whether the document or communication contained any attachments, exhibits or appendices; (j) a general description or the nature and subject matter of the document or communication; (k) the present custodian of the document or communication; (l) the date that the document, or a copy of it bears; and (m) the reason the document or communication was not produced.

9.      You shall make any objections you might have to this discovery request in writing and deliver those written objections to the offices of Thompson Burton, PLLC, ATTN: Phillip Young, 6100 Tower Circle, Suite 200, Franklin, Tennessee 37067, or at such place as may be agreed upon by the parties, on or before 30 days of the date of this discovery was served.

10.     You are asked to state each and every basis to support the answers to the Interrogatories set forth below.

7

11. These Interrogatories are intended to be continuing and you are obligated to amend your responses to them on a timely basis as more information becomes available to you or your counsel to the full extent required by applicable rules and case law.

## **INTERROGATORIES**

1. Identify each person that provided any information used to answer these Interrogatories.

**Response:**

2. Identify each person that has knowledge of any of the contentions, denials and/or defenses alleged in the Answer.

**Response:**

3. Identify each document that relates in any way to the contentions, denials and/or defenses in the Answer.

**Response:**

4. Identify each written or oral communication that relates in any way to the contentions, denials and/or defenses in the Answer.

**Response:**

8

5.     State what amounts (by dollar amount or percentage of recovery) that the Defendant alleges it is entitled to from each of the CM Cases.

**Response:**


6.     List all telephone numbers, websites, email addresses, and physical addresses used by the Defendant since January 1, 2018, and include the dates of the Defendant's use.

**Response:**


7.     List all members and employees of the Defendant, and include the dates of each individual's involvement with the Defendant.

**Response:**


8.     State the legal and/or factual support for the Defendant's response to Interrogatory No. 5 including, without limitation, reference to any communication establishing the amounts to which the Defendant claims entitlement.

**Response:**


9

9. Identify each person or entity whom the Defendant expects to call as an expert witness at a trial in this matter, and state the subject matter on which the expert is expected to testify, the substance of that expert's opinions, and a summary of the grounds for each opinion.

**Response:**

10. Identify each person or entity whom the Defendant expects to call as a fact witness at a trial in this matter, and state the subject matter on which such witness is expected to testify, and provide the contact information for each such witness.

**Response:**

11. For each Request for Admission (served concurrently) that you do not answer with an unqualified admission, please state all facts upon which you base your answer.

**Response:**

12. State the date on which the Defendant was formed.

**Response:**

10

Dated this 24th day of November, 2020.

By: /s/ Phillip G. Young, Jr.
   Phillip G. Young, Jr. (021087)
   Thompson Burton PLLC
   6100 Tower Circle, Suite 200
   Franklin, Tennessee 37067
   Tel: (615) 465-6008
   Fax: (615) 807-3048
   phillip@thompsonburton.com

   Attorneys for Jeanne Ann Burton, Trustee

1272

# OATH

STATE OF TENNESSEE

COUNTY OF DAVIDSON


_____, as the corporate representative of Hagh Law PLLC, being first duly sworn, states that the responses to the foregoing Interrogatories are true and correct to the best of his/her knowledge, information and belief.


_____


Personally appeared before me, the undersigned, a Notary Public in and for said County and State, _____, the within name person, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who acknowledged that he/she executed the within instrument for the purposes therein contained.

Witness my hand and official seal at _____, Tennessee, this the ____ day of _____, 2020.


_____
Notary Public
My Commission Expires: _____

12

1273

**CERTIFICATE OF SERVICE**

As is evidenced by my signature below, I certify that a true and exact copy of the foregoing

document has been forwarded by United State Mail, first class, with sufficient postage, on this the

24th day of November, 2020, to the following parties:

Craig V. Gabbert, Jr.
Bass, Berry & Sims PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
cgabbert@bassberry.com

*Attorneys for Hagh Law, PLLC*

By:   /s/ Phillip G. Young, Jr.
       Phillip G. Young, Jr.

13

1274

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| CUMMINGS MANOOKIAN, PLLC, ) | Case No. 3:19-bk-07235 |
|     Debtor. ) | Chapter 7 |
| ) | Judge Walker |
| JEANNE ANN BURTON, TRUSTEE, ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| HAGH LAW, PLLC; AFSOON HAGH; ) | |
| MANOOKIAN, PLLC; and FIRST- ) | |
| CITIZENS BANK & TRUST ) | |
| COMPANY, ) | |
|     Defendants. ) | |
| ) | Adv. Proc. No. 3:20-ap-90002 |

**PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS
PROPOUNDED TO DEFENDANT HAGH LAW, PLLC**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Plaintiff Jeanne Ann Burton,

Trustee ("Trustee"), propounds these Requests for Production of Documents (the "Requests") to

Defendant Hagh Law, PLLC ("Defendant").

