IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

------------------------------------------------

CUMMINGS MANOOKIAN, PLLC,          )
                                   )
        Debtor                     )
                                   )
JEANNE ANN BURTON, TRUSTEE         )
                                   )
        Plaintiff,                 )
                                   )
VS.                                )   No. 3:19-BK-07235
                                   )   Chapter 7
HAGH LAW, PLLC; AFSOON HAGH;       )   Judge Walker
MANOOKIAN, PLLC; and FIRST         )
CITIZENS BANK & TRUST COMPANY,     )
                                   )
        Defendant.                 )

------------------------------------------------

DEPOSITION OF BRIAN CUMMINGS

Taken on June 9, 2022

------------------------------------------------

PREPARED BY:

CRISTI G. WATSON, LCR
Anne S. Wilson & Associates
P.O. Box 150651
Nashville, Tennessee  37215
Cristicr@bellsouth.net

1               A P P E A R A N C E S

2

FOR THE PLAINTIFF:
3

Phillip Young, Jr., Esq.
4    One Franklin Park
     6100 Tower Circle, Suite 200
5    Franklin, Tennessee 37067
     Phillip@thompsonburton.com
6

FOR DEFENDANT MANOOKIAN:
7

John Spragens, Esq.
8    Spragens Law, PLC
     311 22nd Avenue N.
9    Nashville, Tennessee  37203
     john@spragenslaw.com
10

FOR DEFENDANT HAGH:
11

Craig Gabbert, Jr., Esq.
12   Bass, Berry & Sims
     150 3rd Avenue South
13   Nashville, Tennessee  37201
     cgabbert@bassberry.com
14

FOR MR. CUMMINGS:
15

James Price, Esq.
16   Price Hill & Kolarich
     201 4th Avenue North, Suite 1800
17   Nashville, Tennessee  37219
     jprice@pricehillkolarich.com
18

19

20

21

22

23

24

25

*ANNE S. WILSON & ASSOCIATES*
*615-298-1992*

1                          I N D E X

2     Examination by Mr. Young                      5
      Examination by Mr. Spragens                  85
3     Further Examination by Mr. Young            129

4                        E X H I B I T S

5     No. 1 - Secretary of State filing            11
      No. 2 - Amended and Restated Amended Operating
6              Agreement                           14
      No. 3 - Property tax document                26
7     No. 4 - Attorney-Client Agreement            54
      No. 5 - Complaint                            58
8     No. 6 - Lease Agreement                     104
      No. 7 - Invoice                             104
9     No. 8 - 2016 and 2017 tax returns and
               payment to JL Design               104

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*ANNE S. WILSON & ASSOCIATES*
*615-298-1992*

2037

# S T I P U L A T I O N S

The deposition of BRIAN CUMMINGS was taken on the 9th day of June, 2022, on behalf of the plaintiff, via Zoom, beginning at approximately 1:00 p.m. for all purposes allowed under the Federal rules of Civil Procedure.

It is agreed that Cristi G. Watson, LCR, may swear the witness, take the deposition by stenographic means and afterwards reduce same to typewritten form.

All formalities as to notice, caption, certificate, and signing, et cetera, of the deposition are waived. All objections, except as to the form of the questions, are reserved to the hearing of said matter.

(Unless previously provided, all proper names are spelled phonetically to the best of the court reporter's ability.)

BRIAN CUMMINGS,

having been duly sworn, testified as follows:

EXAMINATION

BY MR. YOUNG:

Q.    Mr. Cummings, good afternoon.  My name is
Phillip Young.  I represent Jeanne Burton, who is the
court appointed trustee for Cummings Manookian, PLLC,
in this case.  Just for the record, I will note that
Ms. Burton is in the room with me today so everyone
knows.  Mr. Cummings, please state your name for the
record.

A.    Kirk Brian Cummings.

Q.    Mr. Cummings, I know you have taken
plenty of depositions, but have you ever given a
deposition before?

A.    I have.

Q.    In what case?

A.    I think there were four different times.
One was a malpractice case where there was a -- from
the other side a claim that there was a discovery rule
issue about a statute of limitations argument.  I was
deposed in that.  One was a real estate lawsuit where I
was a plaintiff.  I was deposed in that.  I was deposed
in a litigation matter filed in Texas against my old
firm and probably named individually as well.  The

Case 3:23-cv-00961    Document 6-3    Filed 10/04/23    Page 5 of 266 PageID #: 4261    2039

fourth one I can think of was a board matter where I
was one of the -- I don't know if they are called
defendants or respondents, but I was one of those
people.

Q.    Let me ask you about the litigation
matter in Texas.  Was Cummings Manookian a defendant in
that matter?

A.    I believe so.

Q.    Tell me about that matter.  What was the
nature of that litigation?

A.    Our firm handled some consumer fraud
cases or claims involving diamonds, overgrading of
diamonds.  One of the offenders of that overgrading
claimed that we as a firm -- I don't know if they used
the word extortion or that's the way I remembered it,
the fact we were pursuing fraud claims against them or
putting the word out there that they were committing
fraud, that we were doing something wrong, and they
filed a lawsuit kind of under that umbrella.

Q.    What was the outcome of that matter?

A.    It settled.  I think the terms are
confidential.  I think they have been disclosed since.
That was a matter where the people who sued us ended up
paying us.

Q.    Have you ever given a deposition via Zoom

1  before?

2          A.      No.

3          Q.      So a lot of this is probably going to be

4  old hat for you, but I will go through it anyway,

5  especially since we're on Zoom and there are some

6  idiosyncracies here I want to make sure we go over.

7  Obviously, please, answer my questions audibly with a

8  yes or no, not with a head shake or uh-huh or uh-uh.  I

9  will ask that you answer all questions that I pose even

10 if another attorney objects unless the attorney

11 specifically tells you not to answer.  If that happens

12 we will resolve the dispute before we move on.  If we

13 need to take a break at any time, let me know.  As long

14 as we're not in the middle of a question, I will be

15 happy to accommodate that.  Where are you physically

16 located today?

17         A.      In my office in Green Hills.

18         Q.      Is anyone else in the room with you?

19         A.      No.

20         Q.      I know just for the record Mr. Price is

21 on the Zoom representing you, but he is in a different

22 location, correct?

23         A.      Correct.  He is not where I am.

24         Q.      How many screens are powered on in the

25 room you are sitting in?

1      A.    I have three monitors, all of which have

2    power if that's what you are asking.

3      Q.    It is.  What is pulled up on those three

4    monitors?

5      A.    You or the video is in the middle.  On

6    the left is you sent some exhibits this morning and one

7    of them was large enough I didn't want to print it, so

8    that's pulled up.  The other actually is what I was

9    working on.  It has nothing to do with this matter.  I

10    am going to close it, so that is now one of those blue

11    screens with your icons on it.

12      Q.    Other than the things you just described

13    that were pulled up on the screen, do you have any

14    paper in front of you?

15      A.    I do.

16      Q.    What is that?

17      A.    I have the exhibits that you sent that I

18    did print.  I have some things that -- matters of my

19    own, but within reach it's your exhibits.

20      Q.    Those other things are not related to

21    this deposition?

22      A.    No, not at all.  They are out because

23    it's my office.

24      Q.    On any of those screens do you have any

25    communication apps open like texting or instant

Case 3:23-cv-00961    Document 6-3    Filed 10/04/23    Page 8 of 266 PageID #: 4264    2042

1   messaging?

2        A.    No.  So you know, my phone is in front of

3   me and the screen is dark.

4        Q.    Mr. Cummings, what is your current

5   occupation?  Are you a practicing lawyer?

6        A.    Yes, sir.

7        Q.    What states are you currently licensed to

8   practice law in?

9        A.    Tennessee, Hawaii, California, Georgia

10  and Florida.

11       Q.    Where did you attend law school?

12       A.    Vanderbilt.

13       Q.    What year did you graduate?

14       A.    1998.

15       Q.    When you finished at Vanderbilt in '98,

16  did you go to work for a law firm?

17       A.    No.

18       Q.    What job did you first have after

19  graduating Vanderbilt Law School?

20       A.    I was a law clerk for a state trial court

21  judge here in Nashville.

22       Q.    How long did you do that?

23       A.    It was a little longer than a year

24  because he needed me to start early.

25       Q.    After you finished that clerkship where

1   did you go?

2         A.    I started at the firm -- the name at the

3   time was Gideon & Wiseman.

4         Q.    How long were you at Gideon & Wiseman?

5         A.    I am going to estimate 12 years.  I don't

6   think it's any shorter than that.  I might be wrong

7   that it's a little longer.

8         Q.    After you left Gideon & Wiseman where did

9   you go?

10        A.    I went to the law firm of Levine, Orr and

11  Geracioti.

12        Q.    How long were you there?

13        A.    About three years.

14        Q.    After you left Levine Orr where did you

15  go?

16        A.    I co-founded a firm named Cummings

17  Manookian.

18        Q.    How long were you with Cummings

19  Manookian?

20        A.    I think a little over three-and-a-half

21  years, less than four years.

22        Q.    When you left Cummings Manookian, where

23  did you go practice?

24        A.    I founded my current law firm of Cummings

25  Law.

1       Q.      Is that Cummings Law, PLC or PLLC?

2       A.      It probably is, and I just don't know

3  offhand which it is.

4       Q.      It is incorporated in some form or

5  fashion?

6       A.      Yes, it's registered with the Tennessee

7  Secretary of State.

8       Q.      Where is Cummings Law located?

9       A.      4235 Hillsboro Pike.  Mailing suite

10  number is 300, Nashville, Tennessee 37215.

11      Q.      What kind of work does Cummings Law do?

12      A.      Plaintiff's medical malpractice and

13  personal injury.

14      Q.      Approximately when did you found Cummings

15  Law, PLC, or PLLC, whatever it is?

16      A.      Around September 1st of 2018.

17      Q.      You mentioned earlier that you were a

18  member of Cummings Manookian, PLC; is that correct?

19      A.      I was a member, yes.

20      Q.      When was Cummings Manookian, PLC, formed?

21      A.      About January 1st of 2015.

22                      (Exhibit No. 1 was marked.)

23  BY MR. YOUNG:

24      Q.      I am going to ask you to take a look at

25  what's been previously marked Exhibit 1 just so we can

1    get this on the record.  You will see that this is the

2    secretary of state's filing information for Cummings

3    Manookian, PLC.  Do you have that in front of you?

4          A.    I do.

5          Q.    It says the date formed is January 1,

6    2015; is that right?

7          A.    Correct.

8          Q.    Who were the original members of Cummings

9    Manookian?

10         A.    Me and Brian Manookian.

11         Q.    What percentage did you each own?

12         A.    I think it was 50/50 unless for a brief

13    period of time it was 51/49.

14         Q.    Do you know who had the 51 percent?

15         A.    No, but it might be in the Amended

16    Operating Agreement that you made an exhibit.

17         Q.    Did the membership of Cummings Manookian

18    change at any time while you were a member of the firm?

19         A.    No, not the membership.

20         Q.    Tell me how you knew Brian Manookian

21    prior to January 1, 2015.

22         A.    We had worked together at that first law

23    firm I mentioned, Gideon & Wiseman, as attorneys for

24    several years.  That was how I knew him.

25         Q.    Tell me about the conversations that led

1    to you forming Cummings Manookian with Brian Manookian.

2         A.    I can tell you generally.  Maybe you know

3    this.  I don't remember one specific conversation.  We

4    both like litigation.  I think we both like the concept

5    of shifting from what we were doing, which was almost

6    all defense work, to plaintiff's work.  Some of those

7    -- I mentioned the diamond consumer claims -- were on

8    the plaintiffs's side.  We enjoyed doing that and I

9    think just realized we had like or similar perspectives

10   on it and decided to do what we did.

11        Q.    When you formed Cummings Manookian in

12   January 2015, did you form it with the intent of it

13   being a plaintiff's firm?

14        A.    I would say yes.  I don't know that we

15   ever said that out loud.  I just think we knew it,

16   yeah, was to do plaintiff's work.

17        Q.    Was there a particular type of work that

18   you anticipated doing like med mal, accident cases,

19   slip and falls?  Was there a particular type of case

20   that you intended to do?

21        A.    I could best answer that by what we did

22   do.  We did medical malpractice.  There were a few car

23   accident cases.  I think we still had some consumer

24   fraud cases then, so that is what we did.  There might

25   have been occasional defense thing.  I think I did some

1  subrogation work for a carrier, but the heart of what
2  we did is what I put in the first part of that answer.
3      Q.    Did Cummings Manookian have an operating
4  agreement when it first formed?
5      A.    I know we had one very early.  I don't
6  know if it was January 1st, 2015, or not.  I would have
7  to look at the document.
8      Q.    You think that you had an operating
9  agreement from early on in the existence of Cummings
10  Manookian?
11      A.    Sure, and it might have been from day
12  one.  I don't want to misstate that when I don't know.
13  It could have been January 2nd.  I didn't want to
14  misstate that.
15      Q.    I am going to ask you to look at the
16  document that I have premarked as Exhibit 2, which is
17  entitled Amended and Restated Amended Operating
18  Agreement of Cummings Manookian, PLLC.  Do you have
19  that document in front of you?
20      A.    I do.
21      Q.    Have you seen this document before?
22      A.    I have.
23                  (Exhibit No. 2 was marked.)
24  BY MR. YOUNG:
25      Q.    Just for the record flip over to page 17

1  for me.

2          A.      I am there.

3          Q.      Can you confirm that's your signature?

4          A.      That is my signature.

5          Q.      First question is who drafted this

6  document?

7          A.      It was drafted by an attorney who wasn't

8  us, because he would have drafted the original.  We may

9  have made the amendments, we being me and/or Brian

10  Manookian, but the heavy core of this was drafted by --

11  it will come to me.

12          Q.      It's fair to say it was somebody Cummings

13  Manookian hired for the purpose of drafting it?

14          A.      Yeah, that part is right.  I am trying to

15  remember the name.  It's not coming to mind, but it

16  will.

17          Q.      You said you or Mr. Manookian may have

18  actually made the amendments; is that right?

19          A.      Correct, because I think it was very

20  limited what the amendment would have been, so I doubt

21  we farmed that out.  I don't think we had to.

22          Q.      The title of this document is Amended and

23  Restated Amended Operating Agreement.  That leads me to

24  believe -- correct me if I am wrong -- that there was a

25  prior amended operating agreement before this; is that

1   right?

2          A.     I follow your logic.  That's the best way

3   I can answer it.

4          Q.     You don't recall?

5          A.     I don't recall, but I follow your logic

6   why it doesn't just say amended operating agreement.

7          Q.     That was the question.

8          A.     Yeah.

9          Q.     Do you recall why Cummings Manookian

10  needed an amended operating agreement in January 2017?

11         A.     I think I do, but I am not positive.

12         Q.     What's the reason you think you amended

13  this operating agreement?

14         A.     I think my personal IRA loaned money to

15  the firm, and there is some IRA or tax or other

16  regulation where the entity that was the beneficiary of

17  that loan could not be one in which I was a 50 percent

18  or more member, something along those lines.

19         Q.     So you needed to make an amendment to the

20  membership interest in order to appropriately account

21  for that IRA loan?

22         A.     That's my memory, that the loan couldn't

23  occur if I was 50 percent member and, therefore, the

24  change.  I might be wrong, but that's my best thought

25  on it.

1      Q.     Where did Cummings Manookian physically

2 operate during your time as a member?

3      A.     When it started we had an office over on

4 Woodmont Boulevard.  That's 37215.  I think the

5 building address is 102 or 104.  I don't remember the

6 unit number.  It might be on -- I thought it might be

7 on Exhibit 1.  It might be on something but not

8 something I have in front of me.  Then we moved to 45

9 Music Square West also in Nashville.

10      Q.     When did the firm move to 45 Music Square

11 West?

12      A.     I think it was by 2016.  I don't know if

13 it was in 2015 or not.

14      Q.     Why did the firm move its offices to 45

15 Music Square West?

16      A.     To have a better office space.  That

17 original Woodmont office was a one-room office in a

18 larger building.  The Music Square West property was

19 bigger, more rooms.  It was a better setup.

20      Q.     You eventually withdrew as a member of

21 Cummings Manookian, correct?

22      A.     Correct.

23      Q.     When was that?

24      A.     It was August or September of 2018.

25      Q.     Why did you choose to withdraw from

1   Cummings Manookian?

2          A.      To start my own firm.

3          Q.      Where there any other factors?

4          A.      I don't know how to answer that.

5          Q.      Were you aware at the time you withdrew

6   Mr. Manookian was going to be suspended from the

7   practice of law?

8          A.      I don't remember.  I don't know how those

9   time lines overlap.  I don't think that necessarily

10  would have been the reason even if your timeline

11  matches your question.

12         Q.      I am going to ask you to look back at

13  Exhibit 2 to this deposition.  It's Amended and

14  Restated Amended Operating Agreement.  Specifically I

15  want you to turn all the way back to Exhibit B of this

16  document, which starts on page 19.  Let me know when

17  you are there.

18         A.      I am there.

19         Q.      My questions here I am going to relate to

20  paragraph 2 of this document.

21         A.      Okay.

22         Q.      With the other party will be entitled.

23  You see that paragraph?

24         A.      I do.

25         Q.      Take a moment to review that paragraph

1   and explain to me what you believe that paragraph

2   provides.

3        A.    I will reread it and then answer.  That

4   paragraph reads to me as a way to proactively address

5   how to split up attorney's fees on a matter that was a

6   Cummings Manookian matter.  One of the two of us

7   withdrew from the firm and after that withdrawal both

8   of us then continue to work on it.

9        Q.    Let me see if I understand the way this

10  is supposed to work in practice or at least your

11  understanding.  If Cummings Manookian opened a matter

12  and the lawyers at Cummings Manookian worked on that

13  matter for 10 months and then you withdrew from

14  Cummings Manookian and took the matter with you and you

15  worked on the matter for another 10 months, do I

16  understand this section to provide that Cummings

17  Manookian would be entitled to 50 percent of the fee

18  and you would be entitled to 50 percent of the fee

19  under that scenario?

20       A.    I would have to reread it again about

21  your math, but I think this is the formula under your

22  scenario and question how it would get divided.

23       Q.    When you withdrew from Cummings Manookian

24  August or September 2018, did you take some firm

25  clients with you?

2053

1          A.      Yes.

2          Q.      When those matters were ultimately

3    resolved, did you use the formula in Exhibit 2 to

4    determine what fees you kept and what fees you paid to

5    Cummings Manookian?

6          A.      Yes.

7          Q.      From paragraph 2 we just looked at?

8          A.      Yes.  I knew what you meant, but, yes.

9          Q.      Did you use that formula with each case

10   that you took with you from Cummings Manookian?

11         A.      I did.

12         Q.      Going back to the property at 45 Music

13   Square West, did Cummings Manookian own the real estate

14   located at that address?

15         A.      The land and building, no.  I figure

16   that's what you mean.  I didn't hear what you said.

17   Did you say real estate or real property?

18         Q.      I said real estate, but I mean real

19   property.

20         A.      That's my fault.  Somebody drove by

21   louder than you.

22         Q.      I am asking whether Cummings Manookian

23   owned the building and land at 45 Music Square?

24         A.      No, they did not.

25         Q.      Who owned the building and land at that

1 address?

2       A.    A different entity whose name I know and

3 can't remember.  It's probably on a register of deeds.

4 If you said it I might -- it was some kind of trust

5 separate from Cummings Manookian.

6       Q.    I will ask you to confirm the way I

7 understand it.  Was that property owned by a general

8 partnership made up of two trusts?

9       A.    The entity that owned the building was

10 comprised of two trusts.  It's your general partnership

11 thing.  I don't know enough to know if that's true or

12 not.  It's just something law-wise I don't know how

13 that term fits.

14       Q.    Did you and Mr. Manookian control the two

15 trusts that owned the building?

16       A.    I don't know about his, and I believe the

17 trust that I was a part of of those two I am pretty

18 sure was my wife and I.

19       Q.    But the building was owned by two trusts

20 that were somehow associated with you and Mr.

21 Manookian?

22       A.    No.  The building was owned -- there is

23 something in the -- it got recorded wrong.  It was

24 either 45 -- it was supposed to be MSW Partnership, and

25 I think somewhere letters got transfixed, so it might

Case 3:23-cv-00961    Document 6-3    Filed 10/04/23    Page 21 of 266 PageID #: 4277    2055

1   be documented as 45 MWS.  That was the entity that

2   owned it.  The trust comprised that entity.  I don't

3   want to answer and make it sound like the trust owned

4   the building because that's not my understanding.

5        Q.   I understand.  That was a bad question.

6   I think you are right.  My understanding is the

7   building was owned by a partnership.  The two partners

8   of the partnership were two trusts.  My understanding

9   -- correct me if I am wrong -- was that one of those

10  trusts was affiliated with you in some way and one of

11  those trusts was associated with Mr. Manookian in some

12  way.  Is that fair?

13       A.   Yes.

14       Q.   Did Cummings Manookian have a lease for

15  the property at 45 Music Square West?

16       A.   Yes.

17       Q.   When did it enter into that lease?

18       A.   In 2016.

19       Q.   Was that a written lease?

20       A.   Yes.

21       Q.   Do you have a copy of that lease?

22       A.   Yes.

23       Q.   Do you know if Mr. Manookian kept a copy?

24       A.   I would have no way of knowing if he kept

25  a copy.

1          Q.     Did Cummings Manookian pay rent for the
2    use of the property at 45 Music Square West?
3          A.     Yes.
4          Q.     How much did it pay?
5          A.     It may have gone up incrementally each
6    year.  I want to say about $9200 a month.
7          Q.     When Cummings Manookian made its lease
8    payments, did it pay the partnership?  Did it pay a
9    bank?  Where were the lease payments actually made?
10          A.     It was one of two things.  It either paid
11   45 Music Square West or it paid InsBank that then used
12   the funds to pay the note.  I don't know if that was
13   one step to get there or two.
14          Q.     Is it fair to say the rent was based upon
15   what the payment due InsBank was?
16          A.     I think that's fair to say.  I think that
17   might have been how it was determined.  The answer is
18   yes.
19          Q.     When did Cummings Manookian stop paying
20   the rent for 45 Music Square West?
21          A.     I don't know that.
22          Q.     Do you know if it paid rent through the
23   entire time you were partner?
24          A.     I do and it did.
25          Q.     Do you know if it stopped paying rent

2057

1  shortly after you withdrew?

2       A.   I don't know that.

3       Q.   Did Cummings Manookian, PLC, ever own any

4  real property, any real estate?

5       A.   The firm did not own any real estate.

6       Q.   Other than 45 Music Square West and the

7  office that you mentioned on Woodmont, prior to that

8  did Cummings Manookian ever lease any other real

9  estate?

10      A.   Yes.

11      Q.   Where was that?

12      A.   For a brief period of time Cummings

13  Manookian had an office in Honolulu.

14      Q.   Did you practice from that office?

15      A.   I am smiling.  I was there a few days out

16  of the year.  If that means I practiced from there,

17  then, yes.  If it means I didn't practice from there,

18  then no.

19      Q.   Did anybody else use that space other

20  than you?

21      A.   No.

22      Q.   Did Cummings Manookian own any personal

23  property?

24      A.   Tell me what you mean by personal

25  property so I can answer.

2058

1      Q.    Sure.  I will give you a few categories

2   that perhaps it owned.  When I say personal property, I

3   am referring, at least for this question, to things

4   like desks, computers, copiers, conference room tables,

5   chairs, things of that nature.

6      A.    Furniture, yes.  Furniture I know is a

7   yes.  The others I don't know one way or another

8   despite I get the logic.

9      Q.    Tell me what furniture you know of that

10  Cummings Manookian owned.

11     A.    We bought furniture from a few companies

12  that we used to help furnish the office.  That's what I

13  am thinking of.

14     Q.    Was that purchased by Cummings Manookian?

15     A.    What I am thinking of, yes.  I had some

16  of my own things.  I would suspect Brian Manookian may

17  have as well, but the firm purchased some of the

18  furniture under that roof.

19     Q.    Do you believe the firm purchased most of

20  the furniture or just a few items?

21          MR. SPRAGENS:  Object to the form of

22  these questions.

23          THE WITNESS:  I don't know about most.  I

24  know it was into the tens of thousands of dollars

25  because I have seen that documented on tax documents.

1                    (Exhibit No. 3 was marked.)

2   BY MR. YOUNG:

3        Q.    So I am going to ask you to go ahead and

4   look at Exhibit 3, which is a property tax payment

5   document for the year -- it shows 2020.  It's for

6   personalty.  Do you have that document in front of you?

7        A.    I do.

8        Q.    Have you ever seen this document before

9   getting it today?

10       A.    Not that I remember.  You might know

11  this.  Well, let me leave it at that, that it's 2020.

12  I was going to say you might know the year is the year

13  I wasn't there anymore.

14       Q.    Do you recall ever seeing a document like

15  this for the years where you remember?

16       A.    I may have, but I don't remember.  The

17  tax document I was thinking about is I think called a

18  franchise and excise return we had prepared that list

19  those things, and if they weren't listed there, I

20  wouldn't remember those.

21       Q.    Who prepared the franchise and excise

22  return for you for Cummings Manookian?

23       A.    The one or two I am thinking about is an

24  accounting company called Mahan, and I think it's

25  called Mahan and associates.

Q.      Is that M-A-H-A-N?

A.      Yes, sir.

Q.      Do you have a copy of that F & E return?

A.      I have a copy of at least one, I think two at the most, because I know I have seen them recently.

Q.      If you look at what's been marked as Exhibit 3, you will see a total value of personal property of 73,806.  Do you see that number?

A.      Yeah, I do.

Q.      Do you know where that number came from?

A.      Absolutely not.  If this year is right, then, no, I have no way of knowing.  I can read the number you see and just read to me.

Q.      Does that number seem accurate to you based on what you knew Cummings Manookian to own?

A.      I don't know, especially to say it under oath.

Q.      That's fair.  I understand.

A.      Okay.

Q.      Who was responsible for filing the personal property tax returns for Cummings Manookian when you were a part of it?

A.      I think Mahan and Associates.  We hired them and paid them to do it.  I think that's the

1  answer.

2      Q.    You talked to the -- you knew Cummings

3  Manookian owned furniture, correct?

4      A.    Correct.

5      Q.    And you believe Cummings Manookian spent

6  tens of thousands of dollars on furniture; is that

7  accurate?

8      A.    Correct, but again that ballpark number

9  is coming from tax returns.  If I hadn't seen that, I

10  wouldn't even have that estimate.

11      Q.    What about computers?  Do you know if

12  Cummings Manookian owned any computers?

13      A.    I do not know that.

14      Q.    What about servers, computer servers?

15      A.    I don't know that either.

16      Q.    What about photocopiers?

17      A.    If you look you will see I am smiling.  I

18  don't think we had a photocopier, so that's -- I don't

19  think we possessed one to own it.  If we did I don't

20  know either way.

21      Q.    When you were a member of Cummings

22  Manookian, did it have computers at 45 Music Square

23  West?

24      A.    We did have computers, yes.

25      Q.    Do you know who purchased those

1    computers?

2           A.     No.   That's why I don't know who owned

3    them.

4           Q.     Do you know who paid to maintain the

5    computers in case of any maintenance issues?

6           A.     Cummings Manookian would have.

7           Q.     So you mentioned that you knew that

8    Cummings Manookian owned some furniture.   What happened

9    to those items of furniture when you left Cummings

10   Manookian?

11          A.     I did not take them, but I do not know

12   what happened to them.

13          Q.     You don't know where that furniture is

14   today?

15          A.     No, sir.

16          Q.     When you were a member of Cummings

17   Manookian, PLLC, did the firm maintain bank accounts?

18          A.     It did.

19          Q.     How many bank accounts did Cummings

20   Manookian have when you were a member?

21          A.     I think we had two at InsBank, and at one

22   time we had at least one account at Avenue Bank.   That

23   might be it.   I am trying to make sure I don't confuse

24   my current firm with that firm.   That's the list I

25   have.

1    Q.    Let's talk about the accounts at InsBank

2  first.  What were the purpose of those two accounts at

3  InsBank?

4    A.    The two I am thinking of one would have

5  been the IOLTA account and one would have been what I

6  will call the operating account.  If each partner had

7  individual accounts there, which makes sense, maybe

8  that falls under your earlier question, but I was

9  thinking more about the firm when I said two.

10    Q.    That's fair.  I am asking about the firm.

11  I am not asking individual accounts.  I am asking about

12  Cummings Manookian, PLLC, accounts.  What about the one

13  account at Avenue; what was its purpose?

14    A.    I think it would have been an operating

15  account, which might mean we had an IOLTA account

16  there, too, but I don't remember that.  I more remember

17  the InsBank aspect.

18    Q.    When you left Cummings Manookian, did you

19  only have accounts at InsBank in August of 2018?

20    A.    I think so because that's all that I

21  remember.

22          MR. SPRAGENS:  Did you ask the question

23  did Cummings Manookian have those accounts, not Mr.

24  Cummings?

25          MR. YOUNG:  Correct, right.

1      Q.    Just to clarify, I am asking whether
2  Cummings Manookian had only accounts at InsBank when
3  you left the firm in August of 2018?
4      A.    Yes, as far as I remember.
5      Q.    Who had signatory authority on the two
6  InsBank accounts?
7      A.    I would think Brian Manookian and I.  I
8  don't know if anybody else did beyond us.
9      Q.    Do you know if Afsoon Hagh ever had
10 signatory authority?
11     A.    That's what I was struggling -- I don't
12 know one way or another.
13     Q.    What kind of balances did the firm
14 typically maintain in its operating account?  By that I
15 mean did it empty it at the end of every month?  Did it
16 carry over a balance?  What was the firm's policy on
17 that?
18     A.    It definitely did not have a policy
19 because it would vary, including being a plaintiff's
20 firm sometimes some nice size deposits would come in
21 that would, what I will call, raise the daily average,
22 but we wouldn't leave the money sitting there.  We
23 would distribute it or transfer it to us or between us.
24     Q.    Did Cummings Manookian normally maintain
25 large balances month over month?

2065

1    A.    No, not the way I think of the word

2  large, no.

3    Q.    When you were a member of Cummings

4  Manookian, did it use any credit cards in its

5  operations?

6    A.    Yes.

7    Q.    What kind of credit card did it have?

8    A.    I remember the firm had American Express

9  card.  If at one time we had another, I call it,

10  corporate or firm credit card, I don't remember it

11  right now.

12    Q.    In whose name was that account held?  Was

13  it Cummings Manookian or one of you individually?

14    A.    I think it was Cummings Manookian, but I

15  can't picture the card in my mind right now.  I bet

16  each card had our names on it, but I think it was a

17  firm card or firm account.

18    Q.    Who was given credit cards on that firm

19  account?

20    A.    I know myself and Brian Manookian.  I

21  don't know that anyone else was.

22    Q.    Did the firm get monthly bills on that

23  credit card?

24    A.    Yes.

25    Q.    Who paid the monthly bills for the credit

2066

1  card?

2       A.    They came out of the firm account.

3       Q.    Who had access to the AmEx statements?

4       A.    I know I did.  I don't know if anyone

5  else did.

6       Q.    Were you the one responsible for

7  reviewing the charges?

8       A.    I know I did review them, yeah.  I don't

9  think it was in an operating agreement that it was

10  somebody's responsibility versus others.

11       Q.    When you were a member of Cummings

12  Manookian, what kind of charges were made to the firm

13  credit card?

14       A.    Can you specify what you want me to talk

15  about?

16       Q.    I will ask you a few categories and ask

17  you whether these are the kinds of things you would

18  normally charge to a firm credit card.  For example,

19  court costs?

20       A.    I think like filing fees, yes, would have

21  gotten on there.

22       Q.    What about payments to court reporters,

23  for example?

24       A.    Yes.

25       Q.    What about personal expenses?

A.    Yes.

Q.    How would that be accounted for if you had personal expenses billed to the corporate card?

A.    It would just show up on the card as a transaction that wasn't one of the other categories.

Q.    Would that be treated as a distribution to the partner?

A.    I don't know how to answer that.  We didn't have a policy about it.  I don't know.  I don't know how to answer that.

Q.    Did Cummings Manookian use telephone numbers in the operation of its business when you were a member there?

A.    Yes.

Q.    Do you remember what telephone numbers Cummings Manookian used?

A.    I will look at one of your exhibits to try to remember.

Q.    Let me ask you a few questions and see if this triggers memory.  Was (615)266-3333 Cummings Manookian's primary office telephone number?

A.    I think so, yes.

Q.    Was (615) 266-0250 its primary fax number?

A.    Correct.

1  Q.    Did Cummings Manookian use other
2  telephone numbers in the operation of its business?
3  A.    When there was that brief time of having
4  a Hawaii office, the answer is yes, but it was not a
5  Nashville number.  It was an 808 area code number.
6  Q.    Did the lawyers at Cummings Manookian
7  have direct dial numbers?
8  A.    I bet we did.  I don't remember.  It
9  makes sense because we didn't have a switchboard.
10  Q.    Who initially established the Cummings
11  Manookian telephone numbers?  Who set those up?
12  A.    Let me go back.  I am actually not sure
13  we had direct numbers.  I am still thinking about the
14  question.  I don't remember that.  I said I thought we
15  did.  I don't remember.  I am sorry, can you repeat the
16  most recent question?
17  Q.    Sure.  Who established the Cummings
18  Manookian telephone numbers?  Who set up those
19  telephone numbers?
20  A.    I don't know.
21  Q.    Was it someone other than you or you
22  don't recall?
23  A.    I don't know.  It might have been me.  I
24  just don't remember.
25  Q.    In whose name was the telephone bill

Case 3:23-cv-00961    Document 6-3    Filed 10/04/23    Page 35 of 266 PageID #: 4291    2069

1 issued every month?

2      A.    I don't know.

3      Q.    Who paid the monthly telephone bill while

4 you were at Cummings Manookian?

5      A.    I think the firm did, but I don't recall.

6 I can't picture a document right now, picture a bill

7 that covers that.

8      Q.    When you resigned your membership from

9 the firm in August or September 2018 did you take any

10 of Cummings Manookian's telephone numbers with you?

11      A.    No.

12      Q.    Did you ever use (615)256-3333 or

13 (615)266-0250 in your new firm?

14      A.    No.

15      Q.    Do you know who was using those two

16 telephone numbers as of December 2018?

17      A.    No.  I just know I wasn't.

18      Q.    Do you know if anyone is using those

19 numbers today?

20      A.    No, I do not.

21      Q.    When you were a member at Cummings

22 Manookian, did it have a website?

23      A.    We did.

24      Q.    What was the domain, the address?

25      A.    I think it was cmtriallawyers.com.

1      Q.    When did cmtriallawyers.com first become

2  operational?  Was it at the very beginning of the firm?

3      A.    I don't know.  I believe it was in the

4  first year, so that would have been in 2015.

5      Q.    Was cmtriallawyers.com still operational

6  as of your exit from the firm?

7      A.    Yes.

8      Q.    Do you know when it ceased operating?

9      A.    No.

10      Q.    Did someone maintain that website for

11  you, or did you do it in-house?

12      A.    I know I did not.  We got help from

13  someone who was not a lawyer, and I think Brian

14  Manookian may have helped some, but I am not sure

15  whether he helped on the site or not.

16      Q.    When you say someone who was not a

17  lawyer, was that an employee?

18      A.    It was Jim Pepe with Helix SEO.  We paid

19  him monthly.  I don't know if he was an employee.  He

20  did work for other companies and other people besides

21  ours.

22      Q.    Was his only job, at least for Cummings

23  Manookian, to maintain the website, or did he have

24  other responsibilities as well?

25      A.    I don't think the website was Jim Pepe's

1  only responsibility in our regard, but I can't tell you
2  what else he did do.
3      Q.    Were there annual billings to continue
4  the use of that domain cmtriallawyers.com?
5      A.    My experience is there is an annual
6  renewal for a domain name, so that's why I am going to
7  say yes.
8      Q.    Do you know who paid that annual renewal?
9      A.    Either me personally or the firm.
10      Q.    Do you know who owns the right to that
11  domain --
12      A.    I'm sorry, or Mr. Manookian.  Mr.
13  Manookian may have been the one who -- whoever first
14  purchased it I believe then got hit with the annual
15  renewal.
16      Q.    Do you know who owns the right to that
17  domain today?
18      A.    No.
19      Q.    When you were a member at Cummings
20  Manookian, did its attorneys have e-mail addresses?
21      A.    Yes.
22      Q.    You had an e-mail address?
23      A.    Yes.
24      Q.    What was that e-mail address?
25      A.    Bcummings@cmtriallawyers.com.

2072

1          Q.     Did Brian Manookian have an e-mail
2     address?

3          A.     He did.

4          Q.     What was that address?

5          A.     Bmanookian@cmtriallawyers.com.

6          Q.     Did Afsoon Hagh have a
7     cmtriallawyers.com e-mail address?

8          A.     I think so.  I am not as certain of that
9     as I am about Mr. Manookian and myself.

10         Q.     Who paid to maintain those e-mail
11    accounts when you were a member of the firm?

12         A.     I don't know how to answer that, because
13    I don't know if that is even an expense.

14         Q.     So you are not sure if there was any cost
15    to maintain it?  Is that what you are saying?

16         A.     Yeah, that's what I am saying.  I just
17    might not understand your question, but I don't know.
18    I don't know what that cost would be is my direct way
19    to put it.

20         Q.     Do you know if any of those
21    cmtriallawyers.com e-mail addresses are active today?

22         A.     No, I don't.

23         Q.     When you were a member of Cummings
24    Manookian, did the firm maintain time records for its
25    contingency cases?

1    A.    No, not routinely or per policy.

2    Q.    Do you know if any individual attorneys

3 working for Cummings Manookian had a policy of keeping

4 time records on their contingency cases?

5    A.    Without making you repeat that question,

6 I am going to carefully word my answer.  Yes, to the

7 extent it was somebody like an outside attorney we had

8 help and they were going to get paid at an hourly rate.

9 That would still be a contingency case, but we would

10 have had them keep up with their time so they could get

11 paid for that time, but as far as the in-house Cummings

12 Manookian attorneys, I don't know of such a practice.

13    Q.    Did Cummings Manookian employ any

14 nonlawyer staff during your time as a member?

15    A.    Yes.

16    Q.    How many?

17    A.    One I am certain of, which is Doug Rice.

18 If Jim Pepe was an employee, he would be the second.

19 As I said before, I am not certain he was an employee

20 despite the fact we paid him regularly.

21    Q.    Any others you can think of other than

22 Doug Rice or Jim Pepe?

23    A.    Was your question about nonlawyer people

24 we employed?

25    Q.    Yes.

1          A.     I don't have anybody else to add to that.

2          Q.     You explained to me what Jim Pepe did

3     generally speaking.  What was Doug Rice's role at

4     Cummings Manookian?

5          A.     He was a paralegal.

6          Q.     Was Doug Rice still working for Cummings

7     Manookian at the time you resigned your membership?

8          A.     Yes.

9          Q.     What about Jim Pepe?  Was he still

10    performing services for the firm when you resigned?

11         A.     I think so, but I am not as clear on Jim

12    as I am about Doug Rice.

13         Q.     Did Cummings Manookian ever employ any

14    attorneys other than you and Mr. Manookian during your

15    time at Cummings Manookian?

16         A.     Afsoon Hagh was an attorney at the firm.

17    It's the term employee.  Just like the thing with Pepe,

18    I don't know if I can put it in that category.

19         Q.     Other than Afsoon Hagh, were there any

20    other lawyers -- other than Afsoon Hagh, you, and Mr.

21    Manookian, were there any other lawyers who did work

22    for Cummings Manookian while you were a member there?

23         A.     Yeah, and I am not trying to confuse you.

24    Mr. Hammervold did depending on your question.  He was

25    an outside lawyer, but he did work on some of our

1    cases.

2           Q.     Did you pay Mr. Hammervold on an hourly

3    basis?

4           A.     The firm did.  I think on some cases Mr.

5    Hammervold may have gotten a percentage division just

6    like we were used to, but I think on other things it

7    was more project based for Mr. Hammervold.

8           Q.     Was it fair to say Mr. Hammervold was not

9    a Cummings Manookian attorney?  He was an outsourced

10   attorney?

11          A.     Correct.

12          Q.     Was Afsoon Hagh ever a member of Cummings

13   Manookian, PLC?

14          A.     Not while I was there.

15          Q.     Was Afsoon Hagh ever paid by Cummings

16   Manookian, PLC, in any kind of capacity while you were

17   there?

18          A.     I don't think so unless health insurance

19   is considered compensation, but I don't think that's

20   what you meant.

21          Q.     Was she on Cummings Manookian's health

22   insurance plan?

23          A.     I don't know that the firm had a plan.  I

24   know the firm was charged for a health insurance plan

25   that I was not on, which was my choice, and I think

2076

1    covered Mr. Manookian and Ms. Hagh.

2         Q.    I think I understand your prior comment

3    about not sure whether Afsoon Hagh would be considered

4    an employee of Cummings Manookian.  Let me ask you this

5    question.  What did you consider Ms. Hagh's role at

6    Cummings Manookian to be while you were a member?

7         A.    She was a lawyer who worked on some firm

8    cases.

9         Q.    Did she ever have a title at Cummings

10   Manookian that you knew of?

11        A.    No.

12        Q.    Did you ever introduce her to clients

13   with any particular title?

14        A.    Right now I don't remember.  I know I do

15   remember one time I was with her with a client.  I

16   don't think I introduced her.  I think they already

17   knew each other.

18        Q.    Did you ever refer to her as senior

19   counsel or senior attorney to anyone?

20        A.    No, not that I remember.

21        Q.    Did you ever hear her --

22        A.    Let me add to that.  I also wouldn't have

23   called her junior counsel either.  I don't think I

24   would have said any such thing.

25        Q.    Did you ever hear Mr. Manookian refer to

1  her by any title?

2      A.    Not that I remember, no.  That's not the

3  way we spoke or at least not the way I remember things.

4      Q.    Did you ever hear her refer to herself by

5  any title?

6      A.    No.  I am trying to picture e-mails I

7  received from her how people have signature blocks.  I

8  don't remember if she had anything on hers or not.  I

9  don't remember her saying that to me.

10      Q.    Do you know if Afsoon Hagh was carried on

11  Cummings Manookian's firm malpractice insurance policy?

12      A.    She was from a certain point forward,

13  yes.  I don't think she was initially.

14      Q.    Do you know when she was added to the

15  firm's malpractice insurance policy?

16      A.    I think it was late 2016.  It was 2016 or

17  2017.  That much I know.

18      Q.    Was she still on the firm's malpractice

19  insurance policy when you resigned Cummings Manookian?

20      A.    Yes.

21      Q.    Did Afsoon Hagh have an office at

22  Cummings Manookian offices at 45 Music Square West?

23      A.    I would say yes to that.

24      Q.    Do you know when she last used that

25  office?

2078

1    A.    No.  I have no idea.

2    Q.    Do you recall whether she was using that

3  office when you left the firm in August or September

4  2018?

5    A.    I am going to answer this way.  I can

6  picture the office.  I am thinking of the space in that

7  building she used.  I can't tell you when I last saw

8  her there even when I was there or when I last saw Mr.

9  Manookian.  I just don't have a memory.  I can picture

10  the space I am thinking of, but I can't picture her in

11  it one time versus another.  I am sorry if that sounds

12  flippant.  I just can't.

13    Q.    Thank you for that clarification.  Do you

14  know if Ms. Hagh was getting mail at 45 Music Square

15  West when you left the firm September 2018?

16    A.    She was.

17    Q.    Do you know if she was using her Cummings

18  Manookian e-mail at that time?

19    A.    I don't know.  She used e-mail.  I don't

20  know what the e-mail address was.  It could be figured

21  out.  Spontaneously I don't know.

22    Q.    Do you know if Ms. Hagh was using the

23  (615) 256-3333 as her telephone number as of the date

24  that you left the firm?

25    A.    I think you mean 266 for your question.

1       Q.    Yes, sorry.

2       A.    I think all of us were at the time I

3  left.   By all of us I mean Manookian, Hagh, Cummings.

4       Q.    Do you know when Ms. Hagh ceased using 45

5  Music Square as her mailing address?

6       A.    I don't, no.

7       Q.    For clarification, the reason I am asking

8  this you did work on cases with Ms. Hagh after you

9  resigned from Cummings Manookian, correct?

10      A.    I know I worked on one case with her.  If

11  it's more than that, it's just me not remembering it,

12  not trying to slight anybody.

13      Q.    Do you remember if you needed to mail

14  something to her like a notice, would you use 45 Music

15  Square West on that case?

16      A.    I would have e-mailed it.  I don't think

17  I would have sent her traditional mail to anywhere.

18      Q.    What e-mail address would you have used

19  to send it to Ms. Hagh?

20      A.    I would have just started typing in her

21  name and the rest would auto populate.  I'm sorry, I

22  know it would have started with her name and then it

23  would complete itself, so I don't know.

24      Q.    Do you know when she ceased using her

25  Cummings Manookian e-mail address?

1      A.    No, I don't.

2      Q.    Do you know when she ceased using the

3  266-3333 telephone number?

4      A.    I do not.

5      Q.    When you resigned from Cummings

6  Manookian, do you know if the firm notified clients of

7  your departure?

8      A.    The clients got notified.  I don't know

9  who did that, if it was me individually, the firm

10  through a human being, or Mr. Manookian, or some

11  combination of that.  Ms. Hagh may have done it, but

12  they learned of it.

13      Q.    When would they have learned of it?

14      A.    Soon around the time I started my new

15  firm at the latest so they would have all that contact

16  information.

17      Q.    Do you recall if they were notified by

18  telephone or in writing of your departure?

19      A.    I don't remember.  I can tell you what I

20  think the practice was just from knowing me.  I will

21  let you tell me if you want to know that.

22      Q.    Sure.  What was your practice?

23      A.    One of us would have sent an e-mail so if

24  somebody later complained you could prove it went out

25  or to a more formal extent a letter, but it would not

1  have just been a phone call.  That's not how I -- that
2  would not have been effective for us of how we do
3  things.
4       Q.    You are now aware that Brian Manookian
5  was suspended from the practice of law in December
6  2018, correct?
7       A.    I know he has been suspended.  Tell me
8  the date again.
9       Q.    December 2018.
10      A.    I don't know that your date is right, but
11  I won't fuss at you.
12      Q.    You knew he was suspended sometime
13  shortly after you resigned your membership?
14      A.    Yes.
15      Q.    I think you mentioned having at least one
16  client in common with Ms. Hagh.  Was that the Shoemaker
17  matter?
18      A.    It was.  It was Brett Keefer.
19      Q.    Do you know if Mr. Manookian ever
20  notified Mr. Keefer of his suspension?
21      A.    I didn't see it, but I didn't see
22  anything he sent out.  I don't know.  You are asking me
23  if I know.  The way I use words, no, I don't know.  Do
24  I believe he did?  Yes, I believe he did.
25      Q.    Did you ever see a copy of a letter?

2082

1     A.    I don't remember one way or another.  I

2  may have.  Brian Manookian may have mailed me a copy.

3  I don't know.  I don't remember.  It wasn't a concern

4  of mine because I believed he did it.

5     Q.    Did you ever have any discussions with

6  Mr. Keefer about Mr. Manookian's suspension?

7     A.    I probably did to help him understand.

8  Again, it's like why I think we mailed clients about

9  what was going on.  Just knowing me, I would have

10  wanted him to understand not to panic when he is being

11  told somebody got suspended.

12     Q.    Do you know whether Mr. Keefer was ever

13  informed Cummings Manookian could no longer represent

14  him?

15     A.    I am going to need you to rephrase that.

16  Before you do I am going to grab a bottle of water five

17  steps away from me.  Remember the question.  Repeat the

18  last one.

19     Q.    Do you know whether Mr. Keefer was ever

20  informed that Cummings Manookian could no longer

21  represent him?

22     A.    No, I don't know that.

23     Q.    Do you know whether Mr. Keefer was ever

24  told that he needed to interview new counsel?

25     A.    No.  Politely I don't really understand

1    the question.  Maybe I don't need to.  I mean he hired

2    us.

3          Q.    I guess the question is this.  Upon Mr.

4    Manookian's suspension, do you know if Mr. Keefer was

5    told he needed to get new counsel because Cummings

6    Manookian couldn't represent him anymore?

7          A.    No.  Are you going to be upset if I

8    elaborate?

9          Q.    No.

10         A.    When Mr. Keefer signed -- maybe I am

11   wrong.  When Mr. Keefer signed an attorney-client

12   agreement, he knew that it wasn't just one attorney

13   that was going to be representing him, so that's the

14   part I am struggling with.  Maybe it happened, but I

15   don't see a hypothetical, and maybe it's an ethical

16   rule I am unaware of unfortunately, where Mr. Manookian

17   as one attorney being suspended and other existing

18   attorney or attorneys being -- that would have

19   triggered a conversation that he could or should

20   interview other attorneys.  That's why I am not -- one,

21   I am not aware of it, but I am talking too much.  I

22   wouldn't have expected that either.

23         Q.    Is it fair to say, at least in your view,

24   Mr. Manookian's suspension didn't change the way the

25   case was being handled?

1          MR. SPRAGENS:  Object to the form.

2          THE WITNESS:  Correct.  I mean we lost

3    Mr. Manookian's ability to work on the case during that

4    time, but we kept moving the case forward.

5          MR. YOUNG:  Let's take about a five

6    minute break at this point.  Come back at 2:18.

7          (A break was taken.)

8    BY MR. YOUNG:

9          Q.    Mr. Cummings, during the break you

10   mentioned that you needed to make a correction to a

11   prior statement?

12         A.    Yeah, I need to fix a year I think I told

13   you.  You asked me about Afsoon Hagh being on or added

14   to the Cummings Manookian malpractice coverage.  I

15   thing I told you 2016 or 2017.  I looked up an e-mail I

16   had with that company, and it looks like it was 2017.

17   So if I had 2016 I was wrong.

18         Q.    Thank you for that clarification.

19   Earlier you were explaining that some lawyers did some

20   work on Cummings Manookian cases that were paid on an

21   hourly basis.  Do you remember that?

22         A.    Yeah.

23         Q.    You used Mark Hammervold as an example?

24         A.    Correct.

25         Q.    Was Ms. Hagh ever paid on an hourly basis

1  like an outside attorney?

2              MR. SPRAGENS:  Object to the form.

3              THE WITNESS:  Not by Cummings Manookian

4  while I was there.

5  BY MR. YOUNG:

6       Q.    Did you consider her to be I think you

7  used the word in-house attorney when referring to the

8  people who routinely worked on Cummings Manookian

9  matters?  Did you consider Ms. Hagh to be an in-house

10 attorney with Cummings Manookian?

11      A.    Yes, which is why we added her to our

12 malpractice coverage.

13      Q.    I am going to shift a bit and ask

14 questions about a few specific cases.  The first one is

15 Fitzgerald versus Osborn.  Were you ever involved in

16 that case?

17      A.    Not that I remember, no.

18      Q.    You have no personal knowledge about that

19 case?

20      A.    Correct.  That's easy.  I have no

21 personal knowledge about that case.

22      Q.    I think you testified earlier that when

23 you left Cummings Manookian you did take some cases

24 with you.  Do you recall which cases you took with you

25 when you left Cummings Manookian?

1    A.    I was afraid you were going to ask that.
2   First of all, let me put it this way.  I am going to
3   try to list -- do you have a list of any of these cases
4   where I can say yes or no?

5    Q.    I don't.  I guess I am asking which ones
6   you recall taking with you.

7    A.    I will change my answer from how you
8   phrased it.  Matters I worked on after I left Cummings
9   Manookian that were initially signed by the Cummings
10  Manookian firm are the Shoemaker case, a case called
11  Marcum.  There are others, and this is how I know this,
12  and you might know this, too, that paragraph you had me
13  look at with how to break out splitting attorney -- I
14  used that formula to send Ms. Burton checks on more
15  than one case after I left.  It would have been
16  something I continued to have a role on that I ended up
17  doing that accounting, but initially it had been a
18  Cummings Manookian matter.  I just don't have that list
19  in that part of my brain to tell you.

20   Q.    Let me ask this question.  Other than
21  Shoemaker -- put that one to the side -- other than
22  Shoemaker, for any case that originated with Cummings
23  Manookian, that is signing an engagement letter first
24  with Cummings Manookian, but on which you worked after
25  you left Cummings Manookian, did you use that formula

1  to divide fees among yourself and Cummings Manookian?

2      A.    Yes.

3      Q.    Why did you split the fees?

4      A.    I am sorry, the first word didn't come

5  through.

6      Q.    Why did you split the fees?  Why didn't

7  you keep it all to yourself?

8      A.    Because it had initially been a Cummings

9  Manookian matter.  That paragraph, paragraph 2 on

10  Exhibit 2, page 19, I think respectfully you or Ms.

11  Burton may have reminded me I needed to do that.

12      Q.    You believe you were required to do so by

13  the operating agreement?

14          MR. SPRAGENS:  Object to the form.

15          THE WITNESS:  I do.

16              (Exhibit No. 4 was marked.)

17  BY MR. YOUNG:

18      Q.    I am going to ask you to look at what's

19  been premarked Exhibit 4.  Just to be sure we're all

20  looking at the same document, it's a document entitled

21  Attorney-client Agreement on Cummings Manookian

22  letterhead dated April 19, 2017, addressed to Edward

23  Goodwin and Brett Keefer.  Do you see that?

24      A.    Yes.  I have it in front of me.

25      Q.    Have you ever seen this document before?

1     A.     Yes.

2     Q.     Is it, in fact, an attorney-client

3 agreement with Mr. Goodwin and Mr. Keefer?

4     A.     Yes, with them and Cummings Manookian,

5 yes.

6     Q.     Is this related to the case that we've

7 sometimes referred to as the Shoemaker case?

8     A.     Yes.

9     Q.     I want you to turn to page 3 of this

10 document and tell me if that's your signature at the

11 bottom of this letter.

12     A.     It is.

13     Q.     Are you the one that initially had

14 conversations with Mr. Keefer?

15     A.     I think so.  I think I was the first one

16 to speak to him, but that's not really the way I

17 remember things.  My mind doesn't categorize things

18 that way.  I think so because this was pretty soon

19 after the event.  It says on page 1 April 14 and this

20 document is going out April 19.  I think I spoke with

21 him, got this to Mr. Goodwin, because that's his e-mail

22 address, and there would be a page where they would

23 have signed it.  Mine only has three pages.

24     Q.     Do you think they ultimately signed this

25 document?  That could have been cut off.

*ANNE S. WILSON & ASSOCIATES*
*615-298-1992*

1          A.    I think they did and there might have
2    been a later very similar agreement that only Mr.
3    Keefer signed when we realize Mr. Goodwin was not the
4    surviving spouse of the decedent.
5          Q.    Was a complaint ultimately filed against
6    Vanderbilt on behalf of Mr. Keefer?
7          A.    Yes.
8          Q.    Do you know when that happened?
9          A.    Can I cheat and look at the exhibit you
10   sent me?
11         Q.    Sure.  Go ahead.  We will look at that in
12   a minute.
13         A.    I know it has a stamp filed date on it.
14   February 11, 2019.
15         Q.    Do you know if any time between April 19,
16   2017, and February 11, 2019, when the case was filed,
17   do you know if at any time during that time Cummings
18   Manookian sent Mr. Keefer a letter informing him it was
19   withdrawing from his representation?
20         A.    Can you repeat that.
21         Q.    Do you know if Cummings Manookian ever
22   sent Mr. Keefer a letter before February 11, 2019,
23   informing him that it was withdrawing from his
24   representation?
25         A.    No.

1          Q.     In fact, when you filed this complaint

2    February 2019, did you believe this attorney-client

3    agreement was still in full force and effect?

4          A.     An agreement between Mr. Keefer and

5    Cummings Manookian was still in full force and effect,

6    yes.  Might not have been the one in front of me,

7    because I think Mr. Keefer may have signed a

8    supplemental one that was just him.

9          Q.     You think the terms were substantially

10   similar?

11         A.     Yes.

12         Q.     Prior to the filing of the complaint,

13   were there any settlement discussions with Vanderbilt?

14         A.     Yes.

15         Q.     Was there ever an offer made?

16         A.     Yes.

17         Q.     Do you recall how much that offer was?

18         A.     It was at a mediation.  I remember what

19   Vanderbilt's last comment was, but I will get Mr.

20   Price's help, my attorney here, on what I am allowed to

21   say in the deposition so I don't violate a rule about

22   that.

23              MR. PRICE:  I need to hear that question

24   again.  The settlement agreement I understand is

25   confidential.  I don't know that the mediation was.  I

1  am worried that this may be a confidential

2  communication between Mr. Keefer and his attorneys in

3  this case, so I am worried about the amounts right now.

4  BY MR. YOUNG:

5      Q.    I understand that.  Let me explain why I

6  am asking this.  The defendants in this case have

7  alleged that there was a very low offer made prior to

8  the filing of the complaint and the defendants allege

9  that that is somehow significant in determining

10 division of the fees later.  That's the only reason I

11 am asking.  Maybe you can answer this or not answer

12 this.  The offer that was made prior to the filing of

13 the claim -- would you have considered that a very low

14 offer?

15          MR. SPRAGENS:  Object to the form.

16          THE WITNESS:  Yes, and that's why it was

17 not accepted.

18 BY MR. YOUNG:

19     Q.    That's ultimately why a complaint was

20 filed?

21     A.    Right.

22              (Exhibit No. 5 was marked.)

23 BY MR. YOUNG:

24     Q.    Let's go ahead and look at a copy of the

25 Complaint premarked as Exhibit 5.  I'll ask have you

1  ever seen this document?

2        A.    Yes.

3        Q.    Is this the document that initiated --

4  this is a complaint that initiated the matter between

5  Mr. Keefer and Vanderbilt?

6        A.    This is the complaint that was filed that

7  started the lawsuit.

8        Q.    This shows it was filed February 11,

9  2019, like you testified earlier, correct?

10        A.    Right.  I see that.

11        Q.    Again, like I did in the deposition of

12  Mr. Manookian, I will plead a little ignorance not

13  being a personal injury lawyer and ask you why it took

14  from April 19, 2017, until February 11, 2019, to file

15  this complaint?

16        A.    Sure.  The bulk of that time between

17  death and this February 2019 filing date was at least

18  one if not multiple tolling agreements with Vanderbilt

19  where they said they wanted a tolling agreement meaning

20  a freeze on the running of the statute of limitations

21  and statute of repose to see if it would settle

22  presuit.  They wanted to try that through the presuit

23  mediation you asked me about or I was thinking of.

24  That didn't result in settlement and then filed the

25  lawsuit before the tolling agreement ran out.  The

1  tolling agreement allowed more time than normal, which
2  might be the best way to answer your question.
3      Q.    That does at least partially answer the
4  question.  What did Cummings Manookian do to ready this
5  file for a complaint between April 19, 2017, and
6  February 11, 2019?
7              MR. SPRAGENS:  Object to the form.
8              THE WITNESS:  I can tell you what I did.
9  Is that okay?
10 BY MR. YOUNG:
11     Q.    Sure.  Explain what you did.
12     A.    Met with the client, obtained and
13 reviewed medical records, reviewed information on line
14 about the medical issues, whether it's, quote, unquote,
15 medical literature or things you could read to better
16 understand the issues, conferred with a pre-suit
17 expert, went to that pre-suit mediation you asked
18 about, prepared this document, the complaint.  Those
19 are the things that come to mind as to what was done
20 between first contact to filing of the complaint.
21     Q.    Do you know if any other attorney at
22 Cummings Manookian worked on this matter before the
23 filing of the complaint?
24             MR. SPRAGENS:  Object to the form.
25             THE WITNESS:  I am hesitating, because

1  this came up earlier.  I don't remember the suspension

2  dates.  I don't know.  I know what I did.  I don't know

3  what other people -- I don't know of anybody else doing

4  anything through the point you asked me.

5  BY MR. YOUNG:

6        Q.    You don't recall anyone else doing

7  anything prior to the filing of this complaint?  Is

8  that fair?

9        A.    I don't remember it, but I would have

10  spoken -- if he was not suspended at the time, spoken

11  with Mr. Manookian about this.  We would have been

12  looking at things in the record together, talked about

13  things, talked about whether to include Dr. Gretchen

14  Edwards, but I don't remember those things, and I can't

15  think of a work product to prove it.

16        Q.    Do you recall having any conversations

17  with Afsoon Hagh before this complaint was filed?

18        A.    Not about this matter, no.

19        Q.    I think you mentioned earlier that you

20  drafted this complaint?

21        A.    Yes.

22        Q.    If we look at page 69 of Exhibit 5, is

23  that your signature on this complaint?

24        A.    Yes, it is.

25        Q.    Do you know whether you circulated this

1   complaint to Brian Manookian for his review before it
2   was filed?

3         A.    I don't know.

4         Q.    Do you know if you circulated this
5   complaint to Afsoon Hagh for her review before it was
6   filed?

7         A.    I do not know that either.  Are you on
8   page 69 of this exhibit?

9         Q.    Sure.

10        A.    You were asking about Ms. Hagh's e-mail
11  address and I told you I didn't remember.  There is one
12  e-mail address.

13        Q.    That's Afsoon@cummingsmanookian.com?

14        A.    Right.  I am reading it from the page.  I
15  obviously didn't remember that.

16        Q.    Would you have sent a copy of this
17  complaint to her for her review before filing?

18              MR. SPRAGENS:  Object to the form.

19              THE WITNESS:  I don't know that I did.

20  BY MR. YOUNG:

21        Q.    While we're on page 69, you see that Ms.
22  Hagh's signature block says Cummings Manookian, PLC,
23  correct?

24        A.    I see that.

25        Q.    It has a telephone number of 266-3333?

1      A.    Right.

2      Q.    And a fax number of 266-0250?

3      A.    Correct.

4      Q.    Like you pointed out before, it shows her
5  e-mail address is Afsoon@cummingsmanookian.com?

6      A.    Yeah.  I have to tell you I might have
7  been wrong when I told you what Mr. Manookian's and my
8  e-mail addresses were.  Cmtriallawyers.com might have
9  been the domain name, but our e-mail addresses were the
10  firm name.  Kind of matching my clear indication to you
11  I was not real clear on my memory about that.

12      Q.    That's fair.  It's been a few years.  I
13  understand.  Looking at the signature block on page 69,
14  why did you include her Cummings Manookian, PLC, firm
15  name and e-mail address and these telephone numbers in
16  the signature block?

17      A.    Because she was co-counsel when we were
18  filing it.

19      Q.    Did you understand this to be her contact
20  information as of February 2019?

21      A.    I certainly wouldn't misrepresent that in
22  a filing, so I guess the answer is yes.  I can't tell
23  you I remember one way or the other.

24      Q.    This is what you believed at least as of
25  February 2019?

1      A.      Right.

2      Q.      Did Ms. Hagh ask you to change this?

3      A.      No.

4      Q.      Did she ever tell you not to use Cummings

5  Manookian signature block?

6      A.      Not that I remember.  Not about this.

7      Q.      Do you remember at any time her telling

8  you not to use her Cummings Manookian signature?

9      A.      I don't remember that, but it may have

10  occurred at some point later when there was a change of

11  address or change of firm.  I just -- I don't remember

12  that occurring either.

13      Q.      You explained to me earlier the work you

14  did on the Shoemaker case up to the point of filing

15  this complaint.  Can you explain to me what work you

16  did on the Shoemaker case after this complaint was

17  filed?

18      A.      Sure.  I want to be as clear as the

19  question was.  When I was answering earlier because of

20  the way -- I was answering through the filing of the

21  complaint.  When you saw page 69 when this complaint

22  was filed I already left the firm.  Making sure you saw

23  that.

24      Q.      I understand.

25      A.      Fair enough.  Now I forgot the question.

1    Were you asking what happened later?

2         Q.     What work did you do on the Shoemaker

3    case after the filing?

4         A.     Helped the client answer written

5    discovery, prepared written discovery that was

6    propounded to the defendant, retained experts, both

7    medical experts and one economist expert, attended

8    and/or took depositions before the expert witness

9    depositions.  Some I attended and did not take.  Some I

10   took the only one there.  It was a variety.  I attended

11   a second mediation with Afsoon Hagh.  This one was

12   during the litigation.

13            Well, obviously, you asked from the

14   complaint forward.  There would have been motion

15   hearings I went to.  I may have even argued part of it.

16   That part I am not as sharp on memory-wise.  I don't

17   want to get -- I'll answer the question.  When we would

18   get things, I prepared summaries of it, whether it was

19   Vanderbilt responses to discovery, key points from

20   deposition transcripts.  Once I would get the expert's

21   opinion orally prepare the expert disclosures.  Rule 26

22   disclosures is the name of that.

23            As part of that maybe prepare summaries

24   to send to those experts, summaries of records,

25   summaries of depositions, summaries of Vanderbilt's

1 discovery responses, speak with them to learn their
2 opinions to prepare the corresponding Rule 26
3 disclosures. I might be leaving something out. Off
4 the top of my head, those are the categories I would
5 use.
6       Q.    Just for the record, I am not asking sort
7 of a blow by blow.
8       A.    Then you could have cut me off.
9       Q.    That's good because you did what I asked,
10 which is I wanted explanation of generally what kind of
11 work you did on this matter after the filing of the
12 complaint. In the same vein I want to ask you
13 generally what work did Brian Manookian do on the
14 Shoemaker case after the filing of this complaint?
15       A.    I can answer that. Easily through the
16 time of -- I can answer that. What I am trying to
17 figure out is he took and/or attended a bunch of
18 depositions. He argued a good number of the motions I
19 was thinking of, a lot of discovery disputes, debates
20 about people and service issues, whether they were --
21 he likely wrote the majority of those discovery related
22 motions, whether we were the motion filer or response
23 filer. So depositions, motion practice. He would have
24 prepared written discovery that was propounded on
25 Vanderbilt. That's my list right now for that answer.

Case 3:23-cv-00961   Document 6-3   Filed 10/04/23   Page 66 of 266 PageID #: 4322   2100

 1      Q.     I will ask the same question.  After the
 2 filing of this complaint, what work did Afsoon Hagh do
 3 on this?
 4      A.     She attended that second mediation, first
 5 one during the litigation.  I think she prepared that
 6 mediation statement.  I don't remember, but I don't
 7 think I did, so she would have done that.  I can't
 8 picture her or remember her attending or taking any of
 9 the depositions Mr. Manookian and I were at.  If I am
10 forgetting one or something, hopefully the transcript
11 shows who was there in the appearance section.  Until I
12 withdrew from the case she would have argued some
13 motions.  She would have argued some of those discovery
14 motions.  She would have attended a case management
15 conference like I would have.  Maybe at times it was
16 one of us without the other or both of us.  Then once I
17 withdrew from the case, that's where I don't know one
18 way or another.
19      Q.     When did you withdraw from the case?
20      A.     October 2020 and I think it was October
21 1st.  If I am wrong there is a letter that documents
22 the date.  By withdrawal I mean where I told Ms. Hagh
23 and the client I was going to withdraw.  I think it was
24 a few days after I filed the motion about withdrawing.
25      Q.     What caused you to want to withdraw from

1    the case?

2           A.    I did not want to withdraw.

3           Q.    Why did you withdraw?

4           A.    I called the board of professional

5    responsibility on October 1st, 2020 or a day or two on

6    either side of that about recent conversations I had

7    with the client and Ms. Hagh that I was concerned

8    about.  I had a feeling I was supposed to withdraw, but

9    you read one of those rules in a book and it says what

10   it says, but I wanted to call whatever they call that

11   where they tell you what they think because it's what

12   they do.  They said I needed to withdraw and said I had

13   to send a letter internally, which I did, and later

14   filed the corresponding motion to withdraw.

15          Q.    If you can answer this question without

16   violating a privilege, because I am sensitive to the

17   privilege issue here, so I will ask the question and

18   you can answer or not answer.  If you can answer this

19   question without violating privilege, what was the

20   ethical issue that caused you to feel that you had to

21   withdraw?

22          A.    When the board person on the very first,

23   you know, the only phone call I had to them about it

24   told me I had to withdraw, that was it.

25          Q.    What were the underlying issues that

1   caused you to call the board?

2        A.    A comment made by the client within about

3   a week of that and things said by Ms. Hagh within about

4   a week of that and those two things happening so close

5   to one another. My concern that if those things were

6   being said that professionally relationship-wise I was

7   concerned I was supposed to withdraw and then being

8   told that is why I did it.

9        Q.    Were they things said about you?

10       A.    Yes.

11       Q.    Were you aware that after your withdrawal

12   the Shoemaker plaintiffs engaged John Edwards to serve

13   as co-counsel in this case?

14       A.    I am.

15       Q.    Do you know when that engagement

16   occurred?

17       A.    I know I have seen the -- and this might

18   not be the right name -- motion for pro hac vice

19   admission Mr. Edwards filed and maybe somebody else in

20   his firm. That would be the date I would give you, but

21   I don't remember the date.

22       Q.    Do you remember if it was shortly after

23   your withdrawal, or was there a time period between?

24       A.    I don't remember it. I was asking you to

25   -- whatever the date he filed the motion and then it

 1    was -- an order was entered granting it would be the

 2    date.

 3         Q.    That's a fair answer.  Do you know what

 4    Mr. Edwards' role on the Shoemaker case was?

 5         A.    I know what I was told.

 6         Q.    What were you told?

 7         A.    That he was to be the trial attorney.  He

 8    is very well known, very well accomplished and that if

 9    the case -- that's my answer unless there is a

10    follow-up.

11         Q.    I guess my follow-up is why didn't Ms.

12    Hagh handle the matter and try the case without

13    co-counsel?

14              MR. SPRAGENS:  Object to the form and

15    foundation.  You can answer.

16              THE WITNESS:  I am going to say the

17    objection didn't affect my answer, Mr. Young.  I don't

18    know how to answer that because I don't know the

19    answer.

20    BY MR. YOUNG:

21         Q.    Did you believe Ms. Hagh was capable of

22    trying this case without co-counsel?

23              MR. PRICE:  Mr. Young, could you rephrase

24    that question.  Any attorney who is licensed here is

25    certainly qualified to try a case.  The question I

1 guess should be more narrow as to that.

2 BY MR. YOUNG:

3     Q.    I will rephrase that question. Did you

4 have any reservations about Ms. Hagh's ability to try

5 this case without co-counsel?

6     A.    I will tell you why I never thought about

7 that issue in your question to have an answer for you

8 in this deposition. My understanding was that somebody

9 like Mr. Edwards was going to get brought on board.

10 Knowing that I hadn't thought through what your

11 question is now. How I would answer that -- I mean

12 there are two ways to answer the question at least, and

13 one of them is not something I am a fan of talking

14 about one way or another. That's not something I go

15 around thinking about one way or the other. They

16 either do stuff or they don't.

17     Q.    Sure. I think your answer is a fair one.

18 Let me make sure I understand. It was your

19 understanding from the time that you withdrew -- it was

20 always your understanding from the time you withdrew

21 that another co-counsel was going to be brought in? Is

22 that what you are saying?

23     A.    I knew after I withdrew that somebody

24 like Mr. Edwards was going to be brought on board, yes.

25     Q.    You never took time to think about

1  whether he should have been brought in, shouldn't have

2  been brought in, Ms. Hagh was capable or not capable of

3  trying the case, because you always knew there was

4  going to be somebody else coming in?

5      A.   I was told there was going to be an

6  attempt to bring somebody in.  To go back to the board

7  call, I wasn't contemplating whether to withdraw,

8  whether to free up my calendar.  I suddenly was told

9  within a week of those two phone calls with the client

10  and co-counsel told by the board I had to withdraw.

11  When I was told I had to withdraw, I didn't think to --

12  I had to do what I had to do.

13          I wasn't in the position like in an

14  ethics class of certain things.  I was following the

15  board's advice.  I knew very soon after that they,

16  being the plaintiff's side of the case, were going to

17  bring on somebody like John Edwards.  Your question is

18  too fresh for me to have an answer.

19      Q.   That's fine.  I understand.  I think you

20  have given me an appropriate answer.  Appreciate that.

21  Did you ever enter into a new engagement letter with

22  Mr. Keefer after you left Cummings Manookian?

23      A.   Not an agreement like we looked at that's

24  an exhibit, no.

25      Q.   Why not?

1          A.      Well, for a good period of time, I was
2    under the understanding the original agreement laid it
3    out.
4          Q.      Did you think the original agreement
5    continued to govern the relationship between Mr. Keefer
6    and the attorneys on the case?
7          A.      Yes.
8          Q.      Do you know if either Mr. Manookian or
9    Ms. Hagh entered into a new written engagement letter
10   with Mr. Keefer?
11         A.      I do know that.
12         Q.      You know that they did?
13         A.      I know they did, yes.
14         Q.      Do you know when they did?
15         A.      I have a copy of the document.  There is
16   a date on the first page that's one date and a date a
17   couple of weeks or so later that he signed it.
18   Whatever that is I don't remember the date.  I want to
19   say it was in 2020, but I think you can hear my answer.
20   Whatever the document says of course is the date I
21   would point to.
22         Q.      Do you know if it was when you were still
23   representing Mr. Keefer or after you stopped
24   representing Mr. Keefer?
25         A.      It was still while I was representing

1   him.

2          Q.     Did you ever consider entering a new

3   engagement agreement for yourself?

4          A.     Months later when I learned of that

5   additional agreement, yes.

6          Q.     Do you know if John Edwards ever entered

7   into an engagement agreement with Mr. Keefer?

8          A.     I don't know that.

9          Q.     Are you aware that the Shoemaker case

10  ultimately settled prior to trial?

11         A.     Yes.

12         Q.     How do you know that?

13         A.     Two ways.  I don't know which was first.

14  That Caselink filing system that Nashville state courts

15  use I have seen it there and I was told by Mr.

16  Manookian.

17         Q.     I want to be very careful about how I

18  state this next question so Mr. Price doesn't get

19  upset.  Listen carefully to the way I ask this

20  question.  Was the settlement amount ever disclosed to

21  you?

22         A.     I think so if what I was told was

23  correct.

24         Q.     It was by Mr. Manookian?

25         A.     Yes.

1       Q.    Have you received any attorney's fees

2 from the Shoemaker case?

3       A.    No.

4       Q.    Why not?

5       A.    Mr. Young, I don't know how to answer

6 that. They've not been provided to me; that's why not.

7 I know that sounds kind of whatever.

8       Q.    I understand.

9       A.    Okay.

10      Q.    Have you asked to be paid attorney's fees

11 in the case?

12      A.    Yes.

13      Q.    Did you advance any expenses in the

14 Shoemaker case?

15      A.    I did.

16      Q.    How much?

17      A.    This is documented on something I think

18 some people on this Zoom depo have. It was more than

19 $60,000, but I don't remember the exact number offhand.

20      Q.    Have you been repaid for those expenses?

21      A.    Yes, after the settlement.

22      Q.    When you said some people on this Zoom

23 have that, is that because you provided proof of that

24 to either Mr. Manookian or Ms. Hagh and their counsel?

25      A.    Someone on that list you just said

2109

1  because I know I got a check for it if that makes

2  sense.

3          Q.      It does.

4          A.      I may have sent it to -- I sent it to

5  somebody and soon thereafter those expenses were

6  reimbursed.

7          Q.      Do you know whether all expenses advanced

8  in the Shoemaker case have been repaid in full?

9          A.      No, I don't.  I just know about mine.

10         Q.      Are you aware of any that are

11 outstanding?

12         A.      No.

13         Q.      Do you believe that your firm is entitled

14 to a portion of the fees from the Shoemaker settlement?

15         A.      Yes.

16         Q.      Have you formed an opinion about what

17 percentage your firm is entitled to?

18         A.      We had some, I will call it, settlement

19 discussions about that, and I proposed a percentage, so

20 to the extent that's a yes, then yes.  I did -- yes.

21         Q.      When you say you proposed a percentage,

22 who did you propose a percentage to?

23         A.      To the mediator we used.

24         Q.      There was a mediation about the fee

25 division?

1     A.    Yes, but I -- it wasn't where we all sat

2   down classic mediation.  It was agree to the mediator,

3   send a written statement, talk with the mediator, he

4   talked with us separately.  There was no pow wow at

5   some geographic location.

6     Q.    Before I ask the next question, let me

7   ask do you believe those mediation discussions are

8   privileged or confidential?

9     A.    I do when they occurred.  I leave it up

10  to Mr. Price what happens when there is an attorney's

11  fee dispute what happens to that privilege.

12          MR. PRICE:  I will tell him not to answer

13  that as to the amounts.  Those are settlement

14  negotiations.  We have a lawsuit about that, so other

15  than the fact there were negotiations, that's fine, but

16  I don't expect him to talk amounts or percentages.

17          MR. YOUNG  I was trying to be cognizant

18  of that.  That's why I asked the question the way I

19  did.  I didn't want to step on your toes.

20    Q.    Do you believe that Afsoon Hagh or Hagh

21  Law is entitled to a portion of the fees from the

22  Shoemaker settlement?

23    A.    I can easily answer about Afsoon Hagh.  I

24  don't know enough about Hagh Law to answer that part of

25  the question.  She did work on the case, so, yeah.

Case 3:23-cv-00961   Document 6-3   Filed 10/04/23   Page 77 of 266 PageID #: 4333   2111

Q.     Again, I don't want to ask a question
that is going to cause you to violate some privilege,
but just have you formed an opinion as to what
percentage Afsoon Hagh is entitled to?

A.     No, except that when I offered a
percentage, that I won't state right now, to that
mediator I mentioned, the resulting math would have
given her a percentage that would answer your question
within that settlement discussion.

Q.     I understand.  Do you believe that Brian
Manookian or Manookian, PLLC, is entitled to a portion
of the Shoemaker fees?

A.     Yes, I would have thought so for Brian
Manookian, but I learned somewhere along the way,
whether it's correct or not, he said he is not seeking
a fee or portion of the fee is the way to say that.  If
that's not true, yes, he did work on the case and did
very good work.

Q.     Again, have you formed an opinion as to
what percentage Mr. Manookian should be entitled to?

A.     No.

Q.     Do you believe that John Edwards' law
firm is entitled to a portion of the fees from the
Shoemaker settlement?

A.     My understanding is he has already gotten

1    a percentage of the attorney's fee per the contract --

2    per some agreement.  I told you I don't know if there

3    is a contract -- per an agreement and, yes, he already

4    got it.

5         Q.    Do you believe that Cummings Manookian,

6    PLC, is entitled to a portion of the fee from the

7    Shoemaker settlement?

8         A.    This is how I would answer that.  I know

9    that a small percentage of the work I did that I

10   discussed with you today was while I was at Cummings

11   Manookian.  To that extent, yes, because I can talk

12   about me.  That's my answer.

13        Q.    Have you formed any opinion as to what

14   percentage that should be?

15        A.    Yes, and I hope you have it.  I did some

16   kind of affidavit or declaration about that at one

17   point where I really looked at the details and tried to

18   estimate what percentage of my work was when I was at

19   Cummings Manookian.  I put a lot of time into figuring

20   out that number, although I don't recall it right now.

21   That was my best work to come up with a number.  I hope

22   you have that.

23        Q.    I am not sure that I do.  When was this

24   affidavit drafted?

25        A.    Affidavit or declaration.  It was in the

past 12 months. It was in the past 12 months. It would have been since the settlement I believe, but certainly in the past 12 months.

Q. Who did you provide that affidavit or declaration to?

A. That's what I am trying to think of. I don't remember, but it was with the intention of it being given to you.

Q. Who asked you to prepare it?

A. Mr. Manookian.

Q. That affidavit or declaration lays out what you believe Cummings Manookian's portion should be of the Shoemaker fees?

A. Not exactly. My memory is it tracks what I thought what percentage of my work was while I was still at Cummings Manookian related to the Shoemaker case.

Q. I understand that. I guess my follow-up question to that is would it be your testimony today that we could use that percentage and figure out then it would be your opinion that that percentage somehow factors into what Cummings Manookian should be entitled to in fees?

A. Yes, but only as to my work. I am not aware of some of your -- everybody on this call some of

2114

1  your other issues.

2      Q.    I think I understand.  Let me ask a

3  hypothetical and see if I am understanding correctly.

4  Let's say ultimately you would be entitled to 30

5  percent of the fees.  I am completely making up that

6  number.  If you were entitled to 30 percent of fees and

7  your affidavit indicated that 10 percent of your work

8  was done while at Cummings Manookian, it would be your

9  belief that Cummings Manookian would be entitled to 3

10  percent of the attorney's fees?  Am I understanding

11  that correctly?

12      A.    Yes and no.

13      Q.    Tell me where I am wrong.

14      A.    I am not sure you are wrong, but I am not

15  sure you are right.  Say this thing I remember drafting

16  says I spent 5 percent of my time on the Shoemaker case

17  while I was at Cummings Manookian.  I am not sure of

18  that 5 percent if Brian Cummings actually gets a

19  portion of that and a portion is the firm.  That's the

20  part I am not -- there might be a division of that

21  division.

22      Q.    I understand.  I think I am following you

23  with that.  After this complaint was filed in February

24  2019, was an amended complaint ultimately filed in the

25  Shoemaker case?

1          A.      An amended complaint was later filed.

2          Q.      Who drafted the amended complaint?

3          A.      I know it wasn't me because I had

4    withdrawn.

5          Q.      It was sometime after October 2020?

6          A.      Yes.

7          Q.      If you know, why did it become necessary

8    to file an amended complaint?

9          A.      My understanding is there was a motion

10   hearing or argument or both about whether the complaint

11   sufficiently laid out what I am going to call a direct

12   liability claim against Vanderbilt and Judge Binkley

13   here in Nashville, whatever the specific ruling was,

14   allowed or encouraged amended complaint to cover it

15   that way.

16         Q.      Do you have an opinion whether it was

17   necessary to amend the complaint?

18         A.      If it helped make sure a claim we wanted

19   on behalf of the plaintiff would not be dismissed prior

20   to trial, then sure.  Necessary, great idea, whatever

21   phrase one would use, sure, do that.

22         Q.      I want to ask you about a few other cases

23   that I don't know whether you were involved in or not.

24   You can let me know.  Were you involved in the Miller

25   versus Vanderbilt medical case?

1      A.    No.

2      Q.    What about Brooks v. Reinking (phonetic

3    spelling)?

4      A.    No.

5      Q.    What about Beckwith versus Lattimore

6    Black?

7      A.    No.  The reason I hesitated is because

8    someone came to our office one day related to the

9    client side of that case wanting to speak with somebody

10   and I spoke with him, so I didn't want to give a quick

11   no because I know that happened.  I didn't do any work

12   on that case.  I don't even know if I listed it as

13   co-counsel.  I don't think I was.  I know I had that

14   contact, but that was random.  Somebody showed up

15   unscheduled and wanted to talk about it and was

16   involved, so I briefly spoke with that person.

17     Q.    You don't know the current status of that

18   matter?

19     A.    No.  I need to take a two minute break.

20   Sorry for that.

21     Q.    I am actually done.

22     A.    Perfect timing.  I still need a break.

23           (A break was taken.)

24                 * * * * *

25

1  BY MR. YOUNG:

2       Q.    Back on the record.  I have a couple of

3  follow-up questions.  You mentioned that you were

4  repaid about $60,000 for expenses you advanced in the

5  Shoemaker case.  Do you recall who repaid you that?

6  Was it John Edwards?  Afsoon Hagh?  Where did those

7  funds come from?

8       A.    I don't remember.  I don't know.

9       Q.    You also testified that --

10      A.    Let me say this.  It wasn't Afsoon Hagh.

11 I didn't receive a check from an individual -- I know

12 that -- or John Edwards.  I didn't get a check that

13 says John Edwards.  Might have been wired from John

14 Edwards' firm, but even with that being my best memory,

15 I am not sure that's right.

16      Q.    You think you got a wire from a law firm?

17      A.    I don't remember a check, but I know it

18 was not from an individual attorney no matter how I got

19 paid.  That would be very unusual and I would remember

20 that.

21      Q.    You don't remember whether Mr. Edwards'

22 firm or Bass Berry Sims or somewhere else?

23      A.    I don't remember.

24      Q.    You mentioned earlier in your testimony

25 that you knew shortly after you withdrew that another

1  co-counsel was going to be brought in on the Shoemaker

2  case.  Do you remember that?

3          A.    Yes.

4          Q.    Who told you that, that new counsel was

5  going to be brought in?

6          A.    Mr. Manookian.

7          Q.    Did he say that it was going to be John

8  Edwards or it's going to be somebody else?

9          A.    I don't remember initially that he said

10  John Edwards' name, but then at some point in him

11  talking to me about that at different times it became

12  about John Edwards.

13              MR. YOUNG:  Those are all the questions I

14  have.  Thank you.

15                    *  *  *  *  *

16                    EXAMINATION

17  BY MR. SPRAGENS:

18          Q.    Mr. Cummings, this is John Spragens.  We

19  met before.  I represent Brian Manookian, PLLC, in this

20  matter.  Can you hear me?

21          A.    I can.

22          Q.    Just to follow up on Mr. Young's

23  questions he was just mentioning, it's your position

24  that you were repaid all of your costs in the Shoemaker

25  case; is that right?

1      A.   I was repaid the litigation expenses I

2 advanced and paid, yes.

3      Q.   When I say costs I am distinguishing

4 between attorney's fees, but in terms of hard costs you

5 advanced, you were repaid all your hard costs?

6      A.   Yes.

7      Q.   Whatever account those came from those

8 were ultimately the client's funds; is that right?

9      A.   I don't know how to answer that.  I think

10 they were held by the law firm and I think the client

11 probably got their percentage.  I don't know -- it came

12 out of the settlement.  I don't know if it's the

13 client's funds.

14      Q.   I guess what I mean is you were paid

15 pursuant to an agreement between you or Cummings

16 Manookian and the client in the Shoemaker case, right?

17      A.   Repeat that or rephrase it.

18      Q.   You were paid pursuant to an agreement

19 between you, as an attorney, and the client; is that

20 right?

21      A.   I think in part.

22      MR. PRICE:  Objection.

23      THE WITNESS:  I think in part, yes.  It

24 was Mr. Manookian who spoke with me about if I agreed

25 that funds could be transferred to John Edwards' firm

1    that would hasten the ability for me to get my
2    litigation expenses repaid.  That was the discussion I
3    had with Mr. Manookian.
4    BY MR. SPRAGENS:
5         Q.    But the payment of the funds was pursuant
6    to an agreement between you and the client?
7                   MR. PRICE:  Object to the form of the
8    question referring to them as funds as opposed to
9    costs.
10                  MR. SPRAGENS:  I'm happy to rephrase.
11        Q.    The repayment of any advanced costs that
12   you were paid, the $60,000 you testified to earlier,
13   that was pursuant to an agreement between you and the
14   client?
15        A.    Yes.
16        Q.    I think you testified you have been
17   deposed four times; is that right?
18        A.    At least four, because those are the four
19   I remember.
20        Q.    You mentioned you had your deposition
21   taken in a board of professional responsibility matter;
22   is that right?
23        A.    Yes.
24        Q.    That was taken by Bill Moody?
25        A.    Yep.

1      Q.      That deposition related to the Diamond

2  Doctor case you mentioned earlier?

3      A.      Yes, it was related to a complaint with

4  the board by the Diamond Doctor people, yes.

5      Q.      Were all your responses in that

6  deposition truthful?

7      A.      As far as I remember, yes, they were

8  truthful based on what I knew at the time absolutely.

9      Q.      In that deposition you testified you have

10 had no role in any of the actions that were alleged to

11 have violated the rules of professional conduct?

12     A.      No role in the -- the way you phrased

13 that I don't recall that being a question and answer.

14     Q.      Generally speaking, you testified that

15 you didn't have anything to do with any actions related

16 to the Diamond Doctor case that were alleged to violate

17 the rules of professional conduct?

18             MR. PRICE:  Object to leading form of

19 that question.

20             THE WITNESS:  I know if I was asked about

21 whether I had a role in putting up this video website

22 that I remember being the focus of that, I know I had

23 no role in that.  If there is a specific issue, I would

24 need it brought up to me.  I was a defendant in the

25 underlying litigation, so they must have thought I had

*ANNE S. WILSON & ASSOCIATES*
*615-298-1992*

1  some role in it, but I would have answered the

2  questions in the deposition honestly.

3  BY MR. SPRAGENS:

4      Q.    If we compared your responses in that

5  deposition to e-mails and text messages between you and

6  Mr. Manookian, is it your view today all those

7  responses would be truthful?

8      A.    Sure, my responses were truthful in that

9  deposition, yes.

10     Q.    Before today's deposition did you speak

11  to Phillip Young at any point?

12     A.    Yes.

13     Q.    On how many occasions did you speak to

14  Mr. Young?

15     A.    At least as many times as I have had to

16  send a check related to matters I settled since I left

17  Cummings Manookian, at least one other time when I know

18  he wanted to get dates for when my deposition was first

19  scheduled, this deposition, and I think I called him at

20  one point.  This might have been before I hired Mr.

21  Price, but either way I wanted to make sure my pursuing

22  an attorney's lien issue didn't violate a bankruptcy

23  stay, because I didn't want to run afoul of that in the

24  bankruptcy court.

25     Q.    Any other times you can think of?

1      A.    Not that I remember, but even that, I

2  mean that number already probably is six to eight

3  minimum.

4      Q.    The attorney's lien issue you are

5  referring to is a lawsuit you filed against -- I am

6  sorry if I get this wrong -- Mr. Manookian and/or his

7  law firm and/or Ms. Hagh and her law firm, correct?

8      A.    The attorney's lien issue I was talking

9  about was my interest in an attorney's lien related to

10 the Shoemaker matter.  I don't think Mr. Manookian is a

11 defendant in that.

12     Q.    That's a case currently pending in

13 Davidson County, right?

14     A.    My lawyer would have to tell me where

15 it's pending right now.

16     Q.    Do you know as you sit here who the

17 defendants are?

18     A.    No, because you said somebody that I did

19 not think was a defendant, so maybe I don't know.

20     Q.    As you sit here, who are the defendants

21 you can remember in the attorney's lien action you are

22 referring to about the Shoemaker case?

23     A.    I believe I don't remember because you

24 listed one in your question I didn't think was a

25 defendant.

1      Q.     You don't remember any of them?

2      A.     I can tell who I think it is, but, again,

3  with your question including somebody I don't remember,

4  I am worried I don't remember it right.

5      Q.     That's fine.  Don't rely on me.  Tell me

6  who you think it is.

7      A.     Mr. Keefer and Ms. Hagh.

8      Q.     Did you understand Mr. Young was the

9  receiver in an action pending in Williamson County

10  related to the Chase case?

11      A.     Yes and no.  I don't know if he was the

12  receiver because of the Chase case, but, yes, I know he

13  has the hat of the receiver somehow and it stems from

14  the Chase case is my understanding.

15      Q.     Are you aware of whether he was appointed

16  by the court to collect the sanctions award in or

17  related to the Chase case?

18      A.     I don't know how he got that role.

19      Q.     Have you ever spoken to Jeanne Burton,

20  the trustee in this case?

21      A.     Maybe once, but that's only because I

22  don't remember doing it at all.

23      Q.     Do you have any understanding whether

24  Cummings Manookian is still a going concern as of

25  today's date?

1    A.    I am sorry, which firm?

2    Q.    Cummings Manookian, PLLC.

3    A.    No, I don't know.

4    Q.    Do you know if Cummings Manookian, PLLC,

5   registration is still active with the Tennessee

6   Secretary of State?

7    A.    I do not.  Wait.  It might be on one of

8   these exhibits.  If it's on an exhibit, I know that.

9   Hold on.  According to Exhibit 1 to this deposition --

10  and I don't know when this was generated.  It says

11  5-9-22.  All I know is it says it was dissolved in

12  October of 2020, but I wouldn't have known that if I

13  didn't see this document today.

14   Q.    Was Afsoon Hagh a member of Cummings

15  Manookian?

16   A.    Not while I was there.

17   Q.    After you left did you ever understand

18  that she became a member of the firm?

19   A.    I don't know one way or another.

20   Q.    So I understand, it's not your testimony

21  that she was ever a member of Cummings Manookian; is

22  that right?

23   A.    Correct, not while I was there, and I

24  don't know regarding after I left.

25   Q.    If I understood your testimony earlier,

1  it was your view that she was an independent contractor

2  who worked on occasion on behalf of Cummings Manookian

3  while you were affiliated with them?

4                    MR. PRICE:  Objection, foundation.

5                    THE WITNESS:  No, that's not what I was

6  trying to say.

7  BY MR. SPRAGENS:

8        Q.    Tell me what you were trying to say.

9        A.    Tell me the question.

10        Q.    I asked if she was an independent

11  contractor who worked on occasion on behalf of Cummings

12  Manookian, but maybe I misunderstood your testimony

13  earlier.  Clarify that point.

14        A.    Sure.  She was somebody who had access to

15  our confidential files on the server.  She was somebody

16  who had access to our building where we had

17  confidential files.  She was somebody who in 2017 I was

18  asked to add to our legal professional liability

19  coverage, the only other attorney besides me and Mr.

20  Manookian.  She was listed as someone at our office

21  address and we were the only law firm there.  She had a

22  Cummings Manookian e-mail address she used.  Those are

23  the things I was thinking of.

24            My understanding beyond that is we -- the

25  firm started paying health coverage that included her,

1    but that's really not the focus of my thoughts, but her

2    access to our confidential files, her work in the firm,

3    her showing up at case management conferences on behalf

4    of the firm and its clients.  That's what I was

5    thinking of.

6          Q.    I believe you testified earlier she was

7    never paid by Cummings Manookian?

8          A.    Not while I was there.  Brian Manookian

9    had told me when he got money obviously they were

10   married.

11         Q.    To that same point, I guess when you say

12   she was added to the health insurance for the firm, did

13   you mean she was independently insured by the firm or

14   that she was a dependent of one of the main partners of

15   the firm?

16         A.    That I don't know.  I know the health

17   insurance was added after the firm began and it was

18   related to that and that I didn't have my own coverage

19   through the firm.

20         Q.    So if I am understanding correctly, Mr.

21   Manookian initiated, obtained health insurance through

22   the firm and Ms. Hagh, as his wife, was a part of that

23   health insurance?

24         A.    That's correct.

25         Q.    Would that have been the same whether or

1  not she did any work on behalf of Cummings Manookian?

2        A.    I don't know because I didn't make that

3  request.

4        Q.    Did he have any children at the time the

5  health insurance was initiated?

6        A.    I don't know that either.

7        Q.    You don't recall at the time you

8  practiced there whether Mr. Manookian had any children?

9        A.    I know they had their first child at some

10 point.  I just don't recall what year that was.  It's

11 now 2022.  I left in -- I don't recall if their oldest

12 is four years old or whatever that math would be.

13       Q.    Do you recall whether any children were

14 added to the health insurance plan that Cummings

15 Manookian took out?

16       A.    No, I don't.

17       Q.    You don't recall Cummings Manookian

18 paying Ms. Hagh a salary, do you?

19       A.    No, I don't.

20       Q.    Or any sort of hourly payment either; is

21 that right?

22       A.    Correct.

23       Q.    I believe you testified you don't have

24 any recollection of Ms. Hagh using the office space you

25 described as hers?

1          A.      Sorry, can you repeat that.

2          Q.      I believe you testified earlier, am I

3     correct, that you can't picture Ms. Hagh using the

4     office space that you described as hers?

5          A.      No.  If I said that, that's not what I

6     meant to convey.  I was saying I didn't remember the

7     last time I saw her in it.  I absolutely can see her

8     using the office space.  We moved Jim Pepe out of that

9     office space so she could use it.  That's the reason I

10    remember it.  She was there occasionally.

11         Q.      But at the time you left the firm in

12    August or September 2018, you don't have a recollection

13    of her using that space?

14         A.      No, that's not correct.  When she was

15    there she would use that space.

16         Q.      You have recollection of her being there

17    August and September 2018?

18         A.      Not during those months I do not.

19         Q.      When is the first time before that you

20    can recall her being there using that office space?

21         A.      I don't remember.

22         Q.      Do you have any recollection of her using

23    it in July of 2018?

24         A.      No.  No matter what month you ask I am

25    not going to know.  I was on a different floor of that

1  building.  I am still not going to know if you want to
2  go through other months.
3      Q.    That's fine.  I think you have testified
4  she received mail at the 45 Music Square West address?
5      A.    She received mail there, yes, whether she
6  was using the address of 45 Music Square West or 47
7  Music Square West.
8      Q.    What's the distinction between those two
9  addresses?
10     A.    One of them doesn't exist as an actual
11 property.
12     Q.    Are they both valid mailing addresses?
13     A.    45 Music Square West is an actual place.
14 There is no building that exist as 47 Music Square
15 West.  Even if mailed to that written address, it got
16 delivered to 45 Music Square West.
17     Q.    Was it your understanding that was just a
18 postal service mixup where they would deliver the
19 47 Music Square West to 45 Music Square West building,
20 or were there two addresses co-located at that same
21 building?
22     A.    I don't know to answer that either way.
23     Q.    Did anyone else or any other entity
24 receive mail at 45 Music Square West or 47 Music Square
25 West during the time you were affiliated with that

Case 3:23-cv-00961   Document 6-3   Filed 10/04/23   Page 97 of 266 PageID #: 4353

2131

1 address?

2      A.    Doug Rice would have. I know that.

3 Brian Manookian would have. I would have. I don't

4 remember if Jim Pepe did. Afsoon would have. Outside

5 of that list, I can't think of anyone. We would get

6 mail for the former occupants, but they weren't there

7 anymore.

8      Q.    Did you ever have any knowledge of Rocky

9 McElhaney's law firm receiving mail at that address?

10      A.    Not that I remember, no.

11      Q.    Do you know if Afsoon Hagh ever stopped

12 using that mailing address?

13      A.    Which one?

14      Q.    45 Music Square West or 47 Music Square

15 West?

16      A.    I don't know one way or another.

17      Q.    After you left Cummings Manookian and Mr.

18 Manookian was suspended from the practice of law, did

19 you believe that Cummings Manookian was still a going

20 concern entitled to represent clients?

21      A.    Can you repeat that and maybe rephrase

22 it.

23      Q.    After you left Cummings Manookian and Mr.

24 Manookian was suspended from the practice of law, did

25 you believe the firm Cummings Manookian could still

1  represent clients?

2       A.   Well, Mr. Manookian was suspended, so he

3  couldn't.  If Ms. Hagh was still there, she could is

4  the only way I can answer that.

5       Q.   You were involved in the formation of

6  Cummings Manookian I think you testified earlier; is

7  that right?

8       A.   Yes.

9       Q.   You understand that a professional

10 limited liability company has to have professionals as

11 members of the company; is that right?

12      A.   That makes sense.  I will say yes.

13      Q.   So my question is without you as a member

14 of the firm or Mr. Manookian as a practicing lawyer in

15 the firm, could Cummings Manookian continue to

16 represent clients?

17           MR. YOUNG:  Objection to the extent it

18 calls for a legal conclusion.

19           THE WITNESS:  I don't know that I have

20 expertise to answer that.  You are asking about after I

21 left whether my old firm could keep operating under the

22 scenario you outlined.

23 BY MR. SPRAGENS:

24      Q.   Sure, without any members practicing law?

25      A.   I don't know.  I would have to look into

1  that.  I understand the question, but I don't know

2  that.

3          Q.    After you withdrew from the firm, did the

4  firm continue to have permission to use your last name

5  as its moniker?

6          A.    That's a good question.  I don't know.

7          Q.    Did you think about that after you left?

8          A.    I am thinking I may have, but I also

9  realize it must not have mattered too much to me

10 because I don't remember if I raised it or what we said

11 about it.

12         Q.    You don't recall if you ever had a

13 conversation with Mr. Manookian or Ms. Hagh or anybody

14 about whether Cummings Manookian could continue to use

15 the name Cummings in its professional marketing?

16         A.    I don't remember that.  I do remember

17 asking that something on their website -- I will call

18 it a button or a tab -- that still allowed people to

19 click on something saying something like meet Brian

20 Cummings, and I know I asked that stop because I wasn't

21 there.  That's the kind of thing I remember, but I

22 don't remember -- to answer the question you asked, I

23 don't remember that specific issue.

24         Q.    Do you recall whether the operating

25 agreement had anything to say about the ongoing use of

1    your name in the event you withdrew from the firm?

2            A.    I don't.  I would have to see what it

3    says.

4            Q.    You were asked questions by Mr. Young

5    about the lease arrangement between 45 Music Square

6    West Partners, if I got that name correct, but whatever

7    the entity was that owned 45 Music Square West, and

8    Cummings Manookian.  Do you remember those?

9            A.    Yeah.  I have a copy here.

10           Q.    I think you testified that the rent

11   payment was based upon the total mortgage payment; is

12   that correct?

13           A.    That's my memory because I think it

14   matched up pretty closely, so, yes.  I don't think it

15   was a coincidence.

16           Q.    Have you been a landlord before in other

17   contexts outside of any involvement in that building?

18           A.    Yes.

19           Q.    In your view is there anything unusual or

20   improper about charging a rent rate that covered

21   mortgage payment on a property?

22           A.    I hope not because we did it and, in

23   fact, on the firm's tax returns, it listed the rent as

24   an annual expense on line item 13 on our annual tax

25   returns for everybody to see, so it was no secret.

1    Q.    My question is just really you didn't
2  think there was anything untoward about that?
3    A.    No.
4    Q.    You thought that was part of the way
5  businesses handle these things all the time?
6    A.    I don't know about other businesses.  I
7  didn't think there was anything untoward about it, no.
8  That's why I was saying it was on our annual tax
9  returns for everybody to see.  I saw nothing untoward
10  about it then or now.
11    Q.    I think you testified that Cummings
12  Manookian owned some personal property that was in that
13  building.  Do you recall that?
14    A.    I recall that answer, yes.
15    Q.    Was any of that personal property paid
16  for by the mortgage that 45 Music Square West took out
17  to purchase that building?
18    A.    That I don't know, but I know some of it
19  wasn't.  Some of it was paid for by Cummings Manookian
20  out of the Cummings Manookian operating account and
21  then was listed on tax returns on behalf of Cummings
22  Manookian, not on behalf of the entity that owned the
23  property.
24    Q.    Do you know what furniture or other
25  personal property Cummings Manookian owned?

Case 3:23-cv-00961   Document 6-3   Filed 10/04/23   Page 102 of 266 PageID #: 4358

2136

1      A.      Some of it, yes.

2      Q.      What property is that?

3      A.      These are items bought from JL Design in

4  2016 -- a chandelier, a side table, a desk, a desk that

5  was a lower end desk for 359 as far as dollars, a

6  chair, another chandelier, an almost $11,000 desk.

7  Those are things on one invoice from JL Design, and

8  there was other furniture beyond that because those tax

9  returns show purchases and ownership of property from

10 -- I might get the name wrong -- something like

11 Mitchell Bob or Mitchell Hunt, some furniture store.

12     Q.      You are referring to something you have

13 in front of you?

14     A.      Sure.  This is a 2016 invoice from JL

15 Design that the firm paid on our tax returns for the

16 45 Music Square West, Nashville, Tennessee.

17     Q.      Would you mind if we made that an exhibit

18 to this deposition so we can all get a copy of it?

19     A.      Sure.  I have that Lease Agreement as

20 well if anybody wants it.

21          MR. SPRAGENS:  That's fine.  Let's make

22 the Lease Agreement Exhibit 6 to the deposition if I

23 have my numbering correct and the invoice you were

24 reading from Exhibit 7.

25          MR. YOUNG:  Works for me.

1                    (Exhibit Nos. 6 and 7 were

2                    marked.)

3    BY MR. SPRAGENS:

4         Q.    Have you provided those documents to Mr.

5    Young before today's deposition?

6         A.    No.  I have not been asked to.

7         Q.    I think you mentioned Mahan Associates

8    prepared the franchise and excise tax returns?

9         A.    Yes.

10        Q.    Do you have a document in front of you

11   reflecting that?

12        A.    I do.  I have one for tax year 2016 and

13   one for tax year 2017.  I have also got a document that

14   looks like Mahan prepared that's not a tax filing that

15   shows one of the payments to JL Design for law office

16   furniture in 2016 from the InsBank account.  That's

17   three documents.

18              MR. SPRAGENS:  Is it appropriate to group

19   those together and make those Exhibit 8?

20              MR. YOUNG:  That's fine.

21                    (Exhibit No. 8 was marked.)

22   BY MR. SPRAGENS:

23        Q.    With respect to the property appraisal

24   document that Mr. Young showed you as Exhibit 3, do you

25   know where that $73,806 amount came from?

1      A.   I don't, but let me compare it against

2  2017.  I left this out.  You guys will see on the 2017

3  franchise and excise thing there was also firm

4  purchases of about $38,000 in rugs that were on the tax

5  return from Henry's Auction House Rugs that I don't

6  think I mentioned.  That Mitchell company is called

7  Mitchell Gold and something, but the $70,000 number or

8  73,000 is pretty close to what was listed as

9  depreciated assets on the 2017 tax return where that

10  totals about $63,000, so all I can tell you is the

11  numbers are close, but I, not being there in 2020,

12  don't know why the number got to 73,000.

13      Q.   There was some question earlier about

14  maintenance on computers at the firm.  Remember that?

15      A.   Yeah, but the first few words of the

16  question cut out.  I heard questions about computers.

17  Repeat that.

18      Q.   I was asking if you remember Mr. Young

19  asking some questions about maintaining computers at

20  the office.  Do you remember that?

21      A.   I do.

22      Q.   Do you recall any specific maintenance

23  that was done on computers at the office?

24      A.   There is one document I was just

25  referring to that I think Mahan produced that includes

1  payments by the firm for networking system at law

2  office, so, I presume network relates to computers and

3  that would be a yes, but, otherwise, if I didn't have

4  this document, I wouldn't --

5       Q.    What about Cummings Manookian bank

6  accounts; did you ever know Afsoon Hagh to have any

7  signatory authority over Cummings Manookian bank

8  accounts?

9       A.    No.  That's how I hope I answered Mr.

10  Young.  I remember Mr. Manookian and I did.  Beyond

11  that I couldn't think of anybody else ever having -- I

12  forget his phrase -- signature authority on those

13  accounts, so whether you ask me about Ms. Hagh or some

14  other person, I don't remember that.

15       Q.    Did Ms. Hagh or Hagh Law ever steal or

16  misuse any Cummings Manookian property as far as you

17  are aware?

18       A.    No, especially not while I was there, no.

19  I didn't mean to -- I sure hope nothing I said implied

20  that.  I never tried to say that.

21       Q.    I am only asking because I think you may

22  be aware -- I'm not sure -- have you looked at the

23  adversary proceeding in this case?

24       A.    If it's not what my attorney filed about

25  the attorney's lien, then my answer is no.

1     Q.    The allegations in this case by the
2  trustee involve Ms. Hagh and her law firm converting
3  property that was alleged to be Cummings Manookian
4  property and using it on her own behalf, so that's why
5  I was asking that question.  Has she to your knowledge
6  ever misused Cummings Manookian property?
7     A.    My answer is the same, no.  I wanted to
8  be clear.  I was worried something I said I was
9  implying that when I have no knowledge like that.
10     Q.    Let's look at Exhibit 4, the
11  representation agreement of April 19, 2017.  Do you
12  have that there?
13     A.    I have it, yes.
14     Q.    If you turn to page 3 of that exhibit,
15  the last section with the header, the header states,
16  Mediation and Binding Arbitration of any
17  Attorney-client Disputes.  Do you see that section?
18     A.    I do.
19     Q.    Do you understand that section of that
20  agreement to obligate Cummings Manookian to enter into
21  mediation and/or binding arbitration with its clients
22  in the event there is a dispute arising out of that
23  agreement?
24     A.    Yes.  Unless that was a trick question,
25  that's the way I read it.

Case 3:23-cv-00961    Document 6-3    Filed 10/04/23    Page 107 of 266 PageID #: 4363

1      Q.    I mean I don't know.  Is this a fairly

2  standard representation agreement for Cummings

3  Manookian at the time you were affiliated with the

4  firm?

5      A.    We added this type of paragraph after we

6  had started.  This wasn't in our initial agreements,

7  but once it was included, I believe it was included

8  from that point forward.

9      Q.    So at whatever time you all added that

10  section it became kind of a standard section in your

11  representation agreements with clients as far as during

12  the time you were affiliated with Cummings Manookian?

13      A.    Yes.

14      Q.    Looking at the prior section, which

15  starts at the bottom of page 2 and continues to page 3,

16  the header there is Termination of Professional

17  Relationship.  See that?

18      A.    I do.

19      Q.    Feel free to take a second to look at

20  that.  My question is, is this standard language from

21  the representation agreement at least at the time you

22  were affiliated with the firm?

23      A.    Yes, I believe it was.

24      Q.    You and Mr. Manookian were the ones who

25  jointly drafted this representation agreement for your

Case 3:23-cv-00961   Document 6-3   Filed 10/04/23   Page 108 of 266 PageID #: 4364

2142

1  clients; is that correct?

2      A.    Correct.  Like I said about that

3  paragraph you asked about a minute ago, we would talk

4  about things to add in or put in and then it became the

5  new standard, but, yes, to your question.

6      Q.    My understanding of this section of the

7  agreement the first paragraph essentially covers a

8  situation in which a client fires the firm and the

9  second paragraph covers a situation in which the firm

10  elects to withdraw from representing the client.  Is

11  that fair?

12          MR. PRICE:  Object to the form.

13          THE WITNESS:  I think it says what it

14  says, but I'm willing to answer your question about it.

15  BY MR. SPRAGENS:

16      Q.    Was it your understanding when you were a

17  named partner at that firm that in the event the client

18  discharged Cummings Manookian as its legal

19  representative, Cummings Manookian was entitled to

20  collect advanced costs and also collect from the

21  proceeds of any recovery a reasonable fee for the work

22  the firm performed?

23      A.    Yes, I believe that's what it says.

24      Q.    Was it also your understanding at the

25  time you were affiliated with the firm that if the firm

1  elected to withdraw from representing a client that the
2  firm was still entitled to recover its advanced costs
3  but was not entitled to recover a reasonable fee for
4  its legal representation, an attorney's fee in other
5  words?

6      A.    No.

7      Q.    That was not your understanding?

8      A.    Correct.

9      Q.    What was your understanding?

10     A.    That if the firm chose to withdraw the
11  obligation about costs discussed in the paragraph
12  before was not relieved.

13     Q.    I think you and I agree that far.  What
14  about attorney's fees?

15     A.    That paragraph is silent that if the firm
16  chose to withdraw it doesn't say there is no right to
17  an attorney's fee as covered elsewhere in the
18  agreement.

19     Q.    So in your view those two paragraphs,
20  first of which states that the firm is entitled to
21  recover an attorney's fee, and second of which is
22  silent, that still permits the firm to attempt to
23  recover an attorney's fee in the event it withdraws?

24     A.    Correct, if the firm chose to withdraw,
25  correct.  I keep saying choose.  I think there are

1  withdrawals that aren't a choice, but, yes, is the

2  answer to your question.

3        Q.    When you say there are withdrawals that

4  aren't a choice, what are you thinking of?

5        A.    Well, in the example related to my

6  attorney's lien issue where you are told -- I am told

7  or an attorney is told by the board you are required to

8  withdraw, there is not a choice there.  That would be

9  one difference in my mind from someone or we, a firm,

10 choosing to withdraw.

11       Q.    I believe you testified earlier -- I

12 think we're done with this Exhibit for now -- you

13 withdraw from Cummings Manookian in August or September

14 of 2018; is that correct?

15       A.    Yes.

16       Q.    It's your testimony that you withdrew

17 irrespective of Mr. Manookian's eventual suspension

18 from the practice of law?  In other words, that's not

19 what motivated your withdrawal from the firm?

20       A.    I remember Mr. Young asking me that.  For

21 a lot of reasons, I wanted to go start my own firm.  I

22 don't remember Mr. Manookian's what was put in a

23 question to me as -- I don't know if this was the

24 phrase -- upcoming suspension driving that decision.

25 It may have affected the timing of it, but I don't even

1  remember that being a factor.  If I didn't answer the

2  question, please, reask it.

3      Q.    That's fine.  I think you clarified

4  and/or sort of restated what you said to Mr. Young.

5  When you withdrew from the firm, you relied on that

6  Article 10.1 of the operating agreement we looked at

7  earlier to sort of govern your right to the withdrawal,

8  right?

9      A.    I have to look.  In 10.1 the 10 is the

10  part I don't recognize.

11      Q.    Sure, paragraph on page 19 -- Exhibit 2

12  --

13      A.    Yeah, the 10 part I don't get the

14  reference.  Ten point one is where?

15      Q.    On page 12, withdrawal of member.

16      A.    I will read that and ask you to repeat

17  your question.  Let me read it first.  I read it.  Ask

18  the question.

19      Q.    When you withdrew from the firm, was that

20  the provision of the operating agreement that governed

21  your withdrawal?

22      A.    I don't know how to answer that.  I spoke

23  with Mr. Manookian about the withdrawal and we worked

24  out who between him and me wanted which cases.  I think

25  Shoemaker might have been the only one we were both

1   going to continue to work on. If that complies with
2   10.1, the answer is yes. If it's different, we went by
3   our discussions.
4        Q.    When Mr. Manookian was suspended from the
5   practice of law in Tennessee, was it your understanding
6   that would be the same provision Section 10.1 that
7   would govern what would happen under the operating
8   agreement in that event?
9        A.    I don't remember if Mr. Manookian was
10  suspended while I was still at Cummings Manookian that
11  I ever thought about that. I don't remember thinking
12  about this paragraph and his suspension, so that's why
13  I don't have an answer for you.
14       Q.    You don't disagree the last sentence of
15  Section 10.1 says if any member becomes legally
16  disqualified to practice law in the state of Tennessee,
17  he shall be deemed to have voluntarily withdrawn from
18  the company?
19       A.    That sentence says what you read it to
20  say, yes.
21       Q.    Did there come a time you became aware
22  Ms. Hagh started her own law firm?
23       A.    I have seen her use Hagh Law on things,
24  yes.
25       Q.    Do you know when you first became aware

1    she had done that?

2           A.    No, I don't.  I don't.  It would have

3    been on -- it might have been on something in the

4    Keefer case, the Shoemaker case, whether it's the first

5    time it's written or first time you saw it, which is

6    the first time I saw it.  No, I don't remember when

7    that was.  It would have been incidental.  I don't

8    think I got some kind of postcard in the mail or

9    anything.  I think she started using it and at some

10   point I noticed it.  I don't remember when it was.

11          Q.    I was just trying to ask you how you

12   learned that she started her own firm.

13          A.    Maybe I -- I don't remember directly, but

14   I would bet it's that I saw it on something.  I saw

15   Hagh Law and that was it.

16          Q.    Let's talk a little bit about the

17   Shoemaker case, which I believe you testified is the --

18   tell me if I got this wrong -- the main case you

19   continued to work on along with Ms. Hagh after you left

20   the firm?  Is that fair?

21          A.    Yeah.  It's the only one I remember that

22   we worked on together after that departure.  If there

23   is another one, it doesn't come to mind.

24          Q.    I think you testified you don't know

25   whether Cummings Manookian informed Mr. Keefer that it

Case 3:23-cv-00961    Document 6-3    Filed 10/04/23    Page 114 of 266 PageID #: 4370

1  was withdrawing from the Shoemaker case; is that right?

2       A.    Yeah.  Mr. Young asked that.  I don't

3  remember either way.  I wasn't trying to say it wasn't

4  done.  I don't remember it.

5       Q.    That's fine.  You don't have any specific

6  reason to doubt that Cummings Manookian told Mr. Keefer

7  it was withdrawing, do you?

8       A.    I don't doubt it.  I have the same answer

9  I told Mr. Young.  I don't know either way.  I am not

10  trying to cast dispersions or validate something.  I

11  don't remember knowing it, so I don't know it today.

12      Q.    It wouldn't surprise you if after you

13  left and you were no longer a member of the firm and

14  after Mr. Manookian was no longer entitled under the

15  operating agreement to be a member of the firm if the

16  firm had to withdraw from that representation, would

17  it?

18                MR. YOUNG:  Objection, foundation.

19                THE WITNESS:  I want to use your word.

20  Did you say surprised?

21  BY MR. SPRAGENS:

22      Q.    Sure, that's what I said.

23      A.    I wouldn't be surprised, no.  I

24  understand what you are asking.  No, I would not be

25  surprised if that occurred.

Case 3:23-cv-00961    Document 6-3    Filed 10/04/23    Page 115 of 266 PageID #: 4371    2149

1  Q.   As I sit here as a lawyer like you
2  reading these documents knowing what transpired, to me
3  there is no Cummings Manookian unless there has been a
4  new member added to the firm.  There is no Cummings
5  Manookian after Cummings withdraws and Manookian is
6  suspended from the practice of law.  Isn't that what
7  you would expect as the signer and co-drafter of the
8  operating agreement?
9           MR. PRICE:  Object to the leading form of
10  that question.
11           MR. SPRAGENS:  This isn't my witness, so
12  I am leading him.
13           MR. PRICE:  I get to object anyway.
14           THE WITNESS:  If you two are done, and I
15  appreciate both of you -- instead of expect, I would
16  not be surprised.  I don't have an expectation about
17  what companies do after I leave.
18  BY MR. SPRAGENS:
19      Q.   You don't know of any other operating
20  agreement that existed after the one we looked at
21  earlier today with Mr. Young and just referenced again
22  a moment ago?
23      A.   No, for Cummings Manookian, no.  Once I
24  left I did not see another operating agreement new or
25  different or any amended operating agreement for a firm

2150

1  I had already left, correct.

2      Q.    A firm that had your name and Mr.

3  Manookian's name and nobody else's name?

4      A.    My answer is the same.

5      Q.    I think you testified that with the

6  Shoemaker case you did not have a separate

7  representation agreement with Mr. Keefer after you left

8  Cummings Manookian.  Do I have that right?

9      A.    Correct.

10      Q.    You drafted the signature blocks on that

11  complaint that we looked at earlier that appear on page

12  69?

13      A.    Yeah, I drafted the whole complaint,

14  sure.  The signature block is part of it.  Want me to

15  pull that up?

16      Q.    Not really.  I am making sure I have your

17  testimony earlier correct, which is I think you said

18  you don't know if Ms. Hagh even reviewed that before it

19  was filed?

20      A.    Correct.  That's what I meant to say, and

21  I will say it this way now.  I don't remember sending

22  this to her to review if that answers your question.

23      Q.    Sure.  Through filing I think you

24  mentioned that you conferred with an expert to evaluate

25  that case?

1          A.    Yes.

2          Q.    Was the expert that you retained and

3    conferred with on that case qualified to testify in the

4    case under Tennessee Healthcare Liability Act?

5          A.    I have been told she wasn't.  I was told

6    by the company that connected me with her and told by

7    her signing the certificate of good faith that she was.

8          Q.    You were asked earlier about the amended

9    complaint.  Do you know whether one of the reasons for

10   that amended complaint was to address that deficiency

11   relating to the expert witness?

12         A.    No, I don't know that.

13         Q.    Just to follow up on something Mr. Young

14   asked you, you don't have any reason to believe that

15   Mr. Manookian failed to notify Mr. Keefer of his

16   suspension from the practice of law in late 2019, do

17   you?

18         A.    Correct.  I don't know one way or another

19   no matter how either one of you ask me that.

20         Q.    Did you take any expert depositions in

21   the Shoemaker case?

22         A.    No.  I had already withdrawn.

23         Q.    I think you testified you prepared

24   summaries for experts though?

25         A.    I did, yes, sir.

2152

1    Q.    Were those medical records summaries or

2    testimony summaries or something else?

3    A.    Both of those, and I think it also

4    included a summary of some of the discovery responses

5    because some responses were more pertinent than others.

6    Those are three things I remember summarizing and

7    sending to the experts.

8    Q.    Do you recall whether Ms. Hagh took

9    expert witness depositions in that case?

10    A.    I know Mr. Manookian told me she did, so

11    I believe she did.

12    Q.    Generally speaking, you have had the

13    opportunity to observe Ms. Hagh as a plaintiff's

14    attorney; is that right?

15    A.    Yes, but if you follow up on that, I need

16    some detail about what specifically you would ask

17    about.

18    Q.    I will put it in the broadest way

19    possible.  Among the allegations in this adversary

20    proceeding it's a suggestion Ms. Hagh is not able to

21    practice law on her own.  You heard Mr. Young ask you

22    earlier if -- why couldn't Ms. Hagh try this wrongful

23    death case by herself.  My question is, did you have

24    any reason to think Ms. Hagh was not a capable

25    plaintiff's attorney?

1      MR. YOUNG:  Object to foundation.

2      THE WITNESS:  I do not think Ms. Hagh is

3 not a capable plaintiff's attorney.

4 BY MR. SPRAGENS:

5      Q.    With respect to the Shoemaker case, would

6 you have tried that case by yourself?

7      A.    Yes, but with someone supporting me.

8      Q.    Meaning a paralegal or technological

9 person, or who you thinking about?

10     A.    A few things, but along the lines to say

11 yes to what you are saying and absolutely like a

12 computer presentation person like Doug Rice who we

13 mentioned earlier, and in past trials I used somebody

14 like Mark Hammervold to help with motions in limine to

15 gather stuff maybe, I will say, spontaneously during

16 the nights of trial, maybe handle a lesser witness,

17 but, yeah, I would have tried it.

18     Q.    I mean you mentioned Mr. Hammervold.

19 That's with co-counsel?

20     A.    Sorry, maybe I misunderstood the

21 question.  If you can ask again.

22     Q.    I think Mr. Young was suggesting why

23 couldn't Ms. Hagh try that case by herself meaning as a

24 solo attorney.  My question is, wouldn't you, as a

25 plaintiff's attorney, want to have another attorney to

Case 3:23-cv-00961   Document 6-3   Filed 10/04/23   Page 120 of 266 PageID #: 4376   2154

1  help you try a multi-million dollar wrongful death case

2  with overnight motion practice and all those things you

3  mentioned, and wouldn't you think it was more

4  reasonable to have co-counsel for the trial in a case

5  like that than to do it by yourself?

6         MR. YOUNG:  Object to foundation.

7         THE WITNESS:  Can you rephrase or repeat

8  that.  I understood the words.  I don't understand the

9  question.

10 BY MR. SPRAGENS:

11        Q.    In your experience as a plaintiff's

12 attorney, with a multi-million dollar wrongful death

13 case on the line, is there anything unreasonable about

14 engaging a second attorney to try that case?

15        A.    The way you phrased it, no.

16        Q.    You just testified that you would have

17 Mr. Hammervold help you with a trial of any significant

18 case like this?

19        A.    I did.

20        Q.    Is it your understanding that Ms. Hagh

21 prepared the mediation statement in the Shoemaker case?

22        A.    For the second mediation I did not and,

23 therefore, I think she did.

24        Q.    I believe you testified you withdrew from

25 the Shoemaker case in October 2020; is that correct?

1    A.    Yes.    I don't know when the order was

2 entered granting my motion to withdraw, but, yes,

3 that's what I said and that's my memory.

4    Q.    I was a little unclear on what prompted

5 that decision, but am I right in understanding the

6 client made comments that made you understand that he

7 had lost confidence in you?

8    A.    No.    That's not it.

9    Q.    What was it that the client said that led

10 you to think you needed to withdraw if you are able to

11 answer that question?

12    MR. PRICE:  Don't answer that question

13 because that's attorney-client privileged information.

14 Mr. Keefer may get in this lawsuit and we can work it

15 out at that time.

16 BY MR. SPRAGENS:

17    Q.    I assume you will take your attorney's

18 advice.

19    A.    I will.  When it gets worked out, I'll

20 answer it later.  I can answer, but I will follow his

21 advice, yes.

22    Q.    I think you testified that you called or

23 otherwise communicated with somebody at the Tennessee

24 Board of Professional Responsibility before deciding to

25 withdraw?

1       A.      Yes.

2       Q.      Who did you speak with?

3       A.      Russ Willis.

4       Q.      Are you able to tell me what Mr. Willis

5   advised you under the circumstance?

6       A.      I think I am.  He is not a client.  I am

7   looking at my attorney on Zoom.  I don't know why I

8   can't.  I have counsel.  I don't know of any privilege,

9   but Mr. Price is smarter than me on this.

10              MR. PRICE:  He can ask that, but you

11  can't answer the question as to what Mr. Keefer told

12  you.

13              THE WITNESS:  Understood.  I'll answer

14  and try to make sure in my answer about what Mr. Willis

15  said I am not betraying something that falls under

16  other privilege.  I don't want to -- does that make

17  sense?

18  BY MR. SPRAGENS:

19      Q.      Sure.  That's perfectly fine.

20      A.      Mr. Willis said those relationships both

21  with the client and with my co-counsel based on things

22  they said to me appeared -- I don't know if he said

23  broken or irreparable, that I could not ethically

24  continue to represent the client, that I needed to

25  immediately tell the client and co-counsel that I was

1  required to withdraw and then later file a motion about
2  that, but that my communications with them not be
3  broader than them, that just being in our group.  Again
4  to answer this without betraying comments that may fall
5  under privilege, that's how I answer that now without
6  invading privilege that has come up.
7        Q.    Did Mr. Willis give you that advice or
8  anything memorializing that in writing?
9        A.    No.  He told me in that conversation on
10 the phone that day.
11       Q.    Ultimately you withdrew from the
12 Shoemaker case, as opposed to the client terminating
13 you from that case?
14       A.    Correct.  Once the board told me I had to
15 withdraw, I took those steps to withdraw I felt I was
16 required to do.  I will say to add to the other there
17 is a letter I sent to Mr. Keefer and Ms. Hagh that
18 touches on some of these comments.  That's out there
19 until we get a ruling that let's me repeat them somehow
20 orally.
21       Q.    At the time you said that to Ms. Hagh you
22 knew that she was working on behalf of Hagh Law at that
23 time?
24       A.    I don't know one way or another.  I don't
25 know.  Again, I don't know one way or another.

1    Q.    You thought there might be some chance
2  she was still working on behalf of Cummings Manookian
3  at that time?
4    A.    I don't know one way or another.  I sent
5  it to wherever I had contact information from her.  As
6  hopefully you understand, I wasn't concerned about what
7  firm she was working for at the time when I sent that.
8    Q.    Is there any reason at the time that you
9  left Cummings Manookian and started representing Mr.
10  Keefer on behalf of Cummings Injury Law you did not
11  enter into a new representation agreement between your
12  firm and Mr. Keefer?
13    A.    Sure.  There are a few reasons, but they
14  migrate over some time if that's okay to answer that
15  way.  Initially I thought the existing agreement
16  covered it.  At one point -- I don't know the date
17  offhand -- it was around the time I withdrew the client
18  told me he thought the initial agreement continued to
19  cover it.  Somewhere in 2019 around the time of the
20  mediation I had an e-mail exchange with Brian
21  Manookian.  He was not suspended at the time of this
22  e-mail exchange.  He and I confirmed in an e-mail an
23  understanding if the case settled it says something
24  like within 30 to 60 days or 30 to 45 days of the
25  summer '19 e-mail, the fees would be split 50/50 with

Case 3:23-cv-00961   Document 6-3   Filed 10/04/23   Page 125 of 266 PageID #: 4381

2159

1   50 percent going to Brian Cummings/Cummings Law.  I had

2   that.

3              In January 2020 I asked the client when I

4   realized that Ms. Hagh and Mr. Manookian had entered

5   into a new agreement with the client asked them to

6   confirm by e-mail that the terms of the earlier

7   agreement -- that he still wanted me to work on the

8   case, that he still authorized it, that we weren't

9   deleting anything from the earlier agreements, but if

10  there was any question, just confirming he wanted me to

11  continue working on it and still did.  He affirmed that

12  after first texting Mr. Manookian if that was okay to

13  do so.  So those things are why I had the understanding

14  I did.

15             One more thing.  As Mr. Young asked me

16  about what feels like multiple hours ago and maybe it

17  was, everything I had worked on after I left Cummings

18  Manookian that later settled we used a paragraph in the

19  operating agreement through the -- I think somebody

20  said the term was receiver -- whatever the term it is

21  to figure out how to divide it.  When I used that, we

22  kept using that is how I will put it.  There was a

23  history there whether it's directly analogous or partly

24  analogous to add that reason in.

25        Q.    How were you deciding in this deposition

1  which attorney-client communications to testify about
2  and not to testify about?  It seems you just testified
3  about your communications with Mr. Keefer, some
4  communication between him and Mr. Manookian, but you
5  are not willing to testify about other communications
6  with Mr. Keefer.
7       A.    Under Mr. Manookian issue it's that he
8  wasn't the client, but I am leaving it up to my
9  attorney when he directs me not to answer because of
10 privilege.
11      Q.    Are you aware what percentage of the
12 Shoemaker fee the trustee in this case claims are due
13 to Cummings Manookian?
14      A.    No, I am not.
15      Q.    If the trustee takes the position all
16 fees from Shoemaker are Cummings Manookian property, do
17 you agree with that position?
18           MR. YOUNG:  Objection, foundation.
19           THE WITNESS:  If someone claims that the
20 time Brian Cummings spent on this case for years after
21 he left Cummings Manookian falls under the Cummings
22 Manookian umbrella, I would disagree with that.  That's
23 my answer.
24 BY MR. SPRAGENS:
25      Q.    Likewise, would you agree the time Afsoon

1  Hagh spent on the case after she left Cummings

2  Manookian would be due to her or her firm?

3        A.    I am not factually aware of the details.

4  I don't know how to answer that about somebody else,

5  other firms.  I am not arguing against it or for it.

6        Q.    You don't have a view one way or another

7  whether Cummings Manookian continued to exist after you

8  left and Mr. Manookian was suspended from the practice

9  of law?

10       A.    The beginning of that question I need to

11 hear again.

12       Q.    You don't have a view one way or the

13 other whether Cummings Manookian continued to exist

14 after you withdrew and Mr. Manookian was suspended from

15 the practice of law?

16       A.    No.  I don't know one way or another when

17 Cummings Manookian ceased to exist.  I don't know.  I

18 don't know that.

19       Q.    Do you agree that when Mr. Manookian was

20 suspended from the practice of law that would

21 constitute a withdrawal from Cummings Manookian?

22            MR. YOUNG:  Objection, calls for a legal

23 conclusion.

24            THE WITNESS:  I don't know.  I am sorry

25 if that's frustrating.  I don't know.  I just don't

1   know.  Again, I am not arguing for or against it.

2               MR. SPRAGENS:  Thank you very much for

3   your time.

4               MR. YOUNG:  Mr. Gabbert, do you have

5   anything?

6               MR. GABBERT:  No.

7               MR. YOUNG:  I have a few very quick

8   follow-up.

9                       *  *  *  *  *

10                  FURTHER EXAMINATION

11  BY MR. YOUNG:

12       Q.    You testified a moment ago when

13  responding to Mr. Spragens that Afsoon Hagh had access

14  to Cummings Manookian confidential files.  Did Mark

15  Hammervold have access to Cummings Manookian

16  confidential files?

17       A.    My understanding is, yes, to the extent

18  it was a file he was working on, that there was some

19  kind of -- this is a Doug Rice issue if that name rings

20  a bell from earlier, that he or somebody else would set

21  up selective access, if even that.

22       Q.    So Mark Hammervold may have had limited

23  access to Cummings Manookian files, correct?

24       A.    Correct, at most.

25       Q.    Afsoon Hagh -- was her access limited or

Case 3:23-cv-00961   Document 6-3   Filed 10/04/23   Page 129 of 266 PageID #: 4385

2163

1   unlimited?

2        A.     I think it's unlimited.  I think it was

3   unlimited.

4        Q.     Did any other attorney, other than you,

5   Mr. Manookian, and Ms. Hagh, have unlimited access to

6   Cummings Manookian confidential files?

7        A.     No.

8        Q.     You mentioned in responding to Mr.

9   Spragens' question that Afsoon Hagh got mail at an

10  address 47 Music Square West.  Where did that address

11  come from?

12            MR. SPRAGENS:  Object to the form.

13            THE WITNESS:  I don't know where it

14  started.  I remember being asked my thoughts on, you

15  know, where it came from, because everybody we've been

16  talking about knows that's not an actual physical

17  presence anywhere.  If that doesn't answer the

18  question, ask another one.  It doesn't exist, so I

19  don't know how else to answer that.  Anybody who was

20  ever asked about 45 Music Square West would know that

21  doesn't exist.

22  BY MR. YOUNG:

23       Q.     Do you know whether Ms. Hagh represented

24  that was her address, or was this just a mistake by the

25  post office?

1    A.    I wasn't trying to say it was a mistake

2  by the post office if it sounded like that.  It doesn't

3  exist.  If somebody used that address -- I know I am

4  the one answering questions, but they would have to

5  answer why they would use an address that doesn't

6  exist.

7    Q.    Do you know if Ms. Hagh used that

8  address?

9    A.    I have seen it on things, yes, but I

10  don't know how often she used it.

11    Q.    Do you know whether Cummings Manookian

12  ever terminated its relationship with Brett Keefer one

13  way or the other?

14    A.    No, and I am -- sounds like something you

15  asked earlier.  I don't know.  I am not trying to say

16  they did or didn't.  I just don't know.

17    MR. YOUNG:  Those are all my questions.

18  Thank you.

19    MR. SPRAGENS:  Nothing further.

20    MR. PRICE:  I have something.  Mr.

21  Spragens asked earlier about the lawsuit.  Let me say

22  there was a lawsuit filed in the circuit court for

23  Davidson County to enforce the attorney's lien Mr.

24  Cummings filed.

25    The defendants in that were Mr. Keefer as

Case 3:23-cv-00961    Document 6-3    Filed 10/04/23    Page 131 of 266 PageID #: 4387

2165

1    the trustee in that.  Ms. Afsoon Hagh was also added

2    because she has a claim in that.  We joined the trustee

3    because the trustee has a claim in that.  The trustee

4    moved that case to bankruptcy court, federal court, now

5    in federal court, and, Craig, let me tell you I have

6    done everything to try to serve Ms. Hagh.  The

7    certified mail I sent is not picked up.  My agent for

8    service of process goes out to the house that is listed

9    by board of professional responsibility as her office

10   and no one comes to the door.

11         We need to get this thing served so we

12   can move on.  I don't feel I ought to chase her like a

13   kid who stole a watermelon out of a patch.

14         Could you ask her to contact me where I

15   can serve her like a professional does.  I don't want

16   to have to chase her down at the grocery store or at

17   her doctor's office, so at least we can move this case

18   on.

19         MR. GABBERT:  I am not representing her

20   in that matter, so I cannot.

21         MR. PRICE:  Could you pass that word to

22   her?  I understand.  Is she present today?  Perhaps she

23   heard.

24         MR. GABBERT:  Not to my knowledge.

25         MR. SPRAGENS:  I don't know that she is

Case 3:23-cv-00961   Document 6-3   Filed 10/04/23   Page 132 of 266 PageID #: 4388   2166

1  here, but sounds like a conversation for another time.

2  Thank you all.

3  (DEPOSITION CONCLUDED.)

REPORTER'S CERTIFICATE

STATE OF TENNESSEE                )

COUNTY OF DAVIDSON                )

     I, Cristi G. Watson, Licensed Court Reporter in and for the State of Tennessee, do hereby certify that the foregoing proceedings were stenographically reported by me on the 9th day of June, 2022, and that the foregoing transcript constitutes a true and accurate record to the best of my ability.

     I further certify that I am not related to nor an employee of counsel or any of the parties to the action, nor am I in any way financially interested in the outcome of this case.

     I further certify that I am duly licensed by the Tennessee Board of Court Reporting as a Licensed Court Reporter as evidenced by the LCR number following my name below.

     IN WITNESS WHEREOF, I have hereunto set my official hand on this 22nd day of June, 2022.

_____

CRISTI G. WATSON

Tennessee License No. 187



# IN THE CIRCUIT COURT FOR WILLIAMSON COUNTY, TENNESSEE

MARTY FITZGERALD and MELISSA
FITZGERALD, individually, as husband
and wife, and on behalf of their deceased
child, MEGAN FITZGERALD,

        Plaintiffs,

v.

JAMES WOODROW OSBORN and
OSBORN ENTERPRISES, INC., II, and
OSBORN ENTERPRISES, INC., III,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**

**DEC 1 3 2018**

Debbie McMillan Barrett
Circuit Court

NO. 2018-311
**JURY DEMAND**

---

### MOTION TO WITHDRAW

---

      Pursuant to Section 28 of Rule 9 of the Tennessee Supreme Court, Brian Manookian moves

to withdraw as counsel in this matter. Afsoon Hagh continues to represent the Plaintiffs.

                    Respectfully submitted,

                    Brian P. Manookian, #26455
                    Afsoon Hagh, #28393
                    Cummings Manookian PLC
                    45 Music Square West
                    Nashville, Tennessee 37203
                    (615) 266-3333 (phone)
                    (615) 266-0250 (fax)

                    *Attorneys for the Plaintiffs*

1

## CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2018, a true and correct copy of the foregoing was proved by US Mail to the following:

Steve Meisner
Brewer Krause Books & Chastain
545 Mainstream Drive
Nashville, Tennessee 37228
T: 615.630.7727
F: 615.256.8985
smeisner@bkblaw.com

Brian P. Manookian

2

ORIGINAL

IN THE CIRCUIT COURT FOR WILLIAMSON COUNTY, TENNESSEE

MARTY FITZGERALD and MELISSA )
FITZGERALD, individually, as husband )
and wife, and on behalf of their deceased )
child, MEGAN FITZGERALD, )
)
        Plaintiffs, )
)
v. )     NO. 2018-311
)     JURY DEMAND
JAMES WOODROW OSBORN and )
OSBORN ENTERPRISES, INC., II, and )
OSBORN ENTERPRISES, INC., III, )
)
        Defendant. )

COPY

---

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY AND COMPARATIVE FAULT

---

Comes now Plaintiffs, Marty Fitzgerald and Melissa Fitzgerald, by and through counsel, and pursuant to Rule 56 of the Tennessee Rules of Civil Procedure, and hereby move this Court for an order granting summary judgment against Defendant James Osborn in favor of the Plaintiffs on the issues of Defendant Osborn's liability and Defendant's Osborn's comparative fault defense.

The Plaintiffs would show that there is no genuine issue as to any material fact and that they are entitled to summary judgment against Defendant Osborn on the issue of liability and comparative fault as a matter of law.

The Plaintiffs rely upon their Memorandum of Law, their Rule 56.03 Statement of Undisputed facts, and the exhibit(s) thereto, all filed contemporaneously with this Motion.

Respectfully submitted,

Afsoon Hagh #28393
Cummings Manookian PLC
45 Music Square West
Nashville, Tennessee 37203
(T) 615.266-3333
(F) 615.266-0250
afsoon@cummingsmanookian.com

*Attorney for the Plaintiffs*

## REQUEST FOR HEARING

**PURSUANT TO RULE 5.03(b) OF THE LOCAL RULES OF COURT, THE PLAINTIFFS HEREBY MOVE THIS COURT FOR A DATE CERTAIN FOR HEARING OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT.**

## CERTIFICATE OF SERVICE

I certify that on January 22, 2019, a true and correct copy of this document was provided by U.S. Mail, postage pre-paid and facsimile to the following:

Mr. Steve Meisner
Brewer Krause Books & Chastain
545 Mainstream Drive
Nashville, Tennessee 37228
T: 615.630.7727
F: 615.256.8985

*Attorney for the Defendants*

Afsoon Hagh

2

IN THE CIRCUIT COURT FOR WILLIAMSON COUNTY, TENNESSEE

| | | |
|---|---|---|
| MARTY FITZGERALD and MELISSA FITZGERALD, individually, as husband and wife, and on behalf of their deceased child, MEGAN FITZGERALD, | ) ) ) ) ) | 2019 JAN 22 PM 3: 54 |
| Plaintiffs, | ) ) | ENTERED _____ |
| v. | ) ) | NO. 2018-311 |
| JAMES WOODROW OSBORN and OSBORN ENTERPRISES, INC., II, and OSBORN ENTERPRISES, INC., III, | ) ) ) ) | JURY DEMAND |
| Defendant. | ) ) | |

ORIGINAL

COPY

---

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUES OF LIABILITY AND COMPARATIVE FAULT

---

The Plaintiffs, Marty Fitzgerald and Melissa Fitzgerald, by and through undersigned counsel, respectfully submit this Memorandum of Law in support of their Motion for Partial Summary Judgment on the Issues of Liability and Comparative Fault.

### INTRODUCTION

This is a clear-liability wrongful death case. Defendant James Osborn admits that he is responsible the death of the Decedent, Megan Fitzgerald:

Q.    You killed Megan Fitzgerald. Correct?

A.    Yes.

Q.    You are responsible for Megan Fitzgerald's death. Correct?

A.    Yes.[1]

---

[1] Osborn Depo. Pg. 10:13-17.

The Decedent, Megan Fitzgerald, was the seventeen (17) year old daughter of Plaintiffs Marty and Melissa Fitzgerald.[2] On May 9, 2018, Megan Fitzgerald was bicycling when Defendant Osborn approached her in his truck and ran her over, thereby causing her death.

The pleadings and discovery in this case have shown that there is no genuine of material fact that the Defendant is legally 100% at fault for Megan Fitzgerald's death. As such, the Plaintiffs ask this Court to enter summary judgment in favor of the Plaintiffs on this issue.

Entry of partial summary judgment in favor of the Plaintiffs on liability is proper under Tenn. R. Civ. P. 56.01. The relief sought by Plaintiffs will serve the interest of judicial economy by permitting the Parties to focus their proof, and the jury's attention, on the only genuinely disputed issue at trial: the amount and extent of damages Defendant Osborn caused when he ran over and killed Megan Fitzgerald on May 9, 2018.

## SUMMARY JUDGMENT STANDARD

A claimant may move for summary judgment as soon as thirty (30) days after service of the Complaint. Tenn. R. Civ. P. 56.01. Summary judgment "shall be rendered" in favor of the moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. "Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial." *Byrd v. Hall*, 847 SW 2d 208, 211 (Tenn. 1993). The purpose of Rule 56 is to provide a means for accelerating litigation of issues that are not disputed, or which cannot be genuinely disputed by the parties. *Byrd*, 847 SW 2d at 210.

---

[2] Plaintiffs' Statement of Undisputed Material Facts, ¶ 1 (hereinafter "P's SUMF, ¶ "); Answer ¶ 1.

Summary judgment motions are often used to determine "whether a defendant owes a duty to a plaintiff in a particular circumstance because questions involving the existence and extent of one's legal duty to prevent harm to others is a question of law for the courts." *Rains v. Bend of the River*, 124 S.W.3d 580, 588 (Tenn. Ct. App. 2003). Although the elements of "breach" and "causation" are typically questions of fact requiring trial by a jury, "these questions may be decided at the summary judgment stage if the evidence is uncontroverted and if the facts and the inferences drawn reasonably from the facts permit reasonable persons to draw only one conclusion." *Rains*, 124 S.W.3d at 588.

Since the Plaintiffs have the burden to prove the prima facie elements of liability (duty, breach and causation), the Plaintiffs must present affirmative evidence to establish these elements. *See Byrd*, 847 SW 2d at 215, n. 5. Once this occurs, the burden of production shifts to Defendant Osborn to show that a genuine dispute of material fact exists as to one or more of these elements. *Id.*

The portion of this motion for partial summary judgment directed towards Defendant Osborn's comparative fault defense is governed by Tenn. Code Ann.§ 20-16-101. As to Defendant's affirmative defense(s), the Plaintiffs need only show that Defendant's evidence is insufficient and the Defendant must come forward with sufficient evidence to show a genuine issue of material fact for trial. *Id.*

## STATEMENT OF FACTS

On May 9, 2018, Megan Fitzgerald was riding her bicycle on the right-hand side of a straight part of Coleman Road in Franklin, Williamson County, Tennessee.[3] There was nothing illegal, improper or inappropriate about the fact or manner that Megan Fitzgerald was riding a bicycle on Coleman Road in May of 2018.[4]

---

[3] P's SUMF ¶ 2; Answer ¶ 12; Osborn Depo. p. 20:19.
[4] P's SUMF ¶ 3; Osborn Depo. p. 10:18-11:12.

On the same day and at the same time, Defendant James Osborn ("Osborn") was traveling in his truck on Coleman Road.[5]

Osborn approached Megan Fitzgerald from behind and struck her with his truck while she was on her bike.[6] The Accident Report provided the following demonstrative of the collision:



There is no dispute that Megan Fitzgerald's death was caused by Defendant Osborn striking her with his truck.[7]

Defendant Osborn also admits that he is 100% responsible for Megan Fitzgerald's death.[8] During his deposition, Osborn testified as follows:

Q.    You killed Megan Fitzgerald. Correct?

A.    Yes.

Q.    You are responsible for Megan Fitzgerald's death. Correct?

A.    Yes.

*****

---

[5] P's SUMF ¶ 4; Answer ¶ 11.
[6] P's SUMF ¶ 5; Answer ¶ 12.
[7] P's SUMF ¶ 6; Answer, ¶¶ 5, 14, 16, 27, 31.
[8] P's SUMF ¶¶ 7-8; Osborn Depo. pp. 10:13-17; 63:15-17.

Q. Do you take responsibility for what occurred?

A. 100%[9]

Defendant Osborn admitted during his deposition that there was no excuse for his conduct that led to Megan Fitzgerald's death.[10] He testified as follows:

Q. …There is no excuse for your conduct that led to Megan Fitzgerald's death. Correct?

A. Yes.[11]

Defendant Osborn clearly should have seen Megan Fitzgerald on the road, but he did not.[12] Nothing about the weather, road conditions, or anything else outside of Osborn's control prevented him from seeing Megan Fitzgerald on May 9, 2018.[13]

If Defendant Osborn had been paying attention and had seen Megan Fitzgerald, he could have passed her in a safe manner without striking her.[14] However, Defendant Osborn took no action to try to avoid striking Megan Fitzgerald with his truck.[15]

When Defendant Osborn was approaching Megan Fitzgerald to pass her, Tennessee law *required* him to provide her at least three (3) feet of clearance.[16] The purpose of this requirement under Tennessee law was for her safety – to protect bicyclists against the risk of the motorist striking the bicyclist.[17] Defendant Osborn violated this safety rule: he did not give Megan Fitzgerald three (3) feet of space as his truck passed and collided with her on May 9, 2018.[18]

---

[9] P's SUMF ¶ 8; Osborn Depo. pp. 10:13-17; 63:15-17.
[10] P's SUMF ¶ 9; Osborn Depo. p. 12:10-15.
[11] P's SUMF ¶ 10; Osborn Depo. p. 12:10-15.
[12] P's SUMF ¶ 11; Osborn Depo. pp. 23:10-14; 24:9-13.
[13] P's SUMF ¶ 12; Osborn Depo. pp. pp. 22:10-23:9, 23:10-14; 24:9-13.
[14] P's SUMF ¶ 14; Osborn Depo. p. 56:9-57:10.
[15] P's SUMF ¶ 13; Osborn Depo. p. 32:22-33:3.
[16] P's SUMF ¶ 15; Tenn. Code Ann. § 55-8-175(c)(2); Osborn Depo. p. 69:4-15.
[17] P's SUMF ¶ 16; Osborn Depo. p. 70:10-15.
[18] P's SUMF ¶ 17; Osborn Depo. p. 70:16-22.

Despite pleading comparative fault in his Answer, Defendant Osborn does not blame Megan Fitzgerald "at all" for her death.[19] During his deposition, Defendant Osborn testified:

> Q. Do you take responsibility for what occurred?
>
> A. 100%
>
> Q. You don't blame Megan Fitzgerald at all for what occurred, do you?
>
> A. No. Not at all.[20]

Coleman road is not unsuitable for bicycle traffic.[21] Defendant Osman admits that Megan Fitzgerald was not doing anything wrong by bicycling on Coleman Road at the time.[22] On this point, Osborn testified:

> Q. It's not your position that Megan Fitzgerald should not have been bicycling on Coleman Road at the time and in the manner she was doing so on May 9, 2018. Correct?
>
> A. No, I'm not saying she was doing anything wrong.
>
> Q. You don't blame Megan Fitzgerald at all for what occurred, do you?
>
> A. No. Not at all.[23]

Likewise, Defendant Osborn does not blame the Plaintiffs "at all" for their daughter, Megan Fitzgerald's death.[24]

## ARGUMENT

To prevail on a negligence claim, a plaintiff must prove the elements of (1) duty, (2) breach and (3) causation. *King v. Anderson Cnty*, 419 S.W.3d 232, 246-47 (Tenn. 2013). The Court should grant summary judgment in favor of the Plaintiffs because there can be no dispute as to any of these elements of the Plaintiffs' negligence / wrongful death claim against Defendant Osborn.

---

[19] P's SUMF ¶ 18; Osborn Depo. p. 61:15-20.
[20] P's SUMF ¶ 19; Osborn Depo. p. 61:15-20.
[21] P's SUMF ¶ 21; Osborn Depo. p. 10:11-11:12.
[22] P's SUMF ¶ 22; Osborn Depo. p. 66:7-13-19.
[23] P's SUMF ¶ 23; Osborn Depo. p. 66:7-13-19.
[24] P's SUMF ¶ 20; Osborn Depo. p. 62:7-12.

## I.    The Plaintiffs are Entitled to Summary Judgment on the Element of Duty.

With respect to the element of duty, it is undisputed that Defendant Osborn owed a duty to the Decedent during the time in question to exercise due care and to follow traffic laws, including the statutory requirement that motorists such as Defendant Osborn provide at least three (3) feet of clearance when overtaking a bicycle on the road.

Duty is a question of law for the court to determine. *Rains*, 124 S.W.3d at 588. In Tennessee, the existence and scope of a defendant's duty may arise from the common law and/or by statute. *Id.* at 588-591.

Under the common law, every driver on any road in Tennessee owes a duty of care to others on or near the road to drive with due care. The Tennessee Pattern Jury Instructions describe this duty as follows:

> Each driver is under a duty to maintain a reasonably safe rate of speed; to keep the automobile [vehicle] under reasonable control; to keep a proper lookout under the existing circumstances; to see and be aware of what is in that driver's view; [and] to use reasonable care to avoid an accident [and to obey the traffic laws].

T.P.I.-CIVIL 5.01, Duty of Driver, 8 Tenn. Prac. Pattern Jury Instr. T.P.I.-Civil 5.01 (2015 ed.).

Tennessee law also imposes a statutory duty on motorists, including the Defendant, with respect to the exact situation at issue in this case. Motorists like Defendant Osborn must provide bicyclists, like the Decedent, at least three (3) feet of clearance when overtaking a bicycle.[25]

On May 9, 2018, Tenn. Code Ann. § 55-8-175(c)(2) required as follows:

> The operator of a motor vehicle, when overtaking and passing a bicycle proceeding in the same direction on the roadway, shall leave a safe distance between the motor vehicle and the bicycle of not less than three feet (3') and shall maintain the clearance until safely past the overtaken bicycle.

This statutory requirement is known as "Jeff Roth and Brian Brown Bicycle Protection Act of 2007." Tenn. Code Ann. § 55-8-175(c)(1). Both Jeff Roth and Brian Brown were hit and killed

---

[25] P's SUMF ¶ 15; Tenn. Code Ann. § 55-8-175(c)(2); Osborn Depo. p. 69:4-15.

2179

from passing motorists while bicycling. This statute was specifically enacted to to protect bicyclists like them, and like Megan Fitzgerald from being hit by motorists like Defendant Osborn.[26]

In his Answer, Defendant Osborn admits that he had a duty to other individuals on the road on May 9, 2018, including bicyclists such as Megan Fitzgerald, (1) to follow the traffic laws; and (2) to exercise due care to avoid causing injuries to others. Answer, ¶ 28. In his deposition, Defendant Osborn specifically agreed that he had a duty to provide a bicyclist such as Megan Fitzgerald at least three (3) feet when passing:

> Q: Having observed and passed hundreds of bicyclists on the road over the last decade in Williamson County in your motor vehicle, you were aware of the risk of failing to leave enough room for a bicyclist as you passed them. Correct?
>
> A: Yes. Three feet.
>
> Q: You're aware that you're required to provide three feet as you pass a bicyclist. Correct?
>
> A: Yes.
>
> Q: You were aware of that on May 9, 2018, and before that time. Correct?
>
> A: Yes.[27]

As a matter of law -- and undisputed fact -- Defendant Osborn owed a duty to the Decedent on May 9, 2018 to exercise due care to avoid causing the Megan Fitzgerald injuries, and this duty required the Defendant to provide the Megan Fitzgerald at least three (3) feet when he approached her bicycling while he was in his truck on Coleman Road. As such, this Court should enter summary judgment in favor of the Plaintiffs on the element of duty.

---

[26] P's SUMF ¶ 16; Osborn Depo. p. 70:10-15.
[27] Deposition of Osborn, p. 69:4-15 (emphasis added).

## II. The Plaintiff is Entitled to Summary Judgment on the Element of Breach.

The evidence also supports only one conclusion as to the element of "breach" in this case. The Defendant failed to exercise due care as a matter of law – and undisputed fact – when he hit and killed Megan Fitzpatrick on May 9, 2018.

The Plaintiffs are entitled to summary judgment of the element of breach because (a) Defendant Osborn was negligent *per se* in violation of Tenn. Code Ann. § 55-8-175(c)(2) when he struck Megan Fitzgerald; and (b) Defendant Osborn admits he was responsible for causing Megan Fitzgerald's because he should have seen her bicycling and has no excuse for striking her.

### a. The Defendant was Negligent *Per Se* (as a Matter of Law) because He Failed to Provide the Decedent at Least Three (3) Feet When Overtaking Her, in Violation Tenn. Code Ann. § 55-8-175(c)(2).

The doctrine of negligence *per se* "enables the courts to mold standards of conduct in penal statutes into rules of civil liability." *Rains,* 124 S.W.3d at 589. When a defendant is negligent *per se,* the defendant is "negligent as a matter of law." *Id.* "[A] person whose conduct is negligent *per se* cannot escape liability by attempting to prove that he or she acted reasonably under the circumstances." *Id.* For the doctrine of negligence *per se* to apply, the following conditions must be present:

a. There must be a causal connection between the statutory violation and the injury; and

b. The plaintiff must be a person whom the law was intended to protect/benefit.

*Bennett v. Putnam County,* 47 S.W.3d 438 (Tenn. App. 2000); *Alex v. Armstrong,* 215 Tenn. 276, 385 S.W.2d 110 (1964).

Tenn. Code Ann. § 55-8-175(c)(2) satisfies these requirements because its requirement that motorists give bicyclists at least three (3) feet of clearance exists precisely to protect bicyclists like Megan Fitzgerald from the exact type of hazard and injury she ultimately sustained.[28]

---

[28] P's SUMF ¶ 16; Osborn Depo. p. 70:10-15.

Defendant Osborn is negligent as a matter of law because Tenn. Code Ann. § 55-8-175(c)(2) required him to give Megan Fitzgerald at least (3) feet of clearance when he approached her on Coleman Road on May 9, 2018,[29] but he failed to do so.[30]

      **b. Defendant Osborn is Negligent as a Matter of Undisputed Fact because he Has No Excuse for his Conduct and Admits that He is Responsible for Her Death.**

Defendant Osborn also agrees – as a matter of undisputed material fact – that he was responsible for Fitzgerald's death, including because he has no excuse for not seeing and not striking Megan Fitzgerald on May 9, 2018.

During his deposition, Defendant Osborn admitted that he is 100% responsible for Megan Fitzgerald's death.[31] Defendant Osborn was correct on this point.

Tennessee law recognizes a presumption that a motorist exercising reasonable care should be able to avoid a collision with a vehicle ahead of him/her unless that vehicle stops suddenly and unexpectedly. *Ewing v. Birthright*, 60 Tenn. App. 454, 460 (Tenn. Ct. App. 1969).

That was the situation in this case. Defendant Osborn approached Megan Fitzgerald from behind and struck her.[32] There were no extraordinary circumstances excusing this conduct.

Tennessee drivers have a duty "to see and be aware of what is in that driver's view." T.P.I.-CIVIL 5.0l, Duty of Driver, 8 Tenn. Prac. Pattern Jury Instr. T.P.I.-Civil 5.01 (2015 ed.). Defendant Osborn breached this duty because he failed to see Megan Fitzgerald in his plain view before he ran her over.[33] He has no excuse for this,[34] including because nothing about the weather, road conditions or anything else outside of Osborn's control prevented or obstructed him from seeing Megan Fitzgerald on May 9, 2018 as he approached her and just ran her over.[35]

---

[29] P's SUMF ¶ 15; Tenn. Code Ann. § 55-8-175(c)(2); Osborn Depo. p. 69:4-15.
[30] P's SUMF ¶ 17; Osborn Depo. p. 70:16-22.
[31] P's SUMF ¶¶ 7-8; Osborn Depo. pp. 10:13-17; 63:15-17.
[32] P's SUMF ¶ 5; Answer ¶ 12.
[33] P's SUMF ¶ 11; Osborn Depo. pp. 23:10-14; 24:9-13.
[34] P's SUMF ¶ 9; Osborn Depo. p. 12:10-15.
[35] P's SUMF ¶ 12; Osborn Depo. pp. pp. 22:10-23:9, 23:10-14; 24:9-13.

Defendant Osborn could have and should have seen Megan Fitzgerald on the road and maneuvered his truck in a safe manner without striking her. [36] Instead, he took no action to try to avoid striking Megan Fitzgerald as he approached and ultimately ran her over.[37]

Even without the specific guidance of Tenn. Code Ann. § 55-8-175(c)(2), it remains clear from the Defendant Osborn's own admissions that he breached his duty to exercise reasonable care when he failed to see and ran over Megan Fitzgerald on May 9, 2018.[38]

### III.     The Plaintiff is Entitled to Summary Judgment on Causation.

This Court should enter summary judgment in favor of the Plaintiffs on the element of causation because Defendant Osborn admits that he caused Megan Fitzgerald's death.[39] He repeatedly admitted this in his Answer,[40] as well as in his deposition:

> Q.     You struck Megan Fitzgerald on Coleman Road on May 9, 2018 with your truck. Correct?
>
> A.     Yes.
>
> Q.     You don't deny that striking Megan Fitzgerald with your truck on May 9, 2018 caused her death. Correct?
>
> A. No, I don't deny that.[41]

There can be no dispute that causation was "proximate" because Defendant Osborn was specifically aware that motorists need to give bicyclists sufficient clearance so they are not injured in a collision.[42]

---

[36] P's SUMF ¶ 14; Osborn Depo. p. 56:9-57:10.
[37] P's SUMF ¶ 13; Osborn Depo. p. 32:22-33:3.
[38] P's SUMF ¶ 17; Osborn Depo. p. 70:16-22.
[39] P's SUMF ¶ 6; Answer, ¶¶ 5, 14, 16, 27, 31.
[40] Answer, ¶¶ 5, 14, 16, 27, 31.
[41] Osborn Depo. p. 17:12-18.
[42] P's SUMF ¶ 16; Osborn Depo. p. 70:10-15.

IV. **The Plaintiffs are Entitled to Summary Judgment on the Defendant Osborn's Comparative Fault Defense.**

Defendant Osborn's Answer asserts comparative fault against Megan Fitzgerald. Answer, p. 5, ¶ 1. In support of this defense, Defendant summarily alleges: "Ms. Fitzgerald was riding a bike on a road unsuitable for bicycle traffic without appropriate safety equipment or clothing."

In his deposition, Defendant Osborn admitted that his comparative fault defense has no merit. Defendant Osborn testified that he does not blame Megan Fitzgerald "at all" for her death.[43] He admitted that he is 100% responsible and she is 0% responsible:

> Q. Do you take responsibility for what occurred?
>
> A. 100%
>
> Q. You don't blame Megan Fitzgerald at all for what occurred, do you?
>
> A. No. Not at all.[44]

Defendant Osman admitted that Megan Fitzgerald was not doing anything wrong by bicycling on Coleman Road at the time, including the "manner she was doing so":

> Q. It's not your position that Megan Fitzgerald should not have been bicycling on Coleman Road at the time and in the manner she was doing so on May 9, 2018. Correct?
>
> A. No, I'm not saying she was doing anything wrong.
>
> Q. You don't blame Megan Fitzgerald at all for what occurred, do you?
>
> A. No. Not at all.[45]

Defendant Osborn also admitted that the Plaintiffs are not responsible "at all" for their daughter's untimely death.[46]

---

[43] P's SUMF ¶ 18; Osborn Depo. p. 61:15-20.
[44] P's SUMF ¶ 19; Osborn Depo. p. 61:15-20.
[45] P's SUMF ¶ 22-23; Osborn Depo. p. 66:7-13-19.
[46] P's SUMF ¶ 20; Osborn Depo. p. 62:7-12.

Regarding the specific allegation that Coleman Road was "unsuited" for bicycle traffic, Defendant Osborn disagreed in his deposition, admitting it was "entirely appropriate" for Megan Fitzgerald to be riding her bicycle on Coleman Road on May 9, 2018.[47]

Likewise, Defendant Osborn does not have any evidence to support a defense of comparative fault against Megan Fitzgerald based on a supposed failure to wear a helmet.[48]

Since no evidence supports Defendant Osborn's comparative fault defense as against the Decedent or the Plaintiffs, the Court should grant summary judgment in favor of the Plaintiffs on that issue.[49]

CONCLUSION

For the foregoing reasons, the Plaintiffs, Marty Fitzgerald and Melissa Fitzgerald, respectfully request that this Court grant their Motion for Partial Summary Judgment and enter judgment in Plaintiffs' favor on the issue of Defendant Osborn's liability for their deceased daughter's wrongful death, including Defendant Osborn's comparative fault affirmative defense.

---

[47] P's SUMF ¶ 21; Osborn Depo. p. 10:11-11:12.
[48] P's SUMF ¶ 24-25.
[49] P's SUMF ¶ 20; Osborn Depo. p. 62:7-12.

Respectfully submitted,

Afsoon Hagh, #28393
Cummings Manookian PLC
45 Music Square West
Nashville, Tennessee 37203
(T) 615.266-3333
(F) 615.266-0250
afsoon@cummingsmanookian.com

*Attorney for the Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on January 22, 2019, a true and correct copy of this document was provided by U.S. Mail, postage pre-paid and facsimile to the following:

Mr. Steve Meisner
Brewer Krause Books & Chastain
545 Mainstream Drive
Nashville, Tennessee 37228
T: 615.630.7727
F: 615.256.8985

*Attorney for the Defendants*

Afsoon Hagh

14

FILED
WILLIAMSON COUNTY
CIRCUIT COURT

2019 JAN 22 PM 3: 54

ENTERED

ORIGINAL

MARTY FITZGERALD and MELISSA
FITZGERALD, individually, as husband
and wife, and on behalf of their deceased
child, MEGAN FITZGERALD,

      Plaintiffs,

v.

JAMES WOODROW OSBORN and
OSBORN ENTERPRISES, INC., II, and
OSBORN ENTERPRISES, INC., III,

      Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

NO. 2018-311
JURY DEMAND

COPY

---

**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUES OF
LIABILITY AND COMPARATIVE FAULT**

---

Pursuant to Tenn. R. Civ. P. 56.03, the Plaintiffs, Marty Fitzgerald and Melissa Fitzgerald,

hereby submit this Statement of Undisputed Material Facts in support of their Motion for Partial

Summary Judgment on the Issues of Liability and Comparative Fault.[1]

The following undisputed facts are material to Plaintiffs' entitlement to partial summary

judgment on the issues of liability and Defendant Osborn's comparative fault defense:

1) **On May 9, 2018, Megan Fitzgerald was the seventeen (17) year-old daughter of

Marty and Melissa Fitzgerald.**

**Source:** Answer, ¶ 1.

**RESPONSE:**

---

[1] A copy of Defendant Osborn's deposition is attached hereto as Exhibit 1.

2) On May 9, 2018, Megan Fitzgerald was riding her bicycle on the righthand side of a straight part of Coleman Road in Franklin, Williamson County, Tennessee.

SOURCE: Answer ¶ 13; Osborn Depo. p. 20:18-21:11.

RESPONSE:

3) There was nothing illegal, improper or inappropriate about Megan Fitzgerald riding a bicycle on Coleman Road in May of 2018.

SOURCE: Osborn Depo. p. 10:18-11:12.

RESPONSE:

4) On the same day and at the same time James Osborn was traveling in a truck the same direction (westbound) on Coleman Road on May 9, 2018.

SOURCE: Answer, ¶ 11.

RESPONSE:

5) Osborn approached Megan Fitzgerald from behand and struck her with his vehicle while she was on her bike.

SOURCE: Answer, ¶ 12; Osborn Depo. p. 17:12-18.

RESPONSE:

6) Megan Fitzgerald's death was caused by Defendant Osborn striking her with his truck.

SOURCE: Answer, ¶¶ 5, 14, 16, 27, 31; Osborn Depo. p. 17:12-18.

RESPONSE:

7) Osborn admits that he is 100% responsible for Megan Fitzgerald's death.

SOURCE: Osborn Depo. pp. 10:13-17; 63:15-17.

RESPONSE:

2

8) During his deposition, Osborn testified as follows:

> Q.  You killed Megan Fitzgerald.  Correct?
>
> A.  Yes.
>
> Q.  You are responsible for Megan Fitzgerald's death.  Correct?
>
> A.  Yes.
>
> *****
>
> Q.  Do you take responsibility for what occurred?
>
> A.  100%

SOURCE: Osborn Depo. p. 10:13-17; 63:15-17

RESPONSE:

9) Osborn admitted during his deposition that there was no excuse for his conduct that led to Megan Fitzgerald's death.

SOURCE: Osborn Depo. p. 12:10-15.

RESPONSE:

10) During his deposition, Osborn testified as follows:

> Q.  …There is no excuse for your conduct that led to Megan Fitzgerald's death. Correct?
>
> A.  Yes.

SOURCE: Osborn Depo. p. 12:10-15.

RESPONSE:

11) Osborn states that he did not see Megan Fitzgerald on the road, but he admits that he "should" have seen her.

SOURCE: Osborn Depo. pp. 23:10-14; 24:9-13.

RESPONSE:

3

12) Nothing about the weather, road conditions or anything else outside of Osborn's control prevented or obstructed Defendant from seeing Megan Fitzgerald on May 9, 2018.

SOURCE: Osborn Depo. pp. 22:10-23:9, 23:10-14; 24:9-13.

RESPONSE:

13) Osborn took no action to try to avoid striking Megan Fitzgerald with his truck.

SOURCE: Osborn Depo. p. 32:22-33:3.

RESPONSE:

14) If Osborn had been paying attention and had seen Megan Fitzgerald, he could have passed her in a safe manner without striking her.

SOURCE: Osborn Depo. p. 56:9-57:10

RESPONSE:

15) When Osborn was approaching Megan Fitzgerald on her bicycle to pass her, Tennessee law *required* him to provide her at least three (3) feet.

SOURCE: Tenn. Code Ann. § 55-8-175(c)(2); Osborn Depo. p. 69:4-15.

RESPONSE:

16) The purpose of the requirement under Tennessee law for motorists to provide bicyclists at least three (3) feet is to protect the bicyclist against the risk of the motorist striking the bicyclist.

SOURCE: Osborn Depo. p. 70:10-15.

RESPONSE:

4

2190

17) Defendant Osborn did __not__ give Megan Fitzgerald three (3) feet of space as his truck passed and collided with her on May 9, 2018.

SOURCE: Osborn Depo. p. 70:16-22.

RESPONSE:

18) Defendant Osborn does not blame Megan Fitzgerald "at all" for her death.

SOURCE: Osborn Depo. p. 61:15-20.

RESPONSE:

19) During his deposition, Defendant Osborn testified as follows:

Q.     Do you take responsibility for what occurred?

A.     100%

Q.     You don't blame Megan Fitzgerald at all for what occurred, do you?

A.     No. Not at all.

SOURCE: Osborn Depo. p. 61:15-20.

RESPONSE:

20) Defendant Osborn does not blame the Plaintiffs "at all" for Megan Fitzgerald's death.

SOURCE: Osborn Depo. p. 62:7-12.

RESPONSE:

21) Coleman Road is not unsuitable for bicycle traffic.

SOURCE: Osborn Depo. p. 10:11-11:12.

RESPONSE:

5

2191

22) Defendant Osman admitted that Megan Fitzgerald was not doing anything wrong by bicycling on Coleman Road at the time.

SOURCE: Osborn Depo. p. 66:13-19.

RESPONSE:

23) During his deposition, Osborn testified as follows:

Q.   It's not your position that Megan Fitzgerald should not have been bicycling on Coleman Road at the time and in the manner she was doing so on May 9, 2018. Correct?

A.   No, I'm not saying she was doing anything wrong.

Q.   You don't blame Megan Fitzgerald at all for what occurred, do you?

A.   No. Not at all.

SOURCE: Osborn Depo. p. 66:13-19.

RESPONSE:

24) Defendant Osborn does not have any information to believe that Megan Fitzgerald was not wearing a helmet on May 9, 2018.

SOURCE: Answer, ¶ 9.

RESPONSE:

25) Even if Megan Fitzgerald was not wearing a helmet on May 9, 2018, Defendant Osborn cannot say whether it would have affected the outcome in any way.

SOURCE: Osborn Depo pp. 64:16-65:9.

RESPONSE:

6

2192

Respectfully submitted,

Afsoon Hagh, #28393
Cummings Manookian PLC
45 Music Square West
Nashville, Tennessee 37203
(T) 615.266-3333
(F) 615.266-0250
afsoon@cummingsmanookian.com

*Attorney for the Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on January 22, 2019, a true and correct copy of this document was provided by U.S. Mail, postage pre-paid and facsimile to the following:

Mr. Steve Meisner
Brewer Krause Books & Chastain
545 Mainstream Drive
Nashville, Tennessee 37228
T: 615.630.7727
F: 615.256.8985

*Attorney for the Defendants*

Afsoon Hagh

7

FILED
WILLIAMSON COUNTY
CIRCUIT COURT

2019 MAR 19 PM 2:24

ENTERED

IN THE CIRCUIT COURT FOR WILLIAMSON COUNTY, TENNESSEE
AT FRANKLIN

MARTY FITZGERALD and MELISSA )
FITZGERALD individually, as )
Husband and wife, and o/b/o their )
deceased child, MEGAN FITZGERALD, )
)
Plaintiffs, )
) NO. 2018-311
v. )
) (JURY DEMAND)
JAMES OSBORN, OSBORN )
ENTERPRISES, INC., II and )
OSBORN ENTERPRISES, INC., III, )
)
Defendants. )

**PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Come now the Plaintiffs' and submit the following Responses to Defendants' Statement of Material Facts in support of their Motion for Partial Summary Judgment.

1.      This is a wrongful death action arising out of an automobile that occurred on May 9, 2018. (Complt. ¶¶ 1, 8-14.)

**RESPONSE:**

**Admitted.**

2.      Megan Fitzgerald ("Megan") was riding a bicycle on Coleman Road at the same time Defendant Osborn was traveling in the same direction heading toward his residence located at 3235 Kennard Springs Road in Franklin, Tennessee. (Complt. ¶¶ 2, 8-14; EXHIBIT 1 - Osborn Res. Interrog. No. 8.)

RESPONSE:

Pursuant to T.R.C.P 56.03, Admitted for purposes of ruling on the motion for summary judgment only.

3.    Prior to the accident, Mr. Osborn was working in the morning, had lunch with his wife and was headed home for the day. (EXHIBIT 1 - Osborn Res. Interrog. No. 8.)

RESPONSE:

Pursuant to T.R.C.P 56.03, Admitted for purposes of ruling on the motion for summary judgment only.

4.    At the time of the accident, Mr. Osborn was driving his personal vehicle, a Silverado pick-up truck registered and titled in his name. (EXHIBIT 7 – Title to Vehicle, Osborn Res. RFP; Plfs. Res. Request Admissions; Police Report.)

RESPONSE:

Pursuant to T.R.C.P 56.03, Admitted for purposes of ruling on the motion for summary judgment only.

5.    In addition to Plaintiffs' claims for negligence and negligence *per se*, Plaintiffs also assert "recklessness and punitive damages" and that the "Osborn Enterprises" are "vicariously liable" for the conduct of Mr. Osborn.  In this regard, Plaintiff asserts the following:

The Osborn Enterprises are vicariously liable for the negligent driving of their owner, director, agent, employee, and/or servant, Defendant James Osborn who was acting within the scope of his agency with the Osborn Enterprises at the time he struck Megan Fitzgerald.

(Complt. ¶ 30.)

RESPONSE:

Admitted.

6.    Defendants deny Mr. Osborn was acting in the course and scope of his employment at the time of the accident. (Complt. ¶ 30.)

2

**RESPONSE:**

**Denied. The citation to the record does not support the purported fact.**

7.     In response to Defendant's Interrogatories, Plaintiffs stated the following:

Regarding the allegations in paragraph six (6) of your Complaint, please state every basis upon which you claim Osborn Enterprises, Inc. II and/or Osborn Enterprises, Inc., III is vicariously liable for the actions of James Osborn.

**ANSWER:**

James Osborn was acting within the course and scope of his employment at the time he struck Megan with his truck. This has been expressly confirmed by Erie Insurance on behalf of the Osborn Enterprises (including Honda of Cool Springs, the name under which it does business), who within days of the incident, began contacting us asking us to speak with them about Megan's death and to provide the Osborn Enterprises with Megan's confidential medical records in order to evaluate a settlement and mediation.

To our knowledge, the truck with which James Osborn struck Megan Fitzgerald was not owned by Osborn Enterprises, but by James Osborn individually. Erie Insurance has nevertheless repeatedly confirmed that James Osborn's act and conduct in striking Megan with his personal truck is a "covered event" under the Osborn Enterprises' commercial policy. Under a standard hired, non-owed vehicle, Commercial Policy or rider, James Osborn would only be covered by the Osborn Enterprises Commercial Policy if he had been acting in the course and scope at the time of the wreck. Erie Insurance, on behalf of Osborn Enterprises, has confirmed to our attorney that this was the case. This is an admission of vicarious liability on behalf of Osborn Enterprises.

(EXHIBIT 2 - Plf. Res. Interrog. No 30.)

**RESPONSE:**

Admitted.

8.     The Osborn Enterprises do business as "Honda of Cool Springs." (EXHIBIT 3-

Osborn Dep. 12:17-21.)

**RESPONSE:**

**Pursuant to T.R.C.P 56.03, Admitted for purposes of ruling on the motion for summary judgment only.**

3

9.     Mr. Osborn owns 50% of the Osborn Enterprises. (EXHIBIT 3- Osborn Dep. 12:22-25.)

**RESPONSE:**

**Pursuant to T.R.C.P 56.03, Admitted for purposes of ruling on the motion for summary judgment only.**

10.     On the date of the accident, Mr. Osborn left work at approximately 11:30 a.m. to have lunch with his wife. (EXHIBIT 3 - Osborn Dep. 13:1-14:6-12.)

**RESPONSE:**

**Admitted.**

11.     Prior to the accident, Mr. Osborn left lunch at noon and drove from Cool Springs to his personal residence in Franklin, Tennessee. (EXHIBIT 3 - Osborn Dep. 15:6-16.)

**RESPONSE:**

**Denied. Mr. Osborn left lunch 15-20 minutes after 12. See, Osborn Depo.15:11-12.**

12.     After lunch on the date of the incident, Mr. Osborn's plans for the remainder of the afternoon consisted of house related activities. (EXHIBIT 3 - Osborn Dep. 15:13-17:11.)

**RESPONSE:**

**The Plaintiff does not have sufficient information to admit or deny, therefore it is denied.**

13.     Mr. Osborn was driving his personal vehicle to his residence when the incident occurred. (EXHIBIT 1 - Osborn Res. Interrog. No. 15.)

**RESPONSE:**

**Admitted.**

14.     Tara Seaborn was a passenger in a vehicle behind Mr. Osborn before the accident. (EXHIBIT 4 - Seaborn Dep. 6-10.)

4

**RESPONSE:**

Denied. Tara Seaborn was a passenger in a vehicle behind another vehicle that was directly behind Mr. Osborn's truck. See, Seaborn Depo. 10:13-15.

15.    Ms. Seaborn testified all the vehicles traveling the speed limit, including the vehicle driven by Mr. Osborn. (EXHIBIT 4 - Seaborn Dep. 10:10-23.)

**RESPONSE:**

Objection – lack of foundation and improper lay opinion testimony under Tenn. R. Evid. 701. There are two methods of determining another car's speed: (1) clocking with a radar device; and (2) pacing. Pacing requires a trained motorist to follow a suspected speedster for a sufficient distance at a constant speed, and then using his/her own speedometer to estimate the speed of the violator. There is no foundation that Ms. Seaborn was employing either of these methods on the day in question, much less, employing them in a manner consistent with the predicates of Tenn. R. Evid. 702-703 for her opinion to be admissible.

16.    Mr. Osborn did not attempt to brake or swerve prior to the accident. (EXHIBIT 4 - Seaborn Dep. 11:14-12:24.)

**RESPONSE:**

Admitted.

17.    Megan was not wearing a helmet or other typical safety gear typically worn by "bicycle people." (EXHIBIT 4 - Seaborn Dep. 38:4-39:10.)

**RESPONSE:**

It is admitted Megan was not wearing a helmet. However, this fact is not material. The Defendant has not and cannot show how Megan's wearing or not wearing helmet would have affected whether Defendant Osborn ran her over, or otherwise somehow serves to excuse Defendant Osborn's role in causing Megan's death. Osborn Depo pp. 64:16-65:9. The Defendant has admitted that Megan's injuries were caused by the collision and has not introduced any medical proof that Megan would have survived being hit by a car that made no effort to brake if she had been wearing a helmet. Otherwise, the statement is impermissibly vague, and not supported by admissible record proof. The cited testimony is improper opinion testimony and, in any event, does not establish that Megan was not wearing any "other safety gear typically worn by 'bicycle people.'" Even if this fact could be established from the cited testimony, it would not be not material. The Defendant has not and cannot show how Megan's

5

wearing or not wearing some other unspecified "other safety gear" would have affected whether Defendant Osborn ran her over, or otherwise somehow serves to excuse Defendant Osborn's role in causing Megan's death.

18.    In observing Mr. Osborn's vehicle, Ms. Seaborn testified Mr. Osborn was not driving in any erratic or unusual manner, having no difficulties navigating his vehicle within his lane of traffic, did not cross over the center lane into oncoming traffic, veer off onto the shoulder of the road or otherwise behave in any unusual manner prior to the accident. (EXHIBIT 4 - Seaborn Dep. 40:3-25.)

RESPONSE:

Pursuant to T.R.C.P 56.03, Admitted for purposes of ruling on the motion for summary judgment only. Ms. Seaborn testified that Defendant did not *appear* to be driving in an erratic or unusual manner from her vantage point. This fact is not material because it does not establish that the Defendant somehow complied with the standard of care applicable to him when he overtook and ran over Megan on the day in question.

19.    Ms. Seaborn testified Coleman Road was not suitable for bicycle traffic because, in her words:

It's curvy; there are no shoulders; there is not a bike lane; it's unpredictable how fast anyone would be going down that road; it's a side road; I've been, you know, passed by cars going way too fast; I drive on it all the time; there's no good shoulder; I mean, just no.

(EXHIBIT 4 - Seaborn Dep. 41:1-11.)

RESPONSE:

The Plaintiffs do not deny that Ms. Seaborn testified, in part, as Defendant block-quoted. However, Plaintiffs deny Defendant's characterization of this testimony as evidence that "Coleman Road was not suitable for bicycle traffic," including for the following reasons:

1.  Any opinion by Ms. Coleman that the Coleman road was not suitable for bicycle traffic is improper opinion testimony.
2.  Nothing about the road prevented the Defendant from seeing Megan Fitzgerald and not running her over on May 9, 2018. Osborn Depo. p. 22:21-23:1.

6

3. According to the Defendant himself, Coleman Road is not unsuitable for bicycle traffic. Osborn Depo. p. 10:11-11:12, 66:13-19.
4. Defendant has conceded that Megan Fitzgerald has a legal right to ride her bicycle on Coleman Road. Defendant's Response to P's SUMF ¶ 6.

20.     Based on Ms. Seaborn's observations, there was no indication Mr. Osborn intentionally struck Megan. (EXHIBIT 4 - Seaborn Dep. 43:2-22.)

**RESPONSE:**

Pursuant to T.R.C.P 56.03, Admitted for purposes of ruling on the motion for summary judgment only that Ms. Seaborn testified she did not believe Mr. Osborn intentionally struck Megan. However, this "fact" is neither admissible, nor material to Plaintiffs' Motion for Partial Summary Judgment.

21.  Mr. Osborn admitted he made no attempt to pass Megan because he did not see her until just prior to impact - it was too late to avoid the collision. (EXHIBIT 3 - Osborn Dep. 24:14-18.)

**RESPONSE:**

It is denied that Mr. Osborn was not "overtaking and passing" Megan for purposes of Tenn. Code Ann. § 55-8-175(c)(2) when he approached her from behind and struck her on May 9, 2018, including because "Overtake" means "to come or catch up with in a course of motion," *Ringwald v. Beene*, 92 S.W.2d 411, 413 (Tenn. 1935), and "Pass" means "to move in a path so as to approach and continue beyond something."[1] Defendant Osborn admitted that he did not comply with Tenn. Code Ann. § 55-8-175(c)(2):

Mr. Manookian:     You did not give Megan Fitzgerald 3 feet of space as your car passed and collided with her on May 9, 2018. Correct?

Mr. Osborn:     That is correct. I didn't.[2]

22.     Mr. Osborn did not attempt to overtake and pass Megan. (EXHIBIT 3 - Osborn Dep. 24:14-18.)

---

[1] Merriam Webster's Dictionary, attached as Exhibit 1 hereto.
[2] Osborn Depo, p. 70:16-22.

7

**RESPONSE:**

It is denied that Mr. Osborn was not "overtaking and passing" Megan for purposes of Tenn. Code Ann. § 55-8-175(c)(2) when he approached her from behind and struck her on May 9, 2018, including because "Overtake" means "to come or catch up with in a course of motion," *Ringwald v. Beene*, 92 S.W.2d 411, 413 (Tenn. 1935), and "Pass" means "to move in a path so as to approach and continue beyond something."[3] Defendant Osborn admitted that he did not comply with Tenn. Code Ann. § 55-8-175(c)(2):

| Mr. Manookian: | You did not give Megan Fitzgerald 3 feet of space as your car passed and collided with her on May 9, 2018. Correct? |
|---|---|
| Mr. Osborn: | That is correct. I didn't.[4] |

23.    Mr. Osborn could not testify why he did not see Megan. (EXHIBIT 3 - Osborn Depo. 23:10-18.)

**RESPONSE:**

Pursuant to T.R.C.P 56.03, Admitted for purposes of ruling on the motion for summary judgment only.

24.    Mr. Osborn noted, however, that there was a strong sun glare on his windshield that may have affected his ability to see. (EXHIBIT 3 - Osborn Dep. 21:25-22:8; 65:11-23.)

**RESPONSE:**

Denied. Defendant Osborn rejected the notion that he could not see Megan Fitzgerald due to it being too bright out. Osborn Depo, p. 23:10-14.

25.    Mr. Osborn surrendered his vehicle and gave a written statement to the police following the incident. (EXHIBIT 1 - Osborn Res. Interrog. No. 6.)

**RESPONSE:**

Denied.

---

[3] Merriam Webster's Dictionary, attached as Exhibit 1 hereto.
[4] Osborn Depo, p. 70:16-22.

8

26. Prior to the incident, he had only been involved in two (2) motor vehicle accidents: one in 1999 and the second approximately five (5) years prior to the accident at issue. (EXHIBIT 1 - Osborn Res. Interrog. No. 9.)

**RESPONSE:**

Objection, this fact is improper character evidence. *See* Tenn. R. Evid. 404. Further, denied as stated. *See*, Def's Exhibit 1: Mr. Osborn only recalls having been involved in two motor vehicle incidents prior to the incident that is the subject of this action. Additionally, this fact is not material because it does not mean that the Defendant was not negligent on May 9, 2018.

27. There is no evidence Mr. Osborn consumed alcohol prior to the incident. (EXHIBIT 1 - Osborn Res. Interrog. No. 11.)

**RESPONSE:**

Pursuant to T.R.C.P 56.03, Admitted for purposes of ruling on the motion for summary judgment only.

28. Mr. Osborn had no prior difficulties operating the vehicle he was driving on the date of the incident. (EXHIBIT 1 - Osborn Res. Interrog. No. 14.)

**RESPONSE:**

Pursuant to T.R.C.P 56.03, Admitted for purposes of ruling on the motion for summary judgment only.

29. There is no evidence Mr. Osborn was talking or texting on his phone at the time the incident occurred. (EXHIBIT 1 - Osborn Res. Interrog. 19-20.)

**RESPONSE:**

Pursuant to T.R.C.P 56.03, Admitted for purposes of ruling on the motion for summary judgment only.

30. No criminal charges have been brought against Mr. Osborn arising out of the incident. (EXHIBIT 1 - Osborn Res. Interrog. No. 27.)

9

RESPONSE:

Denied. *See*, Defs' Exhibit 1: The criminal investigation is still pending.

31.    Coleman Road is dangerous for bicyclists because it is a hilly, curvy, country road with no shoulder for bicycle traffic. (EXHIBIT 3 - Osborn Dep. 9:6-25; EXHIBIT 4 - Seaborn Dep. 19:8-18.)

RESPONSE:

Denied.

32.    Coleman Road is simply not suitable for bicycle traffic. (EXHIBIT 4 - Seaborn Dep. 41:1-11.)

RESPONSE:

Denied, including for the following reasons:

1. Any opinion by Ms. Coleman that the Coleman road was not suitable for bicycle traffic is improper opinion testimony.
2. Nothing about the road prevented the Defendant from seeing Megan Fitzgerald and not running her over on May 9, 2018. Osborn Depo. p. 22:21-23:1.
3. According to the Defendant himself, Coleman Road is not unsuitable for bicycle traffic. Osborn Depo. p. 10:11-11:12, 66:13-19.
4. Defendant has conceded that Megan Fitzgerald has a legal right to ride her bicycle on Coleman Road. Defendant's Response to P's SUMF ¶ 6.

33.    Megan's parents were surprised she had gone so far on Coleman Road. (EXHIBIT 5 - Melissa Fitzgerald Dep. 19:17-24; EXHIBIT 6 - Marty Fitzgerald Dep. 36-40.)

RESPONSE:

This is not a material fact. The referenced testimony is not supported by the cited depositions; however, Melissa Fitzgerald testified at 19:12: "I was surprised she had gone that far."

34.    Megan was not an avid bicyclist. (EXHIBIT 5 - Melissa Fitzgerald Dep. 19:17-24; EXHIBIT 6 - Marty Fitzgerald Dep. 36-40.)

10

**RESPONSE:**

Pursuant to T.R.C.P 56.03, Admitted for purposes of ruling on the motion for summary judgment only. This is not a material fact, including because the issue is that Defendant did not see the Decedent and ran her over from behind. Megan Fitzgerald was not responsible for her death because she rode her bicycle without being an "avid bicyclist."

35.   At the time of the accident, Megan was not riding as close as possible to the right side of the road and was not wearing a safety helmet or appropriate clothing to warn others of her presence on the road. (EXHIBIT 3 - Osborn Dep. 27:14-16; 31:6-15; 61:23-62:6; EXHIBIT 4 - Seaborn Dep. 16:12-16; 38:13-29:4; EXHIBIT 5 - Melissa Fitzgerald Dep. 8:17-25; EXHIBIT 6 - Marty Fitzgerald Dep. 83:13-16.)

**RESPONSE:**

It is admitted that Megan was not wearing a helmet. All other facts are denied because they are not supported by the cited testimony. Megan Fitzgerald was riding her bicycle in the middle of the day. There is no evidence about clothing she should have been wearing to make herself more visible in those conditions. Defendant Osborn's testimony that Megan was not riding as close as possible to the right side of the road is negated by his claim that he did not see her until he struck her. Osborn Deposition, p. 54:20-55:3.

11

2204

Respectfully submitted,

Afsoon Hagh, B.P.R. 028393
45 Music Square West
Nashville, Tennessee 37203
(615) 549-5519 telephone
(615) 266-0250 facsimile
afsoon@cummingsmanookian.com
*Attorney for the Plaintiffs*

12

2205

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the Plaintiffs' Responses to Defendants' Statement of Undisputed Material Facts in Support of their Motion for Partial Summary Judgment has been served by e-mail and facsimile upon the following on this 19th day of March, 2019:

STEVEN J. MEISNER
CAROLINE C. MILLER
Attorney for James Osborn,
Osborn Enterprises, Inc., II and Osborn Enterprises, Inc., III
BREWER KRAUSE BROOKS &
CHASTAIN, PLLC
545 Mainstream Drive, Suite 101
Nashville, TN 37228-1209
E-mail: smeisner@bkblaw.com

AFSOON HAGH

13

# Definition of pass

🌐 merriam-webster.com/dictionary/pass

## pass

<u>verb</u>
\ 'pas 🔊 \
passed; passing; passes

(Entry 1 of 4)

<u>intransitive verb</u>

1

2a : to go away : <u>DEPART</u> the fright passes almost immediately— Fred Majdalany
b : <u>DIE</u> —often used with *on* Her parents have passed on.
3a : to move in a path so as to approach and continue beyond something : move past especially : to move past another vehicle going in the same direction glowered at the other driver as we passed

b : to run the normal course
—used of time or a period of time the hours pass quickly

4a : to go or make one's way through

allow no one to pass

b : to go uncensured, unchallenged, or seemingly unnoticed

let the remark pass

5 : to go from one quality, state, or form to another

passes from a liquid to a gaseous state

6a : to sit in inquest (see <u>INQUEST sense 1</u>) or judgment
b(1) : to render a decision, verdict, or opinion

the court passed on the legality of wiretapping

(2) : to become legally rendered

judgment passed for the plaintiff

EXHIBIT
1

7 : to go from the control, ownership, or possession of one person or group to that of another

the throne passed to the king's son title passes to the buyer upon payment in full

8a : HAPPEN, OCCUR commenting freely on the transactions as they pass— W. L. Sperry
b : to take place or be exchanged as or in a social, personal, or business interaction

words passed

9a : to become approved by a legislature or body empowered to sanction or reject

the proposal passed

b : to undergo an inspection, test, or course of study successfully

took the examination and passed

10a : to serve as a medium of exchange

b : to be accepted or regarded

drivel that passes for literature

c : to identify oneself or be identified as something one is not

tried to pass as an adult Mom could pass as my sister

11a obsolete : to make a pass (see PASS entry 3 sense 5) in fencing
b : to throw or hit a ball or puck to a teammate
—often used with *off* took the ball and quickly passed off to a teammate

12a(1) : to decline to bid, double, or redouble in a card game

Her bridge partner passed.

(2) : to withdraw from the current poker pot

b : to let something go by without accepting or taking advantage of it

thanks for the offer, but I'll pass —often used with *on* passed on the cheesecake

transitive verb

1 : to go beyond: such as

a : SURPASS, EXCEED passes all expectations
b : to advance or develop beyond

2208

c : to go past (one moving in the same direction)

passed a slower moving car

2a : to go by : proceed or extend beyond

pass the school on their way to work

(2) : to omit a regularly scheduled declaration and payment of (a dividend)

3a : to go across, over, or through : CROSS
b : to live through (something, such as an experience or peril) : UNDERGO
c : to go through (something, such as a test) successfully

passed the final exams of his courses

4a : to secure the approval of

the bill passed the Senate

b : to cause or permit to win approval or legal or official sanction

pass a law

c : to give approval or a passing grade to

pass the students
5a : to let (time or a period of time) go by especially while involved in a leisure activity

I'll read to pass the time

b : to let go unnoticed : OVERLOOK, DISREGARD his commander quietly passed his likes or dislikes— George Meredith
6a : PLEDGE had passed his word that he would repay the debt
b : to transfer the right to or property in

pass title to a house

7a : to put in circulation

pass bad checks

b(1) : to transfer or transmit from one to another

pass the salt passing the savings on to customers

(2) : to relay or communicate (something, such as information) to another

2209

c : to cause or enable to go : TRANSPORT waited till the soldiers and wounded were all passed over— Walt Whitman
d : to throw or hit (a ball or puck) especially to a teammate
—often used with *off* passed the ball off to his teammate

8a : to pronounce (something, such as a sentence or opinion) especially judicially

passed sentence on the convicted man

b : UTTER passed a cutting remark
9a : to cause or permit to go past or through a barrier

passed the detectives to view the crime scene

b : to move or cause to move in a particular manner or direction

passed my hand over my face pass the rope through the loop

c : to cause to march or go by in order

pass the troops in review

10 : to emit or discharge from a bodily part and especially the bowels

11a : to give a base on balls to

passed two batters

b : to hit a ball past (an opponent) in a game (such as tennis)

pass muster
: to gain approval or acceptance

His cooking could *pass muster* in an expensive French restaurant.

pass the buck
: to shift a responsibility to someone else

Stop trying to *pass the buck* and take responsibility for what you did.

pass the hat
: to take up a collection for money

*passed the hat* for families affected by the disaster

pass the time of day

2210

: to exchange greetings or engage in pleasant conversation

*passed the time of day* with friends in the park

pass

noun (1)
Definition of *pass* (Entry 2 of 4)

1 : a means (such as an opening, road, or channel) by which a barrier may be passed or access to a place may be gained especially : a low place in a mountain range
2 : a position to be held usually against odds

pass

noun (2)
Definition of *pass* (Entry 3 of 4)

1 : REALIZATION brought his dream to pass

3 : a usually distressing or bad state of affairs

what has brought you to such a pass?

4a : a written permission to move about freely in a place or to leave or enter it

b : a written leave of absence from a military post or station for a brief period

c : a permit or ticket allowing free transportation or free admission

5 archaic : a thrust or lunge in fencing

6a : a transference of objects by sleight of hand or other deceptive means

b : a moving of the hands over or along something

7 archaic : an ingenious sally (as of wit)

8 : the passing of an examination or course of study also : the mark or certification of such passing

9 : a single complete mechanical operation also : a single complete cycle of operations (as for processing, manufacturing, or printing)

10a(1) : a transfer of a ball or a puck from one player to another on the same team

(2) : a ball or puck so transferred

b : PASSING SHOT
11 : BASE ON BALLS

2211

12 : an election not to bid, bet, or draw an additional card in a card game

13 : a throw of dice in the game of craps that wins the bet for the shooter

14 : a single passage or movement (as of an airplane) over a place or toward a target
b : a sexually inviting gesture or approach

16 : PASE
pass

abbreviation
Definition of *pass* (Entry 4 of 4)

passenger

## Other Words from *pass*

Verb

passer noun

## Synonyms for *pass*

Synonyms: Verb

Visit the Thesaurus for More ⊛

## Examples of *pass* in a Sentence

Verb

The boat was too tall to *pass* beneath the bridge.
A flock of geese were *passing* overhead.
See More

## First Known Use of *pass*

Verb

13th century, in the meaning defined at intransitive sense 1

Noun (1)

14th century, in the meaning defined at sense 1

Noun (2)

15th century, in the meaning defined at sense 1

8/10

## History and Etymology for *pass*

Verb and Noun (2)

Middle English, from Anglo-French *passer*, from Vulgar Latin *passare*, from Latin *passus* step — more at <u>pace</u>

Noun (1)

Middle English, from Anglo-French *pas*, from Latin *passus*

## Learn More about *pass*

From the Editors at Merriam-Webster

<u>Keeping Up with 'Passed' and 'Past'</u>

More Definitions for *pass*

pass

<u>verb</u>

## English Language Learners Definition of *pass*

: to move past someone or something

: to move past someone or something that is moving more slowly in the same direction

: to move or go into or through a particular place

<u>See the full definition for *pass* in the English Language Learners Dictionary</u>

pass

<u>verb</u>
\ 'pas \
passed; passing

## Kids Definition of *pass*

(Entry 1 of 3)

1 : <u>MOVE entry 1 sense 1</u>, <u>PROCEED</u> The airplane *passed* out of sight.

2213

2 : to go away

The pain will soon *pass*.

3 : to go by or move past

*Pass* that car.

4 : to go or allow to go across, over, or through

They let me *pass*.

5 : to transfer or throw to another person

Please *pass* the salt. *Pass* me the football!

6 : to go successfully through an examination or inspection

7 : to cause or permit to elapse

We *passed* the time playing cards.

8 : HAPPEN sense 1 The day *passed* without any problems.
9 : to move from one place or condition to another

The business has *passed* to new ownership.

10 : to be or cause to be approved

The Senate *passed* the bill.

11 : to be or cause to be identified or recognized

She tried to *pass* for an expert.

12 : DIE entry 1 sense 1
pass away
: DIE entry 1 sense 1
pass out
: to become unconscious : FAINT
pass up
: to let go by : REFUSE It was an offer too good to *pass up*.
Other Words from *pass*

passer noun

pass

<u>noun</u>
Kids Definition of *pass* (Entry 2 of 3)

1 : an opening or way for going along or through

2 : a gap in a mountain range

pass

<u>noun</u>
Kids Definition of *pass* (Entry 3 of 3)

1 : the act or an instance of moving

The plane made two *passes* over the area.

2 : the act or an instance of throwing or transferring (as a ball) to another person

3 : a written permit to go or come

I got some movie *passes* for my birthday.

4 : <u>SITUATION sense 1</u> Things have come to a strange *pass*.
pass

<u>transitive verb</u>
\ 'pas  \

## Medical Definition of *pass*

pass

<u>intransitive verb</u>

## Legal Definition of *pass*

1a : to issue a decision, verdict, or opinion

the Supreme Court passed on a statute

b : to be legally issued

judgment passed by default

2 : to go from the control, ownership, or possession of one person or group to that of another

9/10

2215

title passes to the buyer

transitive verb

1 : to omit a regularly scheduled declaration and payment of (a dividend)

2a : to get the approval of

the bill passed the House

b : to give approval or legal sanction to

the House passed the bill

3 : to transfer the right to or interest in

the sale passes the title to the goods

4 : to put in circulation

pass bad checks — compare UTTER
5 : to pronounce (as a sentence or judgment) judicially

Comments on *pass*

## Love words? Need even more definitions?

Subscribe to America's largest dictionary and get thousands more definitions and advanced search—ad free!

Merriam-Webster unabridged

2216

IN THE CIRCUIT COURT FOR WILLIAMSON COUNTY, TENNESSEE

FILED
WILLIAMSON COUNTY

2019 MAR 19 PM 2: 24

ENTERED

COPY

MARTY FITZGERALD and MELISSA )
FITZGERALD, individually, as husband )
and wife, and on behalf of their deceased )
child, MEGAN FITZGERALD, )
 )
     Plaintiffs, )
 )
v. )    NO. 2018-311
 )    JURY DEMAND
JAMES WOODROW OSBORN and )
OSBORN ENTERPRISES, INC., II, and )
OSBORN ENTERPRISES, INC., III, )
 )
     Defendant. )

---

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUES OF LIABILITY AND COMPARATIVE FAULT

---

The Plaintiffs, Marty Fitzgerald and Melissa Fitzgerald, by and through undersigned counsel, respectfully submit this Reply in support of their Motion for Partial Summary Judgment on the Issues of Liability and Comparative Fault.

### ARGUMENT

I.    **Plaintiffs are Entitled to Partial Summary Judgment on the Issue of Liability.**

The Plaintiffs are entitled to partial summary judgment on the issue of liability because there are no genuine disputes of fact material to the issues of breach of duty or causation. As a matter of law and/or undisputed fact, Defendant Osborn breached a duty and caused Megan Fitzgerald's death when he approached her from behind and drove into her without braking.

1

a. **The Plaintiffs are Entitled to Summary Judgment on the Issue of Breach of Duty.**

i. **The Defendant was *Per Se* Negligence because his Undisputed Conduct Violated Tenn. Code Ann. § 55-8-175(c)(2) as a Matter of Law.**

A defendant is negligent *per se*, and "negligent as a matter of law," when the defendant's conduct violates a statute that existed to protect the plaintiff/decedent from suffering the manner and type of harm for which the plaintiff is seeking redress.

The Plaintiffs' Motion for Partial Summary Judgment detailed the reasons that the "Jeff Roth and Brian Brown Bicycle Protection Act of 2007" existed to protect Megan Fitzgerald from the exact manner and type of injury she sustained and to proscribe the Defendants undisputed conduct at issue in this case.

Tenn. Code Ann. § 55-8-175(c)(2) provides: "The operator of a motor vehicle, when overtaking and passing a bicycle proceeding in the same direction on the roadway, shall leave a safe distance between the motor vehicle and the bicycle of not less than three feet (3') and shall maintain the clearance until safely past the overtaken bicycle."

In his Response, the Defendant concedes: "the 'Jeff Roth and Brian Brown Bicycle Protection Act of 2007' was enacted to protect bicyclists from accidents that occur when vehicles do not give adequate space while attempting to pass bicyclists on the road." Response, pp. 8-9. But incredibly, the Defendant claims he did not violate Tenn. Code Ann. § 55-8-175(c)(2) because he did not see Megan when he approached her from behind and drove into her. Response, p. 9. The Defendant claims this means he did not attempt to "overtake and pass" Megan, such that Tenn. Code Ann. § 55-8-175(c)(2) does not apply. This argument cannot be supported by either the plain language or intent of Tenn. Code Ann. § 55-8-175(c)(2).

2

2218

Statutory interpretation is an issue of law appropriate for summary judgment. When interpreting a statute, courts must apply its "plain meaning in its normal and accepted use, without a forced interpretation that would limit or expand the statute's application." *Lanier v. Rains,* 229 S.W.3d 656, 661 (Tenn. 2007). "If the language of the statute is ambiguous, the court must examine the entire statutory scheme and the relevant legislative history to ascertain and give effect to the legislative intent." *Perrin v. Gaylord Entm't Co.,* 120 S.W.3d 823, 826 (Tenn. 2003).

"Overtake" means "to come or catch up with in a course of motion." *Ringwald v. Beene,* 92 S.W.2d 411, 413 (Tenn. 1935). "Pass" means "to move in a path so as to approach and continue beyond something."[1]

It is apparent that the Defendant Osborn "overtook and passed" Megan Fitzgerald on May 9, 2018 because it is undisputed both Defendant and Megan were traveling in the same direction on the same stretch of road when the Defendant approached, hit, and continued *past* her in his vehicle. P's SUMF ¶¶ 4-5. To his credit, Defendant Osborn admitted that he did not comply with Tenn. Code Ann. § 55-8-175(c)(2) in his deposition:

> Mr. Manookian:  You did not give Megan Fitzgerald 3 feet of space as your car passed and collided with her on May 9, 2018. Correct?
>
> Mr. Osborn:  That is correct. I didn't.[2]

### ii. The Defendant Has Not Produced Any Admissible Evidence Demonstrating a Genuine Dispute of Fact on the Breach of Duty Issue.

The Plaintiffs are also entitled to summary judgment on the breach of care issue because reasonable minds cannot disagree that Defendant Osborn breached his common law duty to

---

[1] Merriam Webster's Dictionary, attached as Exhibit 1 hereto.
[2] Osborn Depo, p. 70:16-22.

3

exercise reasonable care to avoid causing injuries to others when driving his car on Coleman Road on May 9, 2018.

The Defendant fails to address that Tennessee law recognizes a presumption that a motorist exercising reasonable care should be able to avoid a collision with a vehicle ahead of him/her unless that vehicle stops suddenly and unexpectedly, *Ewing v. Birthright*, 60 Tenn. App. 454, 460 (Tenn. Ct. App. 1969), and fails to offer evidence that might cause a reasonable fact-finder to determine that Defendant was exercising reasonable care.

Tennessee drivers have a duty "to see and be aware of what is in that driver's view." T.P.I.-CIVIL 5.01, Duty of Driver, 8 Tenn. Prac. Pattern Jury Instr. T.P.I.-Civil 5.01 (2015 ed.). Defendant Osborn breached this duty because he should have, but did not see Megan Fitzgerald in his plain view before he ran her over:

> Mr. Manookian: I'm asking you whether or not you concede that you should have seen [Megan Fitzgerald on her bicycle on May 9, 2018.
>
> Mr. Osborn: <u>I probably should have seen her</u>, but I didn't.[3]

The Defendant attempts to obfuscate this straightforward and on-point testimonial admission by intimating that the road and possible "glare" on his windshield excused Defendant Osborn's failure to "see and be aware of" Megan Fitzgerald bicycling on the road in front of him, but the record evidence simply is not supportive.

Defendant Osborn testified that nothing about the road itself interfered with him seeing Megan Fitzgerald on May 9, 2018:

> Mr. Manookian: And there was nothing about the road, itself, that would have interfered with you seeing Megan Fitzgerald on her bicycle on May 9, 2018. Correct?

---

[3] Osborn Depo. p. 24:9-1 (emphasis added). In his Response to P's SUMF ¶ 11, Defendant misstates the record testimony, claiming "Mr. Osborn could not say one way or another whether he 'should' have seen Megan Fitzgerald."

4

Mr. Osborn:  I don't think the road was a factor in me not seeing her.[4]

Mr. Osborn also directly testified that he had "no explanation" for why he did not see Megan Fitzgerald before striking her, and he specifically declined to testify that he did not see Megan due to excessive brightness or glare:

Mr. Manookian:  Is it your testimony that it was actually too bright on May 9, 2018?

Mr. Osborn:  I really don't know why I didn't see her quicker than I did. I don't have an explanation for that. I don't know.[5]

### b. The Plaintiffs are Entitled to Summary Judgment on the Issue of Causation.

The Plaintiffs are entitled to partial summary judgment on the issue of causation because the Plaintiffs have presented uncontroverted proof that the Defendant's conduct caused Megan Fitzgerald's death, and the Defendant has not identified or produced any record evidence demonstrating a genuine dispute of fact material to this issue.

Plaintiffs' Undisputed Material Fact #6 was that "Megan Fitzgerald's death was caused by Defendant Osborn striking her with his truck." Plaintiffs supported this statement with direct judicial admissions from Defendants' Answer (*see e.g.,* ¶5 "Defendants admit Ms. Fitzgerald died because of the accident"), as well as an on-point testimonial admission from Defendant Osborn's deposition:

Q.  You struck Megan Fitzgerald on Coleman Road on May 9, 2018 with your truck. Correct?

A.  Yes.

Q.  You don't deny that striking Megan Fitzgerald with your truck on May 9, 2018 caused her death. Correct?

A.  No, I don't deny that.[6]

---

[4] Osborn Depo. p. 22:21-23:1.
[5] Osborn Depo. p. 23:10-14.
[6] Osborn Depo. p. 17:12-18.

5

2221

Responding to SUMF #6, Defendant admitted: "Defendant admits the accident caused Megan's injuries and death," but then purported to qualify it with a series of non-responsive and unsupported statements relating to to the independent issue of Defendant's comparative fault affirmative defense. While this Court should also grant partial summary judgment in favor of the Plaintiffs on the Defendant's comparative fault defense (for the reasons discussed in Section II below), a potential factual issue as to Defendant's comparative fault affirmative defense does not impede Plaintiffs' entitlement to judgment on the causation element of their prima facie case.

## II. Plaintiffs are Entitled to Partial Summary Judgment on Defendant's Comparative Fault Defense.

Since the Defendant has the burden to establish the elements of his comparative fault affirmative defense at trial, the Defendant must "put up or shut up" by producing sufficient evidence to support each element of his comparative fault defense. Tenn. Code Ann. § 20-16-101. It is not sufficient for the Defendant to simply challenge the sufficiency of Plaintiffs' efforts to negate that defense. *See id.*

The Plaintiff is entitled to partial summary judgment because the Defendant directly admitted in his deposition that he is 100% at fault for Megan Fitzgerald's death, and the Defendant has not produced evidence demonstrating that anything Megan Fitzgerald caused the Defendant to strike and kill her with his vehicle.

During his deposition, Defendant Osborn testified that he was 100% responsible for striking and killing Megan Fitzgerald:

    Q.    Do you take responsibility for what occurred?

    A.    100%

    Q.    You don't blame Megan Fitzgerald at all for what occurred, do you?

6

A.     No. Not at all.[7]

This proof alone satisfied Plaintiffs' initial burden of production and required Defendant Osborn to come forward with sufficient evidence to support every element of his comparative fault defense against Megan Fitzgerald.

The Defendant's Response to Plaintiff's Motion for Partial Summary Judgment does not establish any evidentiary basis upon which a reasonable fact-finder could apportion fault to Megan Fitzgerald.

Defendant first argues that Megan should be blamed for the Defendant striking and killing her because Coleman Road was "simply not suitable for bicycle traffic." This comparative fault defense has no merit in light of Defendant's admission that Megan had a legal right to ride her bicycle on Coleman Road as a matter of law. Defendant's Response to P's SUMF, ¶ 3. A motorist who approaches and runs over a bicyclist cannot assert comparative fault against that bicyclist simply for being on a road when it is lawful for the bicyclist to use that road:

> Two other fundamental principles defeat Mills' alternative ground for the submission of a comparative fault instruction. By statute, a bicyclist in Iowa is subject to the rules of the road and "has all the rights and duties . . . applicable to the driver of a vehicle." Iowa Code § 321.234(2). Mills attempts to fault Vasconez for riding on a county road instead of a bike path, riding alone (thereby reducing his visibility), and riding in a westerly direction near sunset. However none of this conduct is illegal. And ascribing negligence to such choices would be ludicrous if applied to any other motorist. Given the legislative policy implicit in section 321.234(2), we find no basis for the claim that such choices constitute negligence for a bicyclist.
>
> Second, Vasconez was entitled to assume that others using the road would obey the law until the circumstances reasonably revealed otherwise. Iowa R. App. P. 6.14(6)(i). Under the law, Vasconez was entitled to assume that a vehicle approaching him from behind would see him and respond appropriately. Mills testified that there were no vehicles coming toward her in the opposite lane that would have impeded her ability to easily pass Vasconez, had she seen him. Under these facts, Vasconez had no reason—or duty—to take evasive action.

---

[7] P's SUMF ¶ 19; Osborn Depo. p. 61:15-20.

7

2223

The district court aptly summed up the record and the law this way:

> The only evidence is that plaintiff was riding a bicycle on a road and that's all. There is no evidence that the plaintiff did anything other than ride his bike on a sunny day in a westerly direction. That, to me, does not present substantial evidence on which to base [a] comparative fault instruction with respect to liability.

> We agree with the court's conclusion and, accordingly, reject Mills' claim for reversal on this ground.

*Vasconez v. Mills*, 651 N.W.2d 48, 52-53 (Iowa 2002).

As in *Vasconez*, Megan Fitzgerald had the legal right to ride her bicycle on Coleman Road. Megan not only had the right to be on Coleman road, approaching motorists were required to give her at least three (3) feet clearance when overtaking and passing. Tenn. Code Ann. § 55-8-175(c)(2). As such, it was even more reasonable for Megan Fitzgerald to assume that a vehicle approaching her from behind would see her and respond appropriately.

Additionally, Defendant Osborn conceded that nothing about the road itself prevented him from seeing Megan Fitzgerald and not running her over:

| Mr. Manookian: | And there was nothing about the road, itself, that would have interfered with you seeing Megan Fitzgerald on her bicycle on May 9, 2018. Correct? |
|---|---|
| Mr. Osborn: | I don't think the road was a factor in me not seeing her.[8] |

Defendant also argues that Megan can be blamed for the Defendant striking and killing her on the basis that Megan was "not wearing appropriate safety clothing to alert vehicle operators of her presence on the road." This argument has absolutely no merit, including because Megan was riding her bicycle in the middle of the day. While bike riders might, for example, wear reflective clothing when riding in the dark, the Defendant has not and cannot identify what clothing Megan

---

[8] Osborn Depo. p. 22:21-23:1.

8

2224

had a duty to wear during the middle of the day on May 9, 2018 to alert the Defendant to her presence, so that he would not strike and kill her with his vehicle.

Finally, while the Defendant argues in his brief that Megan can be blamed for the Defendant striking and killing her because she was not wearing a helmet, no evidence supports this defense. The Defendant has not and cannot show how Megan's wearing or not wearing a helmet would have affected whether Defendant Osborn ran her over in his vehicle. The Defendant conceded that he could not say one way or the other whether wearing a helmet would have affected the outcome for Megan in any way. P's SUMF ¶ 25. The Defendant has not introduced any medical proof that Megan would have survived being hit by a car. The Defendant's testimony that a helmet "may have" changed the outcome is not admissible and not sufficient to establish a comparative fault defense blaming Megan for her death.

### III. Plaintiffs' Motion for Partial Summary Judgment Should Not be Denied or Postponed Due to Tenn. R. Civ. P. 56.07.

The Plaintiffs' Motion for Partial Summary Judgment should not be denied or postponed due to a claimed need for additional discovery because the Defendant has not shown a specific inability to "present by affidavit facts essential to justify the opposition" in the manner required by Tenn. R. Civ. P. 56.07.

Once a movant files a properly-supported motion for summary judgment, the non-moving party "must set forth *specific facts* showing that there is a genuine issue of material fact for trial." *Byrd v. Hall*, 847 S.W.2d 208, 210-211 (Tenn. 1993) (emphasis in original). The non-moving party must identify *specific facts* that are (a) genuinely disputed and (b) material to resolution of each element of liability. TENN. R. CIV. P. 56.04. The Defendant *cannot* rely on the pleadings to show these facts are genuinely disputed, but must either produce affidavit testimony, or explain why

9

2225

additional targeted discovery is necessary to substantiate those specific facts. *See Byrd*, 847

S.W.2d at 210-211; TENN. R. CIV. P. 56.07.

Under Tenn. R. Civ. P. 56.07, a non-moving party has the burden to "explain[] the necessity

for further discovery." *McCarley v. West Quality Food Service*, 960 SW 2d 585, 588 (Tenn.1998).

Tennessee and federal courts recognize that an opposition to summary judgment based on Rule

56.07, or its federal equivalent, Rule 56(f), must *affirmatively* identify the *specific* facts that a party

will substantiate through discovery and explain how such discovery will ultimately permit the

party to create a genuine issue of disputed *material* fact:

> Rule 56(f) is not a shield that can be raised to block a motion for summary judgment
> without even the slightest showing by the opposing party that his opposition is
> meritorious. A party invoking its protections must do so in good faith by
> affirmatively demonstrating why he cannot respond to a movant's affidavits as
> otherwise required by Rule 56(e) and how postponement of a ruling on the motion
> will enable him, by discovery or other means, to rebut the movant's showing of the
> absence of a genuine issue of fact. Where, as here, a party fails to carry his burden
> under Rule 56(f), postponement of a ruling on a 357*357 motion for summary
> judgment is unjustified.

*Willmar Poultry Co. v. Morton-Norwich Products, Inc.*, 520 F. 2d 289, 297 (8th Cir. 1975). The

non-moving party must "identify what, if any, facts [a]re within [another party's] exclusive control

and how, if at all, discovery would assist them in bringing those facts to light." *Id.*

An affidavit demonstrating a need for further discovery must 1) identify the specific

discovery that the party contends is necessary, 2) explain why the discovery has not been

conducted, and 3) show how the discovery bears upon the issues presented by the motion for

summary judgment. A plaintiff must "identify what, if any, facts [a]re within [another party's]

exclusive control and how, if at all, discovery would assist them in bringing those facts to light."

*Willmar Poultry*, 520 F. 2d at 297. An affidavit fails this requirement if it contains "general and

conclusory statements regarding the need for more discovery." *Ironside v. Simi Valley Hosp.*, 188

10

F. 3d 350, 354 (6th Cir. 1999).. A party is required to demonstrate the "adequacy of the efforts to obtain an opposing affidavit after the summary judgment motion was filed." *Grisham v. McLaughlin*, 2006 WL 1627274, *7, No. M2004-1662-COA-R3-CV (Tenn. Ct. App. June 12, 2006) (emphasis added). The affidavit must describe the steps the non-moving party has "taken to obtain the desired information pursuant to the discovery procedures under the Rules." *Ironside*, 188 F. 3d at 294. Defendant must also demonstrate how the additional discovery will permit the Defendant to create a material issue of disputed fact. *Ironside*, 188 F. 3d at 354 ("The court did not abuse its discretion in granting the motion for summary judgment before plaintiff completed discovery. Plaintiff's affidavit . . . does not show how an extension of time would have allowed information related to the truth or falsity of the letter to be discovered.").

The Defendant has not complied with the specific requirements of Rule 56.07, but rather, appears to be relying on Rule 56.07 as a generic fallback if Defendant's proof is deemed to be insufficient. Mr. Meisner's affidavit does not identify any specific facts "essential" to Defendant's opposition to summary judgment that the Defendant has not been able to present in the exercise of reasonable diligence. Instead, Mr. Meisner indicates that Defendant wishes to depose Madison Heathcock, Ronald Hurst, and Josh Balboa "to fully understand the facts and circumstances leading up to the accident." Mr. Meisner does not indicate how these individual's testimony might bear upon any specific fact that could be material to issues presented in Plaintiffs' Motion, only that "their testimony will undoubtedly affect liability in this case." Mr. Meisner also indicates that Defendant has retained an "accident reconstructionist expert," but does not explain why Defendant was unable to produce an affidavit from this retained expert, or why an affidavit from this expert is necessary to create a genuine dispute of some specific fact that would be material to one or more issue(s) raised by Plaintiff's Motion.

11

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Partial Summary Judgment should be granted.

Respectfully submitted,

_(signature)_

Afsoon Hagh, B.P.R. 028393
45 Music Square West
Nashville, Tennessee 37203
(615) 549-5519 telephone
(615) 266-0250 facsimile
afsoon@cummingsmanookian.com

*Attorney for the Plaintiffs*

## CERTIFICATE OF SERVICE

~~Reply in Support~~

I hereby certify that a true and exact copy of the Plaintiffs' ~~Responses to Defendants'~~ *Reply in Support* ~~Additional Statement of Undisputed Material Facts in Support of their Opposition to Plaintiffs'~~ Motion for Partial Summary Judgment has been served by e-mail and facsimile upon the following on this 19th day of March, 2019: *of their Motion for Partial Summary Judgment*

**STEVEN J. MEISNER**
**CAROLINE C. MILLER**
Attorney for James Osborn,
Osborn Enterprises, Inc., II and Osborn Enterprises, Inc., III
**BREWER KRAUSE BROOKS &**
**CHASTAIN, PLLC**
545 Mainstream Drive, Suite 101
Nashville, TN 37228-1209
E-mail: smeisner@bkblaw.com

_(signature)_

**AFSOON HAGH**

12

2228

IN THE CIRCUIT COURT FOR WILLIAMSON COUNTY, TENNESSEE
AT FRANKLIN

MARTY FITZGERALD and MELISSA )
FITZGERALD individually, as )
Husband and wife, and o/b/o their )
deceased child, MEGAN FITZGERALD, )
)
    Plaintiffs, )
) NO. 2018-311
v. )
) (JURY DEMAND)
JAMES OSBORN, OSBORN )
ENTERPRISES, INC., II and )
OSBORN ENTERPRISES, INC., III, )
)
    Defendants. )

---

## PLAINTIFFS' OPPOSITION TO
## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Comes now the Plaintiffs, by and through the undersigned counsel, and pursuant to Rule 56 of the Tennessee Rules of Civil Procedure and in opposition to Defendants' Motion for Partial Summary Judgment responds as follows:

### I.    SUMMARY JUDGMENT STANDARD

This case is governed by the legislative summary judgment standard set forth by our legislature at Tenn. Code Ann. § 20-16-101.

A party is entitled to summary judgment only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04; Byrd v. Hall, 84 S.W.2d 208, 214 (Tenn. 1993). In Byrd, the Tennessee Supreme Court set out the basic principles involved in determining whether a motion for summary judgment should the granted. The

moving party has the ultimate burden of persuading the Court that there are no disputed, material facts creating a genuine issue for trial and that he is entitled to a judgment as a matter of law. Byrd, 84 S.W.2d at 215. If the moving party makes a properly supported motion, the burden of production then shifts to the non-moving party to show that a genuine issue of material fact exists. Id. To meet its burden of production and shift the burden to the non-moving party, the moving party must either affirmatively negate an essential element of the non-moving party's claim or establish an affirmative defense. Id. at 215 n.5.

Accordingly, a properly supported motion for summary judgment must show that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Staples v. CBL & Assocs., Inc., 15 S.W.3d 83, 88 (Tenn. 2000); McCarley v. W. Quality Food Serv., 960 S.W.2d 585, 588 (Tenn. 1998).

The Tennessee Supreme Court in McCleran v. Mid-South Stone, Inc:, 695 S.W.2d 181, 182 (Tenn. 1985) held that if material facts are not in dispute, and it is apparent from the record that the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. Id at 181. Summary Judgment is appropriate when the facts and legal conclusions drawn from the facts reasonably permit only one conclusion. Carvell v. Bottoms, 900 S.W.2d 23, 26 (Tenn. 1995).

## II.    LAW AND **ARGUMENT**

A.    Defendants' Motion for Partial Summary Judgment on the issue of vicarious liability should be denied because a genuine dispute regarding a material fact- whether Osborn was acting in the course and scope of his employment- exist.

The Plaintiffs' do not dispute that Mr. Osborn testified:

1) He concluded his work activities at the time he hit Megan Fitzgerald;

2

2) Osborn Enterprises owns Hondo of Cool Springs;

3) Osborn owns 50% of Osborn Enterprises.

Defendants' did not provide any testimony, by affidavit or otherwise, from Osborn Enterprises, Inc., II and/or Osborn Enterprises, Inc., III (collectively "Osborn Enterprises"), Hondo of Cool Springs, the other 50% stake owner of Osborn Enterprises or from Mr. Osborn to (1) establish that Mr. Osborn was not acting in the course and scope of his employment; (2) establish that Mr. Osborn is authorized to speak on behalf of Osborn Enterprises; (3) establish that Mr. Osborn is authorized to speak on behalf of Hondo of Cool Springs;(4) establish that Mr. Osborn was not on the business of Osborn Enterprises and/or Hondo of Cool Springs at the time of the incident; (5) establish Mr. Osborn's role and duties with Osborn Enterprises and Hondo of Cool Springs such that he was not on their business at the time of the incident.

The only proof in the record that Mr. Osborn was not acting in the course and scope of his employment is his testimony that he was on his was home for the day when the incident occurred. That testimony alone does not establish that Mr. Osborn was not acting in the course and scope of his employment. Even more, a jury may consider Mr. Osborn's credibility on self-serving testimony and may reject that assertion. Therefore, at this time, Defendants' Motion for Partial Summary Judgment on the issue of acting in the course and scope of his employment should be denied.

3

**B.** **Defendant Osborn's Motion for Partial Summary Judgment on Plaintiffs' Claim for Punitive Damages should be denied because Mr. Osborn's testimony and admissions establish he was reckless on May 9, 2018.**

Punitive damages are awarded to punish wrongful conduct and to deter others from engaging in similar conduct in the future. Flax v. DamilerChrysler Corp., 272 S.W. 3d 521 (Tenn. 2008). In 1992, the Tennessee Supreme Court set forth circumstances in which punitive damages could be awarded and prescribed procedures to assure that punitive damages were not arbitrarily awarded. Hodges v. S.C. Toof & Co., 833, S.W.2d 896 (Tenn. 1992).

These procedures include: (1) a bifurcated trial, (2) a heightened burden of proof, (3) specific instructions, and (4) independent judicial oversight over punitive damage awards. A party seeking punitive damages must present "clear and convincing evidence" that the defendant's acts were intentional, fraudulent, malicious or reckless. Hodges, at 901.

A person acts recklessly, when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances. Id. (citing T.C.A. 39-11-302(c)(1991)).Therefore, to succeed on a punitive damages claim based on a defendant acting recklessly, the jury must have a firm believe or conviction regarding the truth of the facts sought to be established.

The clear and convincing standard is easily met in this case because James Osborn admitted that on May 9, 2018:

4

A. He knew the rules of the road;

B. He had more knowledge than members of the general public about the rules and laws related to the operation of motor vehicles;

C. He was aware the law required him to leave three (3) feet of space as he passed a bicyclist;

D. He was aware of the risk associated with failing to leave enough for a bicyclist when passing;

E. He was aware the risk in failing to abide by the rule to leave three (3) feet of space as he passed a bicyclist is that he could strike the bicyclist.

Specifically, Mr. Osborn testified as follows:

Q: Having observed and passed hundreds of bicyclists on the road over the last decade in Williamson County in your motor vehicle, you were aware of the risk of failing to leave enough room for a bicyclist as you passed them. Correct?

A: Yes. Three feet.

Q: You're aware that you're required to provide three feet as you pass a bicyclist. Correct?

A: Yes.

Q: You were aware of that on May 9, 2018 and before that time. Correct?

A: Yes.

Q: Because of your position and employment in the power-sports industry, you are more aware than, probably, members of the general public about rules and laws related to the operation of motor vehicles, motorcycles, ATVs, and jet skis. Correct?

A: Yeah, I'm pretty knowledgeable about it. Fairly knowledgeable.

Q: You knew of the risk of failing to provide the required 3 feet of space as you pass a bicyclist on May 9, 2018. Correct?

5

MR. MEISNER: Objection. Form.

THE WITNESS: I'm aware of the rule, yes.

Q: And you are aware of the risk inherent in failing to abide by that rule. Correct?

A: Yeah, I'm – yes.

Q: The risk in failing to abide by the rule to leave 3 feet of space as you pass a bicyclist is that you could strike the bicyclist. Correct?

A: Well, if you don't give them 3 feet, yes; that's correct.

Q: You did not give Megan Fitzgerald 3 feet of space as your car passed and collided with her on May 9, 2018. Correct?

MR. MEISNER: Objection to form.

THE WITNESS: That is correct. I didn't.

(Osborn Depo. 67:24–69:13)

Based on Mr. Osborn's testimony and admissions, he was aware at the time of conduct, May 9, 2018, that the risk of someone getting hurt as a result of failing to abide by the rules of the road in giving Megan Fitzgerald three (3) feet of space as he passed her bicycle was great. Further, Mr. Osborn repeatedly testified that he could not explain why he struck Megan Fitzgerald with his truck or how he could have failed to see her. As a result, he has affirmatively declined to take a position on that point and a jury may decide, in his absence of testimony, whether his conduct was merely negligent or rises to the level or recklessness. Defendant Osborn's candid acknowledgment that he is unable to take a position on that point renders him incapable of securing summary judgment on the same. Mr. Osborn's testimony and admissions create a genuine dispute of a material fact, namely, whether his conduct was reckless.

6

### III.   CONCLUSION

Based on the foregoing, the Plaintiffs' respectfully request this Court deny Defendants' Motion for Partial Summary Judgment on the issue of vicarious liability and punitive damages.

Respectfully submitted,

Afsoon Hagh, B.P.R. 028393
45 Music Square West
Nashville, Tennessee 37203
(615) 549-5519 telephone
(615) 266-0250 facsimile
afsoon@cummingsmanookian.com

*Attorney for the Plaintiffs*

7

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the Plaintiffs' Responses to Defendants' Motion for Partial Summary Judgment has been served by e-mail and facsimile upon the following on this 19th day of March, 2019:

**STEVEN J. MEISNER**
**CAROLINE C. MILLER**
Attorney for James Osborn,
Osborn Enterprises, Inc., II and Osborn Enterprises, Inc., III
**BREWER KRAUSE BROOKS &**
**CHASTAIN, PLLC**
545 Mainstream Drive, Suite 101
Nashville, TN 37228-1209
E-mail: smeisner@bkblaw.com

**AFSOON HAGH**

8

IN THE CIRCUIT COURT FOR WILLIAMSON COUNTY, TENNESSEE
AT FRANKLIN

MARTY FITZGERALD and MELISSA )
FITZGERALD individually, as )
Husband and wife, and o/b/o their )
deceased child, MEGAN FITZGERALD, )
)
Plaintiffs, )
)
v. )
)
JAMES OSBORN, OSBORN )
ENTERPRISES, INC., II and )
OSBORN ENTERPRISES, INC., III, )
)
Defendants. )

NO. 2018-311

(JURY DEMAND)

COPY

## PLAINTIFFS' RESPONSES TO OSBORN'S STATEMENT OF ADDITIONAL FACTS IN SUPPORT OF HIS OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Comes now Plaintiffs', by and through counsel, pursuant to Rule 56 of the Tennessee Rules of Civil Procedure, and hereby submits the following responses to Defendants Osborn's additional facts in opposition to Plaintiffs' Motion for Partial Summary Judgment:

1. This is a wrongful death action arising out of an automobile accident that occurred on May 9, 2018. (Complt. ¶¶ 1, 8-14.)

**RESPONSE:**

Admitted.

2. Megan Fitzgerald ("Megan") was riding a bicycle on Coleman Road at the same time Defendant Osborn was traveling in the same direction heading toward his residence located at 3235 Kennard Springs Road in Franklin, Tennessee. (Complt. ¶¶ 2, 8-14; EXHIBIT 1 - Osborn Res. Interrog. No. 8.)

**RESPONSE:**

Pursuant to T.R.C.P 56.03, Admitted for purposes of ruling on the motion for summary judgment only.

3.     Prior to the accident, Mr. Osborn was working in the morning, had lunch with his wife and was headed home for the day. (EXHIBIT 1 - Osborn Res. Interrog. No. 8.)

RESPONSE:

Pursuant to T.R.C.P 56.03, Admitted for purposes of ruling on the motion for summary judgment only.

4.     At the time of the accident, Mr. Osborn was driving his personal vehicle, a Silverado pick-up truck registered and titled in his name. (EXHIBIT 6 – Title to Vehicle, Osborn Res. RFP; Plfs. Res. Request Admissions; Police Report.)

RESPONSE:

Pursuant to T.R.C.P 56.03, Admitted for purposes of ruling on the motion for summary judgment only.

5.   Tara Seaborn was a passenger in a vehicle behind Mr. Osborn before the accident. (EXHIBIT 3 - Seaborn Dep. 6-10.)

RESPONSE:

Denied. Tara Seaborn was a passenger in a vehicle behind another vehicle that was directly behind Mr. Osborn's truck. See, Seaborn Depo. 10:13-15.

6.     Ms. Seaborn testified all the vehicles were traveling the speed limit, including the vehicle driven by Mr. Osborn.  (EXHIBIT 3 - Seaborn Dep. 10:10-23.)

RESPONSE:

Objection – lack of foundation and improper lay opinion testimony under Tenn. R. Evid. 701. There are two methods of determining another car's speed: (1) clocking with a radar device; and (2) pacing. Pacing requires a trained motorist to follow a suspected speedster for a sufficient distance at a constant speed, and then using his/her own speedometer to estimate the speed of the violator.  There is no foundation that Ms. Seaborn was employing either of these methods on the day in question, much less, employing them in a manner consistent with the predicates of Tenn. R. Evid. 702-703 for her opinion to be admissible.

2

7.     Mr. Osborn did not attempt to brake or swerve prior to the accident. (EXHIBIT 3 - Seaborn Dep. 11:14–12:24.)

RESPONSE:

Admitted.

8.     Megan was not wearing a helmet or other safety gear typically worn by "bicycle people." (EXHIBIT 3 - Seaborn Dep. 38:4–39:10.)

RESPONSE:

It is admitted Megan was not wearing a helmet. However, this fact is not material. The Defendant has not and cannot show how Megan's wearing or not wearing helmet would have affected whether Defendant Osborn ran her over, or otherwise somehow serves to excuse Defendant Osborn's role in causing Megan's death. Osborn Depo pp. 64:16–65:9. The Defendant has admitted that Megan's injuries were caused by the collision and has not introduced any medical proof that Megan would have survived being hit by a car that made no effort to brake if she had been wearing a helmet. Otherwise, the statement is impermissibly vague, and not supported by admissible record proof. The cited testimony is improper opinion testimony and, in any event, does not establish that Megan was not wearing any "other safety gear typically worn by 'bicycle people.'" Even if this fact could be established from the cited testimony, it would not be not material. The Defendant has not and cannot show how Megan's wearing or not wearing some other unspecified "other safety gear" would have affected whether Defendant Osborn ran her over, or otherwise somehow serves to excuse Defendant Osborn's role in causing Megan's death.

9.     In observing Mr. Osborn's vehicle, Ms. Seaborn testified Mr. Osborn was not driving in any erratic or unusual manner, having no difficulties navigating his vehicle within his lane of traffic, did not cross over the center lane into oncoming traffic, veer off onto the shoulder of the road or otherwise behave in any unusual manner prior to the accident. (EXHIBIT 3 - Seaborn Dep. 40:3–25.)

RESPONSE:

Pursuant to T.R.C.P 56.03, Admitted for purposes of ruling on the motion for summary judgment only. Ms. Seaborn testified that Defendant did not *appear* to be driving in an erratic or unusual manner from her vantage point. This fact is not material because it does not establish that the Defendant somehow complied with the

3

standard of care applicable to him when he overtook and ran over Megan on the day in question.

10. Ms. Seaborn testified Coleman Road was not suitable for bicycle traffic because, in her words:

> It's curvy; there are no shoulders; there is not a bike lane; it's unpredictable how fast anyone would be going down that road; it's a side road; I've been, you know, passed by cars going way too fast; I drive on it all the time; there's no good shoulder; I mean, just no.

(EXHIBIT 3 - Seaborn Dep. 41:1-11.)

**RESPONSE:**

**The Plaintiffs do not deny that Ms. Seaborn testified, in part, as Defendant block-quoted. However, Plaintiffs deny Defendant's characterization of this testimony as evidence that "Coleman Road was not suitable for bicycle traffic," including for the following reasons:** .
1. **Any opinion by Ms. Coleman that the Coleman road was not suitable for bicycle traffic is improper opinion testimony.**
2. **Nothing about the road prevented the Defendant from seeing Megan Fitzgerald and not running her over on May 9, 2018. Osborn Depo. p. 22:21-23:1.**
3. **According to the Defendant himself, Coleman Road is not unsuitable for bicycle traffic. Osborn Depo. p. 10:11-11:12, 66:13-19.**
4. **Defendant has conceded that Megan Fitzgerald has a legal right to ride her bicycle on Coleman Road. Defendant's Response to P's SUMF ¶ 6.**

11. Based on Ms. Seaborn's observations, there was no indication Mr. Osborn intentionally struck Megan. (EXHIBIT 3 - Seaborn Dep. 43:2-22.)

**RESPONSE:**

**Pursuant to T.R.C.P 56.03, Admitted for purposes of ruling on the motion for summary judgment only that Ms. Seaborn testified she did not believe Mr. Osborn intentionally struck Megan. However, this "fact" is neither admissible, nor material to Plaintiffs' Motion for Partial Summary Judgment.**

12. Mr. Osborn admitted he made no attempt to pass Megan because he did not see her until just prior to impact - it was too late to avoid the collision. (EXHIBIT 2 - Osborn Dep. 24:14-18.)

4

**RESPONSE:**

It is denied that Mr. Osborn was not "overtaking and passing" Megan for purposes of Tenn. Code Ann. § 55-8-175(c)(2) when he approached her from behind and struck her on May 9, 2018, including because "Overtake" means "to come or catch up with in a course of motion," *Ringwald v. Beene*, 92 S.W.2d 411, 413 (Tenn. 1935), and "Pass" means "to move in a path so as to approach and continue beyond something."[1] Defendant Osborn admitted that he did not comply with Tenn. Code Ann. § 55-8-175(c)(2):

| Mr. Manookian: | You did not give Megan Fitzgerald 3 feet of space as your car passed and collided with her on May 9, 2018. Correct? |
|---|---|
| Mr. Osborn: | That is correct. I didn't.[2] |

13.    Mr. Osborn did not attempt to overtake and pass Megan. (EXHIBIT 2 - Osborn Dep. 24:14-18.)

**RESPONSE:**

It is denied that Mr. Osborn was not "overtaking and passing" Megan for purposes of Tenn. Code Ann. § 55-8-175(c)(2) when he approached her from behind and struck her on May 9, 2018, including because "Overtake" means "to come or catch up with in a course of motion," *Ringwald v. Beene*, 92 S.W.2d 411, 413 (Tenn. 1935), and "Pass" means "to move in a path so as to approach and continue beyond something."[3] Defendant Osborn admitted that he did not comply with Tenn. Code Ann. § 55-8-175(c)(2):

| Mr. Manookian: | You did not give Megan Fitzgerald 3 feet of space as your car passed and collided with her on May 9, 2018. Correct? |
|---|---|
| Mr. Osborn: | That is correct. I didn't.[4] |

14.    Mr. Osborn could not testify why he did not see Megan. (EXHIBIT 2 - Osborn Depo. 23:10-18.)

**RESPONSE:**

---

[1] Merriam Webster's Dictionary, attached as Exhibit 1 hereto.
[2] Osborn Depo, p. 70:16-22.
[3] Merriam Webster's Dictionary, attached as Exhibit 1 hereto.
[4] Osborn Depo, p. 70:16-22.

5

Pursuant to T.R.C.P 56.03, Admitted for purposes of ruling on the motion for summary judgment only.

15.     Mr. Osborn noted, however, that there was a strong sun glare on his windshield that may have affected his ability to see. (EXHIBIT 2 - Osborn Dep. 21:25-22:8; 65:11-23.)

**RESPONSE:**
**Denied. Defendant Osborn rejected the notion that he could not see Megan Fitzgerald due to it being too bright out. Osborn Depo, p. 23:10-14.**

16.     Mr. Osborn surrendered his vehicle and gave a written statement to the police following the incident. (EXHIBIT 1 - Osborn Res. Interrog. No. 6.)

**RESPONSE:**

**Denied.**

17.     Prior to the incident, he had only been involved in two (2) motor vehicle accidents: one in 1999 and the second approximately five (5) years prior to the accident at issue. (EXHIBIT 1 - Osborn Res. Interrog. No. 9.)

**RESPONSE:**
**Objection, this fact is improper character evidence. *See* Tenn. R. Evid. 404. Further, denied as stated. *See*, Def's Exhibit 1: Mr. Osborn only recalls having been involved in two motor vehicle incidents prior to the incident that is the subject of this action. Additionally, this fact is not material because it does not mean that the Defendant was not negligent on May 9, 2018.**

18.     There is no evidence Mr. Osborn consumed alcohol prior to the incident. (EXHIBIT 1 - Osborn Res. Interrog. No. 11.)

**RESPONSE:**

**Pursuant to T.R.C.P 56.03, Admitted for purposes of ruling on the motion for summary judgment only.**

6

19.     Mr. Osborn had no prior difficulties operating the vehicle he was driving on the date of the incident. (EXHIBIT 1 - Osborn Res. Interrog. No. 14.)

**RESPONSE:**

**Pursuant to T.R.C.P 56.03, Admitted for purposes of ruling on the motion for summary judgment only.**

20.     There is no evidence Mr. Osborn was talking or texting on his phone at the time the incident occurred. (EXHIBIT 1 - Osborn Res. Interrog. 19-20.)

**RESPONSE:**

**Pursuant to T.R.C.P 56.03, Admitted for purposes of ruling on the motion for summary judgment only.**

21.     No criminal charges have been brought against Mr. Osborn arising out of the incident. (EXHIBIT 1 - Osborn Res. Interrog. No. 27.)

**RESPONSE:**

**Denied.**

22.     Coleman Road is dangerous for bicyclists because it is a hilly, curvy, country road with no shoulder for bicycle traffic. (EXHIBIT 2 - Osborn Dep. 9:6-25; EXHIBIT 3 - Seaborn Dep. 19:8-18.)

**RESPONSE:**

**Denied.**

23.     Coleman Road is simply not suitable for bicycle traffic. (EXHIBIT 3 - Seaborn Dep. 41:1-11.)

**RESPONSE:**

**Denied, including for the following reasons:**
1. **Any opinion by Ms. Coleman that the Coleman road was not suitable for bicycle traffic is improper opinion testimony.**

7

2. Nothing about the road prevented the Defendant from seeing Megan Fitzgerald and not running her over on May 9, 2018. Osborn Depo. p. 22:21-23:1.
3. According to the Defendant himself, Coleman Road is not unsuitable for bicycle traffic. Osborn Depo. p. 10:11-11:12, 66:13-19.
4. Defendant has conceded that Megan Fitzgerald has a legal right to ride her bicycle on Coleman Road. Defendant's Response to P's SUMF ¶ 6.

24. Megan's parents were surprised she had gone so far on Coleman Road. (EXHIBIT 4 - Melissa Fitzgerald Dep. 19:17-24; EXHIBIT 5 - Marty Fitzgerald Dep. 36-40.)

RESPONSE:

This is not a material fact. The referenced testimony is not supported by the cited depositions; however, Melissa Fitzgerald testified at 19:12: "I was surprised she had gone that far."

25. Megan was not an avid bicyclist. (EXHIBIT 4 - Melissa Fitzgerald Dep. 19:17-24; EXHIBIT 5 - Marty Fitzgerald Dep. 36-40.)

RESPONSE:

Pursuant to T.R.C.P 56.03, Admitted for purposes of ruling on the motion for summary judgment only. This is not a material fact, including because the issue is that Defendant did not see the Decedent and ran her over from behind. Megan Fitzgerald was not responsible for her death because she rode her bicycle without being an "avid bicyclist."

26. At the time of the accident, Megan was not riding as close as possible to the right side of the road and was not wearing a safety helmet or appropriate clothing to warn others of her presence on the road. (EXHIBIT 2 - Osborn Dep. 27:14-16; 31:6-15; 61:23-62:6; EXHIBIT 3 - Seaborn Dep. 16:12-16; 38:13-29:4; EXHIBIT 4 - Melissa Fitzgerald Dep. 8:17-25; EXHIBIT 5 - Marty Fitzgerald Dep. 83:13-16.)

RESPONSE:

It is admitted that Megan was not wearing a helmet. All other facts are denied because they are not supported by the cited testimony. Megan Fitzgerald was riding her bicycle in the middle of the day. There is no evidence about clothing she should have

8

been wearing to make herself more visible in those conditions. Defendant Osborn's testimony that Megan was not riding as close as possible to the right side of the road is negated by his claim that he did not see her until he struck her. Osborn Deposition, p. 54:20-55:3.

Respectfully submitted,

Afsoon Hagh, B.P.R. 28393
45 Music Square West
Nashville, Tennessee 37203
(615) 549-5519 telephone
(615) 266-0250 facsimile
afsoon@cummingsmanookian.com
*Attorney for the Plaintiffs*

9

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the Plaintiffs' Responses to Defendants' Additional Statement of Undisputed Material Facts in Support of their Opposition to Plaintiffs' Motion for Partial Summary Judgment has been served by e-mail and facsimile upon the following on this 19th day of March, 2019:

**STEVEN J. MEISNER**
**CAROLINE C. MILLER**
Attorney for James Osborn,
Osborn Enterprises, Inc., II and Osborn Enterprises, Inc., III
**BREWER KRAUSE BROOKS &**
**CHASTAIN, PLLC**
545 Mainstream Drive, Suite 101
Nashville, TN 37228-1209
E-mail: smeisner@bkblaw.com

AFSOON HAGH

10

Copy

## IN THE CIRCUIT COURT FOR DAVIDSON COUNTY, TENNESSEE

BRETTON KEEFER, as surviving adult son )
and next-of-kin of his deceased mother, )
CHESTA SHOEMAKER, )
 )
    Plaintiff, )
 )
    v. ) NO. 19C358
 )
 ) JURY DEMAND
VANDERBILT UNIVERSITY MEDICAL )
CENTER and DR. GRETCHEN EDWARDS, )
 )
    Defendants. )

**2019 FEB 11 PM 3:50 RICHARD R ROOKER, CLERK FILED**

## COMPLAINT

The Plaintiff respectfully states to the Court and Jury the following:

### PARTIES, VENUE, AND JURISDICTION

1.    The Plaintiff, Bretton Keefer ("Mr. Keefer"), is an adult citizen of the State of Tennessee.

2.    Mr. Keefer is a surviving adult son of Chesta Shoemaker ("Ms. Shoemaker" or "the patient" or "the decedent").

3.    Ms. Shoemaker died on April 14, 2017.

4.    Ms. Shoemaker died at Vanderbilt University Medical Center ("Vanderbilt" or "VUMC").

5.    When Ms. Shoemaker died, she had three sons.

6.    Ms. Shoemaker's three sons are (a) Bretton, (b) David, and (c) Chris.

7.    Bretton Keefer is over the age of 18.

8.    Ms. Shoemaker's other two sons, David and Chris, are minors, who are 9 and 13 at the time of the filing of this lawsuit, respectively.





9. Bretton Keefer has full custody of his two brothers, David and Chris.

10. Bretton Keefer obtained full custody of his two brothers after their mother, Ms. Shoemaker, died.

11. Neither of Bretton Keefer's two brothers have any type of relationship with their fathers.

12. Ms. Shoemaker was not legally married at the time of her death.

13. The Defendant, Dr. Gretchen Edwards ("Dr. Edwards"), is a physician, licensed to practice medicine in Tennessee. She may be served at Vanderbilt University Medical Center, 1161 21st Ave., Nashville TN 37232.

14. The Defendant, Vanderbilt University Medical Center ("Vanderbilt"), is a general hospital, licensed by the Tennessee Department of Health Board for Licensing Health Care facilities. Vanderbilt is a "health care provider," as that term is defined by Tenn. Code Ann. §29-26-101(2)(B):

15. Vanderbilt is a non-profit corporation, formed under the laws of the State of Tennessee. Vanderbilt's principle place of business is Vanderbilt University Medical Center, 1161 21st Ave., Nashville TN 37232.

16. Vanderbilt may be served through its registered agent, National Registered Agents, Inc., at 800 S. Gay, St., Suite 2021, Knoxville, TN 37929-9710.

17. This cause of action arose in Davidson County, Tennessee. Venue and a jury demand are proper pursuant to Tenn. Code Ann. §20-4-101(a). This Court has jurisdiction pursuant to Tenn. Code Ann. §16-10-101.

## LEGAL RELATIONSHIP

18. At the time of the matters contained in this Complaint, Ms. Shoemaker had a physician-patient relationship with Dr. Edwards.

2

Copy

19. In April 2017, Dr. Edwards was an employee of Vanderbilt.

20. In April 2017, Dr. Edwards was participating in a residency program at Vanderbilt.

21. The fact that Dr. Edwards was participating in a residency program at Vanderbilt in April 2017 meant Dr. Edwards had not yet successfully completed an approved residency program where she had already demonstrated having the knowledge, experience, and competence to complete any such program.

22. In April 2017, Dr. Edwards was a person selected by Vanderbilt to be involved in providing care and treatment to Ms. Shoemaker during her April 13, 2017 Vanderbilt admission.

23. When Dr. Edwards was chosen by Vanderbilt to be involved in providing case and treatment to Ms. Shoemaker, Dr. Edwards was participating in a residency program at Vanderbilt and Dr. Edwards had not yet successfully completed the requirements of that training program.

24. During Dr. Edwards' involvement with providing care and treatment to Ms. Shoemaker during the April 13, 2017 Vanderbilt admission, Dr. Edwards was an agent of Vanderbilt.

25. During Dr. Edwards' involvement with providing care and treatment to Ms. Shoemaker during the April 13, 2017 Vanderbilt admission, Dr. Edwards was an apparent agent of Vanderbilt.

26. At the time of the matters contained in this Complaint, Ms. Shoemaker had a hospital-patient relationship with Vanderbilt.

27. All of the health care providers who provided care and treatment to Ms. Shoemaker during her April 13, 2017 admission to Vanderbilt were employees of Vanderbilt.

28. All of the health care providers who provided care and treatment to Ms. Shoemaker during her April 13, 2017 admission to Vanderbilt were employees or agents of Vanderbilt.

3

Copy

29. All of the health care providers who provided care and treatment to Ms. Shoemaker during her April 13, 2017 admission to Vanderbilt were selected or staffed by Vanderbilt to be involved in Ms. Shoemaker's care and treatment.

30. Ms. Shoemaker did not choose any of the health care providers who provided care and treatment to her during her April 13, 2017 admission to Vanderbilt.

## STATEMENT OF FACTS AND ALLEGATIONS

31. The Vanderbilt medical records for Ms. Shoemaker's April 13, 2017 admission ("Vanderbilt records") are completely accurate.

32. The Vanderbilt medical records for Ms. Shoemaker's April 13, 2017 contain multiple inaccuracies.

33. The health care providers who created documentation in the Vanderbilt records had an obligation to make their documentation as accurate as possible.

34. The health care providers who created documentation in the Vanderbilt records had an obligation to make their documentation as complete as possible.

35. If a Vanderbilt health care provider made their documentation as accurate and complete as possible, that provider should not have to make an additional note later mentioning things that were not in earlier documentation about the same event.

36. Dr. Edwards made at least one mistake on the morning of April 13, 2017 when she was attempting to place a central line via Ms. Shoemaker's right internal jugular vein ("R IJ").

37. Dr. Edwards made at least one significant mistake on the morning of April 13, 2017 when she was attempting to place a central line via Ms. Shoemaker's R IJ.

38. The R IJ and the right common carotid artery are different vessels in the human body, as shown here:

4

Copy



RIGHT INTERNAL JUGULAR ———

——— RIGHT COMMON CAROTID

39.     When Dr. Edwards was attempting to place a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017, Dr. Edwards did not intend to penetrate Ms. Shoemaker's right common carotid artery.

40.     When Dr. Edwards was attempting to place a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017, Dr. Edwards did not intend to cannulate Ms. Shoemaker's right common carotid artery ("R CCA").

41.     Dr. Edwards did not promptly recognize on the April 13, 2017 that she had penetrated Ms. Shoemaker's right common carotid artery when Dr. Edwards had attempted to place a central line via the R IJ.

5

Copy

42. Dr. Edwards did not promptly recognize on the April 13, 2017 that she had cannulated Ms. Shoemaker's right common carotid artery when Dr. Edwards had attempted to place a central line via the R IJ.

43. If Dr. Edwards had properly performed the attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017, Dr. Edwards would not have penetrated Ms. Shoemaker's R CCA.

44. If Dr. Edwards had properly performed the attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017, Dr. Edwards would not have cannulated Ms. Shoemaker's R CCA.

45. The fact that Dr. Edwards penetrated Ms. Shoemaker's R CCA on the morning of April 13, 2017 during the attempted placement of a central line in Ms. Shoemaker's R IJ means that Dr. Edwards did not properly perform that procedure.

46. The fact that Dr. Edwards cannulated Ms. Shoemaker's R CCA on the morning of April 13, 2017 during the attempted placement of a central line in Ms. Shoemaker's R IJ means that Dr. Edwards did not properly perform that procedure.

47. Dr. Edwards should not have penetrated Ms. Shoemaker R CCA on the morning of April 13, 2017 during the attempted placement of a central line in Ms. Shoemaker's R IJ.

48. Dr. Edwards should not have cannulated Ms. Shoemaker R CCA on the morning of April 13, 2017 during the attempted placement of a central line in Ms. Shoemaker's R IJ.

49. The unintentional penetration of the right common carotid artery in a live person is a medical issue that can cause death.

50. When the unintentional penetration of the right common carotid artery in a live person occurs, early detection is critical.

6

Copy

51. The unintentional cannulation of the right common carotid artery in a live person during the attempted placement of a central line in an internal jugular vein is a medical issue that can cause death.

52. When the unintentional cannulation of the right common carotid artery in a live person occurs during the attempted placement of a central line in an internal jugular vein, early detection is critical.

53. When the unintentional penetration of the right common carotid artery occurs during the attempted placement of a central line in an internal jugular, this can be detected by the provider attempting to place the central line.

54. When the unintentional penetration of the right common carotid artery occurs during the attempted placement of a central line in an internal jugular, this can easily be detected by the provider attempting to place the central line if that provider has an appropriate amount of experience and competence.

55. When the unintentional cannulation of the right common carotid artery occurs during the attempted placement of a central line in an internal jugular, this can be promptly detected by the provider attempting to place the central line if the provider has an appropriate amount of experience and competence.

56. On April 13, 2017, an employee of Vanderbilt unintentionally penetrated Ms. Shoemaker's R CCA.

57. On April 13, 2017, an employee of Vanderbilt unintentionally cannulated Ms. Shoemaker's R CCA.

58. On April 13, 2017, an agent of Vanderbilt unintentionally penetrated Ms. Shoemaker's R CCA.

7

2253

Copy

59. On April 13, 2017, an agent of Vanderbilt unintentionally cannulated Ms. Shoemaker's R CCA.

60. The type of penetration that occurred of Ms. Shoemaker's R CCA on April 13, 2017 can be properly referred to as a cannulation of the R CCA.

61. Dr. Edwards is the provider who penetrated Ms. Shoemaker's R CCA on April 13, 2017 when she meant to be placing a central line in the R IJ.

62. Dr. Edwards is the provider who cannulated Ms. Shoemaker's R CCA on April 13, 2017 when she meant to be placing a central line in the R IJ.

63. When Dr. Edwards penetrated Ms. Shoemaker's R CCA during the attempted placement of a central line in the R IJ, Dr. Edwards was what Vanderbilt referred to in the Vanderbilt records at the time as a "trainee."

64. When Dr. Edwards cannulated Ms. Shoemaker's R CCA during the attempted placement of a central line in the R IJ, Dr. Edwards was what Vanderbilt referred to in the Vanderbilt records at the time as a "trainee."

65. When Dr. Edwards did not promptly recognize on August 13, 2017 that she cannulated Ms. Shoemaker's R IJ, Dr. Edwards was what Vanderbilt referred to in the Vanderbilt records at the time as a "trainee."

66. Nothing regarding Dr. Edwards' attempt to place a central line in Ms. Shoemaker's R IJ was supposed to involve penetrating the R CCA.

67. Nothing regarding Dr. Edwards' attempt to place a central line in Ms. Shoemaker's R IJ was supposed to involve cannulating the R CCA.

68. When Dr. Edwards completed her attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017, Dr. Edwards did not know she had penetrated the R CCA.

8

2254

Copy

69. When Dr. Edwards completed her attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017, Dr. Edwards did not know she had cannulated the R CCA.

70. When Dr. Edwards completed her attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017, Dr. Edwards had absolutely no concern regarding whether she had penetrated the R CCA.

71. When Dr. Edwards completed her attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017, Dr. Edwards had absolutely no concern regarding whether she had cannulated the R CCA.

72. Dr. Edwards was not experienced enough to be permitted to attempt to place a central line in Ms. Shoemaker on April 13, 2017 without supervision by a more experienced physician.

73. Dr. Edwards claims to have used ultrasound during the attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017.

74. Dr. Edwards did not use ultrasound during the attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017.

75. Dr. Edwards did not use ultrasound during the entire attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017.

76. If Dr. Edwards had properly used ultrasound during the attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017, she would have recognized visually on the monitor that displayed what the ultrasound showed that the wire was placed into the R CCA.

77. If Dr. Edwards had properly used ultrasound during the attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017, she would have recognized visually on the monitor that displayed what the ultrasound showed that the catheter was placed into the R CCA.

9

2255

Copy

78. During Dr. Edwards' April 13, 2017 attempt to place a central line in Ms. Shoemaker's R IJ, Dr. Edwards did not ask anyone for help.

79. Within one hour of Dr. Edwards completing her attempt to place a central line in Ms. Shoemaker's R IJ, Dr. Edwards did not ask anyone for help.

80. Dr. Edwards could have asked another provider to help her with the April 13, 2017 attempted placement of a central line in Ms. Shoemaker's R IJ during the performance of that procedure.

81. Nothing prevented Dr. Edwards from asking another provider to help her with the April 13, 2017 attempted placement of a central line in Ms. Shoemaker's R IJ during the performance of that procedure.

82. No one placed a central line in Ms. Shoemaker in the Vanderbilt ER on April 13, 2017.

83. The central line that was placed by Dr. Edwards on the morning of April 13, 2017 was not urgent.

84. The central line that was placed by Dr. Edwards on the morning of April 13, 2017 was not urgent.

85. The central line that Dr. Edwards placed on the morning of April 13, 2017 was not used the first hour after it was placed.

86. The central line that Dr. Edwards placed on the morning of April 13, 2017 was not used the first two hours after it was placed.

87. The central line that Dr. Edwards placed on the morning of April 13, 2017 was not used the first three hours after it was placed.

10



88. The central line that Dr. Edwards attempted to place via Ms. Shoemaker's R IJ on the morning of April 13, 2017 could have been placed by a more experienced physician.

89. The central line that Dr. Edwards attempted to place via Ms. Shoemaker's R IJ on the morning of April 13, 2017 did not have to be placed by a resident.

90. The central line that Dr. Edwards attempted to place via Ms. Shoemaker's R IJ on the morning of April 13, 2017 did not have to be placed by any type of provider who the Vanderbilt records referred to as a "trainee" at that time.

91. Dr. Edwards could have asked another provider to check on the patient or on her central line placement after her April 13, 2017 attempted placement of a central line in Ms. Shoemaker's R IJ.

92. Nothing prevented Dr. Edwards from asking another provider to check on the patient or on her central line placement within one hour after her April 13, 2017 attempted placement of a central line in Ms. Shoemaker's R IJ.

93. The first time that any provider at Vanderbilt recognized that the central line placed by Dr. Edwards penetrated Ms. Shoemaker's R CCA was hours after it occurred.

94. The first time that any provider at Vanderbilt recognized that the central line placed by Dr. Edwards penetrated Ms. Shoemaker's R CCA was hours after it could have been recognized.

95. The first time that any provider at Vanderbilt recognized that the central line placed by Dr. Edwards cannulated Ms. Shoemaker's R CCA was hours after it occurred.

96. The first time that any provider at Vanderbilt recognized that the central line placed by Dr. Edwards cannulated Ms. Shoemaker's R CCA was hours after it could have been recognized.

11

Copy

97. The Vanderbilt medical records document different times, by as much as 30 or 60 minutes different depending on the documentation, that it was first recognized that the central line that was meant to be placed in Ms. Shoemaker's R IJ instead cannulated her R CCA.

98. The Vanderbilt medical records document different times, by as much as 30 or 60 minutes different depending on the documentation, that it was first recognized that Ms. Shoemaker had a neurological change for the worse as a result of the central line that was meant to be placed in Ms. Shoemaker's R IJ instead cannulated her R CCA.

99. After Dr. Edwards learned that the central line that she was supposed to place in Ms. Shoemaker's R IJ instead was placed into Ms. Shoemaker's R CCA, Dr. Edwards made a second note regarding that procedure that added things into the Vanderbilt record regarding that attempted placement of a central line that Dr. Edwards did not include in her earlier note about the same attempted central line placement.

100. On April 13, 2017, Chesta Shoemaker (age 44) presented to the Emergency Department at Vanderbilt by EMS via transfer from UMC Lebanon with complaints of abdominal pain.

101. The abdominal pain that Ms. Shoemaker had upon arrival to the Vanderbilt was documented by Vanderbilt personnel to be "moderate."

102. Vanderbilt's documentation that Ms. Shoemaker's abdominal pain upon arrival to Vanderbilt was moderate is completely accurate.

103. The EMS personnel who transported Ms. Shoemaker from UMC Lebanon to Vanderbilt on April 13, 2017 prepared documentation on April 13, 2017 regarding Ms. Shoemaker's status at and around that time.

12



104. The documentation that EMS prepared on April 13, 2017 regarding Ms. Shoemaker documents that Ms. Shoemaker had experienced pain for two weeks, along with nausea and constipation with decreased bowel movements over those two weeks.

105. The documentation prepared by EMS on April 13, 2017 states that Ms. Shoemaker's Underlying Medical Condition was Pain – Abdominal.

106. The documentation prepared by EMS on April 13, 2017 regarding Ms. Shoemaker that is in the Vanderbilt records is completely accurate.

107. The Vanderbilt records for Ms. Shoemaker's April 13, 2017 admission to Vanderbilt include a document entitled "Transfer Order."

108. According to the Transfer Order in the Vanderbilt records, the Diagnosis for Ms. Shoemaker at the referring hospital was Abdominal Pain.

109. Ms. Shoemaker's vital signs at 0143 on April 13, 2017 prior to arrival at Vanderbilt are documented in documentation in included in the Vanderbilt records as BP 108/71, HR 102, RR 12, O2 saturation 94%, and temperature 97.5.

110. Ms. Shoemaker's vitals while in transport via EMS from UMC Lebanon to Vanderbilt included the following vital signs, which are included in documentation in the Vanderbilt records:

|     | 0227   | 0242   |
|-----|--------|--------|
| BP  | 111/73 | 105/67 |
| HR  | 120    | 123    |
| RR  | 18     | 16     |

111. Ms. Shoemaker was admitted to the ER Vanderbilt at 0303 on April 13, 2017 and she was seen by a physician at 0313 on April 13, 2017.

13

112.    According to the Vanderbilt records, a CT scan from the referring facility, UMC Lebanon, demonstrated an intra-abdominal infection via a large perinephric abscess with pyelonephritis, with a massive amount of portal venous/SMV air, but with the colon and intestines appearing healthy without any wall thickening or fluid collections.

113.    Vanderbilt's independent interpretation of the CT scan performed at UMC Lebanon in April 2017 is in the Vanderbilt records.

114.    Vanderbilt's independent interpretation of the CT scan performed at UMC Lebanon in April 2017 in the Vanderbilt records is accurate and complete.

115.    On the morning of April 13, 2017 at Vanderbilt, Ms. Shoemaker was not hypotensive.

116.    On the morning of April 13, 2017 at Vanderbilt, Ms. Shoemaker was documented to have a temperature of 98.0, which is afebrile.

117.    Ms. Shoemaker did not have a fever at Vanderbilt on the morning of April 13, 2017.

118.    When Ms. Shoemaker was assessed and examined in the Emergency Department at Vanderbilt on the morning of April 13, 2017, she was documented by the physician who examined her as being "nontoxic-appearing".

119.    When Ms. Shoemaker was assessed and examined in the Emergency Department at Vanderbilt on the morning of April 13, 2017, she was "nontoxic-appearing".

120.    The documentation in the Vanderbilt records regarding the assessment of Ms. Shoemaker in the Vanderbilt Emergency Department on the morning of April 13, 2017 documents, in part, that Ms. Shoemaker denied (1) bloody stools, (2) nausea, (3) vomiting, (4) chest pain and (5) SOB.

14



121.    The documentation in the Vanderbilt records regarding the assessment of Ms. Shoemaker in the Vanderbilt Emergency Department on the morning of April 13, 2017 documents, in part, that there was no history of smoking, alcohol use, or illicit drug use.

122.    The documentation in the Vanderbilt records regarding the assessment of Ms. Shoemaker in the Vanderbilt Emergency Department on the morning of April 13, 2017 documents, in part, that her surgical history was a cholecystectomy.

123.    The documentation in the Vanderbilt records regarding the assessment of Ms. Shoemaker in the Vanderbilt Emergency Department on the morning of April 13, 2017 documents, in part, that on Physical Exam, there were hypoactive bowel sounds, RLQ and RUQ abdominal tenderness, and she was tachycardic with regular rhythm and no murmur.

124.    At 0312 on April 13, 2017, Ms. Shoemaker's vital signs were documented by an Emergency Department Triage Nurse at Vanderbilt as BP 131/77, HR 130, RR 26, O2 91%, and temp 98.2.

125.    At 0320 on April 13, 2017, Ms. Shoemaker's labs included:

WBC 16.0

HGB 8.7

PCV 28

Plt-Ct 83

MCV 83

Creatinine 1.03

126.    Ms. Shoemaker's creatinine improved on the morning of April 13, 2017 after fluid resuscitation, including that her creatinine was 1.3 at the outside hospital and it improved to 1.03 with fluid resuscitation.

15



127. Beginning at 0335 on April 13, 2017, Flowsheet documentation was recorded at Vanderbilt, which included System Assessments and vitals.

128. Vasopressin is a mediation that is an option for treating sepsis.

129. Vasopressin is a mediation that is an option for treating septic shock.

130. In April 2017, Vasopressin was a medication used at Vanderbilt to treat sepsis.

131. In April 2017, Vasopressin was a medication used at Vanderbilt to treat septic shock.

132. By the end of the morning of April, 13, 2017, no Vanderbilt physician had ordered that Ms. Shoemaker be given Vasopressin.

133. The April 13, 2017 Flowsheet documentation by Vanderbilt documents that Ms. Shoemaker was not given Vasopressin on the morning of April 13, 2017.

134. Ms. Shoemaker was not given Vasopressin on the morning of April 13, 2017.

135. The first time that Ms. Shoemaker was given Vasopressin on April 13, 2017 was after 1300 that day.

136. At 0349 on April 13, 2017, an Emergency General Surgery consult was performed at Vanderbilt by Dr. Sandra Kavalukas.

137. Dr. Kavalukas performed a consult on the morning of April 13, 2017 and opined that "this looks like emphysematous pyelonephritis with extension into the peritoneal cavity and crossover into the portal system" but noted that no primary intestinal pathology was seen to warrant surgery, and that they would defer to urology with regard to percutaneous draining and antibiotic management.

138. Dr. Kavalukas' consult note documented, in part, that Ms. Shoemaker was afebrile, but there was leukocytosis, lactic academia, and notable anemia on labs.

16

Copy

139.    At 0630 on April 13, 2017, Vanderbilt documented that consent was obtained for (1) placement of an arterial line and (2) placement of a central venous/pulmonary artery catheter.

140.    The "central venous/pulmonary artery catheter" referenced in the consent form signed on April 13, 2017 in the Vanderbilt records can properly be referred to as a "central line".

141.    There is no audio recording or video recording of any conversation that occurred with Ms. Shoemaker on the morning of April 13, 2017 to obtain informed consent for the attempted placement of a central line that day.

142.    There is no documentation of any conversation that occurred with Ms. Shoemaker on the morning of April 13, 2017 to obtain informed consent for the attempted placement of a central line that day other than what is in the Vanderbilt records.

143.    The only witness to the conversation that Dr. Edwards had with Ms. Shoemaker to obtain informed consent for the placement of a central line in the R IJ on the morning of April 13, 2017 other than Dr. Edwards and Ms. Shoemaker was Darrell Goodwin.

144.    Dr. Edwards is not aware of any witness to the conversation that Dr. Edwards had with Ms. Shoemaker to obtain informed consent for the placement of a central line in the R IJ on the morning of April 13, 2017 other than Dr. Edwards and Ms. Shoemaker other than Darrell Goodwin.

145.    Vanderbilt is not aware of any witness to the conversation that Dr. Edwards had with Ms. Shoemaker to obtain informed consent for the placement of a central line in the R IJ on the morning of April 13, 2017 other than Dr. Edwards and Ms. Shoemaker other than Darrell Goodwin.

146.    The documented consent reportedly obtained at Vanderbilt on April 13, 2017 for the central line placement identified multiple risks as risks associated with the procedure.

17



147. The documented consent reportedly obtained at Vanderbilt on April 13, 2017 for the central line placement did not include informing Ms. Shoemaker that the provider who would perform the central line placement was a resident.

148. Ms. Shoemaker was not given the option of having someone more experienced than Dr. Edwards to place the central line on April 13, 2017.

149. The documented consent reportedly obtained at Vanderbilt on April 13, 2017 for the central line placement did not identify an arterial injury as a risk involved with the procedure.

150. The documented consent reportedly obtained at Vanderbilt on April 13, 2017 for the central line placement did not identify an arterial puncture as a risk involved with the procedure.

151. The documented consent reportedly obtained at Vanderbilt on April 13, 2017 for the central line placement did not identify a cannulation of an artery as a risk involved with the procedure.

152. The documented consent reportedly obtained at Vanderbilt on April 13, 2017 for the central line placement did not identify stroke as a risk involved with the procedure.

153. The documented consent reportedly obtained at Vanderbilt on April 13, 2017 for the central line placement did not identify brain injury as a risk involved with the procedure.

154. The documented consent reportedly obtained at Vanderbilt on April 13, 2017 for the central line placement did not identify death as a risk involved with the procedure.

155. On April 13, 2017, Dr. Edwards knew that she was so inexperienced in performing the central line placement procedure that she was required to be supervised by a more senior physician.

156. On April 13, 2017, Dr. Edwards knew that she was a resident.

18

Copy

157. On April 13, 2017, Dr. Edwards did not tell Ms. Shoemaker that Dr. Edwards was a resident.

158. On April 13, 2017, Dr. Edwards knew that the cannulation of the R CCA during the attempted placement of a central line in the R IJ was a known risk of that procedure.

159. On April 13, 2017, Dr. Edwards knew that if the R CCA was cannulated during the attempted placement of a central line in the R IJ, that event could cause a stroke.

160. On April 13, 2017, Dr. Edwards knew that if the R CCA was cannulated during the attempted placement of a central line in the R IJ, that event could cause a brain injury.

161. On April 13, 2017, Dr. Edwards knew that if the R CCA was cannulated during the attempted placement of a central line in the R IJ, that event could cause the patient's death.

162. By 0706 on April 13, 2017, a Surgical Critical Care consult was completed and a detailed, corresponding note was prepared.

163. The note prepared regarding the Surgical Critical Care consult performed on the morning of April 13, 2017 is accurate with regard to all things contained in that documentation.

164. At or around 0750 on April 13, 2017, Dr. Edwards attempted a central venous line insertion in Ms. Shoemaker via the R IJ site.

165. On the morning of April 13, 2017, Dr. Edwards was a surgical resident.

166. Dr. Edwards had not completed her surgical residency by April 13, 2017.

167. By April 13, 2017, Dr. Edwards did not have privileges at any hospital to place a central line without the supervision of a more senior physician.

168. By April 13, 2017, Dr. Edwards did not have privileges at any hospital to perform any type of invasive procedure without the supervision of a more experienced physician.

19

Copy

169. The first documentation that Dr. Edwards prepared regarding her attempted placement of a central line in Ms. Shoemaker's R IJ is entitled "Procedure Note".

170. Dr. Edwards could have included any information she chose to include in her Procedure Note regarding her attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017.

171. Dr. Edwards' Procedure Note regarding her attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 includes all of the information that was known to Dr. Edwards about that attempted procedure at the time she prepared that documentation.

172. Dr. Edwards' Procedure Note regarding her attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 is complete.

173. Dr. Edwards' Procedure Note regarding her attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 is completely accurate.

174. Dr. Edwards' Procedure Note regarding her attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 was not amended by the end of the day on April 14, 2017.

175. Dr. Edwards' Procedure Note regarding her attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 has never been amended in any way compared to how that note existed when first prepared.

176. Dr. Edwards was the only person considered to be a Proceduralist who was directly involved with performing the placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017.

177. Dr. Edwards used the thin-wall needle (Seldinger) technique in attempting to place the central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017.

20

2266

178. Dr. Edwards used the catheter-over-the-needle (modified Seldinger) technique in attempting to place the central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017.

179. Dr. Addison May ("Dr. May") was not physically present in the room where Dr. Edwards attempted to place a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 during Dr. Edwards' attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017.

180. Dr. May was not physically present in the room where Dr. Edwards attempted to place a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 during the entire time that Dr. Edwards performed an attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017.

181. Dr. May should have been physically present in the room where Dr. Edwards attempted to place a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 during the entire time that Dr. Edwards performed an attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017.

182. Dr. May was not present when anyone had a conversation with Ms. Shoemaker on the morning of April 13, 2017 to obtain informed consent for the attempted placement of a central line that day.

183. Dr. May did not prepare any documentation on the morning of April 13, 2017 regarding Dr. Edwards' placement of a central line in Ms. Shoemaker on the morning of April 13, 2017 that is in the Vanderbilt medical records.

184. Dr. May did not prepare any documentation on the morning of April 13, 2017 regarding his supervision of Dr. Edwards' placement of a central line in Ms. Shoemaker on the morning of April 13, 2017.

21

185. Dr. May never prepared any type of documentation, informal or formal, regarding Dr. Edwards' placement of a central line in Ms. Shoemaker on the morning of April 13, 2017.

186. Dr. May never prepared any type of documentation, informal or formal, regarding his supervision of Dr. Edwards' placement of a central line in Ms. Shoemaker on the morning of April 13, 2017.

187. While Dr. Edwards was attempting to place a central line in Ms. Shoemaker's R IJ on the early morning of April 13, 2017, Dr. May did not see what the ultrasound guidance showed during the entire time that Dr. Edwards used ultrasound guidance during that procedure.

188. While Dr. Edwards was attempting to place a central line in Ms. Shoemaker's R IJ on the early morning of April 13, 2017, Dr. May should have personally observed at that time what the ultrasound guidance showed during the entire time that Dr. Edwards used ultrasound guidance during that procedure.

189. While Dr. Edwards was attempting to place a central line in Ms. Shoemaker's R IJ on the early morning of April 13, 2017, Dr. May did not see what the ultrasound guidance showed during at least half the time that Dr. Edwards used ultrasound guidance during that procedure.

190. While Dr. Edwards was attempting to place a central line in Ms. Shoemaker's R IJ on the early morning of April 13, 2017, Dr. May should have personally observed at that time what the ultrasound guidance showed during at least half the time that Dr. Edwards used ultrasound guidance during that procedure.

191. While Dr. Edwards was attempting to place a central line in Ms. Shoemaker's R IJ on the early morning of April 13, 2017, Dr. May did not see what the ultrasound guidance showed during any of the time that Dr. Edwards used ultrasound guidance during that procedure.

22

Copy

192. While Dr. Edwards was attempting to place a central line in Ms. Shoemaker's R IJ on the early morning of April 13, 2017, Dr. May should have personally observed at that time what the ultrasound guidance showed during some of the time that Dr. Edwards used ultrasound guidance during that procedure.

193. All of the people who prepared documentation regarding Ms. Shoemaker and regarding anything regarding Ms. Shoemaker during her April 13, 2017 admission to Vanderbilt should have prepared their documentation to be as accurate as possible based on what was known at the time they initially prepared any such documentation.

194. All of the people who prepared documentation regarding Ms. Shoemaker and regarding anything regarding Ms. Shoemaker during her April 13, 2017 admission to Vanderbilt should have prepared their documentation to be as complete as possible based on what was known at the time they initially prepared any such documentation.

195. If any portion of the documentation in the Vanderbilt records regarding Ms. Shoemaker and regarding anything regarding Ms. Shoemaker during her April 13, 2017 admission to Vanderbilt was at any time found or determined to be inaccurate in any way by anyone at Vanderbilt, that documentation could have been amended to improve the accuracy and factual truth of that documentation.

196. If any portion of the documentation in the Vanderbilt records regarding Ms. Shoemaker and regarding anything regarding Ms. Shoemaker during her April 13, 2017 admission to Vanderbilt was at any time found or determined to be inaccurate in any way by anyone at Vanderbilt, that documentation should have been amended to improve the accuracy and factual truth of that documentation.

23

197. Ms. Shoemaker did not have any unusual anatomical issues on April 13, 2017 that were in any way related to Dr. Edwards' attempt to place a central line in her R IJ that morning.

198. No one at Vanderbilt ever documented on or after April 13, 2017 that Ms. Shoemaker had any unusual anatomical issues on April 13, 2017 that were in any way related to Dr. Edwards' attempt to place a central line in her R IJ that morning.

199. Dr. Edwards' Procedure Note regarding her attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 documents that the procedure that was reportedly performed with ultrasound guidance.

200. If ultrasound guidance was used on April 13, 2017 during the attempted placement of a central line in Ms. Shoemaker's R IJ, a low-resolution ultrasound device would have clearly shown the distinctive and different anatomical locations of Ms. Shoemaker's R IJ and R CCA for Dr. Edwards to recognize.

201. If ultrasound guidance was used on April 13, 2017 during the attempted placement of a central line in Ms. Shoemaker's R IJ, a low-resolution ultrasound device would have clearly shown the distinctive and different anatomical locations of Ms. Shoemaker's R IJ and the R CCA for Dr. May to recognize.

202. The ultrasound device that was available for Dr. Edwards to use during her April 13, 2017 attempted placement of a central line in Ms. Shoemaker's R IJ was able to distinctly show on a monitor where Ms. Shoemaker's R IJ was located.

203. The ultrasound device that was available for Dr. Edwards to use during her April 13, 2017 attempted placement of a central line in Ms. Shoemaker's R IJ was able to distinctly show on a monitor where Ms. Shoemaker's R CCA was located.

24

Copy

204. On April 13, 2017, there were no technical problems or other problems with the ultrasound equipment that was available to be used during Dr. Edwards' placement of a central line in Ms. Shoemaker's R IJ that morning.

205. Any blood that Dr. Edwards aspirated during her attempted placement of a central line in Ms. Shoemaker's R IJ was from the R CCA.

206. Dr. Edwards aspirated from Ms. Shoemaker's R CCA during her attempted placement of a central line in Ms. Shoemaker's R IJ was arterial.

207. Dr. Edwards did not aspirate any venous blood from Ms. Shoemaker during her attempted placement of a central line in Ms. Shoemaker's R IJ.

208. Dr. Edwards' Procedure Note regarding the central line placement does not mention aspirating any of the lumens of the central line she attempted to place in Ms. Shoemaker's R IJ on the morning of April 13, 2017.

209. Dr. Edwards aspirated all lumens of the central line she placed in Ms. Shoemaker on the morning of April 13, 2017.

210. If Dr. Edwards aspirated any lumens of the central line she placed in Ms. Shoemaker on the morning of April 13, 2017, that action would have provided Dr. Edwards with information indicating that any such lumen was not in a vein.

211. If Dr. May was physically present with Dr. Edwards when Dr. Edwards aspirated the lumens of the central line she placed in Ms. Shoemaker on the morning of April 13, 2017, that action would have provided Dr. May with information indicating that any such lumen was not in a vein.

212. Dr. May did not observe Dr. Edwards aspirating any of the lumens of the central line that she placed in Ms. Shoemaker on the morning of April 13, 2017.

25

Copy

213. Dr. May did not observe Dr. Edwards aspirating all of the lumens of the central line that she placed in Ms. Shoemaker on the morning of April 13, 2017.

214. Blood from the R CCA would have a different appearance than blood from the R IJ.

215. Dr. Edwards knew on April 13, 2017 that blood from the R CCA would have a different appearance than blood from the R IJ.

216. On April 13, 2017, Dr. Edwards knew what the difference looked like between blood from the arterial system and venous blood.

217. Dr. May knew on April 13, 2017 that blood from the R CCA would have a different appearance than blood from the R IJ.

218. On April 13, 2017, Dr. May knew what the difference looked like between blood from the arterial system and venous blood.

219. Blood flowing in the R CCA flows at a higher pressure than blood flowing in the R IJ.

220. Dr. Edwards knew on April 13, 2017 that blood in the R CCA would flow at a different pressure than blood in the R IJ.

221. On April 13, 2017, Dr. Edwards was not very experienced with discerning the difference between pressure flow associated with arterial blood compared to pressure flow associated with venous blood.

222. Dr. May knew on April 13, 2017 that blood in the R CCA would flow at a different pressure than blood in the R IJ.

26

Copy

223. On April 13, 2017, Dr. May was experienced with discerning the difference between pressure flow associated with arterial blood compared to pressure flow associated with venous blood.

224. The pressure flow for the central line placement on the morning of April 13, 2017 is not recorded in the Vanderbilt records.

225. Dr. Edwards did not attempt to confirm venous placement of the needle used in her attempted placement of the guidewire in Ms. Shoemaker's R IJ on the morning of April 13, 2017 prior to threading the guidewire.

226. Dr. Edwards did not accurately confirm venous placement of the needle used in her attempted placement of the guidewire in Ms. Shoemaker's R IJ on the morning of April 13, 2017 prior to threading the guidewire.

227. On the morning of April 13, 2017, Dr. Edwards could have used ultrasound guidance during her attempted placement of a central line in Ms. Shoemaker's R IJ to identify and see the actual locations of Ms. Shoemaker's R IJ and R CCA.

228. On the morning of April 13, 2017, Dr. Edwards could have used ultrasound guidance during her attempted placement of a central line in Ms. Shoemaker's R IJ to identify and see the actual locations of Ms. Shoemaker's R IJ and R CCA at the same time that Dr. Edwards was attempting to place the central line into the R IJ.

229. Dr. Edwards' use of ultrasound guidance during her attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 included using ultrasound guidance to distinguish the R IJ from the R CCA.

27

2273

Copy

230. When Dr. Edwards was attempting to place a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017, Dr. Edwards was able to see the R IJ and the R CCA on the monitor screen via her use of ultrasound.

231. Dr. Edwards could see the R CCA on the ultrasound monitor screen when she penetrated the R CCA.

232. Dr. Edwards could see the R CCA on the ultrasound monitor screen when she cannulated the R CCA.

233. On the morning of April 13, 2017, imaging was recorded that showed what could be seen via Dr. Edwards' use of the ultrasound guidance during her attempted placement of a central line in Ms. Shoemaker's R IJ.

234. The imaging that was recorded during Dr. Edwards' use of ultrasound guidance on the morning of April 13, 2017 during her attempted placement of a central line in Ms. Shoemaker's R IJ still exists.

235. The imaging that was recorded during Dr. Edwards' use of ultrasound guidance on the morning of April 13, 2017 during her attempted placement of a central line in Ms. Shoemaker's R IJ existed at some point on April 14, 2017.

236. By the end of the day on April 13, 2017, Vanderbilt knew that the central line that Dr. Edwards attempted to place on the morning of April 13, 2017 in Ms. Shoemaker's R IJ in fact had cannulated the R CCA.

237. The fact that Dr. Edwards' attempted placement of a central line on the morning of April 13, 2017 into Ms. Shoemaker's R IJ resulted in the cannulation of the R CCA was known to be a problem for Ms. Shoemaker once it was recognized.

28

Copy

238. The fact that Dr. Edwards' attempted placement of a central line on the morning of April 13, 2017 into Ms. Shoemaker's R IJ resulted in the cannulation of the R CCA was recognized by Vanderbilt by April 14, 2017 to be a mistake made by Dr. Edwards.

239. The fact that Dr. Edwards' attempted placement of a central line on the morning of April 13, 2017 into Ms. Shoemaker's R IJ resulted in the cannulation of the R CCA was recognized by Vanderbilt by April 14, 2017 to be a mistake made by Dr. Edwards.

240. The fact that Dr. Edwards did not recognize on April 13, 2017 that her attempted placement of a central line on the morning of April 13, 2017 into Ms. Shoemaker's R IJ resulted in the cannulation of the R CCA was recognized by Vanderbilt by April 14, 2017 to be a mistake/failure made by Dr. Edwards.

241. Dr. Edwards' Procedure Note regarding her attempted placement of a central line in the R IJ on the morning of April 13, 2017 does not mention any concern about penetrating the R CCA.

242. Dr. Edwards' Procedure Note regarding her attempted placement of a central line in the R IJ on the morning of April 13, 2017 does not mention any concern about cannulating the R CCA.

243. Dr. Edwards was not trying to cannulate the R CCA during her attempted placement of a central line in the R IJ on the morning of April 13, 2017.

244. No one ever taught Dr. Edwards that it was acceptable to cannulate the R CCA during an attempted placement of a central line in the R IJ.

245. Dr. Edwards has never read, either in Vanderbilt's residency program or elsewhere, that it is acceptable to cannulate the R CCA during an attempted placement of a central line in the R IJ.

29

Copy

246.    Dr. Edwards did not want the R CCA cannulated with the central line as a result of her attempted central line placement on the morning of April 13, 2017.

247.    Dr. Edwards did not use continuous monitoring of hemodynamic waveform during the catheter advancement when she placed a central line in Ms. Shoemaker on the morning of April 13, 2017.

248.    If Dr. Edwards had recognized while she was attempting to place a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 that she had cannulated the R CCA, Dr. Edwards would have acted around that time to address that issue.

249.    If Dr. Edwards had recognized while she was attempting to place a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 that she had cannulated the R CCA, Dr. Edwards would have acted around that time to correct that issue.

250.    The earlier that the cannulation of Ms. Shoemaker's R IJ was recognized on April 13, 2017 would have meant an earlier chance to address that mistake.

251.    The earlier that the cannulation of Ms. Shoemaker's R IJ was addressed on April 13, 2017 would have meant an increased likelihood of a good outcome for Ms. Shoemaker.

252.    The longer that Ms. Shoemaker's R IJ was cannulated on April 13, 2017 increased the amount of time that Ms. Shoemaker's brain was receiving a decreased amount of oxygenated blood.

253.    If any imaging that was recorded during Dr. Edwards' use of ultrasound guidance on the morning of April 13, 2017 during her attempted placement of a central line in Ms. Shoemaker's R IJ existed by the end of the day on April 13, 2017 and it was deleted after it was recognized that Dr. Edwards' attempted placement of a central line in the R IJ on the morning of

30

copy

April 13, 2017 cannulated the R CCA, that imaging was destroyed after it was known that Ms. Shoemaker's R CCA was cannulated during that procedure.

254. Any imaging that was recorded during Dr. Edwards' use of ultrasound guidance on the morning of April 13, 2017 during her attempted placement of a central line in Ms. Shoemaker's R IJ would be evidence to use in considering whether Dr. Edwards properly performed that procedure that day under the recognized standard of acceptable professional practice, including whether she should have recognized that she may have cannulated the R CCA.

255. Dr. Edwards could have used ultrasound guidance during her attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 to confirm that the catheter was placed and was where it was supposed to be.

256. Dr. Edwards should have used ultrasound guidance during her attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 to confirm that the catheter was placed and was where it was supposed to be.

257. Dr. Edwards could have used ultrasound guidance during her attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 to confirm that the guide wire ("wire") she used was where it was supposed to be.

258. Dr. Edwards should have used ultrasound guidance during her attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 to confirm that the wire she used was where it was supposed to be.

259. There was nothing that prevented Dr. Edwards from using ultrasound on the morning of April 13, 2017 to confirm whether the wire she placed during the central line placement was venous.

31

Copy

260. There were methods other than ultrasound available to Dr. Edwards on the morning of April 13, 2017 to confirm whether the wire she placed during the central line placement was venous.

261. Dr. Edwards could have used fluoroscopy on the morning of April 13, 2017 to confirm whether the wire she placed during the central line placement was venous.

262. Dr. Edwards did not use fluoroscopy on the morning of April 13, 2017 to confirm whether the wire she placed during the central line placement was venous.

263. There was nothing that prevented Dr. Edwards from using fluoroscopy on the morning of April 13, 2017 to confirm whether the wire she placed during the central line placement was venous.

264. Dr. Edwards could have used transesophageal echocardiography (TEE) on the morning of April 13, 2017 to confirm whether the wire she placed during the central line placement was venous.

265. Dr. Edwards did not use TEE on the morning of April 13, 2017 to confirm whether the wire she placed during the central line placement was venous.

266. There was nothing that prevented Dr. Edwards from using TEE on the morning of April 13, 2017 to confirm whether the wire she placed during the central line placement was venous.

267. There were methods other than ultrasound available to Dr. Edwards on the morning of April 13, 2017 to confirm whether the catheter she placed during the central line placement was venous.

268. Dr. Edwards could have used manometry on the morning of April 13, 2017 to confirm whether the catheter she placed during the central line placement was venous.

32

COPY

269. Dr. Edwards did not use manometry on the morning of April 13, 2017 to confirm whether the catheter she placed during the central line placement was venous.

270. There was nothing that prevented Dr. Edwards from using manometry on the morning of April 13, 2017 to confirm whether the catheter she placed during the central line placement was venous.

271. Dr. Edwards could have used pressure measurement on the morning of April 13, 2017 to confirm whether the catheter she placed during the central line placement was venous.

272. Dr. Edwards did not use pressure measurement on the morning of April 13, 2017 to confirm whether the catheter she placed during the central line placement was venous.

273. There was nothing that prevented Dr. Edwards from using pressure measurement on the morning of April 13, 2017 to confirm whether the catheter she placed during the central line placement was venous.

274. Dr. Edwards' Procedure Note regarding her attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 documents that blood was aspirated.

275. Arterial blood aspirated during Dr. Edwards' attempted central line placement on the morning of April 13, 2017 would look different than venous blood.

276. On the morning of April 13, 2017, Dr. Edwards was experienced enough to know the difference between what blood aspirated from the R IJ looked like compared against what blood aspirated from the R CCA would look like.

277. On the morning of April 13, 2017, Dr. May was experienced enough to know the difference between what blood aspirated from the R IJ looked like compared against what blood aspirated from the R CCA would look like.

33

Copy

278. The blood that was aspirated on the morning of April 13, 2017 during Dr. Edwards' attempted placement of a central line in Ms. Shoemaker's R IJ was not venous blood.

279. The blood that was aspirated on the morning of April 13, 2017 during Dr. Edwards' attempted placement of a central line in Ms. Shoemaker's R IJ did not include any venous blood.

280. On April 13, 2017, Dr. Edwards documented in her Procedure Note that the central line placement procedure was "successful" with no immediate complications.

281. Dr. Edwards' attempted placement of a central line in Ms. Shoemaker's R IJ was not a "success."

282. Dr. Edwards documented in her Procedure Note that there were two lumens used during her attempt to place a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017.

283. Only two lumens were used when Dr. Edwards attempted to place a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017.

284. The portable chest x-ray (PCXR) performed during Dr. Edwards' attempt to place a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 does not demonstrate whether the R CCA was cannulated or not cannulated.

285. The PCXR performed during Dr. Edwards' attempt to place a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017 does not demonstrate whether the catheter is venous or not venous.

286. At 0800 on April 13, 2017, an arterial line was placed at Ms. Shoemaker's left radial site.

287. The Proceduralists listed in the Vanderbilt records for the placement of an arterial line at 0800 on April 13, 2017 procedure are Dr. Amanda Craig and Dr. Gretchen Edwards.

34

2280

Copy

288. The Proceduralists who performed the placement of an arterial line at 0800 on April 13, 2017 procedure are Dr. Amanda Craig and Dr. Edwards.

289. Dr. May is listed in the Vanderbilt records as being personally present throughout the entire procedure involving the placement of an arterial line in Ms. Shoemaker at 0800 on April 13, 2017.

290. Dr. May was physically present the entire time that Dr. Craig and Dr. Edwards placed an arterial line via Ms. Shoemaker's left radial site on the morning of April 13, 2017.

291. Dr. May was not physically present the entire time that Dr. Craig and Dr. Edwards placed an arterial line via Ms. Shoemaker's left radial site on the morning of April 13, 2017.

292. At 0815 on April 13, 2017, Ms. Shoemaker was intubated by Dr. Edwards for "Airway Protection".

293. The O2 saturation rate, HR, and BP prior to the intubation on the morning of April 13, 2017, and then after that intubation, respectively, were O2 95, HE 122, BP 118/80 and O2 100, HR 122, and BP 210/80.

294. At 1000 on April 13, 2017, Ms. Shoemaker went to CT for a procedure.

295. Beginning at 1106[1] on April 13, 2017, a CT-guided right flank drain placement x2 and an attempted (aborted) CT-guided right percutaneous nephrostomy were performed on Ms. Shoemaker in Interventional Radiology.

296. The Procedural Sedation Record for the drain placement procedure documents that the Time Out was performed at 1106 and that the Post Sedation Evaluation was performed at 1247.

297. Once the two drains were in place, approximately one liter of bloody, purulent fluid mixed with air was drained from Ms. Shoemaker on April 13, 2017.

---

[1] The procedure start time of 1106 is documented at VUMC 124.

35

298. At 1305 on April 13, 2017, Ms. Shoemaker was back to her patient room from CT.

299. Ms. Shoemaker's vital signs dropped as follows in the hours after the central line was placed:

| | 0905[2] | 1000 | 1305 | 1405 | 1505 |
|---|---|---|---|---|---|
| HR | | 138 | 109 | 104 | 103 |
| RR | | 28 | 12 | 15 | 11 |
| ABP | 185/87 | 173/89 | 77/45 | 94/52 | 101/59 |
| Mean | 114 | 114 | 56 | 68 | 75 |

300. When Ms. Shoemaker's vital signs dropped significantly from 1000 to 1305 on April 13, 2017, the Vanderbilt personnel involved with Ms. Shoemaker's care and treatment did not have an explanation at that time for that drop.

301. When Ms. Shoemaker's vital signs dropped significantly from 1000 to 1305 on April 13, 2017, the Vanderbilt personnel involved with Ms. Shoemaker's care and treatment did not notify a physician.

302. The Vanderbilt records document that at 1405 on April 13, 2017 the team was at bedside (in the patient's room), "vital signs monitored throughout procedure" and "verconium and sedation given with team present for procedure".

---

[2] VUMC 296

36



303. Dr. Edwards created an Acute Event Note at 1400 on April 13, 2017 regarding her placement of the central line earlier that same day.

304. The Acute Event Note created on April 13, 2017 by Dr. Edwards was created *after* Dr. Edwards learned that the central line she placed on the morning of April 13, 2017 was in the R CCA.

305. Nothing included in Dr. Edwards' Acute Event Note created on April 13, 2017 was documented to in any way help Ms. Shoemaker's status or outcome.

306. Per Dr. Edwards' Acute Event Note, Dr. Edwards used ultrasound guidance when she inserted the R IJ MAC on the morning of April 13, 2017.

307. Per Dr. Edwards' Acute Event Note, she reportedly noted the return of venous-appearing blood during her central line placement earlier on April 13, 2017.

308. During Dr. Edwards' attempt to place a central line in the R IJ on the morning of April 13, 2017, there was not a return of venous blood.

309. Dr. Edwards' documentation in the Acute Event Note she created does not state that there was a return of venous blood during her central line placement earlier on April 13, 2017.

310. When Dr. Edwards prepared her Procedure Note regarding the central line she placed in Ms. Shoemaker on the morning of April 13, 2017, she did not mention the return of venous-appearing blood during that procedure.

311. Dr. Edwards has never created documentation in the Vanderbilt records for Ms. Shoemaker's April 13, 2017 that states that there was a return of actual venous blood during her central line placement earlier on April 13, 2017.

2283



312. When Dr. Edwards prepared her Procedure Note regarding the central line she placed in Ms. Shoemaker on the morning of April 13, 2017, she could have mentioned the return of venous-appearing blood during that procedure in that Procedure Note.

313. When Dr. Edwards prepared her Procedure Note regarding the central line she placed in Ms. Shoemaker on the morning of April 13, 2017, nothing prevented her from mentioning the return of venous-appearing blood during that procedure in that Procedure Note.

314. When Dr. Edwards prepared her Procedure Note regarding the central line she placed in Ms. Shoemaker on the morning of April 13, 2017, she could have mentioned the return of actual venous blood during that procedure in that Procedure Note.

315. When Dr. Edwards prepared her Procedure Note regarding the central line she placed in Ms. Shoemaker on the morning of April 13, 2017, nothing prevented her from mentioning the return of actual venous blood during that procedure in that Procedure Note.

316. Per Dr. Edwards' Acute Event Note, she noted the return of non-pulsatile blood during her central line placement earlier on April 13, 2017.

317. When Dr. Edwards prepared her Procedure Note regarding the central line she placed in Ms. Shoemaker on the morning of April 13, 2017, she did not mention the return of non-pulsatile blood during that procedure.

318. When Dr. Edwards prepared her Procedure Note regarding the central line she placed in Ms. Shoemaker on the morning of April 13, 2017, she could have mentioned the return of non-pulsatile blood during that procedure.

319. When Dr. Edwards prepared her Procedure Note regarding the central line she placed in Ms. Shoemaker on the morning of April 13, 2017, nothing prevented her from mentioning the return of non-pulsatile blood during that procedure in that Procedure Note.

38



320.    Dr. Edwards documented in the Vanderbilt records that Ms. Shoemaker developed a significant vasopressor requirement after she returned from IR, that a PA catheter was then placed, and upon that placement high pressures with an arterial wave form were noted.

321.    According to Dr. Edwards' documentation in the Vanderbilt records, the first time that Ms. Shoemaker had a significant vasopressor requirement on April 13, 2017 was after the drain placement procedure was completed.

322.    According to Dr. Edwards' documentation in the Vanderbilt records, it was only after Ms. Shoemaker returned to her room after the drain placement procedure that it was first recognized by any Vanderbilt personnel that the central line Dr. Edwards placed that morning was arterial.

323.    According to Dr. Edwards' documentation in the Vanderbilt records, Vascular Surgery was "immediately" contacted after it was recognized that the central line Dr. Edwards placed that morning was arterial.

324.    According to Dr. Edwards' documentation in the Vanderbilt records, Vascular Surgery recommend removal of the central line that was in the R CCA, including because the patient was not on anti-coagulants.

325.    According to Dr. Edwards' documentation in the Vanderbilt records, Dr. Edwards removed the central line that she had placed in the R CCA with Ms. Shoemaker in a head-down position and pressure was held for 30 minutes.

326.    Dr. Richard Betzold ("Dr. Betzold") was a physician at Vanderbilt on April 13, 2017.

327.    Dr. Betzold was involved in at least part of Ms. Shoemaker's care and treatment at Vanderbilt on April 13, 2017.

39

2285

328. Dr. Betzold documented in Ms. Shoemaker's Vanderbilt records.

329. Dr. Betzold's documentation in Ms. Shoemaker's records at Vanderbilt is factually complete.

330. Dr. Betzold's documentation in Ms. Shoemaker's records at Vanderbilt is completely accurate.

331. Dr. Betzold's documentation in the Vanderbilt records states that a Left-sided IJ (L IJ) central line was placed in Ms. Shoemaker at 1430.

332. According to Dr. Betzold's documentation and the times documented in the drain placement procedure records, the L IJ central line was placed two hours after the drain placement procedure was completed.

333. There is documentation in the Vanderbilt chart regarding the condition at line sites in Ms. Shoemaker.

334. The documentation in the Vanderbilt chart regarding the condition at line sites in Ms. Shoemaker includes documentation regarding at least one R IJ site.

335. The documentation in the Vanderbilt chart regarding the condition at line sites in Ms. Shoemaker is completely accurate.

336. The documentation in the Vanderbilt chart regarding the condition at line sites in Ms. Shoemaker includes documentation that there were two R IJ sites started on the morning of April 13, 2017 for MAC[3] lines.

337. The documentation in the Vanderbilt chart regarding the condition at line sites in Ms. Shoemaker includes documentation that one R IJ site was used for insertion by Dr. Edwards at 0700 on April 13, 2017.

---

[3] MAC is Multi-Lumen Access Catheter

40



338. The documentation in the Vanderbilt chart regarding the condition at line sites in Ms. Shoemaker includes documentation that one R IJ site was used for an insertion at 0730 on April 13, 2017, and that documentation does not indicate who inserted anything at that site at that time.

339. The documentation in the Vanderbilt chart regarding the condition at line sites in Ms. Shoemaker includes documentation that the MAC line placed by Dr. Edwards at the R IJ at 0700 on April 13, 2017 was removed by Dr. Edwards at 1530 that same day.

340. If the documentation in the Vanderbilt chart stating that the MAC line placed by Dr. Edwards in the R IJ on the morning of April 13, 2017 was removed at 1530 that same day is correct, then documentation by at least one Vanderbilt physician regarding the supposed time that line was removed is inaccurate.

341. At 1430 on April 13, 2017, Dr. Betzold documented that a Central Venous Line Insertion occurred in Ms. Shoemaker's left internal jugular ("L IJ").

342. Dr. Betzold's documentation regarding the placement of a L IJ central line in Ms. Shoemaker on the afternoon of April 13, 2017 does not list anyone as the Proceduralist for this insertion.

343. Dr. Betzold's documentation regarding the placement of a L IJ central line in Ms. Shoemaker on the afternoon of April 13, 2017 states that Dr. May was available to provide instruction to the trainee/proceduralist who performed that procedure, but that Dr. May was not personally present.

344. Dr. Betzold's documentation regarding the placement of a L IJ central line in Ms. Shoemaker on the afternoon of April 13, 2017 states that consent could not be obtained for this line placement because the procedure was deemed emergent.

41



345. According to the Vanderbilt records, at 1500 on April 13, 2017, the chaplain attempted to visit Ms. Shoemaker but a sterile procedure was being performed at that time.

346. The chaplain's documentation in the Vanderbilt records regarding trying to visit Ms. Shoemaker in her room at 1500 on April 13, 2017 does not identify what type of procedure was being performed at that time.

347. Based on the documentation in the Vanderbilt records created by Dr. Edwards, her removal of the central line that cannulated the R CCA was completed prior to 1500 on April 13, 2017.

348. By 1500 on April 13, 2017, Dr. Edwards had completed her removal of the central line that had cannulated the R CCA.

349. Based on the documentation in the Vanderbilt records created by Dr. Betzold, his placement of a L IJ central line on the afternoon of April 13, 2017 was completed prior to 1500 on April 13, 2017.

350. By 1500 on April 13, 2017, the placement of a L IJ central line had been completed.

351. On April 13, 2017, Dr. Betzold prepared an Acute Event Note regarding the placement of a L IJ central line that day.

352. Dr. Betzold's April 13, 2017 Acute Event note is not timed.

353. In April 2017, Vanderbilt required that all documentation in medical records be timed.

354. In April 2017, Vanderbilt required that physician documentation in medical records be timed.

355. In April 2017, Dr. Betzold was required to time the Acute Event Note he prepared on April 13, 2017.

42



356.   Nothing prevented Dr. Betzold from timing the Acute Event Note he prepared regarding the April 13, 2017 placement of L IJ central line.

357.   According to Dr. Betzold's Acute Event Note prepared on April 13, 2017, it was at 1500 that it was recognized that a catheter was in Ms. Shoemaker's carotid artery.

358.   According to Dr. Betzold's Acute Event Note prepared on April 13, 2017, it was at or after 1500 when he placed a L IJ line in Ms. Shoemaker.

359.   The Procedure Note prepared by Dr. Betzold regarding his placement of a L IJ line in Ms. Shoemaker on April 13, 2017 and the Acute Event Note prepared by Dr. Betzold on April 13, 2017 indicate different times that he placed a L IJ line in Ms. Shoemaker on the afternoon of April 13, 2017.

360.   According to Dr. Betzold's Acute Event Note, Dr. Betzold called Dr. May at 1530 on April 13, 2017 after placing the L IJ line in Ms. Shoemaker, and they thereafter called Vascular Surgery.

361.   According to Dr. Betzold's Acute Event Note, the R IJ line was not removed from Ms. Shoemaker's R CCA until after Dr. Betzold called Dr. May at 1530 on April 13, 2017, including because it was after the call to Dr. May that Vascular Surgery was called and then recommended removing the R IJ line and holding pressure, which was done.

362.   Dr. Betzold documented that Ms. Shoemaker was following commands and moving all four extremities at 1730 on April 13, 2017 after sedation weaning, and that her neurological exam changed around 1900 on April 13, 2017 — which led to Neurology and Vascular Surgery being contacted.

363.   Dr. Betzold's documentation regarding whether Ms. Shoemaker was able to move all four extremities at 1730 on April 13, 2017 is completely accurate.

43



364.     According to the Vanderbilt records, at 1600 on April 13, 2017, Dr. Edwards and Regina Betz attempted the placement of a pulmonary artery catheter (PAC) in the left internal jugular under reported ultrasound guidance and an MAC cordis introducer was used.

365.     The documentation in the Vanderbilt records regarding the placement of a L IJ catheter in Ms. Shoemaker involving Dr. Edwards on the afternoon of April 13, 2017 is completely accurate.

366.     The placement of a L IJ catheter in Ms. Shoemaker by Dr. Edwards, solely or with assistance, occurred at 1600 on April 13, 2017.

367.     When a L IJ catheter was placed in Ms. Shoemaker on the afternoon of April 13, 2017 by Dr. Edwards, solely or with others' assistance, this was done after it was recognized that the central line placed earlier that day by Dr. Edwards was in the R CCA.

368.     C-arm/fluoroscopy was not used when Dr. Edwards was involved in placing a L IJ catheter in Ms. Shoemaker on the afternoon of April 13, 2017.

369.     There was continuous monitoring of hemodynamic waveform during the catheter advancement via the L IJ in Ms. Shoemaker on the afternoon of April 13, 2017.

370.     According to the Vanderbilt records, by the time Dr. Edwards' reportedly placed a L IJ catheter in Ms. Shoemaker, Dr. Betzold had already placed a new central line that afternoon via the L IJ.

371.     Dr. Edwards and Dr. Betzold did not perform separate procedures on the afternoon of April 13, 2017 via Ms. Shoemaker's L IJ.

372.     It was during Dr. Edwards' involvement in placing a L IJ catheter in Ms. Shoemaker on the afternoon of April 13, 2017 that any Vanderbilt personnel first recognized that a line placed that same morning was in the R CCA.

44

Copy

373. According to the Vanderbilt records, at least one person on Ms. Shoemaker's treatment team noticed by or at 1805 on April 13, 2017 that Ms. Shoemaker was not following commands or moving her extremities equally.

374. The Vanderbilt records document that, by or at 1805 on April 13, 2017, Ms. Shoemaker had were left-sided deficits, which included no movement on the left, and that other Vanderbilt personnel were notified of these facts.

375. If the portion of the Vanderbilt records that documents Ms. Shoemaker had left-sided neurological changes by or at 1805 on April 13, 2017 is accurate, then Dr. Betzold's documentation in the Vanderbilt records that represents that it was not until approximately 1900 on April 13, 2017 when Ms. Shoemaker's neurological exam changed is inaccurate.

376. At 1830 on April 13, 2017, a Code Stroke was called and Ms. Shoemaker was being prepared for CT.

377. According to the Vanderbilt records, at 1830 on April 13, 2017, a Code Stroke was called and Ms. Shoemaker was being prepared for CT.

378. A Code Stroke was called at 1830 on April 13, 2017 in response to a change for the worse in Ms. Shoemaker's neurological exam.

379. If the portion of the Vanderbilt records that a Code Stroke was called at 1830 on April 13, 2017 is accurate, then Dr. Betzold's documentation in the Vanderbilt records that represents that it was not until approximately 1900 on April 13, 2017 when Ms. Shoemaker's neurological exam changed is inaccurate.

380. According to the Vanderbilt records, at approximately 1901 on April 13, 2017, Dr. Johnathan Ratcliff ("Dr. Ratcliff"), a Vascular Surgery fellow, was notified by an SICU fellow on

45

Copy

call that Ms. Shoemaker had developed acute neurological decline after removal of an inadvertently placed central line into the R CCA.

381. According to documentation in the Vanderbilt records prepared by Dr. Ratcliff, Ms. Shoemaker had been seen by another member of the Vascular Surgery team in the afternoon of April 13, 2017 who recommended removal of the central line that was in the R CCA and that manual pressure applied to the neck, and that this occurred "hours" before Dr. Ratcliff was called about Ms. Shoemaker's condition.

382. According to documentation in the Vanderbilt records prepared by Dr. Ratcliff, there was a non-lateralizing neurological exam at 1730 on April 13, 2017.

383. According to documentation in the Vanderbilt records prepared by Dr. Ratcliff, a formal consult request to the vascular surgery team was placed at 1903 on April 13, 2017 after recognition of the neurological decline.

384. In response to Ms. Shoemaker's neurological changes, Dr. Ratcliff recommended that a CT Head/CT angiogram of the head/neck be performed.

385. In response to Ms. Shoemaker's neurological changes, the Neurology Stroke Team recommended that a CT Head/CT angiogram of the head/neck be performed.

386. It was Dr. Ratcliff, along with his attending, Dr. Curci, who reviewed the imaging studies and who discussed the plan of care with the primary team and with other consultant teams.

387. According to documentation in the Vanderbilt records prepared by Dr. Ratcliff, the radiographic studies performed in response to Ms. Shoemaker's neurological changes were notable for focal R CCA dissection, an AV fistula between R IJ and R CCA, and occlusion of the R ICA with MCA/ACA distribution stroke.

46



388. The AV fistula between Ms. Shoemaker's R IJ and R CCA was caused by Dr. Edwards' attempted mistakenly penetrating the R CCA during her attempt to place a central line in the R IJ on the morning of April 13, 2017.

389. Ms. Shoemaker's neurological change on April 13, 2017 was caused by the injury to Ms. Shoemaker's R IJ caused by Dr. Edwards' attempt to place a R IJ central line earlier that day, which led to a massive brain injury.

390. The only cause for Ms. Shoemaker's neurological change on April 13, 2017 was the injury to Ms. Shoemaker's R.IJ caused by Dr. Edwards' attempt to place a R IJ central line earlier that day, which led to a massive brain injury.

391. Given the severity of Ms. Shoemaker's neurologic injury, Neurosurgery was consulted and Dr. Ratcliff spoke with the Neurosurgery resident on call, Dr. Voce, on the phone at 2119 on April 13, 2017 and Dr. Voce reported that the Neurosurgery team planned on a R ICA thrombectomy. The Cerebrovascular Neurosurgery service assumed the care for the R carotid injury at that point.

392. According to the Vanderbilt records, at approximately 2000 on April 13, 2017, a Neurology consult was performed due to the left hemiplegia that existed after the puncture of Ms. Shoemaker's right carotid artery. The consult note refers to an "acute event note" that reportedly includes a "description of the events surrounding placement for venous catheter".

393. Within the Neurology consult note prepared as a result of the Neurology consult that was performed at approximately 2000 on April 13, 2017 is mention that Ms. Shoemaker's son initially noticed some asymmetry of movement at an "unclear" time, and that this asymmetry of movement was recognized by the staff at approximately 1730-1800.

47

2293



394. The Neurology consult note prepared, related to the Neurology consult performed at approximately 2000 on April 13, 2017 is completely accurate.

395. If the Neurology consult note is accurate that the staff recognized asymmetry of movement at approximately 1730-1800 on April 13, 2017, then Dr. Betzold's documentation in the Vanderbili records that represents that it was not until approximately 1900 on April 13, 2017 when Ms. Shoemaker's neurological exam changed is inaccurate.

396. According to the Neurology consult note prepared on April 13, 2017, when Ms. Shoemaker returned from the placement of an abdominal drain for a perinephric access on April 13, 2017 she was noted to have pressor requirements and a Swan-Ganz catheter was placed.

397. According to the Neurology consult note prepared on April 13, 2017, when a Swan-Ganz catheter was placed in Ms. Shoemaker after she returned to her from the drain placement, there was an arterial waveform, which led to discussions with Vascular Surgery; the removal of a right-sided line was removed, and the placement a left-sided central venous catheter.

398. According to the Neurology consult note prepared on April 13, 2017, it was around the time that a left-sided venous catheter was placed in Ms. Shoemaker in her room on the afternoon of April 13, 2017 that someone recognized that Ms. Shoemaker was moving asymmetrically.

399. According to the Neurology consult note prepared on April 13, 2017, her NIH Stroke Scale Score was 24.

400. According to the Neurology consult note prepared on April 13, 2017, due to Ms. Shoemaker's poor neurological exam on April 13, 2017 indicating brainstem dysfunction and the likelihood of progressive cerebral edema, it was opined on April 13, 2017 by at least one Vanderbilt physician that the patient's condition would progress to brain death.

48

Copy

401. According to the Vanderbilt records, at approximately 2100 on April 13, 2017, a Vascular Surgery consult was performed by Dr. Allison Umfress due to Ms. Shoemaker's "acute onset" left-sided neurologic deficits after the cannulation of the R common carotid artery.

402. According to the Vanderbilt records, Ms. Shoemaker's carotid artery was "cannulized" during the attempted IJ central venous catheter insertion earlier that day at Vanderbilt.

403. According to the Vanderbilt records, the Physical Exam performed after the cannulation of the R CCA was recognized demonstrated that the patient followed commands in her RUE and RLE, but not in her LUE or LLE, and her pupils were pinpoint but reactive.

404. According to the Vanderbilt records, no site checks of the central line that Dr. Edwards attempted to place in the R IJ were performed on April 13, 2017 prior to Ms. Shoemaker returning from the drain placement procedure that afternoon.

405. According to the Vanderbilt records, by 2127 on April 13, 2017, Dr. May documented that the R IJ catheter that was placed on the morning of April 13, 2017 was placed under US guidance, that it was after Ms. Shoemaker returned from Radiology for percutaneous drainage of her abscess it was discovered that the IJ catheter was in the R carotid, and that the patient had a normal neurologic exam at that time.

406. If Dr. May's documentation that Ms. Shoemaker had a normal neurological exam at the time it was discovered that the IJ catheter was in the R CCA is accurate, then the Vanderbilt documentation stating that Ms. Shoemaker did not follow commands in her LUE or LLE when it was recognized that the R CCA was cannulated is inaccurate.

407. If the Vanderbilt documentation stating that Ms. Shoemaker did not follow commands in her LUE or LLE after it was recognized that the R CCA was cannulated is accurate,

49

2295



then Dr. May's documentation that Ms. Shoemaker had a normal neurological exam at the time the R CCA cannulation was discovered is inaccurate.

408.    According to documentation prepared by Dr. May at 2130 on April 13, 2017, the catheter that had cannulated Ms. Shoemaker's R CCA was reportedly removed at 1730 on April 13, 2017.

409.    According to documentation prepared by Dr. May at 2130 on April 13, 2017, Ms. Shoemaker's neurological exam was normal at 1730 on April 13, 2017.

410.    According to documentation prepared by Dr. May at 2130 on April 13, 2017, Dr. May was told at 1852 on April 13, 2017 that Ms. Shoemaker's neurological examination changed at approximately 1830.

411.    According to the Vanderbilt documentation, with the window of occlusion reportedly being between 1730 and 1830 on April 13, 2017, it was believed that an attempted thrombectomy was of potential benefit and that team was mobilized at approximately 2100 on April 13, 2017.

412.    According to documentation prepared by Dr. May, the cannulation of Ms. Shoemaker's R CCA and the corresponding neurological changes was a severe complication.

413.    According to documentation prepared by Dr. May, Dr. May noticed "the in-house CC faculty" of the fact that Ms. Shoemaker's R CCA was cannulized as the result of an attempt to place a R IJ central line.

414.    By April 14, 2017, Dr. May notified "the in-house CC faculty" that a resident, Dr. Edwards, had cannulated Ms. Shoemaker's R CCA in Dr. Edwards' attempt to place a R IJ central line.

50



415.    By 0030 on April 14, 2017, a cerebral angiogram and clot retrieval were performed at Vanderbilt on Ms. Shoemaker.

416.    The Vanderbilt records include a History section in the documentation related to the cerebral angiogram and clot retrieval performed on Ms. Shoemaker.

417.    The documented History in Vanderbilt's documentation related to the cerebral angiogram and clot retrieval states, in part, "with inadvertent placement of the catheter transjugular into the right common carotid artery with subsequent R CCA-IJ fistula formation".

418.    At 0105 on April 14, 2017, Nurse Practitioner Melissa Wiley ("NP Wiley") performed a Neurology consult.

419.    NP Wiley prepared documentation regarding the Neurology consult she performed on April 14, 2017.

420.    NP Wiley's documentation in the Vanderbilt records is completely accurate.

421.    NP Wiley documented that the fact that the R IJ catheter was in the R carotid artery was discovered while the percutaneous drain and nephrostomy tube placement were performed in Interventional Radiology on April 13, 2017.

422.    NP Wiley's documentation that it was during the April 13, 2017 drain placement procedure that it was discovered that the R IJ catheter was in the R CCA differs with other documentation in the same set of Vanderbilt records regarding when it was first discovered that the R IJ catheter was in the R CCA.

423.    If NP Wiley's documentation is accurate that the fact the R IJ catheter was in the R CCA was discovered during the drain placement procedure, that makes the timing of that discovery hours earlier than this discovery is documented as having occurred in at least one other part of the Vanderbilt records.

51

2297



424. By 0115 on April 14, 2017, Dr. David Voce ("Dr. Voce") performed a Neurosurgery consult.

425. Dr. Voce prepared documentation in the Vanderbilt records regarding the Neurology consult he performed and his corresponding opinions.

426. Dr. Voce's documentation in the Vanderbilt records is completely accurate.

427. Dr. Voce documented in the Vanderbilt records that Ms. Shoemaker had a R MCA ACA territory infarct after iatrogenic R carotid thrombosis.

428. In Dr. Voce's documentation, "iatrogenic" means the condition or event was caused by the act of a health care provider.

429. In Dr. Voce's documentation, "iatrogenic" means the condition or event was caused by medical treatment that was provided.

430. Dr. Voce documented in the Vanderbilt records that Ms. Shoemaker had suffered an infarct throughout much of the right side of her brain.

431. Dr. Voce documented in the Vanderbilt records that Ms. Shoemaker had suffered the loss of gray-white differentiation within the left distal ACA territory of her brain, and also in the right side.

432. Dr. Voce documented in the Vanderbilt records that Ms. Shoemaker had suffered a new left midline shift in her brain.

433. Midline shift occurs when something pushes the natural center of the brain to one side or another.

434. In Ms. Shoemaker's case, the midline shift in her brain was caused by increased intracranial pressure.

52



435. The increased pressure in Ms. Shoemaker's brain that caused the midline shift would not have occurred if Ms. Shoemaker's R CCA had not been cannulated.

436. The increased pressure in Ms. Shoemaker's brain that caused the midline shift would not have occurred if Ms. Shoemaker's R CCA had not been perforated.

437. Dr. Voce documented in the Vanderbilt records that Ms. Shoemaker had suffered an uncal herniation in her brain.

438. Uncal herniation means that the brain has been severely squeezed by unusual amounts of pressure and squeezes down toward the brain stem.

439. The uncal herniation in Ms. Shoemaker's brain that caused the midline shift would not have occurred if Ms. Shoemaker's R CCA had not been cannulated.

440. The uncal herniation in Ms. Shoemaker's brain that caused the midline shift would not have occurred if Ms. Shoemaker's R CCA had not been perforated.

441. Beginning at 0919 on April 14, 2017, the appearance of the R IJ site was documented.

442. At 1515 on April 14, 2017, Vanderbilt completed a Provider of Identification of Surrogate form regarding Ms. Shoemaker.

443. Vanderbilt did not attempt to complete a Provider of Identification Surrogate form regarding Ms. Shoemaker between the time she was admitted on April 13, 2017 and before the cannulation of her R CCA was identified.

444. At 2205 on April 14, 2017, the decision to withdraw care from Ms. Shoemaker was made based on the extent of her new brain injury and her very poor prognosis.

445. There was no discussion at Vanderbilt about withdrawing care from Ms. Shoemaker prior to it being discovered that she had suffered a brain injury.

.53.

2299



446. Ms. Shoemaker did not have a brain injury when she was admitted to Vanderbilt on April 13, 2017.

447. Ms. Shoemaker did not have a brain injury at the time that Dr. Edwards started to perform her attempted placement of a central line in Ms. Shoemaker's R IJ on the morning of April 13, 2017.

448. Terminal extubation was performed at 2210 on April 14, 2017 after Ms. Shoemaker's mother and father arrived.

449. Ms. Shoemaker's Death Certificate ("Death Certificate") is in the Vanderbilt records.

450. The Death Certificate is completely accurate.

451. The Death Certificate was signed by Dr. Eli Zimmerman.

452. When Dr. Zimmerman signed the Death Certificate, he was a Vanderbilt physician.

453. When Dr. Zimmerman signed the Death Certificate, he was a Vanderbilt employee.

454. When Dr. Zimmerman signed the Death Certificate, he was an agent of Vanderbilt.

455. The Death Certificate documents that the Immediate Cause of Death for Ms. Shoemaker was "ischemic stroke."

456. Ms. Shoemaker suffered the ischemic stroke that caused her death as a result of her R CCA being penetrated as a result of Dr. Edwards attempting to place a central line in the R IJ on the morning of April 13, 2017.

457. The Death Certificate does not list anything other than "ischemic stroke" as a cause of death or as contributing to cause the death.

458. The Vanderbilt records include a Report of Death.

459. The Report of Death in the Vanderbilt records is completely accurate.

54