

460. The Report of Death in the Vanderbilt records states that Ms. Shoemaker's Admitting Diagnosis was perinephric abscess.

461. The Report of Death in the Vanderbilt records states that Ms. Shoemaker's death was caused by a diagnostic or therapeutic procedure.

462. The procedure that caused Ms. Shoemaker's death was Dr. Edwards' attempt to place a central line in the R IJ on the morning of April 13, 2017.

463. Ms. Shoemaker had at least an average life expectancy on April 13, 2017 had her R CCA not been cannulated.

464. Ms. Shoemaker did not have diabetes on April 13, 2017.

465. Ms. Shoemaker did not have heart disease on April 13, 2017.

466. Ms. Shoemaker did not have lung disease on April 13, 2017.

467. Ms. Shoemaker did not have cardiovascular disease on April 13, 2017.

468. Ms. Shoemaker did not have liver disease on April 13, 2017.

469. Ms. Shoemaker did not have any brain abnormalities on April 13, 2017 prior to her R CCA being cannulated.

470. Ms. Shoemaker did not have neurological disease on April 13, 2017 prior to her R CCA being cannulated.

## HEALTH CARE LIABILITY CLAIMS

471. The Plaintiff incorporates the factual averments and allegations set forth above as if fully described herein.

472. The relationship of health care provider – patient existed between Ms. Shoemaker and Dr. Edwards on April 13, 2017.

2301



473. Dr. Edwards owed Ms. Shoemaker a duty to provide appropriate care and treatment on April 13, 2017 at Vanderbilt.

474. Dr. Edwards failed to comply with the applicable recognized standard of acceptable professional practice ("standard of care") when she provided care and treatment to Ms. Shoemaker during the April 13, 2017 admission to Vanderbilt:

475. The ways in which Dr. Edwards failed to comply with the applicable standard of care includes, but is not limited to:

    a. Dr. Edwards negligently failed to properly perform the attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017.

    b. Dr. Edwards negligently failed to properly identify the relevant anatomy during the attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017.

    c. Dr. Edwards negligently failed to properly confirm the placement of the wire during the attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017.

    d. Dr. Edwards negligently failed to properly confirm the placement of the catheter during the attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017.

    e. Dr. Edwards negligently failed to timely recognize that she perforated the R CCA on April 13, 2017.

476. The relationship of health care provider-patient existed between Ms. Shoemaker and every provider involved with Ms. Shoemaker's care and treatment during her April 13, 2017 admission to Vanderbilt.

477. The health care providers at Vanderbilt who provided care and treatment to Ms. Shoemaker during her April 13, 2017 admission owed Ms. Shoemaker a duty to provide appropriate care and treatment on April 13, 2017 at Vanderbilt.



478. The health care providers who provided care and treatment to Ms. Shoemaker during her April 13, 2017 admission failed to comply with the applicable standard of care when they provided care and treatment to Ms. Shoemaker during the April 13, 2017 admission to Vanderbilt.

479. The ways in which the health care providers at Vanderbilt failed to comply with the applicable standard of care includes, but is not limited to:

    a. Negligently failing to properly perform the attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017.

    b. Negligently failing to properly identify the relevant anatomy during the attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017.

    c. Negligently failing to properly confirm the placement of the wire during the attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017.

    d. Negligently failing to properly confirm the placement of the catheter during the attempted placement of a central line in Ms. Shoemaker's R IJ on April 13, 2017.

    e. Negligently failing to timely recognize that Ms. Shoemaker's R CCA was penetrated on April 13, 2017.

    f. Negligently allowing Dr. Edwards to perform the attempted placement of the R IJ line on April 13, 2017 without proper education, training, experience, or supervision.

480. All of the above acts of negligence, including because of the severe risk to Ms. Shoemaker of suffering a penetration of her R CCA and that iatrogenic event not being timely recognized and treated to avoid that mistake from being fatal, also constitute reckless conduct.



## CAUSATION AND DAMAGES

481. The Plaintiff incorporates the factual averments and allegations set forth above as if fully described herein.

482. As a direct and proximate result of the negligence of at least one of the Defendants, Ms. Shoemaker suffered a brain injury at Vanderbilt on April 13, 2017.

483. As a direct and proximate result of the negligence of at least one of the Defendants, Ms. Shoemaker suffered a fatal brain injury at Vanderbilt on April 13, 2017.

484. As a direct and proximate result of the negligent acts and omissions of the Defendants, Ms. Shoemaker suffered a brain injury at Vanderbilt on April 13, 2017.

485. As a direct and proximate result of the negligent acts and omissions of the Defendants, Ms. Shoemaker suffered a fatal brain injury at Vanderbilt on April 13, 2017.

486. As a direct and proximate result of the negligence of at least one of the Defendants, Ms. Shoemaker died on April 14, 2017.

487. As a direct and proximate result of the negligent acts and omissions of the Defendants, Ms. Shoemaker died on April 14, 2017.

488. The injury to Ms. Shoemaker's R CCA that occurred on the morning of April 13, 2017 at Vanderbilt was not timely recognized.

489. As a direct and proximate result of the negligent acts and omissions of at least one of the Defendants, the injury to Ms. Shoemaker's R CCA that occurred on the morning of April 13, 2017 was not timely recognized.

490. As a direct and proximate result of the negligent acts and omissions of the Defendants, the injury to Ms. Shoemaker's R CCA that occurred on the morning of April 13, 2017 was not timely recognized.

58.

2304

Copy

491. As a direct and proximate result of the negligent acts and omissions of at least one of the Defendants, the cannulation of Ms. Shoemaker's R CCA that occurred on the morning of April 13, 2017 was not timely recognized.

492. As a direct and proximate result of the negligent acts and omissions of the Defendants, the cannulation of Ms. Shoemaker's R CCA that occurred on the morning of April 13, 2017 was not timely recognized.

493. The injury to Ms. Shoemaker's R CCA on April 13, 2017 at Vanderbilt caused her to suffer a fatal brain injury.

494. The cannulation of Ms. Shoemaker's R CCA on April 13, 2017 at Vanderbilt caused her to suffer a fatal brain injury.

495. The length of time that the injury to Ms. Shoemaker's R CCA on April 13, 2017 went undetected and untreated caused her to suffer a fatal brain injury.

496. The length of time that the injury to Ms. Shoemaker's R CCA on April 13, 2017 went undetected and untreated was a cause of her death.

497. The length of time that the cannulation of Ms. Shoemaker's R CCA on April 13, 2017 went undetected and untreated caused her to suffer a fatal brain injury.

498. The length of time that the cannulation of Ms. Shoemaker's R CCA on April 13, 2017 went undetected and untreated was a cause of her death.

499. The injury to Ms. Shoemaker's R CCA on April 13, 2017 was the only act that started the chain of events that caused her death.

500. The length of time that the injury to Ms. Shoemaker's R CCA on April 13, 2017 went unrecognized and untreated caused her to suffer a fatal brain injury.

59.

501. The length of time that the injury to Ms. Shoemaker's R CCA on April 13, 2017 went unrecognized and untreated was a cause of her death.

502. The length of time that the injury to Ms. Shoemaker's R CCA on April 13, 2017 went unrecognized and untreated was a substantial factor in the causing her death.

503. If Ms. Shoemaker's R CCA had not been penetrated on April 13, 2017, Ms. Shoemaker would not have died on April 14, 2017.

504. The penetration of Ms. Shoemaker's R CCA on April 13, 2017 was a substantial factor in starting the chain of events that caused her death.

505. On April 13, 2017, it was reasonably foreseeable that the type of injury that occurred to Ms. Shoemaker's R CCA could cause a disruption of proper blood flow to the brain and cause a fatal brain injury, including if it was not timely recognized and timely treated.

506. On April 13, 2017, it was reasonably foreseeable that the type of injury that occurred to Ms. Shoemaker's R CCA would cause a disruption of proper blood flow to the brain and cause a fatal brain injury, including if it was not timely recognized and timely treated.

507. If Ms. Shoemaker's R CCA had not been injured on April 13, 2017, Ms. Shoemaker would not have died on April 14, 2017.

508. If the injury to Ms. Shoemaker's R CCA caused at Vanderbilt on April 13, 2017 had been timely recognized and timely treated, Ms. Shoemaker would not have died on April 14, 2017.

509. The injury to Ms. Shoemaker's R CCA on April 13, 2017 was a substantial factor in starting the chain of events that caused her death.

510. The failure to timely recognize that the injury to Ms. Shoemaker's R CCA occurred was a substantial factor in starting the chain of events that caused her death.

60

Copy

2306

Copy

511. The failure to timely treat the injury to Ms. Shoemaker's R CCA was a substantial factor in starting the chain of events that caused her death.

512. On April 13, 2017, it was reasonably foreseeable that the type of injury that occurred to Ms. Shoemaker's R CCA could cause a disruption of proper blood flow to the brain and cause a fatal brain injury, including if it was not timely recognized and timely treated.

513. On April 13, 2017, it was reasonably foreseeable that the type of injury that occurred to Ms. Shoemaker's R CCA would cause a disruption of proper blood flow to the brain and cause a fatal brain injury, including if it was not timely recognized and timely treated.

514. This lawsuit seeks all compensatory damages available in a wrongful death action in Tennessee, including economic damages and non-economic damages. These requested damages include, but are not limited to, medical expenses, lost earnings, lost earning capacity, funeral expenses, burial expenses, physical pain and suffering emotional pain and suffering, loss of consortium (including the loss of consortium suffered by Ms. Shoemaker's adult son, Bretton, and by her two minor sons, David and Chris – both of whom Mr. Bretton has full custody of), and the pecuniary value of Ms. Shoemaker's life.

515. This lawsuit seeks punitive damages for the acts described herein involving a conscious disregard for the known risk of harm posed to Ms. Shoemaker, which constitutes reckless conduct.

516. The medical expenses charged by Vanderbilt for the care and treatment provide to Ms. Shoemaker during her April 13, 2017 admission in response to the injury to Ms. Shoemaker's R CCA were reasonable in amount.

61

Copy

517.    The medical care provided by Vanderbilt to Ms. Shoemaker during her April 13, 2017 admission in response to the R CCA injury was necessary as a result of the R CCA injury that occurred.

## COMPLIANCE WITH STATUTORY NOTICE AND GOOD FAITH REQUIREMENTS

518.    The Plaintiff, through counsel, complied with the provisions of Tenn. Code Ann. §29-26-121 requiring individuals asserting a potential health care liability claim to give written notice of such potential claim to each health care provider that will be a named Defendant at least 60 days prior to filing a complaint ("Pre-Suit Notice" or "Notice").

519.    On or by March 27, 2018, Notice was given to the Defendants in accordance with Tenn. Code Ann. §29-26-121.

520.    The Affidavit of Brian Cummings and supporting documentation demonstrating compliance with regard to Notice are attached to this Complaint as **Exhibit 1**.

521.    The Complaint was filed more than 60 days after March 27, 2018.

522.    March 27, 2018 was less than one year from the date of Ms. Shoemaker's April 14, 2017 death.

523.    The Complaint was filed more than 60 days after Defendants received Pre-Suit Notice.

524.    The Defendants had the opportunity to review the facts of this matter between the time of their receipt of Pre-Suit Notice and the filing of this Complaint.

525.    Neither the Defendants nor any agent acting on a Defendant's behalf, ever communicated to counsel for the Plaintiff any inability or problem with obtaining or reviewing the

62

2308

Copy

pertinent medical records, which counsel for the Plaintiff provided directly or provided access to via an appropriate, HIPAA-compliant release for the Defendants to use to obtain records.[4]

526. In accordance with Tenn. Code Ann. §29-26-122, the Plaintiff's counsel has consulted with one or more experts who provided a signed written statement confirming that upon information and belief they are competent under Tenn. Code Ann. §29-26-115 to express opinions in this case and believe, based on the information available from medical records concerning the care and treatment of the Plaintiff's deceased mother, that there is a good faith basis to maintain this action consistent with the requirements of Tenn. Code Ann. §29-26-115 ("good faith requirement").

527. The Certificate of Good Faith demonstrating compliance with the good faith requirement is attached to this Complaint as **Exhibit 2.**

## THE COMPLAINT WAS TIMELY FILED

528. This lawsuit arises from the professional negligence committed by the Defendants on April 13, 2017 that caused Ms. Shoemaker's April 14, 2017 death.

529. The Plaintiff provided proper Pre-Suit Notice of this lawsuit to the Defendants.

530. The Pre-Suit Notice described in this section was provided within the application period.

531. More than 60 days passed between the Defendants being sent Pre-Suit Notice and the filing of this lawsuit.

---

[4] Since the Defendants are Vanderbilt and a Vanderbilt physician, it should also be noted that the Defendants were already authorized to review Ms. Shoemaker's records from Vanderbilt per 45 C.F.R. §164.506 (allowing use for "health care operations") and 45 C.F.R. §164.501 (defining "health care operations" to include "conducting or arranging for medical review, legal services...").

63

copy

532. More than 60 days passed between the Defendants receiving Pre-Suit Notice and the filing of this lawsuit.

533. Per Tennessee law, the Plaintiff was required to send Pre-Suit Notice to the Defendants within one year of Ms. Shoemaker's death.

534. Ms. Shoemaker died at Vanderbilt on April 14, 2017.

535. One year from Ms. Shoemaker's death was April 14, 2018.

536. Pre-Suit Notice was sent out to the Defendants by April 13, 2018.

537. The Defendants received Pre-Suit Notice by April 13, 2018.

538. As a result of sending Pre-Suit Notice to the Defendants by April 13, 2018, the Plaintiff received an additional 120 days from April 14, 2018 to file a corresponding lawsuit pursuant to Tennessee law.

539. August 12, 2018 is 120 days after April 14, 2018.

540. The parties entered into two Tolling Agreements regarding this matter.

541. The parties entered into the Tolling Agreements to attempt to resolve this matter via mediation, but this matter did not resolve at the mediation that occurred.

542. The most recent Tolling Agreement ("Tolling Agreement") entered into between the parties is a five page document that was signed by counsel for Vanderbilt and by counsel for the Plaintiff.[5]

543. The Tolling Agreement states on page 1 that "Respondent" includes "Vanderbilt University Medical Center and its physicians. staff, agents and employees, including, but not limited to, Gretchen Edwards."

---

[5] Counsel for Vanderbilt communicated to counsel for the Plaintiff on February 6. 2019 that he had no concern regarding the Tolling Agreement being referenced in the Complaint.

Copy

544.    The Tolling Agreement states on page 1 that "Claimants" includes Bretton Keefer, including on behalf of the decedent, Chesta Shoemaker.

545.    The Tolling Agreement states on page 1 that the Effective Date for purposes of the Tolling Agreement is July 24, 2018.

546.    July 24, 2018 is prior to August 12, 2018.

547.    The number of days from July 24, 2018 to August 12, 2018 is 19 days.

548.    The Tolling Agreement states on page 2, including in paragraph 2, that the Tolling Agreement terminates on February 1, 2019.

549.    Per the Tolling Agreement, the statute of limitations did not run from July 24, 2018 through February 1, 2019.

550.    The Tolling Agreement stopped the running of the statute of limitations at a point when at least 19 days were left to file a health care liability lawsuit regarding Ms. Shoemaker's death.

551.    The Tolling Agreement states on page 2, including in the first sentence of paragraph 3, that "Claimant and Respondent hereby agree, through their counsel, to toll the statutes of limitations and repose for the filing of any Claims or causes of action/lawsuits by Claimants against the Respondent."

552.    The Tolling Agreement states on page 2, including in the second sentence of paragraph 3, that "all applicable statute of limitations and/or statutes of repose will be tolled as to the Respondent from the Effective Date until 6:00 p.m. CST on February 1, 2019."

553.    With the "Effective Date" in the Tolling Agreement being July 24, 2018, the Tolling Agreement told the statute of limitations from July 24, 2018 through February 1, 2019.

65

Copy

554. The Tolling Agreement states on page 2, including in the third sentence of paragraph 3, that "The period of time that the statutes are tolled shall be added to the time for bringing an action for any of Claimant's Claims pursuant to state and/or federal law."

555. The period of time from the Effective Date of the Tolling Agreement of July 24, 2018 to when the Tolling Agreement terminated, February 1, 2019, is 192 days.

556. When 192 days is added to August 12, 2018 (which would have been the statute of limitations filing deadline absent a Tolling Agreement), the resulting date is February 20, 2019.

557. When 19 days is added to February 1, 2019, the resulting date is February 20, 2019.

558. Per Tennessee law and the Tolling Agreement, this lawsuit is timely filed if it was filed by February 20, 2019.

559. This lawsuit was filed by February 20, 2019.

560. February 13, 2019 is one week prior to the February 20, 2019 deadline for the filing of this lawsuit, pursuant to Tennessee law and pursuant to the Tolling Agreement.

561. This lawsuit was filed by February 13, 2019.

562. This lawsuit was filed with in the applicable statute of limitations period, including when the Tolling Agreement is considered.

563. This suit was filed within the applicable statute of limitations period (as extended by Tenn. Code Ann. §29-26-121 and per the 192 days "added" to the limitations period via the Tolling Agreement).

INAPPLICABILITY OF STATUTORY NON-ECONOMIC DAMAGES CAPS

564. Tenn. Code Ann. §29-39-102 purports to impose a monetary cap on the amount of "non-economic" damages that a jury can award in a personal injury or wrongful death case, with a different monetary cap applying in a wrongful death case involving the parent of a minor child.

66

565. Ms. Shoemaker had three sons at the time of her April 14, 2017 death.

566. Ms. Shoemaker had two minor sons at the time of her April 14, 2017 death.

567. Each of Ms. Shoemaker's three surviving sons has their own loss of consortium claim as part of this wrongful death lawsuit.

568. None of the three sons' loss of consortium claims is exactly the same as any other son, including based on their ages, the remaining years of their youth that they will not have their mother, their personal and unique relationships with their mother, and for other factual reasons.

569. Pursuant to Tenn. Code Ann. §29-39-102(h), there is no cap on the amount of non-economic damages a jury can award a plaintiff in a case where "the defendant intentionally... falsified ... records containing material evidence with the purpose of wrongfully evading liability in the case at issue."

570. The Defendants are not protected by any statutory cap on non-economic damages because the Vanderbilt records contain entries, including incorrect times for key events (i.e. when it was first discovered that Ms. Shoemaker's R CCA was cannulated; when Ms. Shoemaker first demonstrated a neurological change for the worse on April 13, 2017) and because documentation made after knowledge of the fact that Ms. Shoemaker's R CCA was cannulated suddenly and conveniently for the Defendants included details not mentioned in similar documentation made that same day about the same procedure but that was made prior to the creator of the additional documentation learning that the R CCA was cannulated by the resident physician.

571. The Defendants are not protected by any statutory cap on punitive damages because Tennessee's statutory cap on punitive damages is unconstitutional, including as held by the Sixth Circuit Court of Appeals (federal court) in 2018.

67

Copy

572.    Alternatively, Tenn. Code Ann. §29-39-102 is unconstitutional because it violates the right to a trial by jury enshrined in both the United States Constitution and the Tennessee Constitution.

## PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiff prays for the following relief:

1.    That proper process issue and be served upon the Defendants, and the Defendants be required to appear and answer this Complaint within the time required by law;

2.    That the Plaintiff be awarded fair and reasonable damages, including compensatory damages up to $15,000,000 and punitive damages up to $30,000,000;

3.    That the Plaintiff be awarded the costs of trying this action;

4.    That this action be heard by a jury;

5.    That costs of this action be taxed to the Defendants;

6.    That prejudgment interest be awarded to the Plaintiff for economic damages;

7.    That the Plaintiff be awarded all and any such other and further relief as the Court deems proper; and,

8.    That Plaintiff's right to amend this Complaint to conform to the evidence be reserved.

68

Copy

Respectfully submitted,

Brian Cummings, #19354
Cummings Law
4235 Hillsboro Pike #300
Nashville, TN 37215
(615) 800-6822 (phone)
(615) 815-1876 (fax)
brian@cummingsinjurylaw.com

Afsoon Hagh, #28393
Cummings Manookian PLC
45 Music Square West
Nashville, Tennessee 37203
(615) 266-3333 (phone)
(615) 266-0250 (fax)
afsoon@cummingsmanookian.com

*Attorneys for the Plaintiff*

69

# EXHBIT 8 TO BE FILED UNDER SEAL

# EXHBIT 9 TO BE FILED UNDER SEAL

*Erica S. Gilmore, Metropolitan Trustee*
*Property Tax Payment*



| ADDRESS INFORMATION | Account | 000172363 | Bill | 20-21941 |
|---|---|---|---|---|
| 45 MUSIC SQ W | Receipt | 4558679 | Date | May 18, 2021 |
| NASHVILLE | Receipted By | PATRICK EVANS | | |
| | Received By | PATRICK EVANS | | |

### APPRAISAL INFORMATION

| | |
|---|---|
| Personal Property | Personalty |
| Equal Factor | 1.000000000 |
| Total Value | $73,806.00 |
| Assessed Percent | 30% |
| Assessed Value | $22,142.00 |
| Tax Rate | 4.221000000 |
| | |
| Total Base Tax | $934.62 |

### PAYMENT INFORMATION

| | |
|---|---|
| Total Base Tax | $934.62 |
| Interest Accrued | $42.06 |
| Previous Balance | $976.68 |
| | |
| Tax Paid Today | $934.62 |
| Interest Paid Today | $42.06 |
| Total Paid Today | $976.68 |

**2020**

**THANK YOU FOR YOUR PAYMENT!**

| METHOD | PAID BY | AMOUNT |
|---|---|---|
| Ck#65540 | Attorneys Title Company Inc | $976.68 |

| BALANCE DUE | $0.00 |
|---|---|

- - - - - - - - - - - - - - - - - - - - - - - - - CUT OR TEAR ALONG THIS LINE - - - - - - - - - - - - - - - - - - - - - - - - -



EXHIBIT
Cummings, S
3 CW
6-9-22

CUMMINGS MANOOKIAN PLC
45 MUSIC SQ W
NASHVILLE, TN 37203

Metropolitan Trustee
PO BOX 305012
Nashville, TN 37230-5012

**JL Design**

439 East Iris Dr
TN 37204 US (615) 321-1888
dawnne.stephens@gmail.com

Brian Manookian
45 Music Square W
Nashville, TN 37203-3205
**INVOICE #** 1350

# INVOICE

**DATE** 06/10/2016
**DUE DATE** 06/10/2016
**TERMS** Due on receipt

**BILL TO**

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **cost of goods sold:item**<br>Crate and Barrell - Desk | 1 | 359.10 | 359.10T |
| **cost of goods sold:Shipping** | 1 | 39.90 | 39.90 |
| **cost of goods sold:item**<br>CB2 - Side Table | 1 | 224.10 | 224.10T |
| **cost of goods sold:Shipping** | 1 | 24.90 | 24.90 |
| **cost of goods sold:item**<br>Lumens - Marsh Chandelier (Black) | 1 | 1,925.00 | 1,925.00T |
| **cost of goods sold:item**<br>Four Hands - Chair | 1 | 650.00 | 650.00T |
| **cost of goods sold:Shipping** | 1 | 53.90 | 53.90 |
| **cost of goods sold:item**<br>Lumens - Karrington Chandelier | 1 | 2,075.00 | 2,075.00T |
| **cost of goods sold:item**<br>Nashville Office Interiors - Brian's Desk | 1 | 10,970.00 | 10,970.00T |
| **cost of goods sold:Shipping** | 1 | 110.00 | 110.00 |

|  |  |
|---|---|
| SUBTOTAL | 16,431.90 |
| TAX (9.25%) | 1,498.80 |
| TOTAL | 17,930.70 |
| BALANCE DUE | **$17,930.70** |

2319

# EXHBIT 12 TO BE FILED UNDER SEAL

 **Lawyers**.com

... Lawyers.com / Find a US Lawyer / Tennessee / Nashville / Cummings Manookian PLC

**Not active on Lawyers.com**



**Need Legal Help?**

We will match you with lawyers in your area.

Select your legal issue

**Start Live Chat**



# Cummings Manookian PLC

Law Firm in Nashville, TN

| **Peer Reviews** | **Client Reviews** |
|---|---|
| **5.0** (13) |  no reviews |



What are they? ⓘ

Established in 2014

UPDATE YOUR PROFILE

## Featured Medical Malpractice Firms in Nashville, TN



**The Cochran Firm - Nashville**

n/a

📞 View Phone #

👍 80%

✉ Contact



**Kinnard Law**

5.0

📞 615-823-7422

👍
n/a

✉ Contact



**Hancock, Daniel & Johnson, P.C.**

4.6

📞 615-271-9107

👍 100%

✉ Contact

**Contact All Featured Law Firms**

**View More Law Firms ›**

| OVERVIEW | REVIEWS | LOCATION |
|---|---|---|

# Areas of Law

Medical Malpractice

Personal Injury

Catastrophic Injury

Automobile Accidents

Wrongful Death

## Firm Reviews 

WRITE A CLIENT REVIEW

**CLIENT (0)**　　　PEER (13)

This firm's attorneys do not have client reviews.

## Attorneys at This Firm

 **Brian Philip Manookian**
Member

 **Afsoon Hagh**
Senior Attorney

## Firm Details

**Year Established**

2014

**Firm Size**

3

## Location Details

 **Nashville**

45 Music Square West
Nashville, TN 37203
U.S.A.

## Related Lawyers Near You

> Clarksville Personal Injury Lawyers

> Murfreesboro Personal Injury Lawyers

> Nashville Personal Injury Lawyers

> Clarksville Medical Malpractice Lawyers

> Murfreesboro Medical Malpractice Lawyers

> Nashville Medical Malpractice Lawyers

> Clarksville Automobile Accidents Lawyers

> Murfreesboro Automobile Accidents Lawyers

> Nashville Automobile Accidents Lawyers

---

**LEGAL PROFESSIONALS**    Build Your Business    Canadian Lawyers    Lawyer Blogs

About Us | Contact Us | Terms of Use | Privacy Policy | Do Not Sell My Personal Information | Cookie Policy

**CONNECT WITH US**    

Lawyers.com is part of the Martindale Network

Copyright © 2022 MH Sub I, LLC dba Internet Brands. The information provided on this site is not legal advice, does not constitute a lawyer referral service, and no attorney-client or confidential relationship is or should be formed by use of the site. The attorney listings on the site are paid attorney advertisements. Your access of/to and use of this site is subject to additional Supplemental Terms.

1       IN THE UNITED STATES BANKRUPTCY COURT

2         FOR THE MIDDLE DISTRICT OF TENNESSEE

3                  NASHVILLE DIVISION

4

5    IN RE:                          )
                                     )
6    CUMMINGS MANOOKIAN, PLLC,       )
                                     )
7       Debtor,                      )
                                     )
8    JEANNE ANN BURTON, TRUSTEE,     )
                                     )
9       Plaintiff,                   )
                                     )
10   V.                              )NO. 3:19-bk-07235
                                     )Chapter 7
11   HAGH LAW, PLLC; APSOON          )Judge Walker
     HAGH; MANOOKIAN, PLLC; and      )
12   FIRST-CITIZENS BANK & TRUST     )
     COMPANY,                        )
13                                   )
        Defendants.                  )
14                                   )

15   ----------------------------------------------------

16
                     DEPOSITION OF
17
                 RONETTE LEAL MCCARTHY
18
                    JUNE 8, 2022
19
     ----------------------------------------------------
20

21

22

23                  LEA ANNE GRAY
              ANNE WILSON & ASSOCIATES
24                 P.O. Box 150651
              Nashville, Tennessee  37215
25                 (615) 298-1992

1                          <u>A P P E A R A N C E S</u>

2

**FOR THE TRUSTEE, JEANNE ANN BURTON:**
3    PHILLIP G. YOUNG, JR., ESQUIRE
     Thompson Burton PLLC
4    6100 Tower Circle, Suite 200
     Franklin, Tennessee  37067
5

6    **FOR BRIAN MANOOKIAN AND MANOOKIAN, PLLC:**
     JOHN SPRAGENS, ESQUIRE
7    Spragens Law, PLC
     311 22nd Avenue North
8    Nashville, Tennessee  37203

9

     **FOR FIRST CITIZENS BANK & TRUST:**
10   CRAIG V. GABBERT, JR., ESQUIRE
     BASS BERRY & SIMS
11   150 Third Avenue South
     Suite 2800
12   Nashville, Tennessee  37201

13

14

15                      <u>T A B L E   O F   C O N T E N T S</u>

16

     **RONETTE LEAL MCCARTHY**
17   Stipulations. . . . . . . . . . . . . . . .   3
     Examination by Mr. Young. . . . . . . . . .   4
18   Examination by Mr. Spragens . . . . . . . .  32
     Reporter's Certificate. . . . . . . . . . .  76
19

20

21                      <u>E X H I B I T S</u>

22   NUMBER                DESCRIPTION             PAGE

23     1    Engagement Letter                      10

24     2    5/23/18 Letter                         13

25     3    Privilege Log                          17

2

```
 1
 2
 3                    S T I P U L A T I O N S
 4
 5
 6        The deposition of Ronette Leal McCarthy was
 7   taken via Zoom on the 8th day of June, 2022,
 8   beginning at or about 10:00 a.m., at the instance of
 9   the Trustee, pursuant to the provisions of the
10   Tennessee Rules of Civil Procedure.
11        It is agreed that Lea Anne Gray, court reporter
12   and notary public for the State of Tennessee, may
13   swear the witness, take her deposition by
14   stenographic means, and afterwards reduce same to
15   typewritten form.
16        All formalities as to notice, caption,
17   certificate, and signing of the deposition by the
18   deponent are waived.  All objections, except as to
19   the form of the question, are reserved to the hearing
20   of said matter.
21
22
23
24
25
```

3

```
 1                    RONETTE LEAL MCCARTHY,
 2    having been first duly sworn, testified as follows:
 3    EXAMINATION BY MR. YOUNG:
 4              Q.  Good morning, Ms. McCarthy.  My name is
 5    Phillip Young, and I represent Jeanne Burton, who is
 6    the court-appointed Bankruptcy Trustee for Cummings
 7    Manookian, PLLC.  And, just for the record, I'll let
 8    everyone know that Ms. Burton is in the room with me
 9    this morning.
10         Ms. McCarthy, could you please state your full
11    name for the record?
12              A.  Certainly.  Ronette Leal McCarthy.
13              Q.  Have you ever given a deposition
14    before?
15              A.  I have not.
16              Q.  So I'm going to explain some rules that
17    you probably know, but we'll go through them, anyway.
18    They're specially important, since, you know, Zoom
19    depositions are a little more awkward, even than
20    regular depositions.  I'll ask that you answer all of
21    my questions audibly with a yes or a no, not just a
22    head shake or an uh-huh or huh-uh.  I'll ask that you
23    answer all questions that I ask, even if another
24    attorney objects, unless someone specifically tells
25    you not to answer.  And if that happens, we'll
```

4

1    resolve that issue before we move on.  I expect this
2    to be relatively short, but if you need to take a
3    break, let me know.  As long as we're not in the
4    middle of a question, I'll be happy to take a break.
5    I'm going to ask you a few questions that are sort of
6    unique to Zoom depositions.  Where are you physically
7    located today?
8              A.  Today, I'm in my home.
9              Q.  Is there anyone else in the room with
10   you?
11             A.  There is not.
12             Q.  Okay.  How many screens are powered on
13   in the room that you're in?
14             A.  Just one.
15             Q.  Do you have any paper in front of you
16   this morning?
17             A.  Just the exhibits.
18             Q.  So you don't have any notes, whether
19   they're on paper or pulled up on your screen?
20             A.  I do not.
21             Q.  Do you have any communication apps open
22   on your computer, like texting or instant messaging
23   or anything like that?
24             A.  I do not.
25             Q.  Ms. McCarthy, you're a licensed

5

```
 1    attorney; is that correct?
 2              A.   I am.
 3              Q.   In what state are you licensed?
 4              A.   Illinois.
 5              Q.   Do you currently practice law with that
 6    license?
 7              A.   I do.
 8              Q.   In what area of law do you practice?
 9              A.   There's a few.  I'm inhouse counsel for
10    Elements Cremation Company.  I have my own practice,
11    where I do real estate closings, end of life issues,
12    wills, trusts, small business representations, and
13    then a piece of it is referrals in regards to
14    personal injury matters.
15              Q.   You said you are inhouse counsel.  I'm
16    sorry.  I didn't catch the name of the company.
17    What's the name of the company?
18              A.   Elements Cremation.
19              Q.   And I assume that's a crematory?
20              A.   Correct.
21              Q.   Ms. McCarthy, you're familiar with a
22    Fitzgerald v. Osborne case that was filed in
23    Tennessee, aren't you?
24              A.   I am.
25              Q.   And I'm going to preface this by
```

6

1    saying, I don't want you to violate any
2    attorney/client privilege or anything like that, so
3    I'm not asking you any of those questions.  And if my
4    questions get afoul of that, I'm sure you'll let me
5    know.  But my intention is not to violate -- to ask
6    you to violate the attorney/client privilege.  But
7    without violating any attorney/client privilege,
8    explain to me how you became involved in the
9    Fitzgerald versus Osborne matter.
10          A.   The Fitzgeralds and myself have been
11   friends for probably 40 plus years.  And in that
12   regard, they came to me asking for assistance after
13   their daughter passed.  They had already received
14   calls from other counsel and were thinking that they
15   needed to find representation.
16          Q.   So did you assist them in finding
17   Tennessee counsel?
18          A.   I did.
19          Q.   What did you do in order to help them
20   find Tennessee counsel?
21          A.   I reached out to a number of Tennessee
22   counsel.  I went through some initial intake, as I do
23   with all clients who come to me looking for counsel
24   to represent them in any personal injury matter.  So
25   I had phone calls with a few different counsel

7

```
 1    licensed in Tennessee.

 2              Q.   And you eventually spoke to Brian

 3    Manookian about that representation?

 4              A.   I did.

 5              Q.   How did you get Mr. Manookian's name?

 6              A.   From another friend that lives in

 7    Tennessee.

 8              Q.   So he was referred to you by someone

 9    else?

10              A.   By a -- yeah, by a private party.

11              Q.   Again, without violating any privilege,

12    tell me about your conversations with Mr. Manookian

13    prior to the Fitzgeralds meeting with him.

14              A.   It was basic introduction, learning

15    about his practice area.  He described his wins, his

16    success rate, his commitment to his clients.

17              Q.   Approximately how many times did you

18    speak with Mr. Manookian before the Fitzgeralds met

19    him?

20              A.   I believe it was only a couple of times

21    on the phone.

22              Q.   And why did you ultimately refer the

23    Fitzgeralds to Mr. Manookian?

24              A.   He seemed to be the best choice for

25    them to have commitment to his clients.  I'm not
```

8

1    unfamiliar with working with personal injury counsel,

2    and, at that point, he seemed to be the one that

3    would work the hardest for them.

4             Q.   At the time you first had conversations

5    with Mr. Manookian, did you understand him to be a

6    member of a law firm?

7             A.   I did.

8             Q.   What was the name of that firm?

9             A.   Cummings Manookian.

10            Q.   Did the Fitzgeralds ultimately engage

11   Cummings Manookian to represent them?

12            A.   That is my understanding, yes, in what

13   I read on the retainer agreement.

14            Q.   And were you ever given a copy of an

15   engagement letter between Cummings Manookian and the

16   Fitzgeralds?

17            A.   I was.

18            Q.   Was that before or after they signed

19   the engagement letter?

20            A.   After they signed it.

21            Q.   Okay.  I want to ask you to look at

22   what's been marked as -- pre-marked as Exhibit One.

23   And I circulated it around to all parties this

24   morning.  And I'll represent to you, just to make

25   sure that we're looking at the right letter, Exhibit

9

1    One, it's a letter on Cummings Manookian letterhead
     2    dated May 23, 2018, addressed to Marty and Melissa
     3    Fitzgerald with a RE line of legal representation and
     4    engagement.  Do you see that letter?
     5              A.  I do.
     6              Q.  Okay.
     7              A.  Excuse me if I have to blow my nose.
     8    We live here in Illinois, where allergies are
     9    abundant right now.  So --
    10              Q.  No problem.
    11              A.  -- I apologize.
    12              Q.  We might be in the same position but
    13    for a lot of rain the last few days.
    14    (EXHIBIT NO. 1 WAS DESIGNATED.)
    15    BY MR. YOUNG:
    16              Q.  Have you seen this document that's
    17    marked as Exhibit One before?
    18              A.  I have.
    19              Q.  Okay.  What is this?
    20              A.  This is the legal representation and
    21    engagement letter to me, and Marty and Melissa
    22    Fitzgerald and the Cummings Manookian Law Firm.
    23              Q.  And is this the copy of the engagement
    24    letter that was sent to you?  And I'll specifically
    25    direct you to page two, second paragraph of the

                                                              10

```
 1    contingency fee section, where it says, We will work
 2    with Attorney Ronette McCarthy in this matter.  Was
 3    this the copy of the engagement letter that was sent
 4    to you?
 5              A.  It is.
 6              Q.  And did you produce a copy of this
 7    document to the Trustee in response to a subpoena?
 8              A.  I did.
 9              Q.  And that language that I just read,
10    where it specifically references you, was that
11    language in the version of this letter that was sent
12    to you?
13              A.  It was.
14              Q.  And do you recall when this letter was
15    sent to you?
16              A.  It was a few weeks after the
17    engagement, upon my request.
18              Q.  So you asked for a copy of it?
19              A.  Correct.
20              Q.  And this is what was sent to you,
21    what's been marked as Exhibit One?
22              A.  Yes.
23              Q.  Now, I want to ask you to pick up the
24    document that's been pre-marked as Exhibit Two,
25    which, again, is another letter on Cummings Manookian
```

11

1    letterhead dated May 23, 2018, same date, to Marty
2    and Melissa Fitzgerald regarding legal representation
3    and engagement.  But I'll represent to you, this is
4    slightly different than the one that you just looked
5    at.  And, specifically, I'll direct you, again, to
6    page two, under the contingency fee section, second
7    paragraph.  Do you see where it says, We may work
8    with other attorneys in this matter?  Do you see
9    that?
10           A.   Yes.
11           Q.   Do you see your name referenced
12   anywhere in that paragraph?
13           A.   I do not.
14           Q.   Have you ever seen a copy of this
15   letter that's been marked as Exhibit Two?
16           A.   Not until it became marked as Exhibit
17   Two.
18           Q.   So today is the first time you've ever
19   seen a copy of this letter?
20           A.   I saw it when you forwarded it, when
21   the first deposition was scheduled, a number of weeks
22   ago.
23           Q.   Prior to me sending this to you as a
24   potential exhibit, you had never seen this copy of
25   this letter?