## DEFINITIONS

In construing these discovery requests, the following definitions shall apply:

A.    *"And"* as well as *"or"* shall be construed either disjunctively or conjunctively as

necessary to bring within the scope of these discovery requests any information that might

otherwise be construed as outside their scope.

B.    *"Answer"* means the Answer filed by Defendant in this matter and/or any

amendments to it.

C.    *"CM Cases"* means the following lawsuits initiated by Cummings Manookian, PLC as counsel for the plaintiffs:

| Case Name | Court |
|---|---|
| Bailey v. HCA | Davidson Circuit |
| Balay v. Hutson et al | Davidson Circuit |
| Beckworth v. LBMC | Williamson Circuit |
| Brooks v. Reinking | Davidson Circuit |
| Dyer v. Vanderbilt Imaging | Davidson Circuit |
| Fitzgerald v. Osborn | Williamson Circuit |
| Knapp v. Ripley | Davidson Circuit |
| Manookian v. Pennsylvania Higher Education et al | Davidson Circuit |
| Miller v. Vanderbilt Medical | Davidson Circuit |
| Ruffino v. Archer | M.D. Tenn. |
| Salas v. Rosdeutscher et al | Davidson Circuit |
| Shoemaker v. Vanderbilt Medical | Davidson Circuit |
| Thompson v. Sidrys | Putnam Circuit |
| Waldron v. Monroe County | Monroe Circuit |
| Wheeler Bonding Co. v. Parks | Davidson Circuit |
| Wolf v. Mid-Cumberland Resources Agency | Rutherford Circuit |

D.    *"Communication(s)"* includes any transfer of information, ideas, opinions or thoughts by any means, written, oral or otherwise, at any time or place under any circumstances and is not limited to transfers between persons, but includes other transfers, such as records and memoranda to file, any written letter, memorandum, or other document that was sent by one or more individuals to another or others; any telephone calls between one or more individuals and another or others, whether or not the call was by chance or prearranged, formal or informal; and any conversation or meeting between one or more individuals and another, whether or not the contact was by chance or prearranged, formal or informal.

E.    *"Complaint"* means the Complaint filed by Trustee in this matter and/or any amendments to it.

2

F.    *"Court"* means the United States Bankruptcy Court for the Middle District of Tennessee.

G.    *"Date"* means the exact year, month and date, if known, or, if not known, your best approximation of the year, month and date.

H.    *"Document"* means the original and each non-identical copy of any writing, tape, disk, recording or other item on which or from which information, communications or data may be perceived or obtained, including, but not limited to, financial statements, tax returns, correspondence, notes memoranda, reports, work papers, phone messages, analysis, books, records, real estate tax bills, real estate assessment letters, surveys, appraisals, journals, statements, invoices, computer programs, computer printouts, canceled checks, bank statements, court pleadings, mortgages, guarantees, promissory notes, and any other writings, recordings, photographs, originals, and duplicates, however produced or reproduced, and all drafts, versions, and copies of these documents.

I.    *"Including"* means "including, but not limited", *"includes"* means "includes, but not limited to."

J.    *"Identity"*, when used with respect to a person, requires you to provide information sufficient to allow the service of a subpoena, including, but not limited to, the person's name; last-known residence address and telephone number; and occupation, employer, business address, and telephone number.

K.    *"Identify"*, when used with respect to a business entity, requires you to provide information sufficient to allow the service of a subpoena, including, but not limited to, stating the business entity's name; last-known address and telephone number; and those persons employed or

3

formerly employed by the business entity and believed to be the most knowledgeable about the business entity.

L.    *"Identify"*, when used with respect to a fact or event, requires you to state the fact or event with reasonable particularity, its date, the identity of each person believed to be the most knowledgeable with respect to the fact or event, and the identity of any other person believed to be the most knowledgeable with respect to the fact or event.

M.    *"Identify"*, when used with respect to a document requires you to provide a description of the document with sufficient particularity so as to provide the basis for a request for production or a subpoena; a description of the type or document, a description of the general subject matter of the document; the date of the document; all authors, addresses and recipients of the document, and the location of the document. It is sufficient to produce the document itself if you identify the Interrogatory to which it relates and its location.

N.    *"Persons"* means, without limiting the generality of its meaning, natural persons, groups of natural persons (such as committee or board of directors), corporations, partnerships, associations, joint ventures, and any other unincorporated business, governmental, public, or societal entity.

O.    *"Property"* means any and all property, real or personal, tangible or intangible or any right, title or interest in any property.