                                                    12

```
 1                A.   I had not.

 2                Q.   Do you know whether this letter was

 3    ever reviewed by the Fitzgeralds?

 4                A.   I do not.

 5                Q.   And you were never sent a copy of this

 6    letter by either the Fitzgeralds or by Mr. Manookian?

 7                A.   I was not.

 8                Q.   So you don't know whether or not they

 9    signed a copy of this letter?

10                A.   I do not.

11                Q.   Or whether they authorized this letter?

12                A.   I do not.

13    (EXHIBIT NO. 2 WAS DESIGNATED.)

14    BY MR. YOUNG:

15                Q.   Did you ever speak with an attorney

16    named Afsoon Hagh prior to the Fitzgeralds engaging

17    Cummings Manookian in this matter?

18                A.   No.

19                Q.   Did Mr. Manookian ever tell you that

20    Ms. Hagh would be working on the case?

21                A.   Yes, at one point.

22                Q.   Okay.  When was that?

23                A.   When he was suspended.

24                Q.   And we'll talk about that in a minute.

25    But prior to his suspension, you had never spoken
```

13

```
 1    with Ms. Hagh?

 2               A.   I had not.

 3               Q.   And you didn't know that she was

 4    involved in the case at all?

 5               A.   My only knowledge was that she worked

 6    at the firm, with Brian and with Cummings, as well.

 7               Q.   What were you told about her role at

 8    Cummings Manookian, if anything?

 9               A.   From my recollection, just that it

10    would be very limited.  Brian was the point person;

11    it was Brian's case; Brian was the primary contact.

12    It was always all about Brian being in charge and

13    leading the case.

14               Q.   Were you ever told whether Ms. Hagh was

15    a partner and associate, a contractor, anything like

16    that with Cummings Manookian?

17               A.   I don't think that conversation ever

18    came up.

19               Q.   And the only thing you were told about

20    her role in the case was that it was going to be

21    limited?

22               A.   I'm not even certain that those words

23    were used, limited, but that she was, you know, part

24    of the firm, but I didn't know to what degree.

25               Q.   And prior to Mr. Manookian's
```

14

```
 1    suspension, you had never spoken with Ms. Hagh?

 2              A.   No.

 3              Q.   And I'm jumping ahead just a bit, but

 4    after his suspension, approximately how many times

 5    did you speak with Ms. Hagh?

 6              A.   Probably just one or two.

 7              Q.   And were those substantive

 8    conversations about the case?

 9              A.   They were not.  She responded to my

10    continual calls after I learned Brian was suspended,

11    and per court order, they were to notify counsel,

12    myself, and I had no notice.

13              Q.   You weren't given notice of the

14    suspension?

15              A.   I was not.

16              Q.   How did you learn about the suspension?

17              A.   The client.

18              Q.   How did the client learn about his

19    suspension?

20              A.   Conversation with Brian is my

21    understanding.

22              Q.   Tell me about your involvement in the

23    Fitzgerald case.

24              A.   That is sort of a broad question.

25    Would you like to be more specific?
```

1          Q.   Yeah, sure.   What was your role in the

2     case?  Did you draft pleadings; did you review

3     pleadings; did you -- how often did you communicate

4     with counsel; how often did you communicate with the

5     client, those types things?

6          A.   Okay.   Brian and I talked often and

7     communicated often throughout, from the beginning

8     until close to when it settled.

9          Q.   Did you review pleadings?

10          A.   I did.   There were various pleadings

11     forwarded.   One specific that I can mention is the

12     summary judgment motion.   The PowerPoint drafts were

13     even forwarded.   And the conversation with Brian was,

14     you know, take a look at it, let's review it.

15          Q.   Who forwarded you the drafted motion

16     for summary judgment?

17          A.   I'd have to look at the e-mails, which

18     I have not.   I believe that may have been during the

19     time that Brian was suspended, so it may have come

20     from Afsoon.

21          Q.   And who forwarded you the PowerPoint

22     presentation?

23          A.   It may have been the same, but, again,

24     that's just from my memory.

25               MR. SPRAGENS:   I'm sorry.   I just want

1    to object to your -- I'm looking at this privilege
         2    log, and I'm trying to understand if the witness is
         3    asserting work product privilege or not over these
         4    communications.
         5    BY MR. YOUNG:
         6              Q.   Let's talk about the privilege log.   In
         7    response to a subpoena for documents in this case,
         8    you produced a privilege log to the Trustee, correct?
         9              A.   Correct, yes.
        10              Q.   And did that privilege log detail all
        11    of the conversations, whether written or by
        12    telephone, that you had regarding the Fitzgerald
        13    matter?
        14              A.   Yes.
        15              Q.   And I'll ask you to look at what's been
        16    pre-marked as Exhibit Three to this deposition and
        17    ask if this is the privilege log that you compiled in
        18    response to the Trustee's subpoena?
        19              A.   It is.
        20              Q.   And is all of the information on this
        21    log true and correct to the best of your knowledge?
        22              A.   Yes.
        23    (EXHIBIT NO. 3 WAS DESIGNATED.)
        24    BY MR. YOUNG:
        25              Q.   And to Mr. Spragens' point, I'm going

1    to ask you some questions about this exhibit, but I'm
2    not asking you for privileged information.  So if we
3    get to the point where you feel like I'm asking
4    something that's privileged, I trust that you'll let
5    me know, because I'm not intending to ask you to
6    violate any privilege.  But I do want to ask you
7    about some of the entries.
8         Specifically, let's look at the entries prior to
9    May 23, 2018.  There is a handful of, it looks
10   like -- one, two, three, four, five, six -- six lines
11   prior to May 23, 2018; is that right?
12               A.  Correct.
13               Q.  And if you look back at Exhibit One,
14   you will see that May 23, 2018 is the date that the
15   Fitzgeralds engaged Cummings Manookian; is that
16   right?
17               A.  Pursuant to this privilege log, yes.
18               Q.  Right.  Those entries prior to May
19   23rd, does that fairly describe your communications
20   prior to the execution of the engagement letter
21   between the Fitzgeralds and Cummings Manookian?
22               A.  To my knowledge, yes.
23               Q.  And all of these are communications
24   directly with Brian Manookian, correct?
25               A.  To my knowledge, yes.

18

1          Q.  Except for the first one, which says,

2    Number of telephone conferences with the Fitzgeralds,

3    right?

4          A.  Yes.

5          Q.  And once the engagement letter was

6    signed, it looks like there were a number of e-mails

7    between you and Mr. Manookian concerning the

8    Fitzgerald case from around June 4, 2018 through

9    November; is that right?

10         A.  Through November of 2018, yes.

11         Q.  And other than the very first one that

12   says, Around 6/4/2018, telephone conference with

13   Fitzgeralds, other than that and a 10/2/2018 e-mail

14   from Manookian to Marty Fitzgerald and RLM, which I

15   assume is you, correct?  RLM, is you?

16         A.  Correct, yes.

17         Q.  Other than those two, it looks like all

18   of these communications from June to November were

19   between you and Mr. Manookian; is that right?

20         A.  Yes.

21         Q.  It looks like some of those e-mails

22   were from you to Mr. Manookian, and some were from

23   Mr. Manookian to you; is that accurate?

24         A.  Yes.

25         Q.  Is it fair to say that you were being

1    kept in the loop about what was going on with regards

        2    to the Fitzgerald case during that time?

        3             A.   Yes.

        4             Q.   Were you reviewing any pleadings before

        5    they were filed during this time?

        6             A.   There were documents that were

        7    forwarded to me.  I don't know if I reviewed them

        8    prior to the filing.

        9             Q.   Do you remember if you reviewed the

       10    complaint before it was filed?

       11             A.   No.

       12             Q.   You don't recall or you didn't?

       13             A.   I don't recall if I did or not.

       14             Q.   And during the time from the execution

       15    of the engagement agreement on May 23, 2018 until the

       16    end of November 2018, you had no e-mails or

       17    conversations with Afsoon Hagh?

       18             A.   I would have to look back here and see

       19    when my first -- that one conversation was with her,

       20    but, again, not recalling the date of Mr. Manookian's

       21    suspension, I had not had telephone conversations

       22    with Afsoon prior to that.

       23             Q.   If I represent to you that the date he

       24    was suspended was in December of 2018, then would you

       25    agree that you had no conversations with Afsoon Hagh

1    prior to November of 2018?

2          A.  If that's the date of his suspension, I

3    had no prior conversations with Afsoon.

4          Q.  Was Ms. Hagh copied on any e-mails from

5    Mr. Manookian to you during this time?

6          A.  Periodically.  It was not consistent.

7          Q.  Prior to his suspension, Afsoon Hagh

8    never sent you any draft documents?

9          A.  No.

10         Q.  You mentioned earlier that, at some

11   point, you became aware that Mr. Manookian's law

12   license had been suspended.  Do you recall when you

13   learned that?

14         A.  From your telling me right now, the

15   suspension was in December of 2018, I'm going to say

16   it was on or, you know, after that date.  I remember

17   when I did learn about it.  It was, you know, a

18   number of days, if not more than a week plus, that

19   the suspension had already taken effect.

20         Q.  I think you mentioned that you learned

21   about that from the Fitzgeralds?

22         A.  I learned about it -- and I do want to

23   correct that, too.  I learned about it from the

24   Fitzgeralds, but almost at the same time, too, I had

25   done my own search and saw that he was suspended, as

1    well.

        2            Q.   Do you know how the Fitzgeralds learned

        3    of the suspension?

        4            A.   I don't recall if it was either Brian

        5    Manookian or Afsoon, but one of them told them.

        6            Q.   Do you know if they were notified by

        7    telephone or by letter?

        8            A.   I do not know.

        9            Q.   Have you ever seen a copy of the letter

       10    from Mr. Manookian to the Fitzgeralds notifying them

       11    of his suspension?

       12            A.   No.

       13            Q.   Do you know whether the Fitzgeralds

       14    ever interviewed other counsel in December of 2018

       15    about engaging new counsel?

       16            A.   From my conversation with Ms. Hagh, it

       17    was that they were just going to stay with the same

       18    law firm.  There didn't seem to be any response from

       19    her that there was going to be any review of any

       20    other counsel during that time.

       21            MR. SPRAGENS:  I just want to confirm

       22    for the record that Ms. McCarthy is restating her

       23    client's statements to her right now.

       24    BY MR. YOUNG:

       25            Q.   During the time that Mr. Manookian was

1    suspended, did you have any discussions with
2    Ms. Hagh?
3              A.   Yes, one or two.
4              Q.   Were those by e-mail or by telephone?
5              A.   Telephone.
6              Q.   Would those be reflected in this
7    privilege log?
8              A.   Yes.  Well, I see one of them, but that
9    would have been later.
10             Q.   Which one do you see?
11             A.   I see one on April 3, 2019, in regards
12   to -- with a procedural call in regards to mediation,
13   trial date, scheduling.
14             Q.   And just for the record, that April 3rd
15   e-mail was from you to Ms. Hagh, correct?
16             A.   That was an e-mail, correct.  Yeah.
17             Q.   And if you look at the next page on
18   April 15th, there is an e-mail from Ms. Hagh to you,
19   correct?
20             A.   Correct.  It was, again, just regarding
21   scheduling, nothing substantive.
22             Q.   Other than those two instances, do you
23   see any entry on this privilege log that evidences a
24   communication between you and Ms. Hagh?
25             A.   I do not.

23

Q.   So your recollection is that you only
had one or two conversations with Ms. Hagh while
Mr. Manookian was suspended?

         A.   I did, and her -- she returned one of
my voicemails left, and I don't -- I can't tell you
if it was a voicemail left on the general office
number or on her direct number, and it was a
conversation just to say, Brian will call you to
discuss, you know, the suspension and what's
occurring.

         Q.   During the time that Mr. Manookian's
license was suspended, did Ms. Hagh ever send you
drafts of pleadings, that you recall?

         A.   I believe, during that time, it was
just the summary judgment PowerPoint presentation.

         Q.   Did Mr. Manookian ever send you drafts
of pleadings while he was suspended?

         A.   Not to my memory were there drafts sent
from him.  There were telephone conversations.

         Q.   I want to ask you about a couple of
specific entries on this log.  If you will, get out
Exhibit Three.  And the first one that I'm going to
ask about is on February 4, 2019.  There's an entry
that says, e-mail from Manookian to RLM.  And the
summary says, Update regarding summary judgment

                                                    24

```
 1    motion.  Do you see that?
 2              A.   I do.
 3              Q.   So you received an e-mail on February
 4    4, 2019 from Mr. Manookian updating you on the status
 5    of the summary judgment?
 6              A.   Yes.
 7              Q.   That didn't come from Afsoon Hagh?
 8              A.   No.
 9              Q.   Do you remember if she was copied on
10    that e-mail?
11              A.   I do not.
12              Q.   In February of 2019, did you find it
13    odd that Mr. Manookian was providing you that update
14    and not Ms. Hagh?
15              A.   I don't know if I would call it odd.
16              Q.   How would you describe it?
17              A.   It seemed to me that he was just as
18    involved in the case as he had always been.
19              Q.   The next entry on this log says,
20    February 4, 2019 to March 4, 2019 --
21              A.   Correct.
22              Q.   -- communications from RLM to
23    Manookian, return e-mails from Manookian.  And the
24    summary says, Update strategy discussions regarding
25    pending motions.  Do you see that?
```

```
 1              A.  Yes.

 2              Q.  And were all of those communications

 3    during that time with Brian Manookian?

 4              A.  Yes.

 5              Q.  Was Afsoon Hagh actively involved in

 6    any of those communications?

 7              A.  Could you describe what you mean by

 8    actively?

 9              Q.  Did any of those e-mails or calls come

10    from Ms. Hagh?

11              A.  Not to my knowledge, no.  Not to my

12    memory, no.

13              Q.  Do you know if she was copied on those

14    e-mails?

15              A.  I do not recall.  Again, she would be

16    copied sporadically on things during the entire

17    matter.

18              Q.  Next, look at the next two entries.  It

19    looks like you e-mailed Afsoon Hagh on April 3, 2019.

20    It says, e-mail from RLM to Afsoon Hagh.  Summary,

21    initial e-mail to Afsoon Hagh regarding scheduling of

22    mediation and trial update.  And then the next entry,

23    on the same day, shows an e-mail from Mr. Manookian

24    to you that says, Update regarding litigation and

25    pending motions.  Do you see that?
```

```
 1              A.  I do.
 2              Q.  Did Mr. Manookian respond to your
 3    e-mail asking Ms. Hagh for an update?
 4              A.  I would have to look at the e-mail.  I
 5    don't recall.  I know that the e-mail was back and
 6    forth with us, mine to Afsoon telling her, but I
 7    don't recall if Brian was responding to that or not.
 8              Q.  And the only e-mail from Ms. Hagh on
 9    this list, if you'll turn to the next page, appears
10    on April 15, 2019; is that right?
11              A.  Correct.
12              Q.  And that says, e-mails from Hagh to
13    RLM, update regarding scheduling of litigation.  Do
14    you see that?
15              A.  I do.
16              Q.  And then let's look down the next few
17    lines, from April 30, 2019 through May 8, 2019.
18    There are a few entries that say, Update regarding
19    reinstatement of law license and regarding
20    reinstatement acknowledgement.  Do you see that?
21              A.  I do.
22              Q.  What do you remember about those
23    communications?
24              A.  Brian telling me that he was back.
25              Q.  And after Mr. Manookian's
```

27

1    reinstatement, did you continue to be involved in

2    this case?

3              A.   Yes.

4              Q.   What did you do after his

5    reinstatement?

6              A.   I'm looking at the timeline here.  I

7    recall that the mediation was coming and the trial

8    date, and there was always discussion of me being

9    present for the mediation and for the trial.  So

10   there was discussion in regards to that.  In looking,

11   I can see that there were e-mails in regards to trial

12   strategy that Brian talked about, and in regards to

13   what his thoughts were in regards to witnesses, you

14   know, just how the trial was going to play out.  We

15   had many back and forths in regards to that.

16             Q.   So you were involved -- I'm sorry.  I

17   think there was some feedback.  You were involved in

18   those discussions?

19             A.   I'm sorry.  I couldn't hear what you

20   said.

21             Q.   Were you involved in those discussions

22   about litigation updates and strategies?

23             A.   With Mr. Manookian?

24             Q.   Yes?

25             A.   Yes.

```
 1              Q.  You said there was discussion about you
 2   being involved in the mediation.  Were you ultimately
 3   present at the mediation?
 4              A.  I was not.
 5              Q.  Why not?
 6              A.  Brian said he was going to proceed
 7   forward with just himself.
 8              Q.  Do you know why?
 9              A.  I do not.
10              Q.  But you were aware that mediation
11   occurred?
12              A.  I was.
13              Q.  When did you learn that the case had
14   settled?
15              A.  Sometime after the case had settled.
16              Q.  How did you learn that the case was
17   settled?
18              A.  From third-parties and from --
19              Q.  I'm sorry.  Go ahead.
20              A.  -- from third-parties and discussion
21   with The Court myself.
22              Q.  Mr. Manookian never let you know that
23   the case settled?
24              A.  He did not.
25              Q.  Ms. Hagh never let you know the case
```

29

```
 1   settled?
 2              A.   He did not -- or she did not.
 3              Q.   The Fitzgeralds never let you know the
 4   case settled?
 5              A.   I do not believe, the Fitzgeralds.
 6              Q.   Did they tell you immediately after
 7   that the case had settled?
 8              A.   I knew a short time after.
 9              Q.   From the Fitzgeralds?
10              A.   I don't recall which came first, to be
11   honest.
12              Q.   Were you ever told that the Fitzgeralds
13   didn't want you to share in the fees in this case?
14              A.   No.
15              Q.   You see that the last several entries
16   on this log in August of 2019 into October of 2019
17   all reference the scheduling of a telephone
18   conference.  Do you see that?
19              A.   I do.
20              Q.   Did you ever have that telephone
21   conference?
22              A.   No.
23              Q.   Were these messages ever returned to
24   you?
25              A.   Some of them were returned from
```

1   Mr. Manookian with a, I'll call you later or I have a

2   one o'clock meeting, but there was never a

3   conversation.

4         Q.  You were never told, in response to any

5   of these communications, that the case had settled?

6         A.  Not from Mr. Manookian.

7         Q.  Let's take a break until 10:40.  I'm

8   getting close to being done.

9   (Whereupon, after a short break, the following

10  proceedings were had.)

11  BY MR. YOUNG:

12        Q.  Ms. McCarthy, from your perspective,

13  what was Afsoon's -- Afsoon Hagh's role in the

14  Fitzgerald case?

15        A.  From my perspective, some support

16  possibly to Brian, but it seems -- at least all of my

17  contact with her had been very administrative,

18  meaning scheduling, you know.  But, again, that was

19  only a few times.

20        Q.  What did she do that you believe

21  assisted in the outcome of this case?

22        A.  I don't know her to have any impact in

23  the outcome of this case.

24        Q.  Is there anything else that you would

25  like to say about your involvement in the Fitzgerald

2356

1    matter or anything else that you think is important
2    for the parties to know in this case?
3             A.   Nothing that comes to mind.
4             Q.   I have no further questions.
5    EXAMINATION BY MR. SPRAGENS:
6             Q.   Ms. McCarthy, my name is John Spragens.
7    I represent Brian Manookian and Manookian PLLC in
8    this matter.  Can you hear me okay?
9             A.   I can hear you, yes.
10            Q.   I believe you testified that you
11    referred the case to Mr. Manookian; is that right?
12            A.   I did.  Is it not possible to see you,
13    Mr. Spragens?
14            Q.   No.  I'm just going to stay by phone
15    today, due to my office situation at the moment.
16        What other lawyers did you speak with, besides
17    Mr. Manookian, before referring the case?
18            A.   You know, I would have to look back.
19    This goes back a number of years.  That's something
20    that I did not review in preparation for this
21    deposition.  But there was a number of them that I
22    spoke to in Tennessee.
23            Q.   Was the subpoena that you produced, the
24    privilege log, in response to asking you for those
25    communications, or did it not ask for those

```
 1   communications?
 2            A.   For which communications?
 3            Q.   Any communications with other attorneys
 4   about the Fitzgerald case.
 5            A.   I don't believe so.
 6            Q.   And as you sit here today, you don't
 7   recall what other attorneys you spoke to on behalf of
 8   the Fitzgeralds?
 9            A.   I talked to lots of attorneys
10   throughout the United States in regards to cases like
11   this.  I cannot give you specific names in regards to
12   who I talked to before Brian Manookian.
13            Q.   I think you testified that you and the
14   Fitzgeralds were friends for over 40 years; is that
15   correct?
16            A.   Yes.
17            Q.   How did you first come to know the
18   Fitzgeralds?
19            A.   Growing up in the same town.
20            Q.   And is that a town in Illinois?
21            A.   It is, yes.
22            Q.   What town is that?
23            A.   Sterling.
24            Q.   And which of the Fitzgeralds did you
25   first come to know?
```

```
 1              A.   Probably Melissa, but it could have
 2    been both of them.  Marty was the older brother to
 3    another friend of ours.
 4              Q.   How did you come to speak with them
 5    about their loss that led to the case that we have
 6    been talking about today?
 7              A.   I was a very close friend and assisted
 8    with the funeral services for them.
 9              Q.   I think you testified that you provide
10    legal advice about end of life issues; is that right?
11              A.   Correct.
12              Q.   Is that through a law firm?
13              A.   No.  Well, both, I guess, yes.  So
14    estates and trusts, and then in regards to families
15    that need cremation services that may need to be
16    pointed in the right direction after a loved one
17    passes, in regards to -- it could be simple things,
18    like what do they do with the driver's license to,
19    you know, who do they have to notify if they want to
20    sell a car.
21              Q.   What was the law firm -- I'm sorry --
22    that you mentioned at the beginning of that response?
23              A.   The law firm?  I don't believe I told
24    you my law firm name.
25              Q.   Oh, okay.  Could you, please?
```

34

```
 1              A.   Yep.  Leal McCarthy Law Group.

 2              Q.   And is that an active law practice

 3    today?

 4              A.   It's new.  So it's new, yes.  If you

 5    are asking what I was practicing under at the time of

 6    this matter, it would be just the Law Office of

 7    Ronette Leal McCarthy.

 8              Q.   Was that incorporated in any way?

 9              A.   The Law Office of Ronette Leal

10    McCarthy, no.

11              Q.   So you were a solo practitioner, in the

12    sense that you didn't have, like, an LLC or some

13    other corporate form?

14              A.   Correct.

15              Q.   At that time, that the Fitzgeralds

16    spoke with you after the loss of their daughter, were

17    you also working inhouse at Element Cremation?

18              A.   I was.

19              Q.   Did they come to you with respect to

20    the services that Element Cremation provided or just

21    independently as friends?

22              A.   No.  It had nothing to do with that.

23    We're personal friends.

24              Q.   What is your role as an inhouse

25    attorney at Element Cremation?
```

1          A.   To help in regards to any business
2    aspects of Elements Cremation.  And then as I already
3    stated, if there is any families that have any
4    questions in regards to, you know, notifying social
5    security, how to, you know, finalize insurance
6    payments, maybe life insurance, what do they have to
7    do with a home, a car, those type of things.
8          Q.   I think you testified that you're
9    licensed to practice law in Illinois; is that right?
10         A.   Yes.
11         Q.   Are you licensed to practice law in
12   Tennessee?
13         A.   I am not.
14         Q.   Are you licensed to practice law in any
15   other states?
16         A.   I am not.
17         Q.   With respect to your Illinois law
18   license, that's been active since before January 1,
19   2018?
20         A.   Correct.
21         Q.   Are you affiliated with any other
22   businesses or law practices, aside from your own
23   personal practice and Element Creation?
24         A.   No.  It's cremation.  Elements
25   Cremation.

36

1          Q.   Sorry.  I think I said that, but my
2     connection may not be very good.
3          A.   Okay.
4          Q.   And at the time that the Fitzgeralds
5     contacted you about Megan's death, you were
6     affiliated with your own law practice and Element
7     Cremation; is that right?
8          A.   If you want to say affiliated with,
9     again, that's where I work.  The Fitzgeralds
10    contacted me, because I'm their personal friend.
11         Q.   But were you also maintaining a private
12    practice, at the time?
13         A.   Correct.
14         Q.   Were you representing clients in that
15    practice, at the time?
16         A.   It's more an advisory role.  I have two
17    young children.  And so I would have to look back in
18    2018, but I did have some other clients that were
19    similar to the Fitzgeralds that were all using, you
20    know, other counsel for personal injury matters.
21         Q.   At the time they came to you, which was
22    prior to May 18, 2018, did you have engagement
23    agreements with any clients, other than through your
24    work at Element Cremation?
25         A.   No.  Other personal injury firms had

```
 1    engagement agreements with clients that I had
 2    referred to them.
 3              Q.   Did you ever have an engagement
 4    agreement with the Fitzgeralds, other than the
 5    agreement that we looked at earlier today, the
 6    Cummings Manookian agreement?
 7              A.   Individually, no.  That's not my
 8    position.
 9              Q.   Do you have any ownership interest in
10    Element Cremation?
11              A.   No.
12              Q.   How did you get Mr. Manookian's name,
13    originally, do you recall?
14              A.   I believe I answered that with
15    Mr. Young.  Would you like me to answer it, again?
16              Q.   Sure.
17              A.   I did some research in regards to
18    counsel in the Tennessee area, and then I also have
19    some individuals that live outside -- friends that
20    live outside of the Nashville area, and both through
21    my research and then a friend, his name came up.
22              Q.   So when you say research, you mean
23    online research?
24              A.   Correct, yes.  Just looking at who the
25    counsel are, and, you know, the area they practice,
```

```
 1    doing some reading on them.
 2            Q.  And who was the friend you spoke with
 3    before referring the case to Mr. Manookian?
 4            A.  John Menefee.
 5            Q.  And how did Mr. Menefee know
 6    Mr. Manookian, to the extent that you are aware?
 7            A.  I do not know.
 8            Q.  What was the nature of his experience
 9    with him in the past, such that he gave you a
10    recommendation?
11            A.  I don't believe Mr. Manookian and
12    Mr. Menefee know each other directly.
13            Q.  Is Mr. Menefee an attorney?
14            A.  He is not.
15            Q.  Do you know anything about
16    Mr. Menefee's awareness of or experience with
17    Mr. Manookian before that referral?
18            A.  Again, I don't believe it was personal
19    experience.
20            Q.  But do you know anything about what led
21    him to, if I'm understanding you correctly, vouch for
22    Mr. Manookian as an appropriate referral source?
23            A.  I do not.
24            Q.  And am I understanding you correctly
25    that Mr. Menefee vouched for Mr. Manookian as an
```

1    appropriate referral source, let's say, referral

2    recipient for you?

3              A.  I would not use the word vouch, no.  It

4    was a name that he was provided.  I cannot tell you

5    who or where it came from.  And I had also came

6    across Brian Manookian's name, so kind of twice

7    seeing the name and hearing it.  I don't believe

8    there was any vouching on Mr. Menefee's part of Brian

9    Manookian.

10             Q.  So is it correct that you sort of

11   contacted Mr. Menefee to ask him if he had any

12   recommendations for personal injury and wrongful

13   death attorneys in Middle Tennessee?

14             A.  Yes.

15             Q.  And do you recall if the only name he

16   came back with was Mr. Manookian's, or were there

17   multiple names?

18             A.  I believe that there were a couple.

19   There was at least one other, but I had already kind

20   of crossed that person off my list.

21             Q.  And who was that?

22             A.  You know, again, I don't recall exact

23   names, but I know that there were two names that

24   Mr. Menefee gave me.

25             Q.  I'm sorry.  Did you say two names or a

1   few names?

2           A.   Two.  It was two.  But I don't remember

3   who.  I talked to a number of counsel prior to that,

4   and then a number of counsel, you know, at the

5   conclusion of the Fitzgerald matter, too.  So I don't

6   remember names.

7           Q.   The other counsel that you talked to

8   before recommending Mr. Manookian to the Fitzgeralds,

9   did you have phone conversations with them, or how

10  did you come across the other counsels' names?

11          A.   The wonderful world of Google.

12          Q.   Got it.  Was there anybody else, other

13  than Mr. Menefee, that you relied on locally for

14  expertise?

15          A.   I wouldn't call Mr. Menefee's referral

16  to me as an expertise, because, again, he's not an

17  attorney.  He's a lay person.  It just happened to be

18  a name that he told me, and since Brian was a name

19  that I hadn't crossed out, yet, it was kind of, you

20  know, there's that name again, and I should probably

21  reach out to him.

22          Q.   Is Mr. Menefee owed any portion of the

23  Fitzgerald fee, as far as you know?

24          A.   No.

25          Q.   And you're not planning to pay him

```
 1    anything as a result of any fee in this case?
 2              A.  No.  I believe that would be illegal.
 3              Q.  You are claiming a portion of the fee
 4    in the Fitzgerald matter?
 5              A.  Yes.
 6              Q.  And what portion of the fee do you
 7    contend you're entitled to recover?
 8              A.  That had always been up to discussion
 9    between Brian and I.  And in the -- you know, it has
10    gone back and forth so many times in regards to the
11    bankruptcy matter, but our -- my fee that I am
12    standard with is a third, a third of a third.  That's
13    based off of, you know, work like this throughout
14    Illinois and other states.
15              Q.  And do you have a written agreement
16    with Mr. Manookian or anyone else memorializing that?
17              A.  The engagement letter, and then there's
18    e-mails confirming it.
19              Q.  So, first, with respect to the
20    engagement letter, does it specify what your portion
21    of the contingency fee will be?
22              A.  It does not.
23              Q.  And do you have e-mails in which it
24    spells out what your portion of the contingency fee
25    will be?
```

42

```
 1                A.   I do.
 2                Q.   And that portion is one-third of
 3      one-third?
 4                A.   There was discussion, yes.
 5                Q.   Can you tell me what you mean by, there
 6      was discussion?
 7                A.   Yes.  That's what it says in the
 8      e-mail.
 9                Q.   And did both sides, from your
10      perspective, agree to that?
11                A.   Yes, because we went into great
12      conversation about what I was going to do with that
13      third of mine.
14                Q.   What were you going to do with that
15      third?
16                A.   The Fitzgeralds had planned on giving
17      to a not-for-profit during the case, prior to the
18      case and even during the case.  It wasn't decided
19      exactly which one.  They were very committed to
20      Megan's swimming and her school and also her future
21      pursuits, in regards to making prosthetics for
22      veterans that had lost limbs.  So I had always talked
23      with Mr. Manookian that I would not be keeping the
24      third that I was going to take, but it was going to
25      be distributed amongst the not-for-profits that the
```

43

2368

```
 1    Fitzgeralds had selected.  I asked him to not have
 2    that conversation with them when they met.  He went
 3    into great, great conversations with me about how
 4    wonderful that was, and how he had many times not
 5    taken his amount, because he felt so committed to
 6    different families that he had represented over time.
 7              Q.  And is it still your intention to
 8    donate that portion of -- I mean, your full portion
 9    of any recovery in this bankruptcy case to that
10    not-for-profit?
11              A.  I think that question is irrelevant.
12              Q.  That's fine.  Is that still your
13    intention?
14              A.  I'm not going to answer that question,
15    because I don't know what the answer to that is, at
16    this point.
17              Q.  You're an attorney, and you're aware
18    that the Rules of Civil Procedure require you to
19    answer the questions, even if you think they are
20    irrelevant, in a deposition?
21              A.  I do.  And I don't have an answer for
22    you.  I can't -- I honestly cannot tell you what will
23    be done if there's a recovery.
24              Q.  Because as you sit here today, it's not
25    your intention to give all of that money to that
```

44

```
 1    not-for-profit; is that correct?
 2              A.   My intention is to make certain that I
 3    can pay the legal fees that I have incurred in
 4    regards to representation for my involvement in this
 5    bankruptcy matter.
 6              Q.   And those legal fees are the time
 7    you've spent that's memorialized in the privilege
 8    log?
 9              A.   No.  I had to hire counsel in regards
10    to the bankruptcy matter that represented me
11    initially, that represented me to get my claim heard.
12              Q.   Are you represented today in the
13    bankruptcy matter?
14              A.   I am not.
15              Q.   What's the total of your legal fees in
16    the bankruptcy matter?
17              A.   Approximately $26,000.
18              Q.   So your intention is to pay those legal
19    fees, and then do you know what's going to happen
20    with the remainder of any amount that you're paid in
21    the bankruptcy?
22              A.   I do not.
23              Q.   When was the last time you spoke with
24    Marty or Melissa Fitzgerald?
25              A.   Approximately, right around the
```

45

1    conclusion of this matter.  So whenever the date

2    would be.  Right around the fall of 2019.

3             Q.  And what was the nature of that

4    conversation?

5             A.  The -- it was a text message.

6             Q.  And can you tell me what it said?

7             A.  From which part?  The text message,

8    basically, just said that the matter was concluded,

9    and that was about it.

10            Q.  Is that a text message you sent them or

11   they sent you?

12            A.  I would have to look back and see who

13   initiated it.  It's not something that I reviewed for

14   this deposition.

15            Q.  Does that not fall within the scope of

16   the documents that you were asked to provide for the

17   deposition?

18            A.  No, because it was a friendly -- I

19   mean, this matter was over, you know.  We're friends.

20            Q.  And that was in 2019?

21            A.  Correct.

22            Q.  Have you maintained your friendship

23   since that time?

24            A.  I have not.

25            Q.  And is that a decision you made, or a

46

```
1   decision that they made, or that both sides made?
2              A.  I'm not sure that there is a correct
3   answer to that.  What I have heard is that there were
4   other things told to them in regards to how I was
5   going to utilize the money, which wasn't true.
6              Q.  What was told to them, as far as you
7   heard?
8              A.  I was told that I was money-seeking,
9   and that I was going to use all of the proceeds for
10  my own benefit, and that I had even encouraged
11  Mr. Manookian to go after the Plaintiff individually
12  for more money outside of the insurance award.
13             Q.  And do you deny that?
14             A.  I absolutely, categorically deny that.
15             Q.  Who told you that?
16             A.  A third-party.
17             Q.  And who was that?
18             A.  Another friend of ours.
19             Q.  What was that friend's name?
20             A.  It came from multiple friends.
21             Q.  And what were their names?
22             A.  Andrew Burton, Jessica Wright.
23             Q.  Anyone else?
24             A.  No.
25             Q.  You said that it was a false
```

47

1    representation that you were going to keep the money
2    for yourself, but you also --
3              A.   I'm sorry.  You cut out.
4              Q.   I'm sorry.  I believe you said that it
5    was a false representation that was made that you
6    were going to keep the remainder of the money for
7    yourself, or the attorney's fee for yourself, but you
8    also, today, are not prepared to testify what you're
9    going to do with the money; is that right?
10             A.   Absolutely correct.  A lot has
11   transpired between 2019 and 2022, and so for me to
12   answer that question honestly, I can't, because I
13   don't have an answer.  It may still be donated, but
14   it just may not be donated to the Fitzgeralds' not-
15   or-profit.
16             Q.   So is it fair to say that you've had a
17   falling out with them?
18             A.   If that's what you want -- that's not
19   how I would categorize it, but if you wish to use
20   those words.
21             Q.   How would you categorize it?
22             A.   We just haven't talked in some time and
23   aren't friends, at this point.  From what I have
24   heard, they have been lied to, in regards to many
25   things that I represented to Mr. Manookian, and it

48

1    has made for a very strained relationship.
         2              Q.   The statement that you said was false
         3    is not necessarily false today?
         4              A.   Which is that?
         5              Q.   What you're planning to do with your
         6    portion of any recovery.
         7              A.   I don't believe that you asked me if
         8    the statement is false.  What statement?  Can you
         9    read the statement back to me that you are asking if
        10    it's false?
        11              Q.   I don't have a live transcript of this
        12    deposition, but I believe what you said was that they
        13    were told that you were going to keep your portion of
        14    the proceeds, rather than donating it to their
        15    nonprofit or their not-for-profit, and, today, you
        16    can't say one way or the other of what you're going
        17    to do with that portion of the proceeds; is that
        18    right?
        19              A.   That's correct.
        20              Q.   Other than your initial referral of the
        21    Fitzgeralds to Mr. Manookian, did you offer legal
        22    advice to the family about the case?
        23              A.   I think you would have to be more
        24    specific in regards to what legal advice.  We did
        25    have conversations throughout the case.

                                                                    49

1          Q.   Well, I am trying to walk that line, as
2     I'm sure you appreciate, between asking you about the
3     nature of the conversations and just finding out if
4     you gave them legal advice during the litigation.  So
5     I have to rely on your own judgment as an attorney
6     here to find out if, in your view, you provided them
7     legal advice after the initial referral.
8          A.   Yes, we had conversations in regards to
9     the case.
10         Q.   And were those in the nature of sort of
11    strategy and kind of big picture conversations?
12         A.   I would have to look back at what our
13    communications were to answer that for you.
14         Q.   Did you include those communications in
15    the privilege log?
16         A.   There were mentions of the Fitzgeralds
17    in the privilege log, yes.
18         Q.   Let's look at Exhibit Three that was
19    designated by Mr. Young as your -- Exhibit Three to
20    this deposition, which was the privilege log that you
21    produced in response to his subpoena.  Can you
22    identify for me any communications in here between
23    you and the Fitzgeralds, period?
24         A.   On the first page, around 6/4/2018,
25    telephone conversation with the Fitzgeralds.  In

1      regards to the 2/10 -- 2/18 -- I'm sorry -- the 2/18,

2      e-mail from Manookian to Marty Fitzgerald and I,

3      there was communication there.

4                  Q.   That's an e-mail that you received?

5                  A.   Correct.  But nowhere else is the

6      Fitzgerald name mentioned, in my quick review.

7                  Q.   I think on June 4, 2019, there were

8      e-mails to the Fitzgeralds and you from Manookian; is

9      that right?