P.    *"Relate"*, *"relating to"*, *"refer to"*, *"referencing"*, *"regarding"*, *"pertain"* and *"pertaining to"* means to be legally, logically, factually, or in any way connected to, in whole or in part, the matter discussed.

Q.    *"You"* or *"Your"* means Defendant and its members, agents, employees or representatives.

4

## INSTRUCTIONS

1.     As required by law, your responses should supply documents not only in your possession, custody, or control, but also such information and documents which are available to all other persons acting on your behalf in this case.

2.     If you claim privilege for any document or any communication encompassed by this discovery, set forth the basis for such claim of privilege and give a sufficient description to identify, specifically, each document or communication, the authors and the persons to whom it was addressed and/or copies, and the basis for your claim of privilege.

3.     When this discovery calls for a document which, while known to you, is not in your possession or control, identify its present location and custodian if known, or otherwise its last known location and custodian.

4.     Where the context in the discovery makes it appropriate, each singular word shall include its plural and each plural word shall include its singular. The words "any," "and," and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery all responses which might otherwise be construed to be outside its scope. Each of the following words includes the meaning of every other word: "each," "every," "all," and "any." The present tense shall be construed to include the past tense, and the past tense shall be construed to include the present tense.

5.     This discovery is continuing in nature, and you are requested to supplement your response to any request promptly after receiving or obtaining any further documents responsive to any request herein. You are also requested to produce additional responsive documents within fourteen (14) days upon discovery of said documents.

1279

## REQUESTS FOR PRODUCTION

1.     Please produce every Document or Communication that you allege supports your denials in the Answer.

**Response:**


2.     Please produce every Document or Communication that evidences any lease of real property by which Defendant is tenant.

**Response:**


3.     Please produce every Document or Communication that evidences the creation of an attorney/client relationship between Defendant and any party to the CM Cases, including but not limited to engagement letters.

**Response:**


4.     Please produce every Document or Communication that evidences the termination of an attorney/client relationship between Defendant and any party to the CM Cases, including but not limited to disengagement letters..

**Response:**


5.     Please produce every Document or Communication that supports your response to Interrogatory 5, served contemporaneously herewith.

6

1280

**Response:**

6.      Please produce copies of every Document or Communication that evidences an expense advanced by Defendant in any of the CM Cases.

**Response:**

7.      Please produce copies of all Documents and Communications that relate to the creation, operation, or corporate structure of Defendant, including but not limited to corporate formation documents and operating agreements.

**Response:**

8.      Please produce copies of all Documents and Communications that relate or refer to the *Fitzgerald v. Osborn* case in the Circuit Court for Williamson County, Tennessee, including but not limited to correspondence between you and counsel for the defendants in that matter.

**Response:**

9.      Please produce any and all bank statements for any account in which funds from the settlement of *Fitzgerald v. Osborn* was deposited, transferred, or held, including any trust account or operating account maintained by Defendant at Citizens Bank & Trust Company, since August 1, 2019.

7

**Response:**

10.     Please produce any and all Documents you intend to introduce as exhibits at the trial of this matter.

**Response:**

11.      For each Request for Admission (served concurrently) that you do not answer with an unqualified admission, please produce any and all Documents that support your response.

**Response:**

12.     Please produce any Document referenced in your responses to Plaintiff's First Set of Interrogatories Propounded to Defendant, to the extent not already produced in response to other Requests for Production.

**Response:**

8

Dated this 24th day of November, 2020.

By:   /s/ Phillip G. Young, Jr.
      Phillip G. Young, Jr. (021087)
      Thompson Burton PLLC
      6100 Tower Circle, Suite 200
      Franklin, Tennessee 37067
      Tel:   (615) 465-6008
      Fax:   (615) 807-3048
      phillip@thompsonburton.com

      Attorneys for Jeanne Ann Burton, Trustee

## CERTIFICATE OF SERVICE

As is evidenced by my signature below, I certify that a true and exact copy of the foregoing

document has been forwarded by United State Mail, first class, with sufficient postage, on this the

24th day of November, 2020, to the following parties:

Craig V. Gabbert, Jr.
Bass, Berry & Sims PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
cgabbert@bassberry.com

*Attorneys for Hagh Law, PLLC*

By:   /s/ Phillip G. Young, Jr.
      Phillip G. Young, Jr.

9

1283

| | |
|---|---|
| IN RE: | ) |
| | ) |
| CUMMINGS MANOOKIAN, PLLC, | ) Case No. 3:19-bk-07235 |
|     Debtor. | ) Chapter 7 |
| | ) Judge Walker |
| JEANNE ANN BURTON, TRUSTEE, | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| HAGH LAW, PLLC; AFSOON HAGH; | ) |
| MANOOKIAN, PLLC; and FIRST- | ) |
| CITIZENS BANK & TRUST | ) |
| COMPANY, | ) |
|     Defendants. | ) |
| | ) Adv. Proc. No. 3:20-ap-90002 |

## REQUESTS FOR ADMISSION PROPOUNDED TO HAGH LAW, PLLC

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, Plaintiff Jeanne Ann Burton, Trustee ("Trustee"), propounds these Requests for Admission (the "Requests") to Defendant Hagh Law, PLLC ("Defendant").