10                 A.   Yes.  On June 4, 2019, yes.

11                 Q.   There's no communications after May 22,

12     2018, in which you -- oh, excuse me.  I apologize --

13     after June 4, 2018, in which you were providing any

14     information to them; is that right?

15                 A.   Missy and I would have telephone calls

16     separately, as friends.  You know, our only -- the

17     conversation wouldn't necessarily be in regards to

18     the case and what legal strategies were happening,

19     but, again, we were friends, as well.

20                 Q.   Well, that's tricky --

21                 A.   It is.

22                 Q.   -- because that's the two hats that, I

23     guess, you were wearing.  But nothing else that

24     you've memorialized in this privilege log in which

25     you communicated legal advice to them or legal

```
 1    strategy to them; is that right?
 2             A.  No.  In regards to the case, that was
 3    Brian's role.
 4             Q.  Do you know whether the Fitzgeralds
 5    believe that you are entitled to a fee in this case
 6    today?
 7             A.  I do not know.  I have not asked them
 8    that question.
 9             Q.  With respect to the privilege log, when
10    it says Manookian, does that always mean Brian
11    Manookian or might that mean the law firm?
12             A.  No.  If you look at 5/18/2018, after
13    Brian Manookian's name, I put a (Manookian).  It
14    always means Brian Manookian.
15             Q.  Okay.  Is there somewhere on the
16    privilege log where you document a conversation about
17    Mr. Manookian's suspension from the practice of law?
18             A.  There's a couple mentions of that.  The
19    first one -- if you can find it quicker than I can,
20    you can note it.  I know on 4/30, on page two,
21    4/30/2019, there's updates regarding the instatement
22    of law license.  And then, two lines after that,
23    5/8/2019, from me.  So there's three of them, I
24    guess, right there in a row regarding the
25    reinstatement of the law license between Brian and
```

52

```
 1   myself.
 2              Q.   Anything about the original suspension,
 3   which Mr. Young represented to you --
 4              A.   Yeah, I'm looking.
 5              Q.   -- went into effect in December of
 6   2018?
 7              A.   I'm not seeing anything in regards to
 8   the suspension.
 9              Q.   I think you testified that you learned
10   about the suspension from the Fitzgeralds; is that
11   right?
12              A.   Melissa, correct.
13              Q.   And that was in a friendly phone call
14   with Ms. Fitzgerald?
15              A.   Correct.
16              Q.   But you don't know when that took
17   place?
18              A.   I do not.
19              Q.   And that's not memorialized in this
20   privilege log anywhere?
21              A.   No.
22              Q.   You don't have any reason to believe
23   that Mr. Manookian did not inform the Fitzgeralds
24   about his initial suspension, do you?
25              A.   No.
```

```
 1              Q.   Did Melissa tell --
 2              A.   Well --
 3              Q.   I'm sorry.  Go ahead.
 4              A.   Brian Manookian told me that he told
 5    them, so I'm going to believe him on his word, at
 6    that point, that he told them.
 7              Q.   How did Melissa learn about the
 8    suspension?
 9              A.   I don't -- if you're asking specifics,
10    if it was a telephone call or a letter, I can't
11    answer that.  I just knew that she knew about it.
12              Q.   I guess my first question probably is,
13    did she learn about it from Mr. Manookian or from
14    some other source?
15              A.   I don't know.  My memory tells me that
16    it was from Mr. Manookian himself.
17              Q.   Okay.  And that's -- I was trying to
18    clear up that point.  But you don't have any reason
19    to believe that Mr. Manookian failed to inform the
20    Fitzgeralds about his suspension?
21              A.   No.  He -- no.  I believe he told them,
22    told them, from my recollection, that once the
23    suspension was over, everything was going to go, you
24    know, back to how it was, he would be involved after
25    that point.  I know that I was one that was not
```

1    notified per the, you know, per the court order, as
2    he was to notify all referring counsel, as well.
3              Q.   And that's a court order that you
4    reviewed after talking to Melissa Fitzgerald?
5              A.   Correct.  I'm not certain what it's
6    called in your state, but the Tennessee attorney
7    reviewed the plan commission.  I mean, in Illinois,
8    that's what it's called.  So, I mean, if that's the
9    name for Tennessee.  I could be wrong.
10             Q.   In Illinois, it's the IRADC; is that
11   right?
12             A.   Yes.
13             Q.   And here, we have the Tennessee Board
14   of Professional Responsibility, which we call the
15   BPR.
16             A.   Sure.  Okay.  So, yes, I reviewed it on
17   their website.
18             Q.   Do you understand that's an order of
19   the Tennessee Supreme Court?
20             A.   Correct.
21             Q.   And so you understand that upon the
22   order of the Tennessee Supreme Court, Mr. Manookian
23   was no longer entitled to practice law while his
24   license was suspended?
25             A.   Yes.

1          Q.  Did you talk to Melissa Fitzgerald as a

2   friend or as an attorney about whether they were

3   going to speak with other lawyers in his absence?

4          A.  You cut out horribly during that

5   question, Mr. Spragens, but I believe you asked if I

6   talked to Melissa Fitzgerald during that time period

7   in regards to whether they were going to review

8   other -- or interview other counsel.  Is that what

9   you were asking?

10         Q.  Yes, ma'am.  Sorry about the

11  technological problem.

12         A.  That's okay.  All she said to me was

13  that Brian had notified -- from, again, my memory,

14  Brian had notified her of the suspension, assured

15  them that everything was going to be, you know,

16  handled just as it was, everything would be smooth

17  and be continued, and that his firm would continue on

18  until he was back able to practice law, again.

19         Q.  And was it your understanding, at some

20  point, that Afsoon Hagh began representing the

21  Fitzgeralds in this case?

22         A.  I don't believe I ever had that belief

23  or information, that she was the sole one

24  representing them.  I knew that there was some other

25  party at the law firm, as well, even though I had

1    never talked to them.  I don't think I was under the
2    assumption as to who was doing the work when |
3    Mr. Manookian wasn't there.
4              Q.  The other party that you are referring
5    to is Mr. Cummings?
6              A.  Correct.
7              Q.  Did you come to learn, at any time,
8    whether Mr. Cummings had resigned from the law firm?
9              A.  I did not.
10             Q.  You understood that he was a named
11   partner in the law firm at the beginning of the
12   representation?
13             A.  No.  I don't believe I was ever
14   explained his relationship with the firm.
15             Q.  You knew that the firm was called
16   Cummings Manookian, though?
17             A.  Yes.
18             Q.  And in that initial representation
19   letter, it did say that Ms. Hagh would be an attorney
20   who would work on the case; is that right?
21             A.  I would have to look back at the letter
22   to see specifically, names.
23             Q.  Well, looking at Exhibit One to this
24   deposition, it says, All work on this matter will be
25   done by Brian Manookian, Brian Cummings or Afsoon

```
 1   Hagh; is that right?

 2            A.   Yes.

 3            Q.   You don't have any reason to believe

 4   that Ms. Hagh is not qualified to practice plaintiff

 5   personal injury or wrongful death law, do you?

 6            A.   I do not.

 7            Q.   And, in fact, after Mr. Manookian was

 8   suspended, she sent you that PowerPoint presentation;

 9   is that right?

10            A.   Correct.

11            Q.   Was it your understanding that she also

12   drafted the summary judgement opposition?

13            A.   I don't have an understanding as to who

14   drafted it.

15            Q.   Was it your understanding that she

16   drafted the PowerPoint in opposition to the summary

17   judgment?

18            A.   I don't have any understanding in

19   regards to that.  I do recall her telling me that

20   Brain would call me to discuss it.

21            Q.   Do you have any understanding of

22   whether Ms. Hagh argued the summary judgment

23   opposition at the hearing?

24            A.   I do not know.

25            Q.   You didn't attend that hearing?
```

```
 1              A.  I did not.
 2              Q.  Did you ask who was going to be
 3    handling this case in Mr. Manookian's absence?
 4              A.  Ask who?
 5              Q.  Anybody.
 6              A.  Again, the law firm, did I ask that
 7    specific question; no.  I mean, when I see an
 8    attorney part of a named law firm, Cummings
 9    Manookian, and one is suspended, I'm going to assume
10    the other party, as you just note, Brian Cummings and
11    Afsoon Hagh, would, you know, carry on.  Brian always
12    assured me that everything would be handled, even in
13    his absence, just as it was as he was there.
14              Q.  Do you have any view of whether the
15    Fitzgeralds received a fair outcome in their case?
16              A.  I don't know.
17              Q.  Do you know whether Mr. Cummings ever
18    retired from Cummings Manookian?
19              A.  I have no knowledge.
20              Q.  Is it your understanding that if both
21    named partners of that firm were not able to practice
22    law, that that firm could not continue as a going
23    concern?
24              MR. YOUNG:  Objection, to the extent
25    that it calls for a legal conclusion for Tennessee
```

1   law.

2   BY MR. SPRAGENS:

3           Q.   You can answer, Ms. McCarthy.

4           A.   You have to re-ask your question,

5   please.

6           Q.   Sure.  Is it your understanding that if

7   Mr. Cummings was no longer affiliated with the firm

8   and Mr. Manookian was not entitled to practice law,

9   that that firm would no longer be a going concern?

10          A.   You're asking me for an opinion, and

11  I -- it seems almost like a hypothetical.  I don't

12  know either of those things to be true, so I can't

13  answer that question.

14          Q.   Do you know of any law firms in

15  Illinois in which there is no partner who is able to

16  practice law?

17          A.   I haven't reviewed all of the law firms

18  in Illinois.

19          Q.   I know, but do you know of any that you

20  have?  You're a lawyer in Illinois.  Would it

21  surprise you if there was a law firm in Illinois

22  where it was owned by someone other than a lawyer?

23          A.   You know what, I don't know what our

24  rule in Illinois states, as if a non-lawyer can own a

25  law firm or not.

```
 1              Q.  But you don't think that you could
 2    practice law for private clients through Element
 3    Cremation, do you?
 4              A.  I'm not exactly certain of your
 5    question.
 6              Q.  Well, when you represent clients
 7    individually, you don't represent them through
 8    Element Cremation; you represent them through your
 9    own practice; is that right?
10              A.  Correct.  It's two distinct entities.
11    I do not represent; I'm inhouse counsel.  Do you
12    understand what inhouse counsel means?
13              Q.  I think so.
14              A.  Okay.  So I'm inhouse counsel for
15    Elements Cremation.  I do not represent clients in
16    Elements Cremation.
17              Q.  What percentage of the clients that you
18    represent in your private practice also use Element
19    Cremation for its services?
20              A.  Next to none.  That's not the carryover
21    that I do.
22              Q.  I think you testified that you had an
23    impression that Ms. Hagh had a limited role in the
24    case during the period before Mr. Manookian's
25    suspension; is that right?
```

61

1               A.   Yes.

        2               Q.   And it was your understanding that she

        3    had a limited role in the firm; is that right?

        4               A.   I don't believe I answered that.   I

        5    don't know what her role in the firm is.

        6               Q.   You said she was copied on e-mails,

        7    periodically?

        8               A.   Yes.

        9               Q.   Did she talk to you by phone multiple

       10    times after Mr. Manookian's suspension?

       11               A.   She did not talk to me multiple times

       12    after his suspension.

       13               Q.   Okay.   How many times did she talk to

       14    you after he was suspended?

       15               A.   Twice.

       16               Q.   And what dates were those?   Feel free

       17    to refer to the privilege log.

       18               A.   And when we say talked, it could be an

       19    e-mail.   The 4/3/2019 e-mail from me, I guess, that's

       20    from me to her.   The 4/15/2019 e-mail from Hagh to

       21    RLM.

       22               Q.   I think you testified that you talked

       23    to her on the phone twice, didn't you?

       24               A.   She did -- yeah, she did respond to --

       25    again, I don't know if it was a general voicemail.   I

                                                                62

```
1    had left voicemails for Mr. Cummings, Mr. Manookian
2    in a general voice mailbox after he was suspended to
3    know the status in regards to how things were going
4    to be moving forward.  Afsoon did return the call
5    saying Brian would call me.  That was the extent of
6    our conversation.
7              Q.  So you only talked to her on the phone
8    one time?
9              A.  Yeah, I believe so, now that I'm
10   thinking about it.  Excuse my error earlier.
11             Q.  So it's one e-mail and one phone call,
12   and that's the extent of your communications with
13   Ms. Hagh?
14             A.  From my direct communication with her,
15   correct.  As you mentioned, she was copied on things,
16   periodically, not consistently.
17             Q.  And just for clarity, the e-mails in
18   which she was copied, your privilege log does not
19   reflect whether she was copied on an e-mail or not;
20   is that right?
21             A.  My privilege log would show if she was.
22   So, again, there's only a couple of times her name
23   even appears on here.
24             Q.  Okay.  So this privilege log, where it
25   says, e-mail from Manookian to RLM, or RLM to
```

1    Manookian, or Manookian to clients, all of that would
2    reflect whether or not she was cc'd on a
3    communication?
4              A.   I don't know.  I would have to look
5    back at the e-mail, now, since you are asking.
6              Q.   I mean, I just -- frankly, I don't see
7    anything where you indicate somebody being cc'd on a
8    communication, so that's why I'm asking.
9              A.   No.  I mean, if it was, like the
10   10/2/2018 e-mail from Manookian to Marty and myself,
11   it would note.  Yeah, cc'd.  You're correct.  I don't
12   know that, either.
13             Q.   All right.  So she may have been cc'd
14   on any number of these e-mails in the privilege log?
15             A.   Again, I don't know.  I would have to
16   look back at the e-mails.
17             Q.   Okay.  I'm just getting you to agree
18   with me that we can't tell from looking at the
19   privilege log whether or not she was cc'd on an
20   e-mail; is that fair?
21             A.   You cannot tell in regards to if there
22   was anyone copied on it or not.
23             Q.   And that would include Ms. Hagh?
24             A.   Possibly.
25             Q.   Is that a yes to that question?

```
 1              A.   Sure, yes.   I mean, whoever was copied,
 2    no, you cannot tell.   But I can tell you, from my
 3    review of the e-mail for this matter prior to doing
 4    this privilege log, I have not looked at them after,
 5    it was very sporadic that she was on any e-mails.   It
 6    was merely as a copy.   There never engagement
 7    with her, except for the couple of times noted.
 8              Q.   And I appreciate that you're
 9    distinguishing between -- you've got the to and the
10    from on the privilege, just not necessarily the cc,
11    and I get that, and I don't have any dispute with you
12    there.   Did you maintain contemporaneous time records
13    of your work on the Fitzgerald case?
14              A.   What kind of contemporaneous time
15    records are you --
16              Q.   I'm referring to where you --
17              A.   Like a time log?
18              Q.   Yeah, your time entries or how much
19    time you spent on the case, as it went along.
20              A.   No.   There is no need to do so, as the
21    referring.   I do not keep my time, in regards to
22    matters that I refer.
23              Q.   Well, you understand that the rules
24    require you to be paid in proportion for your
25    services or in some other arrangement as the client
```

```
 1    may approve?
 2              A.  I do, and that's in regards to
 3    Tennessee law.
 4              Q.  And this case was pending in Tennessee?
 5              A.  Yes.  So in regards to the substantive
 6    issues or anything, yes, there would be -- you know,
 7    I could tell you the time, but e-mails, no.  I don't
 8    keep the e-mails and the telephone conversations as
 9    time for them.
10              Q.  So if I understand, the privilege log
11    reflects some communications, but that privilege log
12    was generated in response to the subpoena in this
13    bankruptcy case?
14              A.  Correct, yes.
15              Q.  Other than that privilege log, you did
16    not maintain contemporaneous logs of your work on the
17    case?
18              A.  I have a file that has my work in it in
19    regards to this case.
20              Q.  What's in that file?
21              A.  Just printouts of the e-mails, summary
22    judgment motion, some research that Brian and I had
23    talked about that I was looking into, in regards to,
24    potentially, bringing in a possible claim against
25    business insurance providers.
```

66

```
 1              Q.  And that's the hard copy?

 2              A.  Pardon?

 3              Q.  I'm sorry.

 4              A.  You cut out, again.  And I don't know

 5    if there is someone else with you in the room, but I

 6    keep hearing another voice, Mr. Spragens.

 7              Q.  There is no one else in the room with

 8    me, and I hear the same feedback that you do, so I'm

 9    not sure where it's coming from.  But that's

10    maintained in hard copy?

11              A.  Yes.

12              Q.  In that file, just for clarity, there

13    is not, like, a log where you say, on this date, I

14    spent this amount of time on this case?

15              A.  I have not reviewed that file, and it's

16    no longer, like, in my current possession.  It's

17    packed away.  So to say what's specifically in it, I

18    cannot.  I know how I typically keep my notes, but I

19    can't tell you what specifically -- how they were,

20    you know, kept there.

21              Q.  Okay.  Well, we'll do this the hard

22    way.  I'm just trying to find out, do you maintain

23    regular records of your time spent on work, or do you

24    not?

25              A.  I do.  I keep -- but it's more -- it's
```

67

1    like a running list, a time.  So, for example, 11:24
2    a.m., and then, at the conclusion of a telephone
3    conference or me working on something, there will be
4    an end time, so, for example, 12 noon, making it up,
5    if I was doing something between now and 12 noon.
6            Q.  So does that mean that you do have
7    contemporaneous time records of your work on the
8    Fitzgerald matter?
9            A.  Yes.  If you want to call my note
10   entries on paper, yes, that would be, I guess,
11   contemporaneous time.  When I think of
12   contemporaneous time notes, I'm thinking of when I
13   worked in a law firm on litigation matters, and we
14   actually had a time system where you would put in
15   your time spent on a matter.
16           Q.  Sure.  I understand.  So while you
17   don't have a fancy billing software, for example, you
18   do jot down your notes of the time you spent on these
19   cases?
20           A.  I do.
21           Q.  And you expect that that would be in a
22   file, which I believe you said was in storage, now?
23           A.  Correct.
24           Q.  Is that external storage or in your
25   house or in your office somewhere?

```
 1              A.   External.
 2              Q.   Would you have the ability to get that,
 3    if it's needed?
 4              A.   Yes.
 5              Q.   And have you done so in connection with
 6    this bankruptcy or this subpoena that Mr. Young sent
 7    you?
 8              A.   No.
 9              Q.   When was the first time you spoke to
10    Mr. Young?
11              A.   I would have absolutely no idea, in
12    regards to that.  Whenever -- the first time I spoke
13    to Mr. Young.  You know, it wasn't me; my counsel
14    spoke to Mr. Young.  So a few months back, I guess.
15    I don't know.  I would have to have something to
16    refresh my memory to tell me the date when
17    communication occurred between Mr. Young and either
18    my counsel or myself.
19              Q.   And that was your counsel in connection
20    with the Cummings Manookian bankruptcy?
21              A.   Correct, yes.
22              Q.   Did you or your counsel speak to
23    Mr. Young when he -- during the time period before
24    the bankruptcy, when he had been appointed receiver
25    in a state court action in Tennessee?
```

69

1          A.   I would have no idea of the answer to

          2    that question without looking at a timeline,

          3    Mr. Spragens.  And I -- I don't know which matter

          4    you're, you know, referring to there, either.

          5          Q.   So as far as you're aware, the first

          6    contact that you or anybody on your behalf had with

          7    Mr. Young was your attorney in this bankruptcy

          8    talking to Mr. Young as Trustee for -- or counsel for

          9    the Trustee in this bankruptcy?

         10          A.   Again, I don't know, Mr. Spragens.  I

         11    would have to look back at the dates to see when it

         12    was.

         13          Q.   And what would we look at to find that

         14    out?

         15          A.   I guess, an e-mail between myself and

         16    when I hired representation in regards to the

         17    bankruptcy matter.

         18          Q.   So I guess what I'm trying to find out

         19    is, did you ever speak to Mr. Young before the

         20    bankruptcy was initiated?

         21          A.   You kind of positioned that in regards

         22    to some other matter, as well.  So are you just

         23    asking in regards to the bankruptcy matter, or -- I'm

         24    a little unclear.

         25          Q.   My question is whether you spoke to

```
1     Mr. Young before the bankruptcy matter was opened.
2            A.  Again, I don't know.  I would have to
3     look back and see when my counsel initiated
4     conversation.
5            Q.  Did you retain counsel before the
6     Cummings Manookian bankruptcy?
7            A.  I retained counsel in regards to the
8     bankruptcy.
9            Q.  Okay.  So prior to learning about the
10    Cummings Manookian bankruptcy, you had not retained a
11    lawyer to deal with your fee in this matter?
12           A.  No.
13           Q.  And prior to learning about the
14    Cummings Manookian bankruptcy, your lawyer wouldn't
15    have had any contact with Mr. Young?
16           A.  I guess you can draw that conclusion.
17           Q.  You agree that that's correct?
18           A.  There wouldn't be a need for my counsel
19    to have communication.  I hired counsel in regards to
20    the bankruptcy matter and filing a claim.
21           Q.  And then my only other question about
22    this is, prior to the bankruptcy matter, you didn't
23    have any communications with Mr. Young?
24           A.  No.
25           Q.  And what about any communications with
```

1    Jeanne Burton, who is the Trustee in this matter?

2    Have you had any?

3              A.   No.

4              Q.   When was the last time you spoke to

5    Mr. Young before today's deposition?

6              A.   Again, I would have to look back at

7    dates, but it was in regards to my deposition not

8    going, the first -- for the first schedule.  So

9    whatever that date was.

10             Q.   Have you and Mr. Young had any

11   conversation where you discussed the substance of the

12   questions that he would ask you during today's

13   deposition?

14             A.   No.

15             Q.   And about how many times have you

16   directly talked to Mr. Young before today's

17   deposition?

18             A.   Maybe three.  It was in regards to the

19   scheduling of it, when I would be available, the

20   scope, which is exactly the scope on the notice of

21   the deposition, and how long he anticipated, which

22   we're about half an hour over what he anticipated the

23   deposition to run.

24             Q.   Did you understand that after

25   Mr. Manookian was suspended from the practice of law,

1    he had an obligation to keep you informed about

2    matters relating to the transfer of his file to

3    another attorney?

4              A.  You cut out at the very beginning, so I

5    didn't hear what you asked.

6              Q.  Did you understand whether

7    Mr. Manookian, when he was suspended from the

8    practice of law, had an obligation to keep you

9    informed about matters relating to the transfer of

10   his client file to another attorney?

11             A.  Did I understand that he had a duty to

12   me to let me know if the file was transferred to

13   another attorney; is that what you're asking me?

14             Q.  No.  Did you understand whether, due to

15   his duty to his former client, he had an obligation

16   to apprise future attorneys about matters relating to

17   the representation?

18             A.  Your question is confusing me.  Maybe

19   you could break it apart.

20             Q.  Sure.  When an attorney is suspended

21   from the practice of law, do you have any

22   understanding about whether they're expected to, as a

23   part of the hand-off of their client file to other

24   attorneys, who are continuing to represent the

25   client, if they have any obligation to communicate

73

1     with those other attorneys about the representation,

2     notwithstanding the fact that they have been

3     suspended from the practice of law?

4              A.   If you're asking to referring

5     attorneys, yes, I believe he had a duty to let

6     referring attorneys know.  If you're talking

7     generally, to the world of attorneys, I don't know

8     what his responsibility is to tell other attorneys.

9              Q.   And I also mean to the client's next

10    attorney.  After Mr. Manookian hands off that file to

11    somebody else, he has a duty to continue

12    communicating with respect to the hand-off of the

13    client file; do you agree with that?

14             A.   Mr. Spragens, I am sorry.  I don't know

15    if it's my end or yours, but you broke up horribly,

16    again, at the beginning of that question.

17             Q.   Sure.  And I'm sorry about that.  My

18    question is, do you have any understanding about

19    whether an attorney, who is suspended from the

20    practice of law, is required to communicate on behalf

21    of his client with that client's next attorney as

22    part of the transition process of that file going

23    from the suspended attorney to the ongoing

24    representation?

25             A.   I have absolutely no idea.

```
 1    Mr. Manookian was the first counsel I have ever come

 2    in contact with before that has been suspended.

 3              Q.  And that's -- let me ask you this.  Do

 4    you know whether Mr. Manookian consulted with the

 5    Tennessee Board of Professional Responsibility about

 6    his obligations in handing off the client file upon

 7    his suspension and what he was required to do going

 8    forward to ensure that the client was represented?

 9              A.  I have no idea what his conversations

10    were with your Tennessee Board of Professional

11    Responsibility.

12              Q.  Okay.  Well, I appreciate your time

13    today, Ms. McCarthy.  I don't have anything further,

14    at this time.

15              A.  Thank you.

16              MR. GABBERT:  No questions from Craig

17    Gabbert.

18              MR. YOUNG:  Ms. McCarthy, I have no

19    further questions.  Thank you for your time, today.

20              WITNESS:  Thank you.

21              FURTHER DEPONENT SAITH NOT

22              /signature waived/

23              Sworn to before me when taken
                _____
24              LEA ANNE GRAY, LCR 445
                Court Reporter for the
25              State of Tennessee
```

```
 1
 2                          CERTIFICATE
 3
 4            I, Lea Anne Gray, court reporter for the
 5    State of Tennessee, do hereby certify that the
 6    foregoing transcript was recorded stenographically by
 7    me and reduced to typewritten form by me.
 8            I FURTHER CERTIFY that the foregoing
 9    transcript is a true and correct transcript, to the
10    best of my ability, of the testimony given by the
11    said witness at the time and place specified herein.
12            I FURTHER CERTIFY that I am not a relative
13    or employee or attorney or counsel of any of the
14    parties, nor a relative or employee of such attorney
15    or counsel, or financially interested directly or
16    indirectly in this action.
17            IN WITNESS WHEREOF, I have hereunto set my
18    hand this 27th day of June, 2022.
19            _____
20            LEA ANNE GRAY, LCR 445
21            Court Reporter for the
22            State of Tennessee
23
24
25
```

2401

## $

$26,000 [1] - 45:17

## /

/signature [1] - 75:22

## 1

1 [3] - 2:23, 10:14, 36:18
10 [1] - 2:23
10/2/2018 [2] - 19:13, 64:10
10:00 [1] - 3:8
10:40 [1] - 31:7
11:24 [1] - 68:1
12 [2] - 68:4, 68:5
13 [1] - 2:24
15 [1] - 27:10
150 [1] - 2:11
150651 [1] - 1:24
15th [1] - 23:18
17 [1] - 2:25
18 [1] - 37:22

## 2

2 [2] - 2:24, 13:13
2/10 [1] - 51:1
2/18 [2] - 51:1
200 [1] - 2:4
2018 [19] - 10:2, 12:1, 18:9, 18:11, 18:14, 19:8, 19:10, 20:15, 20:16, 20:24, 21:1, 21:15, 22:14, 36:19, 37:18, 37:22, 51:12, 51:13, 53:6
2019 [17] - 23:11, 24:23, 25:4, 25:12, 25:20, 26:19, 27:10, 27:17, 30:16, 46:2, 46:20, 48:11, 51:7, 51:10
2022 [4] - 1:18, 3:7, 48:11, 76:18
22 [1] - 51:11
22nd [1] - 2:7
23 [6] - 10:2, 12:1, 18:9, 18:11, 18:14, 20:15
23rd [1] - 18:19
27th [1] - 76:18
2800 [1] - 2:11
298-1992 [1] - 1:25

## 3

3 [5] - 2:17, 2:25, 17:23, 23:11, 26:19
30 [1] - 27:17
311 [1] - 2:7
32 [1] - 2:18
37067 [1] - 2:4
37201 [1] - 2:12
37203 [1] - 2:8
37215 [1] - 1:24
3:19-bk-07235 [1] - 1:10
3rd [1] - 23:14

## 4

4 [9] - 2:17, 19:8, 24:23, 25:4, 25:20, 51:7, 51:10, 51:13
4/15/2019 [1] - 62:20
4/3/2019 [1] - 62:19
4/30 [1] - 52:20
4/30/2019 [1] - 52:21
40 [2] - 7:11, 33:14
445 [2] - 75:24, 76:20

## 5

5/18/2018 [1] - 52:12
5/23/18 [1] - 2:24
5/8/2019 [1] - 52:23

## 6

6/4/2018 [2] - 19:12, 50:24
6100 [1] - 2:4
615 [1] - 1:25

## 7

7 [1] - 1:10
76 [1] - 2:18

## 8

8 [2] - 1:18, 27:17
8th [1] - 3:7

## A

a.m [2] - 3:8, 68:2
ability [2] - 69:2, 76:10
able [3] - 56:18, 59:21, 60:15
absence [1] - 56:3, 59:3, 59:13
absolutely [4] - 47:14, 48:10, 69:11, 74:25
abundant [1] - 10:9
accurate [1] - 19:23
acknowledgement [1] - 27:20
action [2] - 69:25, 76:16
active [2] - 35:2, 36:18
actively [2] - 26:5, 26:8
addressed [1] - 10:2
administrative [1] - 31:17
advice [6] - 34:10, 49:22, 49:24, 50:4, 50:7, 51:25
advisory [1] - 37:16
affiliated [4] - 36:21, 37:6, 37:8, 60:7
afoul [1] - 7:4
Afsoon [19] - 13:16, 16:20, 20:17, 20:22, 20:25, 21:3, 21:7, 22:5, 25:7, 26:5, 26:19, 26:20, 26:21, 27:6, 31:13, 56:20, 57:25, 59:11, 63:4
Afsoon's [1] - 31:13
afterwards [1] - 3:14
ago [1] - 12:22
agree [5] - 20:25, 43:10, 64:17, 71:17, 74:13
agreed [1] - 3:11
agreement [6] - 9:13, 20:15, 38:4, 38:5, 38:6, 42:15
agreements [2] - 37:23, 38:1
ahead [2] - 15:3, 29:19, 54:3
allergies [1] - 10:8
almost [2] - 21:24, 60:11
amount [3] - 44:5, 45:20, 67:14
AND [1] - 2:6
andrew [1] - 47:22
ANN [2] - 1:8, 2:2
Anne [2] - 3:11, 76:4
ANNE [4] - 1:23, 1:23, 75:24, 76:20
answer [16] - 4:20, 4:23, 4:25, 38:15, 44:14, 44:15, 44:19, 44:21, 47:3, 48:12, 48:13, 50:13, 54:11, 60:3, 60:13, 70:1
answered [2] - 38:14, 62:4
anticipated [2] -

72:21, 72:22
anyway [1] - 4:17
apart [1] - 73:19
apologize [2] - 10:11, 51:12
APPEARANCES [1] - 2:1
appointed [2] - 4:6, 69:24
appreciate [3] - 50:2, 65:8, 75:12
apprise [1] - 73:16
appropriate [2] - 39:22, 40:1
approve [1] - 66:1
apps [1] - 5:21
April [2] - 23:11, 23:14, 23:18, 26:19, 27:10, 27:17
APSOON [1] - 1:11
area [5] - 6:8, 8:15, 38:18, 38:20, 38:25
argued [1] - 58:22
arrangement [1] - 65:25
aside [1] - 36:22
aspects [1] - 36:2
asserting [1] - 17:3
assist [1] - 7:16
assistance [1] - 7:12
assisted [2] - 31:21, 34:7
associate [1] - 14:15
ASSOCIATES [1] - 1:23
assume [3] - 6:19, 19:15, 59:9
assumption [1] - 57:2
assured [2] - 56:14, 59:12
attend [1] - 58:25
attorney [23] - 4:24, 6:1, 1:15, 35:25, 39:13, 41:17, 44:17, 50:5, 55:6, 56:2, 57:19, 59:8, 70:7, 73:3, 73:10, 73:13, 73:20, 74:10, 74:19, 74:21, 74:23, 76:13, 76:14
Attorney [1] - 11:2
attorney's [1] - 48:7
attorney/client [3] - 7:2, 7:6, 7:7
attorneys [12] - 12:8, 33:3, 33:7, 33:9, 40:13, 73:16, 73:24, 74:1, 74:5, 74:6, 74:7, 74:8
audibly [1] - 4:21

August [1] - 30:16
authorized [1] - 13:11
available [1] - 72:19
Avenue [2] - 2:7, 2:11
award [1] - 47:12
aware [5] - 21:11, 29:10, 39:6, 44:17, 70:5
awareness [1] - 39:16
awkward [1] - 4:19

## B

BANK [2] - 1:12, 2:9
Bankruptcy [1] - 4:6
BANKRUPTCY [1] - 1:1
bankruptcy [23] - 42:11, 44:9, 45:5, 45:10, 45:13, 45:16, 45:21, 66:13, 69:6, 69:20, 69:24, 70:7, 70:9, 70:17, 70:20, 70:23, 71:1, 71:6, 71:8, 71:10, 71:14, 71:20, 71:22
based [1] - 42:13
basic [1] - 8:14
BASS [1] - 2:10
became [3] - 7:8, 12:16, 21:11
began [1] - 56:20
beginning [3] - 3:8, 16:7, 34:22, 57:11, 73:4, 74:16
behalf [3] - 33:7, 70:6, 74:20
belief [1] - 56:22
benefit [1] - 47:10
BERRY [1] - 2:10
best [3] - 8:24, 17:21, 76:10
between [14] - 9:15, 18:21, 19:7, 19:19, 23:24, 42:9, 48:11, 50:2, 50:22, 52:25, 65:9, 68:5, 69:17, 70:15
big [1] - 50:11
billing [1] - 68:17
bit [1] - 15:3
blow [1] - 10:7
Board [2] - 55:13, 75:5, 75:10
Box [1] - 1:24
BPR [1] - 55:15
Brain [1] - 58:20
break [5] - 5:3, 5:4, 31:7, 31:9, 73:19
Brian [36] - 8:2, 14:6,

14:11, 14:12, 15:10,
15:20, 16:6, 16:13,
16:19, 18:24, 22:4,
24:8, 26:3, 27:7,
27:24, 28:12, 29:6,
31:16, 32:7, 33:12,
40:6, 40:8, 41:18,
42:9, 52:10, 52:13,
52:14, 52:25, 56:13,
56:14, 57:25, 59:10,
59:11, 63:5, 66:22

**BRIAN** [1] - 2:6

**brian** [2] - 14:10, 54:4

**Brian's** [2] - 14:11,
52:3

**bringing** [1] - 66:24

**broad** [1] - 15:24

**broke** [1] - 74:15

**brother** [1] - 34:2

**Burton** [5] - 2:3, 4:5,
4:8, 47:22, 72:1

**BURTON** [2] - 1:8, 2:2

**business** [3] - 6:12,
36:1, 66:25

**businesses** [1] -
36:22

**BY** [9] - 4:3, 10:15,
13:14, 17:5, 17:24,
22:24, 31:11, 32:5,
60:2

---

### C

**cannot** [6] - 33:11,
40:4, 44:22, 64:21,
65:2, 67:18

**caption** [1] - 3:16

**car** [2] - 34:20, 36:7

**carry** [1] - 59:11

**carryover** [1] - 61:20

**case** [55] - 6:22, 13:20,
14:4, 14:11, 14:13,
14:20, 15:8, 15:23,
16:2, 17:7, 19:8,
20:2, 25:18, 28:2,
29:13, 29:15, 29:16,
29:23, 29:25, 30:4,
30:7, 30:13, 31:5,
31:14, 31:21, 31:23,
32:2, 32:11, 32:17,
33:4, 34:5, 39:3,
42:1, 43:17, 43:18,
44:9, 49:22, 49:25,
50:9, 51:18, 52:2,
52:5, 56:21, 57:20,
59:3, 59:15, 61:24,
65:13, 65:19, 66:4,
66:13, 66:17, 66:19,
67:14

**cases** [2] - 33:10,

68:19

**catch** [1] - 6:16

**categorically** [1] -
47:14

**categorize** [2] - 48:19,
48:21

**cc** [1] - 65:10

**cc'd** [5] - 64:2, 64:7,
64:11, 64:13, 64:19

**certain** [4] - 14:22,
45:2, 55:5, 61:4

**certainly** [1] - 4:12

**CERTIFICATE** [1] -
76:2

**Certificate** [1] - 2:18

**certificate** [1] - 3:17

**certify** [1] - 76:5

**CERTIFY** [2] - 76:8,
76:12

**Chapter** [1] - 1:10

**charge** [1] - 14:12

**children** [1] - 37:17

**choice** [1] - 8:24

**Circle** [1] - 2:4

**circulated** [1] - 9:23

**CITIZENS** [2] - 1:12,
2:9

**Civil** [2] - 3:10, 44:18

**claim** [3] - 45:11,
66:24, 71:20

**claiming** [1] - 42:3

**clarity** [2] - 63:17,
67:12

**clear** [1] - 54:18

**client** [7] - 15:17,
15:18, 16:5, 65:25,
73:10, 73:15, 73:23,
73:25, 74:13, 74:21,
75:6, 75:8

**client's** [2] - 22:23,
74:9, 74:21

**clients** [12] - 7:23,
8:16, 8:25, 37:14,
37:18, 37:23, 38:1,
61:2, 61:6, 61:15,
61:17, 64:1

**close** [3] - 16:8, 31:8,
34:7

**closings** [1] - 6:11

**coming** [2] - 28:7,
67:9

**commission** [1] - 55:7

**commitment** [2] -
8:16, 8:25

**committed** [2] - 43:19,
44:5

**communicate** [4] -
16:3, 16:4, 73:25,
74:20

**communicated** [2] -

16:7, 51:25

**communicating** [1] -
74:12

**communication** [8] -
5:21, 23:24, 51:3,
63:14, 64:3, 64:8,
69:17, 71:19

**communications** [21]
- 17:4, 18:19, 18:23,
19:18, 25:22, 26:2,
26:6, 27:23, 31:5,
32:25, 33:1, 33:2,
33:3, 50:13, 50:14,
50:22, 51:11, 63:12,
66:11, 71:23, 71:25