## DEFINITIONS

In construing these discovery requests, the following definitions shall apply:

A.     *"And"* as well as *"or"* shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these discovery requests any information that might otherwise be construed as outside their scope.

B.     *"Answer"* means the Answer filed by Defendant in this matter and/or any amendments to it.

C.     *"Communication(s)"* includes any transfer of information, ideas, opinions or thoughts by any means, written, oral or otherwise, at any time or place under any circumstances

and is not limited to transfers between persons, but includes other transfers, such as records and memoranda to file, any written letter, memorandum, or other document that was sent by one or more individuals to another or others; any telephone calls between one or more individuals and another or others, whether or not the call was by chance or prearranged, formal or informal; and any conversation or meeting between one or more individuals and another, whether or not the contact was by chance or prearranged, formal or informal.

D.     *"Complaint"* means the Complaint filed by the Trustee in this matter and/or any amendments to it.

E.     *"Court"* means the United States Bankruptcy Court for the Middle District of Tennessee.

F.     *"Date"* means the exact year, month and date, if known, or, if not known, your best approximation of the year, month and date.

G.     *"Document"* means the original and each non-identical copy of any writing, tape, disk, recording or other item on which or from which information, communications or data may be perceived or obtained, including, but not limited to, financial statements, tax returns, correspondence, notes memoranda, reports, work papers, phone messages, analysis, books, records, real estate tax bills, real estate assessment letters, surveys, appraisals, journals, statements, invoices, computer programs, computer printouts, canceled checks, bank statements, court pleadings, mortgages, guarantees, promissory notes, and any other writings, recordings, photographs, originals, and duplicates, however produced or reproduced, and all drafts, versions, and copies of these documents.

H.     *"Including"* means "including, but not limited", *"includes"* means "includes, but not limited to."

2

I. *"Identity"*, when used with respect to a person, requires you to provide information sufficient to allow the service of a subpoena, including, but not limited to, the person's name; last-known residence address and telephone number; and occupation, employer, business address, and telephone number.

J. *"Identify"*, when used with respect to a business entity, requires you to provide information sufficient to allow the service of a subpoena, including, but not limited to, stating the business entity's name; last-known address and telephone number; and those persons employed or formerly employed by the business entity and believed to be the most knowledgeable about the business entity.

K. *"Identify"*, when used with respect to a fact or event, requires you to state the fact or event with reasonable particularity, its date, the identity of each person believed to be the most knowledgeable with respect to the fact or event, and the identity of any other person believed to be the most knowledgeable with respect to the fact or event.

L. *"Identify"*, when used with respect to a document requires you to provide a description of the document with sufficient particularity so as to provide the basis for a request for production or a subpoena; a description of the type or document, a description of the general subject matter of the document; the date of the document; all authors, addresses and recipients of the document, and the location of the document. It is sufficient to produce the document itself if you identify the Interrogatory to which it relates and its location.

M. *"Persons"* means, without limiting the generality of its meaning, natural persons, groups of natural persons (such as committee or board of directors), corporations, partnerships, associations, joint ventures, and any other unincorporated business, governmental, public, or societal entity.

3

N.      *"Property"* means any and all property, real or personal, tangible or intangible or any right, title or interest in any property.

O.      *"Relate", "relating to", "refer to", "referencing", "regarding", "pertain"* and *"pertaining to"* means to be legally, logically, factually, or in any way connected to, in whole or in part, the matter discussed.

P.      *"You"* or *"Your"* means Defendant and its members, agents, employees or representatives.

## INSTRUCTIONS

1.      These Requests shall be deemed continuing and you shall promptly supply, by way of supplemental answers, any and all information that may become known prior to the trial of this action this is additionally responsive or necessary to maintain the accuracy of answers previously served.

2.      If you fail to comply with the provisions of Rule 36 of the Federal Rules of Civil Procedure with respect to any admission, the matter with respect to which an admission is requested will be deemed admitted.

3.      In accordance with Federal Rule of Civil Procedure 36, you must supply an answer to any request for admission not unequivocally admitted that specifically denies the matter or sets forth in detail the reasons why the answering party cannot truthfully admit or deny the matter. If only a portion of the request for admission should, in good faith, be denied, you must specify so much of the matter that is true and qualify or deny the remainder.

## REQUESTS FOR ADMISSION

4