**company** [2] - 6:16,
6:17

**Company** [1] - 6:10

**COMPANY** [1] - 1:12

**compiled** [1] - 17:17

**complaint** [1] - 20:10

**computer** [1] - 5:22

**concern** [2] - 59:23,
60:9

**concerning** [1] - 19:7

**concluded** [1] - 46:8

**conclusion** [5] - 41:5,
46:1, 59:25, 68:2,
71:16

**conference** [4] -
19:12, 30:18, 30:21,
68:3

**conferences** [1] - 19:2

**confirm** [1] - 22:21

**confirming** [1] - 42:18

**confusing** [1] - 73:18

**connection** [3] - 37:2,
69:5, 69:19

**consistent** [1] - 21:6

**consistently** [1] -
63:16

**consulted** [1] - 75:4

**contact** [5] - 14:11,
31:17, 70:6, 71:15,
75:2

**contacted** [1] - 37:5,
37:10, 40:11

**contemporaneous** [6]
- 65:12, 65:14,
66:16, 68:7, 68:11,
68:12

**contend** [1] - 42:7

**CONTENTS** [1] - 2:15

**contingency** [4] -
11:1, 12:6, 42:21,
42:24

**continual** [1] - 15:10

**continue** [4] - 28:1,
56:17, 59:22, 74:11

**continued** [1] - 56:17

**continuing** [1] - 73:24

**contractor** [1] - 14:15

**conversation** [16] -
14:17, 15:20, 16:13,
20:19, 22:16, 24:8,
31:3, 43:12, 44:2,
46:4, 50:25, 51:17,
52:16, 63:6, 71:4,
72:11

**conversations** [18] -
8:12, 9:4, 15:8,
17:11, 20:17, 20:21,
20:25, 21:3, 24:2,
24:19, 41:9, 44:3,
49:25, 50:3, 50:8,
50:11, 66:8, 75:9

**copied** [10] - 21:4,
25:9, 26:13, 26:16,
62:6, 63:15, 63:18,
63:19, 64:22, 65:1

**copy** [14] - 9:14,
10:23, 11:3, 11:6,
11:18, 12:14, 12:19,
12:24, 13:5, 13:9,
22:9, 65:6, 67:1,
67:10

**corporate** [1] - 35:13

**Correct** [1] - 66:14

**correct** [43] - 6:1,
6:20, 11:19, 17:8,
17:9, 17:21, 18:12,
18:24, 19:15, 19:16,
21:23, 23:15, 23:16,
23:19, 23:20, 25:21,
27:11, 33:15, 34:11,
35:14, 36:20, 37:13,
38:24, 40:10, 45:1,
46:21, 47:2, 48:10,
49:19, 51:5, 53:12,
53:15, 55:5, 55:20,
57:6, 58:10, 61:10,
63:15, 64:11, 68:23,
69:21, 71:17, 76:9

**correctly** [2] - 39:21,
39:24

**counsel** [39] - 6:9,
6:15, 7:14, 7:17,
7:20, 7:22, 7:23,
7:25, 9:1, 15:11,
16:4, 22:14, 22:15,
22:20, 37:20, 38:18,
38:25, 41:3, 41:4,
41:7, 45:9, 55:2,
56:8, 61:11, 61:12,
61:14, 69:13, 69:18,
69:19, 69:22, 70:8,
71:3, 71:5, 71:7,
71:18, 71:19, 75:1,
76:13, 76:15

**counsels'** [1] - 41:10

**couple** [6] - 8:20,
24:20, 40:18, 52:18,
63:22, 65:7

**COURT** [1] - 1:1

**court** [7] - 3:11, 4:6,
15:11, 55:1, 55:3,
69:25, 76:4

**Court** [5] - 29:21,
55:19, 55:22, 75:24,
76:21

**court-appointed** [1] -
4:6

**CRAIG** [1] - 2:10

**Craig** [1] - 75:16

**Creation** [1] - 36:23

**Cremation** [15] - 6:10,
6:18, 35:17, 35:20,
35:25, 36:2, 36:25,
37:7, 37:24, 38:10,
61:3, 61:8, 61:15,
61:16, 61:19

**cremation** [1] - 34:15,
36:24

**crematory** [1] - 6:19

**crossed** [2] - 40:20,
41:19

**cummings** [1] - 57:5

**Cummings** [27] - 4:6,
9:9, 9:11, 9:15, 10:1,
10:22, 11:25, 13:17,
14:6, 14:8, 14:16,
18:15, 18:21, 38:6,
57:8, 57:16, 57:25,
59:8, 59:10, 59:17,
59:18, 60:7, 63:1,
69:20, 71:6, 71:10,
71:14

**CUMMINGS** [1] - 1:6

**current** [1] - 67:16

**cut** [4] - 48:3, 56:4,
67:4, 73:4

---

### D

**date** [12] - 12:1, 18:14,
20:20, 20:23, 21:2,
21:16, 23:13, 28:8,
46:1, 67:13, 69:16,
72:9

**dated** [2] - 10:2, 12:1

**dates** [3] - 62:16,
70:11, 72:7

**daughter** [2] - 7:13,
35:16

**days** [2] - 10:13, 21:18

**deal** [1] - 71:11

**death** [3] - 37:5,
40:13, 58:5

**Debtor** [1] - 1:7

**December** [4] - 20:24,

21:15, 22:14, 53:5
**decided** [1] - 43:18
**decision** [2] - 46:25, 47:1
**Defendants** [1] - 1:13
**degree** [1] - 14:24
**deny** [2] - 47:13, 47:14
**DEPONENT** [1] - 75:21
**deponent** [1] - 3:18
**DEPOSITION** [1] - 1:16
**deposition** [19] - 3:6, 3:13, 3:17, 4:13, 12:21, 17:16, 32:21, 44:20, 46:14, 46:17, 49:12, 50:20, 57:24, 72:5, 72:7, 72:13, 72:17, 72:21, 72:23
**depositions** [3] - 4:19, 4:20, 5:6
**describe** [3] - 18:19, 25:16, 26:7
**described** [1] - 8:15
**DESCRIPTION** [1] - 2:22
**designated** [1] - 50:19
**DESIGNATED** [3] - 10:14, 13:13, 17:23
**detail** [1] - 17:10
**different** [3] - 7:25, 12:4, 44:6
**direct** [2] - 10:25, 12:5, 24:7, 63:14
**direction** [1] - 34:16
**directly** [4] - 18:24, 39:12, 72:16, 76:15
**discuss** [2] - 24:9, 58:20
**discussed** [1] - 72:11
**discussion** [7] - 28:8, 28:10, 29:1, 29:20, 42:8, 43:4, 43:6
**discussions** [4] - 23:1, 25:24, 28:18, 28:21
**dispute** [1] - 65:11
**distinct** [1] - 61:10
**distinguishing** [1] - 65:9
**distributed** [1] - 43:25
**DISTRICT** [1] - 1:2
**DIVISION** [1] - 1:3
**document** [4] - 10:16, 11:7, 11:24, 52:16
**documents** [4] - 17:7, 20:6, 21:8, 46:16
**donate** [1] - 44:8
**donated** [2] - 48:13, 48:14

**donating** [1] - 49:14
**done** [5] - 21:25, 31:8, 44:23, 57:25, 69:5
**down** [2] - 27:16, 68:18
**draft** [2] - 16:2, 21:8
**drafted** [4] - 16:15, 58:12, 58:14, 58:16
**drafts** [4] - 16:12, 24:13, 24:16, 24:18
**draw** [1] - 71:16
**driver's** [1] - 34:18
**due** [2] - 32:15, 73:14
**duly** [1] - 4:2
**during** [18] - 16:18, 20:2, 20:5, 20:14, 21:5, 22:20, 24:11, 24:14, 26:3, 26:16, 43:17, 43:18, 50:4, 56:4, 56:6, 61:24, 69:23, 72:12
**During** [1] - 22:25
**duty** [4] - 73:11, 73:15, 74:5, 74:11

### E

**e-mail** [29] - 19:13, 23:4, 23:15, 23:16, 23:18, 24:24, 25:3, 25:10, 26:20, 26:21, 26:23, 27:3, 27:4, 27:5, 27:8, 43:8, 51:2, 51:4, 62:19, 62:20, 63:11, 63:19, 63:25, 64:5, 64:10, 64:20, 65:3, 70:15
**e-mailed** [1] - 26:19
**e-mails** [21] - 16:17, 19:6, 19:21, 20:16, 21:4, 25:23, 26:9, 26:14, 27:12, 28:11, 42:18, 42:23, 51:8, 62:6, 63:17, 64:14, 64:16, 65:5, 66:7, 66:8, 66:21
**effect** [2] - 21:19, 53:5
**either** [6] - 13:6, 22:4, 60:12, 64:12, 69:17, 70:4
**Element** [10] - 35:17, 35:20, 35:25, 36:23, 37:6, 37:24, 38:10, 61:2, 61:8, 61:18
**Elements** [4] - 6:10, 36:2, 61:15, 61:16
**elements** [2] - 6:18, 36:24
**employee** [2] - 76:13, 76:14

**encouraged** [1] - 47:10
**end** [5] - 6:11, 20:16, 34:10, 68:4, 74:15
**engage** [1] - 9:10
**engaged** [1] - 18:15
**Engagement** [1] - 2:23
**engagement** [17] - 9:15, 9:19, 10:4, 10:21, 10:23, 11:3, 11:17, 12:3, 18:20, 19:5, 20:15, 37:22, 38:1, 38:3, 42:17, 42:20, 65:6
**engaging** [2] - 13:16, 22:15
**ensure** [1] - 75:8
**entire** [1] - 21:18
**entities** [1] - 61:10
**entitled** [4] - 42:7, 52:5, 55:23, 60:8
**entries** [9] - 18:7, 18:8, 18:18, 24:21, 26:18, 27:18, 30:15, 65:18, 68:10
**entry** [4] - 23:23, 24:23, 25:19, 26:22
**error** [1] - 63:10
**ESQUIRE** [3] - 2:3, 2:6, 2:10
**estate** [1] - 6:11
**estates** [1] - 24:14
**eventually** [1] - 8:2
**evidences** [1] - 23:23
**exact** [1] - 40:22
**exactly** [3] - 43:19, 61:4, 72:20
**Examination** [2] - 2:17, 2:18
**EXAMINATION** [2] - 4:3, 32:5
**example** [3] - 68:1, 68:4, 68:17
**except** [3] - 3:18, 19:1, 65:7
**excuse** [3] - 10:7, 51:12, 63:10
**execution** [2] - 18:20, 20:14
**EXHIBIT** [3] - 10:14, 13:13, 17:23
**Exhibit** [13] - 9:22, 9:25, 10:17, 11:21, 11:24, 12:15, 12:16, 17:16, 18:13, 24:22, 50:18, 50:19, 57:23
**exhibit** [2] - 12:24, 18:1
**exhibits** [1] - 5:17

**expect** [2] - 5:1, 68:21
**expected** [1] - 73:22
**experience** [3] - 39:8, 39:16, 39:19
**expertise** [2] - 41:14, 41:16
**explain** [2] - 4:16, 7:8
**explained** [1] - 57:14
**extent** [4] - 39:6, 59:24, 63:5, 63:12
**external** [1] - 68:24
**External** [1] - 69:1

### F

**fact** [2] - 58:7, 74:2
**failed** [1] - 54:19
**fair** [4] - 19:25, 48:16, 59:15, 64:20
**fairly** [1] - 18:19
**fall** [2] - 46:2, 46:15
**falling** [1] - 48:17
**false** [6] - 47:25, 48:5, 49:2, 49:3, 49:8, 49:10
**familiar** [1] - 6:21
**families** [3] - 34:14, 36:3, 44:6
**family** [1] - 49:22
**fancy** [1] - 68:17
**far** [5] - 41:23, 47:6, 70:5
**February** [4] - 24:23, 25:3, 25:12, 25:20
**fee** [12] - 11:1, 12:6, 41:23, 42:1, 42:3, 42:6, 42:11, 42:21, 42:24, 48:7, 52:5, 71:11
**feedback** [2] - 28:17, 67:8
**fees** [5] - 30:13, 45:3, 45:6, 45:15, 45:19
**felt** [1] - 44:5
**few** [10] - 5:5, 6:9, 7:25, 10:13, 11:16, 27:16, 27:18, 31:19, 41:1, 69:14
**file** [13] - 66:18, 66:20, 67:12, 67:15, 68:22, 73:2, 73:10, 73:12, 73:23, 74:10, 74:13, 74:22, 75:6
**filed** [3] - 6:22, 20:5, 20:10
**filing** [2] - 20:8, 71:20
**finalize** [1] - 36:5
**financially** [1] - 76:15
**fine** [1] - 44:12
**Firm** [1] - 10:22

**firm** [27] - 9:6, 9:8, 14:6, 14:24, 22:18, 34:12, 34:21, 34:23, 34:24, 52:11, 56:17, 56:25, 57:8, 57:11, 57:14, 57:15, 59:6, 59:8, 59:21, 59:22, 60:7, 60:9, 60:21, 60:25, 62:3, 62:5, 68:13
**firms** [3] - 37:25, 60:14, 60:17
**first** [21] - 4:2, 9:4, 12:18, 12:21, 19:1, 19:11, 20:19, 24:22, 30:10, 33:17, 33:25, 42:19, 50:24, 52:19, 54:12, 62:9, 69:12, 70:5, 72:8, 75:1
**FIRST** [2] - 1:12, 2:9
**FIRST-CITIZENS** [1] - 1:12
**fitzgerald** [1] - 53:14
**Fitzgerald** [24] - 6:22, 7:9, 10:3, 10:22, 12:2, 15:23, 17:12, 19:8, 19:14, 20:2, 31:14, 31:25, 33:4, 41:5, 41:23, 42:4, 45:24, 51:2, 51:6, 55:4, 56:1, 56:6, 65:13, 68:8
**Fitzgeralds** [45] - 7:10, 8:13, 8:18, 8:23, 9:10, 9:16, 13:3, 13:6, 13:16, 18:15, 18:21, 19:2, 19:13, 21:21, 21:24, 22:2, 22:10, 22:13, 30:3, 30:5, 30:9, 30:12, 33:8, 33:14, 33:18, 33:24, 35:15, 37:4, 37:9, 37:19, 38:4, 41:8, 43:16, 44:1, 49:21, 50:16, 50:23, 50:25, 51:8, 52:4, 53:10, 53:23, 54:20, 56:21, 59:15
**Fitzgeralds'** [1] - 48:14
**five** [1] - 18:10
**following** [1] - 31:9
**follows** [1] - 4:2
**FOR** [4] - 1:2, 2:2, 2:6, 2:9
**foregoing** [2] - 76:6, 76:8
**form** [4] - 3:15, 3:19, 35:13, 76:7
**formalities** [1] - 3:16

former [1] - 73:15
forth [2] - 27:6, 42:10
forths [1] - 28:15
forward [3] - 29:7, 63:4, 75:8
forwarded [6] - 12:20, 16:11, 16:13, 16:15, 16:21, 20:7
four [1] - 18:10
Franklin [1] - 2:4
frankly [1] - 64:6
free [1] - 62:16
friend [8] - 8:6, 34:3, 34:7, 37:10, 38:21, 39:2, 47:18, 56:2
friend's [1] - 47:19
friendly [2] - 46:18, 53:13
friends [10] - 7:11, 33:14, 35:21, 35:23, 38:19, 46:19, 47:20, 48:23, 51:16, 51:19
friendship [1] - 46:22
front [1] - 5:15
full [2] - 4:10, 44:8
funeral [1] - 34:8
FURTHER [3] - 75:21, 76:8, 76:12
future [2] - 43:20, 73:16

### G

Gabbert [1] - 75:17
GABBERT [2] - 2:10, 75:16
general [3] - 24:6, 62:25, 63:2
generally [1] - 74:7
generated [1] - 66:12
given [4] - 4:13, 9:14, 15:13, 76:10
Google [1] - 41:11
GRAY [3] - 1:23, 75:24, 76:20
Gray [2] - 3:11, 76:4
great [3] - 43:11, 44:3
Group [1] - 35:1
growing [1] - 33:19
guess [10] - 34:13, 51:23, 52:24, 54:12, 62:19, 68:10, 69:14, 70:15, 70:18, 71:16

### H

hagh [17] - 15:5, 22:16, 23:15, 23:18, 23:24, 24:2, 24:12, 25:14, 26:10, 27:3, 27:8, 29:25, 58:4, 58:22, 61:23, 63:13, 64:23
HAGH [2] - 1:11, 1:11
Hagh [21] - 13:16, 13:20, 14:1, 14:14, 15:1, 20:17, 20:25, 21:4, 21:7, 23:2, 25:7, 26:5, 26:19, 26:20, 26:21, 27:12, 56:20, 57:19, 58:1, 59:11, 62:20
Hagh's [1] - 31:13
half [1] - 72:22
hand [3] - 73:23, 74:12, 76:18
hand-off [2] - 73:23, 74:12
handful [1] - 18:9
handing [1] - 75:6
handled [2] - 56:16, 59:12
handling [1] - 59:3
hands [1] - 74:10
happy [1] - 5:4
hard [2] - 67:1, 67:10, 67:21
hardest [1] - 9:3
hats [1] - 51:22
head [1] - 4:22
hear [5] - 28:19, 32:8, 32:9, 67:8, 73:5
heard [4] - 45:11, 47:3, 47:7, 48:24
hearing [5] - 3:19, 40:7, 58:23, 58:25, 67:6
help [2] - 7:19, 36:1
hereby [1] - 76:5
herein [1] - 76:11
hereunto [1] - 76:17
himself [2] - 29:7, 54:16
hire [1] - 45:9
hired [2] - 70:16, 71:19
home [2] - 5:8, 36:7
honest [1] - 30:11
honestly [2] - 44:22, 48:12
horribly [2] - 56:4, 74:15
hour [1] - 72:22
house [1] - 68:25
hypothetical [1] - 60:11

### I

idea [4] - 69:11, 70:1, 74:25, 75:9
identify [1] - 50:22
illegal [1] - 42:2
Illinois [13] - 6:4, 10:8, 33:20, 36:9, 36:17, 42:14, 55:7, 55:10, 60:15, 60:18, 60:20, 60:21, 60:24
immediately [1] - 30:6
impact [1] - 31:22
important [2] - 4:18, 32:1
impression [1] - 61:23
IN [3] - 1:1, 1:5, 76:17
include [2] - 50:14, 64:23
incorporated [1] - 35:8
incurred [1] - 45:3
independently [1] - 35:21
indicate [1] - 64:7
indirectly [1] - 76:16
individually [2] - 47:11, 61:7
Individually [1] - 38:7
individuals [1] - 38:19
inform [2] - 53:23, 54:19
information [4] - 17:20, 18:2, 51:14, 56:23
informed [2] - 73:1, 73:9
inhouse [7] - 6:9, 6:15, 35:17, 35:24, 61:11, 61:12, 61:14
initial [6] - 7:22, 26:21, 49:20, 50:7, 53:24, 57:18
initiated [3] - 46:13, 70:20, 71:3
injury [6] - 6:14, 7:24, 9:1, 37:20, 37:25, 40:12, 58:5
instance [1] - 3:8
instances [1] - 23:22
instant [1] - 5:22
instatement [1] - 52:21
insurance [4] - 36:5, 36:6, 47:12, 66:25
intake [1] - 7:22
intending [1] - 18:5
intention [6] - 7:5, 44:7, 44:13, 44:25, 45:2, 45:18
interest [1] - 38:9
interested [1] - 76:15
interview [1] - 56:8
interviewed [1] - 22:14
introduction [1] - 8:14
involved [10] - 7:8, 14:4, 25:18, 26:5, 28:1, 28:16, 28:17, 28:21, 29:2, 54:24
involvement [2] - 15:22, 31:25, 45:4
IRADC [1] - 55:10
irrelevant [2] - 44:11, 44:20
issue [1] - 5:1
issues [3] - 6:11, 34:10, 66:6

### J

January [1] - 36:18
JEANNE [2] - 1:8, 2:2
Jeanne [2] - 4:5, 72:1
Jessica [1] - 47:22
John [2] - 32:6, 39:4
JOHN [1] - 2:6
jot [1] - 68:18
JR [2] - 2:3, 2:10
Judge [1] - 1:11
judgement [1] - 58:12
judgment [9] - 16:12, 16:16, 24:15, 24:25, 25:5, 50:5, 58:17, 58:22, 66:22
jumping [1] - 15:3
JUNE [1] - 1:18
June [7] - 3:7, 19:8, 19:18, 51:7, 51:10, 51:13, 76:18

### K

keep [10] - 48:1, 48:6, 49:13, 65:21, 66:8, 67:6, 67:18, 67:25, 73:1, 73:8
keeping [1] - 43:23
kept [2] - 20:1, 67:20
kind [6] - 40:6, 40:19, 41:19, 50:11, 65:14, 70:21
knowledge [6] - 14:5, 17:21, 18:22, 18:25, 26:11, 59:19

### L

language [2] - 11:9, 11:11
last [4] - 10:13, 30:15, 45:23, 72:4
law [45] - 6:5, 6:8, 9:6, 21:11, 22:18, 27:19, 34:12, 34:21, 34:23, 34:24, 35:2, 36:9, 36:11, 36:14, 36:17, 36:22, 37:6, 52:11, 52:17, 52:22, 52:25, 55:23, 56:18, 56:25, 57:8, 57:11, 58:5, 59:6, 59:8, 59:22, 60:1, 60:8, 60:14, 60:16, 60:17, 60:21, 60:25, 61:2, 66:3, 68:13, 72:25, 73:8, 73:21, 74:3, 74:20
Law [5] - 2:7, 10:22, 35:1, 35:6, 35:9
LAW [1] - 1:11
lawyer [5] - 60:20, 60:22, 60:24, 71:11, 71:14
lawyers [2] - 32:16, 56:3
lay [1] - 41:17
LCR [2] - 75:24, 76:20
Lea [2] - 3:11, 76:4
LEA [3] - 1:23, 75:24, 76:20
leading [1] - 14:13
LEAL [3] - 1:17, 2:16, 4:1
Leal [5] - 3:6, 4:12, 35:1, 35:7, 35:9
learn [8] - 15:16, 15:18, 21:17, 29:13, 29:16, 54:7, 54:13, 57:7
learned [7] - 15:10, 21:13, 21:20, 21:22, 21:23, 22:2, 53:9
learning [3] - 8:14, 71:9, 71:13
least [2] - 31:16, 40:19
led [2] - 34:5, 39:20
left [3] - 24:5, 24:6, 63:1
legal [16] - 10:3, 10:20, 12:2, 34:10, 45:3, 45:6, 45:15, 45:18, 49:21, 49:24, 50:4, 50:7, 51:18, 51:25, 59:25
Letter [2] - 2:23, 2:24
letter [27] - 9:15, 9:19, 9:25, 10:1, 10:4, 10:21, 10:24, 11:3, 11:11, 11:14, 11:25, 12:15, 12:19, 12:25, 13:2, 13:6, 13:9, 13:11, 18:20, 19:5, 22:7, 22:9, 42:17,

42:20, 54:10, 57:19, 57:21
**letterhead** [2] - 10:1, 12:1
**license** [9] - 6:6, 21:12, 24:12, 27:19, 34:18, 36:18, 52:22, 52:25, 55:24
**licensed** [5] - 5:25, 6:3, 8:1, 36:9, 36:11, 36:14
**lied** [1] - 48:24
**life** [3] - 6:11, 34:10, 36:6
**limbs** [1] - 43:22
**limited** [5] - 14:10, 14:21, 14:23, 61:23, 62:3
**line** [2] - 10:3, 50:1
**lines** [3] - 18:10, 27:17, 52:22
**list** [3] - 27:9, 40:20, 68:1
**litigation** [5] - 26:24, 27:13, 28:22, 50:4, 68:13
**live** [4] - 10:8, 38:19, 38:20, 49:11
**lives** [1] - 8:6
**LLC** [1] - 35:12
**locally** [1] - 41:13
**located** [1] - 5:7
**log** [33] - 17:2, 17:6, 17:8, 17:10, 17:17, 17:21, 18:17, 23:7, 23:23, 24:21, 25:19, 30:16, 32:24, 45:8, 50:15, 50:17, 50:20, 51:24, 52:9, 52:16, 53:20, 62:17, 63:18, 63:21, 63:24, 64:14, 64:19, 65:4, 65:17, 66:10, 66:11, 66:15, 67:13
**Log** [1] - 2:25
**logs** [1] - 66:16
**look** [24] - 9:21, 16:14, 16:17, 17:15, 18:8, 18:13, 20:18, 23:17, 26:18, 27:4, 27:16, 32:18, 37:17, 46:12, 50:12, 50:18, 52:12, 57:21, 64:4, 64:16, 70:11, 70:13, 71:3, 72:6
**looked** [3] - 12:4, 38:5, 65:4
**looking** [11] - 7:23, 9:25, 17:1, 28:6, 28:10, 38:24, 53:4,

57:23, 64:18, 66:23, 70:2
**looks** [5] - 18:9, 19:6, 19:17, 19:21, 26:19
**loop** [1] - 20:1
**loss** [2] - 34:5, 35:16
**lost** [1] - 43:22
**loved** [1] - 34:16

**M**

**ma'am** [1] - 56:10
**mail** [29] - 19:13, 23:4, 23:15, 23:16, 23:18, 24:24, 25:3, 25:10, 26:20, 26:21, 26:23, 27:3, 27:4, 27:5, 27:8, 43:8, 51:2, 51:4, 62:19, 62:20, 63:11, 63:19, 63:25, 64:5, 64:10, 64:20, 65:3, 70:15
**mailbox** [1] - 63:2
**mailed** [1] - 26:19
**mails** [21] - 16:17, 19:6, 19:21, 20:16, 21:4, 25:23, 26:9, 26:14, 27:12, 28:11, 42:18, 42:23, 51:8, 62:6, 63:17, 64:14, 64:16, 65:5, 66:7, 66:8, 66:21
**maintain** [3] - 65:12, 66:16, 67:22
**maintained** [2] - 46:22, 67:10
**maintaining** [1] - 37:11
**manookian** [3] - 55:22, 60:8, 75:1
**Manookian** [91] - 4:7, 8:3, 8:12, 8:18, 8:23, 9:5, 9:9, 9:11, 9:15, 10:1, 10:22, 11:25, 13:6, 13:17, 13:19, 14:8, 14:16, 18:15, 18:21, 18:24, 19:7, 19:14, 19:19, 19:22, 19:23, 21:5, 22:5, 22:10, 22:25, 24:3, 24:16, 24:24, 25:4, 25:13, 25:23, 26:3, 26:23, 27:2, 28:23, 29:22, 31:1, 31:6, 32:7, 32:11, 32:17, 33:12, 38:6, 39:3, 39:6, 39:11, 39:17, 39:22, 39:25, 40:9, 41:8, 42:16, 43:23, 47:11, 48:25, 49:21,

51:2, 51:8, 52:10, 52:11, 52:14, 53:23, 54:4, 54:13, 54:16, 54:19, 57:3, 57:16, 57:25, 58:7, 59:9, 59:18, 63:1, 63:25, 64:1, 64:10, 69:20, 71:6, 71:10, 71:14, 72:25, 73:7, 74:10, 75:4
**MANOOKIAN** [4] - 1:6, 1:11, 2:6
**Manookian's** [13] - 8:5, 14:25, 20:20, 21:11, 24:11, 27:25, 38:12, 40:6, 40:16, 52:13, 52:17, 59:3, 62:10
**manookian's** [1] - 61:24
**Manookian)** [1] - 52:13
**March** [1] - 25:20
**marked** [8] - 9:22, 10:17, 11:21, 11:24, 12:15, 12:16, 17:16
**Marty** [8] - 10:2, 10:21, 12:1, 19:14, 34:2, 45:24, 51:2, 64:10
**matter** [34] - 3:20, 7:9, 7:24, 11:2, 12:8, 13:17, 17:13, 26:17, 32:1, 32:8, 35:6, 41:5, 42:4, 42:11, 45:5, 45:10, 45:13, 45:16, 46:1, 46:8, 46:19, 57:24, 65:3, 68:8, 68:15, 70:3, 70:17, 70:22, 70:23, 71:1, 71:11, 71:20, 71:22, 72:1
**matters** [7] - 6:14, 37:20, 65:22, 68:13, 73:2, 73:9, 73:16
**McCarthy** [16] - 3:6, 4:4, 4:10, 4:12, 5:25, 6:21, 11:2, 22:22, 31:12, 32:6, 35:1, 35:7, 35:10, 60:3, 75:13, 75:18
**MCCARTHY** [3] - 1:17, 2:16, 4:1
**mean** [15] - 26:7, 38:22, 43:5, 44:8, 46:19, 52:10, 52:11, 55:7, 55:8, 59:7, 64:6, 64:9, 65:1, 68:6, 74:9
**meaning** [1] - 31:18
**means** [3] - 3:14,

52:14, 61:12
**mediation** [7] - 23:12, 26:22, 28:7, 28:9, 29:2, 29:3, 29:10
**meeting** [2] - 8:13, 31:2
**Megan's** [2] - 37:5, 43:20
**Melissa** [11] - 10:2, 10:21, 12:2, 34:1, 45:24, 53:12, 54:1, 54:7, 55:4, 56:1, 56:6
**member** [1] - 9:6
**memorialized** [3] - 45:7, 51:24, 53:19
**memorializing** [1] - 42:16
**memory** [6] - 16:24, 24:18, 26:12, 54:15, 56:13, 69:16
**Menefee** [4] - 39:4, 39:5, 39:12, 39:25
**menefee** [5] - 39:13, 40:11, 40:24, 41:13, 41:22
**Menefee's** [2] - 39:16, 40:8
**menefee's** [1] - 41:15
**mention** [1] - 16:11
**mentioned** [5] - 21:10, 21:20, 34:22, 51:6, 63:15
**mentions** [2] - 50:16, 52:18
**merely** [1] - 65:6
**message** [3] - 46:5, 46:7, 46:10
**messages** [1] - 30:23
**messaging** [1] - 5:22
**met** [2] - 8:18, 44:2
**Middle** [1] - 40:13
**MIDDLE** [1] - 1:2
**middle** [1] - 5:4
**might** [2] - 10:12, 52:11
**mind** [1] - 32:3
**mine** [2] - 27:6, 43:13
**minute** [1] - 13:24
**Missy** [1] - 51:15
**moment** [1] - 32:15
**money** [7] - 44:25, 47:5, 47:8, 47:12, 48:1, 48:6, 48:9
**money-seeking** [1] - 47:8
**months** [1] - 69:14
**morning** [4] - 4:4, 4:9, 5:16, 9:24
**motion** [4] - 16:12,

16:15, 25:1, 66:22
**motions** [2] - 25:25, 26:25
**move** [1] - 5:1
**moving** [1] - 63:4
**MR** [14] - 4:3, 10:15, 13:14, 16:25, 17:5, 17:24, 22:21, 22:24, 31:11, 32:5, 59:24, 60:2, 75:16, 75:18
**multiple** [4] - 40:17, 47:20, 62:9, 62:11

**N**

**name** [23] - 4:4, 4:11, 6:16, 6:17, 8:5, 9:8, 12:11, 32:6, 34:24, 38:12, 38:21, 40:4, 40:6, 40:7, 40:15, 41:18, 41:20, 47:19, 51:6, 52:13, 55:9, 63:22
**named** [4] - 13:16, 57:10, 59:8, 59:21
**names** [10] - 33:11, 40:17, 40:23, 40:25, 41:1, 41:6, 41:10, 47:21, 57:22
**NASHVILLE** [1] - 1:3
**Nashville** [4] - 1:24, 2:8, 2:12, 38:20
**nature** [4] - 39:8, 46:3, 50:3, 50:10
**necessarily** [3] - 49:3, 51:17, 65:10
**need** [5] - 5:2, 34:15, 65:20, 71:18
**needed** [2] - 7:15, 69:3
**never** [12] - 12:24, 13:5, 13:25, 15:1, 21:8, 29:22, 29:25, 30:3, 31:2, 31:4, 57:1, 65:6
**new** [3] - 22:15, 35:4
**next** [10] - 23:17, 25:19, 26:18, 26:22, 27:9, 27:16, 61:20, 74:9, 74:21
**NO** [5] - 10:14, 13:13, 17:23
**non** [1] - 60:24
**non-lawyer** [1] - 60:24
**none** [1] - 61:20
**nonprofit** [1] - 49:15
**noon** [2] - 68:4, 68:5
**North** [1] - 2:7
**nose** [1] - 10:7
**NOT** [1] - 75:21

Case 3:23-cv-00961     Document 6-4     Filed 10/04/23     Page 106 of 202 PageID #: 4628
2406

**not-for-profit** [4] - 43:17, 44:10, 45:1, 49:15

**not-for-profits** [1] - 43:25

**notary** [1] - 3:12

**note** [4] - 52:20, 59:10, 64:11, 68:9

**noted** [1] - 65:7

**notes** [4] - 5:18, 67:18, 68:12, 68:18

**nothing** [4] - 23:21, 32:3, 35:22, 51:23

**notice** [4] - 3:16, 15:12, 15:13, 72:20

**notified** [4] - 22:6, 55:1, 56:13, 56:14

**notify** [3] - 15:11, 34:19, 55:2

**notifying** [2] - 22:10, 36:4

**notwithstanding** [1] - 74:2

**November** [5] - 19:9, 19:10, 19:18, 20:16, 21:1

**nowhere** [1] - 51:5

**NUMBER** [1] - 2:22

**Number** [1] - 19:2

**number** [11] - 7:21, 12:21, 19:6, 21:18, 24:7, 32:19, 32:21, 41:3, 41:4, 64:14

---

## O

**o'clock** [1] - 31:2

**object** [1] - 17:1

**objection** [1] - 59:24

**objections** [1] - 3:18

**objects** [1] - 4:24

**obligation** [4] - 73:1, 73:8, 73:15, 73:25

**obligations** [1] - 75:6

**occurred** [2] - 29:11, 69:17

**occurring** [1] - 24:10

**October** [1] - 30:16

**odd** [2] - 25:13, 25:15

**OF** [3] - 1:2, 1:16, 2:15

**offer** [1] - 49:21

**office** [3] - 24:6, 32:15, 68:25

**Office** [2] - 35:6, 35:9

**often** [4] - 16:3, 16:4, 16:6, 16:7

**older** [1] - 34:2

**once** [2] - 19:5, 54:22

**One** [6] - 9:22, 10:1, 10:17, 11:21, 18:13,
57:23

**one** [33] - 5:14, 9:2, 12:4, 13:21, 15:6, 16:11, 18:10, 19:1, 19:11, 20:19, 22:5, 23:3, 23:8, 23:10, 23:11, 24:2, 24:4, 24:22, 31:2, 34:16, 40:19, 43:2, 43:3, 43:19, 49:16, 52:19, 54:25, 56:23, 59:9, 63:8, 63:11, 67:7

**one-third** [2] - 43:2, 43:3

**ongoing** [1] - 74:23

**online** [1] - 38:23

**open** [1] - 5:21

**opened** [1] - 71:1

**opinion** [1] - 60:10

**opposition** [3] - 58:12, 58:16, 58:23

**or-profit** [1] - 48:15

**order** [6] - 7:19, 15:11, 55:1, 55:3, 55:18, 55:22

**original** [1] - 53:2

**originally** [1] - 38:13

**Osborne** [2] - 6:22, 7:9

**outcome** [3] - 31:21, 31:23, 59:15

**outside** [3] - 38:19, 38:20, 47:12

**owed** [1] - 41:22

**own** [8] - 6:10, 21:25, 36:22, 37:6, 47:10, 50:5, 60:24, 61:9

**owned** [1] - 60:22

**ownership** [1] - 38:9

---

## P

**P.O** [1] - 1:24

**packed** [1] - 67:17

**page** [6] - 10:25, 12:6, 23:17, 27:9, 50:24, 52:20

**PAGE** [1] - 2:22

**paid** [2] - 45:20, 65:24

**paper** [3] - 5:15, 5:19, 68:10

**paragraph** [3] - 10:25, 12:7, 12:12

**pardon** [1] - 67:2

**part** [6] - 14:23, 40:8, 46:7, 59:8, 73:23, 74:22

**parties** [5] - 9:23, 29:18, 29:20, 32:2, 76:14

**partner** [3] - 14:15, 57:11, 60:15

**partners** [1] - 59:21

**party** [5] - 8:10, 47:16, 56:25, 57:4, 59:10

**passed** [1] - 7:13

**passes** [1] - 34:17

**past** [1] - 39:9

**pay** [3] - 41:25, 45:3, 45:18

**payments** [1] - 36:6

**pending** [3] - 25:25, 26:25, 66:4

**per** [3] - 15:11, 55:1

**percentage** [1] - 61:17

**period** [4] - 50:23, 56:6, 61:24, 69:23

**periodically** [3] - 21:6, 62:7, 63:16

**person** [3] - 14:10, 40:20, 41:17

**personal** [11] - 6:14, 7:24, 9:1, 35:23, 36:23, 37:10, 37:20, 37:25, 39:18, 40:12, 58:5

**perspective** [3] - 31:12, 31:15, 43:10

**PHILLIP** [1] - 2:3

**Phillip** [1] - 4:5

**phone** [9] - 7:25, 8:21, 32:14, 41:9, 53:13, 62:9, 62:23, 63:7, 63:11

**physically** [1] - 5:6

**pick** [1] - 11:23

**picture** [1] - 50:11

**piece** [1] - 6:13

**place** [2] - 53:17, 76:11

**Plaintiff** [2] - 1:9, 47:11

**plaintiff** [1] - 58:4

**plan** [1] - 55:7

**planned** [1] - 43:16

**planning** [2] - 41:25, 49:5

**play** [1] - 28:14

**PLC** [1] - 2:7

**pleadings** [7] - 16:2, 16:3, 16:9, 16:10, 20:4, 24:13, 24:17

**PLLC** [7] - 1:6, 1:11, 1:11, 2:3, 2:6, 4:7, 32:7

**plus** [2] - 7:11, 21:18

**point** [12] - 9:2, 13:21, 14:10, 17:25, 18:3, 21:11, 44:16, 48:23, 54:6, 54:18, 54:25,
56:20

**pointed** [1] - 34:16

**portion** [11] - 41:22, 42:3, 42:6, 42:20, 42:24, 43:2, 44:8, 49:6, 49:13, 49:17

**position** [2] - 10:12, 38:8

**positioned** [1] - 70:21

**possession** [1] - 67:16

**possible** [2] - 32:12, 66:24

**possibly** [2] - 31:16, 64:24

**potential** [1] - 12:24

**potentially** [1] - 66:24

**powered** [1] - 5:12

**PowerPoint** [5] - 16:12, 16:21, 24:15, 58:8, 58:16

**practice** [28] - 6:5, 6:8, 6:10, 8:15, 35:2, 36:9, 36:11, 36:14, 36:23, 37:6, 37:12, 37:15, 38:25, 52:17, 55:23, 56:18, 58:4, 59:21, 60:8, 60:16, 61:2, 61:9, 61:18, 72:25, 73:8, 73:21, 74:3, 74:20

**practices** [1] - 36:22

**practicing** [1] - 35:5

**practitioner** [1] - 35:11

**pre** [3] - 9:22, 11:24, 17:16

**pre-marked** [3] - 9:22, 11:24, 17:16

**preface** [1] - 6:25

**preparation** [1] - 32:20

**prepared** [1] - 48:8

**present** [2] - 28:9, 29:3

**presentation** [3] - 16:22, 24:15, 58:8

**primary** [1] - 14:11

**printouts** [1] - 66:21

**private** [4] - 8:10, 37:11, 61:2, 61:18

**Privilege** [1] - 2:25

**privilege** [34] - 7:2, 7:6, 7:7, 8:11, 17:1, 17:3, 17:6, 17:8, 17:10, 17:17, 18:6, 18:17, 23:7, 23:23, 32:24, 45:7, 50:15, 50:17, 50:20, 51:24, 52:9, 52:16, 53:20,
62:17, 63:18, 63:21, 63:24, 64:14, 64:19, 65:4, 65:10, 66:10, 66:11, 66:15

**privileged** [2] - 18:2, 18:4

**problem** [2] - 10:10, 56:11

**procedural** [1] - 23:12

**Procedure** [2] - 3:10, 44:18

**proceed** [1] - 29:6

**proceedings** [1] - 31:10

**proceeds** [3] - 47:9, 49:14, 49:17

**process** [1] - 74:22

**produce** [1] - 11:6

**produced** [3] - 17:8, 32:23, 50:21

**product** [1] - 17:3

**Professional** [3] - 55:14, 75:5, 75:10

**profit** [5] - 43:17, 44:10, 45:1, 48:15, 49:15

**profits** [1] - 43:25

**proportion** [1] - 65:24

**prosthetics** [1] - 43:21

**provide** [2] - 34:9, 46:16

**provided** [3] - 35:20, 40:4, 50:6

**providers** [1] - 66:25

**providing** [2] - 25:13, 51:13

**provisions** [1] - 3:9

**public** [1] - 3:12

**pulled** [1] - 5:19

**pursuant** [2] - 3:9, 18:17

**pursuits** [1] - 43:21

**put** [2] - 52:13, 68:14

---

## Q

**qualified** [1] - 58:4

**questions** [12] - 4:21, 4:23, 5:5, 7:3, 7:4, 18:1, 32:4, 36:4, 44:19, 72:12, 75:16, 75:19

**quick** [1] - 51:6

**quicker** [1] - 52:19

---

## R

**rain** [1] - 10:13

**rate** [1] - 8:16

**rather** [1] - 49:14

RE [2] - 1:5, 10:3
re [1] - 60:4
re-ask [1] - 60:4
reach [1] - 41:21
reached [1] - 7:21
read [3] - 9:13, 11:9, 49:9
reading [1] - 39:1
real [1] - 6:11
reason [3] - 53:22, 54:18, 58:3
recalling [1] - 20:20
received [4] - 7:13, 25:3, 51:4, 59:15
receiver [1] - 69:24
recipient [1] - 40:2
recollection [3] - 14:9, 24:1, 54:22
recommendation [1] - 39:10
recommendations [1] - 40:12
recommending [1] - 41:8
record [4] - 4:7, 4:11, 22:22, 23:14
recorded [1] - 76:6
records [4] - 65:12, 65:15, 67:23, 68:7
recover [1] - 42:7
recovery [3] - 44:9, 44:23, 49:6
reduce [1] - 3:14
reduced [1] - 76:7
refer [3] - 8:22, 62:17, 65:22
reference [1] - 30:17
referenced [1] - 12:11
references [1] - 11:10
referral [7] - 39:17, 39:22, 40:1, 41:15, 49:20, 50:7
referrals [1] - 6:13
referred [3] - 8:8, 32:11, 38:2
referring [9] - 32:17, 39:3, 55:2, 57:4, 65:16, 65:21, 70:4, 74:4, 74:6
reflect [2] - 63:19, 64:2
reflected [1] - 23:6
reflects [1] - 66:11
refresh [1] - 69:16
regard [1] - 7:12
regarding [12] - 12:2, 17:12, 23:20, 24:25, 25:24, 26:21, 26:24, 27:13, 27:18, 27:19, 52:21, 52:24

regards [45] - 6:13, 20:1, 23:11, 23:12, 28:10, 28:11, 28:12, 28:13, 28:15, 33:10, 33:11, 34:14, 34:17, 36:1, 36:4, 38:17, 42:10, 43:21, 45:4, 45:9, 47:4, 48:24, 49:24, 50:8, 51:1, 51:17, 52:2, 53:7, 56:7, 58:19, 63:3, 64:21, 65:21, 66:2, 66:5, 66:19, 66:23, 69:12, 70:16, 70:21, 70:23, 71:7, 71:19, 72:7, 72:18
regular [4] - 4:20, 67:23
reinstatement [5] - 27:19, 27:20, 28:1, 28:5, 52:25
relating [3] - 73:2, 73:9, 73:16
relationship [2] - 49:1, 57:14
relative [2] - 76:12, 76:14
relatively [1] - 5:2
relied [1] - 41:13
rely [1] - 50:5
remainder [2] - 45:20, 48:6
remember [6] - 20:9, 21:16, 25:9, 27:22, 41:2, 41:6
Reporter [2] - 75:24, 76:21
reporter [2] - 3:11, 76:4
Reporter's [1] - 2:18
represent [14] - 4:5, 7:24, 9:11, 9:24, 12:3, 20:23, 32:7, 61:6, 61:7, 61:8, 61:11, 61:15, 61:18, 73:24
representation [14] - 7:15, 8:3, 10:3, 10:20, 12:2, 45:4, 48:1, 48:5, 57:12, 57:18, 70:16, 73:17, 74:1, 74:24
representations [1] - 6:12
represented [7] - 44:6, 45:10, 45:11, 45:12, 48:25, 53:3, 75:8
representing [3] - 37:14, 56:20, 56:24
request [1] - 11:17

require [2] - 44:18, 65:24
required [2] - 74:20, 75:7
research [5] - 38:17, 38:21, 38:22, 38:23, 66:22
reserved [1] - 3:19
resigned [1] - 57:8
resolve [1] - 5:1
respect [5] - 35:19, 36:17, 42:19, 52:9, 74:12
respond [2] - 27:2, 62:24
responded [1] - 15:9
responding [1] - 27:7
response [9] - 11:7, 17:7, 17:18, 22:18, 31:4, 32:24, 34:22, 50:21, 66:12
Responsibility [3] - 55:14, 75:5, 75:11
responsibility [1] - 74:8
restating [1] - 22:22
result [1] - 42:1
retain [1] - 71:5
retained [2] - 71:7, 71:10
retainer [1] - 9:13
retired [1] - 59:18
return [2] - 25:23, 63:4
returned [3] - 24:4, 30:23, 30:25
review [8] - 16:2, 16:9, 16:14, 22:19, 32:20, 51:6, 56:7, 65:3
reviewed [1] - 13:3, 20:7, 20:9, 46:13, 55:4, 55:7, 55:16, 60:17, 67:15
reviewing [1] - 20:4
RLM [9] - 19:14, 19:15, 24:24, 25:22, 26:20, 27:13, 62:21, 63:25
role [10] - 14:7, 14:20, 16:1, 31:13, 35:24, 37:16, 52:3, 61:23, 62:3, 62:5
Ronette [5] - 3:6, 4:12, 11:2, 35:7, 35:9
RONETTE [3] - 1:17, 2:16, 4:1
room [5] - 4:8, 5:9, 5:13, 67:5, 67:7
row [1] - 52:24
rule [1] - 60:24
Rules [2] - 3:10, 44:18

rules [2] - 4:16, 65:23
run [1] - 72:23
running [1] - 68:1

S

SAITH [1] - 75:21
saw [2] - 12:20, 21:25
schedule [1] - 72:8
scheduled [1] - 12:21
scheduling [7] - 23:13, 23:21, 26:21, 27:13, 30:17, 31:18, 72:19
school [1] - 43:20
scope [3] - 46:15, 72:20
screen [1] - 5:19
screens [1] - 5:12
search [1] - 21:25
second [2] - 10:25, 12:6
section [2] - 11:1, 12:6
security [1] - 36:5
see [25] - 10:4, 12:7, 12:8, 12:11, 18:14, 20:18, 23:8, 23:10, 23:11, 23:23, 25:1, 25:25, 26:25, 27:14, 27:20, 28:11, 30:15, 30:18, 32:12, 46:12, 57:22, 59:7, 64:6, 70:11, 71:3
seeing [2] - 40:7, 53:7
seeking [1] - 47:8
seem [1] - 22:18
selected [1] - 44:1
sell [1] - 34:20
send [2] - 24:12, 24:16
sending [1] - 12:23
sense [1] - 35:12
sent [12] - 10:24, 11:3, 11:11, 11:15, 11:20, 13:5, 21:8, 24:18, 46:10, 46:11, 58:8, 69:6
separately [1] - 51:16
services [5] - 34:8, 34:15, 35:20, 61:19, 65:25
set [1] - 76:17
settled [9] - 16:8, 29:14, 29:15, 29:17, 29:23, 30:1, 30:4, 30:7, 31:5
several [1] - 30:15
shake [1] - 4:22
share [1] - 30:13
short [3] - 5:2, 30:8,

31:9
show [1] - 63:21
shows [1] - 26:23
sides [2] - 43:9, 47:1
signed [3] - 9:18, 9:20, 13:9, 19:6
signing [1] - 3:17
similar [1] - 37:19
simple [1] - 34:17
SIMS [1] - 2:10
sit [2] - 33:6, 44:24
situation [2] - 32:15
six [2] - 18:10
slightly [1] - 12:4
small [1] - 6:12
smooth [1] - 56:16
social [1] - 36:4
software [1] - 68:17
sole [1] - 56:23
solo [1] - 35:11
someone [4] - 4:24, 8:8, 60:22, 67:5
sometime [1] - 29:15
somewhere [2] - 52:15, 68:25
sorry [15] - 6:16, 16:25, 28:16, 28:19, 29:19, 34:21, 37:1, 40:25, 48:3, 48:4, 51:1, 54:3, 67:3, 74:14, 74:17
Sorry [1] - 56:10
sort [4] - 5:5, 15:24, 40:10, 50:10
source [3] - 39:22, 40:1, 54:14
South [1] - 2:11
specially [1] - 4:18
specific [6] - 15:25, 16:11, 24:21, 33:11, 49:24, 59:7
specifically [8] - 4:24, 10:24, 11:10, 12:5, 18:8, 57:22, 67:17, 67:19
specifics [1] - 54:9
specified [1] - 76:11
specify [1] - 42:20
spells [1] - 42:24
spent [6] - 45:7, 65:19, 67:14, 67:23, 68:15, 68:18
spoken [2] - 13:25, 15:1
sporadic [1] - 65:5
sporadically [1] - 26:16
spragens [1] - 70:10
SPRAGENS [5] - 2:6, 16:25, 22:21, 32:5,

60:2

**Spragens** [8] - 2:7, 2:18, 32:6, 32:13, 56:5, 67:6, 70:3, 74:14

**Spragens'** [1] - 17:25
**standard** [1] - 42:12
**State** [4] - 3:12, 75:25, 76:5, 76:22
**state** [4] - 4:10, 6:3, 55:6, 69:25
**statement** [4] - 49:2, 49:8, 49:9
**statements** [1] - 22:23
**states** [3] - 36:15, 42:14, 60:24
**States** [1] - 33:10
**STATES** [1] - 1:1
**status** [2] - 25:4, 63:3
**stay** [2] - 22:17, 32:14
**stenographic** [1] - 3:14
**stenographically** [1] - 76:6
**Sterling** [1] - 33:23
**still** [3] - 44:7, 44:12, 48:13
**Stipulations** [1] - 2:17
**storage** [2] - 68:22, 68:24
**strained** [1] - 49:1
**strategies** [2] - 28:22, 51:18
**strategy** [4] - 25:24, 28:12, 50:11, 52:1
**subpoena** [7] - 11:7, 17:7, 17:18, 32:23, 50:21, 66:12, 69:6
**substance** [1] - 72:11
**substantive** [3] - 15:7, 23:21, 66:5
**success** [1] - 8:16
**Suite** [2] - 2:4, 2:11
**summary** [12] - 16:12, 16:16, 24:15, 24:25, 25:5, 25:24, 26:20, 58:12, 58:16, 58:22, 66:21
**support** [1] - 31:15
**Supreme** [2] - 55:19, 55:22
**surprise** [1] - 60:21
**suspended** [22] - 13:23, 15:10, 16:19, 20:24, 21:12, 21:25, 23:1, 24:3, 24:12, 24:17, 55:24, 58:8, 59:9, 62:14, 63:2, 72:25, 73:7, 73:20, 74:3, 74:19, 74:23,

75:2

**suspension** [27] - 13:25, 15:1, 15:4, 15:14, 15:16, 15:19, 20:21, 21:2, 21:7, 21:15, 21:19, 22:3, 22:11, 24:9, 52:17, 53:2, 53:8, 53:10, 53:24, 54:8, 54:20, 54:23, 56:14, 61:25, 62:10, 62:12, 75:7
**swear** [1] - 3:13
**swimming** [1] - 43:20
**Sworn** [1] - 75:23
**sworn** [1] - 4:2
**system** [1] - 68:14

---

## T

**TABLE** [1] - 2:15
**technological** [1] - 56:11
**telephone** [15] - 17:12, 19:2, 19:12, 20:21, 22:7, 23:4, 23:5, 24:19, 30:17, 30:20, 50:25, 51:15, 54:10, 66:8, 68:2
**TENNESSEE** [1] - 1:2
**Tennessee** [30] - 1:24, 2:4, 2:8, 2:12, 3:10, 3:12, 6:23, 7:17, 7:20, 7:21, 8:1, 8:7, 32:22, 36:12, 38:18, 40:13, 55:6, 55:9, 55:13, 55:19, 55:22, 59:25, 66:3, 66:4, 69:25, 75:5, 75:10, 75:25, 76:5, 76:22
**testified** [4] - 4:2, 32:10, 33:13, 34:9, 36:8, 53:9, 61:22, 62:22
**testify** [1] - 48:8
**testimony** [1] - 76:10
**text** [4] - 46:5, 46:7, 46:10
**texting** [1] - 5:22
**THE** [3] - 1:1, 1:2, 2:2
**thinking** [3] - 7:14, 63:10, 68:12
**Third** [1] - 2:11
**third** [11] - 29:18, 29:20, 42:12, 43:2, 43:3, 43:13, 43:15, 43:24, 47:16
**third-parties** [2] - 29:18, 29:20
**third-party** [1] - 47:16
**Thompson** [1] - 2:3

thoughts [1] - 28:13
**three** [3] - 18:10, 52:23, 72:18
**Three** [4] - 17:16, 24:22, 50:18, 50:19
**throughout** [4] - 16:7, 33:10, 42:13, 49:25
**timeline** [1] - 28:6, 70:2
**today** [16] - 5:7, 5:8, 12:18, 32:15, 33:6, 34:6, 35:3, 38:5, 44:24, 45:12, 48:8, 49:3, 49:15, 52:6, 75:13, 75:19
**today's** [3] - 72:5, 72:12, 72:16
**took** [1] - 53:16
**total** [1] - 45:15
**Tower** [1] - 2:4
**town** [3] - 33:19, 33:20, 33:22
**transcript** [4] - 49:11, 76:6, 76:9
**transfer** [2] - 73:2, 73:9
**transferred** [1] - 73:12
**transition** [1] - 74:22
**transpired** [1] - 48:11
**trial** [6] - 23:13, 26:22, 28:7, 28:9, 28:11, 28:14
**tricky** [1] - 51:20
**true** [4] - 17:21, 47:5, 60:12, 76:9
**trust** [1] - 18:4
**TRUST** [2] - 1:12, 2:9
**Trustee** [3] - 3:9, 4:6, 11:7, 17:8, 70:8, 70:9, 72:1
**TRUSTEE** [2] - 1:8, 2:2
**Trustee's** [1] - 17:18
**trusts** [2] - 6:12, 34:14
**trying** [5] - 17:2, 50:1, 54:17, 67:22, 70:18
**turn** [1] - 27:9
**twice** [3] - 40:6, 62:15, 62:23
**two** [17] - 10:25, 12:6, 15:6, 18:10, 19:17, 23:3, 23:22, 24:2, 26:18, 37:16, 40:23, 40:25, 41:2, 51:22, 52:20, 52:22, 61:10
**Two** [4] - 11:24, 12:15, 12:17, 41:2
**type** [1] - 36:7
**types** [1] - 16:5
**typewritten** [2] - 3:15,

76:7
**typically** [1] - 67:18

---

## U

**ultimately** [3] - 8:22, 9:10, 29:2
**unclear** [1] - 70:24
**under** [3] - 12:6, 35:5, 57:1
**understood** [1] - 57:10
**unfamiliar** [1] - 9:1
**unique** [1] - 5:6
**UNITED** [1] - 1:1
**United** [1] - 33:10
**unless** [1] - 4:24
**up** [5] - 5:19, 11:23, 14:18, 33:19, 38:21, 42:8, 54:18, 68:4, 74:15
**Update** [4] - 24:25, 25:24, 26:24, 27:18
**update** [4] - 25:13, 26:22, 27:3, 27:13
**updates** [2] - 28:22, 52:21
**updating** [1] - 25:4
**utilize** [1] - 47:5

---

## V

**various** [1] - 16:10
**version** [1] - 11:11
**versus** [1] - 7:9
**veterans** [1] - 43:22
**via** [1] - 3:7
**view** [2] - 50:6, 59:14
**violate** [4] - 7:1, 7:5, 7:6, 18:6
**violating** [2] - 7:7, 8:11
**voice** [2] - 63:2, 67:6
**voicemail** [2] - 24:6, 62:25
**voicemails** [2] - 24:5, 63:1
**vouch** [2] - 39:21, 40:3
**vouched** [1] - 39:25
**vouching** [1] - 40:8

---

## W

**waived** [2] - 3:18, 75:22
**walk** [1] - 50:1
**Walker** [1] - 1:11
**WAS** [3] - 10:14, 13:13, 17:23

**wearing** [1] - 51:23
**website** [1] - 55:17
**week** [1] - 21:18
**weeks** [2] - 11:16, 12:21
**WHEREOF** [1] - 76:17
**wills** [1] - 6:12
**WILSON** [1] - 1:23
**wins** [1] - 8:15
**wish** [1] - 48:19
**witness** [3] - 3:13, 17:2, 76:11
**WITNESS** [2] - 75:20, 76:17
**witnesses** [1] - 28:13
**wonderful** [2] - 41:11, 44:4
**word** [2] - 40:3, 54:5
**words** [2] - 14:22, 48:20
**world** [2] - 41:11, 74:7
**Wright** [1] - 47:22
**written** [2] - 17:11, 42:15
**wrongful** [2] - 40:12, 58:5

---

## Y

**years** [3] - 7:11, 32:19, 33:14
**YOUNG** [10] - 2:3, 4:3, 10:15, 13:14, 17:5, 17:24, 22:24, 31:11, 59:24, 75:18
**Young** [4] - 2:17, 4:5, 38:15, 53:3
**young** [7] - 37:17, 50:19, 69:6, 69:10, 69:13, 69:14, 69:17, 69:23, 70:7, 70:8, 70:19, 71:1, 71:15, 71:23, 72:5, 72:10, 72:16
**yourself** [3] - 48:2, 48:7

---

## Z

**Zoom** [3] - 3:7, 4:18, 5:6

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

IN RE: )
)
**CUMMINGS MANOOKIAN, PLLC,** )
    Debtor. )
)
**JEANNE ANN BURTON, TRUSTEE,** )
    Plaintiff, )
)
v. )
)
**HAGH LAW, PLLC; AFSOON HAGH;** )
**MANOOKIAN, PLLC; and FIRST-** )
**CITIZENS BANK & TRUST** )
**COMPANY,** )
    Defendants. )
)

**Case No. 3:19-bk-07235**
**Chapter 7**
**Judge Walker**

**Adv. Proc. No. 3:20-ap-90002**

## AFFIDAVIT OF JEANNE ANN BURTON, TRUSTEE

STATE OF TENNESSEE )
)
COUNTY OF DAVIDSON )

Jeanne Ann Burton, Trustee, being duly sworn, states as follows:

1. I am over eighteen years of age and have personal knowledge of the matters set forth herein.

2. I am the plaintiff in the above-referenced matter and currently serving as the Chapter 7 trustee for the bankruptcy estate of Cummings Manookian, PLC.

3. In order to appropriately respond to Defendants Afsoon Hagh, Hagh Law, PLLC, and Manookian PLLC's Joint Motion for Summary Judgment and Memorandum in Support Thereof (Doc. 188) (the "Motion"), it is necessary for me to depose Marty Fitzgerald.

4. More specifically, this deposition is necessary for me to discover whether Mr. Fitzgerald was informed by any of the Defendants (in writing or orally) that Cummings Manookian, PLC intended to withdraw from representing him and his wife in a wrongful death suit, whether any of the Defendants instructed him to hire new counsel, whether he in fact interviewed new counsel, and what (if anything) he was told about the future involvement of Cummings Manookian, PLC, Afsoon Hagh, Hagh Law, PLLC and/or Manookian PLC in his lawsuit. These facts are potentially relevant in responding to portions of the Motion. Moreover, this deposition is necessary in order for me to respond to Paragraph 27 of the Defendants' Joint Statement of Undisputed Material Facts.

5. I took every reasonable step possible to take Mr. Fitzgerald's deposition prior to the July 29, 2022 deadline for filing motions for summary judgment and before the August 12, 2022 deadline for filing responses thereto. On May 5, 2022, my counsel issued a subpoena for Mr. Fitzgerald's testimony on May 27, 2022 at my request. No timely objection was filed to that first subpoena. The week before that deposition was to occur, counsel for the Defendants asked me to reschedule all third-party depositions, including Mr. Fitzgerald's, because Brian Manookian and Afsoon Hagh were scheduled to be out of state. As an accommodation, I agreed to reschedule the depositions so long as other pretrial deadlines were likewise rescheduled. The Defendants agreed.

6. I then directed my counsel to issue another subpoena for Mr. Fitzgerald's testimony, which was served on Mr. Fitzgerald on June 7, 2022. That subpoena required Mr. Fitzgerald's appearance at a rescheduled deposition via Zoom on June 24, 2022. On June 21, 2022, Attorney John Spragens sent an email to my counsel objecting to the subpoena on behalf of Mr. Fitzgerald.

2

7.  On July 22, 2022, I filed a motion to compel Mr. Fitzgerald's compliance with the subpoena. The Court has not set a hearing to consider the motion to compel.

FURTHER AFFIANT SAITH NOT.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August __11__, 2022.


_____
Jeanne Ann Burton, Trustee

STATE OF TENNESSEE          )
                            )
COUNTY OF DAVIDSON          )


Subscribed and sworn to before me this __11__ day of August, 2022.

_____
Notary Public

My Commission Expires: __03-03-2025__

3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| MANOOKIAN PLLC and BRIAN MANOOKIAN, | ) ) ) | |
| Appellants, | ) ) | |
| v. | ) ) ) | Case No. 3:22-cv-00474<br>Bankr. Case No. 3:19-bk-07235<br>Adv. Pro. No. 3:20-ap-90002 |
| JEANNE ANN BURTON, TRUSTEE, | ) ) | Judge Aleta A. Trauger |
| Appellee. | ) ) | |

## MEMORANDUM and ORDER

Before the Court is the Notice of Appeal filed by defendants/appellants Brian Manookian and Manookian PLLC. (Adv. Pro. No. 185; Doc. No. 1.)[1] The appellants have filed a Statement of Issues, supporting Brief, and the record pertaining to their appeal. (Doc. Nos. 4, 5, 5-1.) The plaintiff/appellee, Trustee Jeanne Ann Burton, has filed a responding Brief (Doc. No. 6), and the appellants filed a Reply (Doc. No. 7). The court finds that a hearing on this matter is unnecessary and, therefore, **DENIES** the appellants' request for oral argument. For the reasons that follow, defendants/appellants' Notice of Appeal, which the court construes as a motion for leave to appeal, is **DENIED**.

---

[1] Citations to "Doc. No." refer to the docket number of filings made in the case in this court. Citations to "Bankr. No." are to the lead bankruptcy court docket in the underlying bankruptcy case, *In re Cummings Manookian, PLLC*, Case No. 3:19-bk-07235 (Bankr. M.D. Tenn.). Citations to "Adv. Pro. No." are to filings in the subject adversary proceeding, *Burton v. Hagh Law PLLC et al.*, Adv. Pro. No. 3:20-ap-90002 (Bankr. M.D. Tenn.).

## I.  BACKGROUND

On November 6, 2019, Cummings Manookian, PLC[2] filed a Chapter 7 Voluntary Petition in the Bankruptcy Court, which was assigned to Bankruptcy Court Judge Charles M. Walker. (Bankr. No. 1.) Trustee Jeanne Ann Burton was appointed to serve as the Chapter 7 Trustee for the debtor on the same day and continues to serve in that capacity.

On January 8, 2020, the Trustee filed the Adversary Proceeding against Hagh Law PLLC ("Hagh Law"), Afsoon Hagh, Manookian PLLC ("Manookian Law"), and First-Citizens Bank and Trust Company (the "Bank"), asserting claims for conversion, fraudulent transfer, tortious interference with contract, successor liability/alter ego, and turnover, and seeking a declaratory judgment, injunctive relief, and other related relief. (Adv. Pro. No. 1, at 1.)[3] What followed was a contentious eighteen months or so of discovery, culminating in a hearing on March 17, 2022 ("March 17 hearing") before Judge Walker, for the purpose of resolving a number of outstanding discovery disputes.

The court and the parties were able to resolve several matters during the first half of the March 17 hearing. (*See generally* Mar. 17, 2022 Hr'g Tr., Adv. Pro. No. 140.) The court then adjourned for several hours while the parties continued to work toward further resolution on their own. When court reconvened on the afternoon of March 17, the parties reported to the judge the progress they had made and areas in which they had reached an impasse. One of the remaining areas of conflict was where to conduct four depositions the parties agreed should be taken. (Adv.

---

[2] The debtor's correct name is apparently Cummings Manookian, PLC. It was named incorrectly as Cummings Manookian, PLLC in the Petition.

[3] After the Bank turned over $715,000 (representing disputed fees in a case in which the debtor had represented one of the parties) being held by the Bank to the Clerk of Court, pursuant to the Bankruptcy Court's Order, the Trustee dismissed the Complaint as to the Bank on January 28, 2020.

Pro. No. 140, at 81–82.) The Trustee had suggested that the depositions take place in the courthouse, a proposal Judge Walker immediately approved. Counsel for Brian Manookian and Manookian Law registered his objection, and the court observed that, while the parties still had the ability to agree on a location, in the absence of an agreement, they would have to hold a hearing. (*Id.* at 82.) Counsel for the appellants continued to express the reasons why he believed that holding the depositions at the courthouse would be inconvenient for all concerned. He noted in particular that parking at the courthouse was expensive and that he did not understand the basis for departing from the ordinary course of holding depositions at lawyers' offices. The court then asked counsel for the Trustee to articulate a basis for conducting the depositions at the courthouse. Counsel for the Trustee stated several reasons why he believed the depositions should be taken at the courthouse, including his belief that there was, as he explained it, "a security issue here. There's already been a restraining order put down against Mr. Manookian by one of the creditor's lawyers in this case, and I don't take that lightly on behalf of my client." (*Id.* at 83.)

Counsel for the appellants again posited that his office was "just down the street" and offered free parking, and he objected to the suggestion of a security issue "in this ordinary bankruptcy case involving professional lawyers on all sides." (*Id.* at 84.) At this point, the court asked counsel for the Trustee if he was "uncomfortable doing depositions" in the appellants' counsel's office. (*Id.*) Counsel for the Trustee stated that he was. The court then made the following statement:

> All right. And then I'll just address the 100-pound gorilla in the room on that issue.
>
> To be candid, Mr. Spragens, I mean, your client's past behavior before the tribunals, and I've had at least two lawyers call the Court and say they don't feel comfortable if your client is going to appear, and, you know, the Court takes those concerns very seriously and makes no conclusion on whether they are valid, they are perceptions which drive behaviors of other parties. And to eliminate any of those perceptions, and to protect everyone against any allegations of bad behavior, misbehavior, or perceived misbehavior, it makes sense to do them here in an

environment where no one can get your client further down a rabbit hole of he did this or he did that, that we're in a neutral environment, which affords certain protections. And if nothing else, in terms of everybody's on their best behavior.

And so the Court's going to make that determination, that the depositions, unless the parties can agree, will be held here in the courthouse.

(*Id.* at 84–85.) No further discussion on this topic ensued, and counsel did not object contemporaneously to the court's statement regarding his "client's past behavior" or the two phone calls to the court by unidentified lawyers.

However, on May 5, 2022, Brian Manookian and Manookian Law, through counsel, filed their Motion to Disqualify Bankruptcy Judge Charles Walker, on the basis that the judge had "engaged in multiple prohibited *ex parte* communications about Brian Manookian and this proceeding . . . while this action has been pending." (Adv. Pro. No. 161, at 1–2.) In addition to the "communications with at least two [unidentified] lawyers" referenced by the judge at the March 17 hearing, the appellants represented that they had learned during the deposition of Phillip Young[4] that the Trustee, "through her Special Counsel, has had at least one improper *ex parte* communication with the Court about Mr. Manookian." (*Id.* at 1–2 n.2 (citing Adv. Pro. No. 161-2, Young Dep. 43–45).)[5] The Bankruptcy Court scheduled a hearing on the Motion to Disqualify

---

[4] Phillip Young functioned as receiver in a state court action filed in Williamson County, before being retained as counsel for the Trustee in Cummings Manookian's Chapter 7 bankruptcy proceeding. In that capacity, he was identified by the Trustee as a fact witness in the Adversary Proceeding. (*See* Adv. Pro. No. 140, at 69, 85.)

[5] As relevant here, Young testified as follows during his deposition:

[T]he very, very first hearing in this case, I called [Judge Walker's] courtroom deputy to alert her to the fact that a creditor's lawyer had an order of protection [against Brian Manookian]. And I didn't know how that was going to work logistically when you have a lawyer who's representing a creditor in the bankruptcy and the debtor's representatives and there was an order of protection down. And so I called to alert them to that so they would know how to handle that. But I don't know if anybody else called.

(Adv. Pro. No. 161-2, Young Dep. 44.) Specifically, he did not know if the lawyer who had obtained the order of protection had also called chambers. (*Id.*)

for June 29, 2022.[6] Counsel for Hagh Law and Afsoon Hagh filed a Response expressing their support for the Motion to Disqualify. (Adv. Pro. No. 173, at 1, 2.) The Trustee filed a Response opposing the motion and pointing out that counsel for the Trustee testified that he had had a brief conversation with the judge's courtroom deputy—not with the judge himself—and that the conversation involved a procedural question rather than substantive issues. (Adv. Pro. No. 174, at 2.) The Trustee also argued that the judge's comments at the March 17 hearing and the decision to hold depositions at the courthouse did not reflect bias but instead a desire to have the depositions conducted at the courthouse in order "to avoid any allegations of bad behavior, whether real or perceived." (*Id.* at 4.) The Trustee also objected to the appellants' characterization of the legal standards purportedly supporting disqualification.

On May 31, 2022, defendant/appellant Manookian Law noticed the deposition of Judge Walker, for the purpose of addressing "(1) Judge Walker and his staff's communications about this matter with third parties outside of court proceedings and (2) Judge Walker and his staff's investigation into this matter, the parties, or witnesses outside of the Court record."(Adv. Pro. No. 177.) Judge Walker entered an eight-page Order the next day, quashing the Notice of Deposition. (Adv. Pro. No. 178.) Manookian Law and Brian Manookian filed their Notice of Appeal and Statement of Election on June 14, 2022, specifically giving notice of their appeal to this court "from the Bankruptcy Court's June 1, 2022 Order (Doc. 178)," that is, from the Order Quashing Notice of Deposition.

At the hearing on the Motion to Disqualify, which convened as planned on June 29, 2022, Judge Walker read a statement into the record. In this statement, he expressed his conclusion that,

---

[6] The docket reflects that the parties, throughout this time period, continued to engage in discovery disputes.

in light of the appeal of the Order Quashing Notice of Deposition, the court was divested of jurisdiction over certain aspects of the case, specifically including both the Motion to Disqualify and the appellants' Motion for Summary Judgment, filed ten days after their Notice of Appeal. (Adv. Pro. No. 212, at 4; *see also* Adv. Pro. No. 188 (Motion for Summary Judgment).)

The appeal of the Order Quashing Notice of Deposition is now before the court.

## II.    LEGAL STANDARD

Under 28 U.S.C. § 158, a district court has jurisdiction to hear a timely appeal as a matter of right from final orders or decrees issued by a bankruptcy court and, "with leave of court," from interlocutory orders. 28 U.S.C. § 158(a)(1), (a)(3). Rule 8004(a) of the Federal Rules of Bankruptcy Procedure provides that, to appeal from an interlocutory order, a party should file a motion for leave to appeal with its notice of appeal. Fed. R. Bankr. P. 8004(a)(2). At the same time, however, Rule 8004(d) allows the district court to treat a timely notice of appeal as a motion for leave to appeal.

Rule 8004(b) identifies the required elements of a motion for leave to appeal, including (1) "the facts necessary to understand the question presented"; (2) "the question itself"; (3) "the relief sought"; (4) "the reasons why leave to appeal should be granted"; and (5) "a copy of the interlocutory order." With respect to the fourth element, neither Rule 8004 nor 28 U.S.C. § 158(a) states what factors a district court should consider in deciding whether to grant a motion for leave to appeal. District courts within the Sixth Circuit have adopted the standard set forth in 28 U.S.C. § 1292(b), which deals with interlocutory appeals from district courts to courts of appeal. *In re Energy Conversion Devices, Inc.*, 638 B.R. 81, 88 (E.D. Mich. 2022) (citations omitted). Thus, a district court may permit an interlocutory appeal if (1) the order involves a controlling question of law; (2) a substantial ground for difference of opinion exists regarding the correctness of the decision; and (3) an immediate appeal may materially advance the ultimate termination of the

litigation. *Id.* (citations omitted). "It is well-established that all three statutory requirements must be met for the court to certify an appeal under § 1292(b)." *Id.* (quoting *Lang v. Crocker Park LLC*, No. 1:09 CV 1412, 2011 WL 3297865, at *5 (N.D. Ohio July 29, 2011)). Even when all three criteria are met, "district courts have 'unfettered discretion to deny certification' in light of the strong bias in federal practice against interlocutory appeals." *In re Great Atl. & Pac. Tea Co.*, 615 B.R. 717, 722 (S.D.N.Y. 2020) (citation omitted). Further, it is well established that permitting interlocutory appeals is "the exception, rather than the rule." *Energy Conversion Devices*, 638 B.R. at 89 (citing *In re Doria*, No. 09-75261, 2010 WL 2870813, at *2 (E.D. Mich. July 21, 2010)).

## III.    ANALYSIS

### A.    The Order Quashing Subpoena Is Not a "Final Order"

In their opening Brief, the appellants contend that the court has jurisdiction over this appeal as a matter of right, under 28 U.S.C. § 158(a), because the Order Quashing Notice of Deposition is a final, appealable order. (Doc. No. 5, at 3.) Alternatively, they ask the court to consider their timely Notice of Appeal as a motion for leave to file an interlocutory appeal. (*Id.*)

"Orders in bankruptcy cases qualify as 'final' when they definitively dispose of discrete disputes within the overarching bankruptcy case." *Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 140 S. Ct. 582, 586 (2020) (citing *Bullard v. Blue Hills Bank*, 575 U.S. 496, 501 (2015)). Thus, for example, "the adjudication of a motion for relief from the automatic stay forms a discrete procedural unit within the embracive bankruptcy case. That unit yields a final, appealable order when the bankruptcy court unreservedly grants or denies relief." *Id.* Likewise, orders "denying an application for an administrative expense," "sustaining an objection to a creditor's claim," or "denying a motion under Federal Rule of Civil Procedure 60(b)" all qualify as "final orders" that are appealable as of right. *In re Murray Energy Holdings Co.*, 640 B.R. 558, 560–61 (B.A.P. 6th Cir. 2022). Courts distinguish between "discrete disputes" and "discrete issues," with only the

former being subject to immediate appeal. *In re Comdisco, Inc.*, 538 F.3d 647, 651–52 (7th Cir. 2008). "A discrete dispute is one that is essentially separable from the larger case," while "a decision or order that resolves only an issue that arises during the administration of a bankruptcy estate is too small a litigation unit to justify treatment as a final judgment." *Id.*; *see also In re Jackson Masonry, LLC*, 906 F.3d 494, 500 (6th Cir. 2018) (identifying the "appropriate 'judicial unit' for finality analysis" as a "discrete 'proceeding'" (citations omitted)), *aff'd sub nom. Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 140 S. Ct. 582 (2020).

The order appealed from in this case is an order quashing a deposition that was sought for the purpose of obtaining evidence in support of the appellants' Motion to Disqualify Judge Walker. Irrespective of the appellants' attempts to cast it as a final order, the bankruptcy judge stayed the case pending this appeal, finding that he was divested of jurisdiction over the Motion to Disqualify and the appellants' Motion for Summary Judgment as a result of their appeal of the Order Quashing Notice of Deposition. The appellants, thus, are not in a position to appeal the disposition of the Motion to Disqualify or the Motion for Summary Judgment, because those motions are still pending. While the Motion to Disqualify might arguably constitute a discrete dispute, the resolution of which would qualify as a final order (an issue the court does not reach here), the Order Quashing Notice of Deposition is clearly not. It is an issue arising in the context of resolving the Motion to Disqualify. The court finds, therefore, that the Order Quashing Notice of Deposition is an interlocutory order, not a final order as contemplated by 28 U.S.C. § 158(a).

### B. Whether to Grant Leave to Appeal

As set forth above, the court may permit an interlocutory appeal if (1) the order in question involves a controlling question of law; (2) a substantial ground for difference of opinion exists regarding the correctness of the decision; and (3) an immediate appeal may materially advance the ultimate termination of the litigation. *Energy Conversion Devices*, 638 B.R. at 88.

The appellants' argument in support of an interlocutory appeal glosses over the nature of the order they seek to appeal. Thus, for instance, they argue that their appeal "involves a controlling question of law, because the "[d]isqualification of a judge . . . is governed by statute," which creates an objective standard. (Doc. No. 5, at 9.) They argue that the bankruptcy judge "refused to apply the objective standard or otherwise disclose its *ex parte* communications about Appellant Manookian," instead scheduling an evidentiary hearing requiring the appellants to put on evidence in support of their Motion to Disqualify—evidence that, they claim, is "exclusively in the Court's possession." (*Id.* at 10.) The court quashed the Notice of Deposition, thereby allegedly depriving the appellants of the only means by which they could obtain the evidence of the judge's *ex parte* communications needed to support their Motion to Disqualify.

The appellants are wrong, of course: they possess evidence (such as it is) in the form of the judge's comments during the March 17 hearing and Phillip Young's deposition testimony—the evidence upon which their motion was premised in the first place. Moreover, because they took an appeal prior to the evidentiary hearing and before the judge ruled on their Motion to Disqualify, they have no idea how the judge might have ruled on that motion. More to the point, the appellants have not discussed the law that actually controls the issue they seek leave to appeal: the law establishing the standards for either setting or quashing the deposition of a presiding judge.

Instead, they argue that this court's guidance on the "appropriate standard for recusal and the correct process for considering disqualification requests relating to *ex parte* communications and extrajudicially developed bias will aid the parties and the Bankruptcy Court." (*Id.*) They posit that, "[i]f the Bankruptcy Court's Order is vacated and the case returned with instructions that it be transferred to another judge," that new judge "can promptly address remaining discovery and dispositive motions." (*Id.*) Again, however, the disqualification of the judge is not the question on

appeal. The Motion to Disqualify is still pending before the bankruptcy judge, albeit stayed pending resolution of this appeal of the Order Quashing Notice of Deposition. The appellants have not referenced or even alluded to the standard the judge applied in quashing the Notice setting his own deposition, much less shown that he applied the wrong standard or that a substantial ground for difference of opinion exists regarding the correctness of the decision.

Regarding the third factor, the appellants argue that denying leave for an interlocutory appeal would result in "wasted litigation and expense," as it would require them to go back before the Bankruptcy Court for an evidentiary hearing "in which Appellants lack key evidence." (*Id.* at 11.) Then, if the Bankruptcy Court denied their disqualification motion, "Appellants would seek review of the denial for the same reasons they now seek review of the Bankruptcy Court's handling of the disqualification motion." (*Id.*) The appellants, again, place the cart before the horse. Judge Walker has not yet "handled" the disqualification motion, and the appellants do not know how he would have ruled on it if they had not sought an interlocutory appeal of the Order Quashing Notice of Deposition. They have engaged in wasteful litigation and incurred unnecessary expense in seeking to appeal the Order Quashing Notice of Deposition rather than waiting to see how the judge ruled on their Motion to Disqualify and whether they actually had substantial grounds at that point for seeking to appeal that ruling.

In sum, the appellants have not made the requisite showing on even one of the three required factors. Moreover, even if the court were inclined to grant leave to pursue an interlocutory appeal, the only issue appealed is the appropriateness of the Order Quashing Notice of Deposition. That eight-page Order encompasses six pages of detailed consideration of the regulations governing requests to take the deposition of a judicial officer, set forth in Volume 20, Chapter 8

of the Guide to Judiciary Policy, promulgated by the Director of the Administrative Office of United States Courts.[7] (*See* Adv. Pro. No. 178, at 2–7.)

Generally, "[o]rders quashing a subpoena and limiting discovery are reviewed for an abuse of discretion." *In re Milholland*, No. AP 14-01589, 2017 WL 895752, at *4 (B.A.P. 10th Cir. Mar. 7, 2017) (citations omitted); *accord Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322, 1326 (11th Cir. 2020); *In re Grand Jury Proceedings*, 744 F.3d 211, 220–21 (1st Cir. 2014); *Pointer v. DART*, 417 F.3d 819, 821 (8th Cir. 2005); *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004). Moreover, although authority is somewhat limited, courts considering the issue appear to have universally held that, if a presiding judge can be subpoenaed to testify at all "concerning actions taken in his judicial capacity," it is "[o]nly under extraordinary circumstances." *In re Thompson*, 77 B.R. 113, 114 (N.D. Ohio 1987); *see also Kananian v. Brayton Purcell, LLP*, No. 1:07 CV 3188, 2009 WL 10689208, at *8 (N.D. Ohio May 29, 2009) (noting that those cases finding that a subpoena to compel a judge's deposition "may proceed in extreme and extraordinary circumstances, in fact never find that such circumstances exist" (collecting cases)). The appellants have not argued that extraordinary circumstances warrant compelling Judge Walker to appear for a deposition and, further, have provided *no* basis for finding that Judge Walker abused his discretion in issuing the Order Quashing the Notice of Deposition directed to him personally.

Thus, even if the appellants had shown that an interlocutory appeal was warranted, they have not provided a basis for setting aside the Order they seek to appeal.

---

[7] Available at https://jnet.ao.dcn/policy-guidance/guide-judiciary-policy/volume-20-administrative-claims-and-litigation/ch-8-testimony-and-production-records#810.

**IV.    CONCLUSION AND ORDER**

The court finds that the Order the appellants seek to appeal is not a "final order" that the appellants have an automatic right to appeal. The court, therefore, construes the Notice of Appeal as incorporating a motion for leave to appeal an interlocutory order. That motion is **DENIED**, for the reasons set forth herein.

It is so **ORDERED**.

_____
ALETA A. TRAUGER
United States District Judge

Burton,
  Plaintiff

Adv. Proc. No. 20-90002-CMW

Hagh Law PLLC,
  Defendant

# CERTIFICATE OF NOTICE

| District/off: 0650-3 | User: admin | Page 1 of 2 |
|---|---|---|
| Date Rcvd: Feb 16, 2023 | Form ID: pdf001 | Total Noticed: 6 |

The following symbols are used throughout this certificate:

| Symbol | Definition |
|---|---|
| + | Addresses marked '+' were corrected by inserting the ZIP, adding the last four digits to complete the zip +4, or replacing an incorrect ZIP. USPS regulations require that automation-compatible mail display the correct ZIP. |

**Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on Feb 18, 2023:**

| Recip ID | | Recipient Name and Address |
|---|---|---|
| dft | + | Afsoon Hagh, 45 Music Square W, Nashville, TN 37203-3205 |
| intp | + | BRIAN MANOOKIAN, 45 MUSIC SQUARE WEST, NASHVILLE, TN 37203-3205 |
| dft | + | Hagh Law PLLC, c/o Afsoon Hagh, Managing Member, 45 Music Square W, Nashville, TN 37203-3205 |
| dft | + | Manookian PLLC, c/o Brian Manookian, Managing Member, 45 Music Square W, Nashville, TN 37203-3205 |

TOTAL: 4

**Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.**
Electronic transmission includes sending notices via email (Email/text and Email/PDF), and electronic data interchange (EDI). Electronic transmission is in Eastern Standard Time.

| Recip ID | | Notice Type: Email Address | Date/Time | Recipient Name and Address |
|---|---|---|---|---|
| ust | | Email/Text: ustpregion08.na.ecf@usdoj.gov | Feb 16 2023 23:12:00 | US TRUSTEE, OFFICE OF THE UNITED STATES TRUSTEE, 701 BROADWAY STE 318, NASHVILLE, TN 37203-3966 |
| pla | + | Email/Text: jeanne.burton@comcast.net | Feb 16 2023 23:12:00 | Jeanne Ann Burton, 95 White Bridge Road, Ste 512, Nashville, TN 37205-1490 |

TOTAL: 2

# BYPASSED RECIPIENTS

The following addresses were not sent this bankruptcy notice due to an undeliverable address, *duplicate of an address listed above, *P duplicate of a preferred address, or ## out of date forwarding orders with USPS.

NONE

# NOTICE CERTIFICATION

**I, Gustava Winters, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed .R. Bank. P.2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

Date: Feb 18, 2023          Signature:      /s/Gustava Winters

# CM/ECF NOTICE OF ELECTRONIC FILING

The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email) system on February 16, 2023 at the address(es) listed below:

| Name | Email Address |
|---|---|

CRAIG VERNON GABBERT, JR
    on behalf of Defendant Hagh Law PLLC cgabbert@bassberry.com  bankr@bassberry.com;delores.walker@bassberry.com

GLENN BENTON ROSE
    on behalf of Defendant Hagh Law PLLC grose@bassberry.com  bankr@bassberry.com

JOHN T. SPRAGENS
    on behalf of Defendant Hagh Law PLLC JOHN@SPRAGENSLAW.COM  spragenslaw@ecf.courtdrive.com

PHILLIP G YOUNG
    on behalf of Plaintiff Jeanne Ann Burton phillip@thompsonburton.com

RONALD G STEEN, JR
    on behalf of Plaintiff Jeanne Ann Burton ronn.steen@thompsonburton.com


TOTAL: 5

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

MANOOKIAN PLLC and BRIAN )
MANOOKIAN, )
 )
   Appellants, )
 )     **Case No. 3:22-cv-00474**
 )     **Bankr. Case No. 3:19-bk-07235**
v. )     **Adv. Pro. No. 3:20-ap-90002**
 )
JEANNE ANN BURTON, TRUSTEE, )
 )     **Judge Aleta A. Trauger**
   Appellee. )
 )

## MEMORANDUM and ORDER

     Before the Court is the Notice of Appeal filed by defendants/appellants Brian Manookian and Manookian PLLC. (Adv. Pro. No. 185; Doc. No. 1.)[1] The appellants have filed a Statement of Issues, supporting Brief, and the record pertaining to their appeal. (Doc. Nos. 4, 5, 5-1.) The plaintiff/appellee, Trustee Jeanne Ann Burton, has filed a responding Brief (Doc. No. 6), and the appellants filed a Reply (Doc. No. 7). The court finds that a hearing on this matter is unnecessary and, therefore, **DENIES** the appellants' request for oral argument. For the reasons that follow, defendants/appellants' Notice of Appeal, which the court construes as a motion for leave to appeal, is **DENIED**.

---

[1] Citations to "Doc. No." refer to the docket number of filings made in the case in this court. Citations to "Bankr. No." are to the lead bankruptcy court docket in the underlying bankruptcy case, *In re Cummings Manookian, PLLC*, Case No. 3:19-bk-07235 (Bankr. M.D. Tenn.). Citations to "Adv. Pro. No." are to filings in the subject adversary proceeding, *Burton v. Hagh Law PLLC et al.*, Adv. Pro. No. 3:20-ap-90002 (Bankr. M.D. Tenn.).

## I. BACKGROUND

On November 6, 2019, Cummings Manookian, PLC[2] filed a Chapter 7 Voluntary Petition in the Bankruptcy Court, which was assigned to Bankruptcy Court Judge Charles M. Walker. (Bankr. No. 1.) Trustee Jeanne Ann Burton was appointed to serve as the Chapter 7 Trustee for the debtor on the same day and continues to serve in that capacity.

On January 8, 2020, the Trustee filed the Adversary Proceeding against Hagh Law PLLC ("Hagh Law"), Afsoon Hagh, Manookian PLLC ("Manookian Law"), and First-Citizens Bank and Trust Company (the "Bank"), asserting claims for conversion, fraudulent transfer, tortious interference with contract, successor liability/alter ego, and turnover, and seeking a declaratory judgment, injunctive relief, and other related relief. (Adv. Pro. No. 1, at 1.)[3] What followed was a contentious eighteen months or so of discovery, culminating in a hearing on March 17, 2022 ("March 17 hearing") before Judge Walker, for the purpose of resolving a number of outstanding discovery disputes.

The court and the parties were able to resolve several matters during the first half of the March 17 hearing. (*See generally* Mar. 17, 2022 Hr'g Tr., Adv. Pro. No. 140.) The court then adjourned for several hours while the parties continued to work toward further resolution on their own. When court reconvened on the afternoon of March 17, the parties reported to the judge the progress they had made and areas in which they had reached an impasse. One of the remaining areas of conflict was where to conduct four depositions the parties agreed should be taken. (Adv.

---

[2] The debtor's correct name is apparently Cummings Manookian, PLC. It was named incorrectly as Cummings Manookian, PLLC in the Petition.

[3] After the Bank turned over $715,000 (representing disputed fees in a case in which the debtor had represented one of the parties) being held by the Bank to the Clerk of Court, pursuant to the Bankruptcy Court's Order, the Trustee dismissed the Complaint as to the Bank on January 28, 2020.

Pro. No. 140, at 81–82.) The Trustee had suggested that the depositions take place in the courthouse, a proposal Judge Walker immediately approved. Counsel for Brian Manookian and Manookian Law registered his objection, and the court observed that, while the parties still had the ability to agree on a location, in the absence of an agreement, they would have to hold a hearing. (*Id.* at 82.) Counsel for the appellants continued to express the reasons why he believed that holding the depositions at the courthouse would be inconvenient for all concerned. He noted in particular that parking at the courthouse was expensive and that he did not understand the basis for departing from the ordinary course of holding depositions at lawyers' offices. The court then asked counsel for the Trustee to articulate a basis for conducting the depositions at the courthouse. Counsel for the Trustee stated several reasons why he believed the depositions should be taken at the courthouse, including his belief that there was, as he explained it, "a security issue here. There's already been a restraining order put down against Mr. Manookian by one of the creditor's lawyers in this case, and I don't take that lightly on behalf of my client." (*Id.* at 83.)

Counsel for the appellants again posited that his office was "just down the street" and offered free parking, and he objected to the suggestion of a security issue "in this ordinary bankruptcy case involving professional lawyers on all sides." (*Id.* at 84.) At this point, the court asked counsel for the Trustee if he was "uncomfortable doing depositions" in the appellants' counsel's office. (*Id.*) Counsel for the Trustee stated that he was. The court then made the following statement:

> All right. And then I'll just address the 100-pound gorilla in the room on that issue.
>
> To be candid, Mr. Spragens, I mean, your client's past behavior before the tribunals, and I've had at least two lawyers call the Court and say they don't feel comfortable if your client is going to appear, and, you know, the Court takes those concerns very seriously and makes no conclusion on whether they are valid, they are perceptions which drive behaviors of other parties. And to eliminate any of those perceptions, and to protect everyone against any allegations of bad behavior, misbehavior, or perceived misbehavior, it makes sense to do them here in an

environment where no one can get your client further down a rabbit hole of he did this or he did that, that we're in a neutral environment, which affords certain protections. And if nothing else, in terms of everybody's on their best behavior.

And so the Court's going to make that determination, that the depositions, unless the parties can agree, will be held here in the courthouse.

(*Id.* at 84–85.) No further discussion on this topic ensued, and counsel did not object contemporaneously to the court's statement regarding his "client's past behavior" or the two phone calls to the court by unidentified lawyers.

However, on May 5, 2022, Brian Manookian and Manookian Law, through counsel, filed their Motion to Disqualify Bankruptcy Judge Charles Walker, on the basis that the judge had "engaged in multiple prohibited *ex parte* communications about Brian Manookian and this proceeding . . . while this action has been pending." (Adv. Pro. No. 161, at 1–2.) In addition to the "communications with at least two [unidentified] lawyers" referenced by the judge at the March 17 hearing, the appellants represented that they had learned during the deposition of Phillip Young[4] that the Trustee, "through her Special Counsel, has had at least one improper *ex parte* communication with the Court about Mr. Manookian." (*Id.* at 1–2 n.2 (citing Adv. Pro. No. 161-2, Young Dep. 43–45).)[5] The Bankruptcy Court scheduled a hearing on the Motion to Disqualify

---

[4] Phillip Young functioned as receiver in a state court action filed in Williamson County, before being retained as counsel for the Trustee in Cummings Manookian's Chapter 7 bankruptcy proceeding. In that capacity, he was identified by the Trustee as a fact witness in the Adversary Proceeding. (*See* Adv. Pro. No. 140, at 69, 85.)

[5] As relevant here, Young testified as follows during his deposition:

[T]he very, very first hearing in this case, I called [Judge Walker's] courtroom deputy to alert her to the fact that a creditor's lawyer had an order of protection [against Brian Manookian]. And I didn't know how that was going to work logistically when you have a lawyer who's representing a creditor in the bankruptcy and the debtor's representatives and there was an order of protection down. And so I called to alert them to that so they would know how to handle that. But I don't know if anybody else called.

(Adv. Pro. No. 161-2, Young Dep. 44.) Specifically, he did not know if the lawyer who had obtained the order of protection had also called chambers. (*Id.*)

for June 29, 2022.[6] Counsel for Hagh Law and Afsoon Hagh filed a Response expressing their

support for the Motion to Disqualify. (Adv. Pro. No. 173, at 1, 2.) The Trustee filed a Response

opposing the motion and pointing out that counsel for the Trustee testified that he had had a brief

conversation with the judge's courtroom deputy—not with the judge himself—and that the

conversation involved a procedural question rather than substantive issues. (Adv. Pro. No. 174, at

2.) The Trustee also argued that the judge's comments at the March 17 hearing and the decision to

hold depositions at the courthouse did not reflect bias but instead a desire to have the depositions

conducted at the courthouse in order "to avoid any allegations of bad behavior, whether real or

perceived." (*Id.* at 4.) The Trustee also objected to the appellants' characterization of the legal

standards purportedly supporting disqualification.

On May 31, 2022, defendant/appellant Manookian Law noticed the deposition of Judge

Walker, for the purpose of addressing "(1) Judge Walker and his staff's communications about

this matter with third parties outside of court proceedings and (2) Judge Walker and his staff's

investigation into this matter, the parties, or witnesses outside of the Court record."(Adv. Pro. No.

177.) Judge Walker entered an eight-page Order the next day, quashing the Notice of Deposition.

(Adv. Pro. No. 178.) Manookian Law and Brian Manookian filed their Notice of Appeal and

Statement of Election on June 14, 2022, specifically giving notice of their appeal to this court

"from the Bankruptcy Court's June 1, 2022 Order (Doc. 178)," that is, from the Order Quashing

Notice of Deposition.

At the hearing on the Motion to Disqualify, which convened as planned on June 29, 2022,

Judge Walker read a statement into the record. In this statement, he expressed his conclusion that,

---

[6] The docket reflects that the parties, throughout this time period, continued to engage in discovery disputes.

in light of the appeal of the Order Quashing Notice of Deposition, the court was divested of jurisdiction over certain aspects of the case, specifically including both the Motion to Disqualify and the appellants' Motion for Summary Judgment, filed ten days after their Notice of Appeal. (Adv. Pro. No. 212, at 4; *see also* Adv. Pro. No. 188 (Motion for Summary Judgment).)

The appeal of the Order Quashing Notice of Deposition is now before the court.

## II.   LEGAL STANDARD

Under 28 U.S.C. § 158, a district court has jurisdiction to hear a timely appeal as a matter of right from final orders or decrees issued by a bankruptcy court and, "with leave of court," from interlocutory orders. 28 U.S.C. § 158(a)(1), (a)(3). Rule 8004(a) of the Federal Rules of Bankruptcy Procedure provides that, to appeal from an interlocutory order, a party should file a motion for leave to appeal with its notice of appeal. Fed. R. Bankr. P. 8004(a)(2). At the same time, however, Rule 8004(d) allows the district court to treat a timely notice of appeal as a motion for leave to appeal.

Rule 8004(b) identifies the required elements of a motion for leave to appeal, including (1) "the facts necessary to understand the question presented"; (2) "the question itself"; (3) "the relief sought"; (4) "the reasons why leave to appeal should be granted"; and (5) "a copy of the interlocutory order." With respect to the fourth element, neither Rule 8004 nor 28 U.S.C. § 158(a) states what factors a district court should consider in deciding whether to grant a motion for leave to appeal. District courts within the Sixth Circuit have adopted the standard set forth in 28 U.S.C. § 1292(b), which deals with interlocutory appeals from district courts to courts of appeal. *In re Energy Conversion Devices, Inc.*, 638 B.R. 81, 88 (E.D. Mich. 2022) (citations omitted). Thus, a district court may permit an interlocutory appeal if (1) the order involves a controlling question of law; (2) a substantial ground for difference of opinion exists regarding the correctness of the decision; and (3) an immediate appeal may materially advance the ultimate termination of the

litigation. *Id.* (citations omitted). "It is well-established that all three statutory requirements must be met for the court to certify an appeal under § 1292(b)." *Id.* (quoting *Lang v. Crocker Park LLC*, No. 1:09 CV 1412, 2011 WL 3297865, at *5 (N.D. Ohio July 29, 2011)). Even when all three criteria are met, "district courts have 'unfettered discretion to deny certification' in light of the strong bias in federal practice against interlocutory appeals." *In re Great Atl. & Pac. Tea Co.*, 615 B.R. 717, 722 (S.D.N.Y. 2020) (citation omitted). Further, it is well established that permitting interlocutory appeals is "the exception, rather than the rule." *Energy Conversion Devices*, 638 B.R. at 89 (citing *In re Doria*, No. 09-75261, 2010 WL 2870813, at *2 (E.D. Mich. July 21, 2010)).

## III.    ANALYSIS

### A.    The Order Quashing Subpoena Is Not a "Final Order"

In their opening Brief, the appellants contend that the court has jurisdiction over this appeal as a matter of right, under 28 U.S.C. § 158(a), because the Order Quashing Notice of Deposition is a final, appealable order. (Doc. No. 5, at 3.) Alternatively, they ask the court to consider their timely Notice of Appeal as a motion for leave to file an interlocutory appeal. (*Id.*)

"Orders in bankruptcy cases qualify as 'final' when they definitively dispose of discrete disputes within the overarching bankruptcy case." *Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 140 S. Ct. 582, 586 (2020) (citing *Bullard v. Blue Hills Bank*, 575 U.S. 496, 501 (2015)). Thus, for example, "the adjudication of a motion for relief from the automatic stay forms a discrete procedural unit within the embracive bankruptcy case. That unit yields a final, appealable order when the bankruptcy court unreservedly grants or denies relief." *Id.* Likewise, orders "denying an application for an administrative expense," "sustaining an objection to a creditor's claim," or "denying a motion under Federal Rule of Civil Procedure 60(b)" all qualify as "final orders" that are appealable as of right. *In re Murray Energy Holdings Co.*, 640 B.R. 558, 560–61 (B.A.P. 6th Cir. 2022). Courts distinguish between "discrete disputes" and "discrete issues," with only the

former being subject to immediate appeal. *In re Comdisco, Inc.*, 538 F.3d 647, 651–52 (7th Cir. 2008). "A discrete dispute is one that is essentially separable from the larger case," while "a decision or order that resolves only an issue that arises during the administration of a bankruptcy estate is too small a litigation unit to justify treatment as a final judgment." *Id.*; *see also In re Jackson Masonry, LLC*, 906 F.3d 494, 500 (6th Cir. 2018) (identifying the "appropriate 'judicial unit' for finality analysis" as a "discrete 'proceeding'" (citations omitted)), *aff'd sub nom. Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 140 S. Ct. 582 (2020).

The order appealed from in this case is an order quashing a deposition that was sought for the purpose of obtaining evidence in support of the appellants' Motion to Disqualify Judge Walker. Irrespective of the appellants' attempts to cast it as a final order, the bankruptcy judge stayed the case pending this appeal, finding that he was divested of jurisdiction over the Motion to Disqualify and the appellants' Motion for Summary Judgment as a result of their appeal of the Order Quashing Notice of Deposition. The appellants, thus, are not in a position to appeal the disposition of the Motion to Disqualify or the Motion for Summary Judgment, because those motions are still pending. While the Motion to Disqualify might arguably constitute a discrete dispute, the resolution of which would qualify as a final order (an issue the court does not reach here), the Order Quashing Notice of Deposition is clearly not. It is an issue arising in the context of resolving the Motion to Disqualify. The court finds, therefore, that the Order Quashing Notice of Deposition is an interlocutory order, not a final order as contemplated by 28 U.S.C. § 158(a).

**B.     Whether to Grant Leave to Appeal**

As set forth above, the court may permit an interlocutory appeal if (1) the order in question involves a controlling question of law; (2) a substantial ground for difference of opinion exists regarding the correctness of the decision; and (3) an immediate appeal may materially advance the ultimate termination of the litigation. *Energy Conversion Devices*, 638 B.R. at 88.

The appellants' argument in support of an interlocutory appeal glosses over the nature of the order they seek to appeal. Thus, for instance, they argue that their appeal "involves a controlling question of law, because the "[d]isqualification of a judge . . . is governed by statute," which creates an objective standard. (Doc. No. 5, at 9.) They argue that the bankruptcy judge "refused to apply the objective standard or otherwise disclose its *ex parte* communications about Appellant Manookian," instead scheduling an evidentiary hearing requiring the appellants to put on evidence in support of their Motion to Disqualify—evidence that, they claim, is "exclusively in the Court's possession." (*Id.* at 10.) The court quashed the Notice of Deposition, thereby allegedly depriving the appellants of the only means by which they could obtain the evidence of the judge's *ex parte* communications needed to support their Motion to Disqualify.

The appellants are wrong, of course: they possess evidence (such as it is) in the form of the judge's comments during the March 17 hearing and Phillip Young's deposition testimony—the evidence upon which their motion was premised in the first place. Moreover, because they took an appeal prior to the evidentiary hearing and before the judge ruled on their Motion to Disqualify, they have no idea how the judge might have ruled on that motion. More to the point, the appellants have not discussed the law that actually controls the issue they seek leave to appeal: the law establishing the standards for either setting or quashing the deposition of a presiding judge.

Instead, they argue that this court's guidance on the "appropriate standard for recusal and the correct process for considering disqualification requests relating to *ex parte* communications and extrajudicially developed bias will aid the parties and the Bankruptcy Court." (*Id.*) They posit that, "[i]f the Bankruptcy Court's Order is vacated and the case returned with instructions that it be transferred to another judge," that new judge "can promptly address remaining discovery and dispositive motions." (*Id.*) Again, however, the disqualification of the judge is not the question on

appeal. The Motion to Disqualify is still pending before the bankruptcy judge, albeit stayed pending resolution of this appeal of the Order Quashing Notice of Deposition. The appellants have not referenced or even alluded to the standard the judge applied in quashing the Notice setting his own deposition, much less shown that he applied the wrong standard or that a substantial ground for difference of opinion exists regarding the correctness of the decision.

Regarding the third factor, the appellants argue that denying leave for an interlocutory appeal would result in "wasted litigation and expense," as it would require them to go back before the Bankruptcy Court for an evidentiary hearing "in which Appellants lack key evidence." (*Id.* at 11.) Then, if the Bankruptcy Court denied their disqualification motion, "Appellants would seek review of the denial for the same reasons they now seek review of the Bankruptcy Court's handling of the disqualification motion." (*Id.*) The appellants, again, place the cart before the horse. Judge Walker has not yet "handled" the disqualification motion, and the appellants do not know how he would have ruled on it if they had not sought an interlocutory appeal of the Order Quashing Notice of Deposition. They have engaged in wasteful litigation and incurred unnecessary expense in seeking to appeal the Order Quashing Notice of Deposition rather than waiting to see how the judge ruled on their Motion to Disqualify and whether they actually had substantial grounds at that point for seeking to appeal that ruling.

In sum, the appellants have not made the requisite showing on even one of the three required factors. Moreover, even if the court were inclined to grant leave to pursue an interlocutory appeal, the only issue appealed is the appropriateness of the Order Quashing Notice of Deposition. That eight-page Order encompasses six pages of detailed consideration of the regulations governing requests to take the deposition of a judicial officer, set forth in Volume 20, Chapter 8

Case 3:22-cv-00474   Document 8   Filed 02/09/23   Page 10 of 12 PageID #: 221

of the Guide to Judiciary Policy, promulgated by the Director of the Administrative Office of United States Courts.[7] (*See* Adv. Pro. No. 178, at 2–7.)

Generally, "[o]rders quashing a subpoena and limiting discovery are reviewed for an abuse of discretion." *In re Milholland*, No. AP 14-01589, 2017 WL 895752, at *4 (B.A.P. 10th Cir. Mar. 7, 2017) (citations omitted); *accord Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322, 1326 (11th Cir. 2020); *In re Grand Jury Proceedings*, 744 F.3d 211, 220–21 (1st Cir. 2014); *Pointer v. DART*, 417 F.3d 819, 821 (8th Cir. 2005); *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004). Moreover, although authority is somewhat limited, courts considering the issue appear to have universally held that, if a presiding judge can be subpoenaed to testify at all "concerning actions taken in his judicial capacity," it is "[o]nly under extraordinary circumstances." *In re Thompson*, 77 B.R. 113, 114 (N.D. Ohio 1987); *see also Kananian v. Brayton Purcell, LLP*, No. 1:07 CV 3188, 2009 WL 10689208, at *8 (N.D. Ohio May 29, 2009) (noting that those cases finding that a subpoena to compel a judge's deposition "may proceed in extreme and extraordinary circumstances, in fact never find that such circumstances exist" (collecting cases)). The appellants have not argued that extraordinary circumstances warrant compelling Judge Walker to appear for a deposition and, further, have provided *no* basis for finding that Judge Walker abused his discretion in issuing the Order Quashing the Notice of Deposition directed to him personally.

Thus, even if the appellants had shown that an interlocutory appeal was warranted, they have not provided a basis for setting aside the Order they seek to appeal.

---

[7] Available at https://jnet.ao.dcn/policy-guidance/guide-judiciary-policy/volume-20-administrative-claims-and-litigation/ch-8-testimony-and-production-records#810.

## IV.  CONCLUSION AND ORDER

The court finds that the Order the appellants seek to appeal is not a "final order" that the appellants have an automatic right to appeal. The court, therefore, construes the Notice of Appeal as incorporating a motion for leave to appeal an interlocutory order. That motion is **DENIED**, for the reasons set forth herein.

It is so **ORDERED**.

_____

ALETA A. TRAUGER
United States District Judge

_Charles M. Walker_
Charles M. Walker
U.S. Bankruptcy Judge
Dated: 3/10/2023



IN THE UNITED STATTES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| IN RE: | ) |
| | ) Case No: 3:19-bk-07235 |
| Cummings Manookian, PLLC, | ) Chapter 7 |
| | ) Honorable Charles M. Walker |
| Debtor. | ) |
| | ) |
| _____ | ) |
| | ) |
| Jeanne Ann Burton, Trustee, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. Proceeding: 3:20-ap-90002 |
| | ) |
| Hagh Law, PLLC; Afsoon Hagh; and | ) |
| Manookian PLLC | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

**ORDER SCHULING HEARING**
**ON MOTION TO DISQUALIFY BANKRUPTCY JUDGE**

THIS MATTER is before the Court on the motion to disqualify filed on May 5, 2022,
located at Docket Entry #161, as well as the Responses located at Dkt. # 173 and #174. The
Court being duly advised,

IT IS HEREBY ORDERED that:

(1) An evidentiary hearing is set for presentation of the motion and any objections/responses
on <u>March 28, 2023 at 1:00 p.m.</u>

(2) All parties and/or counsel must appear in person at the above scheduled date and time at
Courtroom 2, Second Floor, Customs House, 701 Broadway, Nashville, Tennessee.

(3) Presentation of evidence and argument subject to applicable Federal and Local Rules.

*THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY AS*
*INDICATED AT THE TOP OF THE FIRST PAGE*

This Order has been electronically
signed. The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.

2439

Burton,
    Plaintiff                                               Adv. Proc. No. 20-90002-CMW
Hagh Law PLLC,
    Defendant

# CERTIFICATE OF NOTICE

District/off: 0650-3                         User: admin                              Page 1 of 2

Date Rcvd: Mar 10, 2023              Form ID: pdf001                         Total Noticed: 6

The following symbols are used throughout this certificate:

| Symbol | Definition |
| --- | --- |
| + | Addresses marked '+' were corrected by inserting the ZIP, adding the last four digits to complete the zip +4, or replacing an incorrect ZIP. USPS regulations require that automation-compatible mail display the correct ZIP. |

**Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on Mar 12, 2023:**

| Recip ID | | Recipient Name and Address |
| --- | --- | --- |
| dft | + | Afsoon Hagh, 45 Music Square W, Nashville, TN 37203-3205 |
| intp | + | BRIAN MANOOKIAN, 45 MUSIC SQUARE WEST, NASHVILLE, TN 37203-3205 |
| dft | + | Hagh Law PLLC, c/o Afsoon Hagh, Managing Member, 45 Music Square W, Nashville, TN 37203-3205 |
| dft | + | Manookian PLLC, c/o Brian Manookian, Managing Member, 45 Music Square W, Nashville, TN 37203-3205 |

TOTAL: 4

**Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.**
Electronic transmission includes sending notices via email (Email/text and Email/PDF), and electronic data interchange (EDI). Electronic transmission is in Eastern Standard Time.

| Recip ID | | Notice Type: Email Address | Date/Time | Recipient Name and Address |
| --- | --- | --- | --- | --- |
| ust | | Email/Text: ustpregion08.na.ecf@usdoj.gov | Mar 10 2023 23:39:00 | US TRUSTEE, OFFICE OF THE UNITED STATES TRUSTEE, 701 BROADWAY STE 318, NASHVILLE, TN 37203-3966 |
| pla | + | Email/Text: jeanne.burton@comcast.net | Mar 10 2023 23:39:00 | Jeanne Ann Burton, 95 White Bridge Road, Ste 512, Nashville, TN 37205-1490 |

TOTAL: 2

# BYPASSED RECIPIENTS

The following addresses were not sent this bankruptcy notice due to an undeliverable address, *duplicate of an address listed above, *P duplicate of a preferred address, or ## out of date forwarding orders with USPS.

NONE

# NOTICE CERTIFICATION

**I, Gustava Winters, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed .R. Bank. P.2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

Date: Mar 12, 2023                  Signature:        /s/Gustava Winters

# CM/ECF NOTICE OF ELECTRONIC FILING

The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email) system on March 10, 2023 at the address(es) listed below:

| Name | Email Address |
| --- | --- |

CRAIG VERNON GABBERT, JR
                        on behalf of Defendant Hagh Law PLLC cgabbert@bassberry.com  bankr@bassberry.com;delores.walker@bassberry.com

GLENN BENTON ROSE
                        on behalf of Defendant Hagh Law PLLC grose@bassberry.com  bankr@bassberry.com

JOHN T. SPRAGENS
                        on behalf of Defendant Hagh Law PLLC JOHN@SPRAGENSLAW.COM  spragenslaw@ecf.courtdrive.com

PHILLIP G YOUNG
                        on behalf of Plaintiff Jeanne Ann Burton phillip@thompsonburton.com

RONALD G STEEN, JR
                        on behalf of Plaintiff Jeanne Ann Burton ronn.steen@thompsonburton.com


TOTAL: 5


Charles M. Walker
U.S. Bankruptcy Judge
Dated: 3/10/2023



IN THE UNITED STATTES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| IN RE: | ) |
| | ) Case No: 3:19-bk-07235 |
| Cummings Manookian, PLLC, | ) Chapter 7 |
| | ) Honorable Charles M. Walker |
| Debtor. | ) |
| | ) |
| ———————————————— | ) |
| | ) |
| Jeanne Ann Burton, Trustee, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. Proceeding: 3:20-ap-90002 |
| | ) |
| Hagh Law, PLLC; Afsoon Hagh; and | ) |
| Manookian PLLC | ) |
| | ) |
| Defendants. | ) |
| ———————————————— | ) |

**ORDER SCHULING HEARING
ON MOTION TO DISQUALIFY BANKRUPTCY JUDGE**

THIS MATTER is before the Court on the motion to disqualify filed on May 5, 2022,
located at Docket Entry #161, as well as the Responses located at Dkt. # 173 and #174. The
Court being duly advised,

IT IS HEREBY ORDERED that:

(1) An evidentiary hearing is set for presentation of the motion and any objections/responses
on March 28, 2023 at 1:00 p.m.

(2) All parties and/or counsel must appear in person at the above scheduled date and time at
Courtroom 2, Second Floor, Customs House, 701 Broadway, Nashville, Tennessee.

(3) Presentation of evidence and argument subject to applicable Federal and Local Rules.

*THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY AS
INDICATED AT THE TOP OF THE FIRST PAGE*

This Order has been electronically
signed. The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

IN RE:                                              )
                                                    )        **Case No. 3:19-bk-07235**
CUMMINGS MANOOKIAN, PLLC,                           )        **Chapter 7**
                                                    )        **Judge Walker**
         Debtor.                                    )
                                                    )
JEANNE ANN BURTON, TRUSTEE,                         )
                                                    )
         Plaintiff,                                 )
                                                    )
v.                                                  )        **Adv. Proc. No. 3:20-ap-90002**
                                                    )
HAGH LAW, PLLC; AFSOON HAGH;                        )
MANOOKIAN, PLLC; and FIRST-                         )
CITIZENS BANK & TRUST COMPANY,                      )
                                                    )
         Defendants.                                )

---

## EMERGENCY MOTION TO CONTINUE HEARING

---

Come now Defendants Hagh Law, PLLC ("Hagh Law"), Afsoon Hagh ("Ms. Hagh") and Mannokian, PLLC ("Manookian", collectively "Defendants"), by and through counsel, and respectfully move to continue the hearing on the Motion to Disqualify Bankruptcy Judge scheduled in this matter on March 28, 2023 at 1:00 p.m. As grounds for this Motion, the Defendants state that due to the recent traumatic shooting at the school in Green Hills near the school attended by the children of Defendants, counsel for the Defendants and the Trustee are in agreement to continue the hearing until next week or at such a time as convenient for the Court.

WHEREFORE, Defendants respectfully request that the Court enter an order continuing the hearing on the Motion to Disqualify Bankruptcy Judge until April 4, 2023 at 1:00 p.m. CDT or such other later date as agreeable to the Court.

Respectfully submitted,

/s/ Craig V. Gabbert, Jr.
Craig V. Gabbert, Jr. (BPR 004702)
Glenn B. Rose (BPR 10598)
Bass, Berry & Sims PLC
150 Third Ave. S., Suite 2800
Nashville, TN 37201
(615) 742-6200
cgabbert@bassberry.com
grose@bassberry.com

*Attorney for Afsoon Hagh and
Hagh Law, PLLC*

/s/ John Spragens
John Spragens (TN Bar No. 31445)
Spragens Law PLC
311 22nd Ave. N.
Nashville, TN 37203
T: (615) 983-8900
F: (615) 682-8533
john@spragenslaw.com

*Attorney for Manookian PLLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed March 27, 2023, and served electronically upon all parties in interest or their counsel as indicated on the receipt issued by the Court's electronic filing system.

/s/ Craig V. Gabbert, Jr.

Charles M. Walker
U.S. Bankruptcy Judge
Dated: 3/27/2023



IN THE UNITED STATTES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

IN RE:                                    )
                                          ) Case No: 3:19-bk-07235
Cummings Manookian, PLLC,                 ) Chapter 7
                                          ) Honorable Charles M. Walker
          Debtor.                         )
_____       )
                                          )
Jeanne Ann Burton, Trustee,               )
                                          )
          Plaintiff,                      )
                                          )
          v.                              ) Adv. Proceeding: 3:20-ap-90002
                                          )
Hagh Law, PLLC; Afsoon Hagh; and          )
Manookian PLLC                            )
                                          )
          Defendants.                     )
_____       )

**ORDER GRANTING EMERGENCY MOTION TO CONTINUE HEARING**

THIS MATTER came before the Court on the Motion of Defendant's Hagh Law, PLLC,

Afsoon Hagh, and Manookian, PLLC, to continue the hearing on the Motion to Disqualify

Bankruptcy Judge scheduled for March 28, 2023 at 1:00 p.m.

Based on the Trustee/Plaintiff's agreement to a continuance, IT IS HEREBY ORDERED

that

1) the Motion to Disqualify Bankruptcy Judge is reset to **April 4, 2023 at 8:00 a.m.**; and

2) all other provisions of the Order at Dkt. #220 remain in effect.

**THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY AS
INDICATED AT THE TOP OF THE FIRST PAGE**

This Order has been electronically
signed. The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.

Burton,

    Plaintiff

Hagh Law PLLC,

    Defendant

Adv. Proc. No. 20-90002-CMW

# CERTIFICATE OF NOTICE

| District/off: 0650-3 | User: admin | Page 1 of 2 |
| Date Rcvd: Mar 27, 2023 | Form ID: pdf001 | Total Noticed: 6 |

The following symbols are used throughout this certificate:

| Symbol | Definition |
| --- | --- |
| + | Addresses marked '+' were corrected by inserting the ZIP, adding the last four digits to complete the zip +4, or replacing an incorrect ZIP. USPS regulations require that automation-compatible mail display the correct ZIP. |

**Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on Mar 29, 2023:**

| Recip ID | | Recipient Name and Address |
| --- | --- | --- |
| dft | + | Afsoon Hagh, 45 Music Square W, Nashville, TN 37203-3205 |
| intp | + | BRIAN MANOOKIAN, 45 MUSIC SQUARE WEST, NASHVILLE, TN 37203-3205 |
| dft | + | Hagh Law PLLC, c/o Afsoon Hagh, Managing Member, 45 Music Square W, Nashville, TN 37203-3205 |
| dft | + | Manookian PLLC, c/o Brian Manookian, Managing Member, 45 Music Square W, Nashville, TN 37203-3205 |

TOTAL: 4

**Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.**
Electronic transmission includes sending notices via email (Email/text and Email/PDF), and electronic data interchange (EDI). Electronic transmission is in Eastern Standard Time.

| Recip ID | | Notice Type: Email Address | Date/Time | Recipient Name and Address |
| --- | --- | --- | --- | --- |
| ust | | Email/Text: ustpregion08.na.ecf@usdoj.gov | Mar 27 2023 23:24:00 | US TRUSTEE, OFFICE OF THE UNITED STATES TRUSTEE, 701 BROADWAY STE 318, NASHVILLE, TN 37203-3966 |
| pla | + | Email/Text: jeanne.burton@comcast.net | Mar 27 2023 23:24:00 | Jeanne Ann Burton, 95 White Bridge Road, Ste 512, Nashville, TN 37205-1490 |

TOTAL: 2

# BYPASSED RECIPIENTS

The following addresses were not sent this bankruptcy notice due to an undeliverable address, *duplicate of an address listed above, *P duplicate of a preferred address, or ## out of date forwarding orders with USPS.

NONE

# NOTICE CERTIFICATION

**I, Gustava Winters, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed .R. Bank. P.2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

Date: Mar 29, 2023

Signature:     /s/Gustava Winters

# CM/ECF NOTICE OF ELECTRONIC FILING

The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email) system on March 27, 2023 at the address(es) listed below:

| Name | Email Address |
| --- | --- |

CRAIG VERNON GABBERT, JR
on behalf of Defendant Hagh Law PLLC cgabbert@bassberry.com bankr@bassberry.com;delores.walker@bassberry.com

GLENN BENTON ROSE
on behalf of Defendant Hagh Law PLLC grose@bassberry.com bankr@bassberry.com

JOHN T. SPRAGENS
on behalf of Defendant Hagh Law PLLC JOHN@SPRAGENSLAW.COM spragenslaw@ecf.courtdrive.com

PHILLIP G YOUNG
on behalf of Plaintiff Jeanne Ann Burton phillip@thompsonburton.com

RONALD G STEEN, JR
on behalf of Plaintiff Jeanne Ann Burton ronn.steen@thompsonburton.com

TOTAL: 5



Charles M. Walker
U.S. Bankruptcy Judge
Dated: 3/27/2023

IN THE UNITED STATTES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

IN RE:                                          )
                                                ) Case No: 3:19-bk-07235
Cummings Manookian, PLLC,                       ) Chapter 7
                                                ) Honorable Charles M. Walker
          Debtor.                               )
_____         )
                                                )
Jeanne Ann Burton, Trustee,                     )
                                                )
          Plaintiff,                            )
                                                )
     v.                                         ) Adv. Proceeding: 3:20-ap-90002
                                                )
Hagh Law, PLLC; Afsoon Hagh; and                )
Manookian PLLC                                  )
                                                )
          Defendants.                           )
_____         )

### ORDER GRANTING EMERGENCY MOTION TO CONTINUE HEARING

THIS MATTER came before the Court on the Motion of Defendant's Hagh Law, PLLC,

Afsoon Hagh, and Manookian, PLLC, to continue the hearing on the Motion to Disqualify

Bankruptcy Judge scheduled for March 28, 2023 at 1:00 p.m.

Based on the Trustee/Plaintiff's agreement to a continuance, IT IS HEREBY ORDERED

that

1) the Motion to Disqualify Bankruptcy Judge is reset to **April 4, 2023 at 8:00 a.m.**; and

2) all other provisions of the Order at Dkt. #220 remain in effect.

**THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY AS
INDICATED AT THE TOP OF THE FIRST PAGE.**

This Order has been electronically
signed.  The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| IN RE: | Case No, 3:19-bk-07235 |
| CUMMINGS MANOOKIAN, PLLC | Chapter 7 |
| | Judge Walker |
| Debtor. | |
| | Adv. Proc. No. 3:20-ap-90002 |
| JEANNE ANN BURTON, TRUSTEE | |
| Plaintiff, | |
| v. | |
| HAGH LAW, PLLC; AFSOON HAGH; and MANOOKIAN PLLC, | |
| Defendants. | |

## BRIAN MANOOKIAN AND MANOOKIAN PLLC'S LIST OF POTENTIAL WITNESSES FOR HEARING ON MOTION TO DISQUALIFY BANKRUPTCY JUDGE CHARLES WALKER

Brian Manookian and Manookian PLLC ("the Manookian Parties") respectfully submit this list of potential witnesses who may be called affirmatively by the Manookian parties at the April 4, 2023 hearing on the Manookian Parties' motion to disqualify:

1. Phillip Young, counsel for the Trustee.

2. Brian Manookian, interested party.

3. Judge Charles M. Walker.[1]

---

[1] The Manookian Parties recognize, based on the Court's prior ruling, that it may not permit itself to be called to testify, but they renew their request for the Court's testimony

1

Date:  April 3, 2023

Respectfully submitted,

/s/ John Spragens
John Spragens (TN Bar No. 31445)
Spragens Law PLC
311 22nd Ave. N.
Nashville, TN 37203
T: (615) 983-8900
F: (615) 682-8533
john@spragenslaw.com

*Attorney for Manookian PLLC and
Brian Manookian*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed April 3, 2023 and served electronically upon all parties in interest or their counsel as indicated on the receipt issued by the Court's electronic filing system.

/s/ John Spragens

---

on the limited topic of any *ex parte* communications about a litigant, and preserve the issue for the record.

# UNITED STATES BANKRUPTCY COURT

## - MIDDLE DISTRICT OF TENNESSEE -

### TRANSCRIPT REQUEST FORM

Please complete one form for each trial or hearing, attach payment (search fee only),
and deliver to Clerk's office at: 701 BROADWAY, ROOM 170, NASHVILLE, TN 37203
or file electronically through CM/ECF.

| | |
|---|---|
| **1. NAME OF PARTY REQUESTING TRANSCRIPT**<br><br>Jeanne Ann Burton, Trustee | **2. DATE OF ORDER**<br>4/4/23 |
| **3. EMAIL ADDRESS**<br>phillip@thompsonburton.com | **4. PHONE NUMBER**<br>615-465-6000 |

**5. MAILING ADDRESS**

c/o Phillip Young

Thompson Burton PLLC

6100 Tower Circle, Suite 200

Franklin, Tennessee 37067

| | | |
|---|---|---|
| **6. CASE NUMBER**<br>20-ap-90002 | **7. CASE NAME**<br>Burton v. Hagh, et al | **8. JUDGE**<br>Walker |

**9. DATE(S) OF HEARING/TRIAL** (If hearing/trial was on multiple days, please fill in all days hearing/trial held)

From 4/4/23 _____ to 4/4/23 _____

**10. ORDER IS FOR**
☐ APPEAL          ☐ BANKRUPTCY          ☑ ADVERSARY
☐ OTHER:_____

**11. PORTIONS REQUESTED** (Indicate the portion of the hearing/trial requested)

☑ Entire Hearing/Trial          ☐ Court Ruling Only
☐ Voir Dire          ☐ Testimony of (Specify Name):
☐ Opening Statement (Plaintiff)
☐ Opening Statement (Defendant)          _____
☐ Closing Statement (Plaintiff)          _____
☐ Closing Statement (Defendant)          ☐ Other: _____

**12. REQUESTED TURNAROUND TIME**
☐ Daily (24-Hour)          ☐ 7-Day Expedited
☐ 14-Day Expedited          ☑ Standard (30-Day)

**13. NUMBER OF COPIES REQUESTED** (Transcript request includes 1 copy for the Court)    1

*By signing below, I certify that I will pay all charges for the preparation of the transcript, including
search fee, deposit, and any additional charges as specified by the assigned transcriptionist.*

/s/ Phillip G. Young, Jr.                    4/4/23
_____                    _____
Signature of Person Ordering                    Date

| FOR COURT USE ONLY | DATE | BY |
|---|---|---|
| ORDER RECEIVED BY INTAKE | | |
| SEARCH FEE PAID | | |
| FILE(S) UPLOADED | | |

jjk 3/2017

2451



Charles M. Walker
U.S. Bankruptcy Judge
Dated: 4/5/2023

IN THE UNITED STATTES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| IN RE: | ) |
| | ) Case No: 3:19-bk-07235 |
| Cummings Manookian, PLLC, | ) Chapter 7 |
| | ) Honorable Charles M. Walker |
| Debtor. | ) |
| _____ | ) |
| | ) |
| Jeanne Ann Burton, Trustee, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. Proceeding: 3:20-ap-90002 |
| | ) |
| Hagh Law, PLLC; Afsoon Hagh; and | ) |
| Manookian PLLC | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

**ORDER DENYING MOTION TO DISQUALIFY
BANKRUPTCY JUDGE CHARLES WALKER**

THIS MATTER came before the Court for an evidentiary hearing[1] on April 4, 2023. At

that time, Counsel for the Plaintiff and Counsel for Defendants and Brian Manookian[2] appeared

and were heard. When counsel for the Movants sought to call his first witness, Trustee's counsel

---

[1] The hearing was set to afford the opportunity for the movants to prosecute their motion either by introduction of evidence and/or argument. "The purpose of an evidentiary hearing is to permit both parties to present their cases and to challenge the other side's case in court and on the record."
*In re McCashen*, 339 B.R. 907, 908 (Bankr. N.D. Ohio 2006)
[2] John T. Spragens and Craig V. Gabbert, Jr. for Hagh Law PLLC and Afsoon Hagh. Mr. Spragens also appeared on behalf of Manookian PLLC and Brian Manookian as Movants.

1

2452

objected on the grounds that Movants filed their Witness list in violation of Local Rule 9014-1.[3] The Court sustained the objection and no witnesses were presented per that oral ruling. The Court then heard argument from both sides, and for the following reasons, the Motion to Disqualify is DENIED.

<u>The Motion to Disqualify</u>

Brian Manookian, a non-party to this action,[4] and Manookian PLLC (hereinafter "Movants"), seek to have the sitting judge in this case recused for *ex parte* communications and extrajudicial research regarding this case. The bases for this motion lie in statements made by Trustee's counsel during a deposition[5] on April 12, 2022[6], and those made in Judge Charles M. Walker's decision regarding discovery disputes that were the subject of a March 17, 2022 hearing.

This motion alleges that *ex parte* communications about Brian Manookian made to the Court were improper *ex parte* conversations requiring Judge Walker to recuse himself for

---

[3] Local Rule 9014 provides in relevant part: (1) Pretrial Court Filings. In addition to the initial disclosures that may be invoked by paragraph (2) below, and regardless of whether such pretrial disclosure process has been invoked,
every party shall file with the court and provide to every other party by noon 2 business days prior to the hearing the following information regarding evidence it may present at a hearing or trial (other than solely for impeachment purposes):
    (a) The name, address and telephone number of each witness the party expects to present or may call if the need arises;
    (b) A copy of the transcript of testimony or affidavit of any witness whose testimony will be offered in that form;
    (c) A list and copy, with appropriate identification, of each document or other exhibit a party expects to offer or may offer as evidence. (For any matter to be heard in the Nashville Division, the exhibits shall be filed and exchanged utilizing the court's Electronic Evidence Submission Application pursuant to the Electronic Evidence Procedures.) . . .
[4] Sole member of the Debtor and of Defendant, Manookian PLLC
[5] Philip Young, Trustee's counsel in this matter, also served as the receiver in a related state court case.
[6] Although the referenced communication is referred to in footnote #2 of the motion and the transcript attached, the communication is repeatedly referred to as a communication with chambers. Mr. Young states that he spoke with Judge Walker's courtroom deputy-at-the-time, an employee of the Clerk of Court. No reference, allegation, or argument appears in the motion regarding any *ex parte* communication between Mr. Young and chambers staff.

2

violating 28 U.S.C. §§ 455(a) and (b)(1), and the Code of Conduct for Federal Judges.[7] Specifically, the motion refers to Judge Walker's statements on the record in open court, with all parties' counsel present, regarding calls to the court from lawyers expressing their discomfort if Mr. Manookian were to appear at hearings and depositions in this case. Transcript, P.84. Movants allege that Judge Walker "engaged in multiple prohibited *ex parte* communications about Brian Manookian and this proceeding with 'at least two [unidentified] lawyers' while this action has been pending." ECF 161, P1. It appears the allegation of "multiple . . . at least two [unidentified] lawyers" includes a conversation the Trustee's attorney had with a courtroom deputy.[8]

Movants go on to accuse Judge Walker of failing to notify the parties of "its repeated conversations" alleging that the Court only did so much later to justify a ruling regarding the location of depositions, and movants were not afforded the opportunity to respond. Additionally, movants state that these communications had a "corrosive effect on the Court" which has only recently become clear. *Id.* at P.2.

The motion goes on to assert that Judge Walker's statements regarding Mr. Manookian's "past behavior before tribunals" indicates that the judge has engaged in extrajudicial research and has formed a bias against Mr. Manookian as a result – also requiring recusal. *Id.* The motion quite emphatically states that "No court has ever found that he [Mr. Manookian] acted even remotely inappropriately, much less in a physically threatening manner, during a deposition – nor, crucially, does the record in this case support such a finding." *Id* at P6.

---

[7] See § 20:118.25. Ethics and Code of Conduct for Federal Judges, 6 Pat. L. Fundamentals § 20:118.25 (2d ed.).
[8] The Trustee's attorney is identified in the motion at FN 2.

3

Co-counsel for Defendants Afsoon Hagh and Hagh Law PLLC filed a response joining in the motion. In this response (ECF 173), those Defendants question the Court's Order setting this motion for evidentiary hearing (ECF 165)[9] "when the person holding the most pertinent factual information to resolve this motion is the Court, in terms of the contents of the *ex parte* communications bearing on safety issues." Id at P2. The Plaintiff/Trustee also filed a response, emphasizing that the communications at issue although *ex parte*, were permissible. ECF 174.

Recusal Standards

Fed. R. Bankr. P. 5004(a) mandates that a bankruptcy judge shall be governed by 28 USC § 455 and disqualified from presiding over a proceeding or contested matter in which the disqualifying circumstance arises or, if appropriate, shall be disqualified from presiding over the case. 28 U.S.C. § 455 provides the legal standards for disqualification of a Judge from a proceeding: 28 U.S.C. § 455(a) and 28 U.S.C. §455 (b)(1). [10]

1. Mandatory Recusal under 28 U.S.C. §455(a)

The relevant sections of 28 U.S.C. 455 require that a judge be disqualified if there exists a reasonable question as to his impartiality. 28 U.S.C. § 455(a). Specifically:

> **(a)** Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
> **(b)** He shall also disqualify himself in the following circumstances:
> **(1)** Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;
> 28 U.S.C.A. § 455 (West)

"A violation of § 455(a) is established when a reasonable person, knowing the relevant facts, would expect that a justice, judge, or magistrate knew of circumstances creating an

---

[9] ECF 165 set the motion for evidentiary hearing on June 29, 2022. That hearing was canceled pending resolution of the Appeal of this Court's order at ECF 178

[10] For the purposes of this Order, only the relevant sections of 28 U.S.C. 455 will be discussed. Additionally, 28 U.S.C. § 455(d)(1) provides terminology infra.

4

appearance of partiality...." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 850 (1988). Scienter of the Judge is not required for a violation of § 455(a). *Id.* at 859. "[S]ection 455(a) was intended to establish an objective test." *Health Services Acquisition Corp. v. Liljeberg*, 796 F.2d 796, 800 (5th Cir. 1986). Judges must recuse themselves if a reasonable, objective person, knowing all of the circumstances, would question the judge's impartiality. *Hughes v. United States*, 899 F.2d 1495, 1501 (6th Cir. 1990).

While this statute imposes a duty to recuse where grounds exist, there is also a duty not to do so if no cause is shown. *In re Fowler,* No. 01-10615, 2004 Bankr. LEXIS 67 at *10 (Bankr. E.D. Ky. Jan 29, 2004) (citing *Computer Dynamics, Inc.*, 253 B.R. 693, 698 (E.D. Va. 2000)). Since the standard is objective, "the judge need not recuse himself based on the 'subjective view of a party' no matter how strongly that view is held." *United States v. Sammons*, 918 F.2d 592, 599 (6th Cir. 1990) (citing *Browning v. Foltz*, 837 F.2d 276, 279 (6th Cir. 1988), cert. denied, 488 U.S. 1018, 109 S. Ct. 816, 102 L. Ed. 2d 805 (1989). In fact, "there is as much obligation upon a judge not to recuse himself when there is no occasion as there is for him to do so when there is." *Easley v. Univ. of Mich. Bd. of Regents*, 853 F.2d 1351, 1356 (6th Cir. 1988) (quoting *In re Union Leader Corp.*, 292 F.2d 381, 391 (1st Cir. 1961))."

2.  Mandatory Recusal under 28 U.S.C. §455(b)(1)

A Judge shall disqualify himself "where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1)

a.  Personal bias or prejudice

Personal bias is prejudice emanating from a source other than participation in the proceedings or prior contact with related cases. *Wheeler v. Southland Corp.*, 875 F.2d 1246,

5

1251 (6th Cir. 1989) (citing *Demjanjuk v. Petrovsky*, 776 F.2d 571, 577 (6th Cir. 1985), *cert. denied*, 475 U.S. 1016, 89 L. Ed. 2d 312, 106 S. Ct. 1198 (1986)). Disqualifying prejudice or bias must ordinarily be personal or extrajudicial. *United States v. Sammons*, 918 F.2d 592, 599 (6th Cir. 1990); *Wheeler v. Southland Corp.*, 875 F.2d 1246, 1251 (6th Cir. 1989). Predilections resulting from the record and/or proceedings before the judge, do not constitute bias unless they display such a high degree of favoritism or antagonism as to make fair judgment impossible. *Liteky v. United States*, 510 U.S. 540, 555 (1994). A judge's conduct must be "so extreme as to display clear inability to render fair judgment" to be characterized as bias or prejudice. *Id* at 551.

Moreover, a judge is charged with efficient and justiciable case administration. This sometimes means navigating potential difficulties between the parties, as well as ensuring that all proceedings are conducted fairly and do not put any party participating in the proceeding in a position of concern or discomfort. "A judge's ordinary efforts at courtroom administration -- even a stern and short-tempered judge's ordinary efforts at courtroom administration -- remain immune." *Id* at 556.

Under § 455(b)(1), the issue to be determined is whether the judge retains bias or prejudice as to a particular party or has knowledge of disputed facts. *In re AVN Corp.*, No. 98-20098-L, 1998 WL 35324198 at *3 (Bankr. W.D. Tenn. Dec. 8, 1998). A judge should not recuse himself if his alleged personal bias stems from the facts the judge learned when participating in the case in his judicial capacity. *United States v. Story*, 716 F.2d 1088, 1090 (6th Cir. 1983). "Under § 455(b)(1), as under § 455(a), inferences drawn from prior judicial determinations concerning a party in the case in which recusal is sought are insufficient because it is the duty of the judge to rule upon issues of fact and law and questions of conduct which form part of the proceedings before him." *In re AVN* at *3. The United States Supreme Court

6

has emphasized that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky* at 555.

### b. Personal knowledge of disputed evidentiary facts

'[P]ersonal knowledge' is "knowledge gained through firsthand observation or experience, as distinguished from a belief based on what someone else has said." KNOWLEDGE, Black's Law Dictionary (11th ed. 2019). Therefore, when it is clear that the facts at issue were gleaned from the court record, including court filings and proceedings before the judge, and thereby not from extrajudicial sources, the judge need not, and should not, recuse himself. *United States v. Baker*, 441 F. Supp. 612, 618 (M.D.Tenn. 1977). See also *Liteky* at 551 ("[N]ot subject to deprecatory characterization as "bias" or "prejudice" are opinions held by judges as a result of what they learned in earlier proceedings.")

### 3. Code of Conduct for Federal Judges[11]

The Code of Conduct for Federal Judges sets forth the obligations and constraints imposed upon federal judges. This Code of Conduct is not a suggestion or a guideline, it contains provisions that are to be adhered to in an effort to maintain the integrity of the judiciary and cultivate confidence in the judicial process. The relevant provisions or Canons are set forth below:

### *Canon 3: A Judge Should Perform the Duties of the Office Fairly, Impartially and Diligently*

The duties of judicial office take precedence over all other activities. The judge should perform those duties with respect for others, and should not engage in behavior that is harassing, abusive, prejudiced, or biased. The judge should adhere to the following standards:

(A) *Adjudicative Responsibilities*.

- [.]..

---

[11] Hereinafter "Code of Conduct"

7

- (4) A judge should accord to every person who has a legal interest in a proceeding, and that person's lawyer, the full right to be heard according to law. Except as set out below, a judge should not initiate, permit, or consider *ex parte* communications or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers. If a judge receives an unauthorized *ex parte* communication bearing on the substance of a matter, the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond, if requested. A judge may:
  - (a) initiate, permit, or consider *ex parte* communications as authorized by law;
  - (b) when circumstances require it, permit *ex parte* communication for scheduling, administrative, or emergency purposes, but only if the *ex parte* communication does not address substantive matters and the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the *ex parte* communication; . . .
- (C) *Disqualification*.
- (1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which:
  - (a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

§ 20:118.25. Ethics and Code of Conduct for Federal Judges, 6 Pat. L. Fundamentals § 20:118.25 (2d ed.)

Canon 3C of the Code of Conduct mirrors § 455. The statutory provision is binding on the courts as law applicable to whether recusal is required. "The substantially identical canon provision is a subset of a code of judicial obligations that are ethically binding." *Ragozzine v. Youngstown State Univ.*, 783 F.3d 1077, 1080 (6th Cir. 2015).

"Based on Canon 2 of the Code of Judicial Conduct which states that '[a] judge should avoid impropriety and the appearance of impropriety in all his activities' § 455(a) provides that a 'judge . . . . shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.'" *Securities Investor Protection Corp. v. Bell & Beckwith*, 28 B.R. 285, 288, (Bankr. N.D. Ohio 1983).

8

*4. Ex Parte* Communications

A. Definition

Black's Law Dictionary defines "*ex parte* communication" as "A communication between counsel or a party and the court when opposing counsel or party is not present." COMMUNICATION, Black's Law Dictionary (11th ed. 2019). Black's Law Dictionary further defines "*ex parte*" as "[d]one or made at the instance and for the benefit of one party only, and without notice to, or argument by, anyone having an adverse interest; of, relating to, or involving court action taken or received by one party without notice to the other." EX PARTE, Black's Law Dictionary (11th ed. 2019)

B. *Ex Parte* and the Code of Conduct:
Communication Regarding Scheduling is Allowable.

The Code of Conduct for Federal Judges discusses *ex parte* communications in Canon 3(A) stating specifically that "*except as set out below*, a judge should not initiate, permit, or consider *ex parte* communications." (emphasis added). Then below, Canon 3 states "A judge may (b) when circumstances require it, permit *ex parte* communication for scheduling, administrative, or emergency purposes, but only if the *ex parte* communication does not address substantive matters and the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the *ex parte* communication." Code of Conduct Canon 3(A)(4)(b). Additionally, Canon 3 states that "[i]f a judge receives an *unauthorized ex parte* communication bearing on the substance of the matter, the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond, if requested." Id. (emphasis added).

9

The 6th Circuit in *Gerber v. Veltri* verified that a communication between Judge and counsel for limited, administrative purposes was not prohibited by Canon 3(A)(4)(b):

> "When circumstances require it, Canon 3(A)(4)(b) 'permit[s] *ex parte* communication for scheduling, administrative, or emergency purposes,' but only 'if the *ex parte* communication does not address substantive matters and the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the *ex parte* communication.' Judge Zouhary's discussion with defense counsel was for these limited, administrative purposes. What is more, plaintiff identifies no advantage that defendant received as a result of the communication."
> *Gerber v. Veltri*, 702 Fed. App'x. 423, 433 n.7 (6th Cir. 2017).

C. *Ex parte* communications on the record provide<br>all parties meaningful opportunity to address.

Disclosing *ex parte* communications on the record and before counsel allows for any objections and affords all parties the opportunity to correct any errors which may have resulted. See *Moore v. Mitchell,* No. 1:00-CV-023, 2007 WL 4754340, at *30 (S.D. Ohio Feb. 15, 2007) (citations omitted).

As described by other Bankruptcy Courts and as noted in Black's Law Dictionary, "the term '*ex parte*' includes in the definition: 'a judicial proceeding, order, injunction, etc., is said to be *ex parte* when it is taken or granted at the instance and for the benefit of one party only, *and without notice to,* or contestation by, any person adversely interested.'" (emphasis supplied). *Attorney Registration & Disciplinary Com. of Supreme Court of Illinois v. Betts*, 143 B.R. 1016, 1019 (Bkrtcy.N.D.Ill. 1992) (quoting *Black's Law Dictionary,* (6th ed. 1990)).

Discussion

The movants here rely on three immaterial facts to support their request for disqualification: (1) the calls to the court by two lawyers advising of their concerns for their safety regarding Brian Manookian, (2) Mr. Young's communication with a courtroom deputy

regarding the same concerns; and (3) Judge Walker's statement on the record regarding Mr. Manookian's behavior in other tribunals.

Movants argue that Judge Walker received numerous phone calls from attorneys informing the court that there existed a restraining order against Mr. Manookian put in place by an attorney for one of the creditors of the case and that those calls were impermissible *ex parte* communications that prejudiced the judge against Mr. Manookian. The motion alleges that Mr. Young also contacted the judge regarding the same situation.

In fact, Judge Walker did not refer to his personal receipt of any calls regarding the case. He did refer to the court receiving communication from lawyers about Mr. Manookian, but at no time did Judge Walker indicate that any material issue was the topic of an *ex parte* communication, nor did he state that there was any *ex parte* communication involving himself or any chambers staff:

> [.] . . and I've had at least two lawyers call the Court and say they don't
> feel comfortable if your client is going to appear, . . .
> Transcript at p. 84

Despite accusations to the contrary, Judge Walker fully explained on the record the effect those calls had on his view of the matter before him:

> . . . and, you know, the Court takes those concerns very seriously and makes no
> conclusion on whether they are valid, they are perceptions which drive behaviors of other
> parties.
> Transcript at p. 85

The Court is charged with the integrity of the record. Part of maintaining that integrity involves courts calling for parties to articulate matters on the record. It is also important to note that the record contains past rulings made by a tribunal in the proceeding, or in the case of bankruptcy, an adversary to the proceeding. Moreover, Courts communicate with the parties to an action via the record. That is why this Court disclosed the *ex parte* communications from

11

counsel regarding the restraining order against Mr. Manookian on the record in open Court. That is the way courts disclose these things.

Although the motion states that the movants were never able to respond to the *ex parte* representations or even make a record regarding those allegedly improper communications, when given the opportunity, Mr. Spragens merely objected to the depositions being held at the courthouse:

> MR. SPRAGENS: That's fine, Your Honor. And just for the record, I'll preserve my objection to that. And I heard Mr. Gabbert object to it earlier, as well.
> THE COURT: Okay. Well, if the parties can't agree, you know, you still have the opportunity to agree on a location.
> MR. SPRAGENS: Sure.
> Transcript at p.83

> MR. SPRAGENS: Well, and, you know, my office is just down the street and parking is free. There's no security issue. I don't think that there's any record that would support that there is a security issue in this ordinary bankruptcy case involving professional lawyers on all sides. So this proposal was presented to me. I said I disagreed with it. And Mr. Young said, well, we'll take it up with the Court. So, you know, in my view, this is the departure from the norm, not the other way around.
> Transcript at p. 84

Mr. Spragen's disagreement that there was a security issue was heard and considered by the court because it is the responsibility of the judge to consider any issues brought before him that would impact the integrity of the judicial process. Mr. Spragen's opinion, however, does not trump a state court judge who found there to be a threat such that a restraining order was issued. Security is one of the issues Judge Walker is charged with addressing. Doing so in an abundance of caution does not indicate overreach or prejudice, but instead indicates his diligence in protecting the parties and the veracity of the proceedings.

The third occurrence that movants insist requires disqualification stems from Judge Walker's comments regarding Mr. Manookian's behavior before other tribunals. Although

12

movants insist that there is nothing in the record regarding information that would support these comments, movants would be dead wrong.

On November 18, 2019, the Trustee filed an *Application and Notice to Employ Thompson Burton PLLC as Special Counsel* to the Trustee in the main bankruptcy case. See 3:19-bk-07235, ECF 6. Brian Manookian, acting *pro se[12]*, filed an objection to the application. The Court conducted a hearing on December 17, 2019 at which time both parties appeared and presented argument. The Court took the matter under advisement, entering *Order Regarding Trustee's Application and Notice to Employ Thompson Burton PLLC as Special Counsel for the Estate and Allowing the Trustee Until December 24, 2019 to File Supplemental Application and Supporting Affidavit to Specifically Detail the Scope of Work and Provide Details and Full Disclosure of Any Current or Potential Conflicts that May Exist*. ECF 20. On December 21, 2019, the Trustee filed a *Supplemental Brief/Memorandum in Support of the Application to Employ Special Counsel*. ECF 21. Exhibit A to that filing was a copy of a *Motion to Subject Property, Issue Writs of Execution and Distrings/Fieri Facias, Appoint Receiver and Grant Injunctive Relief as filed in the Circuit Court of Williamson County, Tennessee*, filed on April 25, 2019. *Id*. at Ex. A. The motion included the following relevant statements:

> 5. After a series of hearings and follow-up motions that spanned more than two years, Judge Binkley of this Court found that Mr. Manookian had knowingly, willfully, and intentionally violated the Protective Order and, inter alia attempted "to mislead the Court from uncovering his violations of the Court's Orders by any means necessary.". . [.]
> 6. Finding that Messrs. Manookian and Hammervold had (a) abused the discovery process, (b) failed to maintain candor with this court, (c) continuously violated the Agreed Protective Order, and (d) attempted to defaud the court for over two years, this Court imposed monetary sanctions on Mr. Manookian . . [.]

---

[12] Brian Manookian was acting in his capacity as owner of the Debtor, Cummings Manookian, PLLC. He was not acting as an attorney representing himself as the owner due to his disbarment by the Tennessee Supreme Court.

2464

Additionally, on page 14 of the referenced motion, there is an entire section entitled MR. MANOOKIAN'S HISTORY OF VIOLATING COURT ORDERS in which Mr. Young, as potential Receiver, illustrates Mr. Manookian's behavior in other tribunals by recounting sanctions imposed against him by federal and state courts for:

- Acting in bad faith and disrupting the litigation process

- Engaging in a pattern of obfuscation

- Failure to provide credible explanations

- Engaging in conduct that essentially amounted to a flouting of the Court's Orders

- Repeatedly ignoring the clear directives of the Court

- *Conducting himself in a reckless manner* (emphasis added)

Mr. Manookian prosecuted his objection to the Application but did not at any time contest any supplement to the application that contained information about his behavior before other courts.

In the same vein, during the March 17, 2022 hearing, Mr. Spragens at no time expressed any concern or asked even one question regarding the issue of the *ex parte* communications or any alleged extrajudicial inquiry, despite numerous opportunities to address these alleged egregiously prejudicial acts. In fact, Judge Walker expressed his objective approach to the situation by pointing out that it would protect all parties from any uncomfortable situation or any accusation, as well as aid in the expeditious and efficient administration of discovery:

> And to eliminate any of those perceptions, and to protect everyone against any allegations of bad behavior, misbehavior, or perceived misbehavior, it makes sense to do them here in an environment where no one can get your client further down a rabbit hole of he did this or he did that, that we're in a neutral environment, which affords certain protections. And if nothing else, in terms of everybody's on their best behavior.
> Transcript at p. 85

14

> And so the Court's going to make that determination, that the depositions, unless
> the parties can agree, will be held here in the courthouse. And as a matter of fact,
> again, there will be some method available to reach the Court if during those
> depositions we have further issues with discovery.
> Transcript at p. 86

Moreover, despite alleging a "corrosive effect on the Court," movants point to no other prejudice to Mr. Manookian than the location of the depositions. There was no accusation linked to any ruling on a material issue, no objection overruled that hindered or impaired the movant's rights in this matter, and in fact, no instance of prejudice against the movants was articulated at all. The prejudice alleged from these three occurrences  was that the depositions in this case were conducted in the courthouse. The location of depositions is an administrative issue, not a material issue. It does not impact the issues before the Court. Although Movants insist that requiring the depositions to be held in the courthouse reflects the presence of the Court's prejudice against Mr. Manookian, what it more reasonably reflects is the judge's familiarity with the case. The hearing on March 17, 2022 involved cross-motions to compel and reflected the biggest issue so far in this adversary: discovery. In fact, the case is comprised mostly of three years of discovery disputes, with rulings reflecting the Court's stamina for fairness and justiciable administration of the case.

Moreover, none of these issues are material to the case. Material to the logistics of the case, sure, but given the inability of these parties and these witnesses to conduct discovery without disagreeing about every little detail, it was necessary for the judge to rule on all of the discovery matters and to do so in an equitable, fair and reasonable manner – and that he did. The judge's directions and rulings regarding the exhausting number disclosure disputes were clearly issued so as to prevent all involved from becoming hostages of the discovery process.

The expectation of lawyers in the discovery process, as reflected in the applicable rules, is to conduct themselves in a professional, civil, and agreeable manner in order to resolve the

15

2466

case, either on the merits or by settlement. The contentious nature of these discovery proceedings are a beast – one might say a gorilla - with which the Court has tamed as best as possible.

Furthermore, this Court never had to rely on extrajudicial research. The record contains the rulings from other tribunals that have found Mr. Manookian to have acted in bad faith, engaged in a pattern of obfuscation, and conducted himself in a reckless manner. Specifically, a Williamson County judge found that Mr. Manookian had knowingly, willfully, and intentionally violated a Protective Order and then attempted to mislead that court about the violation. That judge found Mr. Manookian's behavior regarding discovery matters to be so egregious that he imposed significant monetary sanctions against him. All of this is part of the record of *this* case.

Additionally, *this* Court did not find that Mr. Manookian posed a threat. That was a conclusion found by the state court that issued the restraining order. This Court simply sought to honor that order – as federal courts do with most state court orders – and protect the integrity of these proceedings. Further, Movants neglect to mention that this judge emphasized that having the depositions in the courthouse protected everyone, including Mr. Manookian.

<u>Conclusion</u>

Therefore, although the Movants express their perceptions of bias and prejudice, the record does not support that as a reasonable view. The record shows not only evenhanded judgment in this proceeding, but also illustrates this Court's elevated patience with a painful number of discovery disputes, including the one that is the catalyst to this motion. Since any *ex parte* communication was permissible in that it was not material but concerned security and administrative procedures within the Court, and because no extrajudicial research was conducted to impair this Court's impartiality, it is mandatory that the motion to disqualify be denied. Since

16

there was no reasonable possibility that the sitting judge's objectivity and neutrality has been compromised, it is incumbent that he remain on the case

Therefore, for the reasons stated above, IT IS HEREBY ORDERED that the Motion to Disqualify is DENIED.

*THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY AS INDICATED AT THE TOP OF THIS PAGE*

This Order has been electronically
signed.  The Judge's signature and
Court's seal appear at the top of the
first page.                      17
United States Bankruptcy Court.

2468

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **CUMMINGS MANOOKIAN, PLLC,** | ) | **Case No. 3:19-bk-07235** |
| Debtor. | ) | **Chapter 7** |
| | ) | **Judge Walker** |
| **JEANNE ANN BURTON, TRUSTEE,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **HAGH LAW, PLLC; AFSOON HAGH;** | ) | |
| **MANOOKIAN, PLLC; and FIRST-** | ) | |
| **CITIZENS BANK & TRUST** | ) | |
| **COMPANY,** | ) | |
| Defendants. | ) | **Adv. Proc. No. 3:20-ap-90002** |

| | | |
|---|---|---|
| **BRIAN CUMMINGS,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **BRETTON KEEFER, on behalf of the** | ) | |
| **deceased Chesta Shoemaker; JEANNE** | ) | |
| **BURTON, as Trustee on behalf of** | ) | |
| **Cummings Manookian, PLC; and** | ) | |
| **AFSOON HAGH,** | ) | |
| Defendants. | ) | **Adv. Proc. No. 3:23-ap-90036** |
| | ) | |

## MOTION TO SCHEDULE PRETRIAL CONFERENCE

Comes now Jeanne Ann Burton, Trustee (the "Trustee"), who respectfully moves to schedule a pretrial conference both Adversary Proceeding Number 3:20-ap-90002 (the "Trustee AP") and Adversary Proceeding Number 3:23-ap-90036 (the "Cummings AP"). As grounds for this Motion, the Trustee states that:

1

1.     The Trustee AP has essentially been on hold for nearly a year, after Afsoon Hagh, Hagh Law, PLLC, Manookian, PLLC, and Brian Manookian filed a motion to recuse The Honorable Charles M. Walker from this proceeding, and then proceeded to appeal an interlocutory order related to that motion.   There are a number of matters that need to be discussed and/or scheduled related to the Trustee AP, including: (1) ordering a key witness, Marty Fitzgerald, to sit for a subpoenaed deposition; and (2) resetting all pretrial dates, including deadlines for dispositive motions, since those deadlines all expired during the pendency of the appeal.

2.     More recently, the United States District Court for the Middle District of Tennessee has referred the Cummings AP to this Court for determination.   In essence, the Cummings AP seeks a legal determination as to the rights to legal fees generated in a case known as the "Shoemaker" case among Brian Cummings, Afsoon Hagh, and this bankruptcy estate. The Cummings AP involves some (but not all) issues that are present in the Trustee AP.  The Trustee believes that the parties and the Court need to determine whether the Cummings AP should proceed in concert with the Trustee AP, or whether it should proceed on an independent schedule to be set by the Court.

3.     Wherefore, the Trustee respectfully requests that the Court schedule a pretrial conference at the Court's convenience to discuss these matters or, alternatively, to enter its own pretrial order that addresses these issues.

Case 3:23-cv-00961     Document 6-4     Filed 10/04/23     Page 170 of 202 PageID #: 4692 2470

Respectfully submitted,

/s/ Phillip G. Young, Jr.
Phillip G. Young, Jr.
Thompson Burton PLLC
6100 Tower Circle, Suite 200
Franklin, TN 37067
Tel: (615) 465-6000
phillip@thompsonburton.com

Special Counsel to Jeanne Ann Burton, Trustee

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been sent to all parties requesting notice via CM/ECF Electronic Filing on the 11th day of April, 2023.

/s/ Phillip G. Young, Jr.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| IN RE: | Case No, 3:19-bk-07235 |
| | Chapter 7 |
| CUMMINGS MANOOKIAN, PLLC | Judge Walker |
| Debtor. | Adv. Proc. No. 3:20-ap-90002 |
| JEANNE ANN BURTON, TRUSTEE | |
| Plaintiff, | |
| v. | |
| HAGH LAW, PLLC; AFSOON HAGH; and MANOOKIAN PLLC, | |
| Defendants. | |

## BRIAN MANOOKIAN, MANOOKIAN PLLC, AFSOON HAGH, AND HAGH LAW PLLC'S NOTICE OF APPEAL AND STATEMENT OF ELECTION

Manookian PLLC, Brian Manookian, Afsoon Hagh, and Hagh Law PLLC ("Appellants") through counsel, give notice of their appeal from the Bankruptcy Court's April 5, 2023 Order (Doc 229). In furtherance of the same, Appellants state as follows.

**Part 1: Identity of Appellant**

1. The names of the appellants are Brian Manookian, Manookian, PLLC, Afsoon Hagh, and Hagh Law PLLC. Mr. Manookian is the sole owner and member of the Debtor, Cummings Manookian, PLLC as well as the sole owner and member of Adversary Proceeding Defendant, Manookian, PLLC. Afsoon Hagh is the sole owner and member of Adversary Proceeding Defendant, Hagh Law PLLC.

1

**Part 2: Subject of the Appeal**

2.     Appellants appeals from the Court's Order Denying Motion to Disqualify Bankruptcy Judge Charles Walker (Doc. 229). The Order was entered on April 5, 2023.

**Part 3: Parties to the Appeal**

3.     The names of the Parties to the Order appealed from as well as the contact information for their attorneys are:

> a.  Debtor Cummings Manookian,
> Jay R. Lefkovitz
> Lefkovitz & Lefkovitz, PLLC
> 312 East Broad Street, Suite A
> Cookeville, TN 38501
> (931) 528-5297 (T)
> 931-526-6244 (F)
> JLefkovitz@lefkovitz.com
>
> b.  Trustee Jeanne Anne Burton
> Phillip Young
> One Franklin Park
> 6100 Tower Circle, Suite 200
> Franklin, TN 37067
> (615) 465-6008 (T)
> phillip@thompsonburton.com
>
> c.  Creditor Grant, Konvalinka & Harrison, P.C.,
> John P. Konvalinka
> Grant, Konvalinka & Harrison, P.C.
> 633 Chestnut Street Suite 900 Republic Centre
> Chattanooga, TN  37450-0900
> (423) 756-8400 (T)
> (423) 756-6518 (F)
> jkonvalinka@gkhpc.com
>
> d.  Creditor D.F. Chase, Inc.
> Daniel Puryear
> Puryear Law Group
> 104 Woodmont Boulevard, Suite 201
> Nashville, TN 37205
> (615) 255-4859 (T)

2

(615) 630-6602 (F)
dpuryear@puryearlawgroup.com

**Part 4: Election to have appeal heard by District Court**

4.     Appellants elect to have the appeal heard by the United States District Court rather than by the Bankruptcy Appellate Panel.

Date:  April 18, 2023

Respectfully submitted,

*/s/ John Spragens*
John Spragens (TN Bar No. 31445)
Spragens Law PLC
311 22nd Ave. N.
Nashville, TN 37203
T: (615) 983-8900
F: (615) 682-8533
john@spragenslaw.com

*Attorney for Manookian PLLC, Brian Manookian, Afsoon Hagh, and Hagh Law PLLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed April 18, 2023 and served electronically upon all parties in interest or their counsel as indicated on the receipt issued by the Court's electronic filing system.

*/s/ John Spragens*

3

UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

IN RE:

Case No. 3:19-bk-07235

CUMMINGS MANOOKIAN, PLLC

Debtor.

Jeanne Ann Burton

Plaintiff,

v.

Adversary Case No. 3:20-ap-90002

Hagh Law PLLC,
Afsoon Hagh,
Manookian PLLC

Defendants.

CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2023, the Notice of Appeal, document 231 on the record of the above case, was served by first class mail postage prepaid (or hand delivered as indicated below) to the following recipients:

**JAY R. LEFKOVITZ**
**Lefkovitz & Lefkovitz, PLLC**
Debtor Cummings Manookian
312 East Broad Street, Suite A
Cookeville, TN 38501

**PHILLIP YOUNG**
Trustee Jeanne Anne Burton
One Franklin Park
6100 Tower Circle, Suite 200
Franklin, TN 37067

**JOHN P. KONVALINKA**
Grant, Konvalinka & Harrison, P.C.
Creditor Grant, Konvalinka & Harrison P.C.,
633 Chestnut Street Suite 900 Republic Centre
Chattanooga, TN 37450-0900

**DANIEL PURYEAR**
Puryear Law Group
Creditor D.F. Chase, Inc.
104 Woodmont Boulevard, Suite 201
Nashville, TN 37205

**JOHN SPRAGENS**
Spragens Law PLC
311 22nd Ave. N.
Nashville, TN 37203

**MEGAN SELIBER**
U.S. TRUSTEE
701 Broadway, Room 318
Nashville, TN  37203
(HAND DELIVERED)

Dated: April 20, 2023                                    /s/ Teresa C. Azan, Clerk of Court

LQ

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| IN RE: | Case No, 3:19-bk-07235 |
| | Chapter 7 |
| **CUMMINGS MANOOKIAN, PLLC** | Judge Walker |
| Debtor. | Adv. Proc. No. 3:20-ap-90002 |
| **JEANNE ANN BURTON, TRUSTEE** | |
| Plaintiff, | |
| v. | |
| **HAGH LAW, PLLC; AFSOON HAGH; and MANOOKIAN PLLC,** | |
| Defendants. | |

## APPELLANTS BRIAN MANOOKIAN, MANOOKIAN PLLC, AFSOON HAGHM HAGH LAW PLLC STATEMENT OF ISSUES ON APPEAL AND DESIGNATION OF RECORD

Pursuant to Federal Rule of Bankruptcy Procedure 8009, and the District Court's Acknowledgement of Receipt of Appeal dated April 24, 2023 (Doc. No. 235) Appellants Brian Manookian, Manookian PLLC, Afsoon Hagh, and Hagh Law PLLC ("Appellants") hereby file this Statement of the Issues to be Presented on Appeal and Designation of Items to be Included in the Appellate Record.

## I.   Issues To Be Presented

Whether the Bankruptcy Court erred in failing to recuse itself where it belatedly revealed, but declines to detail, engaging in multiple *ex parte* communications about this

1

litigation with one or more attorneys representing parties in this litigation ; and where the Court continues to decline to reveal the substance, date, and parties to each of the *ex parte* communications.

Whether the Bankruptcy Court erred in failing to recuse itself where it quashed a subpoena to itself seeking to determine the specifics of the Court's *ex parte* communications and, in that Order, articulated additional biases and prejudices against the moving party.

Whether the Bankruptcy Court erred in failing to recuse itself where it belatedly revealed that it has been relying upon, and, indeed, admitted to basing its decisions in this case on, a highly inflammatory, vacated Tennessee state court order, which had long since been overturned by the Tennessee Court of Appeals, about one of the parties to this litigation; and which order was issued by a Tennessee state trial court judge who was additionally disqualified from that action on the bases of bias.

## II.    Designation of Items To Be Included in Appellate Record

The items to be included in the appellate record consist of the following:

- All docket entries in the bankruptcy proceeding (No. 3:19-bk-07235) and related adversary proceeding (No. 3:20-ap-90002), specifically including adversary proceeding docket entries 161, 165, 173, 174, 177, 178, 229 and all attachments thereto.

- Transcript of June 29, 2022 adversary proceeding hearing on motion to disqualify.

- Transcript (forthcoming) of April 4, 2023 hearing on motion to disqualify (transcript requested at Docket No. 226).

2

Date:  May 5, 2023                    Respectfully submitted,

/s/ John Spragens
John Spragens (TN Bar No. 31445)
Spragens Law PLC
311 22nd Ave. N.
Nashville, TN 37203
T: (615) 983-8900
F: (615) 682-8533
john@spragenslaw.com

*Attorney for Appellants*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing was filed May 5, 2023 and served electronically upon all parties in interest or their counsel as indicated on the receipt issued by the Court's electronic filing system.

/s/ John Spragens

```
                                    .
IN RE:                              .    Case No. 3:19-bk-07235
                                    .    Chapter 7
CUMMINGS MANOOKIAN, PLLC,           .
                                    .
               Debtor.              .
                                    .
                                    .
. . . . . . . . . . . . . . . . .   .
JEANNE ANN BURTON,                  .    Adv. No. 3:20-ap-90002
                                    .
               Plaintiff,           .
                                    .
v.                                  .    701 Broadway
                                    .    Nashville, TN 37203
HAGH LAW PLLC, et al.,              .
                                    .    Tuesday, April 4, 2023
               Defendants.          .    8:03 a.m.
. . . . . . . . . . . . . . . . .   .
```

TRANSCRIPT OF MOTION TO RECUSE JUDGE CHARLES M. WALKER [161]
BEFORE THE HONORABLE CHARLES M. WALKER
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Plaintiff:          Thompson Burton PLLC
                            By:  PHILLIP G. YOUNG, ESQ.
                            One Franklin Park
                            6100 Tower Circle, Suite 200
                            Franklin, TN 37067
                            (615) 465-6008

APPEARANCES CONTINUED.

Audio Operator:             Alison DeVore, ECR

Transcription Company:      Access Transcripts, LLC
                            10110 Youngwood Lane
                            Fishers, IN 46048
                            (855) 873-2223
                            www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (Continued):

For the Defendants:

    Spragens Law PLC
    By:  JOHN T. SPRAGENS, ESQ.
    311 22nd Avenue North
    Nashville, TN 37203
    (615) 983-8900

    Bass, Berry & Sims PLC
    By:  CRAIG VERNON GABBERT, JR., ESQ.
    150 Third Avenue South, Suite 2800
    Nashville, TN 37201
    (615) 742-6277

1    (Proceedings commence at 8:03 a.m.)

2    THE COURTROOM DEPUTY:  All rise.  The United States

3 Bankruptcy Court for the Middle District of Tennessee is now in

4 session.  The Honorable Charles M. Walker presiding.

5    THE COURT:  Good morning.  Please take your seats.

6    THE COURTROOM DEPUTY:  Your Honor, we're here on Case

7 20-90002, Burton v. Hagh Law, PLLC.

8    THE COURT:  All right.  Mr. Spragens, your motion.

9    MR. SPRAGENS:  Yes, Your Honor.  Your Honor, as the

10 Court knows, excuse me, we're here today on a motion to recuse

11 the Court from proceeding -- presiding over this matter.  I'd

12 be happy to reserve argument for the end, if that's okay with

13 the Court, and just go ahead and put on a witness.

14    THE COURT:  Proceed.

15    MR. YOUNG:  Your Honor, at this time I'm going to

16 lodge an objection to any witnesses or exhibits being offered

17 because of failure to comply with Rule 9014-1.  That rule

18 requires any witness and exhibit list to be filed by noon on

19 the second business day prior to a hearing.  That would have

20 been Friday at noon.

21    In this case, no witness and exhibit list was filed

22 until yesterday at about 10:30, and even then it didn't comply

23 with the rule in that there was no substance of testimony

24 listed.  So we would object to the presentation of any

25 witnesses or exhibits in this case.

1          THE COURT:  Okay.  Mr. Spragens, response?

2          MR. SPRAGENS:  Your Honor, it is true that we filed

3    our exhibit list inside of two business days prior to this

4    morning's hearing, and I apologize to the Court for that.  That

5    was an oversight on our part.  I thought that the substance of

6    the testimony that we were expecting to offer was well known to

7    everyone since we had put it in the briefing.  I didn't think

8    there were any surprises there.

9          So I would ask the Court to let me call Mr. Young to

10   testify about the limited topic of his conversations with the

11   Court or the Court staff, for purposes of today's evidentiary

12   hearing.

13         THE COURT:  All right.  Mr. Young?

14         MR. YOUNG:  Yes, Your Honor.

15         THE COURT:  Do you still have an objection to

16   offering that limited scope?

17         MR. YOUNG:  I do, Your Honor, because Rule 9014-1

18   wasn't complied with, and the Local Rules are here for a

19   reason.  The Court's order specifically directed the parties to

20   comply with all federal rules and all local rules.  The Court

21   put that in the order itself scheduling this hearing.  So we

22   would have an objection, and if the Court is going to allow me,

23   I also want to -- is going to allow testimony on my part, I

24   want to talk about Rule 3.7 of the Rules of Professional

25   Conduct as well regarding my participation in the hearing, if

1    the Court's inclined to allow that testimony.

2              MR. SPRAGENS:  Your Honor, could I just briefly

3    respond to that?

4              THE COURT:  Yes.

5              MR. SPRAGENS:  I haven't heard any articulation of

6    prejudice.  I do apologize for failing to follow the local

7    rule, but I -- since we've talked about this subject now for

8    several months, and we briefed the testimony that we're seeking

9    from Mr. Young previously, I don't think there's any unfair

10   surprise.  And I don't think that the very limited nature of

11   the testimony we're seeking, you know, there's any prejudice

12   from filing the list 26 hours in advance of the hearing instead

13   of 48 hours on business days.

14             THE COURT:  Well, I guess here's the question.  Since

15   you've already got Mr. Young's deposition, that's been

16   submitted in the record already, what new is to be gained by

17   further testimony from Mr. Young covering the same ground?  Why

18   not just proceed with your argument?

19             MR. SPRAGENS:  Well, I would be inclined to ask Mr.

20   Young if he stands by all the testimony in that deposition,

21   just to confirm that.  I would certainly be prepared to impeach

22   him with that testimony if he changes his responses, you know,

23   typical of any courtroom testimony.

24             Beyond that, if the Court declines to let Mr. Young

25   testify today, we do have his deposition transcript, and I

1    would ask the Court to take judicial notice of it.

2              THE COURT:  Okay.

3              MR. YOUNG:  And we would have no objection to the

4    entry of that deposition testimony.

5              THE COURT:  All right.  Well, this one is an

6    interesting case, as all parties are aware.  The fact that this

7    case was scheduled last week, so there was an actual additional

8    week to file and comply with all the rules, makes the Court

9    hesitant to extend further grace in this matter.  So the Court

10   is going to sustain the objection lodged by the trustee's

11   counsel, and you may proceed with your argument.  And,

12   obviously, the Court's well aware of the issues.  Mr. Young has

13   given his deposition.  So you're welcome to proceed.

14             MR. SPRAGENS:  Your Honor, the next matter with

15   respect to argument is how -- how I might inquire about the

16   Court's knowledge of ex parte communications between Mr. Young

17   and the Court's office, or the Court's staff.

18             As you know, we attempted to notice your deposition

19   to try to find out what you knew.  You quashed that subpoena.

20   I've tried to list you again as a witness today because we're

21   in a tough situation here as a litigant who is -- I'm trying to

22   find out about ex parte communications between some outside

23   attorneys and the Court, and we don't know what's been said.

24   We don't know who said them.  So --

25             THE COURT:  I think you do know.  You took

1  Mr. Young's deposition, and you have exactly what you have that

2  led to you filing the motion in the first place.  You have my

3  statements on the record.  You may proceed however you like,

4  but the Court doesn't have any knowledge other than what you've

5  already been given.

6           MR. SPRAGENS:  Okay.  Well, if that's the Court's

7  statement on the matter, I appreciate it.  Your Honor,

8  my -- I'll just argue and let you know the way we look at this

9  issue in this case.

10          THE COURT:  And let me clarify.  When you say "we,"

11  Mr. Gabbert, are you joined in with this argument in full or

12  partially?

13          MR. GABBERT:  I'm supporting the motion, Your Honor.

14          THE COURT:  Okay.

15          MR. SPRAGENS:  So, Your Honor, the fact is this

16  Court, in setting up the logistics of depositions, which

17  ordinarily would be occurring at my office when I'm putting

18  forward a witness -- that's routine in my practice.  You know,

19  I've got parking places.  I've got a conference room, and we

20  have depositions there on a weekly or every other weekly basis.

21  You know, Mr. Young made a representation at a hearing that he

22  was not comfortable with that deposition being set in my

23  conference room and with Mr. Manookian testifying there.

24          We stood at this podium and had a discussion about

25  that, and the Court undertook to address the hundred pound

1    gorilla in the room, that's the Court's language, and what the

2    Court said was that my client's "past behavior before the

3    tribunals -- I've had at least two lawyers call the Court and

4    say they don't feel comfortable if your client is going to

5    appear and you know the Court takes those concerns very

6    seriously and makes no conclusion on whether they're valid.

7    They are perceptions which drive behaviors of other parties."

8              That was the first I had ever learned or, you know,

9    my client had ever learned about contact from outside lawyers

10   with the Court about whether Mr. Manookian posed a safety risk

11   or whether other people felt uncomfortable, whatever that

12   means, appearing with him in this court.  We endeavored to

13   learn more about that.  I did ask Mr. Young those questions

14   during his deposition.  I learned about one contact that Mr.

15   Young had had, and that was at the outset of this whole

16   proceeding.

17             Mr. Young testified, on Page 44 of his deposition,

18   that he called this Court's Courtroom Deputy to alert her to

19   the fact that a creditor's lawyer had an order of protection.

20   And he, Mr. Young, represented that this was a logistical

21   question about an order of protection that Dan Puryear had and

22   that he was contacting the Court about that.  He testified he

23   believed that the person he spoke to was Lauren, the courtroom

24   reputy, and the record speaks for himself -- itself that he did

25   not file a motion about this issue.  He did not alert me at any

1     time. The first we learned about this contact was when the

2     Court mentioned it, assuming the Court is talking about the

3     same telephone call that Mr. Young testified about.

4           So there was an ex parte communication specifically

5     about the safety risk posed by my client. That was how we

6     started this case, and I first learned about that when the

7     Court mentioned it sua sponte in endeavoring to build a record

8     sua sponte to justify holding depositions in this courthouse

9     instead of in the ordinary course at my office. So to me, that

10    contact is troubling. That contact was not disclosed by the

11    Court. It was not disclosed by Mr. Young, and I learned about

12    it in this courtroom from this Court's, you know, statements on

13    the record.

14          Then there has been apparently another -- you know,

15    you said at least two. I don't know who the second phone call

16    was. I don't know what attorney called. I don't know if it

17    was Mr. Puryear or somebody else, but there have been

18    apparently two phone calls to the Court or its personnel about

19    my client, and the Court formed enough of a view about

20    Mr. Manookian that it departed from the ordinary course in how

21    depositions were to be conducted.

22          I would add that those depositions were completely

23    uneventful. We all sat in those -- in those rooms down the

24    hall and, you know, I can't prove the counterfactual, but

25    that's how they would have been if they were held at my office

1     too. I have every reason --

2           THE COURT: Well, you can't prove that, can you?

3           MR. SPRAGENS: No, I can't, Your Honor.

4           THE COURT: Were other depositions taken here in the

5     courthouse?

6           MR. SPRAGENS: Yes, Your Honor.

7           THE COURT: So it wasn't just Mr. Manookian's

8     deposition?

9           MR. SPRAGENS: That's right. You ordered that all

10     depositions would be taken in the courthouse based on the

11     finding that Mr. Manookian posed some sort of a risk to other

12     parties. That's my recollection. I think that was the basis

13     for your ruling.

14           So the -- the issue here is we know about one contact

15     that is, I think, very prejudicial to my client. I think the

16     fact that we departed from the ordinary course demonstrates

17     that it has tainted the Court's view of my client. Your

18     comments about his behavior toward the tribunals and other

19     lawyers calling, I believe that that gives a reasonable

20     observer a basis to question this Court's impartiality.

21           And to this day, I don't know about the second

22     contact. I know that there's been another attorney who's

23     called your chambers, and I don't know who it was. I don't

24     know what they said, and this Court never came out and

25     disclosed that to us until it served the interest of the ruling

1    that the Court was making.  It never disclosed it on the

2    record.  It never said I think everyone just needs to know

3    about this.  And, certainly, Mr. Young never disclosed his

4    contact to us, didn't get me on the phone to call the Court.

5    And there was nothing emergent about the phone call.  It could

6    have been done through the ordinary adversary process.  It

7    could have been put on the docket.

8         So in our view, the two contacts, the failure to

9    disclose the contacts, the departure from the ordinary course,

10   all provides a reasonable basis to suggest that this Court's

11   impartiality can be questioned.  It is not to say that this

12   Court is a, you know, biased tribunal.  It's not to say that

13   this Court is unfair, and I make no judgments about this

14   Court's, you know, fairness or decency.  It's, obviously, not

15   fun to have to come stand here and argue this motion in front

16   of you.  However, the standard is an objective standard.  It is

17   would a reasonable observer question this Court's impartiality,

18   and I think given the multiple contacts, the lack of

19   disclosure, and the fact that the litigation somewhat sua

20   sponte departed from the ordinary course suggests that a

21   reasonable observer would raise those questions.

22        So that's why we've asked this Court to recuse

23   itself.  It shouldn't slow down the litigation.  There are

24   other bankruptcy judges in this courthouse who can pick right

25   back up where we left off.  If they have formed views of

1  Mr. Manookian, by reading news articles or other interactions
2  they've had with lawyers in the community, they can disclose
3  them.  We can figure out what to do about them, and we can find
4  a bankruptcy judge who doesn't have any knowledge or
5  prejudgment of Mr. Manookian's character or his propensity for
6  some sort of unspecified misconduct.

7            Finally, I would just point out that I don't think
8  there is anything in the record that suggests that he's ever
9  behaved in any sort of dangerous or threatening way in front of
10 a court or in a deposition.  I would just note that for the
11 record.  So if Your Honor has any questions, I'm happy to
12 answer them.  I appreciate the hearing.

13           THE COURT:  Well, are there any documents that have
14 filed in this case from other tribunals?

15           MR. SPRAGENS:  I'm not sure I understand what the
16 Court is asking.

17           THE COURT:  Just that.  There are documents that have
18 been filed on the record in this case from other tribunals.
19 Could that possibly be a way that a court might find out about
20 what's going on in a case?

21           MR. SPRAGENS:  If you're talking about the Williamson
22 County Court in front of Judge Binkley, is that the -- I'm
23 sorry, Your Honor.  I can't -- it feels a little bit like law
24 school where I don't know the answer that you're looking for
25 here, so --

```
 1            THE COURT:  I'm not looking for an answer at all,
 2   Mr. Spragens.  I -- and disregard -- disregard the question.
 3            MR. SPRAGENS:  Okay.  I mean, to me I don't know
 4   anything in the record in this case that demonstrates some sort
 5   of misconduct toward a tribunal.  If the Court is suggesting
 6   that it contacted another judge to ask about Mr. Manookian, or
 7   something like that, you know, I think that that's also
 8   improper and an ex parte communication.  So I'd love to hear
 9   about that if that is what we're getting at here.
10            THE COURT:  That's not what we're getting at.  So any
11   other argument?
12            MR. SPRAGENS:  No, Your Honor.  Thank you.
13            THE COURT:  All right.  Anything, Mr. Gabbert?
14            MR. GABBERT:  No, Your Honor.
15            THE COURT:  All right.  Mr. Young?
16            MR. YOUNG:  Your Honor, Phillip Young on behalf of
17   the trustee.  I'm going to keep this very brief because this
18   isn't our motion, and the motion seeks relief that's not
19   directly related to the trustee's case.  I'll only note really
20   two things just for the record.
21            I don't think that scheduling depositions at the
22   courthouse is a departure from the ordinary course.  Trustees
23   depose people at the courthouse all the time.  We discussed
24   that at this status conference.
25            I also would note that the Chase -- the orders that
```

1  gave rise to the Chase claim, that's what we've referred to it,

2  so the Williamson County orders have in fact been filed in this

3  case on multiple occasions by multiple parties, and I

4  don't -- I think that could certainly form the basis of the

5  Court's opinion about other tribunals.

6          We filed a response in this case at Docket Number

7  174.  The purpose of that response was just to clarify some of

8  the facts and to clarify the law and the issues related to the

9  motion.  But unless the Court has further questions of me,

10 we'll just rely on that response.

11         THE COURT:  All right.  No questions.

12         MR. GABBERT:  Just for the record, I've been

13 practicing in this court for 40 years, over 40 years.  This is

14 the first case I have ever had that depositions have been

15 required at the courthouse without any explanation except that.

16         THE COURT:  All right.  Anything else?

17         MR. SPRAGENS:  No, Your Honor.  We'll rest on our

18 brief and the argument presented today.

19         MR. YOUNG:  Nothing else, Your Honor.

20         THE COURT:  All right.  The Court will take a short

21 recess, and I will rule from the bench.

22         THE COURTROOM DEPUTY:  All rise.

23     (Recess taken at 8:19 a.m.)

24     (Proceedings resumed at 9:17 a.m.)

25         THE COURTROOM DEPUTY:  All rise.

1        THE COURT:  Please take your seats.  All right.  We

2   are here in the Burton v. Hagh, Case Number 20-90002, motion to

3   disqualify.  I will read an oral ruling from the bench at this

4   time.  Court would like to thank counsel for the briefings and

5   the arguments in this case.

6        This matter is before the Court today to address

7   Defendant's motion to disqualify the presiding judge from the

8   case pursuant to 28 U.S.C. Sections 455(a) and (b)(1), and the

9   Code of Conduct for Federal Judges.  Mr. Gabbert advised the

10  Court that he joins in the motion on behalf of the Defendants,

11  Afsoon Hagh and Hagh Law.

12       We opened today with the objection of the trustee to

13  the presentation of any witnesses or evidence based on the

14  motion -- on the movant's failure to comply with Local Rule

15  9014-1.  Mr. Spragens apologized to the Court and stated that

16  there was no prejudice from the filing of the witness list a

17  mere 26 hours prior to the hearing.  That argument begs the

18  question then why have a rule.  The rules are in place to

19  maintain the balance and integrity of these proceedings.  That

20  is why the Court ordered compliance with all applicable federal

21  and local rules in the order setting this hearing.

22       It is also important to note that upon Mr. Gabbert's

23  motion the afternoon before the original hearing, this matter

24  was continued with no witness list filed prior to that hearing

25  or in the week after.  And, finally, as Mr. Gabbert so

graciously reminded the Court, he has been practicing in this

Court for 40 years.  So the rules and procedures are not

unknown to him.  They should, in fact, be second nature.

Therefore, the objection to the presentation of witnesses and

evidence is sustained.

As for the motion, movants allege the -- that

impermissible ex parte communications have occurred between the

Judge, the Judge's chamber staff, and third parties, as well as

Plaintiff's attorney, and this Court failed to disclose these

communications.  They also allege that the judge conducted an

independent investigation involving extra judicial research

into matters regarding Brian Manookian, and these allegations

have resulted in a prejudice against Mr. Manookian.

Although it appears that it is an impermissible

stretch to accuse a sitting judge of having direct

conversations with third parties, as well as conducting an

investigation regarding a person who is not a party to any case

before him, the movants insist that the allegations are so

egregious that disqualification is the only judicial -- the

only judiciable outcome of their motion.

The accusations here are that the judge is prejudice

against a potential witness in this adversary proceeding.  The

accusations are based on various fragments and snippets, both

on and off the record, all attributed to the judge in some

convoluted way and that somehow these allegations pieced

1 together, like letters cut from a magazine for a ransom note,

2 contains some legitimacy simply because Mr. Manookian says they

3 do.  The motion is rife with language and projections crafted

4 to incite indignation.  But Mr. Manookian is mistaken to think

5 that such presentation lends legitimacy to an argument relying

6 on a reasonable belief.

7 He is also mistaken to think his judgment rules the

8 day.  Although his belief is the subject of the motion, that

9 belief is also subject to a test for reasonableness.  The

10 determination he seeks is an objective one.  In other words, it

11 is not legitimate simply because he believes it.  It is only

12 valid if a reasonable person would believe the same thing.

13 28 U.S.C. Section 455(a) states any United States

14 judge shall disqualify himself in any proceeding in which his

15 impartiality might reasonably be questioned.  28 U.S.C. Section

16 455(b)(1) states that a judge shall disqualify himself where he

17 has a personal bias or prejudice concerning a party, or

18 personal knowledge of disputed evidentiary facts concerning the

19 proceedings.  Canon 3(c) of the Code of Conduct for Federal

20 Judges is almost identical to 28 U.S.C. Section 455, requiring

21 a judge to remove themselves from a case if there is a

22 reasonable appearance of impartiality, personal bias or

23 prejudice, or personal knowledge of a disputed evidentiary

24 fact.

25 The record, for those of you who might need a

1   refresher, is established by either communicating with the

2   Court while the Court is in session, or by filing something on

3   the Court docket.  The Court is charged with the integrity of

4   the record.  Part of maintaining that integrity involves

5   court -- courts calling for parties to articulate matters on

6   the record.  It is also important to note that the record

7   contains past rulings made by a tribunal in the proceedings, or

8   in the case of a bankruptcy, an adversary to the proceeding.

9   Moreover, courts communicate with the parties to an action via

10  the record.  That is why this Court disclosed the ex parte

11  communications from counsel, regarding the restraining order

12  against Mr. Manookian, on the record in open court.  That is

13  why courts disclose these things.

14          Extrajudicial research, on the other hand, would be

15  information garnered through means other than reading the

16  record.  As independent investigation presumably falls under

17  the category of extrajudicial research, it also would require a

18  source outside the record.  In the matter before us, the record

19  extends back to November 6, 2019, and contains the 168 docket

20  entries in the main bankruptcy case, as well as the 225 docket

21  entries in this adversary proceeding.  Although the movants

22  insist that the judge has been prejudiced against

23  Mr. Manookian, the record reflects no such prejudice.  Although

24  movants insist that requiring the depositions to be held in the

25  courthouse reflects the presence of the Court's prejudice

1   against Mr. Manookian, what it more reasonably reflects is the

2   judge's familiarity with the case.

3        Mr. Spragens stated that Mr. Young called the

4   courtroom deputy to inform her of an order of protection

5   against Mr. Manookian by a creditor's attorney, and that was

6   how we started this case.  First of all, the courtroom deputy

7   is not a member of Judge Walker's chamber staff.  Secondly,

8   that is not how we started this case.  The hearing on March 17,

9   2022, involved cross motions to compel and reflected the

10  biggest issue so far in this adversary, discovery.  In fact,

11  the case is comprised mostly of three years of discovery

12  disputes with rulings reflecting the Court's stamina for

13  fairness and judiciable administration of the case.

14       Mr. Spragens sought to take advantage of the Court's

15  patience by stepping dangerously close to a line with his

16  accusation that this judge may have had communications with

17  judges in other tribunals about his client.  His accusation was

18  with absolutely no basis and was, as I stated, dangerously

19  close to the line drawn by Rule 11.  The fact is the applicable

20  standard here is an objective one applied to facts, not applied

21  to whatever imaginative scenario the movants can conjure up out

22  of thin air.

23       Simply because a ruling does not reflect the stated

24  interest of a party or non-party doesn't mean we default to

25  disqualifying prejudice.  The transcript shows that the

decision on March 17, 2022, as on all days, was so that there
would be no advantage or disadvantage to any party.
Illustrative of this, the order that Mr. Manookian's deposition
be scheduled the courthouse. What is glaringly absent from the
motion is the fact that the judge ordered all depositions to be
conducted under the same terms in that order. All parties,
including the plaintiff, were to have their depositions at the
courthouse. This was another ruling in another discovery
controversy with another clearly objective, reasonable, and
fair ruling.

Moreover, none of these issues are material to the
case. Material to the logistics of the case, sure. But given
the inability of these parties and these witnesses to conduct
discovery without disagreeing about every little detail, it was
necessary for the judge to rule on all of the discovery matters
and to do so in an equitable, fair, and reasonable manner, and
that he did.

The expectation of lawyers in the discovery process,
as reflected in the applicable rules, is to conduct themselves
in a professional, civil, and agreeable manner in order to
resolve the case either on the merits or by settlement. The
contentious nature of these discovery proceedings were a beast,
one might say a gorilla, with which the Court has tamed as best
as possible.

Furthermore, this Court never had to rely on

1   extrajudicial research.  Now let's get back to the record for

2   this one.  The record contains the rulings from other tribunals

3   that have found Mr. Manookian to have acted in bad faith,

4   engage in a pattern of obfuscation, and conduct himself in a

5   reckless manner.  Specifically, a Williamson County judge found

6   that Mr. Manookian had knowingly, willfully, and intentionally

7   violated a protective order and then attempted to mislead that

8   court about that violation.  That judge found Mr. Manookian's

9   behavior regarding discovery matters to be so egregious that he

10  imposed significant monetary sanctions against him.  All of

11  this is part of the record in this case.

12          Additionally, this case did not find that Mr.

13  Manookian posed a threat.  That would be the state court that

14  issued the restraining order.  This Court simply sought to

15  honor that order, as federal courts do with most state court

16  orders, and to protect the integrity of the proceedings.

17  Movants neglect to mention that the judge stated having the

18  depositions in the courthouse protects everyone, including

19  Mr. Manookian.

20          Therefore, although the movants express their

21  perceptions of bias and prejudice, the record does not support

22  that as a reasonable view.  The record shows not only

23  evenhanded judgment in this proceeding, but also illustrates

24  the Court's elevated patience with a painful number of

25  discovery disputes, including the ones that is the catalyst of

1   this motion.

2          Since any ex parte communication was permissible and

3   that it was not material, but concerned with security and

4   administrative procedures within the Court, and because no

5   extrajudicial research was conducted to impair this Court's

6   impartiality, it is mandatory that I deny the motion to

7   disqualify.  Since there was no reasonable possibility that my

8   objectivity and neutrality has been compromised, it is

9   incumbent that I remain on the case.  The absence of any

10  reasonable question regarding my impartiality demands that I

11  deny the motion to disqualify.

12         The Court will issue an order containing full

13  analysis and discussion.  The Court will also enter an order

14  scheduling an evidentiary hearing on Mr. Manookian's objection

15  to the motion to compromise in the main case, that hearing

16  being bifurcated into Mr. Manookian's standing issue and the

17  substance of his objections.  Any questions?

18         MR. SPRAGENS:  No, Your Honor.

19         MR. YOUNG:  No, Your Honor.

20         THE COURT:  All right.  Court will be adjourned.

21         THE COURTROOM DEPUTY:  All rise.

22    (Proceedings concluded at 9:32 a.m.)

23                    * * * * *

24

25

1

2          **C E R T I F I C A T I O N**

3

4          I, Alicia Jarrett, court-approved transcriber, hereby

5    certify that the foregoing is a correct transcript from the

6    official electronic sound recording of the proceedings in the

7    above-entitled matter.

8

9

10

11   _____

12   ALICIA JARRETT, AAERT NO. 428      DATE: May 5, 2023

13   ACCESS TRANSCRIPTS, LLC

14

15

16

17

18

19

20

21

22

23

24

25